DECHERT LLP
Dennis H. Hranitzky
(dennis.hranitzky@dechert.com)
Eric C. Kirsch
(eric.kirsch@dechert.com)
1095 Avenue of the Americas
New York, New York 10036
(212) 698-3500
*Attorneys for Plaintiffs Themis Capital LLC*
*and Des Moines Investments Ltd.*



'09 CIV 1652

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------- x

THEMIS CAPITAL, LLC, and             :
DES MOINES INVESTMENTS LTD.,         :          No. 09 Civ. _____
                                     :
                    Plaintiffs,      :
                                     :
v.                                   :
                                     :
DEMOCRATIC REPUBLIC OF CONGO         :
and CENTRAL BANK OF THE              :
DEMOCRATIC REPUBLIC OF THE           :
CONGO,                               :
                                     :
                    Defendants.      :

-------------------------------------------------- x

### COMPLAINT

Plaintiffs Themis Capital LLC ("Themis") and Des Moines Investments Ltd. ("Des Moines," and together with Themis, "Plaintiffs"), by and through their attorneys, Dechert LLP, for their Complaint against defendants the Democratic Republic of Congo ("Congo") and the Central Bank of the Democratic Republic of the Congo (the "Central Bank," and together with Congo, the "Defendants"), allege as follows.

### NATURE OF ACTION

1.      This is a breach of contract action arising from Defendants' failure to make contractually-mandated payments under a Refinancing Credit Agreement, dated March 31, 1980

13210854

(the "Credit Agreement") between Congo (then known as the Republic of Zaire), the Central Bank (then known as the Bank of Zaire), certain creditors of Congo, and various others. For their relief, Plaintiffs seek payment of the principal amount together with all accrued and unpaid interest due to them as assignees of certain original creditors' rights under the Credit Agreement. A true and correct copy of the Credit Agreement is annexed as Exhibit A.

## THE PARTIES

2.      Plaintiff Themis is a limited liability company organized and existing under the laws of the Cayman Islands.

3.      Plaintiff Des Moines is a limited liability company organized and existing under the laws of the British Virgin Islands.

4.      Defendant Congo is a Foreign State as defined in 28 U.S.C. § 1603.

5.      Defendant the Central Bank is a Foreign State, as defined in 28 U.S.C. § 1603(b), because it is an agency or instrumentality of Congo.

## JURISDICTION AND VENUE

6.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1330 because both Defendants are Foreign States that have explicitly and unconditionally waived sovereign immunity with respect to actions arising out of the Credit Agreement, and are therefore not entitled to immunity under 28 U.S.C. §§ 1605-07 or under any applicable international agreement.

7.      In addition, both Defendants consented in the Credit Agreement to submit to the jurisdiction of this Court with respect to actions arising out of or relating to the Credit Agreement. Pursuant to Section 12.07 of the Credit Agreement, Defendants appointed CT

Corporation System, currently located at 111 Eighth Avenue, New York, New York 10011, as their authorized agent for service of process.

8.      Venue is proper in this district by agreement of the parties and pursuant to 28 U.S.C. § 1391(f).

## FACTUAL ALLEGATIONS

### The Credit Agreement

9.      The Credit Agreement was entered into on March 31, 1980 by Congo, the Central Bank, certain creditors of Congo, various "agent" banks and a "servicing" bank for the purpose of restructuring certain debts then owed to those creditors by Congo. The debts rescheduled by the Credit Agreement are identified in various Credit Information Schedules identified as A-1 through A-26 (each a "Schedule") annexed to the Credit Agreement, and the rescheduled amounts of principal and interest owed to each creditor by Congo are set forth in those Schedules.

10.     Pursuant to Sections 2.01, 3.02-3.05, and 4.01 of the Credit Agreement, Congo was obligated to make periodic payments of principal and interest to the creditors (or their assigns), and to repay all amounts of principal due on or before March 31, 1990.

11.     Pursuant to Sections 8.03 and 9.01 of the Credit Agreement, the Central Bank is irrevocably authorized and obligated, for the benefit of Congo's creditors, to make all principal and interest payments due under the Credit Agreement on behalf of Congo, if sufficient dollars or other foreign currency is available to make the payments and Congo has not made such payments.

12.     Upon information and belief, at all times material to this action, the Central Bank had foreign currency available with which to make the payments of principal and interest not

paid by Congo which were owed to Defendants' predecessors-in-interest under the Credit Agreement.

13.    On February 25, 2003, both Defendants acknowledged and confirmed their obligations under the Credit Agreement for the purpose of renewing any applicable statute of limitations period or prescription period, including the New York statute of limitations. This acknowledgment was a writing signed by both Defendants which contained nothing inconsistent with an intention on the part of Defendants to fulfill their obligations under the Credit Agreement.

14.    Section 12.10 of the Credit Agreement provides that the Credit Agreement "shall be governed by, and construed in accordance with, the laws of the State of New York, United States of America, without giving effect to the principles of choice of laws thereof."

<u>**Defendants' Debt to Des Moines**</u>

15.    Des Moines is the assignee of all right, title, and interests under the Credit Agreement corresponding to an aggregate outstanding principal amount of $7,981,058.35 (the "Des Moines Interests").

16.    The Des Moines Interests consist of all right, title, and interests in:

    a.    $487,900.00 principal amount originally held by Citibank N.A. under Schedule A-1 of the Credit Agreement;

    b.    $308,463.08 principal amount originally held by Banque Bruxelles-Lambert S.A. under Schedule A-2 of the Credit Agreement;

    c.    $483,125.00 principal amount originally held by Electro Banque under Schedule A-14(A) & (B) of the Credit Agreement;

-4-

d.   $1,449,375.00 principal amount under Schedule A-14(A) of the Credit Agreement;

e.   $254,472.50 principal amount originally held by Banque Bruxelles-Lambert S.A. under Schedule A-19 of the Credit Agreement;

f.   $308,451.77 principal amount originally held by Banque Bruxelles-Lambert S.A. under Schedule A-21 of the Credit Agreement; and

g.   $4,689,271.00 principal amount originally held by Citibank N.A. under Schedule A-26 of the Credit Agreement.

17.   Upon information and belief, none of the principal amount of the Des Moines Interests has been paid, nor have the corresponding amounts of accrued and compounded interest due and owing by Defendants been paid in full.

**Defendants' Debt to Themis**

18.   Themis is the assignee of all right, title, and interests under the Credit Agreement corresponding to an aggregate outstanding principal amount of $10,022,499.97 (the "Themis Interests").

19.   The Themis consist of all right, title, and interests in:

a.   $9,562,500.00 principal amount originally held by Citibank N.A. under Schedule A-7 of the Credit Agreement; and

b.   $459,999.67 principal amount originally held by Bayerische Vereinsbank International S.A. under Schedule A-16 of the Credit Agreement.

20.   Upon information and belief, none of the principal amount of the Themis Interests has been paid, nor have the corresponding amounts of accrued and compounded interest due and owing by Defendants been paid in full.

## COUNT I

### (By Des Moines Against Congo, For Breach of the Credit Agreement)

21.     Des Moines repeats and realleges the allegations set forth in paragraphs 1 through 20.

22.     The Credit Agreement is a valid contract between Des Moines, as assignee of all right, title, and interests in the Des Moines Interests, and Congo.

23.     Upon information and belief, Congo has failed to make any payments of principal on the Des Moines Interests, and has failed to pay in full the corresponding amounts of interest due and owing to Des Moines under the Credit Agreement and New York law.

24.     By reason of the foregoing, Congo has breached its contractual obligations and is liable to Des Moines for damages in an amount to be determined at trial, but not less than $7,981,058.35 principal amount, together with interest and all other accumulated amounts due under the terms of the Credit Agreement and New York law.

## COUNT II

### (By Des Moines Against the Central Bank, For Breach of the Credit Agreement)

25.     Des Moines repeats and realleges the allegations set forth in paragraphs 1 through 20.

26.     The Credit Agreement is a valid contract between Des Moines, as assignee of all right, title, and interests in the Des Moines Interests, and the Central Bank.

27.     Upon information and belief, the Central Bank has failed to make any payments of principal on the Des Moines Interests, and has failed to pay in full the corresponding amounts of interest due and owing to Des Moines under the Credit Agreement and New York law.

28.     By reason of the foregoing, the Central Bank has breached its contractual obligations and is liable to Des Moines for damages in an amount to be determined at trial, but not less than $7,981,058.35 principal amount, together with interest and all other accumulated amounts due under the terms of the Credit Agreement and New York law.

## COUNT III

### (By Themis Against Congo, For Breach of the Credit Agreement)

29.     Themis repeats and realleges the allegations set forth in paragraphs 1 through 20.

30.     The Credit Agreement is a valid contract between Themis, as assignee of all right, title, and interests in the Themis Interests, and Congo.

31.     Upon information and belief, Congo has failed to make any payments of principal on the Themis Interests, and has failed to pay in full the corresponding amounts of interest due and owing to Themis under the Credit Agreement and New York law.

32.     By reason of the foregoing, Congo has breached its contractual obligations and is liable to Themis for damages in an amount to be determined at trial, but not less than $10,022,499.97 principal amount, together with interest and all other accumulated amounts due under the Credit Agreement and New York law.

## COUNT IV

### (By Themis Against the Central Bank, For Breach of the Credit Agreement)

33.     Themis repeats and realleges the allegations set forth in paragraphs 1 through 20.

34.     The Credit Agreement is a valid contract between Themis, as assignee of all right, title, and interests in the Themis Interests, and the Central Bank.

35.     Upon information and belief, the Central Bank has failed to make any payments of principal on the Themis Interests, and has failed to pay in full the corresponding amounts of interest due and owing to Themis under the Credit Agreement and New York law.

36.     By reason of the foregoing, the Central Bank has breached its contractual obligations and is liable to Themis for damages in an amount to be determined at trial, but not less than $10,022,499.97 principal amount, together with interest and all other accumulated amounts due under the Credit Agreement and New York law.

WHEREFORE, Plaintiffs demand judgment against Defendants as follows:

1.     Awarding Des Moines a money judgment in an amount to be determined at trial, but not less than $7,981,058.35, together with interest and any other accumulated amounts due and owing on that principal, jointly and severally against Defendants.

2.     Awarding Themis a money judgment in an amount to be determined at trial, but not less than $10,022,499.97 principal amount, together with interest and any other accumulated amounts due and owing on that principal, jointly and severally against Defendants.

3.     Awarding Plaintiffs their attorneys' fees, costs, and such other and further relief as the Court shall deem just and proper.

Dated: New York, New York
      February 23, 2009

DECHERT LLP

By: _____
    Dennis H. Hranitzky
    Eric C. Kirsch

1095 Avenue of the Americas
New York, New York 10036
(212) 698-3500 (phone)
(212) 698-3599 (facsimile)

*Attorneys for Plaintiffs Themis Capital LLC
and Des Moines Investments Ltd.*

-8-

CONFORMED COPY

REFINANCING CREDIT AGREEMENT

Dated as of March 31, 1980

Among

REPUBLIC OF ZAIRE

as Obligor

BANK OF ZAIRE

as the Central Bank of the Republic of Zaire

BANKERS TRUST COMPANY
BANQUE FRANCAISE DU COMMERCE EXTERIEUR
BANQUE NATIONALE DE PARIS
BANQUE DE PARIS ET DES PAYS-BAS
CHASE MANHATTAN BANK, N.A.
CITIBANK, N.A.
CITICORP INTERNATIONAL BANK LIMITED
COMMERCE UNION BANK
CREDIT COMMERCIAL DE FRANCE
EQUATOR BANK LIMITED
GRINDLAY BRANDTS LIMITED
MORGAN GRENFELL & CO. LIMITED
MORGAN GUARANTY TRUST COMPANY OF NEW YORK
RABOAMERICA INTERNATIONAL BANK N.V.
SOCIETE GENERALE DE BANQUE S.A.

as Agents

CERTAIN BANK CREDITORS OF THE REPUBLIC OF ZAIRE

as Banks

and

THE BANK OF TOKYO TRUST COMPANY

as Servicing Bank

## TABLE OF CONTENTS

**Section**                                                          **Page**

     Recitals.................................   R - 1


### ARTICLE I
### DEFINITIONS

1.01   Certain Defined Terms................   1 - 1


### ARTICLE II
### PAYMENT AND REFINANCING

2.01   Agreement to Pay Certain Amounts.....   2 - 1
2.02   Agreement to Refinance...............   2 - 1
2.03   Acknowledgment by the Obligor........   2 - 2
2.04   Acknowledgment by Each Bank..........   2 - 2
2.05   Effect of Credit Information Schedules  2 - 2


### ARTICLE III
### INTEREST

3.01   Reference Date Interest..............   
3.02   Interest from the Reference Date
     to the Reconciliation Date.........   3 - 1
3.03   Interest from the Reconciliation
     Date...............................   3 - 1
3.04   Interest Periods.....................   3 - 1
3.05   Interest on Overdue Principal........   3 - 2
3.06   Alternative Interest Rates...........   3 - 2
3.07   Miscellaneous Interest Provisions....   3 - 3
3.08   Interest Accruals Under the
     Existing Agreements................   3 - 6

Section                                                                Page

ARTICLE IV
PRINCIPAL PAYMENTS

4.01  Scheduled Payments....................      4 - 1
4.02  Mandatory Prepayments Upon More
        Favorable Payments of Other
        Credits............................      4 - 2
4.03  Other Prepayments....................      4 - 3


ARTICLE V
OTHER PAYMENT PROVISIONS

5.01  Servicing Bank's Fees................      5 - 1
5.02  Making Payments......................      5 - 1
5.03  Special Rules as to Application
        of Payments........................      5 - 3
5.04  Sharing of Payments, Etc.............      5 - 3
5.05  Evidence of Debt.....................      5 - 4
5.06  Increased Costs......................      5 - 4
5.07  Taxes................................      5 - 5
5.08  Payments Subsequently Repaid ........      5 - 6
5.09  Funds Incorrectly Disbursed..........      5 - 6
5.10  Special Provisions for the Guilder
        Credits............................      5 - 6
5.11  Special Provisions for the
        Swiss Franc Credit.................      5 - 8
5.12  Special Provisions for the
        Canadian Dollar Credit.............      5 - 9

ARTICLE VI
CONDITIONS OF EFFECTIVENESS

6.01  Conditions Precedent to the
        Effective Date.....................      6 - 1
6.02  Action after the Effective Date......      6 - 3
6.03  Consequences of the
        Effective Date.....................      6 - 3

ARTICLE VII
REPRESENTATIONS AND WARRANTIES
OF THE OBLIGOR AND THE BANKS

7.01  Representations and Warranties
        of the Obligor.....................      7 - 1
7.02  Representations and Warranties
        of the Banks.......................      7 - 3

<u>Section</u>                                                    <u>Page</u>

ARTICLE VIII
COVENANTS AND INSTRUCTION

8.01   Affirmative Covenants of the
       Obligor.............................
8.02   Negative Covenants of the Obligor...        8 - 1
8.03   Instruction of the Obligor..........        8 - 3
                                                   8 - 5


ARTICLE IX
BANK OF ZAIRE

9.01   Foreign Exchange
       Undertaking........................
9.02   Representations and Warranties            9 - 1
       of the Bank of Zaire................
9.03   Covenants of the Bank of Zaire......        9 - 1
                                                   9 - 2


ARTICLE X
EVENTS OF DEFAULT

10.01  Event of Default Defined............       10 - 1
10.02  Effects of Events of Default........       10 - 3


ARTICLE XI
THE SERVICING BANK AND THE AGENTS

11.01  Limited Appointment and
       Responsibilities of Servicing
       Bank and Agents....................        11 - 1
11.02  Discretions and Protections
       of Servicing Bank and Agents.....          11 - 1
11.03  Limited Liability of Servicing
       Bank and Agents....................
11.04  Indemnification by Banks...........        11 - 4
11.05  Successor Servicing Bank...........        11 - 4
11.06  Successor Agents...................         11 - 5
                                                  11 - 6


ARTICLE XII
MISCELLANEOUS

12.01  Amendments, Etc. ...................        12 - 1
12.02  Notices, Etc. ......................        12 - 1
12.03  No Waiver; Cumulative Remedies......        12 - 2
12.04  Accounting Terms; Calculations.....        12 - 2

| Section | | Page |
|---|---|---|
| 12.05 | Costs and Expenses................... | 12 - 2 |
| 12.06 | Judgment............................. | 12 - 4 |
| 12.07 | Consent to Jurisdiction;  Waiver | |
| | of Immunities ...................... | 12 - 5 |
| 12.08 | Binding Effect; Partial | |
| | Invalidity; Survival............... | 12 - 6 |
| 12.09 | Lending Office;  Assignments...... | 12 - 6 |
| 12.10 | Governing Law........................ | 12 - 8 |
| 12.11 | Table of Contents and Section | |
| | Headings; Banking Terms........... | 12 - 8 |
| 12.12 | Execution in Counterparts......... | 12 - 8 |
| 12.13 | Obligations of the Banks and | |
| | Agents Several................... | 12 - 9 |
| 12.14 | Termination.......................... | 12 - 9 |

Schedule A -- Credit Information Schedules

Schedule B -- Paris Club Summary

Schedule C -- Existing Liens

Schedule D -- Required Information


EXHIBIT 1 -     Form of Certification of Government
                Approvals

EXHIBIT 2 -     Form of Incumbency Certificate for
                the Obligor and the Governor of the
                Bank of Zaire

EXHIBIT 3 -     Form of Incumbency Certificate for the
                Bank of Zaire

EXHIBIT 4 -     Form of Certificate of the Obligor
                as to the Accuracy of Representations

EXHIBIT 5 -     Form of Certificate of the Bank of
                Zaire as to the Accuracy of Represen-
                tations

EXHIBIT 6 -     Form of Acceptance of Appointment
                of New York Process Agent

EXHIBIT 7 -     Form of Acceptance of Appointment
                of London Process Agent

EXHIBIT 8 -     Form of Opinion of Counsel to the
                Obligor and the Bank of Zaire

EXHIBIT 9 -     Form of Opinion of Special United
                States Counsel to the Obligor and
                the Bank of Zaire

EXHIBIT 10 -    Form of Opinion of Special Zaire
                Counsel to the Agents

EXHIBIT 11 -    Form of Opinion of Special English
                Counsel to the Agents

EXHIBIT 12 -    Form of Opinion of Special United
                States Counsel to the Agents

EXHIBIT 13 -    Form of Notice of Default

R - 1

THIS REFINANCING CREDIT AGREEMENT dated as of
March 31, 1980 is among:

(i)   the Republic of Zaire (the "Obligor"),

(ii)   the Bank of Zaire, as the central bank
of the Republic of Zaire,

(iii)   the financial institutions listed on the
signature pages of this Agreement under the heading
"Agents" (the "Agents"),

(iv)   the financial institutions listed on such
pages under the heading "Banks" (the "Banks"), and

(v)   The Bank of Tokyo Trust Company (the
"Servicing Bank").

WHEREAS the parties hereto make the following
recitals (see Article I for definitions):

(A)   Each Bank has previously extended one or
more Credits to the Obligor, either directly to the Obligor
or in reliance on a guaranty of the Obligor of Credits
extended to third parties.   Each Credit is governed by an
Existing Agreement. The Credit Information Schedules to
this Agreement set forth certain information with respect to
each Credit which is subject to this Agreement, including
the Outstanding Principal Amount, the Reference Date Prin-
cipal, the First Principal Payment and the Reference
Date Interest.

(B)   The Obligor and the Bank of Zaire have
requested each Bank to refinance each Credit extended by
such Bank on the terms and conditions of this Agreement.
Each Bank is willing to refinance each such Credit as
provided in this Agreement.

(C)   The Obligor is requesting certain of its
creditors to refinance or reschedule Other Credits which are
not subject to this Agreement on terms which are no more
favorable to such other creditors than the terms of this
Agreement are to the Banks with respect to the Credits
subject to this Agreement.   Schedule B hereto sets forth a
summary of the meeting in Paris on December 10 and 11, 1979
among representatives of the Obligor and the Paris Club
reflecting arrangements reached and discussions held in
respect of rescheduling certain existing supplier credits
guaranteed by various governmental export credit agencies
and rescheduling portions of direct government to government
debt.

R ~ 2

(D)   Each Agent currently acts as an Existing Agent for one or more Syndicates under one or more Existing Agreements under which the Credits have been extended by the Banks (except there is no Existing Agent for the Single Bank Credits listed in the Credit Information Schedules). Each Syndicate has requested its Agent to perform the mechanical and clerical functions set forth in this Agreement for such Agent in the administration of this Agreement.   The Agents are willing to perform such functions.

(E)   The Banks and the Agents have requested the Servicing Bank to perform the mechanical and clerical functions set forth in this Agreement for the Servicing Bank in the administration of this Agreement. The Servicing Bank is willing to perform such functions.

NOW THEREFORE, in consideration of mutual promises contained in this Agreement and subject to the terms and conditions hereof, the parties hereto agree as follows:

1 - 1

## ARTICLE I

## DEFINITIONS

SECTION 1.01.   Certain Defined Terms.   As used in this Agreement, the following terms shall have the following meanings (such meanings to be equally applicable to both the singular and plural forms of the terms defined):

"Agent" means, with respect to each Syndicate, the institution designated as Agent on the Credit Information Schedule on which the Syndicate Members of such Syndicate are identified and, with respect to each Credit, the institution designated as Agent on the Credit Information Schedule in which such Credit is listed.

"Applicable Margin" means (i) 1 7/8 per cent (1.875%) for the period from the date of this Agreement to the last day of the Month in which occurs the fifth anniversary of the date of this Agreement and (ii) two per cent (2%) for the period from the last day of the Month in which occurs the fifth anniversary of the date of this Agreement to payment in full of the Credits.

"Assets" means assets of any kind whatsoever, including without limitation revenues and rights to receive income or other payments.

"Bank" means each bank listed under the heading "Banks" on the signature pages hereof and the successors and permitted assigns of each such bank.

"Bank of Zaire" means Banque du Zaire, as the central bank of the Republic of Zaire, and any successor thereto which operates as the central bank of the Republic of Zaire.

"Business Day" means a day of the year on which dealings are carried on in the London interbank market and banks are open for domestic and international business in London and New York City.

"Canadian Dollars" refers to lawful money of Canada.

"Canadian Dollar Credit" means the Credit denominated in Canadian Dollars and listed on Credit Information Schedule A-23.   The Canadian Dollar Credit shall be converted into Dollars on the Reconciliation Date as provided in Section 5.12(e).

"Credit" means, as the context may require, (i) each separate credit heretofore extended by a Bank and listed in a Credit Information Schedule or (ii) the unpaid principal amount of any such credit outstanding from time to time (both before and after the Effective Date). No credit heretofore extended by any Bank is a Credit subject to this Agreement unless such credit is listed in a Credit Information Schedule.

"Credit Information Schedule" means each of Schedules A-1 to A-27 on which certain information is set forth. Certain terms used in the Credit Information Schedules are defined in this Agreement and are used in the Credit Information Schedules with such defined meanings.

"Declaration" has the meaning set forth in Section 10.02(a), 10.02(b) and 10.02(c).

"Dollars" and the sign "$" refer to lawful money of the United States of America.

"Effective Date" means the day on which all of the conditions specified in Section 6.01 shall have been satisfied in accordance with such Section or waived pursuant to Section 12.01.

"Event of Default" means any of the events or conditions described in Section 10.01.

"Existing Agent" means, with respect to each Syndicate, the institution now acting as agent under the Existing Agreement applicable to the Credits extended by such Syndicate, as such Existing Agent is identified on each separate Credit Information Schedule.

"Existing Agreement" means, with respect to each Credit, each existing credit agreement, promissory note, guaranty and other documentation (other than this Agreement), as amended prior to the date of this Agreement, which sets forth the payment obligations of the Obligor and other provisions governing the terms of such Credit, which Existing Agreement, as so amended, is identified on the Credit Information Schedule on which such Credit is described by title, date and the parties thereto, including reference to all amendments prior to the date of this Agreement.

"Existing Rate" means, with respect to each Credit, the interest rate or rates applicable to such Credit from time to time during the period from the Reference Date to the Reconciliation Date pursuant to the interest provisions of the Existing Agreement applicable to such Credit, all of which provisions

1 - 3

(including any provisions for alternate interest rates)
are incorporated herein by reference for the purpose of
this definition.   The Existing Rate for each Credit
shall be determined in accordance with such interest
provisions, it being understood that any such Existing
Rate which consists of a stated margin over a refer-
enced rate (such as LIBO, PIBO, prime rate or base
rate, etc.) shall continue to be determined for the
periods permitted or contemplated by such interest
provisions; provided that for each Credit the deter-
mination of such referenced rate for the last such
period beginning before the Reconciliation Date shall
be for a period ending on the Reconciliation Date.

    "External Indebtedness" of any Person means
(i) each obligation of such Person to repay a loan,
deposit, advance or similar extension of credit (inclu-
ding without limitation any extension of credit under a
refinancing or rescheduling agreement or an acceptance
facility), (ii) each obligation of such Person evidenc-
ed by a note, bond, debenture or similar written
evidence of indebtedness and (iii) each Guarantee by
such Person of an obligation constituting External
Indebtedness of another Person; provided in each case
that such obligation is (A) denominated in a Foreign
Currency or (B) payable at the option of the payee in a
Foreign Currency.

    "Foreign Currency" means any currency other than
the lawful money of the Republic of Zaire.

    "Governmental Agency" means any agency, ministry,
authority, department, commission or instrumentality of
the Republic of Zaire which does not under the laws of
the Republic of Zaire constitute a juridical entity
separate from the Republic of Zaire.

    "Governmental Enterprise" means any corporation
or other entity (excluding the Bank of Zaire) which
constitutes under the laws of the Republic of Zaire a
juridical entity separate from the Republic of Zaire
and in which the Obligor or any Governmental Agency
owns, directly or indirectly, more than 50% of the
capital stock or other equity interest.

    "Guarantee" by any Person means any obligation,
direct or indirect, contingent or otherwise, of such
Person guaranteeing or in effect guaranteeing, directly
or indirectly, any obligation of another Person,
including without limitation any such obligation of
such Person to purchase goods or services or supply
funds or take any other action for the purpose of
protecting the holders of any obligation of another
Person against loss (in whole or in part).   "Guaran-
teed" has a correlative meaning.

1 - 4

"Guilder Credits" means the Credits denominated in Guilders and listed on Credit Information Schedule A-20 for which Rabomerica is the Existing Agent and Agent.   The Guilder Credits shall be converted into Dollars on the Reconciliation Date as provided in Section 5.10(e).

"Guilders" refers to lawful money of The Kingdom of the Netherlands.

"IBRD" means the International Bank for Reconstruction and Development and any successor.

"IMF" means the International Monetary Fund and any successor.

"Information Memorandum" means the Information Memorandum dated October 1979 prepared by the Bank of Zaire entitled "The Republic of Zaire", as supplemented by a separate memorandum dated October 1979 entitled "The Republic of Zaire, Balance of Payments Projections and Analysis of External Resource GAP", a copy of which has heretofore been delivered to each Bank.

"Interest Payment Date" means the Reconciliation Date and thereafter the last day of each Interest Period.

"Interest Period" has the meaning set forth in Section 3.04.

"Interim Rate" means a per annum rate of interest which is the sum of the Applicable Margin and a LIBO Rate calculated for a period from the date of this Agreement to the Reconciliation Date.   The Reference Banks have heretofore advised to the Servicing Bank the information necessary in order to calculate such LIBO Rate and the Interim Rate.

"Interim Rate Election" means an election with respect to all Credits listed on a Credit Information Schedule that the interest rate applicable to such Credits during the period from the date of this Agreement to the Reconciliation Date shall be determined in accordance with Section 3.02(b)(ii)(A) rather than in accordance with Section 3.02(b)(ii)(B).   Any Interim Rate Election with respect to such Credits shall be made on the Credit Information Schedule for such Credits by completing Section B of such Credit Information Schedule with the statement "The Interim Rate Election has been made for all Credits listed on this Credit Information Schedule".   If the Interim Rate Election is not made in such manner, Section B of such Credit Information Schedule shall be completed with the statement "The Interim Rate Election has not been made for all Credits listed on this Credit Information Schedule".

1 - 5

"International Monetary Assets" means all (i) gold, (ii) Special Drawing Rights, (iii) Reserve Positions in the Fund and (iv) Foreign Exchange which is owned or held by the Obligor or the Bank of Zaire. For purposes of this definition, the terms "Special Drawing Rights", "Reserve Positions in the Fund" and "Foreign Exchange" have, as to the types of assets included, the meanings given to them in the IMF's publication entitled "International Financial Statistics" dated December 1979 or such other meanings as shall be formally adopted by the IMF from time to time.

"Lending Office" means, with respect to each Credit of each Bank, the office of such Bank (or its affiliate) at which such Credit is carried as an asset on the date of this Agreement or such other office designated pursuant to Section 12.09(a).

"LIBO Rate" means, with respect to each Interest Period or Overdue Period, the average (rounded upward, if necessary, to the nearest whole multiple of 1/16 of 1% per annum) of the rate per annum at which deposits in Dollars are offered to each of the Reference Banks by prime banks in the London interbank market at 11:00 A.M. (London time) two Business Days before the first day of such period for a period equal thereto and in an amount equal to $5,000,000.

"Lien" means any lien, mortgage, deed of trust, charge, pledge, security interest or other encumbrance on or with respect to, or any preferential arrangement which has the practical effect of constituting a security interest with respect to the payment of any obligation with or from the proceeds of, any Asset.

"London Process Agent" has the meaning set forth in Section 12.07.

"Majority Agents" means at any time Agents acting for Syndicate Members holding more than 51% in the then outstanding aggregate principal amount of all Credits which are not Single Bank Credits.

"Majority Banks" means at any time Banks holding more than 51% in the then outstanding aggregate principal amount of the Credits.

"Month" means any monthly period beginning on the first Business Day of a calendar month and ending on the first Business Day of the next calendar month.

"New York Process Agent" has the meaning set forth in Section 12.07.

"Notice of Default" means a written communication from any Bank or Agent, addressed to any Agent which

1 - 6

an event or condition, (iii) expressly states that such
event or condition is an "Event of Default" hereunder
or would constitute such an Event of Default upon the
giving of notice hereunder or lapse of time or both, or
upon a determination, and (iv) requests such Agent to
notify the other Agents and/or the Banks for which it
is Agent of such event or condition. Any such Notice of
Default may (but need not) be in the form of Exhibit
13.

"Other Credit" means any loan, deposit, advance or
similar extension of credit constituting External
Indebtedness other than a Credit subject to this
Agreement which was disbursed prior to the date of this
Agreement by any Person to the Obligor, the Bank
of Zaire or any Governmental Agency or Governmental
Enterprise, the original final maturity of which Other
Credit is stated by the terms of the credit agreement,
promissory note or other documentation applicable
thereto to be more than one year from the date of such
documentation or the final maturity of which is extend-
ible at the sole option of the debtor thereunder beyond
one year from the date of such documentation.

"Outstanding Principal Amount" means, with respect
to each Credit, the total unpaid principal amount of
such Credit outstanding on the Reference Date irres-
pective of whether such principal amount is due and
payable on the Reference Date, as such Outstanding
Principal Amount is set forth in the Credit Information
Schedule for such Credit.

"Overdue Period" has the meaning set forth in
Section 3.05(b).

"Payment Date" means the date upon which the
Obligor pays in full the aggregate First Principal
Payments due on all Credits under Section 2.01(a).

"Person" means an individual, corporation, part-
nership, joint venture, trust, unincorporated organiza-
tion or any other juridical entity, including without
limitation a government or governmental body or any
agency, instrumentality or official thereof or any
international organization or agency.

"Principal Payment" means, with respect to
each Credit, each of (i) the First Principal Payment,
(ii) the Second Principal Payment, (iii) the Third
Principal Payment, (iv) the Fourth Principal Payment,
(v) the Fifth Principal Payment and (vi) each Subse-
quent Principal Payment, as each such term is defined
below:

1 - 7

(i)  "First Principal Payment" means, with
respect to each Credit, ten per cent (10%) of
the Reference Date Principal of such Credit
(rounded to the nearest integral currency
unit), as such First Principal Payment is set
forth in the Credit Information Schedule for
such Credit.

(ii)  "Second Principal Payment" means, with
respect to each Credit, five per cent
(5%) of the Reference Date Principal of such
Credit (rounded to the nearest Dollar).

(iii)  "Third Principal Payment" means, with
respect to each Credit, three per cent
(3%) of the Reference Date Principal of such
Credit (rounded to the nearest Dollar).

iv)  "Fourth Principal Payment" means, with
respect to each Credit, three per cent
(3%) of the Reference Date Principal of such
Credit (rounded to the nearest Dollar).

(v)  "Fifth Principal Payment" means, with
respect to each Credit, three per cent
(3%) of the Reference Date Principal of such
Credit (rounded to the nearest Dollar).

(vi)  "Subsequent Principal Payment" means, with
respect to each Credit, each of eleven
approximately equal principal install-
ment payments, each in the amount of one
eleventh (1/11th) of such Credit outstanding
on the last day of the Month in which the
fifth anniversary of the date of this Agree-
ment occurs (excluding from the calculation
of the Credit outstanding on such day, any
amount which is then past due).

"Principal Payment Date" means each of the dates
specified in Section 4.01 on which a payment of princi-
pal of the Credits is due.

"Process Agent" has the meaning set forth in
Section 12.07(a).

"Rabomerica" means Rabomerica International
Bank N.V., a banking institution organized under the
laws of The Kingdom of the Netherlands.

"Reconciliation Date" means September 2, 1980.

"Reference Banks" means the principal London
offices of (i) Bankers Trust Company, (ii) Grindlays
Bank Limited, and (iii) The Fuji Bank Limited.

1 - 8

"Reference Date" means January 31, 1980.

"Reference Date Interest" means, with respect to each Credit, the total accrued and unpaid interest with respect to such Credit as of the Reference Date, calculated in accordance with the terms of the Existing Agreement applicable to such Credit on the Outstanding Principal Amount of such Credit to the Reference Date and irrespective of whether such interest is due and payable on the Reference Date, all as such Reference Date Interest is set forth in the Credit Information Schedule for such Credit.

"Reference Date Principal" means, with respect to each Credit, the principal amount of such Credit which was due and payable on the Reference Date in accordance with the payment schedule of the Existing Agreement applicable to such Credit, calculated without giving effect to any acceleration of such payment schedule in accordance with the terms of such Existing Agreement, as such Reference Date Principal is set forth in the Credit Information Schedule for such Credit.

"Refinanced Principal Amount" means, with respect to each Credit, the difference obtained by subtracting (x) the First Principal Payment of such Credit from (y) the Outstanding Principal Amount of such Credit, as such Refinanced Principal Amount is set forth in the Credit Information Schedule for such Credit.

"Servicing Bank" means The Bank of Tokyo Trust Company when acting in its capacity as Servicing Bank hereunder, through its office at 100 Broadway, New York, New York 10005, U.S.A. or such other office as it shall hereafter designate for the purpose by notice to the other parties hereto, and any permitted successor.

"Single Bank Credit" means any Credit listed on Credit Information Schedules A-23 to A-27.

"Swiss Francs" refers to lawful money of the Swiss Confederation.

"Swiss Franc Credit" means the Credit denominated in Swiss Francs and listed on Credit Information Schedule A-27. The Swiss Franc Credit shall be converted into Dollars on the Reconciliation Date as provided in Section 5.11(e).

"Syndicate" means all Banks listed as Syndicate Members on each separate Credit Information Schedule. A Bank is a member of each Syndicate for which it is listed as a Syndicate Member on a Credit Information Schedule.

"Syndicate Instructing Group" means, with respect to each Syndicate at any time, Syndicate Members holding more than 51% in the then outstanding aggregate principal amount of the Credits in such Syndi[...]

1 - 9

"Syndicate Member" means each Bank listed as a Syndicate Member holding a Credit on each separate Credit Information Schedule.

"United States" and "U.S." each means the United States of America.

"World Bank Report" means Report No. 2518-2R entitled "Zaire Economic Memorandum, The Zairian Economy: Current Situation and Constraints", dated October 19, 1979, prepared by the World Bank and available upon request to the World Bank, 1818 H Street, N.W., Washington, D.C. 20433, U.S.A.

2 - 1

## ARTICLE II

## PAYMENT AND REFINANCING

**SECTION 2.01.   Agreement to Pay Certain Amounts.**
On or before the eighth Business Day after the signature of
this Agreement by all parties hereto and on the terms and
conditions of this Agreement, the Obligor shall pay for the
account of each Bank all of the following amounts:

    (a)   The First Principal Payment of each Credit
        of such Bank,

    (b)   The Reference Date Interest on each Credit
        of such Bank, and

    (c)   all costs and expenses payable pursuant to
        Section 12.05 which shall have been noti-
        fied to the Obligor by the Servicing Bank
        on or prior to the day occurring 2 Business
        Days after the signature of this Agreement by
        all parties hereto;

    provided that if any such amount shall be other-
wise paid to the parties entitled thereto the
Obligor shall be relieved of its obligations under
this Section 2.01 to the extent of such other
payment.  Each Agent and each Bank having a Single
Bank Credit agrees to notify the Obligor and the
Servicing Bank of any such other payment so
received (x) in the case of each Agent, for the
account of all Syndicate Members for which such
Agent acts and (y) in the case of each Bank having
a Single Bank Credit, for the account of such
Bank.  The Servicing Bank may rely conclusively on
any such notice received by it.

The payment of each such amount shall be applied by the
Servicing Bank and the appropriate Bank to satisfy each
payment obligation with respect to such amount under this
Agreement and the applicable Existing Agreement.

    **SECTION 2.02.   Agreement to Refinance.**   On
the terms and conditions of this Agreement, each Bank
severally agrees to refinance on the Effective Date, through
the Lending Office for each Credit of such Bank, the Refi-
nanced Principal Amount of each such Credit.  The Refinanced

2 - 2

Principal Amount of each Credit so refinanced will be due and payable in installments as provided in Article IV and will bear interest as provided in Article III of this Agreement.   Such refinancing and the consequences thereof specified in Section 6.03 will occur automatically upon the occurrence of the Effective Date in accordance with this Agreement and without further action by or notice to any Person.

SECTION 2.03.   Acknowledgment by the Obligor. The Obligor acknowledges that the information set forth in the Credit Information Schedules is true and correct.

SECTION 2.04.   Acknowledgment by Each Bank.   Each Bank acknowledges that the information set forth in the Credit Information Schedules with respect to such Bank is true and correct.

SECTION 2.05.   Effect of Credit Information Schedules.   The information set forth in each Credit Information Schedule shall be binding on the parties hereto and may be relied upon by the Servicing Bank and each Agent for all purposes of this Agreement.

3 - 1

## ARTICLE III

## INTEREST

SECTION 3.01.   <u>Reference Date Interest</u>.   The Obligor shall pay the Reference Date Interest on each Credit as provided in Section 2.01(b).

SECTION 3.02.   <u>Interest from the Reference Date to the Reconciliation Date</u>.   (a)   <u>Payment Obligation</u>.   The Obligor shall pay interest on each Credit from the Reference Date to the Reconciliation Date at the interest rates applicable to such Credit as specified in subsection (b) below, such interest to be due and payable on the Reconciliation Date and to be payable on the Outstanding Principal Amount of such Credit during the period from the Reference Date to the Payment Date and on the Refinanced Principal Amount of such Credit from the Payment Date to the Reconciliation Date.

(b)   <u>Interest Rates</u>.   The interest rates specified below shall apply for the periods indicated:

(i)   During the period from the Reference Date to the date of this Agreement, the Existing Rate shall apply to each Credit.

(ii)  During the period from the date of this Agreement to the Reconciliation Date,

(A)   the Interim Rate shall apply to each Credit for which the Interim Rate Election has been made, and

(B)   the Existing Rate shall apply to each Credit for which the Interim Rate Election has not been made; <u>provided</u> that any component of an Existing Rate which is a margin over any referenced rate (such as LIBO, FIBO, prime rate, base rate, etc.) shall be the Applicable Margin.   It shall be the responsibility of each Agent and each Bank having a Single Bank Credit to make the calculations of interest required by Section 3.07(b) in accordance with this <u>proviso</u>.

SECTION 3.03.   <u>Interest from the Reconciliation Date</u>.   The Obligor shall pay interest on each Credit from the Reconciliation Date to the final Principal Payment Date at an interest rate per annum equal at all times during each Interest Period to the sum of the Applicable Margin and the LIBO Rate for such Interest Period, such interest to be due and payable on the last day of each Interest Period for interest accrued during such Interest Period.

3 — 2

SECTION 3.04   Interest Periods.   The period from
the Reconciliation Date to the final Principal Payment Date
shall be divided into successive Interest Periods.   The
first Interest Period shall begin on the Reconciliation
Date and end on the last day of the Month in which occurs
the first anniversary of the date of this Agreement.   Each
subsequent Interest Period shall be a period of six Months
and shall begin on the last day of the immediately preceding
Interest Period.

SECTION 3.05.   Interest on Overdue Principal. (a)
In the event that any principal amount of any Credit is not
paid when due after the Effective Date, the Obligor shall
pay interest on such unpaid principal amount from the date
such principal amount is due to the date such principal
amount is paid in full, payable on demand, at an interest
rate per annum equal at all times during each Overdue Period
to the sum of one percent (1%) plus the Applicable Margin
plus the LIBO Rate for such Overdue Period.   If the Servic-
ing Bank receives notice from two or more Reference Banks
that deposits in Dollars are not being offered to them by
prime banks in the London interbank market for the applic-
able Overdue Period or in the applicable amounts, then the
interest rate for the purposes of this subsection (a) shall
be the sum of one percent (1%) plus the Applicable Margin
plus the cost to each Bank (as set forth in the certificate
referred to in subsection (c) below) of obtaining, from time
to time, funds for such Overdue Period in the amount equal
to the  overdue principal amount owed to such Bank.

(b)   For purposes of determining the interest
rate pursuant to subsection (a) above, the period between
the date the principal amount referred to therein is due and
the date such principal amount is paid in full shall be
divided into Overdue Periods of one Month (each of which
other than the first shall begin on the last day of the next
preceding Overdue Period).

(c)   Without prejudice to the rights of any
Bank under the foregoing provisions of this Section 3.05,
the Obligor shall indemnify each Bank against any loss or
expense which it may sustain or incur as a result of the
failure by the Obligor to pay when due any principal of any
Credit, to the extent that any such loss or expense is not
recovered pursuant to such foregoing provisions but exclud-
ing any loss of profits.   A certificate of any such Bank
setting forth the basis for the determination of the inter-
est due on overdue principal and of the additional amounts
necessary to indemnify such Bank pursuant to this subsection
(c) in respect of such loss or expense, submitted to the
Obligor, shall be conclusive and binding for all purposes in
the absence of manifest error.

3 - 3

(d)   To the extent permitted by law, the Obligor further agrees to pay interest as provided in subsections (a) and (b) above on all interest which is not paid when due hereunder after the Effective Date, such interest is to be payable on demand, to accrue from the due date of such interest until payment in full thereof and to be calculated on the basis of successive Overdue Periods of one Month.

SECTION 3.06.   Alternative Interest Rates.
(a) If (i) on or before any date on which an interest rate is to be determined pursuant to Section 3.07(a), the Servicing Bank receives notice from two or more Reference Banks that deposits in Dollars are not being offered to such Reference Banks by prime banks in the London interbank market for the applicable Interest Period or in the applicable amount or (ii) not later than the first day of such Interest Period, the Servicing Bank receives notice from any Agent that the LIBO Rate previously calculated by the Servicing Bank for such period does not adequately reflect the cost to a Syndicate Instructing Group for which such Agent acts of funding or maintaining during the applicable period their respective Credits, the Servicing Bank shall forthwith give notice of such event to the Obligor.   Within 15 days following the date of any such notice, the Obligor and each Affected Agent shall enter into negotiations in good faith with a view to agreeing to an alternative basis acceptable to the Obligor and each Affected Syndicate Instructing Group for determining the interest rate (the "Substitute Interest Rate") which shall be applicable during such period to the Affected Credits and which shall reflect the cost to the Syndicate Members comprising each such Affected Syndicate Instructing Group (as agreed upon by each such Syndicate Instructing Group) of funding their Credits for such period from alternative sources plus the Applicable Margin.   If, at the expiration of 30 days from the giving of such notice by the Servicing Bank, a Substitute Interest Rate shall have been agreed to, such Substitute Interest Rate shall take effect with respect to each Affected Credit for such Interest Period from the beginning of such period.

(b)   If, at the expiration of 30 days from the giving of any notice by the Servicing Bank to the Obligor provided for in subsection (a) above, a Substitute Interest Rate shall not have been agreed to, each Affected Agent shall give notice to the Obligor of that rate of interest (as agreed upon by the respective Affected Syndicate Instructing Group) for the applicable period at which the Affected Syndicate Members are prepared to continue to lend the then unpaid amount of the Affected Credits of such Syndicate Members during such period.   Such notice shall set forth the computations made in determining such rate of interest, which computations shall reflect the cost to each Affected Syndicate Member of funding for such period said Credits from alternative sources plus the Applicable

3 - 4

Margin.   The Obligor may, within twenty days after the
giving of any such notice, give notice (the giving of which
shall be irrevocable) to the Servicing Bank and the Agent
for each Affected Syndicate of its election to prepay all
Affected Credits in full on a date which shall be specified
in such notice of election and which shall be a Business Day
not less than seven nor more than 40 days after the date of
such notice of election by the Obligor to prepay.  If the
Obligor does so elect to prepay, the Obligor shall be
obligated to pay on such date the unpaid principal amount of
the Affected Credits, together with (i) an amount equal to
the cost to such Syndicate Member of funding such Credits
for the period from the last Interest Payment Date applic-
able to such Credits to the date of prepayment pursuant to
this subsection (b), plus the Applicable Margin and (ii) any
other amounts required hereunder (all such amounts, in the
absence of manifest error, as determined by such Syndicate
Member and notified by the Agent for such Syndicate to the
Obligor).   If the Obligor does not so elect to prepay, the
rate of interest applicable to each such Credit in respect
of such period shall be the rate as determined pursuant to
the first sentence of this subsection (b), and the Agent
shall then promptly notify the Obligor, the Servicing Bank
and each Affected Syndicate Member to such effect.

(c)   For the purposes of this Section 3.06, the
term "Affected" shall mean either (x) each Credit, Agent,
Syndicate, Syndicate Instructing Group, Syndicate Member and
Bank in the event of a notification referred to in clause
(i) of subsection (a) above or (y) the Credits, Agent,
Syndicate, Syndicate Instructing Group and each Syndicate
Member of a Syndicate with respect to which an Agent gives
a notice referred to in clause (ii) of subsection (a)
above.   The provisions of clause (ii) of subsection (a)
above shall not apply or be extended to any Single Bank
Credit.

(d)   It is understood that prior to invoking the
benefits of subsection (a) or (b) above, during any negotia-
tion of a Substitute Interest Rate and in making any deter-
mination pursuant to subsection (b) above, each Affected
Bank or Syndicate Member will use all reasonable efforts
exercised in good faith to avoid the need to implement
the provisions of this Section and to provide the lowest
feasible alternate interest rate, all without affecting or
diminishing the obligations of the Obligor under this
Section.

SECTION 3.07  Miscellaneous Interest Provisions.
(a) Determination of Interest Rates.   The interest rate and
the LIBO Rate for the Interim Rate and each Interest
Period and Overdue Period shall be determined by the Servic-
ing Bank on the basis of applicable quotations for the LIBO
Rate furnished to and received by the Servicing Bank from

3 - 5

the Reference Banks prior to 3:00 P.M. (New York City time)
two Business Days prior to the first day of the applicable
period.   Each Reference Bank agrees to advise the Servicing
Bank at such times forthwith by telephone, telex, telegram
or cable of the applicable rate, if any, offered to it at
11:00 A.M. (London time) on each such day.   If any one or
more of the Reference Banks shall not so furnish a quotation
of the applicable rate to the Servicing Bank for any such
period, the interest rate for such period shall be based
upon the quotations furnished to the Servicing Bank by the
other Reference Banks.   Not later than one Business Day
prior to each Interest Period and Overdue Period, the
Servicing Bank shall give telex notice to the Obligor, each
Agent and each Bank of the interest rate determined for
each Interest Period and Overdue Period as hereinabove
provided and the applicable rate quoted by each Reference
Bank, and such notice shall be conclusive and binding for
all purposes in the absence of manifest error.

          (b)   <u>Calculations of Interest</u>.   Each interest rate
specified in this Agreement is a per annum percentage rate.
All computations of interest shall be made on the basis of a
year of 360 days for the actual number of days (including
the first day but excluding the last day) occurring in the
period for which interest is payable. Each Agent shall
advise the Servicing Bank by telex or cable, at least
90 days before each Interest Payment Date, of the aggregate
amount of interest payable by the Obligor hereunder on such
Interest Payment Date to the Syndicate Members of each
Syndicate of such Agent.   Simultaneously, each Agent
shall advise by telex or cable each such Syndicate Member of
the amount of interest payable to it on such Interest
Payment Date.   Each Bank which has a Single Bank Credit
shall advise the Servicing Bank by telex or cable, at least
90 days before each Interest Payment Date, of the amount of
interest payable by the Obligor hereunder on such Interest
Payment Date to such Bank with respect to such Single Bank
Credit.   On the basis of the information received by it
the Servicing Bank shall advise the Obligor by telex or
cable at least 60 days before each Interest Payment Date of
the aggregate amount of interest payable to the Banks
hereunder on such Interest Payment Date, which advice shall
be conclusive and binding for all purposes in the absence of
manifest error.

          With respect to interest payable on the Recon-
ciliation Date, the foregoing provisions shall apply to the
extent practicable.   Otherwise the notifications by each
Agent, each Bank having a Single Bank Credit and the
Servicing Bank shall be made as soon as the interest payable
on the Reconciliation Date can be determined by the appro-
priate Agent or Bank.

3 - 6

SECTION 3.08.   Interest Accruals Under the Existing Agreements.   (a) Any payment of the Reference Date Interest on a Credit on or prior to the Effective Date shall be applied to the interest payment obligations on such Credit under this Agreement and the applicable Existing Agreement.   If the Effective Date does not occur, the interest payment obligations on each Credit shall continue to be governed by the terms of the applicable Existing Agreement.

(b)  With respect to each Existing Agreement under which the interest rate is determined by a referenced rate (such as LIBO, PIBO, prime rate, base rate, etc.), the Obligor consents to any change of the periods for which such referenced rate is calculated under such Existing Agreement which (i) permits the calculation of such referenced rate for the period from the date of this Agreement to the Reconciliation Date or (ii) shortens any period for which such referenced rate would otherwise be calculated so that such period ends on the Reconciliation Date.   Any such change of such periods under any Existing Agreement in accordance with its terms shall be binding upon the Obligor for the purpose of calculating the interest obligations under such Existing Agreement if the Effective Date does not occur.

4 - 1

## ARTICLE IV

## PRINCIPAL PAYMENTS

SECTION 4.01.   Scheduled Payments.   The Obligor shall repay the Outstanding Principal Amount of each Credit as follows:

(a)   The First Principal Payment shall be repaid as provided in Section 2.01(a).

(b)   The Second Principal Payment shall be repaid on the last day of the Month in which the first anniversary of the date of this Agreement occurs.

(c)   The Third Principal Payment shall be repaid on the last day of the Month in which the second anniversary of the date of this Agreement occurs.

(d)   The Fourth Principal Payment shall be repaid on the last day of the Month in which the third anniversary of the date of this Agreement occurs.

(e)   The Fifth Principal Payment shall be repaid on the last day of the Month in which the fourth anniversary of the date of this Agreement occurs.

(f)   Thereafter, each Credit shall be repaid in eleven approximately equal semi-annual installments in an amount equal to a Subsequent Principal Payment on each of the last eleven Interest Payment Dates, commencing with the Interest Payment Date which is the last day of the Month in which the fifth anniversary of the date of this Agreement occurs and ending with the Interest Payment Date which is the last day of the Month in which the tenth anniversary of the date of this Agreement occurs, provided that the last such installment shall repay in full the remainder of each Credit then outstanding.

4 - 2

SECTION 4.02.   Mandatory Prepayments Upon More Favorable Payments of Other Credits.   If after the Reference Date the Obligor shall apply any Foreign Currency or permit the Bank of Zaire or any Governmental Agency or Governmental Enterprise to apply any Foreign Currency to repay, in whole or in part, the principal amount of any Other Credit, the Obligor shall on the next Interest Payment Date prepay for the account of the Banks pro rata an aggregate principal amount of the Credits then outstanding which bears the same relationship to the aggregate principal amount of all Credits then outstanding (before giving effect to such repayment thereof) as the principal amount of such Other Credit so repaid bears to the aggregate principal amount of such Other Credit outstanding on the date of such repayment (before giving effect to such repayment), provided that this subsection shall not apply to any repayment with respect to any Other Credit:

(i)   if both (x) the amount of all repayments of such Other Credit in the calendar year in which such repayment is made does not exceed $500,000 (or its equivalent in another currency) and (y) the sum of such repayment and all other repayments of Other Credits made in the calendar year in which such repayment is made does not exceed $5,000,000 (or its equivalent in other currencies); or

(ii)   if made from Assets subject to a Lien existing on the date hereof and created to secure or provide for the payment of such Other Credit or from the proceeds of such Assets; or

(iii)   if made pursuant to the present arrangements with the Paris Club referred to in clause (C) of the recitals hereto; or

(iv)   if such repayment does not, together with all payments in Foreign Currency of such Other Credit after the Reference Date, cause a greater proportion of such Other Credit to be repaid in Foreign Currency after the Reference Date than the proportion of the Credits paid hereunder by the same date, all calculated by reference to the principal amount of each Credit and each Other Credit outstanding on the Reference Date; or

(v)   for which either (x) the Société Zairoise de Commercialisation des Minerais or (y) La Générale des Carrières et des Mines is the primary obligor and which is paid out of the Foreign Currency of such primary obligor.

4 - 3

Each partial prepayment with respect to a Credit pursuant to this Section shall reduce the principal installments applicable to such Credit in inverse order of their maturities. The Obligor shall give the Servicing Bank irrevocable notice of any prepayment pursuant to this Section at least five Business Days prior thereto, specifying the principal amount of Credits to be prepaid and the date of such prepayment, whereupon the principal amounts so specified, together with interest accrued thereon, shall become due and payable on the date so specified.

For the purposes of this Section 4.02, it is understood that repayment of the Other Credits listed below in the circumstances described below shall not be considered to be more favorable so as to give rise to a prepayment obligation under this Section 4.02:

(a)   any Other Credit entitled to the benefits of the arrangement described in item 3 of paragraph B of Schedule C if such Other Credit is repaid in accordance with its existing repayment schedule;

(b)   any Other Credit payable to the IBRD or any similar multilateral or international development bank or lending institution if such Other Credit is repaid in accordance with its existing repayment schedule;

(c)   any Other Credit repaid in accordance with future rescheduling arrangements with the Paris Club if such future arrangements are not substantially more favorable to such Other Credit than are the present arrangements with the Paris Club referred to in clause (C) of the recitals to this Agreement.

SECTION 4.03.   Other Prepayments. (a) Optional Prepayments. The Obligor may, upon at least 30 Business Days' notice to the Servicing Bank stating the proposed date and aggregate principal amount of the prepayment, and if such notice is given the Obligor shall, prepay the outstanding aggregate principal amount of the Credits in whole or ratably in part on any Business Day with accrued interest to the date of such prepayment on the principal amount prepaid, provided that each partial prepayment shall be in an aggregate principal amount not less than $5,000,000 and shall be applied to the principal installments of each Credit in the inverse order of their maturities.   It is understood that if such prepayment is made on any day other than an Interest Payment Date the indemnity contained in Section 12.05(b) shall apply to such prepayment.

(b)   Prepayments after Change of Circumstances.

If either

(i)   the introduction of or any change in or in the interpretation of any law or regulation shall make it unlawful, or any central bank or

4 - 4

other governmental authority shall assert that it is unlawful, for any Bank to continue to fund or maintain any Credit or to perform its obligations hereunder, upon demand by such Bank given to the Obligor (with a copy to the Servicing Bank and the Agent of such Bank) the Obligor shall forthwith upon the occurrence of such actual or asserted illegality, or

(ii)  any Bank shall claim payment of increased costs or reduced amounts receivable pursuant to Section 5.06, the Obligor may, upon at least 15 Business Days' notice to the Servicing Bank stating that the Obligor intends to prepay the Credits of such Bank, and if such notice is given the Obligor shall (on the next Interest Payment Date after such notice period),

prepay in full all Credits of such Bank with accrued interest thereon and all other amounts payable to such Bank by the Obligor hereunder.  If any Bank demands prepayment pursuant to clause (i) above, it shall furnish to its Agent and the Obligor documentation which substantiates the actual or asserted illegality which gives rise to such demand.

5 - 1

## ARTICLE V

### OTHER PAYMENT PROVISIONS

SECTION 5.01.  **Servicing Bank's Fees.** The Obligor shall pay fees to the Servicing Bank for acting as Servicing Bank hereunder, as provided in a letter dated March 28, 1980 from the Servicing Bank to the Obligor, a copy of which has been delivered to each of the Agents and Banks.

SECTION 5.02.  **Making Payments.**  (a)  **Place of Payment.**  Each payment to be made by the Obligor pursuant to this Agreement shall be made in Dollars in New York Clearing House funds (or such other funds as may at the time be customary for the settlement in New York City of international payments in Dollars) prior to 11:00 A.M. (New York City time) on the day such payment is due.  Each such payment with respect to

    (i)   all amounts payable pursuant to Section 2.01,

    (ii)  the principal amount of any Credit,

    (iii) interest on any Credit,

    (iv)  fees and other amounts payable to the Servicing Bank and the Agents for their own account pursuant to Sections 5.01 and 12.05, and

    (v)   any other amount which the relevant provision hereof expressly requires to be paid to the Servicing Bank

shall be paid to Account No. 30001206 at The Bank of Tokyo, Ltd., New York Agency, 100 Broadway, New York, N.Y. 10005 (or to such other account of the Servicing Bank at a commercial bank in New York City as the Servicing Bank shall designate in a notice to the Obligor) for the account of The Bank of Tokyo Trust Company, as Servicing Bank, for the account of the party or parties entitled thereto.  All other payments by the Obligor under this Agreement shall be made directly to the party entitled thereto at such account at such commercial bank in the United States as such party shall specify in a notice to the Obligor or as such party and the Obligor shall otherwise agree.  Contemporaneously with any payment made to the Servicing Bank hereunder, the Obligor will advise (by telex or otherwise in writing) the Servicing Bank as to the party or parties for whose account, and the purpose for which, such payment is made.  Upon

5 - 2

receipt of such funds the Servicing Bank shall, subject to Section 5.03, promptly cause such monies in like funds to be distributed to such party or parties for such purpose; _provided_ that until so distributed such funds shall be held in trust for the party or parties entitled thereto pursuant to the provisions hereof.  Any distribution by the Servicing Bank with respect to the Credits of the Syndicate Members in any one Syndicate shall be made by the Servicing Bank to the Agent for such Syndicate for the account of such Syndicate Members, and upon receipt such Agent shall distribute like funds to the Syndicate Members entitled thereto;  _provided_ that until so distributed such funds shall be held in trust for the party or parties entitled thereto pursuant to the provisions hereof.  Contemporaneously with any payment made by the Servicing Bank to any Agent, the Servicing Bank will advise such Agent as to the party or parties for whose account, and the purpose for which, such payment is made. Contemporaneously with any payment made by any Agent to any Syndicate Member, such Agent shall advise the purpose for which such payment is made.  Any distribution by the Servicing Bank with respect to any Single Bank Credit shall be made by the Servicing Bank directly to the Bank to which such Single Bank Credit is owed.  Amounts to be distributed with respect to any Credit of any Bank shall be distributed to such Bank for the account of the Lending Office for such Credit.

(b)  _Time of Discharge_.  Subject to the provisions of Section 5.08, any payment made by the Obligor or the Bank of Zaire (the purpose for which is advised to the Servicing Bank at the time of such payment as required above) and credited in the required funds to the appropriate account of the Servicing Bank referenced above, shall discharge the obligations of the Obligor at the time such account of the Servicing Bank is credited with such payment, irrespective of the time of any distribution of such payment by the Servicing Bank to the Agents or any Bank or by any Agent to any Bank.

(c)  _Payments on Business Days_.  Whenever any payment hereunder shall be stated to be due on a day other than a Business Day, such payment shall be made on the next succeeding Business Day, and such extension of time shall in such case be included in the computation of payment of interest.

(d)  _No Set-Off or Counterclaim_.  To the fullest extent permitted by law, the Obligor shall make all payments hereunder unconditionally in full without set-off, defense or counterclaim, including, without limitation, any defense or counterclaim based on any law, rule or policy which is now or hereafter promulgated by any governmental authority or regulatory body and which may adversely affect the obligation to make, or the right of any Bank to receive, such payments.

5 - 3

SECTION 5.03.   Special Rules as to Application of Payments.   (a)   Insufficient Funds; Ratable Distribution. If funds to be distributed by the Servicing Bank to the Agents and Banks are insufficient to make the relevant payments in full, the Servicing Bank shall (subject to subsection (c) of this Section) distribute such funds ratably in proportion to the amounts of the relevant payments due. If funds to be distributed by an Agent to two or more Syndicate Members in a Syndicate are insufficient to make the relevant payments in full, such Agent shall (subject to subsection (c) of this Section) distribute such funds to such Syndicate Members ratably in proportion to the amounts of the relevant payments due to each such Syndicate Member.

(b)   Purpose Not Identified.   If the Servicing Bank cannot identify the party or parties for whose account and the purpose for which funds received by it are to be applied and the Obligor does not advise the Servicing Bank of the party or parties for whose account and the purpose for which such funds are to be applied, within two Business Days after the Servicing Bank shall request such advice, the Servicing Bank shall (subject to subsection (c) of this Section) distribute such funds to pay the interest, principal and other amounts then due hereunder which are to be paid through the Servicing Bank pursuant to Section 5.02(a), in the following order: first, ratably to pay all such interest then due, second, ratably to pay all such principal then due and third, ratably to pay all such other amounts then due.

(c)   Application of Payments after a Declaration. All funds received or held by the Servicing Bank after a Declaration shall be distributed by the Servicing Bank to pay the principal, interest and other amounts then due hereunder which are to be paid through the Servicing Bank pursuant to Section 5.02(a) in the following order: first, ratably to pay all such principal then due, second, ratably to pay all such interest then due and third, ratably to pay all such other amounts then due.   Any Bank may apply funds received by it pursuant to this subsection in a different order, but such application shall not affect the duties of the Servicing Bank or any Agent or the obligations of the Obligor hereunder.

SECTION 5.04.   Sharing of Payments; Etc. If any Bank shall obtain any payment (whether voluntary, involuntary, through the exercise of any right of set-off, or otherwise) on account of its Credits (other than pursuant to Section 3.06(b) or 4.03(b)) in excess of its ratable share of payments on account of the Credits obtained by all the Banks, such Bank shall forthwith purchase from the other Banks such participations in their Credits as shall be

5 - 4

necessary to cause such purchasing Bank to share the excess payment ratably with each of them; _provided_ that if all or any portion of such excess payment is thereafter recovered from such purchasing Bank, the purchase shall be rescinded and the purchase price restored to the extent of such recovery, but without interest;  it being understood that this Section shall not impair any right of any Bank to apply amounts obtained by it to pay indebtedness other than indebtedness of the Obligor under this Agreement nor impose any obligation to obtain payment of the Credits in any manner.   The Obligor agrees that any Bank so purchasing a participation from another Bank pursuant to this Section 5.04 may, to the fullest extent permitted by law, exercise all its rights of payment (including any right of set-off provided by law) with respect to such participation as fully as if such Bank were the direct creditor of the Obligor in the amount of such participation. Each Bank purchasing any such participation from another Bank shall promptly notify its Agent, the Servicing Bank and the Obligor of each such purchase of a participation and any such rescission thereof.

SECTION 5.05.  _Evidence of Debt_.   Each Bank, with respect to Credits owed to it, each Agent, with respect to Credits of its Syndicates, and the Servicing Bank, with respect to all the Credits, shall maintain on its books control accounts setting forth the amounts of principal, interest and other sums paid and payable by the Obligor from time to time hereunder with respect thereto.   In case of any dispute, action or proceeding relating to any Credit, the entries in each such account shall be _prima facie_ evidence of the amount of such Credit and of such amounts paid and payable.   In case the entries in such accounts are not identical, each Agent's account shall be considered correct in the absence of manifest error with respect to Credits of its Syndicates, and the account of each Bank having a Single Bank Credit shall be considered correct in the absence of manifest error with respect to such Single Bank Credit.

SECTION 5.06.   _Increased Costs_.   If, due to either (1) the introduction after the date of this Agreement of or any change after the date of this Agreement in or in the interpretation of any law or regulation (including any regulation relating to reserve requirements) or (ii) the compliance with any request after the date of this Agreement from any central bank or other governmental authority (whether or not having the force of law), there shall be any (A) increase in the cost to any Bank of funding or maintaining its Credits or (B) reduction in the amount of any payment received or receivable by any Bank in respect of its Credits, then the Obligor shall from time to time, upon demand by such Bank (with a copy of such demand to the Servicing Bank and Agent for such Bank), pay to the Servicing Bank for account of such Bank additional amounts sufficient to indemnify such Bank against such increased cost or reduced amount.   A certificate as to the amount of such increased cost or reduced amount, submitted to the Obligor and the Servicing Bank and each such Agent by such

5 - 5

Bank, shall be conclusive and binding for all purposes in the absence of manifest error. It is understood that this Section does not apply to any increase in the income or franchise taxes levied by any jurisdiction (or political subdivision or taxing authority thereof) under the laws of which a Bank is organized or in which the Lending Office of such Bank is located.

SECTION 5.07.  Taxes.  (a)  All payments by the Obligor in respect of principal, interest, fees and other amounts due hereunder shall be made free and clear of and without deduction for any and all present and future taxes, levies, imposts, deductions, charges and withholdings, and all liabilities with respect thereto, asserted, imposed, levied, collected or assessed on or as a result of the payment of any such amounts either by the Republic of Zaire or by any jurisdiction from which any such payment by the Obligor is made (and any political subdivision or taxing authority of either thereof or therein), provided that this subsection shall not apply to any income and franchise taxes of, in the case of each Bank and Agent and the Servicing Bank, the jurisdiction under the laws of which such Bank, Agent or the Servicing Bank (as the case may be) is organized and, in the case of each Bank, the jurisdiction of such Bank's Lending Office and any political subdivision or taxing authority of either thereof or therein (all such non-excluded taxes, levies, imposts, deductions, charges, withholdings and liabilities being hereinafter referred to as "Taxes"). Within 45 days after the date of each such payment hereunder, the Obligor will also furnish to the Servicing Bank for the account of each Agent and Bank the original or a certified copy of a receipt for payment of any Taxes payable in respect of any such payment.

(b)  In addition, the Obligor will pay any taxes on the acquisition of debt obligations of a foreign obligor and any stamp or similar taxes of any jurisdiction with respect to the execution, delivery, registration, performance and enforcement of this Agreement, Taxes specified in subsection (a) above and Taxes with respect to any amount paid under this subsection (b). If any Taxes specified in subsection (a) above or any taxes mentioned in this subsection (b) are paid by any Bank, Agent or the Servicing Bank, or are asserted, imposed, levied or assessed against and paid by any affiliate thereof, the Obligor will, upon demand of such Bank, Agent, Servicing Bank or affiliate and whether or not such Taxes or taxes shall be correctly or legally asserted, indemnify such Bank, Agent, Servicing Bank or affiliate (as the case may be) for such payments, together with any interest, penalties and expenses in connection therewith plus interest thereon at the then current rate in effect pursuant to Section 3.03, provided that no Bank or Agent nor the Servicing Bank shall voluntarily pay any such Taxes or taxes prior to the thirtieth day after it shall have notified the Obligor that it proposes to do so, unless in its opinion failure to pay the same before such thirtieth day would result in the imposition of fines, penalties or

5 - 6

other sanctions against it.   Each Bank, each Agent and the
Servicing Bank agree to remit promptly to the Obligor any
amount so indemnified by the Obligor which is refunded by
the appropriate taxing authority.

(c)   Without prejudice to the survival of any
other agreement of the Obligor hereunder, the agreements of
the Obligor contained in this Section 5.07 shall survive
the payment in full of the Credits.

SECTION 5.08.   Payments Subsequently Repaid.   If
(a) all or any portion of any payment to the Servicing Bank
or any Agent or Bank in respect of any amount payable by
the Obligor hereunder shall at any time be repaid to the
Obligor or Bank of Zaire in compliance with an order of a
court of competent jurisdiction and (b) at such time such
amount is due and payable hereunder, the Obligor shall
concurrently with such repayment become obligated hereunder
to make a payment in the same amount to the Servicing Bank
or such Agent or Bank, as the case may be.   Such obliga-
tion shall be deemed to arise at such time for purposes of
any statute of limitations.

SECTION 5.09.   Funds Incorrectly Disbursed.   If
due to inaccurate instructions from the Obligor or the Bank
of Zaire or any other reason, the Servicing Bank disburses
funds to any Agent or Bank or any Agent disburses funds to
any Bank either (x) in excess of the ratable share allocable
to such Agent or Bank or (y) on an assumption which proves
to be inaccurate that sufficient funds for such payment have
been provided to the Servicing Bank by the Obligor or the
Bank of Zaire, or to such Agent or Bank by the Servicing
Bank or the Obligor or the Bank of Zaire, then immediately
upon receipt of such notice of such incorrect disbursement the
recipient Agent or Bank shall promptly remit a like amount,
in funds similar to those incorrectly disbursed, to the
Servicing Bank or such Agent, as the case may be, together
with interest thereon for each day during which such recipi-
ent Agent or Bank had such amount available for its use,
calculated at the rate per annum at which interbank adjust-
ments for late payments are customarily made in New York
City among New York Clearing House Banks.

SECTION 5.10.   Special Provisions for the Guilder
Credits.   (a)   Initial Payments.   All payments with respect
to the Guilder Credits to be made pursuant to Section 2.01
shall be made in Guilders in the amounts specified on the
Credit Information Schedule for the Guilder Credits.

(b)   Interest from the Reference Date to the
Reconciliation Date.   The provisions of Section 3.02(b) to
the contrary notwithstanding, the interest rate applicable
to the Guilder Credits from the Reference Date to the
Reconciliation Date shall be a fluctuating interest rate
equal at all times to the sum of (i) the official discount
rate for promissory notes of De Nederlandsche Bank N.V.,
(ii) two per cent (2%) and (iii) any money market surcharge

5 - 7

applied generally by Rabomerica from time to time, each change in such fluctuating rate to take effect simultaneously with any change in items (i) and (iii) above, provided that during the period from and after the date of this Agreement item (ii) shall be reduced from two percent (2%) to the Applicable Margin.   Rabomerica will inform the Obligor, the Servicing Bank and each Syndicate Member for which it acts as Agent not later than 60 days before the Reconciliation Date of the interest payable to each such Syndicate Member on the Reconciliation Date in Guilders by the Obligor.

(c)   Interest from the Reconciliation Date. Section 3.03 shall apply to the Guilder Credits from and after the Reconciliation Date.

(d)   Guilder Payments.   All payments required to be made by the Obligor hereunder in Guilders shall be made not later than 11:00 A.M. (Amsterdam time) on the day when due to Rabomerica in such funds as shall at the time be customary for the settlement of international payments in Guilders by deposit of such funds in account no.60.01.86.970 at De Nederlandsche Bank N.V., Amsterdam, Netherlands for the account of Rabomerica International Bank N.V. for the account of the party or parties entitled thereto, with a separate telex advice to Rabomerica as to the party or parties for whose account, and the purpose for which such payment is made.   Rabomerica will promptly thereafter cause like funds to be distributed to each Syndicate Member for which it acts as Agent in accordance with the provisions of Section 5.02(a) and Section 5.03, provided that until so distributed such funds shall be held in trust for the party or parties entitled thereto pursuant to the provisions hereof.

(e)   Conversion of Guilder Credits on the Reconciliation Date.   The principal amount outstanding of each Guilder Credit shall be converted into Dollars for all purposes on the Reconciliation Date.   Such conversion shall be effected at an exchange rate equal to the official quotation of the Amsterdam Exchange in Dollars two Amsterdam banking days (i.e., days on which the Amsterdam Exchange is open for business) before the Reconciliation Date for the spot sale, against delivery of Dollars, of Guilders in an amount approximately equal to the aggregate principal amount outstanding of the Guilder Credits.   Rabomerica shall promptly inform the Obligor, the Servicing Bank, each other Agent and each Syndicate Member for which it acts as Agent of such exchange rate and of the respective Dollar amounts of each Guilder Credit as so converted.   From and after the Reconciliation Date, all payments of principal and interest on the Guilder Credits shall be made in Dollars and the special provisions of this Section 5.10 shall no longer apply to the Guilder Credits, except that for the purpose of calculating each of the Second, Third, Fourth and Fifth Principal Payments on the Guilder Credits, the Dollar equivalent of the Reference Date Principal of such Credits

5 - 8

shall be determined by using the foregoing exchange rate and the amount of each Subsequent Principal Payment shall be calculated by reference to the Dollar amount of such Credits outstanding on the last day of the Month in which the fifth anniversary of the date of this Agreement occurs.

SECTION 5.11.  Special Provisions for the Swiss Franc Credit.   (a)  Initial Payments.   All payments with respect to the Swiss Franc Credit to be made pursuant to Section 2.01 shall be made in Swiss Francs in the amounts specified on the Credit Information Schedule for such Credit.

(b)  Interest from the Reference Date to the Reconciliation Date.   The provisions of Section 3.02(b) to the contrary notwithstanding, the interest rate applicable to the Swiss Franc Credit from the Reference Date to the Reconciliation Date shall be equal at all times to 9 3/4% per annum (being the sum of the Applicable Margin and an agreed Swiss Franc LIBO for the period from the Reference Date to the Reconciliation Date).  Lloyds Bank International Limited ("Lloyds") will inform the Obligor and the Servicing Bank not later than 60 days before the Reconciliation Date of the interest payable to it on the Reconciliation Date in Swiss Francs by the Obligor.

(c)  Interest from the Reconciliation Date.   Section 3.03 shall apply to the Swiss Franc Credit from and after the Reconciliation Date.

(d)  Swiss Franc Payments.   All payments required to be made by the Obligor hereunder in Swiss Francs shall be made not later than 11:00 A.M. (Zurich time) on the day when due to Lloyds in such funds as shall at the time be customary for the settlement of international payments in Swiss Francs by deposit of such funds in account no. 4425605V at Union Bank of Switzerland in Zurich for the account of Lloyds.

(e)  Conversion of Swiss Franc Credit on the Reconciliation Date.   The principal amount outstanding of the Swiss Franc Credit shall be converted into Dollars for all purposes on the Reconciliation Date.  Such conversion shall be effected at an exchange rate equal to the official quotation of Union Bank of Switzerland in Dollars two Swiss banking days (i.e., days on which Union Bank of Switzerland is open for business) before the Reconciliation Date for the spot sale, against delivery of Dollars, of Swiss Francs in an amount approximately equal to the aggregate principal amount outstanding of the Swiss Franc Credit.  Lloyds shall promptly inform the Obligor, the Servicing Bank and each Agent of such exchange rate and of the Dollar amount of the Swiss Franc Credit as so converted.  From and after the Reconciliation Date, all payments of principal and interest on the Swiss Franc Credit shall be made in Dollars and the special provisions of this Section 5.11 shall no longer apply to the Swiss Franc Credit, except that for the purpose of calculating each of the Second, Third, Fourth and Fifth

5 - 9

Principal Payments on the Swiss Franc Credit, the Dollar
equivalent of the Reference Date Principal of such Credit
shall be determined by using the foregoing exchange rate and
the amount of each Subsequent Principal Payment shall be
calculated by reference to the Dollar amount of such Credit
outstanding on the last day of the Month in which the fifth
anniversary of the date of this Agreement occurs.

SECTION 5.12.  Special Provisions for the Canadian
Dollar Credit.  (a)  Initial Payments.  All payments with
respect to the Canadian Dollar Credit to be made pursuant to
Section 2.01 shall be made in Canadian Dollars in the
amounts specified on the Credit Information Schedule for
such Credit.

(b)  Interest from the Reference Date to the
Reconciliation Date.  The provisions of Section 3.02(b) to
the contrary notwithstanding, the interest rate applicable
to the Canadian Dollar Credit from the Reference Date to the
Reconciliation Date shall be a fluctuating interest rate
equal at all times to the Existing Rate.  Bank of Montreal
will inform the Obligor and the Servicing Bank not later
than 60 days before the Reconciliation Date of the interest
payable to it on the Reconciliation Date in Canadian Dollars
by the Obligor.

(c)  Interest from the Reconciliation Date.
Section 3.03 shall apply to the Canadian Dollar Credit from
and after the Reconciliation Date.

(d)  Canadian Dollar Payments.  All payments
required to be made by the Obligor hereunder in Canadian
Dollars shall be made not later than 11:00 A.M. (Montreal
time) on the day when due to Bank of Montreal in such funds
as shall at the time be customary for the settlement of
international payments in Canadian Dollars by deposit of
such funds at the Bank of Montreal, International Banking,
129 St. James Street West, Montreal, Quebec for the account
of the Collection Centre of the Bank of Montreal.

(e)  Conversion of Canadian Dollar Credit on the
Reconciliation Date.  The principal amount outstanding of
the Canadian Dollar Credit shall be converted into Dollars
for all purposes on the Reconciliation Date.  Such conver-
sion shall be effected at an exchange rate equal to the
average of the official quotations of the head office of
Canadian Imperial Bank of Commerce, Royal Bank of Canada and
Toronto-Dominion Bank in Dollars two Canadian banking days
(i.e., days on which Canadian banks are open for business)
before the Reconciliation Date for the spot sale, against
delivery of Dollars, of Canadian Dollars in an amount
approximately equal to the principal amount outstanding of
the Canadian Dollar Credit.  Bank of Montreal shall promptly
inform the Obligor, the Servicing Bank and each Agent of
such exchange rate and of the Dollar amount of the Canadian
Dollar Credit as so converted.  From and after the Reconc-
iliation Date, all payments of principal and interest on the
Canadian Dollar Credit shall be made in Dollars and the

5 - 10

special provisions of this Section 5.12 shall no longer apply to the Canadian Dollar Credit, except that for the purpose of calculating each of the Second, Third, Fourth and Fifth Principal Payments on the Canadian Dollar Credit, the Dollar equivalent of the Reference Date Principal of such Credit shall be determined by using the foregoing exchange rate and the amount of each Subsequent Principal Payment shall be calculated by reference to the Dollar amount of such Credit outstanding on the last day of the Month in which the fifth anniversary of the date of this Agreement occurs.

6 - 1

ARTICLE VI

CONDITIONS OF EFFECTIVENESS

SECTION 6.01.   Conditions Precedent to the Effec-
tive Date.   The Effective Date shall be the day on which all
of the following conditions shall have been satisfied:

(a) The Servicing Bank shall have received:

(x)   payment in full of the following
amounts (as calculated and agreed upon
by the Obligor and the Servicing Bank):

(i) all of the amounts to be paid pur-
suant to Section 2.01 in Dollars;
and

(ii) the fees of the Servicing Bank
payable prior to the Effective Date
pursuant to Section 5.01;   and

(y)   confirmation by tested telex from (i)
Rabomerica that Rabomerica has received
payment in full of all amounts to be
paid pursuant to Section 2.01 in
Guilders in accordance with the provi-
sions of Section 5.10, (ii) Lloyds
Bank International Limited that it has
received payment in full of all amounts
to be paid pursuant to Section 2.01 in
Swiss Francs in accordance with the
provisions of Section 5.11 and (iii)
Bank of Montreal that it has received
payment in full of all amounts to be
paid pursuant to Section 2.01 in
Canadian Dollars in accordance with the
provisions of Section 5.12.

(b) The Servicing Bank shall have received
five executed originals for distribution to the Servic-
ing Bank, three Agents (as designated by the Majority
Agents) and counsel for the Agents (with sufficient
photocopies for distribution to each Agent and its
Syndicate Members) of each of the following, each dated
in accordance with the relevant Exhibit hereto:

(i)   a certificate of the Director of the
Office of the Presidency of the Republic of
Zaire in substantially the form of Exhibit 1
certifying the receipt of all government approvals
related hereto;

6 - 2

(ii)  a certificate of the Director of the
Office of the Presidency of the Republic of
Zaire in substantially the form of Exhibit 2 as to
the incumbency and true signatures of (A) the
officials of the Obligor authorized to execute and
deliver the Agreement on behalf of the Obligor and
the other documents required to be delivered on
behalf of the Obligor hereunder and (B) the
Governor of the Bank of Zaire;

(iii)  a certificate of the Governor of the
Bank of Zaire in substantially the form of
Exhibit 3 with respect to the incumbency and
true signatures of the officials of the Bank
of Zaire authorized to execute and deliver this
Agreement;

(iv)  a certificate of the Commissaire d'Etat
aux Finances et Budget or any other authorized
official of the Obligor in substantially the form
of Exhibit 4 as to the accuracy of the representa-
tions and warranties contained in Section 7.01;

(v)  a certificate of the Governor of the
Bank of Zaire in substantially the form of Exhibit
5 as to the accuracy of the representations and
warranties contained in Section 9.02;

(vi)  a letter from the New York Process
Agent in substantially the form of Exhibit 6;

(vii)  a letter from the London Process
Agent in substantially the form of Exhibit 7;

(viii)  an opinion of the Director of the
Office of the Presidency of the Republic of Zaire
as counsel to the Obligor and the Bank of Zaire,
in substantially the form of Exhibit 8;

(ix)  an opinion of Messrs. White & Case,
special United States counsel to the Obligor and
the Bank of Zaire, in substantially the form of
Exhibit 9;

(x)  an opinion of Cabinet Robert Berlippens,
special Zaire counsel to the Agents, in substan-
tially the form of Exhibit 10;

(xi)  an opinion of Messrs. Slaughter and
May, special English counsel to the Agents,
in substantially the form of Exhibit 11;  and

(xii)  an opinion of Messrs. Shearman
& Sterling, special United States counsel to the
Agents, in substantially the form of Exhibit
12.

6 - 3

The final proviso of Section 12.01 sets forth the circumstances in which documentation which varies from the above requirements may be accepted in satisfaction of the conditions precedent to the Effective Date set forth in this Section 6.01(b).

SECTION 6.02.   Action after the Effective Date. Immediately after all of the conditions set forth in Section 6.01 for the Effective Date have been satisfied, the Servicing Bank shall notify (by telex or cable) the Agents and the Obligor that such conditions have been satisfied and shall specify the day on which the Effective Date occurred.  Upon receipt of and in reliance upon such notice from the Servicing Bank, each Agent shall promptly notify (by telex or cable) each Syndicate Member for which it is Agent that the Effective Date has occurred, specifying the day on which it occurred.  The occurrence of the Effective Date shall not be affected by the failure of any Agent to give notice thereof to each such Syndicate Member.  As soon as practicable after the occurrence of the Effective Date, the Servicing Bank shall transmit to the three Agents designated by the Majority Banks an executed original of each document delivered in satisfaction of the conditions set forth in Section 6.01(b) and shall transmit to each Agent sufficient photocopies of such documents for distribution to each Syndicate Member in the Syndicates for which such Agent acts.

SECTION 6.03.   Consequences of the Effective Date. The parties to this Agreement agree that the occurrence of the Effective Date shall have the following consequences, automatically and without further action by or notice to any Person:

(a)   The refinancing contemplated by Section 2.02 shall be complete and effective for all purposes and the Obligor shall be the primary obligor on all Credits, from and after the Effective Date.

(b)   This Agreement shall exclusively control and govern the mutual rights and obligations of the parties hereto with respect to all Credits and the Existing Agreements shall be superseded and cancelled in all respects except as provided in this subsection (b) and in subsection (c) below; provided that if, for any reason whatsoever, this Agreement shall be adjudicated by a court of competent jurisdiction outside of the Republic of Zaire in any proceedings between any Bank and the Obligor, the Bank of Zaire or any Governmental Agency or Governmental Enterprise to be or have become void, unenforceable or ineffective with respect to any Credit or any

6 - 4

part thereof and such adjudication shall be
subject to no further appeal, the Existing
Agreement applicable to such Credit shall
control and govern the rights and obligations
of the parties hereto with respect to such
Credit or part thereof from the instant this
Agreement is so adjudicated and all amounts
previously received under this Agreement with
respect to such Credit or part thereof shall
be applied to the payment obligations under
such Existing Agreement;   and _provided
further_ that this Agreement shall continue to
control and govern exclusively the mutual
rights and obligations of the parties hereto
with respect to all Credits or parts thereof
not the subject of such adjudication.

(c)   The terms and provisions of each Existing
Agreement shall continue to govern each Other
Credit extended under such Existing Agreement
which is not a Credit subject to this Agree-
ment.

7 - 1

ARTICLE VII

REPRESENTATIONS AND WARRANTIES
OF THE OBLIGOR AND THE BANKS

SECTION 7.01.    Representations and Warranties of
the Obligor.    The Obligor represents and warrants to each
other party to this Agreement as follows:

(a)    The Obligor has full power and authority to
execute this Agreement, to repay all Credits and pay
interest thereon as primary obligor as provided in this
Agreement and    otherwise to perform and observe the
provisions of this Agreement on its part to be perfor-
med or observed.

(b)    The execution, delivery and performance by
the Obligor of this Agreement have been (or prior to
the Effective Date will have been) duly authorized by
all necessary legislative, administrative and other
governmental action in the Republic of Zaire, and
do not contravene (i) the Constitution of the Republic
of Zaire, (ii) any treaty, law, rule, regulation,
order, decree, writ, judgment, award, injunction or
similar legal restriction applicable to the Obligor or
this Agreement in the Republic of Zaire or (iii) any
contractual restriction contained in any loan or credit
agreement, guaranty or other agreement or instrument
which binds or affects the Obligor or any of its
Assets.

(c)    No authorization or approval (including
exchange control approval) or other action by, and no
notice to or filing with, any governmental authority or
regulatory body is required under law applicable to
this Agreement in the Republic of Zaire for the due
execution, delivery and performance by the Obligor of
this Agreement except for the approval of the Bank of
Zaire which has been duly obtained and is in full force
and effect by virtue of the execution of this Agreement
by the Bank of Zaire and except for those listed in
Exhibit 1, all of which either have been duly obtained
or made or will be duly obtained or made prior to the
Effective Date and all of which will be in full force
and effect on the Effective Date.

(d)    This Agreement has been duly executed and
delivered by the Obligor and is the legal, valid and
binding obligation of the Obligor enforceable against
the Obligor in accordance with its terms.

7 - 2

(e)   This Agreement and each payment obligation
of the Obligor hereunder is a direct, unconditional and
general obligation of the Obligor as primary obligor.

(f)   The payment obligations of the Obligor
under this Agreement rank at least pari passu in
priority of payment with all other External Indebted-
ness of the Obligor.

(g)   To the knowledge of the Obligor, there are
no Liens upon or with respect to any of the present or
future Assets of the Obligor, the Bank of Zaire or any
Governmental Agency or Governmental Enterprise which
secure or provide for the payment of any External
Indebtedness of any Person except for those listed on
Schedule C.

(h)   To the knowledge of the Obligor, there is no
pending or threatened action or proceeding affecting
the Obligor, the Bank of Zaire or any Governmental
Agency or Governmental Enterprise or any of their
respective Assets before any court, governmental agency
or arbitrator which would, if adversely determined,
materially adversely affect the ability of the Obligor
to comply with its payment obligations hereunder
or which purports to affect the legality, validity or
enforceability of this Agreement.

(i)   The Obligor is subject to civil and commer-
cial law with respect to its obligations hereunder.
Neither the Obligor nor any of its Assets has any
immunity from jurisdiction of any court or from
any legal process (whether through service or notice,
attachment prior to judgment, attachment in aid of
execution, execution or otherwise) in the Republic of
Zaire or under its laws.  The execution and delivery of
this Agreement by the Obligor and the performance of
its obligations hereunder constitute private and
commercial acts rather than public or governmental
acts.  The Republic of Zaire is not a party to any
treaty or other agreement with the United States of
America (or any other nation or sovereign) which
relates to any immunity from jurisdiction of any court
or from any legal process which could be deemed applic-
able to any transaction contemplated hereby.

(j)   There is no tax, levy, impost, deduction,
charge or withholding imposed by the Republic of Zaire
or any political subdivision or taxing authority
thereof or therein (i) on or by virtue of the execution
or delivery of this Agreement or any other document to

7 — 3

be furnished hereunder or (ii) on any payment to be made by the Obligor pursuant to this Agreement, provided that any Credits carried as assets on the books of, and any payments made in respect of any such Credits to, any Lending Office or other branch of a Bank located in the Republic of Zaire are subject to taxation in accordance with the laws of the Republic of Zaire.

(k)  To ensure the enforceability or admissibility in evidence of this Agreement in the Republic of Zaire, it is not necessary that this Agreement or any other document be filed or recorded with any court or other authority in the Republic of Zaire or that any stamp or similar tax be paid on or in respect of this Agreement.

SECTION  7.02.  Representations and Warranties of the Banks. Each Bank represents and warrants and agrees to and with each other Bank, each Agent and the Servicing Bank as follows:

(a)  Independent Investigation by Each Bank. Such Bank is familiar with such matters (including without limitation the economic and financial condition of the Obligor and the Bank of Zaire) as in its opinion may affect the performance by the Obligor and the Bank of Zaire of their respective obligations hereunder and in that connection has made its own independent appraisal of the economic affairs, financial condition, foreign exchange and reserve holdings, prospective foreign exchange income and holdings, creditworthiness, condition, affairs, status and nature of the Obligor and the Bank of Zaire.  It will continue to be solely responsible for making its own independent appraisal of all such matters in the future and has not relied, and will not hereafter rely, on any other Bank or on any Agent or the Servicing Bank (i) to check or inquire on such Bank's behalf into the adequacy, accuracy or completeness of the Information Memorandum or the World Bank Report or any information provided by the Obligor or the Bank of Zaire in connection herewith, whether or not such information has been or is hereafter distributed by any other Bank, any Agent or the Servicing Bank or any of their respective affiliates, (ii) to assess or keep under review on such Bank's behalf such information or any of the matters referred to in this subsection or (iii) to inform such Bank concerning the results of any such appraisal, check, inquiry, assessment or review made by

7 - 4

such other Bank or any Agent or the Servicing Bank
or any of their respective affiliates.   Each Bank
acknowledges that the World Bank Report is available to
it upon request to the World Bank and that such Bank
has received the World Bank Report to the extent
requested by it.

(b)   Independent Appraisal by Each Bank.   In
deciding whether or not to enter into this Agreement,
such Bank has relied upon its own independent appraisal
of the matters referred to in clause (a) above, and
such Bank expressly agrees that it is not relying upon
[i] any representation or warranty, express or implied,
made to it by any other Bank, any Agent, the Servicing
Bank or any of their respective affiliates with respect
to the information contained in the Information Memor-
andum or the World Bank Report or in any other oral or
written communication to such Bank relating to the
Obligor, the Bank of Zaire or the matters contemplated
herein or (ii) any oral or written communication made
by any other Bank, any Agent or the Servicing Bank or
any of their respective affiliates.

(c)   Parties Having Other Credit Relationships.
Such Bank is aware that the Servicing Bank, each
Agent and each other Bank and their respective affil-
iates may have, in addition to this Agreement and
the Existing Agreements, existing credit relation-
ships with the Obligor, the Bank of Zaire and other
Persons organized under the laws of or located in the
Republic of Zaire and that in many cases these existing
relationships are substantial and in some cases involve
existing agency or similar responsibilities of the
Servicing Bank, the Agents, other Banks or their
respective affiliates.   Such Bank acknowledges and
accepts that such other relationships in fact exist and
that the existence, nature and extent of each such
other relationships have not been specifically dis-
closed to such Bank and that each other Bank, each
Agent, the Servicing Bank and their respective affil-
iates may also in the future accept deposits from,
lend money to, act as trustee under indentures of, act
as agent or in similar function under any credit
relationship with, and generally engage in any kind of
business with, the Obligor, the Bank of Zaire and any
other Person, all as if such other Bank, Agent or
the Servicing Bank were not a party to this Agreement.
Such Bank acknowledges that the Servicing Bank, each
other Bank, each Agent and their respective affili-
ates may exercise all contractual and legal rights and
remedies which may exist from time to time with respect
to such other existing and future relationships without
any duty to account therefor to such Bank.

7 - 5

(d)  No Duty to Investigate Events of Default.
Except as otherwise provided in Section 10.02(e), the
Banks, the Agents and the Servicing Bank shall have
no duty or obligation to any Bank to ascertain or
inquire or inform it as to the occurrence of any Event
of Default or any event or condition which, with the
giving of notice or the lapse of time or both, or upon
a determination, would constitute an Event of Default
and each Bank, each Agent and the Servicing Bank
and their respective affiliates may communicate in
writing or orally with the Obligor, the Bank of Zaire,
any Bank or Agent, the Servicing Bank or any other
Person about the occurrence of any such Event of
Default, event or condition or about any other matter
whatsoever arising in the administration, coordination
and performance of this Agreement, all without communi-
cating with any Bank about any such matter. Each Bank
may in its discretion, but without any obligation to
any other Bank, any Agent or the Servicing Bank,
notify the Agent of any Syndicate in which such Bank
is a Syndicate Member of the occurrence of any such
Event of Default, event or condition by giving a Notice
of Default with respect thereto.  However, in no event
shall any Bank, any Agent (except as provided in
Section 10.02(e)) or any of their respective affil-
iates be under any duty to notify any Bank, any
Agent or the Servicing Bank about any "Event of De-
fault", any event or condition which could become an
"Event of Default" or any other default under any other
agreement relating to any credit relationship referred
to in clause (c) above or about any matter relating to
any such agreement.

8 - 1

ARTICLE VIII

COVENANTS AND INSTRUCTION

SECTION 8.01. Affirmative Covenants of the Obligor. So long as any Credit shall remain outstanding, the Obligor will:

(a)  Undertake to include in its budget for each of its fiscal years amounts sufficient to repay principal of and interest on the Credits and all other amounts payable by the Obligor hereunder in accordance with the terms hereof.

(b)  Duly obtain and maintain in full force and effect all governmental approvals (including any exchange control approvals) which may be necessary under the law of the Republic of Zaire for the execution, delivery and performance of this Agreement by the Obligor or for the validity or enforceability hereof and duly take all necessary and appropriate governmental and administrative action in the Republic of Zaire in order to make all payments to be made hereunder as required by this Agreement.

(c)  Ensure that at all times its payment obligations hereunder constitute unconditional general obligations of the Obligor ranking at least pari passu in priority of payment with all other External Indebtedness of the Obligor now or hereafter outstanding.

(d)  Furnish to the Servicing Bank and to each Agent in sufficient copies for distribution to the Syndicate Members in each of its Syndicates:

(i)  semiannually, within 180 days after the end of each calendar year and half-year, a reasonably detailed report and analysis on the financial and economic condition of the Obligor as of the end of such period or, in the case of each half-year period, an update of the report covering the previous calendar year, in each case prepared by the Obligor and the Bank of Zaire and including, among other matters, all of the items set forth in Schedule D hereto;

(ii)  within 30 days after delivery to the Obligor or the Bank of Zaire and to the extent not specifically prohibited by the IMF, each annual report prepared by the IMF staff after the date hereof on the economy and international balance of payments of the Obligor or any report prepared by the IMF staff in lieu of such an annual report;

8 - 2

(iii)   promptly after it is entered into and to
        the extent not specifically prohibited by
        the IMF or the IBRD, each agreement, under-
        taking and understanding reached by the
        Obligor, the Bank of Zaire or any Govern-
        mental Agency after the date hereof with the
        IMF or the IBRD;

(iv)    within 30 days after with the transmittal
        thereof to the IMF and to the extent not
        specifically prohibited by the IMF, copies
        of all economic or financial reports on the
        performance of the economy or financial
        condition of the Republic of Zaire which are
        transmitted to the IMF with respect to the
        compliance of the Republic of Zaire with any
        economic or financial targets established by
        or in consultation with the IMF;

(v)     within 30 days after delivery to the
        Obligor or the Bank of Zaire and to the
        extent not specifically prohibited by the
        IBRD, each periodic report entitled "Zaire
        Economic Memorandum, The Zairian Economy:
        Current Situation and Constraints" (or any
        similar report) prepared by the IBRD after
        the date hereof;

(vi)    upon request of the Majority Banks or
        Majority Agents and within 30 days after
        they become available, each general finan-
        cial, statistical or economic report with
        respect to the Obligor, the Bank of Zaire or
        any Governmental Agency which is furnished
        after the date hereof to the holders of any
        External Indebtedness of the Obligor, the
        Bank of Zaire or any Governmental Agency;
        and

(vii)   such other financial, statistical and
        general information (including reasonably
        detailed reports on any refinancing or
        rescheduling of External Indebtedness) about
        the Obligor, the Bank of Zaire, any Govern-
        mental Agency or Governmental Enterprise
        as the Majority Banks or Majority Agents
        may from time to time reasonably request
        through the Servicing Bank or any Agent.

        For the purpose of clauses (ii), (iii), (iv) and
(v) above, any written request to the Obligor or the Bank of
Zaire from the IMF or the IBRD that the Obligor or the Bank
of Zaire refrain from distributing to the Banks or third
parties generally any particular report or document referred
to in any of such clauses shall be considered to be a
specific prohibition.

B - 3

SECTION 8.02.   Negative Covenants of the Obligor.
So long as any Credit shall remain outstanding, the Obligor
will not:

(a)  Create or permit to be created and continue,
nor permit the Bank of Zaire or any other Governmental
Agency or Governmental Enterprise to create or permit
to be created and continue,

(i)  any Lien for any purpose upon or with
respect to (A) any International Monetary Assets
or (B) any Foreign Exchange or gold owned or held
by the Obligor, the Bank of Zaire or any Govern-
mental Agency or Governmental Enterprise;

(ii)  any Lien upon or with respect to any
Asset of the Obligor, the Bank of Zaire or any
Governmental Agency or Governmental Enterprise to
secure or provide for the payment of External
Indebtedness of any Person; or

(iii)  any Lien upon or with respect to any
Exportable Assets of any Person to secure or
provide for the payment of External Indebtedness
incurred or Guaranteed by the Obligor, the Bank of
Zaire or any Governmental Agency or Governmental
Enterprise;

Provided that the foregoing restrictions shall not
apply to:

(1)  any Lien on Foreign Currency (or depos-
its denominated in Foreign Currency) securing
obligations with respect to a letter of credit
issued in the course of ordinary commercial
banking transactions (and expiring within one year
thereafter) to finance the importation of goods
into the Republic of Zaire;

(2)  any Lien on Exportable Assets securing
External Indebtedness incurred to finance the
business of producing and/or exporting similar
Exportable Assets, provided that (A) such Lien
applies only to goods which are expected to be
sold or documents evidencing title thereto and the
proceeds of any insurance thereon, and the pro-
ceeds of sale of which are expected to be receiv-
ed, within 24 months after such goods or proceeds
become subject to such Lien and (B) such External
Indebtedness (i) is incurred in the normal course
of business, (ii) is to be repaid primarily out of
proceeds of sale of the Exportable Assets subject
to such Lien and (iii) does not arise out of
financing provided by the lender with a view to
obtaining repayment of other External Indebtedness
or on condition that other External Indebtedness
be repaid;

8 - 4

(3)   any Lien securing External Indebtedness
incurred for the purpose of financing any acquisi-
tion of Assets, provided that the Assets which are
subject to such Lien are (A) tangible Assets
acquired in such acquisition, (B) claims which
arise from the loss of or damage to such Assets,
or (C) rent or charter hire payable by a lessee or
charterer of such Assets;

(4)   any Lien on Assets acquired (or deemed
to be acquired) by the Obligor, the Bank of Zaire
or any Governmental Agency or Governmental Enter-
prise under a financial lease, or claims arising
from the use or loss of or damage to such Assets,
provided that (A) such Lien secures only rentals
and other amounts payable under such lease and (B)
such Assets were not owned by the Obligor, the
Bank of Zaire or any Governmental Agency or
Governmental Enterprise at any time prior to
becoming subject to such lease unless at the time
of the acquisition of such Assets contractual
arrangements contemplated that such lease would be
executed;

(5)   any Lien which arises pursuant to any
order of attachment, distraint or similar legal
process arising in connection with court proceed-
ings so long as the execution or other enforcement
thereof is effectively stayed and the claims
secured thereby are being contested in good faith
by appropriate proceedings, provided that any such
Lien is released or discharged in any case within
one year of its imposition;

(6)   any Lien arising by operation of law
(and not pursuant to any agreement) which has not
been foreclosed or otherwise enforced against the
Assets to which it applies;

(7)   any Lien securing or providing for
the payment of External Indebtedness incurred in
connection with any Project Financing, provided
that the Assets to which such Lien applies are (A)
Assets which are the subject of such Project
Financing or (B) revenues or claims which arise
from the operation, failure to meet specifica-
tions, exploitation, sale or loss of, or damage
to, such Assets;   and

(8)   Liens in existence on the date hereof,
provided that such Liens remain confined to the
Assets presently affected thereby and Assets which
become affected by such Liens under contracts in
effect on the date of this Agreement and provided
further that such Liens secure or provide for the
payment of only those obligations so secured or
provided for on the date hereof.

8 - 5

As used in this subsection, "Exportable Assets" means goods which are sold or intended to be sold for a consideration consisting of or denominated in a Foreign Currency and any right to receive Foreign Currency in connection with the sale thereof; "Foreign Exchange" has, as to the types of assets included, the meaning given to it in the IMF's publication entitled "International Financial Statistics" dated December 1979 or such other meaning as shall be formally adopted by the IMF from time to time; and "Project Financing" means any financing (but not a refinancing) of the acquisition, construction or development of any Asset in connection with a project if the Person or Persons providing such financing expressly agree to look to the Asset financed and the revenues to be generated by the operation of, or loss of or damage to, such Asset as the principal source of repayment for the moneys advanced and have been provided with a feasibility study prepared by competent independent experts on the basis of which it was reasonable to conclude that such project would generate sufficient Foreign Currency income to repay substantially all of the principal of and interest on all External Indebtedness incurred in connection with such project.

(b)   Enter into any credit agreement or other contract for External Indebtedness, nor permit the Bank of Zaire or any Governmental Agency to enter into any credit agreement or other contract for External Indebtedness, which grants by contract to any other Person any right of set off, banker's lien, counterclaim or similar contractual right.

SECTION 8.03.   Instruction of the Obligor. The Obligor hereby irrevocably and unconditionally instructs the Bank of Zaire, for the benefit of each Bank, to make all payments required by this Agreement as contemplated by clause (ii) of Section 9.01(c).

9 - 1

ARTICLE IX
BANK OF ZAIRE

SECTION 9.01.    Foreign Exchange Undertaking.
The Bank of Zaire irrevocably and unconditionally states
and agrees for the benefit of each Bank that:

(a)  All payments of principal, interest and other
amounts required under this Agreement are irrevocably
authorized by all action required in the Republic of
Zaire so that such payments can be made in the currency
and manner and at the time required by the terms of
this Agreement.   The Bank of Zaire will maintain in
full force and effect all authorizations necessary to
make all such payments as so required.

(b)  The Bank of Zaire will use its best efforts
to ensure that the Obligor and the Bank of Zaire will
maintain sufficient Dollars or other Foreign Currency
so that all such payments will be made as so required.

(c)  Subject to the availability to the Bank of
Zaire of Dollars or other Foreign Currency and pursuant
to the instructions of the Obligor contained in Section
8.03, the Bank of Zaire will either (i) make available
to the Obligor sufficient Dollars or other Foreign
Currency to enable the Obligor to make each such
payment as so required or (ii) on behalf of the
Obligor make each payment as so required.

SECTION 9.02.    Representations and Warranties of
the Bank of Zaire.    The Bank of Zaire represents and war-
rants as follows:

(a)  It is duly organized and validly existing
under the laws of the Republic of Zaire as the central
bank and monetary authority of the Republic of Zaire
and as such exercises, with the Obligor, full power and
control over the International Monetary Assets of the
Republic of Zaire.

(b)  It has full power and authority under the
law of the Republic of Zaire to execute and deliver
this Agreement and to perform and observe the provi-
sions of this Agreement on its part to be performed and
observed.

(c)   The execution, delivery and performance of this Agreement by it have been duly authorized by all necessary legislative, administrative and other governmental action under the charter ("statuts") of the Bank of Zaire or under the law of the Republic of Zaire and do not contravene law or any contractual restriction which binds or affects the Bank of Zaire or any of its Assets.

(d)   This Agreement has been duly executed and delivered by the Bank of Zaire and is the legal, valid and binding obligation of the Bank of Zaire enforceable against the Bank of Zaire in accordance with its terms.

(e)   Neither the Bank of Zaire nor any of its Assets has any immunity from the jurisdiction of any court or from any legal process in the Republic of Zaire or under its laws.  The execution and delivery of this Agreement by the Bank of Zaire and the performance of its obligations hereunder constitute private and commercial acts of the Bank of Zaire.

SECTION 9.03 Covenants of the Bank of Zaire.   So long as any Credit shall remain outstanding, the Bank of Zaire will:

(a)   Not create or permit to be created and continue any Lien on its Assets which the Obligor agrees in Section 8.02(a) that it will not permit to be created.

(b)   Not enter into any credit agreement or other contract for External Indebtedness which grants by contract to any other Person any right of set off, banker's lien, counterclaim or similar contractual right.

10 -1

## ARTICLE X

### EVENTS OF DEFAULT

SECTION 10.01.  **Event of Default Defined**.  Each of the following events or conditions shall be an "Event of Default":

(a)   The Obligor shall fail to pay when due under this Agreement any amount of principal of any Credit or the Obligor shall fail to pay any interest due under this Agreement on any Credit within fifteen days after the due date thereof;

(b)   Any representation, warranty or certification (other than those contained in subsection (g) of Section 7.01) made by the Obligor or the Bank of Zaire (or by any of their respective officials) herein or in any certificate delivered pursuant hereto shall prove to have been incorrect in any material respect when made;

(c)   The Obligor shall fail to perform or observe any of its covenants contained in Sections 4.02, 8.01(b), 8.01(c) or 8.02 or the Bank of Zaire shall fail to perform or observe any of its covenants contained in Sections 9.01(a) or 9.03;

(d)   The Obligor or the Bank of Zaire shall fail to perform or observe any term, covenant or agreement contained in this Agreement on its part to be performed or observed (other than those covered by subsections (a), (b) or (c) above) and any such failure shall remain unremedied for 30 days after written notice thereof shall have been given to the Obligor, or to the Bank of Zaire with a copy to the Obligor, as may be appropriate, by the Servicing Bank or any Agent;

(e)   The Obligor, the Bank of Zaire or any Governmental Agency or Governmental Enterprise shall fail to pay (i) any External Indebtedness (other than in respect of any Credit) of the Obligor, the Bank of Zaire or such Governmental Agency or Governmental Enterprise (as the case may be), or any interest or premium thereon, or (ii) any sum, not constituting External Indebtedness, owing to any Bank with respect to any such External Indebtedness (other than in respect of any Credit and other than any sum guaranteed or insured by any governmental credit export agency), whether or not such External Indebtedness remains outstanding, in each case when due (whether at scheduled maturity or by required prepayment, acceleration, demand or otherwise) and such failure shall continue after the applicable grace period, if any, specified in the agreement or instrument relating to such External Indebtedness; **provided** that with respect to any such External Indebtedness or any such sum outstanding on the date hereof, any such non-payment

10 - 2

when due shall not constitute an Event of Default under this subsection (e) until the day on which any refinancing or rescheduling agreement with respect to such currently outstanding External Indebtedness or such sum becomes effective in accordance with its terms and such External Indebtedness or such sum shall not be paid when due in accordance with the terms of such refinancing or rescheduling agreement, after any applicable grace period provided therein; and provided further that the foregoing proviso shall not apply to any such External Indebtedness, interest, premium or sum with respect to which any creditor initiates legal proceedings or takes any other action or exercises any other contractual or legal remedy in order to receive payment of such External Indebtedness, interest, premium or sum rather than refinance or reschedule such External Indebtedness, interest, premium or sum on payment terms no more favorable to such External Indebtedness, interest, premium or sum than this Agreement is to the Credits;

(f)   External Indebtedness of the Obligor, the Bank of Zaire or any Governmental Agency or Governmental Enterprise exceeding in the aggregate $1,000,000 (or its equivalent in other currencies) during any period of twelve consecutive months shall be declared to be due and payable, or required to be prepaid (other than by a regularly scheduled required prepayment) prior to the stated maturity thereof; provided that with respect to any such External Indebtedness outstanding on the date hereof, any such declaration or requirement shall not constitute an Event of Default under this subsection (f) unless it is made pursuant to any refinancing or rescheduling agreement entered into after the date of this Agreement with respect to such currently outstanding External Indebtedness; and provided further that the foregoing proviso shall not apply to any such currently outstanding External Indebtedness with respect to which any creditor initiates legal proceedings or takes any other action or exercises any other contractual or legal remedy in order to receive payment of such External Indebtedness rather than refinance or reschedule such External Indebtedness on payment terms no more favorable to such External Indebtedness than this Agreement is to the Credits;

(g)   The Obligor shall cease to be a member, or shall cease to be entitled to use the general resources, of the IMF;

(h)   The Obligor shall cease to be a member of or shall be suspended from membership in the IBRD, and the Majority Banks or all Agents shall determine in their sole discretion that such cessation or suspension shall constitute an Event of Default;

(i)   The Bank of Zaire shall not at all times remain the central bank of the Republic of Zaire;

(j)   The Bank of Zaire shall not at all times hold substantially all of (i) the International Monetary Assets and (ii) the gold owned by the Obligor, the Bank of Zaire and the Governmental Agencies;

(k)   The validity of this Agreement shall be contested by the Obligor or the Bank of Zaire, or the Obligor or the Bank of Zaire shall deny liability hereunder (whether by a general suspension of payments or a moratorium on the payment of External Indebtedness or otherwise), or any change in any treaty, law, regulation, communique, decree, ordinance or policy of the Obligor or the Bank of Zaire shall occur which purports to render any material provision of this Agreement invalid or unenforceable or which purports to prevent or materially delay the performance or observance by the Obligor or the Bank of Zaire of their respective obligations hereunder;

(l)   The payment terms of any refinancing or rescheduling of any Other Credit shall provide more favorable payment to other creditors than the payment terms of this Agreement provide with respect to the Credits, and the Majority Banks or all Agents shall determine in their sole discretion that such condition shall constitute an Event of Default;   or

(m)   Any event or condition (including, without limitation, any material adverse change in the economic or financial condition of the Obligor or the Bank of Zaire) shall occur which gives reasonable grounds to conclude that the Obligor or the Bank of Zaire will not pay any amount when it becomes due under this Agreement.

SECTION 10.02.   **Effects of Events of Default.**
(a)  **Action by Servicing Bank.**   If any Event of Default referred to in Section 10.01 shall occur and be continuing at any time after the Effective Date, the Servicing Bank shall at the request of either the Majority Banks or the Majority Agents , by notice to the Obligor, declare the entire unpaid principal amount of all Credits, all interest accrued and unpaid thereon and all other amounts payable under this Agreement to be forthwith due and payable, whereupon all such Credits, interest and other amounts shall become and be forthwith due and payable, without presentment, demand, protest or other notice of any kind, all of which are hereby expressly waived by the Obligor.   The Servicing Bank shall give immediate notice of any declaration (a "Declaration") under this subsection to each Agent and Bank, but failure to give such notice shall not affect the effectiveness of such Declaration.

(b)   **Action by Agent.**   If (i) any Event of Default referred to in subsection (a) of Section 10.01 shall occur and be continuing at any time after the Effective Date, each Agent shall at the request, or may with the consent, of Syndicate Members holding 66 2/3% or more of the then outstanding aggregate principal amount of the Credits in

10 - 4

the Syndicate for which such Agent acts or (ii) any Event of Default referred to in subsections (b) through (m) of Section 10.01 shall occur and be continuing at any time after the Effective Date, each Agent shall at the request, or may with the consent, of Syndicate Members holding 75% or more of the then outstanding aggregate principal amount of the Credits in the Syndicate for which such Agent acts, by notice to the Obligor, declare the entire unpaid principal amount of the Credits of such Syndicate, all interest accrued and unpaid thereon and all other amounts payable under this Agreement with respect to such Credits to be forthwith due and payable, whereupon such Credits, all such accrued interest and all such amounts shall become and be forthwith due and payable, without presentment, demand, protest or further notice of any kind, all of which are hereby expressly waived by the Obligor; <u>provided</u> that no such notice of any declaration (a "Declaration") under this subsection (b) shall be effective with respect to the Credits in any one Syndicate until one or more Agents for one or more other Syndicates transmits a similar Declaration with respect to the Credits in such other Syndicate or Syndicates so that the aggregate principal amount of the Credits subject to such Declarations transmitted by Agents represents 15% or more of the aggregate principal amount of all Credits. Each Agent shall give immediate notice of any Declaration to each Bank for which such Agent acts as Agent (irrespective of the Syndicate in which such Bank is a Syndicate Member), each Agent and the Servicing Bank, but failure to give such notice shall not affect the effectiveness of such Declaration. The Servicing Bank shall immediately advise the Obligor of each notice of any Declaration received by it under this subsection, together with a calculation of the aggregate principal amount and aggregate percentage by amount of all Credits subject to such Declaration; <u>provided</u> the effectiveness of each such Declaration shall not be affected by the failure of the Servicing Bank to give notice thereof to the Obligor.

(c)  <u>Action by Bank Having a Single Bank Credit</u>.  If (i) any Event of Default referred to in Section 10.01 shall occur and be continuing at any time after the Effective Date and (ii) any Credit of any Bank is the subject of a Declaration given pursuant to Section 10.02(b), such Bank may, by notice to the Obligor, declare the entire unpaid principal amount of each Single Bank Credit of such Bank, all interest accrued and unpaid thereon and all other amounts payable under this Agreement with respect to such Credit to be forthwith due and payable, whereupon such Credit, all such accrued interest and all such amounts shall become and be forthwith due and payable, without presentment, demand, protest or further notice of any kind, all of which are hereby expressly waived by the Obligor; <u>provided</u> that no such notice of any declaration (a "Declaration") under this subsection (c) shall be effective with respect to any Single Bank Credit until the Declaration referred to in clause (ii) of this subsection (c) is effective in accordance with the <u>proviso</u> of Section 10.02(b). Each Bank shall give immediate notice of any Declaration to each Bank, each Agent and the Servicing Bank, but failure to give such notice shall not affect the effectiveness of such Declaration.

10 - 5

(d)   Determinations of Events of Default.  If any
Syndicate Instructing Group believes that an event or
condition exists which, upon a determination of the requi-
site Banks or Agents, would constitute an Event of Default
under Sections 10.01(h) or (l), such Syndicate Instructing
Group may communicate such belief to its Agent with a
request that such Agent request the other Agents to poll the
Syndicate Members for which the other Agents act as to
whether such event or condition should be determined to be
an Event of Default.  Upon receipt of any such request, each
other Agent shall poll the Syndicate Members for which it
acts.   Each Agent shall tabulate the results of any such
poll of its Syndicate Members according to the principal
amount of the Credits represented by the responses of such
Syndicate Members and shall communicate such results to the
Servicing Bank and the other Agents; provided that no Agent
shall include in such tabulation the principal amount of any
Single Bank Credit unless the Syndicate Member having such
Single Bank Credit shall have confirmed to such Agent that
such Syndicate Member has not included such Single Bank
Credit in any other response of such Syndicate Member to any
other Agent.  Each Agent shall, promptly upon the request of
any other Agent, so tabulate and communicate the results
received by it from the Syndicate Members for which it acts
even though all such Syndicate Members have not yet respond-
ed.  If the foregoing procedures are followed, such tabula-
tions and communications of the Agents shall be conclusive,
in the absence of manifest error, as to whether the Majority
Banks have made a determination that an Event of Default
exists under Section 10.01(h) or (l), but the foregoing
shall not prohibit the making of any such determination in
any other reasonable manner.

(e)   Transmittal of Notice of Default.  If any
Agent receives a Notice of Default (x) from another Agent,
it shall promptly notify each Syndicate Member for which it
acts of the contents thereof, and (y) from any Syndicate
Member for which it acts, it shall promptly notify each
other Agent and each other Syndicate Member for which it
acts of the contents thereof.

11 - 1

## ARTICLE XI

### THE SERVICING BANK AND THE AGENTS

The provisions of this Article XI contain agreements among the Banks, the Agents and the Servicing Bank. Any appointment of a successor Servicing Bank or successor Agent pursuant to Sections 11.05 or 11.06 shall be binding on all parties to this Agreement.

SECTION 11.01.   Limited Appointment and Responsibilities of Servicing Bank and Agents.   (a)   General. The Servicing Bank and each Agent shall perform the mechanical and clerical functions in connection with the administration of this Agreement which are specifically set forth herein for the Servicing Bank and each Agent, and in connection therewith shall have such powers as are reasonably incidental thereto.   The responsibilities of the Servicing Bank and each Agent are strictly limited to those specifically set forth in this Agreement, and no unstated functions, responsibilities, duties, obligations or liabilities shall be read into this Agreement or otherwise exist against the Servicing Bank or any Agent.   The Servicing Bank shall not be agent, trustee or fiduciary for the Obligor, the Bank of Zaire, any Agent or any Bank, except as expressly provided in Section 5.02.   No Agent shall be agent, trustee or fiduciary for any Syndicate or Syndicate Member except as expressly provided in Sections 5.02 and 5.10 or otherwise expressly provided in this Agreement.

(b)   General Appointment of Agents.   Each Bank hereby appoints and authorizes each Agent to take such action as agent on its behalf and to exercise such powers under this Agreement as are expressly delegated to the Agents generally by the terms hereof, together with such powers as are reasonably incidental thereto.

(c)   Individual Appointment of Each Agent.   In addition, each Syndicate Member in each Syndicate hereby appoints and authorizes the Agent for such Syndicate to take such action as agent on its behalf and to exercise such powers under this Agreement as are expressly delegated to such Agent, together with such powers as are reasonably incidental thereto.

SECTION 11.02.   Discretions and Protections of Servicing Bank and Agents.   (a)   No Duty to Exercise Discretion; Consultations.   As to any matters not expressly set forth in this Agreement as a function or responsibility or discretionary power of the Servicing Bank or any Agent, the Servicing Bank and such Agent shall not be required to exercise any discretion or take any action, except that the Servicing Bank and such Agent may, in its sole discretion, act or refrain from acting (and shall be fully protected in so acting or refraining from acting) upon the instructions

11 - 2

of the Requisite Banks (as defined below), and such instruc-
tions shall be binding upon the Servicing Bank and all
Agents and Banks.  If, with respect to a proposed action to
be taken by it, the Servicing Bank or any Agent shall
determine in good faith that the provisions of this Agree-
ment relating to the functions or responsibilities or
discretionary powers of the Servicing Bank or such Agent are
or may be ambiguous or inconsistent, the Servicing Bank or
such Agent may so notify the appropriate parties hereto
(identifying the proposed action and the provisions that it
considers are or may be ambiguous or inconsistent) and may
decline either to perform such function or responsibility or
to exercise such discretionary power unless it has received
the written confirmation of the Requisite Banks that the
Requisite Banks concur in the circumstances that the action
proposed to be taken by the Servicing Bank or such Agent is
consistent with the terms of this Agreement or is otherwise
appropriate.  The Servicing Bank and each Agent shall be
fully protected in acting or refraining from acting upon the
confirmation of the Requisite Banks in this respect, and
such confirmation shall be binding upon the Servicing Bank
and all Agents and Banks.  For the purpose of this Section,
"Requisite Banks" shall mean:

> (i)   in the case of the Servicing Bank, the
>        Majority Agents or the Majority Banks;
>
> (ii)  in the case of the Agent for each
>        Syndicate, a Syndicate Instructing Group for
>        such Syndicate.

This subsection is for the protection of the Servicing Bank
and each Agent but neither the Servicing Bank nor any
Agent shall be required to obtain any such written confir-
mation of the Requisite Banks in order to perform any
function or responsibility or to exercise any discretionary
power of the Servicing Bank or such Agent set forth in
this Agreement.  Nothing in this subsection shall be con-
strued to permit any additional obligation to be imposed
upon any Bank or the Obligor, to permit the reduction or
postponement of payment of any amount to which any Bank is
entitled hereunder, or to alter the requirements of the
provisos to Section 12.01 with respect to certain amend-
ments or waivers of this Agreement.

        (b)   No Requirement to Take Certain Actions.
Neither the Servicing Bank nor any Agent shall in any
event be required to take any action which in the judgment
of the Servicing Bank or such Agent (i) is contrary to
this Agreement or applicable law or (ii) exposes the Servic-
ing Bank or such Agent to personal liability.

        (c)   Exercise of Discretion Not an Undertaking to
Do So Again.  If in one or more instances the Servicing Bank
or any Agent takes any action or assumes any responsi-
bility not specifically delegated to it pursuant to the

11 - 3

provisions of this Agreement, neither the taking of such
action nor the assumption of such responsibility shall be
deemed to be any express or implied undertaking on the part
of the Servicing Bank or such Agent that it will take the
same or similar action or assume the same or similar respon-
sibility in any other instance.

(d) <u>Reliance on Documents</u>.  Neither the Servicing
Bank nor any Agent shall have any responsibility to review
or verify the accuracy or completeness of any information
contained in any notice or certificate or other communica-
tion received by the Servicing Bank or such Agent from any
Person.  Neither the Servicing Bank nor any Agent shall
incur any liability under or in respect of this Agreement by
acting upon any notice, consent, certificate or other
instrument or writing (which may be by telegram, cable or
telex) believed by it to be genuine and signed or sent by
the proper party or parties or by acting upon any represen-
tation or warranty of the Obligor made in this Agreement or
in any document delivered pursuant to the provisions hereof.
To the extent that the Servicing Bank or any Agent is
required by any provision of this Agreement to take any
action or prepare any report in reliance upon any informa-
tion, report or document to be furnished by any other party
to this Agreement, the failure of any such other party to
furnish such information, report or document shall excuse
the Servicing Bank and such Agent from taking such action or
preparing such required report; <u>provided</u> that the Servicing
Bank and such Agent may in its discretion (but only to the
extent not inconsistent with the other provisions hereof)
partially take such required action or partially prepare
such required report on the basis of the information,
reports or documents furnished to it by other parties
hereto.

(e) <u>Reliance on Counsel</u>.  The Servicing Bank
and each Agent may consult with legal counsel (including
counsel for the Obligor) and other professional experts and
consultants selected by it and shall not be liable for any
action taken or omitted to be taken in good faith by it in
accordance with the advice of such counsel, experts or
consultants.

(f) <u>No Duty to Inquire</u>.  Neither the Servicing
Bank nor any Agent shall have any duty to ascertain or to
inquire as to the performance or observance of any of the
terms, covenants or conditions of this Agreement on the part
of the Obligor or the Bank of Zaire.

(g) <u>No Responsibility for Validity of this
Agreement</u>.  Neither the Servicing Bank nor any Agent
shall be responsible to any Bank for the due execution,
legality, validity, enforceability, genuineness, sufficiency
or value of this Agreement or any other instrument or
document furnished pursuant hereto.

11 - 4

(h)   No Duty to Initiate Suits.   Neither the
Servicing Bank nor any Agent shall in any event be required
to initiate any suit, action or proceeding arising out of or
in connection with this Agreement.

SECTION 11.03.   Limited Liability of Servicing
Bank and Agents.   Neither the Servicing Bank nor any
Agent nor any of their respective directors, officers,
agents or employees shall be liable for any action taken or
omitted to be taken by it or them in connection with this
Agreement (including without limitation any action taken or
omitted to be taken prior to the date hereof by the Servic-
ing Bank or any Agent in preparation for acting here-
under) except for its or their own gross negligence or
wilful misconduct.   Each Bank agrees that the limitation on
liability contained in this Section is for the benefit and
protection of the Servicing Bank and each Agent and not
for the protection of the Banks.

SECTION 11.04.   Indemnification by Banks.   (a)
Expenses.   The Banks agree to indemnify the Servicing Bank
and each Syndicate Member agrees to reimburse its Agent
(to the extent not reimbursed by the Obligor) for their
respective ratable shares of any and all liabilities,
obligations, losses, damages, penalties, judgments, costs,
expenses or disbursements of any kind or nature whatsoever
which may be imposed on or incurred by the Servicing Bank or
such Agent for any action taken or omitted to be taken by
the Servicing Bank or such Agent under this Agreement
(including without limitation any action taken or omitted to
be taken prior to the date hereof by the Servicing Bank or
such Agent in preparation for acting hereunder); pro-
vided that no Bank or Syndicate Member shall be liable for
any portion of any such amount resulting from the gross
negligence or wilful misconduct of the Servicing Bank or any
Agent.   Without limiting the generality of the foregoing,
each Bank agrees that it will, subject to the limitations
set forth in the proviso to the preceding sentence, upon
demand pay or reimburse the Servicing Bank (to the extent
that the Servicing Bank is not reimbursed by the Obligor)
for its ratable share of any out-of-pocket expenses (includ-
ing fees of special United States and other counsel to the
Agents generally and United States counsel to the Servic-
ing Bank) incurred in connection with the negotiation,
preparation, printing, signing and administration of this
Agreement or any amendment hereof or waiver or consent
hereunder or in connection with investigating any alleged
Event of Default or preserving any rights of the Banks or
Agents generally or of the Servicing Bank hereunder or
obtaining legal advice in respect of the rights and respon-
sibilities of the Banks or Agents generally or the Servicing
Bank hereunder.   Further without limiting the generality of
the foregoing, each Bank agrees that it will, subject to the
same limitations, upon demand pay or reimburse its Agent (to
the extent that such Agent is not reimbursed by the Obligor)

11 - 5

for its ratable share of any out-of-pocket expenses (includ-
ing all legal fees) of such Agent in connection with inves-
tigating any alleged Event of Default or preserving general-
ly any rights of the Syndicate in which such Bank is a
Syndicate Member or of such Agent hereunder or of obtaining
legal advice in respect of the general rights and responsi-
bilities of the Syndicate Members of such Syndicate or of
such Agent hereunder.

(b)  Servicing Bank's Fees.  The Banks also agree
to pay to the Servicing Bank upon its demand (but not more
often and no earlier than quarterly in arrears) their
respective ratable shares of any fees payable to the Servic-
ing Bank under Section 5.01 which the Obligor fails to
pay within 90 days after such fees are due and payable.

(c)  Calculation of Ratable Shares.  Except as
otherwise provided in this Agreement, the ratable shares of
the Banks shall be determined in proportion to their respec-
tive Credits and the ratable shares of the Syndicate Members
in each Syndicate shall be determined in proportion to their
respective Credits in such Syndicate. All such determina-
tions shall be made in Dollars.  The principal amount in
Dollars of any Credit which is not denominated in Dollars
shall be determined as provided in Sections 5.10(e), 5.11(e)
and 5.12(e).

SECTION 11.05.  Successor Servicing Bank.  The
Servicing Bank may resign at any time by giving written
notice thereof to the Banks, the Agents and the Obligor
and may be removed at any time with or without cause by the
Majority Banks or Majority Agents.  Upon any such removal
or notice of resignation the Majority Agents (in consul-
tation with their respective Syndicates) shall have the
right to appoint, on behalf of the Obligor, the Agents
and the Banks, a successor Servicing Bank, and the Agents
shall use their best efforts to so appoint a successor
Servicing Bank.  If no successor Servicing Bank shall have
been so appointed by the Majority Agents and shall have
accepted such appointment within 60 days after such removal
or notice of resignation, then the retiring Servicing Bank
may appoint, on behalf of the Obligor, the Agents and the
Banks, a successor Servicing Bank, which shall have offices
in London, New York or Paris and which shall be a commercial
bank having a combined capital and surplus of at least
$100,000,000 or its equivalent in another currency or shall
be a merchant bank affiliated with such a commercial bank.
Upon the acceptance by a successor Servicing Bank of any
appointment as Servicing Bank hereunder, such successor
Servicing Bank shall succeed to and become vested with all
the rights, powers, privileges and duties of the retiring
Servicing Bank, and upon (but only upon) such acceptance,
the retiring Servicing Bank shall be discharged from further
responsibilities under this Agreement.  The provisions of
this Article XI shall continue to inure to the benefit of
the retiring Servicing Bank as to any actions taken or
omitted to be taken by it while it was Servicing Bank under
this Agreement.

SECTION 11.06.  *Successor Agents.*  Each Agent may resign at any time by giving written notice thereof to the Syndicate Members for which it acts as Agent, the Servicing Bank, the other Agents and the Obligor and may be removed at any time with or without cause by a Syndicate Instructing Group of the Syndicate for which it acts as Agent.  Upon any such removal or notice of resignation, a Syndicate Instructing Group of such Syndicate shall have the right to appoint, on behalf of all parties to this Agreement, a successor Agent for such Syndicate.  If no successor Agent shall have been so appointed by such a Syndicate Instructing Group and shall have accepted such appointment within 60 days after such removal or notice of resignation, then the retiring Agent may appoint, on behalf of all parties to this Agreement, a successor Agent, which shall have offices in London, New York, Paris or the same city in which the retiring Agent has its principal office and which shall be a commercial or merchant bank having combined capital and surplus at least comparable to that of the retiring Agent or shall be a merchant bank affiliated with such a commercial bank. Upon the acceptance by a successor Agent of any appointment as Agent hereunder, such successor Agent shall succeed to and become vested with all the rights, powers, privileges and duties of the retiring Agent and upon (but only upon) such acceptance, the retiring Agent shall be discharged from further responsibilities under this Agreement.  The provisions of this Article XI shall continue to inure to the benefit of the retiring Agent as to any actions taken or omitted to be taken by it while it was Agent under this Agreement.

12 - 1

## ARTICLE XII

## MISCELLANEOUS

SECTION 12.01.  Amendments, Etc.  No amendment or waiver of any provision of this Agreement, nor consent to any departure by the Obligor or the Bank of Zaire therefrom, shall in any event be effective unless the same shall be in writing and consented to (including by telex, telegraph or cable) by the Majority Banks, and then such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given; provided that no amendment, waiver or consent shall, unless in writing and consented to (including by telex, telegraph or cable) by all the Banks, do any of the following: (a) subject the Banks to any additional obligations, (b) reduce the principal of, or interest on, any of the Credits, (c) postpone any date fixed for any payment in respect of principal of, or interest on, any of the Credits, (d) change the percentage of the Credits referred to in the definitions of Majority Banks, Majority Agents or Syndicate Instructing Group or referred to elsewhere in this Agreement where the consent of (i) Banks holding a specified percentage of all the Credits or (ii) Syndicate Members holding a specified percentage of the Credits in a Syndicate is required for any action to be taken hereunder or (e) change this Section; provided further that no amendment, waiver or consent shall, unless consented to (including by telex, telegraph or cable) by the Servicing Bank in addition to the Banks required hereinabove to take such action, affect the rights or duties of the Servicing Bank under this Agreement; provided further that no amendment, waiver or consent shall, unless in writing and consented to (including by telex, telegraph or cable) by the Agent affected in addition to the Banks required hereinabove to take such action, affect the rights or duties of such Agent under this Agreement; and provided further that the Servicing Bank may accept, with the consent of all the Agents, documentation submitted to satisfy the conditions of the Effective Date set forth in Section 6.01(b) which differs from the requirements of the relevant Exhibit in a manner which all the Agents consider in their judgment to be acceptable.

SECTION 12.02.  Notices, Etc.  All notices and other communications provided for hereunder shall, unless otherwise stated herein, be in writing (including by telex, telegraph or cable) and mailed or sent or delivered, (a) as to each of the Obligor, the Bank of Zaire, the Servicing Bank and each Agent, at its address set forth under its name on the signature pages hereof, (b) as to each Bank, at the address which such Bank shall notify the Servicing Bank (which shall notify the Obligor of each such address) and each Agent of such Bank, and (c) as to each party at such other address as shall be designated by

such party from time to time in a written notice to the
other parties hereto.  All such notices and communications
shall be effective, when delivered by hand, or when deposit-
ed in the mails, air mail, postage prepaid, and, in the case
of telegraph or cable, when sent addressed as set forth
above, and, in the case of telex, when the telex is sent and
the appropriate answerback is received.  All notices,
communications and other documents delivered hereunder
shall, unless submitted in the English language, be accom-
panied by a certified English translation thereof.

SECTION 12.03.   No Waiver; Cumulative Remedies.
No failure on the part of the Servicing Bank, any Agent or
any Bank to exercise, and no delay in exercising, any right
hereunder shall operate as a waiver thereof, nor shall any
single or partial exercise of any such right preclude any
other or further exercise thereof or the exercise of any
other right.  The rights and remedies herein provided are
cumulative and not exclusive of any remedies provided by
law.

SECTION 12.04.   Accounting Terms; Calculations.
(a) All accounting terms not specifically defined herein
shall be construed in accordance with generally accepted
United States accounting principles consistently applied,
except as otherwise stated herein.  Except as otherwise
provided in this Agreement, the equivalent in another
currency of an amount in Dollars shall be determined at the
rate of exchange quoted by the Servicing Bank, at 9:00 A.M.
(New York City time) on the date of determination, to prime
banks in New York City for the spot purchase in the New York
foreign exchange market of Dollars with such other currency.
Except as otherwise provided in this Agreement, the equiva-
lent in Dollars of an amount in another currency shall be
determined at the rate of exchange quoted by the Servicing
Bank, at 9:00 A.M. (New York City time) on the date of
determination, to prime banks in New York City for the spot
purchase in the New York foreign exchange market of such
other currency with Dollars.

(b) Whenever any payments are to be made ratably
or pro rata or any amount is to be divided equally, such pro
ration or division shall be calculated to the nearest one
Dollar (or comparable unit of any other currency in which
such calculation is made).

SECTION 12.05.   Costs and Expenses.   (a)  The
Obligor agrees to pay, in the currency in which incurred:

(i)  to the Servicing Bank and each Agent upon
its demand an amount equal to any and all liabilities,
obligations, losses, damages, penalties, judgments,
costs, expenses or disbursements of any kind or nature
whatsoever which may be imposed on or incurred by the

12 - 3

Servicing Bank or such Agent in any way relating to or arising out of this Agreement or any action taken or omitted by the Servicing Bank or such Agent hereunder, provided that the Obligor shall not be (i) liable for any such amount resulting from the gross negligence or willful misconduct of the Servicing Bank or such Agent or (ii) obligated to pay under this Section any such amount which is included in calculating the Servicing Bank's fees payable pursuant to Section 5.01;

(ii)  to the Servicing Bank upon demand of the Servicing Bank or any Agent all reasonable fees and disbursements of special United States, Zaire or other individual or general counsel to the Agents and special United States counsel to the Servicing Bank and all other out-of-pocket expenses incurred on behalf of the Agents generally or by the Servicing Bank in connection with the negotiation, preparation, translation, printing, signing and administration of this Agreement or any amendment hereof or waiver or consent hereunder or in connection with any reasonable investigation of any alleged Event of Default or preserving any rights of the Banks or Agents generally or of the Servicing Bank hereunder or obtaining legal advice in respect of the rights and responsibilities of the Banks or Agents generally or the Servicing Bank hereunder; provided that the liability of the Obligor for legal fees and disbursements of individual counsel for each separate Agent in connection with the preparation, execution and delivery of this Agreement is limited to $10,000 (or its equivalent in another currency) per syndicate for which such Agent acts, shall not apply to counsel fees and disbursements for services rendered prior to November 1, 1979 and shall not exceed an aggregate of $125,000 (or its equivalent in other currencies) for all such legal fees and disbursements of individual counsel for the separate Agents, it being understood that this limitation shall not apply to fees and disbursements of any counsel representing the Agents generally.  In the event that the aggregate amount of such fees for individual counsel to the separate Agents exceeds $125,000 (or its equivalent in other currencies), the Servicing Bank shall allocate the $125,000 to be paid by the Obligor to the Agents submitting invoices for individual counsel fees, ratably in accordance with the amount of each such invoice up to $10,000 per Syndicate per Agent;

(iii)  to each Agent upon its demand and as invoiced by such Agent to the Obligor through the Servicing Bank all out-of-pocket expenses incurred by such Agent in connection with the negotiation, preparation, execution and delivery of this Agreement in the period commencing with November 1, 1979 to and including the date of execution of this Agreement by such Agent;

12 - 4

(iv)   to each Bank and Agent upon its demand
all out-of-pocket expenses (including, without limita-
tion, all counsel fees and court costs, stamp taxes,
duties and fees) incurred in connection with investi-
gating any Event of Default or enforcing this Agreement
or suing for or collecting any overdue amount payable
by the Obligor hereunder or otherwise protecting its
rights in the event of any failure by the Obligor or
Bank of Zaire to comply with the provisions hereof;
and

(v)   to the Servicing Bank upon demand of the
Servicing Bank the respective fees then owed to the
New York Process Agent and the London Process Agent.

The Servicing Bank agrees to promptly transmit to the
Obligor all invoices received by it for each of the fore-
going.

(b)   The Obligor further agrees that if, at any
time after the Reconciliation Date due to acceleration of
the maturity of any of the Credits pursuant to Section 10.02
or due to any other reason (but excluding any prepayment
pursuant to Section 4.03(b)), any Bank receives payments of
principal of any Credit other than on an Interest Payment
Date or a Principal Payment Date, the Obligor shall, upon
demand by such Bank, pay to such Bank any amounts required
to compensate such Bank for any additional losses, costs or
expenses which it may reasonably incur as a result of such
payment, including, without limitation, any loss (excluding
loss of anticipated profits), cost or expense incurred by
reason of the liquidation of reemployment of deposits or
other funds acquired by any Bank to fund or maintain such
Credit.

(c)   Nothing in Section 11.04 shall relieve
the Obligor of any liability under this Agreement to any
party hereto.  If any Bank pays any amount which the Obligor
is obligated to pay to the Servicing Bank or any Agent
hereunder, such Bank shall be subrogated to the rights of
the Servicing Bank or such Agent against the Obligor in
respect of such amount.

SECTION 12.06.   Judgment.   (a)   If for the pur-
poses of obtaining judgment in any court it is necessary to
convert a sum due hereunder in Dollars into another curren-
cy, the parties hereto agree, to the fullest extent that
they may effectively do so, that the rate of exchange used
shall be that at which in accordance with normal banking
procedures the Servicing Bank could purchase Dollars with
such other currency in New York City on the Business Day
preceding that on which final judgment is given.

(b)   The obligation of the Obligor in respect of
any sum due from it to any Bank, any Agent or the Servic-
ing Bank hereunder shall, notwithstanding any judgment in a
currency other than Dollars, be discharged only to the

12 - 5

extent that on the Business Day following receipt by such
Bank or Agent or the Servicing Bank (as the case may be)
of any sum adjudged to be so due in such other currency such
Bank or Agent or the Servicing Bank (as the case may be)
may in accordance with normal banking procedures purchase
Dollars with such other currency;  if the Dollars so pur-
chased are less than the sum originally due to such Bank or
Agent or the Servicing Bank (as the case may be) in Dollars,
the Obligor agrees, as a separate obligation and notwith-
standing any such judgment, to indemnify such Bank or
Agent or the Servicing Bank (as the case may be) against
such loss, and if the Dollars so purchased exceed the sum
originally due to any Bank or Agent or the Servicing Bank
(as the case may be) in Dollars, such Bank or Agent or
the Servicing Bank (as the case may be) agrees to remit to
the Obligor such excess.

SECTION 12.07.   Consent to Jurisdiction; Waiver
of Immunities.  (a)  The Obligor and the Bank of Zaire each
hereby irrevocably submits to the non-exclusive jurisdiction
of the High Court of Justice in London and any New York
State or United States Federal court sitting in the Borough
of Manhattan of New York City and any appellate court from
any thereof in any action or proceeding arising out of or
relating to this Agreement, and the Obligor and the Bank of
Zaire each hereby irrevocably agrees that all claims in
respect of any such action or proceeding may be heard and
determined in the High Court of Justice in London or such
New York State court or, to the fullest extent permitted by
law, such United States Federal court or any such appel-
late court.   The Obligor and the Bank of Zaire each hereby
irrevocably appoints (i) The Law Debenture Corporation,
Limited (the "London Process Agent"), with an office on the
date hereof at Estates House, 66 Gresham Street, London EC2V
7HX, England, as its agent to receive on behalf of it and
its property service of copies of the summons and complaint
and any other process which may be served in any such action
or proceeding before the High Court of Justice in London and
(ii) CT Corporation System (the "New York Process Agent",
and together with the London Process Agent being collective-
ly the "Process Agents" and each a "Process Agent"), with an
office on the date hereof at 277 Park Avenue, New York, New
York 10017, United States, as its agent to receive on behalf
of it and its property service of copies of the summons and
complaint and any other process which may be served in any
such action or proceeding before any such New York State or
United States Federal court.   Such service may be made by
delivering a copy of such process to the Obligor or the Bank
of Zaire, as the case may be, in care of the appropriate
Process Agent at such Process Agent's address, and the
Obligor and the Bank of Zaire each hereby irrevocably
authorizes and directs each Process Agent to accept such
service on its behalf.   The Obligor and the Bank of Zaire
agree that a final judgment in any such action or proceed-
ing shall be conclusive and may be enforced in other juris-
dictions by suit on the judgment or in any other manner
provided by law.

        (b)   Nothing in this Section 12.07 shall affect
the right of any Bank or Agent or the Servicing Bank to
serve legal process in any other manner permitted by law or

12 - 6

affect the right of any Bank or Agent or the Servicing
Bank to bring any action or proceeding against the Obligor
or the Bank of Zaire or their respective property in the
courts of other jurisdictions.

(c)  To the extent that the Obligor or the Bank of
Zaire may be entitled, in any jurisdiction in which any
suit, action or proceeding may at any time be commenced with
respect to this Agreement or any judgment based on its
obligations hereunder, to claim for itself or its Assets or
the Assets of any Governmental Agency immunity from suit,
from the jurisdiction of any court (including without
limitation any court of the United States of America, the
State of New York or the United Kingdom), from attachment
prior to judgment, from attachment in aid of execution on a
judgment, from execution on a judgment or from the giving of
any other relief or issue of any process, or to the extent
that in any such jurisdiction there may be attributed such
an immunity (whether or not claimed), the Obligor and the
Bank of Zaire each irrevocably agrees not to claim and
irrevocably waives any and all such immunity to the fullest
extent now or hereafter permitted under the laws of the
jurisdiction in which any such suit, action or proceeding
may be commenced and (without limiting the generality of the
foregoing) consents generally for the purposes of the State
Immunity Act of 1978 of the United Kingdom to the giving of
any relief or the issue of any process.

SECTION 12.08.  Binding Effect; Partial Inva-
lidity; Survival.  Upon the execution of this Agreement by
the Obligor, the Bank of Zaire, the Servicing Bank and each
Agent and Bank, this Agreement shall be binding on and
inure to the benefit of the parties hereto and their respec-
tive successors and permitted assigns.  If one or more
provisions contained in this Agreement shall be invalid,
illegal or unenforceable in any respect in any jurisdiction
or with respect to any party, such invalidity, illegality or
unenforceability in such jurisdiction or with respect to
such party shall not, to the fullest extent permitted by
applicable law, invalidate or render illegal or unenforce-
able such provision in any other jurisdiction or with
respect to any other party.  To the fullest extent it may
effectively do so under applicable law, each of the parties
hereto waives any provision of law which renders any provi-
sion hereof invalid or illegal in any respect.  Without
prejudice to the survival of any other agreement of the
Obligor hereunder, the agreements of the Obligor in Sections
5.06, 5.07, 5.08 and 12.05 and the agreements of the Banks
in Section 11.04 shall survive the payment in full of the
Credits.

SECTION 12.09.  Lending Office; Assignments.
(a)  Change of Lending Office.  Promptly after signature of
this Agreement each Bank shall confirm or advise the Agent
for each of its Credits, or the Servicing Bank in the case
of a Single Bank Credit, of the Lending Office of such Bank
for each such Credit.  Upon request of the Obligor or the
Servicing Bank, each Agent shall notify the Servicing Bank

12 - 7

of the Lending Office for each Credit for which it acts as Agent, and the Servicing Bank shall notify the Obligor of each such Lending Office.  Any Bank may at any time change the Lending Office of any Credit of such Bank by giving notice to the Obligor, the Servicing Bank and the Agents of such Bank designating a different office of such Bank (or its affiliate) as such Lending Office for purposes of this Agreement.

(b)  **Assignment by any Bank**.  Any Bank may at any time after the Effective Date assign its rights and obligations under this Agreement with respect to each Credit of such Bank as a whole to another bank or financial institution (an "Assignee"); provided that

(i)  such Bank shall not be relieved of any obligation so assigned unless the Assignee is a Controlled Affiliate of such Bank or such assignment is made with the Obligor's prior written consent (which shall not be unreasonably withheld and shall be deemed to have been given if the Obligor fails to reply to a request for its consent within 15 Business Days after its receipt thereof);

(ii)  the Obligor, the Servicing Bank and each Agent of such Bank may continue (A) to treat such Bank as a Bank named herein for all purposes hereof (including payments) until the Obligor, the Servicing Bank and each such Agent shall have received written notice of such assignment signed by such Bank and (B) to treat such Bank as a Bank named herein for all purposes hereof (other than payments) until the Obligor, the Servicing Bank and each such Agent shall have received an agreement (in form satisfactory to the Servicing Bank and each such Agent) signed by the Assignee that the Assignee is bound by this Agreement as fully and to the same extent as if originally named as a Bank herein; and

(iii)  upon compliance with subclause (A) of clause (ii) above, all payments in respect of the Credit assigned shall be made to the Assignee and upon compliance with subclause (B) of clause (ii) above, the Assignee shall become a "Bank" for all purposes hereof with respect to the rights and obligations assigned to it and the rights and obligations of the assigning Bank shall terminate.

Nothing in this Section shall prevent any Bank from granting participations in its rights under this Agreement if the existence of such participations does not affect the rights or obligations of any of the other parties to this Agreement.

12 - 8

(c)  Assignment by the Obligor or the Bank of
Zaire.  Neither the Obligor nor the Bank of Zaire shall
assign any of its rights or obligations under this Agree-
ment.

(d)  Special Definitions.  As used in this Sec-
tion, "assign" means assign or otherwise transfer; "rights"
means any rights or other benefits; and "Controlled Affili-
ate" of a Bank means any corporation directly or indirectly
controlled by, controlling or under common control with such
Bank.  For purposes of the foregoing definition, a Person
"controls" a corporation if such Person beneficially owns
more than 50% of the capital stock or equity interest having
voting power under ordinary circumstances in such corpora-
tion.

(e)  Limitation on Certain Payments.  The Obligor
shall not be obligated under Section 5.06 or 5.07 to (x)
make any greater payment to a Bank which changes any Lending
Office pursuant to this Section than such Bank would have
been entitled to receive if its Lending Office had not been
changed or (y) make any greater payment to an Assignee of
a Bank than such Bank would have been entitled to receive
with respect to the rights assigned to such Assignee, unless
such Lending Office was changed or such assignment was made
(i) with the Obligor's prior written consent (which shall
not be unreasonably withheld and shall be deemed to have
been given if the Obligor fails to reply to a request for
its consent within 15 Business Days after its receipt
thereof), (ii) at the request of the Obligor, (iii) to avoid
the requirement of prepayment in the circumstances contem-
plated by Section 4.03(b)(i) or (iv) at a time when the
circumstances giving rise to such greater payment did not
exist.

SECTION 12.10.  Governing Law.  This Agreement has
been negotiated, prepared, executed and delivered in
several jurisdictions.  Furthermore, the Servicing Bank, the
Agents and the Banks are organized under the laws of
various jurisdictions different from that of the Obligor and
the Bank of Zaire.  Accordingly, in order to establish
a certain body of well-developed commercial law to govern
this Agreement, the parties hereto have expressly agreed
that this Agreement shall be governed by, and construed in
accordance with, the laws of the State of New York, United
States of America, without giving effect to the principles
of choice of laws thereof.

SECTION 12.11.  Table of Contents and Section
Headings; Banking Terms.  The table of contents and the
headings herein are intended for convenience only and shall
be ignored in construing this Agreement.  All banking terms
not specifically defined herein shall be construed in
accordance with general practice among international commer-
cial banks in New York City and London.

SECTION 12.12.  Execution in Counterparts.  This
Agreement may be executed in any number of counterparts and
by different parties hereto in separate counterparts, each

of which when so executed shall be deemed to be an original
and all of which taken together shall constitute one and the
same agreement.   Complete sets of counterparts shall be
lodged with the Servicing Bank and the Obligor.   A set of
counterparts signed by the Obligor, the Bank of Zaire, the
Servicing Bank, each Agent and each Syndicate Member for
which an Agent acts shall be lodged with such Agent.

SECTION 12.13.    Obligations of the Banks and
Agents Several.    The obligations of the Banks and Agents
hereunder are several.   The failure of any Bank or Agent to
carry out its obligations hereunder shall not relieve any
other Bank, any other Agent, the Servicing Bank, the Obligor
or the Bank of Zaire of any of its obligations hereunder,
nor shall any Bank or Agent be responsible for the obliga-
tions of, or any action taken or omitted by, any other Bank
or Agent hereunder.

SECTION 12.14.    Termination.    This Agreement and
all rights, obligations and duties of the parties hereunder
shall terminate on the 90th day after the date hereof if the
Effective Date shall not have occurred prior to such day
[except such rights, obligations and duties as shall have
accrued on or prior to such termination or shall arise
thereafter under Section 5.01, 11.04 or 12.05], provided
that such termination date may be extended once with the
consent of all the Agents to a day not later than the 120th
day after the date hereof and may be further extended with
the consent of all the Banks.

IN WITNESS WHEREOF, the parties hereto have
caused this Agreement to be executed by their respective
officials, officers or agents thereunto duly authorized, as
of the date first above written.

12 - 10

REPUBLIC OF ZAIRE                         BANK OF ZAIRE

By /s/ Namwisi Ma Koyi              By /s/ Emony Mondanga
      Commissaire d'Etat                   Gouverneur
      aux Finances et Budget

Address: Départment des Finances    Address:   B.P. 2697
         et Budget                             Kinshasa I
         B.P. 12997                            Zaire
         Kinshasa I
         Zaire

Attention:  Commissaire d'Etat      Attention:  Gouverneur
            aux Finances et Budget
Telex:      21161                   Telex:      21335

Answerback: DPTFIN ZR               Answerback: BZKIN ZR


                   THE BANK OF TOKYO TRUST COMPANY,
                        as Servicing Bank

                   By /s/ Michiaki Matsuda
                        Senior Vice President

                   Address:   100 Broadway
                              New York, New York 10005
                              U.S.A.

                   Attention: Trust Department

                   Telex:   420742

                   Answerback: TOHBANK

12 - 11

AS AGENTS

BANKERS TRUST COMPANY

By /s/ Peter C. Blenk
   Vice President


Address:
9 Queen Victoria Street
London EC4P 4DB
England


Attention:  Loan Division

Telex:  883341

Answerback:  BTCO A-C G

BANQUE FRANCAISE DU COMMERCE
   EXTERIEUR

By /s/ J.J. Brun
   Fondé de Pouvoirs

By /s/ Gilbert Lacan
   Sous Directeur

Address:
21, boulevard Haussman
75009 Paris
France


Attention:  M. Thierry Becker

Telex:  660370

Answerback:  BFCE PARIS


BANQUE NATIONALE DE PARIS

By /s/ P.H. Herr
   Sous Directeur


Address:
16, boulevard des Italiens
75009 Paris
France


Attention:
M. Meneau, ler Fonde
du Pouvoirs

Telex:  280605

Answerback:  NATIOPAR

BANQUE DE PARIS ET DES PAYS-BAS

By /s/ T.J.L. Taylor
   Attorney-in-Fact


Address:
Boite Postale 141
3 rue d'Antin
75060 Paris Cedex 02
France


Attention:
M. Larlane
Relations Étrangères

Telex:  210041

Answerback:  PARISBAS

12 - 12

CHASE MANHATTAN BANK, N.A.

By /s/ Jean Louis Glaizes
    Vice President

Address:

1 Chase Manhattan Plaza
New York, New York 10081
U.S.A.

Attention: Mr. John Charlton

Telex:  RCA - 232163
       ITT - 420650

Answerback:  RCA - CMB UR
         ITT - CMB UI


CITIBANK, N.A.

By /s/ Wilder K. Abbott
    Vice President

Address:

Asia/Australia/Middle East/
  Africa Group
399 Park Avenue - 5th Floor
New York, New York 10043
U.S.A.

Attention: Mr. B.C. Wehrman, V.P.

Telex:  RCA - 235530
       ITT - 420392

Answerback:  RCA - FNCB UR
         ITT - FNC UIA


CITICORP INTERNATIONAL BANK
  LIMITED

By /s/ François Bervé
    Attorney-in-Fact

Address:
335 Strand
London WC2R 1LS
England

Attention:  Loans Agency

Telex:  299831

Answerback:  CIBILG


COMMERCE UNION BANK

By /s/ Tone M. Grant
    Secretary and
    General Counsel

Address:
One Commerce Place
Nashville, Tennessee 37219
U.S.A.

Attention:
General Counsel
Tennessee Valley Bancorp, Inc.
and Commerce Union Bank

Telex:  554389

Answerback: COMUNIONBK NAS

12 - 13

CREDIT COMMERCIAL DE FRANCE

By /s/ Paul J. Monnory
Attorney-In-Fact

Address:
103, avenue des Champs-
Elysées
75008 Paris
France


Attention:   M. O'Neill and
M. d'Aloia

Telex:   620086 F

Answerback:  CCFAF


EQUATOR BANK LIMITED

By /s/ Paul J. Monnory
Attorney-In-Fact

Address:
P.O. Box N3249
Beaumont House Bay Street
Nassau, N.P. Bahamas

cc:  Equator Bank Limited
777 Main Street
Hartford, Connecticut 06115
U.S.A.


Telex:   99356

Answerback:  EQUATOR BK HFD


GRINDLAY BRANDTS LIMITED

By /s/ Charles von Westenholz
Director

Address:
23 Fenchurch Street
London EC3P 3ED
England


Attention:
Loans Administration Unit/
Eurocurrency Department

Telex:  889304

Answerback:  GBRNDT G


MORGAN GRENFELL & CO.
LIMITED

By /s/ M.J.D. Ripley
Attorney-In-Fact

Address:
23 Great Winchester Street
London EC2P 2AX
England

Attention:
Currency Loans Dept./
Credit Administration Dept.

Telex:  886815

Answerback:  MG LDN G

12 - 14

MORGAN GUARANTY TRUST COMPANY
OF NEW YORK

By /s/ T.H. Donaldson
Vice President

P.O. Box 161
Morgan House
1 Angel Court
London EC2R 7AE
England

Attention:
T.H. Donaldson, V.P.

Telex:  896631

Answerback:  MGT

RABOAMERICA INTERNATIONAL BANK
N.V.

By /s/ B. van der Kwast
Attorney-In-Fact

c/o Centrale Rabobank
P.O. Box 8098
3503 SE Utrecht
The Netherlands

Attention:
B.V.D. Kwast
J.A.F. Doornbos

Telex:  40200

Answerback:  RABO NL

SOCIETE GENERALE DE BANQUE S.A.

By /s/ Georges Roger
Attorney-In-Fact

Address:
Rue Montagne du Parc, 3
B-1000-Brussels
Belgium

Attention:
M. Baudoux or P. Baldan
Arbitrage Department

Telex:  22029

Answerback:  GEXBR B

12 - 15

BANKS

AMERICAN EXPRESS INTERNATIONAL
   BANKING CORPORATION

By /s/ Paul J. Monnory
      Attorney-in-Fact


AMERICAN EXPRESS INTERNATIONAL
   BANKING CORPORATION (BELGIUM)

By /s/ Georges Roger
      Attorney-in-Fact


AMSTERDAM-ROTTERDAM BANK N.V.

By /s/ Georges Roger
      Attorney-in-Fact


ASSOCIATED JAPANESE BANK
   (INTERNATIONAL) LIMITED

By /s/ Charles von Westenholz
      Attorney-in-Fact


BANCA COMMERCIALE ITALIANA

By /s/ D.J. Paget
      Attorney-in-Fact


BANCA COMMERCIALE ITALIANA
   (LONDON)

By /s/ D.J. Paget
      Attorney-in-Fact


BANCA COMMERCIALE ITALIANA
   OVERSEAS LIMITED (NASSAU)

By /s/ Georges Roger
      Attorney-in-Fact

12 - 16

BANK OF AMERICA NATIONAL TRUST
& SAVINGS ASSOCIATION

By /s/ B. van der Kwast
      Attorney-in-Fact


BANK OF MONTREAL

By /s/ G. Smith
      Area Manager Africa


BANK OF MONTREAL INTERNATIONAL
   LIMITED

By /s/ G. Smith
      Attorney-in-Fact


THE BANK OF TOKYO, BRUSSELS

By /s/ Yamada Yasuro
      Directeur


BANKERS TRUST COMPANY

By /s/ Peter C. Blenk
      Vice President


BANQUE ARABE ET INTERNATIONALE
   D'INVESTISSEMENT

By /s/ P. d'A. Willis
      Attorney-in-Fact


BANQUE BELGE LIMITED

By /s/ François Hervé
      Attorney-in-Fact

12 - 17

BANQUE BELGO-ZAIROISE S.A.

By /s/ Georges Roger
      Attorney-In-Fact


BANQUE BRUXELLES-LAMBERT S.A.

By /s/ D.J. Paget
      Attorney-In-Fact


BANQUE COMMERCIALE POUR
  L'EUROPE DU NORD (EUROBANK)

By /s/ Patrice Remond
      Attorney-In-Fact


BANQUE EUROPEENNE DE TOKYO S.A.

By /s/ Yukio Koba
      Directeur Adjoint


BANQUE FRANCAISE DU COMMERCE
  EXTERIEUR

By /s/ J.J. Brun
      Fondé de Pouvoirs

By /s/ Gilbert Lacan
      Sous Directeur


BANQUE FRANCO-ROUMAINE

By /s/ Paul J. Monnory
      Attorney-In-Fact


BANQUE DE L'INDOCHINE ET DE SUEZ

By /s/ Paul J. Monnory
      Attorney-In-Fact

12 - 18

BANQUE INTERNATIONALE POUR
  L'AFRIQUE OCCIDENTALE

By /s/ D. Demarquette
       Directeur

By /s/ H. Clerc
       Attache de Direction


BANQUE LOUIS-DREYFUS

By /s/ Jean-Luc Herrenschmidt
       Manager


BANQUE NATIONALE DE PARIS

By /s/ P.H.Herr
       Sous Directeur


BANQUE DE PARIS ET DES PAYS-BAS

By /s/ T.J.L. Taylor
       Attorney-in-Fact


BANQUE DE L'UNION EUROPEENNE

By /s/ Arnaud de Beauregard
       Attorney-in-Fact


BANQUE VERNES ET COMMERCIALE
  DE PARIS

By /s/ Christian Ginolhac
       Attorney-in-Fact


BARCLAYS BANK INTERNATIONAL
  LIMITED

By /s/ P.A.S. Scott
       International Manager

12 - 19

BAYERISCHE VEREINSBANK INTER-
   NATIONAL SOCIETE ANONYME

By /s/ Charles von Westenholz
       Attorney-in-Fact


CALIFORNIA FIRST BANK

By /s/ Ione N. Grant
       Attorney-in-Fact


CANADIAN IMPERIAL BANK OF
   COMMERCE

By /s/ W.J.D. Ripley
       Attorney-in-Fact


CHASE MANHATTAN BANK, N.A.

By /s/ Jean Louis Gleizes
       Vice President


CHASE INTERNATIONAL INVESTMENT
   CORPORATION

By /s/ Jean Louis Gleizes
       Attorney-in-Fact


CHEMICAL BANK

By /s/ Charles J. Moizeau
       Vice President


THE CHUO TRUST & BANKING
   COMPANY LIMITED

By /s/ W.J.D. Ripley
       Attorney-in-Fact

12 - 20

CITIBANK, N.A.

By /s/ Wilder K. Abbott
        Vice President

CITICORP INTERNATIONAL BANK
LIMITED

By /s/ François Hervé
        Attorney-in-Fact

COMMERCE UNION BANK

By /s/ Tone N. Grant
        Secretary and
        General Counsel

CONTINENTAL ILLINOIS NATIONAL
   BANK AND TRUST COMPANY
   OF CHICAGO

By /s/ Chantal Mestres
        Second Vice President

CREDIT COMMERCIAL DE FRANCE

By /s/ Paul J. Monnory
        Attorney-in-Fact

CREDIT INDUSTRIEL ET COMMERCIAL

By /s/ Edouard Charles Emmet
        Attorney-in-Fact

CREDIT LYONNAIS

By /s/ Jean Roussel
        Attorney-in-Fact

12 - 21

CREDITO ITALIANO

By /s/ Antonino Parisi
      Attorney-in-Fact


CREDITO ITALIANO-LONDON

By /s/ Antonino Parisi
      Attorney-in-Fact

DAI-ICHI KANGYO BANK, LIMITED

By /s/ T.H.Donaldson
      Attorney-in-Fact


THE DAIWA BANK, LIMITED

By /s/ H.J.D. Ripley
      Attorney-in-Fact


DAIWA EUROPE N.V.

By /s/ François Hervé
      Attorney-in-Fact


DETROIT BANK AND TRUST COMPANY

By /s/ Tony N. Grant
      Attorney-in-Fact


ELECTRO BANQUE

By /s/ Louis Dixneuf
      Manager

12 - 22

EQUATOR BANK LIMITED

By /s/ Paul J. Monnory
      Attorney-in-Fact


EUROPEAN AMERICAN BANKING CORPORATION

By /s/ Georges Roger
      Attorney-in-Fact


EUROPEAN-ARAB BANK S.A.

By /s/ Georges Roger
      Attorney-in-Fact


FEDERAL DEPOSIT INSURANCE
   CORPORATION (AS LIQUIDATOR
   OF FRANKLIN NATIONAL BANK)

By /s/ N.J.D. Ripley
      Attorney-in-Fact


THE FIDELITY BANK

By /s/ Wilder X. Abbott
      Attorney-in-Fact


FIDELITY UNION TRUST
   COMPANY OF NEW JERSEY

By /s/ Paul J. Monnory
      Attorney-in-Fact


THE FIRST NATIONAL BANK
   OF CHICAGO

By /s/ Richard W. Lombardi
      Assistant Vice President

12 - 23

FIRST PENNSYLVANIA BANK N.A.

By /s/ Peter C. Blenk
     Attorney-In-Fact


PRAB BANK INTERNATIONAL

By /s/ Gerard Sibert
     Attorney-In-Fact


FRENCH AMERICAN BANKING COR-
  PORATION

By /s/ Jacques Azoulai
     Attorney-In-Fact


FRENCH-ARAB BANK FOR INTER-
  NATIONAL INVESTMENTS

By /s/ Gerard Sibert
     Attorney-In-Fact


THE FUJI BANK, LIMITED

By /s/ T. Kitamura
     Manager


THE FUJI BANK, LIMITED
  (NEW YORK AGENCY)

By /s/ T. Kitamura
     Manager


GRINDLAY BRANDTS LIMITED

By /s/ Charles von Westenholz
     Director

12 - 24

GRINDLAYS BANK LIMITED

By /s/ Charles von Westenholz
     Attorney-in-Fact


GRINDLAYS BANK S.A.

By /s/ Charles von Westenholz
     Attorney-in-Fact


HARTFORD NATIONAL BANK
   AND TRUST COMPANY

By /s/ Tone N. Grant
     Attorney-in-Fact


THE HOKKAIDO TAKUSHOKU BANK
   LIMITED

By /s/ N.J.D. Ripley
     Attorney-in-Fact


THE INDUSTRIAL BANK OF
   JAPAN LIMITED

By /s/ T.B. Donaldson
     Attorney-in-Fact


INTERNATIONAL COMMERCIAL
   BANK LIMITED

By /s/ D.J. Paget
     Attorney-in-Fact


INTERNATIONAL WESTMINSTER
   BANK LIMITED

By /s/ François Hervé
     Attorney-in-Fact

12 - 25

IRVING TRUST COMPANY

By /s/ Georges Roger
      Attorney-in-Fact


JAPAN INTERNATIONAL
  BANK LIMITED

By /s/ N.J.D. Ripley
      Attorney-in-Fact


THE KYOWA BANK, LTD.

By /s/ Paul J. Monnory
      Attorney-in-Fact


LAVORO BANK OVERSEAS N.V.

By /s/ Peter C. Blenk
      Attorney-in-Fact


LIBYAN ARAB FOREIGN BANK

By /s/ Saed El Atrash
      Attorney-in-Fact


LLOYDS BANK INTERNATIONAL
  LIMITED

By /s/ A.J. Moseley
      Attorney-in-Fact


THE LONG-TERM CREDIT BANK
  BANK OF JAPAN, LIMITED

By /s/ T. Watanabe
      Chief Representative

12 - 26

MANUFACTURERS HANOVER
   TRUST COMPANY

By /s/ Peter C. Blenk
      Attorney-in-Fact


MARINE MIDLAND BANK N.A.

By /s/ Michel Margueron
      Vice President


MIDLAND BANK LIMITED

By /s/ T.J. Redman
      Manager, Loan
      Syndication Dept.


THE MITSUBISHI BANK,
   LIMITED

By /s/ Hajime Oda
      Manager


THE MITSUBISHI TRUST AND
   BANKING CORPORATION

By /s/ N.J.D. Ripley
      Attorney-in-Fact


THE MITSUI BANK, LIMITED

By /s/ Yoshinori Tsutsumi
      Assistant Manager


THE MITSUI BANK, LIMITED
   (BRUSSELS)

By /s/ Yoshinori Tsutsumi
      Assistant Manager

12 - 27

THE MITSUI BANK, LIMITED
  (NEW YORK AGENCY)

By /s/ Yoshinori Tsutsumi
     Assistant Manager


THE MITSUI TRUST AND BANKING
  COMPANY LIMITED

By /s/ N.J.D. Ripley
     Attorney-in-Fact


MONTE DEI PASCHI DI SIENA

By /s/ Georges Roger
     Attorney-in-Fact


MORGAN GRENFELL & CO. LIMITED

By /s/ N.J.D. Ripley
     Attorney-in-Fact


MORGAN GUARANTY TRUST
  COMPANY OF NEW YORK

By /s/ T.H.Donaldson
     Vice President


MOSCOW NARODNY BANK LIMITED

By /s/ N.J.D. Ripley
     Attorney-in-Fact


NATIONAL BANK OF CANADA

By /s/ Laurent Dufau
     Area Manager

12 - 28

NATIONAL CITY BANK
  OF CLEVELAND

By /s/ Wilder K. Abbott
    Attorney-in-Fact


NEDERLANDSE CREDIETBANK N.V.

By /s/ D. van der Kwast
    Attorney-in-Fact


THE NIPPON CREDIT BANK, LTD.

By /s/ N.J.D. Ripley
    Attorney-in-Fact


THE NIPPON TRUST AND
  BANKING CO., LTD.

By /s/ N.J.D. Ripley
    Attorney-in-Fact


NOMURA EUROPE N.V.

By /s/ François Hervé
    Attorney-in-Fact


NORTH CAROLINA NATIONAL BANK

By /s/ Peter C. Blenk
    Attorney-in-Fact


THE PHILADELPHIA NATIONAL
  BANK

By /s/ Didier Defert
    Assistant Vice President
    and Representative

12 — 29

RABOMERICA INTERNATIONAL
BANK N.V.

By /s/ B. van der Kwast
        Attorney-in-Fact


REPUBLIC INTERNATIONAL BANK
OF NEW YORK, MIAMI

B /s/ Tone N. Grant
        Attorney-in-Fact


REPUBLIC NATIONAL BANK OF
NEW YORK (INTL) LIMITED

By /s/ Charles von Westenholz
        Attorney-in-Fact


REPUBLIC NATIONAL BANK
OF NEW YORK, NEW YORK

By /s/ Tone N. Grant
        Attorney-in-Fact


THE ROYAL BANK OF CANADA

By /s/ R.C. French
        Attorney-in-Fact


THE ROYAL BANK OF CANADA
  (FRANCE)

By /s/ B. Hodges
        Attorney-in-Fact


ROYWEST BANKING CORPORATION
  LIMITED

By /s/ N.J.D. Ripley
        Attorney-in-Fact

12 - 30

THE SAITAMA BANK, LTD.

By /s/ Charles von Westenholz
    Attorney-in-Fact

THE SANWA BANK, LIMITED

By /s/ N.J.D. Ripley
    Attorney-in-Fact

SOCIETE FINANCIERE POUR LES
   PAYS D'OUTRE-MER

By /s/ Charles von Westenholz
    Attorney-in-Fact

SOCIETE GENERALE

By /s/ Françoise de Galis
    Attorney-in-Fact

SOCIETE GENERALE DE
   BANQUE S.A.

By /s/ Georges Roger
    Attorney-in-Fact

SOCIETE INTERNATIONALE
   FINANCIERE POUR LES
   INVESTISSEMENTS ET LE
   DEVELOPPEMENT EN AFRIQUE
   S.A. (SIFIDA)

By /s/ A. Bochet
    Attorney-in-Fact

STANDARD CHARTERED BANK LIMITED

By /s/ N.J. Holden
    Attorney-in-Fact

12 - 31

THE SUMITOMO BANK, LIMITED

By /s/ Takayuki Tsukuda
       Assistant General Manager


THE SUMITOMO TRUST AND BANKING
    COMPANY LIMITED

By /s/ N.J.D. Ripley
       Attorney-in-Fact


TAIYO KOBE BANK, LTD.
(LONDON BRANCH)

By /s/ N.J.D. Ripley
       Attorney-in-Fact


THE TOKAI BANK LIMITED

By /s/ T.H. Donaldson
       Attorney-in-Fact


GRINDLAY BRANDTS LIMITED for
    TRADE DEVELOPMENT BANK

By /s/ Charles von Westenholz
       Attorney-in-Fact


UBAF BANK LIMITED

By /s/ N.J.D. Ripley
       Attorney-in-Fact


UNION DE BANQUES ARABES
    ET FRANCAISES - U.B.A.F.

By /s/ Rachid Hassam
       Attorney-in-Fact

12 - 32

UNITED CALIFORNIA BANK

By /s/ R.J. Chenballs-Walker
      Assistant Vice President


VEREINS-UND WESTBANK INTER-
   NATIONALE S.A.

By /s/ Michael Jacobs
      Managing Director


WELLS FARGO BANK, N.A.

By /s/ Jacques de la Chauviniere
      Vice President


THE YASUDA TRUST AND
   BANKING COMPANY LIMITED

By /s/ François Hervé
      Attorney-in-Fact

Schedule A-

## CREDIT INFORMATION SCHEDULE

### Section A:  Basic Information

1. Existing Agent:

2. Agent:

3. Currency of Credits:

4. Existing Agreement Identification:

### Section B:  Information as to Interim Rate Election

*[Either]*

5. The Interim Rate Election has been made for all Credits listed on this Credit Information Schedule.

*[or]*

5. The Interim Rate Election has not been made for all Credits listed on this Credit Information Schedule.

### Section C:  Information as to Each Credit

| Syndicate Number | Outstanding Principal Amount | Reference Date Principal | First Principal Payment | Refinanced Principal Amount | Reference Date Interest |
|---|---|---|---|---|---|

Schedule A-

# SINGLE BANK CREDIT INFORMATION SCHEDULE

**Section A:   Basic Information**

1.  Bank:

2.  Currency of Credit:

3.  Existing Agreement Identification:

**Section B:   Information as to Interim Rate Election**

*[Either]*

4.  The Interim Rate Election has been made for all Credits
    listed on this Credit Information Schedule.

*[Or]*

4.  The Interim Rate Election has not been made for all Credits
    listed on this Credit Information Schedule.

**Section C:   Information as to Simple Bank Credit**

| Outstanding Principal Amount | Refinanced Principal Amount | Reference Date Principal | First Principal Payment | Reference Date Interest |
|---|---|---|---|---|

Schedule A-1, page 1

## CREDIT INFORMATION SCHEDULE

### Section A: Basic Information

1. Existing Agent: BANKERS TRUST COMPANY

2. Agent: BANKERS TRUST COMPANY

3. Currency of Credit: U.S. Dollars

4. Existing Agreement Identification:
   Eurodollar Loan Agreement
   Dated October 30, 1970
   The Democratic Republic of the Congo
   U.S.$ 25,000,000

### Section B: Information as to Interim Rate Election

5. The Interim Rate Election has been made for all Credits listed on this Credit Information Schedule.

### Section C: Information as to Each Credit

| Syndicate Member | Outstanding Principal Amount | Reference Date Principal | First Principal Payment | Refinanced Principal Amount | Reference Date Interest |
|---|---|---|---|---|---|
| Bank of America NT & SA | 574,000 | 574,000 | 57,400 | 516,600 | 92,916.25 |
| Bankers Trust Company | 574,000 | 574,000 | 57,400 | 516,600 | 92,916.25 |
| Banque Europeenne de Tokyo S.A. | 148,000 | 148,000 | 14,800 | 133,200 | 23,957.50 |
| Chase Manhattan Bank, N.A. | 574,000 | 574,000 | 57,400 | 516,600 | 92,916.25 |
| Citibank, N.A. | 574,000 | 574,000 | 57,400 | 516,600 | 92,916.25 |
| Continental Illinois National Bank and Trust Company of Chicago | 148,000 | 148,000 | 14,800 | 133,200 | 23,957.50 |
| First Pennsylvania Bank N.A. | 148,000 | 148,000 | 14,800 | 133,200 | 23,957.50 |

Schedule A-1, page 2

## CREDIT INFORMATION SCHEDULE

### Section C:  Information as to Each Credit (continued)

| Syndicate Member | Outstanding Principal Amount | Reference Date Principal | First Principal Payment | Refinanced Principal Amount | Reference Date Interest |
|---|---|---|---|---|---|
| International Westminster Bank Limited | 290,000 | 290,000 | 29,000 | 261,000 | 46,943.75 |
| Manufacturers Hanover Trust Company | 148,000 | 148,000 | 14,800 | 133,200 | 23,957.50 |
| Marine Midland Bank N.A. | 148,000 | 148,000 | 14,800 | 133,200 | 23,957.50 |
| Standard Chartered Bank Limited | 290,000 | 290,000 | 29,000 | 261,000 | 46,943.75 |

Schedule A-2, page 1

## CREDIT INFORMATION SCHEDULE

### Section A: Basic Information

1. Existing Agent: BANKERS TRUST COMPANY

2. Agent: BANKERS TRUST COMPANY

3. Currency of Credit: U.S. Dollars

4. Existing Agreement Identification:
   Eurodollar Loan Agreement
   Dated as of February 16, 1972
   Air Zaire, as Borrower
   The Republic of Zaire, as Guarantor
   U.S. $30,000,000

### Section B: Information as to Interim Rate Election

5. The Interim Rate Election has been made for all Credits listed on this Credit Information Schedule.

### Section C: Information as to Each Credit

| Syndicate Member | Outstanding Principal Amount | Reference Date Principal | First Principal Payment | Refinanced Principal Amount | Reference Date Interest |
|---|---|---|---|---|---|
| Bank of Montreal International Limited | 2,727,375 | 2,727,375 | 272,737 | 2,454,638 | 363,719.84 |
| Bankers Trust Company | 3,091,025 | 3,091,025 | 309,102 | 2,781,923 | 392,921.98 |
| Banque Bruxelles-Lambert S.A. | 727,300 | 727,300 | 72,730 | 654,570 | 75,489.67 |
| Banque Française du Commerce Extérieur | 363,650 | 363,650 | 36,365 | 327,285 | 37,744.82 |
| Chemical Bank | 1,454,600 | 1,454,600 | 145,460 | 1,309,140 | 160,650.57 |
| Continental Illinois National Bank and Trust Company of Chicago | 2,181,900 | 2,181,900 | 218,190 | 1,963,710 | 210,975.83 |
| Lazard Bank Overseas N.V. | 727,300 | 727,300 | 72,730 | 654,570 | 75,489.67 |

## CREDIT INFORMATION SCHEDULE

### Section C: Information as to Each Credit (continued)

| Syndicate Member | Outstanding Principal Amount | Reference Date Principal | First Principal Payment | Refinanced Principal Amount | Reference Date Interest |
|---|---|---|---|---|---|
| Lloyds Bank International Limited | 727,300 | 727,300 | 72,730 | 654,570 | 75,489.67 |
| Midland Bank Limited | 363,680 | 363,650 | 36,365 | 327,285 | 37,744.82 |
| North Carolina National Bank | 727,300 | 727,300 | 72,730 | 654,570 | 70,325.28 |
| Société Générale de Banque S.A. | 1,454,600 | 1,454,600 | 145,460 | 1,309,160 | 150,979.32 |

Schedule A-3

## CREDIT INFORMATION SCHEDULE

### Section A: Basic Information

1. Existing Agent: BANQUE FRANCAISE DU COMMERCE EXTERIEUR

2. Agent: BANQUE FRANCAISE DU COMMERCE EXTERIEUR

3. Currency of Credit: U.S. Dollars

4. Existing Agreement Identification:
Convention de Prêt, dated July 16, 1971
between Borrowertura Nyamu, as Borrower
The Republic of Zaire, as Guarantor
U.S.$600,000

### Section B: Information as to Interim Rate Election

5. The Interim Rate Election has been made for all Credits listed on this Credit Information Schedule.

### Section C: Information as to Each Credit

| Syndicate Member | Outstanding Principal Amount | Reference Date Principal | First Principal Payment | Refinanced Principal Amount | Reference Date Interest |
|---|---|---|---|---|---|
| Banque Commerciale Pour L'Europe du Nord (Eurobank) | 75,000 | 75,000 | 7,500 | 67,500 | 41,860.77 |
| Banque Francaise du Commerce Exterieur | 150,000 | 150,000 | 15,000 | 135,000 | 83,721.55 |
| Crédit Lyonnais | 75,000 | 75,000 | 7,500 | 67,500 | 41,860.77 |

Schedule A-1

## CREDIT INFORMATION SCHEDULE

### Section A:  Basic Information

1. Existing Agent:  BANQUE NATIONALE DE PARIS

2. Agent:  BANQUE NATIONALE DE PARIS

3. Currency of Credit:  U.S. Dollars

4. Existing Agreement Identification:
   Accord de Financement
   Dated September 4, 1974
   République du Zaïre
   U.S.$8,000,000

### Section B:  Information as to Interim Rate Election

5. The Interim Rate Election has been made for all Credits listed on this Credit Information Schedule.

### Section C:  Information as to Each Credit

| Syndicate Member | Outstanding Principal Amount | Reference Date Principal | First Principal Payment | Refinanced Principal Amount | Reference Date Interest |
|---|---|---|---|---|---|
| Banque Arabe et Internationale d'Investissement | 444,293.12 | 444,293.12 | 44,429 | 399,864.12 | 34,533.60 |
| Banque Commerciale Pour L'Europe du Nord (Eurobank) | 444,293.12 | 444,293.12 | 44,429 | 399,864.12 | 34,533.60 |
| Banque de l'Union Européenne | 444,293.12 | 444,293.12 | 44,429 | 399,864.12 | 34,533.60 |
| Banque Française du Commerce Extérieur | 111,073.28 | 111,073.28 | 11,107 | 99,966.28 | 8,633.42 |
| Banque Nationale de Paris | 999,659.52 | 999,659.52 | 99,966 | 899,693.52 | 77,700.62 |
| Crédit Lyonnais | 999,659.52 | 999,659.52 | 99,966 | 899,693.52 | 77,700.62 |
| Société Générale | 999,659.52 | 999,659.52 | 99,966 | 899,693.52 | 77,700.62 |

Schedule A-5

## CREDIT INFORMATION SCHEDULE

### Section A:  Basic Information

1. Existing Agent: BANQUE DE PARIS ET DES PAYS-BAS

2. Agent: BANQUE DE PARIS ET DES PAYS-BAS

3. Currency of Credit: U.S. Dollars

4. Existing Agreement Identification:
   Accord de Prêt
   Dated October 23, 1975
   République du Zaire
   U.S.$3,200,000

### Section B:  Information as to Interim Rate Election

5. The Interim Rate Election has not been made for all Credits listed on this Credit Information Schedule.

### Section C:  Information as to Each Credit

| Syndicate Member | Outstanding Principal Amount | Reference Date Principal | First Principal Payment | Refinanced Principal Amount | Reference Date Interest |
|---|---|---|---|---|---|
| Banque Française du Commerce Extérieur | 400,000 | 240,000 | 24,000 | 376,000 | 64,206.40 |
| Banque de Paris et des Pays-Bas | 666,666.67 | 400,000 | 40,000 | 626,666.67 | 107,010.66 |
| Banque de l'Union Européenne | 666,666.67 | 400,000 | 40,000 | 626,666.67 | 107,010.66 |
| Banque Worms et Commerciale de Paris | 266,666.67 | 160,000 | 16,000 | 250,666.67 | 42,804.26 |
| Crédit Lyonnais | 666,666.67 | 400,000 | 40,000 | 626,666.67 | 107,080.66 |

CREDIT INFORMATION SCHEDULE

Schedule A-6

## Section A:  Basic Information

1.  Existing Agent:  CHASE MANHATTAN BANK, N.A.

2.  Agent:  CHASE MANHATTAN BANK, N.A.

3.  Currency of Credit:  U.S. Dollars

4.  Existing Agreement Identification:
    Debenture Loan Agreement
    Dated as of July 25, 1972, as amended
    Société Textile de Kisangani, S.A. (SOTEXKI),
    as Borrower
    The Republic of Zaire, as Guarantor

## Section B:  Information as to Interim Rate Election

5.  The Interim Rate Election has been made for all Credits
    listed on this Credit Information Schedule.

## Section C:  Information as to Each Credit

| Syndicate Member | Outstanding Principal Amount | Reference Date Principal | First Principal Payment | Refinanced Principal Amount | Reference Date Interest |
|---|---|---|---|---|---|
| Chase International Investment Corporation | 1,173,831 | 658,831 | 45,883 | 1,127,948 | 129,121 |
| Société Générale | 361,179 | 141,179 | 14,118 | 347,061 | 39,730 |
| Société Internationale Financière Pour les Investissements et le Développement en Afrique S.A. (SIFIDA) | 722,357 | 282,357 | 28,236 | 694,121 | 79,659 |

Schedule A-7, page 1

## CREDIT INFORMATION SCHEDULE

### Section A: Basic Information

1. Existing Agent: CITIBANK, N.A.

2. Agent: CITIBANK, N.A.

3. Currency of Credit: U.S. Dollars

4. Existing Agreement Identification:
   Credit Agreement, dated as of August 25, 1972
   The Republic of Zaire, as Borrower
   U.S.$250,000,000

### Section B: Information as to Interim Rate Election

5. The Interim Rate Election has not been made for all Credits listed on this Credit Information Schedule.

### Section C: Information as to Each Credit

| Syndicate Member | Outstanding Principal Amount | Reference Date Principal | First Principal Payment | Refinanced Principal Amount | Reference Date Interest |
|---|---|---|---|---|---|
| Bank of America N.T. & S.A. | 4,500,000 | 4,500,000 | 450,000 | 4,050,000 | 311,140.63 |
| Bank of Montreal | 4,500,000 | 4,500,000 | 450,000 | 4,050,000 | 311,140.63 |
| Chemical Bank | 3,150,000 | 3,150,000 | 315,000 | 2,835,000 | 217,798.44 |
| Citibank, N.A. | 15,750,000 | 15,750,000 | 1,575,000 | 14,175,000 | 1,088,992.18 |
| The Fidelity Bank | 2,250,000 | 2,250,000 | 225,000 | 2,025,000 | 155,570.31 |
| First Pennsylvania Bank N.A. | 2,250,000 | 2,250,000 | 225,000 | 2,025,000 | 155,570.31 |
| The Fuji Bank, Limited (New York Agency) | 4,500,000 | 4,500,000 | 450,000 | 4,050,000 | 311,140.63 |

Schedule A-7, page 2

## CREDIT INFORMATION SCHEDULE

### Section C: Information as to Each Credit (continued)

| Syndicate Member | Outstanding Principal Amount | Reference Date Principal | First Principal Payment | Refinanced Principal Amount | Reference Date Interest |
|---|---|---|---|---|---|
| Irving Trust Company | 1,800,000 | 1,800,000 | 180,000 | 1,620,000 | 124,456.25 |
| National City Bank of Cleveland | 900,000 | 900,000 | 90,000 | 810,000 | 62,228.12 |
| The Philadelphia National Bank | 900,000 | 900,000 | 90,000 | 810,000 | 62,228.12 |
| The Sumitomo Bank, Limited | 4,500,000 | 4,500,000 | 450,000 | 4,050,000 | 311,140.63 |

Schedule A-8, page 1

## CREDIT INFORMATION SCHEDULE

### Section A: Basic Information

1. Existing Agent: CITIBANK, N.A.
2. Agent: CITIBANK, B.A.
3. Currency of Credit: U.S. Dollars
4. Existing Agreement Identification:
   Eurodollar Credit Agreement
   Dated as of February 14, 1974
   Société nationale d'Electricité, as Borrower
   The Republic of Zaire, as Guarantor
   U.S.$63,600,000

### Section B: Information as to Interim Rate Election

5. The Interim Rate Election has not been made for all Credits listed on this Credit Information Schedule.

### Section C: Information as to Each Credit

This Credit Information Schedule relates to B Advances made under the Agreement, identified in Item 4 above, such b Advances being Credits subject to refinancing under this Agreement. Other loans made under the Agreement identified in Item 4 are Other Credits and as such are not subject to refinancing under this Agreement.

| Syndicate Member | Outstanding Principal Amount | Reference Date Principal | First Principal Payment | Refinanced Principal Amount | Reference Date Interest(A) |
|---|---|---|---|---|---|
| Bank of Montreal | 2,940,000 | 1,960,000 | 196,000 | 2,744,000 | 111,747.22 |
| Banque Internationale Pour L'Afrique Occidentale | 1,470,000 | 980,000 | 98,000 | 1,372,000 | 55,873.61 |
| Chemical Bank | 2,058,000 | 1,372,000 | 137,200 | 1,920,800 | 78,223.06 |
| Citibank, N.A. | 5,292,000 | 3,528,000 | 352,800 | 4,939,200 | 201,145.00 |
| Continental Illinois National Bank and Trust Company of Chicago | 2,940,000 | 1,960,000 | 196,000 | 2,744,000 | 111,747.22 |

Schedule A-8, page 2

## CREDIT INFORMATION SCHEDULE

### Section C: Information as to Each Credit (continued)

| Syndicate Member | Outstanding Principal Amount | Reference Date Principal | First Principal Payment | Refinanced Principal Amount | Reference Date Interest(A) |
|---|---|---|---|---|---|
| First Pennsylvania Bank N.A. | 1,470,000 | 980,000 | 98,000 | 1,372,000 | 55,873.61 |
| The Fuji Bank, Limited (New York Agency) | 2,940,000 | 1,960,000 | 196,000 | 2,744,000 | 111,747.22 |
| Grindlays Bank Limited | 1,470,000 | 980,000 | 98,000 | 1,372,000 | 55,873.61 |
| The Mitsui Bank, Limited (New York Agency) | 2,940,000 | 1,960,000 | 196,000 | 2,744,000 | 111,747.22 |
| United California Bank | 2,940,000 | 1,960,000 | 196,000 | 2,744,000 | 111,747.22 |
| Wells Fargo Bank, N.A. | 2,940,000 | 1,960,000 | 196,000 | 2,744,000 | 111,747.22 |

Note: (A) The Reference Date Interest set forth in this Credit Information Schedule has been reduced by the amount of a payment received on February 6, 1980 and thus reflects the net amount due under Section 2.01 of the Agreement. The payment on February 6, 1980 covered an interest payment due on November 11, 1979, and the Reference Date Interest so set forth is interest accrued as of January 31, 1980 minus the interest received on February 6, 1980.

Schedule A-9, page 1

## CREDIT INFORMATION SCHEDULE

**Section A: Basic Information**

1. Existing Agent: CITICORP INTERNATIONAL BANK LIMITED

2. Agent: CITICORP INTERNATIONAL BANK LIMITED

3. Currency of Credit: U.S. Dollars

4. Existing Agreement Identification:
   Loan Agreement, dated September 25, 1973
   Office des Transports en Commun du Zaire, as Borrower
   Borrower:
   The Republic of Zaire, as Guarantor
   U.S.$34,000,000

**Section B:  Information as to Interim Rate Election**

5. The Interim Rate Election has not been made for all Credits listed on this Credit Information Schedule.

**Section C:  Information as to Each Credit**

| Syndicate Number | Outstanding Principal Amount | Reference Date Principal | First Principal Payment | Refinanced Principal Amount | Reference Date Interest |
|---|---|---|---|---|---|
| Associated Japanese Bank (International) Limited | 1,916,666.67 | 1,175,182.54 | 117,518 | 1,799,148.67 | 182,972.84 |
| Banque Belge Limited | 958,333.34 | 587,591.26 | 58,759 | 899,574.34 | 91,486.37 |
| Banque Belgo-Zairoise S.A. | 958,333.34 | 587,591.26 | 58,759 | 899,574.34 | 91,486.37 |
| Banque Commerciale Pour L'Europe du Nord (Eurobank) | 958,333.34 | 587,591.26 | 58,759 | 899,574.34 | 91,486.37 |
| Banque Française du Commerce Exterieur | 958,333.34 | 587,591.26 | 58,759 | 899,574.34 | 91,486.37 |
| Barclays Bank International Limited | 958,333.34 | 587,591.26 | 58,759 | 899,574.34 | 91,486.37 |

Schedule A-9, page 2

## Section C: CREDIT INFORMATION SCHEDULE
### Information as to Each Credit (continued)

| Syndicate Member | Outstanding Principal Amount | Reference Date Principal | First Principal Payment | Refinanced Principal Amount | Reference Date Interest |
|---|---|---|---|---|---|
| Citicorp International Bank Limited | 958,333.28 | 587,590.88 | 58,759 | 899,574.28 | 91,486.38 |
| Credit Industriel et Commercial | 958,333.34 | 587,591.26 | 58,759 | 899,574.34 | 91,486.37 |
| Credito Italiano – London | 857,333.34 | 587,591.26 | 58,759 | 899,574.34 | 91,486.37 |
| Daiwa Europe N.V. | 958,333.28 | 587,590.88 | 58,759 | 899,574.28 | 91,486.38 |
| Federal Deposit Insurance Corporation (as Liquidator of Franklin National Bank) | 1,750,000.61 | 1,077,992.64 | 107,299 | 1,642,701.61 | 167,062.09 |
| Franch-Arab Bank for International Investments | 958,333.34 | 587,591.26 | 58,759 | 899,574.34 | 91,486.37 |
| Grindlays Bank Limited | 958,333.34 | 587,591.26 | 58,759 | 880,574.34 | 91,486.37 |
| International Westminster Bank Limited | 958,333.34 | 587,591.26 | 58,759 | 899,574.34 | 91,486.37 |
| Japan International Bank Limited | 1,916,666.67 | 1,175,182.54 | 117,518 | 1,799,148.67 | 182,972.84 |
| The Mitsui Trust and Banking Company Limited | 958,333.34 | 587,591.26 | 58,759 | 899,574.34 | 91,486.37 |
| Mumusa Europe N.V. | 958,333.34 | 587,591.26 | 58,759 | 899,574.34 | 91,486.37 |
| The Saitama Bank, Ltd. | 958,333.34 | 587,591.26 | 58,759 | 899,574.34 | 91,486.37 |
| Union de Banques Arabes et Françaises – U.B.A.F. | 958,333.34 | 587,591.26 | 58,759 | 899,574.34 | 91,486.37 |
| The Yasuda Trust and Banking Corporation Limited | 1,916,666.67 | 1,175,182.54 | 117,518 | 1,799,148.67 | 182,972.84 |

## CREDIT INFORMATION SCHEDULE

### Section A:  Basic Information

1. Existing Agent:  COMMERCE UNION BANK

2. Agent:  COMMERCE UNION BANK

3. Currency of Credit:  U.S. Dollars

4. Existing Agreement Identification:
   Master Loan Agreement
   Dated as of May 2, 1973
   The Republic of Zaire
   U.S.$13,000,000,000

### Section B:   Information as to Interim Rate Election

5. The Interim Rate Election has not been made for all Credits
   listed on this Credit Information Schedule.

### Section C:  Information as to Each Credit

| Syndicate Member | Outstanding Principal Amount | Reference Date Principal | First Principal Payment | Refinanced Principal Amount | Reference Date Interest |
|---|---|---|---|---|---|
| American Express International Banking Corporation | 1,397,025.77 | 1,397,025.77 | 139,703 | 1,257,322.77 | 76,324.42 |
| California First Bank | 698,512.89 | 698,512.89 | 69,851 | 628,661.89 | 38,162.18 |
| Commerce Union Bank | 698,512.92 | 698,512.92 | 69,851 | 628,661.92 | 38,162.18 |
| Detroit Bank and Trust Company | 698,512.89 | 698,512.89 | 69,851 | 628,661.89 | 38,162.18 |
| European American Banking Corporation | 2,444,795.09 | 2,444,795.09 | 244,480 | 2,200,315.09 | 133,568.13 |
| The First National Bank of Chicago | 1,397,025.77 | 1,397,025.77 | 139,703 | 1,257,322.77 | 76,324.42 |

## CREDIT INFORMATION SCHEDULE

### Section C:  Information as to Each Credit (continued)

| Syndicate Member | Outstanding Principal Amount | Reference Date Principal | First Principal Payment | Refinanced Principal Amount | Reference Date Interest |
|---|---|---|---|---|---|
| Hartford National Bank and Trust Company | 698,812.89 | 698,512.89 | 69,852 | 528,660.89 | 38,162.18 |
| Republic International Bank of New York, Miami | 261,942.31 | 261,942.31 | 26,194 | 235,748.31 | 14,310.74 |
| Republic National Bank of New York, New York | 436,570.55 | 436,570.55 | 43,657 | 392,913.55 | 23,833.27 |

Schedule A-11(A)

## CREDIT INFORMATION SCHEDULE

### Section A: Basic Information

1. Existing Agent: CREDIT COMMERCIAL DE FRANCE

2. Agent: CREDIT COMMERCIAL DE FRANCE

3. Currency of Credit: U.S. Dollars

4. Existing Agreement Identification:
   Convention de Prêt, du July 18, 1971
   Avenant, du April 11, 1972
   entre la République du Zaire et le
   Crédit Commercial de France
   U.S.$1,280,936.49

### Section B: Information as to Interim Rate Election

5. The Interim Rate Election has not been made for all Credits listed on this Credit Information Schedule.

Each of Credit Information Schedule A-11(A) and Credit Information Schedule A-11(B) identifies Credits which were extended under the Existing Agreement identified in Item 4 hereof. Schedule A-11(A) identifies Credits for which the Interim Rate Election has not been made. Schedule A-11(B) identifies Credits for which the Interim Rate Election has been made.

### Section C: Information as to Each Credit

| Syndicate Member | Outstanding Principal Amount | Reference Date Principal | First Principal Payment | Refinanced Principal Amount | Reference Date Interest |
|---|---|---|---|---|---|
| Banque Belgo-Zaïroise S.A. | 100,074.92 | n/a | n/a | 100,074.92 | 5,954.46 |
| Banque de l'Indochine et de Suez | 35,741.05 | n/a | n/a | 35,741.05 | 2,126.59 |
| Banque Internationale pour l'Afrique Occidentale | 35,741.05 | n/a | n/a | 35,741.05 | 2,126.59 |
| Banque Nationale de Paris | 35,741.05 | n/a | n/a | 35,741.05 | 2,126.59 |
| Crédit Commercial de France | 150,112.42 | n/a | n/a | 150,112.42 | 8,931.69 |

Schedule A-11(B)

## CREDIT INFORMATION SCHEDULE

### Section A:  Basic Information

1. Existing Agent: CREDIT COMMERCIAL DE FRANCE

2. Agent:  CREDIT COMMERCIAL DE FRANCE

3. Currency of Credit:  U.S. Dollars

4. Existing Agreement Identification:
   Convention du Prêt, du July 18, 1971
   Avenement, du April 11, 1973
   entre la République du Zaire et le
   Crédit Commercial de France
   U.S.$1,250,936.49

### Section B:  Information as to Interim Rate Election

5. The Interim Rate Election has been made for all Credits listed on this Credit Information Schedule.

Each of Credit Information Schedule A-11(A) and Credit Information Schedule A-11(B) identifies Credits which were extended under the Existing Agreement identified in Item 4 hereof. Schedule A-11(A) identifies Credits for which the Interim Rate Election has not been made. Schedule A-11(B) identifies Credits for which the Interim Rate Election has been made.

### Section C:  Information as to Each Credit

| Syndicate Number | Outstanding Principal Amount | Reference Date Principal | First Principal Payment | Refinanced Principal Amount | Reference Date Interest |
|---|---|---|---|---|---|
| Banque Belgo-Zaïroise S.A. | 200,149.84 | 200,149.84 | 20,015 | 180,134.84 | 28,316.76 |
| Banque de l'Indochine et de Suez | 71,482.08 | 71,482.08 | 7,148 | 64,334.08 | 10,113.11 |
| Banque Internationale pour l'Afrique Occidentale | 71,482.08 | 71,482.08 | 7,148 | 64,334.08 | 10,113.11 |
| Banque Nationale de Paris | 71,482.08 | 71,482.08 | 7,148 | 64,334.08 | 10,113.11 |
| Crédit Commercial de France | 300,224.72 | 300,224.72 | 30,022 | 270,202.72 | 42,475.17 |

Schedule A-12

## CREDIT INFORMATION SCHEDULE

### Section A:  Basic Information

1. Existing Agent:  CREDIT COMMERCIAL DE FRANCE

2. Agent:  CREDIT COMMERCIAL DE FRANCE

3. Currency of Credit:  U.S. Dollars

4. Existing Agreement Identification:
   Convention de Financement
   Dated March 6, 1973
   Republique du Zaire
   U.S.$45,000,000

### Section B:  Information as to Interim Rate Election

5. The Interim Rate Election has been made for all Credits
   listed on this Credit Information Schedule.

### Section C:  Information as to Each Credit

| Syndicate Number | Outstanding Principal Amount | Reference Date Principal | First Principal Payment | Refinanced Principal Amount | Reference Date Interest |
|---|---|---|---|---|---|
| Bankers Trust Company | 360,000 | 360,000 | 36,000 | 324,000 | 34,281.61 |
| Banque Commerciale Pour l'Europe du Nord (Eurobank) | 360,000 | 360,000 | 36,000 | 324,000 | 34,281.61 |
| Banque Internationale Pour l'Afrique Occidentale | 360,000 | 360,000 | 36,000 | 324,000 | 34,281.61 |
| Credit Commercial de France | 360,000 | 360,000 | 36,000 | 324,000 | 34,281.61 |
| The Fidelity Bank | 180,000 | 180,000 | 18,000 | 162,000 | 17,141.32 |
| The Mitsubishi Bank, Limited | 180,000 | 180,000 | 18,000 | 162,000 | 17,141.32 |

Schedule A-13(A), page 1

## CREDIT INFORMATION SCHEDULE

**Section A:  Basic Information**

1. Existing Agent: CREDIT COMMERCIAL DE FRANCE

2. Agent: CREDIT COMMERCIAL DE FRANCE

3. Currency of Credit: U.S. Dollars

4. Existing Agreement Identification:
   Convention de Prêt
   Dated July 23, 1973
   Négotiaque de Suite
   U.S.$30,000,000

**Section B:  Information as to Interim Rate Election**

5. The Interim Rate Election has not been made for all Credits listed on this Credit Information Schedule.

Each of Credit Information Schedule A-13(A) and Credit Information Schedule A-13(B) identifies Credits which were extended under the Existing Agreement identified in Item 4 hereof. Schedule A-13(A) identifies Credits for which the Interim Rate Election has not been made. Schedule A-13(B) identified Credits for which the Interim Rate Election has been made.

**Section C:  Information as to Each Credit**

| Syndicate Member | Outstanding Principal Amount | Reference Date Principal | First Principal Payment | Refinanced Principal Amount | Reference Date Interest |
|---|---|---|---|---|---|
| Banque Belgo-Zairoise S.A. | 266,664 | n/a | n/a | 266,664 | 17,261.86 |
| Banque Commerciale Pour L'Europe du Nord (Eurobank) | 533,336 | n/a | n/a | 533,336 | 34,524.25 |
| Banque Européenne de Tokyo S.A. | 533,336 | n/a | n/a | 533,336 | 34,524.25 |
| Frab Bank International | 266,664 | n/a | n/a | 266,664 | 17,261.86 |
| Banque Internationale Pour l'Afrique Occidentale | 586,664 | n/a | n/a | 586,664 | 37,976.31 |
| Banque Nationale de Paris | 2,400,000 | n/a | n/a | 2,400,000 | 155,358.33 |
| Chase Manhattan Bank, N.A. | 533,336 | n/a | n/a | 533,336 | 34,524.25 |
| Crédit Commercial de France | 533,304 | n/a | n/a | 533,304 | 34,522.20 |

## CREDIT INFORMATION SCHEDULE

### Information as to Each Credit (continued)

Section C:

| Syndicate Member | Outstanding Principal Amount | Reference Date Principal | First Principal Payment | Refinanced Principal Amount | Reference Date Interest |
|---|---|---|---|---|---|
| Credito Italiano | 533,336 | n/a | n/a | 533,336 | 34,524.25 |
| Fidelity Union Trust Company of New Jersey | 533,336 | n/a | n/a | 533,336 | 34,524.25 |
| The First National Bank of Chicago | 1,546,664 | n/a | n/a | 1,546,664 | 100,119.62 |
| Franch American Banking Corporation | 1,066,672 | n/a | n/a | 1,066,672 | 69,048.49 |
| The Fuji Bank, Limited | 1,066,672 | n/a | n/a | 1,066,672 | 69,048.49 |
| Grindlays Bank S.A. | 266,664 | n/a | n/a | 266,664 | 17,261.86 |
| The Kyowa Bank, Ltd. | 533,336 | n/a | n/a | 533,336 | 34,524.25 |
| Lloyds Bank International Limited | 533,336 | n/a | n/a | 533,336 | 34,524.25 |
| Midland Bank Limited | 533,336 | n/a | n/a | 533,336 | 34,524.25 |
| National Bank of Canada | 800,000 | n/a | n/a | 800,000 | 51,786.11 |
| The Nippon Credit Bank, Ltd. | 1,066,672 | n/a | n/a | 1,066,672 | 69,048.49 |
| The Sanwa Bank, Limited | 1,066,672 | n/a | n/a | 1,066,672 | 69,048.49 |
| Standard Chartered Bank Limited | 533,336 | n/a | n/a | 533,336 | 34,524.25 |
| Vereins-und Westbank International S.A. | 266,664 | n/a | n/a | 266,664 | 17,261.86 |

Schedule A-13(B), page 1

## CREDIT INFORMATION SCHEDULE

### Section A: Basic Information

1. Existing Agent: CREDIT COMMERCIAL DE FRANCE

2. Agent: CREDIT COMMERCIAL DE FRANCE

3. Currency of Credit: U.S. Dollars

4. Existing Agreement Identification:
Convention de Pret
Dated July 23, 1973
Republique du Zaire
U.S.$30,000,000

### Section B: Information as to Interim Rate Election

5. The Interim Rate Election has been made for all Credits listed on this Credit Information Schedule.

Each of Credit Information (Schedule A-13(A)) and Credit Information Schedule A-13(B) identifies Credits which were extended under the Existing Agreement identified in Item 4 hereof. Schedule A-13(A) identifies Credits for which the Interim Rate Election has not been made. Schedule A-13(B) identifies Credits for which the Interim Rate Election has been made.

### Section C: Information as to Each Credit

| Syndicate Member | Outstanding Principal Amount | Reference Date Principal | First Principal Payment | Refinanced Principal Amount | Reference Date Interest |
|---|---|---|---|---|---|
| Banque Belgo-Zairoise S.A. | 233,336 | 233,336 | 23,334 | 210,002 | 19,161.09 |
| Banque Commerciale Pour L'Europe du Nord (Eurobank) | 466,664 | 466,664 | 46,666 | 419,998 | 38,322.18 |
| Banque Europeenne de Tokyo S.A. | 466,664 | 466,664 | 46,666 | 419,998 | 38,322.18 |
| Frab Bank International | 233,336 | 233,336 | 23,334 | 210,002 | 19,161.09 |
| Banque Internationale Pour l'Afrique Occidentale | 513,336 | 513,336 | 51,334 | 462,002 | 42,156.40 |
| Banque Nationale de Paris | 2,100,000 | 2,100,000 | 210,000 | 1,890,000 | 172,449.81 |
| Chase Manhattan Bank, N.A. | 466,664 | 466,664 | 46,666 | 419,998 | 38,322.18 |
| Crédit Commercial de France | 466,696 | 466,696 | 46,670 | 420,026 | 38,322.20 |

## CREDIT INFORMATION SCHEDULE

### Section C: Information as to Each Credit (continued)

| Syndicate Member | Outstanding Principal Amount | Reference Date Principal | First Principal Payment | Refinanced Principal Amount | Reference Date Interest |
|---|---|---|---|---|---|
| Credito Italiano | 466,664 | 466,664 | 46,666 | 419,998 | 38,322.18 |
| Fidelity Union Trust Company of New Jersey | 466,664 | 466,664 | 46,666 | 419,998 | 38,322.18 |
| The First National Bank of Chicago | 1,353,336 | 1,353,336 | 135,334 | 1,218,002 | 111,134.32 |
| French American Banking Corporation | 933,328 | 933,328 | 93,333 | 839,995 | 76,644.36 |
| The Fuji Bank, Limited | 933,328 | 933,328 | 93,333 | 839,995 | 76,644.36 |
| Grindlays Bank S.A. | 233,336 | 233,336 | 23,334 | 210,002 | 19,161.09 |
| The Ryoss Bank, Ltd. | 466,664 | 466,664 | 46,666 | 419,998 | 38,322.18 |
| Lloyds Bank International Limited | 466,664 | 466,664 | 46,666 | 419,998 | 38,322.18 |
| Midland Bank Limited | 466,664 | 466,664 | 46,666 | 419,998 | 38,322.18 |
| National Bank of Canada | 700,000 | 700,000 | 70,000 | 630,000 | 57,483.28 |
| The Nippon Credit Bank, Ltd. | 933,328 | 933,328 | 93,333 | 839,995 | 76,644.36 |
| The Sanwa Bank, Limited | 933,328 | 933,328 | 93,333 | 839,995 | 76,644.36 |
| Standard Chartered Bank Limited | 466,664 | 466,664 | 46,666 | 419,998 | 38,322.18 |
| Vereins-und Westbank International S.A. | 233,336 | 233,336 | 23,334 | 210,002 | 19,161.09 |

Schedule A-14(A), page 1

## CREDIT INFORMATION SCHEDULE

### Section A: Basic Information

1. Existing Agent: CREDIT COMMERCIAL DE FRANCE
2. Agent: CREDIT COMMERCIAL DE FRANCE
3. Currency of Credit: U.S. Dollars
4. Existing Agreement Identification:
   Convention de Prêt
   Dated June 28, 1974
   République du Zaïre
   U.S.$120,000,000

### Section B: Information as to Interim Rate Election

5. The Interim Rate Election has not been made for all Credits listed on this Credit Information Schedule.

Each of Credit Information Schedule A-14(A) and Credit Information Schedule A-14(B) identifies Credits which were extended under the Existing Agreement identified in Item 4 hereof. Schedule A-14(A) identifies Credits for which the Interim Rate Election has not been made. Schedule A-14(B) identifies Credits for which the Interim Rate Election has been made.

### Section C: Information as to Each Credit

| Syndicate Member | Outstanding Principal Amount | Reference Date Principal | First Principal Payment | Refinanced Principal Amount | Reference Date Interest |
|---|---|---|---|---|---|
| American Express International Banking Corporation | 775,000 | n/a | n/a | 775,000 | 49,815.28 |
| Banque Commerciale Pour L'Europe du Nord (Eurobank) | 1,550,000 | n/a | n/a | 1,550,000 | 99,630.55 |
| Banque Franco-Roumaine | 775,000 | n/a | n/a | 775,000 | 49,815.28 |
| Banque Internationale Pour L'Afrique Occidentale | 2,325,000 | n/a | n/a | 2,325,000 | 149,445.83 |
| Banque Louis-Dreyfus | 1,808,330 | n/a | n/a | 1,808,330 | 116,235.43 |
| Banque Nationale de Paris | 1,227,080 | n/a | n/a | 1,227,080 | 78,873.97 |
| Chemical Bank | 1,550,000 | n/a | n/a | 1,550,000 | 99,630.55 |
| Crédit Commercial de France | 1,227,090 | n/a | n/a | 1,227,090 | 78,874.62 |

Schedule A-14(A), page 2

## CREDIT INFORMATION SCHEDULE

### Section C:  Information as to Each Credit  (continued)

| Syndicate Member | Outstanding Principal Amount | Reference Date Principal | First Principal Payment | Refinanced Principal Amount | Reference Date Interest |
|---|---|---|---|---|---|
| Electro Banque | 387,500 | n/a | n/a | 387,500 | 24,907.65 |
| FBD Bank International | 775,000 | n/a | n/a | 775,000 | 49,815.28 |
| Midland Bank Limited | 775,000 | n/a | n/a | 775,000 | 49,815.28 |
| National Bank of Canada | 775,000 | n/a | n/a | 775,000 | 49,815.28 |
| The Royal Bank of Canada (France) | 775,000 | n/a | n/a | 775,000 | 49,815.28 |
| Union de Banques Arabes et Françaises-U.B.A.F. | 775,000 | n/a | n/a | 775,000 | 49,815.28 |

Schedule A-14(B), page 1

## CREDIT INFORMATION SCHEDULE

**Section A:  Basic Information**

1. Existing Agent: CREDIT COMMERCIAL DE FRANCE

2. Agent: CREDIT COMMERCIAL DE FRANCE

3. Currency of Credit: U.S. Dollars

4. Existing Agreement Identification:
   Convention de Prêt
   Dated June 28, 1974
   Republique du Zaire
   U.S.$20,000,000

**Section B:  Information as to Interim Rate Election**

5. The Interim Rate Election has been made for all Credits listed on this Credit Information Schedule.

Each of Credit Information Schedule A-14(A) and Credit Information Schedule A-14(B) identifies Credits which were extended under the Existing Agreement identified in Item 4 hereof. Schedule A-14(A) identifies Credits for which the Interim Rate Election has not been made. Schedule A-14(B) identifies Credits for which the Interim Rate Election has been made.

**Section C:  Information as to Each Credit**

| Syndicate Member | Outstanding Principal Amount | Reference Date Principal | First Principal Payment | Refinanced Principal Amount | Reference Date Interest |
|---|---|---|---|---|---|
| American Express International Banking Corporation | 225,000 | 225,000 | 22,500 | 202,500 | 17,742.05 |
| Banque Commerciale Pour L'Europe du Nord (Eurobank) | 450,000 | 450,000 | 45,000 | 405,000 | 35,484.09 |
| Banque Franco-Roumaine | 225,000 | 225,000 | 22,500 | 202,500 | 17,742.05 |
| Banque Internationale Pour L'Afrique Occidentale | 675,000 | 675,000 | 67,500 | 607,500 | 53,226.14 |
| Banque Louis-Dreyfus | 525,000 | 525,000 | 52,500 | 472,500 | 41,388.10 |
| Banque Nationale de Paris | 396,250 | 356,250 | 35,625 | 320,625 | 28,091.57 |
| Chemical Bank | 450,000 | 450,000 | 45,000 | 405,000 | 35,484.09 |
| Crédit Commercial de France | 396,250 | 356,250 | 35,625 | 320,625 | 28,091.57 |

Schedule A-14(8), page 2

## CREDIT INFORMATION SCHEDULE

### Section C: Information as to Each Credit (continued)

| Syndicate Member | Outstanding Principal Amount | Reference Date Principal | First Principal Payment | Refinanced Principal Amount | Reference Date Interest |
|---|---|---|---|---|---|
| Electro Banque | 112,500 | 112,500 | 11,250 | 101,250 | 8,871.02 |
| PWB Bank International | 225,000 | 225,000 | 22,500 | 202,500 | 17,742.05 |
| Midland Bank Limited | 225,000 | 225,000 | 22,500 | 202,500 | 17,742.05 |
| National Bank of Canada | 225,000 | 225,000 | 22,500 | 202,500 | 17,742.05 |
| The Royal Bank of Canada (France) | 225,000 | 225,000 | 22,500 | 202,500 | 17,742.05 |
| Union de Banques Arabes et Françaises-U.B.A.F. | 225,000 | 225,000 | 22,500 | 202,500 | 17,742.05 |

Schedule A-15

## CREDIT INFORMATION SCHEDULE

### Section A: Basic Information

1. Existing Agent: EQUATOR BANK LIMITED

2. Agent: EQUATOR BANK LIMITED

3. Currency of Credit: U.S. Dollars

4. Existing Agreement Identification:
   Agreement, dated as of September 18, 1974
   The Republic of Zaire
   U.S.$10,000,000

### Section B:  Information as to Interim Rate Election

5. The Interim Rate Election has been made for all Credits listed on this Credit Information Schedule.

### Section C:  Information as to Each Credit

| Syndicate Member | Outstanding Principal Amount | Reference Date Principal | First Principal Payment | Refinanced Principal Amount | Reference Date Interest |
|---|---|---|---|---|---|
| Equator Bank Limited | 1,000,000 | 666,666 | 66,666 | 933,334 | 80,184 |
| Hartford National Bank and Trust Company | 562,500 | 375,000 | 37,500 | 525,000 | 45,104 |
| The Royal Bank of Canada | 2,687,500 | 1,791,666 | 179,166 | 2,508,334 | 215,495 |

## CREDIT INFORMATION SCHEDULE

### Section C: Information as to Each Credit (continued)

| Syndicate Member | Outstanding Principal Amount | Reference Date Principal | First Principal Payment | Refinanced Principal Amount | Reference Date Interest |
|---|---|---|---|---|---|
| Grindlays Bank Limited (formerly National and Grindlays Bank Limited) | 9,000,000.00 | 4,266,666.64 | 426,667 | 7,573,333 | 591,286.50 |
| Japan International Bank Limited | 4,000,000.00 | 2,133,333.36 | 213,333 | 3,786,667 | 295,643.33 |
| The Ryowa Bank, Ltd. | 2,000,000.00 | 1,066,666.64 | 106,667 | 1,893,333 | 147,821.79 |
| Lavoro Bank Overseas N.V. (formerly Lavoro Bank Finance Company N.V.) | 3,500,000.00 | 1,866,666.69 | 186,667 | 3,313,333 | 258,687.89 |
| The Long-Term Credit Bank of Japan, Limited | 2,000,000.00 | 1,066,666.64 | 106,667 | 1,893,333 | 147,821.79 |
| Marine Midland Bank N.A. | 4,000,000.00 | 2,133,333.36 | 213,333 | 3,786,667 | 295,643.33 |
| National Bank of Canada (formerly Banque Canadienne Nationale (Europe) S.A.) | 2,000,000.00 | 1,066,666.64 | 106,667 | 1,893,333 | 147,821.79 |
| Republic National Bank of New York (Int'l) Limited | 1,000,000.00 | 533,333.36 | 53,333 | 946,667 | 73,910.90 |
| The Royal Bank of Canada | 2,000,000.00 | 1,066,666.64 | 106,667 | 1,893,333 | 147,821.79 |
| The Saitama Bank, Ltd. | 2,000,000.00 | 1,066,666.64 | 106,667 | 1,893,333 | 147,821.79 |
| The Sanwa Bank, Limited | 2,000,000.00 | 1,066,666.64 | 106,667 | 1,893,333 | 147,821.79 |
| Société Financière Pour les Pays d'Outre-Mer | 2,000,000.00 | 1,066,666.64 | 106,667 | 1,893,333 | 147,821.79 |
| The Sumitomo Bank, Limited | 2,000,000.00 | 1,066,666.64 | 106,667 | 1,893,333 | 147,821.79 |
| Trade Development Bank | 1,000,000.00 | 533,333.36 | 53,333 | 946,667 | 73,910.90 |

Schedule A-16, page 1

## CREDIT INFORMATION SCHEDULE

### Section A:  Basic Information

1. Existing Agent: GRINDLAY BRANDTS LIMITED
2. Agent: GRINDLAY BRANDTS LIMITED
3. Currency of Credit: U.S. Dollars
4. Existing Agreement Identification: Agreement, dated 23rd July 1973 The Republic of Zaire U.S.$60,000,000

### Section B:  Information as to Interim Rate Election

5. The Interim Rate Election has been made for all Credits listed on this Credit Information Schedule.

### Section C:  Information as to Each Credit

| Syndicate Member | Outstanding Principal Amount | Reference Date Principal | First Principal Payment | Refinanced Principal Amount | Reference Date Interest |
|---|---|---|---|---|---|
| Associated Japanese Bank (International) Limited | 1,000,000,000.00 | 533,333,333.36 | 53,333 | 946,667 | 73,910.90 |
| Bank of America NT & SA | 2,000,000,000.00 | 1,066,666,666.64 | 106,667 | 1,893,333 | 147,821.79 |
| Bank of Montreal | 2,000,000,000.00 | 1,066,666,666.64 | 106,667 | 1,893,333 | 147,821.79 |
| Banque Commerciale Pour L'Europe du Nord (Eurobank) | 2,000,000,000.00 | 1,066,666,666.64 | 106,667 | 1,893,333 | 147,821.79 |
| Banque Francaise Du Commerce Exterieur | 500,000,000.00 | 266,666,666.67 | 26,667 | 473,333 | 36,955.44 |
| Bayerische Vereinsbank International Societe Anonyme | 7,000,000,000.00 | 3,733,333,333.36 | 373,333 | 6,626,667 | 517,375.43 |
| The Daiwa Bank, Limited | 2,000,000,000.00 | 1,066,666,666.64 | 106,667 | 1,893,333 | 147,821.79 |
| The Fuji Bank, Limited | 4,000,000,000.00 | 2,133,333,333.36 | 213,333 | 3,786,667 | 295,643.33 |
| Grindlay Brandts Limited (formerly Wm. Brandt's Sons & Co. Limited) | 2,000,000,000.00 | 1,066,666,666.64 | 106,667 | 1,893,333 | 147,821.79 |

Schedule A-17(A), page 1

# CREDIT INFORMATION SCHEDULE

## Section A:  Basic Information

1. Existing Agent: MORGAN GRENFELL & CO. LIMITED

2. Agent: MORGAN GRENFELL & CO. LIMITED

3. Currency of Credit:  U.S. Dollars

4. Existing Agreement Identification:
   Financial Agreement
   Dated March 26, 1973
   The Republic of Zaire
   U.S.$50,000,000

## Section B:  Information as to Interim Rate Election

5. The Interim Rate Election has not been made for all Credits listed on this Credit Information Schedule.

Each of Credit Information Schedule A-17(A) and Credit Information Schedule A-17(B) identifies Credits which were extended under the Existing Agreement identified in Item 4 hereof. Schedule A-17(A) identifies Credits for which the Interim Rate Election has not been made. Schedule A-17(B) identifies Credits for which the Interim Rate Election has been made.

## Section C:  Information as to Each Credit

| Syndicate Member | Outstanding Principal Amount | Reference Date Principal | First Principal Payment | Refinanced Principal Amount | Reference Date Interest |
|---|---|---|---|---|---|
| Associated Japanese Bank (International) Limited | 458,333.44 | n/a | n/a | 458,333.44 | 21,302.96 |
| Banque Commerciale Pour L'Europe du Nord (Eurobank) | 229,166.72 | n/a | n/a | 229,166.72 | 10,651.48 |
| Barclays Bank International Limited | 458,333.44 | n/a | n/a | 458,333.44 | 21,302.96 |
| The Chuo Trust & Banking Company Limited | 458,333.44 | n/a | n/a | 458,333.44 | 21,302.96 |
| Federal Deposit Insurance Corporation (as liquidator of Franklin National Bank) | 458,333.44 | n/a | n/a | 458,333.44 | 21,302.96 |
| The Fuji Bank, Limited | 229,166.72 | n/a | n/a | 229,166.72 | 10,651.48 |

Schedule A-17(A), page 2

## CREDIT INFORMATION SCHEDULE

### Section C:  Information as to Each Credit  (continued)

| Syndicate Member | Outstanding Principal Amount | Reference Date Principal | First Principal Payment | Refinanced Principal Amount | Reference Date Interest |
|---|---|---|---|---|---|
| Grindlays Bank Limited | 458,333.44 | n/a | n/a | 458,333.44 | 21,302.96 |
| The Hokkaido Takushoku Bank, Limited | 458,333.44 | n/a | n/a | 458,333.44 | 21,302.96 |
| Japan International Bank Limited | 916,666.88 | n/a | n/a | 916,666.88 | 42,605.91 |
| The Ryoma Bank, Ltd. | 458,333.44 | n/a | n/a | 458,333.44 | 21,302.96 |
| Libyan Arab Foreign Bank | 458,333.44 | n/a | n/a | 458,333.44 | 21,302.96 |
| The Long-Term Credit Bank of Japan, Limited | 229,166.72 | n/a | n/a | 229,166.72 | 10,651.48 |
| Marine Midland Bank N.A. | 916,666.88 | n/a | n/a | 916,666.88 | 42,605.91 |
| Midland Bank Limited | 229,166.72 | n/a | n/a | 229,166.72 | 10,651.48 |
| The Mitsui Bank, Limited | 458,333.44 | n/a | n/a | 458,333.44 | 21,302.96 |
| The Mitsui Trust and Banking Company Limited | 458,333.44 | n/a | n/a | 458,333.44 | 21,302.96 |
| Moscow Narodny Bank Limited | 229,166.72 | n/a | n/a | 229,166.72 | 10,651.48 |

Schedule A-17(A), page 3

## CREDIT INFORMATION SCHEDULE

### Section C: Information as to Each Credit (continued)

| Syndicate Number | Outstanding Principal Amount | Reference Date Principal | First Principal Payment | Refinanced Principal Amount | Reference Date Interest |
|---|---|---|---|---|---|
| The Nippon Credit Bank, Ltd. | 458,333.44 | n/a | n/a | 458,333.44 | 21,302.96 |
| The Royal Bank of Canada | 916,666.88 | n/a | n/a | 916,666.88 | 42,605.91 |
| Sumitomo Banking Corporation Limited | 229,166.72 | n/a | n/a | 229,166.72 | 10,651.48 |
| The Sanwa Bank, Ltd. | 458,333.44 | n/a | n/a | 458,333.44 | 21,302.96 |
| Standard Chartered Bank Limited | 458,333.44 | n/a | n/a | 458,333.44 | 21,302.96 |
| Taiyo Kobe Bank, Ltd. (London Branch) | 229,166.72 | n/a | n/a | 229,166.72 | 10,651.48 |
| The Tokai Bank Limited | 916,666.88 | n/a | n/a | 916,666.88 | 42,605.91 |
| UBAF Bank Limited | 229,166.72 | n/a | n/a | 229,166.72 | 10,651.48 |

Schedule A-17(B), page 1

# CREDIT INFORMATION SCHEDULE

## Section A: Basic Information

1. Existing Agent: MORGAN GRENFELL & CO. LIMITED

2. Agent: MORGAN GRENFELL & CO. LIMITED

3. Currency of Credit: U.S. Dollars

4. Existing Agreement Identification:
   Financial Agreement
   Dated March 26, 1973
   The Republic of Zaire
   U.S.$250,000,000

## Section B: Information as to Interim Rate Election

5. The Interim Rate Election has been made for all Credits listed on this Credit Information Schedule.

Each of Credit Information Schedule A-17(A) and Credit Information Schedule A-17(B) identifies Credits which were extended under the Existing Agreement identified in Item 4 hereof. Schedule A-17(A) identifies Credits for which the Interim Rate Election has not been made. Schedule A-17(B) identifies Credits for which the Interim Rate Election has been made.

## Section C: Information as to Each Credit

| Syndicate Member | Outstanding Principal Amount | Reference Date Principal | First Principal Payment | Refinanced Principal Amount | Reference Date Interest |
|---|---|---|---|---|---|
| Associated Japanese Bank (International) Limited | 1,541,666.56 | 1,541,666.56 | 154,167 | 1,387,499.56 | 166,579.56 |
| Banque Commerciale Pour L'Europe du Nord (Eurobank) | 770,833.28 | 770,833.28 | 77,083 | 693,750.28 | 83,289.78 |
| Barclays Bank International Limited | 1,541,666.56 | 1,541,666.56 | 154,167 | 1,387,499.56 | 166,579.56 |
| The Chuo Trust & Banking Company Limited | 1,541,666.56 | 1,541,666.56 | 154,167 | 1,387,499.56 | 166,579.56 |
| Federal Deposit Insurance Corporation (as Liquidator of Franklin National Bank) | 1,541,666.56 | 1,541,666.56 | 154,167 | 1,387,499.56 | 166,579.56 |
| The Fuji Bank, Limited | 770,833.28 | 770,833.28 | 77,083 | 693,750.28 | 83,289.78 |

## CREDIT INFORMATION SCHEDULE

### Section C: Information as to Each Credit (continued)

| Syndicate Member | Outstanding Principal Amount | Reference Date Principal | First Principal Payment | Refinanced Principal Amount | Reference Date Interest |
|---|---|---|---|---|---|
| Grindlays Bank Limited | 1,541,666.56 | 1,541,666.56 | 154,167 | 1,387,499.56 | 166,579.56 |
| The Hokkaido Takushoku Bank, Limited | 1,541,666.56 | 1,541,666.56 | 154,167 | 1,387,499.56 | 166,579.56 |
| Japan International Bank Limited | 3,083,333.12 | 3,083,333.12 | 308,333 | 2,775,000.12 | 333,159.12 |
| The Kyowa Bank, Ltd. | 1,541,666.56 | 1,541,666.56 | 154,167 | 1,387,499.56 | 166,579.56 |
| Libyan Arab Foreign Bank | 1,541,666.56 | 1,541,666.56 | 154,167 | 1,387,499.56 | 166,579.56 |
| The Long-Term Credit Bank of Japan, Limited | 770,833.28 | 770,833.28 | 77,083 | 693,750.28 | 83,289.78 |
| Marine Midland Bank N.A. | 3,083,333.12 | 3,083,333.12 | 308,333 | 2,775,000.12 | 333,159.12 |
| Midland Bank Limited | 770,833.28 | 770,833.28 | 77,083 | 693,750.28 | 83,289.78 |
| The Mitsui Bank, Limited | 1,541,666.56 | 1,541,666.56 | 154,167 | 1,387,499.56 | 166,579.56 |
| The Mitsui Trust and Banking Company Limited | 1,541,666.56 | 1,541,666.56 | 154,167 | 1,387,499.56 | 166,579.56 |
| Moscow Narodny Bank Limited | 770,833.28 | 770,833.28 | 77,083 | 693,750.28 | 83,289.78 |

Schedule A-17(B), page 3

## CREDIT INFORMATION SCHEDULE

### Section C:   Information as to Each Credit (continued)

| Syndicate Number | Outstanding Principal Amount | Reference Date Principal | First Principal Payment | Refinanced Principal Amount | Reference Date Interest |
|---|---|---|---|---|---|
| The Nippon Credit Bank, Ltd. | 1,541,666.56 | 1,541,666.56 | 154,167 | 1,387,499.56 | 166,579.56 |
| The Royal Bank of Canada | 3,083,333.12 | 3,083,333.12 | 308,333 | 2,775,000.12 | 333,159.12 |
| Payment Banking Corporation Limited | 770,833.28 | 770,833.28 | 77,083 | 693,750.28 | 83,289.78 |
| The Sanwa Bank, Ltd. | 1,541,666.56 | 1,541,666.56 | 154,167 | 1,387,499.56 | 166,579.56 |
| Standard Chartered Bank Limited | 1,541,666.56 | 1,541,666.56 | 154,167 | 1,387,499.56 | 166,579.56 |
| Taiyo Kobe Bank, Ltd. (London branch) | 770,833.28 | 770,833.28 | 77,083 | 693,750.28 | 83,289.78 |
| The Tokai Bank Limited | 3,083,333.12 | 3,083,333.12 | 308,333 | 2,775,000.12 | 333,159.12 |
| UBAF Bank Limited | 770,833.28 | 770,833.28 | 77,083 | 693,750.28 | 83,289.78 |

Schedule A-18(A), page 1

## CREDIT INFORMATION SCHEDULE

**Section A: Basic Information**

1. Existing Agent: MORGAN GRENFELL & CO. LIMITED

2. Agent: MORGAN GRENFELL & CO LIMITED

3. Currency of Credit: U.S. Dollars

4. Existing Agreement Identification:
   Financial Agreement
   Dated 10 September 1973
   Republique du Zaire
   U.S.$640,000,000

**Section B: Information as to Interim Rate Election**

5. The Interim Rate Election has not been made for all Credits listed on this Credit Information Schedule.

Each of Credit Information Schedule A-18(A) and Credit Information Schedule A-18(B) identifies Credits which were extended under the Existing Agreement identified in Item 4 hereof. Schedule A-18(A) identifies Credit for which the Interim Rate Election has not been made. Schedule A-18(B) identifies Credits for which the Interim Rate Election has been made.

**Section C: Information as to Each Credit**

| Syndicate Member | Outstanding Principal Amount | Reference Date Principal | First Principal Payment | Refinanced Principal Amount | Reference Date Interest |
|---|---|---|---|---|---|
| Bank of Montreal | 571,428.60 | n/a | n/a | 571,428.60 | 26,559.53 |
| Banque de L'Union Europeenne | 571,428.60 | n/a | n/a | 571,428.60 | 26,559.53 |
| Barclays Bank International Limited | 571,428.60 | n/a | n/a | 571,428.60 | 26,559.53 |
| Canadian Imperial Bank of Commerce | 1,142,857.20 | n/a | n/a | 1,142,857.20 | 53,119.05 |
| The Chase Trust & Banking Company Limited | 1,714,285.80 | n/a | n/a | 1,714,285.80 | 79,678.58 |
| Credito Italiano-London | 571,428.60 | n/a | n/a | 571,428.60 | 26,559.53 |
| The Daiwa Bank, Limited | 1,142,857.20 | n/a | n/a | 1,142,857.20 | 53,119.05 |

Schedule A-18(A), page 2

## CREDIT INFORMATION SCHEDULE

### Section C: Information as to Each Credit (continued)

| Syndicate Member | Outstanding Principal Amount | Reference Date Principal | First Principal Payment | Refinanced Principal Amount | Reference Date Interest |
|---|---|---|---|---|---|
| FNB Bank International | 571,428.60 | n/a | n/a | 571,428.60 | 26,559.53 |
| The Industrial Bank of Japan Limited | 571,428.60 | n/a | n/a | 571,428.60 | 26,559.53 |
| Japan International Bank Limited | 1,714,285.80 | n/a | n/a | 1,714,285.80 | 79,678.58 |
| Lloyds Bank International Limited | 1,714,285.80 | n/a | n/a | 1,714,285.80 | 79,678.58 |
| The Long-Term Credit Bank of Japan, Limited | 571,428.60 | n/a | n/a | 571,428.60 | 26,559.53 |
| The Mitsubishi Bank, Limited | 1,714,285.80 | n/a | n/a | 1,714,285.80 | 79,678.58 |
| The Mitsubishi Trust Banking Corporation | 1,142,857.20 | n/a | n/a | 1,142,857.20 | 53,119.05 |
| Morgan Grenfell & Co. Limited | 571,428.60 | n/a | n/a | 571,428.60 | 26,559.53 |
| National Bank of Canada | 571,428.60 | n/a | n/a | 571,428.60 | 26,559.53 |
| The Nippon Credit Bank, Ltd. | 1,142,857.20 | n/a | n/a | 1,142,857.20 | 53,119.05 |
| The Nippon Trust and Banking Co., Ltd. | 571,428.60 | n/a | n/a | 571,428.60 | 26,559.53 |
| The Saitama Bank, Ltd. | 571,428.60 | n/a | n/a | 571,428.60 | 26,559.53 |
| The Sumitomo Bank, Ltd. | 571,428.60 | n/a | n/a | 571,428.60 | 26,559.53 |
| The Sumitomo Trust and Banking Company Limited | 1,714,285.80 | n/a | n/a | 1,714,285.80 | 79,678.58 |

Schedule A-1B(A), page 3

## CREDIT INFORMATION SCHEDULE

### Section C:  Information as to Each Credit (continued)

| Syndicate Member | Outstanding Principal Amount | Reference Date Principal | First Principal Payment | Refinanced Principal Amount | Reference Date Interest |
|---|---|---|---|---|---|
| The Toktai Bank Limited | 2,285,714.40 | n/a | n/a | 2,285,714.40 | 106,238.10 |
| ANP Bank Limited | 571,428.60 | n/a | n/a | 571,428.60 | 26,559.53 |

## CREDIT INFORMATION SCHEDULE

### Section A:  Basic Information

1.  Existing Agent:  MORGAN GRENFELL & CO. LIMITED

2.  Agent:  MORGAN GRENFELL & CO LIMITED

3.  Currency of Credit:  U.S. Dollars

4.  Existing Agreement Identification:
    Financial Agreement
    Dated 30 September 1973
    Republique du Zaire
    U.S.$40,000,000

### Section B:  Information as to Interim Rate Election

5.  The Interim Rate Election has been made for all Credits
    listed on this Credit Information Schedule.

Each of Credit Information Schedule A-18(A) and Credit Informa-
tion Schedule A-18(B) identifies Credits which were extended under
the Existing Agreement identified in Item 4 hereof.  Schedule
A-18(A) identifies Credits for which the Interim Rate Election
has not been made.  Schedule A-18(B) identifies Credits for which
the Interim Rate Election has been made.

### Section C:  Information as to Each Credit

| Syndicate Number | Outstanding Principal Amount | Reference Date Principal | First Principal Payment | Refinanced Principal Amount | Reference Date Interest |
|---|---|---|---|---|---|
| Bank of Montreal | 428,571.40 | 428,571.40 | 42,857 | 385,714.40 | 47,747.97 |
| Banque de L'Union Europeenne | 428,571.40 | 428,571.40 | 42,857 | 385,714.40 | 47,747.97 |
| Barclays Bank International Limited | 428,571.40 | 428,571.40 | 42,857 | 385,714.40 | 47,747.97 |
| Canadian Imperial Bank of Commerce | 857,142.80 | 857,142.80 | 85,714 | 771,428.80 | 95,495.94 |
| The Chuo Trust & Banking Company Limited | 1,285,714.20 | 1,285,714.20 | 128,572 | 1,157,142.20 | 143,283.92 |
| Credito Italiano-London | 428,571.40 | 428,571.40 | 42,857 | 385,714.40 | 47,747.97 |
| The Daiwa Bank, Limited | 857,142.80 | 857,142.80 | 85,714 | 771,428.80 | 95,495.94 |

Schedule A-18(B), page 2

## CREDIT INFORMATION SCHEDULE

### Section C: Information as to Each Credit (continued)

| Syndicate Member | Outstanding Principal Amount | Reference Date Principal | First Principal Payment | Refinanced Principal Amount | Reference Date Interest |
|---|---|---|---|---|---|
| FRAS Bank International | 428,571.40 | 428,571.40 | 42,857 | 385,714.40 | 47,742.97 |
| The Industrial Bank of Japan Limited | 428,571.40 | 428,571.40 | 42,857 | 385,714.40 | 47,747.97 |
| Japan International Bank Limited | 1,285,714.20 | 1,285,714.20 | 128,572 | 1,157,142.20 | 143,243.92 |
| Morgan Bank International Limited | 1,285,714.20 | 1,285,714.20 | 128,572 | 1,157,142.20 | 143,243.92 |
| The Long-Term Credit Bank of Japan Limited | 428,571.40 | 428,571.40 | 42,857 | 385,714.40 | 47,747.97 |
| The Mitsubishi Bank, Limited | 1,285,714.20 | 1,285,714.20 | 128,572 | 1,157,142.20 | 143,243.92 |
| The Mitsui Trust Banking Corporation | 857,142.80 | 857,142.80 | 85,714 | 771,428.80 | 95,495.94 |
| Morgan Grenfell & Co. Limited | 428,571.40 | 428,571.40 | 42,857 | 385,714.40 | 47,747.97 |
| National Bank of Canada | 428,571.40 | 428,571.40 | 42,857 | 385,714.40 | 47,747.97 |
| The Nippon Credit Bank, Ltd. | 857,142.80 | 857,142.80 | 85,714 | 771,428.80 | 95,495.94 |
| The Nippon Trust and Banking Co., Ltd. | 428,571.40 | 428,571.40 | 42,857 | 385,714.40 | 47,747.97 |
| The Saitama Bank, Ltd. | 428,571.40 | 428,571.40 | 42,857 | 385,714.40 | 47,747.97 |
| The Sumitomo Bank, Ltd. | 428,571.40 | 428,571.40 | 42,857 | 385,714.40 | 47,747.97 |
| The Sumitomo Trust and Banking Company Limited | 1,285,714.20 | 1,285,714.20 | 128,572 | 1,157,142.20 | 143,243.92 |

Schedule A-10(B), page 3

**CREDIT INFORMATION SCHEDULE**

Section C:  Information as to Each Credit (continued)

| Syndicate Member | Outstanding Principal Amount | Reference Date Principal | First Principal Payment | Refinanced Principal Amount | Reference Date Interest |
|---|---|---|---|---|---|
| The Toronto Bank Limited | 1,714,285.60 | 1,714,285.60 | 171,429 | 1,542,856.60 | 130,991.90 |
| UBAF Bank Limited | 428,571.40 | 428,571.40 | 42,857 | 385,714.40 | 47,747.97 |

## CREDIT INFORMATION SCHEDULE

### Section A:  Basic Information

1.  Existing Agent:  MORGAN GUARANTY TRUST COMPANY
    OF NEW YORK

2.  Agent:  MORGAN GUARANTY TRUST COMPANY OF NEW YORK

3.  Currency of Credit:  U.S. Dollars

4.  Existing Agreement Identification:
    Loan Agreement, dated July 20, 1971
    The Democratic Republic of the Congo
    U.S.$30,000,000

### Section B:  Information as to Interim Rate Election

5.  The Interim Rate Election has not been made for all Credits
    listed on this Credit Information Schedule.

### Section C:  Information as to Each Credit

| Syndicate Member | Outstanding Principal Amount | Reference Date Principal | First Principal Payment | Refinanced Principal Amount | Reference Date Interest |
|---|---|---|---|---|---|
| Associated Japanese Bank (International) Limited | 600,000 | 600,000 | 60,000 | 540,000 | 75,514.46 |
| Banca Commerciale Italiana | 600,000 | 600,000 | 60,000 | 540,000 | 75,514.46 |
| Banque Belgo-Zaïroise S.A. | 600,000 | 600,000 | 60,000 | 540,000 | 75,514.46 |
| Banque Bruxelles-Lambert S.A. | 600,000 | 600,000 | 60,000 | 540,000 | 75,514.46 |
| Banque Nationale de Paris | 1,200,000 | 1,200,000 | 120,000 | 1,080,000 | 151,028.91 |
| Crédit Lyonnais | 1,200,000 | 1,200,000 | 120,000 | 1,080,000 | 151,028.91 |
| The Daiwa Bank, Limited | 600,000 | 600,000 | 60,000 | 540,000 | 75,514.46 |
| Dai-Ichi Kangyo Bank, Limited | 600,000 | 600,000 | 60,000 | 540,000 | 75,514.46 |

## CREDIT INFORMATION SCHEDULE

### Section C: Information as to Each Credit (continued)

| Syndicate Member | Outstanding Principal Amount | Reference Date Principal | First Principal Payment | Refinanced Principal Amount | Reference Date Interest |
|---|---|---|---|---|---|
| The Fuji Bank, Limited | 600,000 | 600,000 | 60,000 | 540,000 | 75,514.46 |
| The Industrial Bank of Japan Limited | 600,000 | 600,000 | 60,000 | 540,000 | 75,514.46 |
| International Commercial Bank Limited | 900,000 | 900,000 | 90,000 | 810,000 | 113,271.68 |
| Japan International Bank Limited | 600,000 | 600,000 | 60,000 | 540,000 | 75,514.46 |
| Lemaco Bank Overseas N.V. | 600,000 | 600,000 | 60,000 | 540,000 | 75,514.46 |
| The Mitsubishi Bank, Limited | 600,000 | 600,000 | 60,000 | 540,000 | 75,514.46 |
| Morgan Guaranty Trust Company of New York | 3,300,000 | 3,300,000 | 330,000 | 2,970,000 | 415,329.49 |
| The Royal Bank of Canada | 1,200,000 | 1,200,000 | 120,000 | 1,080,000 | 151,028.91 |
| Société Générale de Banque S.A. | 1,200,000 | 1,200,000 | 120,000 | 1,080,000 | 151,028.91 |
| The Sumitomo Bank, Limited | 600,000 | 600,000 | 60,000 | 540,000 | 75,514.46 |
| The Tokai Bank, Limited | 1,200,000 | 3,200,000 | 120,000 | 1,080,000 | 151,028.91 |
| Union de Banques Arabes et Françaises - U.B.A.F. | 600,000 | 600,000 | 60,000 | 540,000 | 75,514.46 |

Schedule A-20

## CREDIT INFORMATION SCHEDULE

### Section A: Basic Information

1. Existing Agent: RABOBANK INTERNATIONAL BANK N.V.

2. Agent: RABOBANK INTERNATIONAL BANK N.V.

3. Currency of Credit: Dutch Guilders

4. Existing Agreement Identification:
   Certain Bills of Exchange
   Dated March 20, 1974
   Accepted by The Republic of Zaire

### Section B: Information as to Interim Rate Election

Not applicable.

### Section C: Information as to Each Credit

| Syndicate Member | Outstanding Principal Amount | Reference Date Principal | First Principal Payment | Refinanced Principal Amount | Reference Date Interest |
|---|---|---|---|---|---|
| Bank of America N.T. & S.A. | 1,653,209.34 | 1,653,108.34 | 165,311 | 1,487,797.34 | 118,664.19 |
| Continental Illinois National Bank and Trust Company of Chicago | 3,306,216.66 | 3,306,216.66 | 330,622 | 2,975,594.66 | 237,728.38 |
| Nederlandse Creditbank N.V. | 3,306,216.66 | 3,306,216.66 | 330,622 | 2,975,594.66 | 237,728.38 |
| Rabroamerica International Bank N.V. | 1,653,108.34 | 1,653,108.34 | 165,311 | 1,487,797.34 | 118,664.19 |

Schedule A-21, page 1

## CREDIT INFORMATION SCHEDULE

**Section A: Basic Information**

1. Existing Agent: SOCIETE GENERALE DE BANQUE S.A.

2. Agent: SOCIETE GENERALE DE BANQUE S.A.

3. Currency of Credit: U.S. Dollars

4. Existing Agreement Identification:
   Convention de Crédit, 29 août 1972
   Republique du Zaire
   U.S.$20,000,000

**Section B: Information as to Interim Rate Election**

5. The Interim Rate Election has been made for all Credits listed on this Credit Information Schedule.

**Section C: Information as to Each Credit**

| Syndicate Member | Outstanding Principal Amount | Reference Rate Principal | First Principal Payment | Refinanced Principal Amount | Reference Rate Interest |
|---|---|---|---|---|---|
| American Express International Banking Corporation (Belgium) | 727,273 | 727,273 | 72,727.00 | 654,546.00 | 47,948.25 |
| Amsterdam-Rotterdam Bank N.V. | 727,273 | 727,273 | 72,727.00 | 654,546.00 | 47,948.25 |
| Banca Commerciale Italiana (London) | 1,454,546 | 1,454,546 | 145,455.00 | 1,309,091.00 | 95,896.50 |
| Bankers Trust Company | 1,454,546 | 1,454,546 | 145,455.00 | 1,309,091.00 | 95,896.50 |
| Banque Belgo Zairoise S.A. | 363,638 | 363,638 | 36,364.00 | 327,274.00 | 23,974.22 |
| Banque Bruxelles-Lambert S.A. | 727,273 | 727,273 | 72,727.00 | 654,546.00 | 47,948.25 |
| Frab Bank International | 363,638 | 363,638 | 36,364.00 | 327,274.00 | 23,974.22 |

## CREDIT INFORMATION SCHEDULE

### Section C:  Information as to Each Credit (continued)

| Syndicate Member | Outstanding Principal Amount | Reference Date Principal | First Principal Payment | Refinanced Principal Amount | Reference Date Interest |
|---|---|---|---|---|---|
| Japan International Bank Limited | 727,273 | 727,273 | 72,727.00 | 654,546.00 | 47,948.25 |
| Morgan Guaranty Trust Company of New York | 1,454,546 | 1,454,546 | 145,455.00 | 1,309,091.00 | 95,896.50 |
| The Royal Bank of Canada | 1,454,546 | 1,454,546 | 145,455.00 | 1,309,091.00 | 95,896.50 |
| Société Générale | 727,273 | 727,273 | 72,727.00 | 654,546.00 | 47,948.25 |
| Société Générale de Banque S.A. | 2,545,457 | 2,545,457 | 254,546.00 | 2,290,911.00 | 167,818.99 |
| The Sumitomo Bank, Limited | 1,454,546 | 1,454,546 | 145,455.00 | 1,309,091.00 | 95,896.50 |
| Vereins-und Westbank International S.A. | 363,638 | 363,638 | 36,364.00 | 327,274.00 | 23,974.22 |

Schedule A-22

## CREDIT INFORMATION SCHEDULE

**Section A:  Basic Information**

1. Existing Agent:  SOCIETE GENERALE DE BANQUE S.A.

2. Agent:  SOCIETE GENERALE DE BANQUE S.A.

3. Currency of Credit:  U.S. Dollars

4. Existing Agreement Identification:
   Convention de Crédit, 9 février 1973
   République du Zaïre
   U.S.$6,600,000

**Section B:  Information as to Interim Rate Election**

5. The Interim Rate Election has been made for all Credits listed on this Credit Information Schedule.

**Section C:  Information as to Each Credit**

| Syndicate Member | Outstanding Principal Amount | Reference Date Principal | First Principal Payment | Refinanced Principal Amount | Reference Date Interest |
|---|---|---|---|---|---|
| Banca Commerciale Italiana Overseas Limited (Nassau) | 500,000 | 500,000 | 50,000 | 450,000 | 32,937.50 |
| The Bank of Tokyo, Brussels | 500,000 | 500,000 | 50,000 | 450,000 | 32,937.50 |
| Banque Belgo-Zaïroise S.A. | 500,000 | 500,000 | 50,000 | 450,000 | 32,937.50 |
| Crédit Commercial de France | 500,000 | 500,000 | 50,000 | 450,000 | 32,937.50 |
| European-Arab Bank S.A. | 500,000 | 500,000 | 50,000 | 450,000 | 32,937.50 |
| European American Banking Corporation | 500,000 | 500,000 | 50,000 | 450,000 | 32,937.50 |
| Irving Trust Company | 500,000 | 500,000 | 50,000 | 450,000 | 32,937.50 |
| The Mitsui Bank, Limited Brussels | 1,000,000 | 1,000,000 | 100,000 | 900,000 | 65,875.00 |
| Monte dei Paschi di Siena | 1,000,000 | 1,000,000 | 100,000 | 900,000 | 65,875.00 |
| Société Générale de Banque S.A. | 1,100,000 | 1,100,000 | 110,000 | 990,000 | 72,462.50 |

Schedule A-23

## SINGLE BANK CREDIT INFORMATION SCHEDULE

**Section A: Bank Information**

1. Bank:    BANK OF MONTREAL

2. Currency of Credit:    Canadian Dollars

3. Existing Agreement Identification:
   Agreement, dated April 8, 1974
   As amended June 12, 1976, as further
   amended August 29, 1978
   The Republic of Zaire, as Borrower
   Can.$3,168,200

**Section B:    Information as to Interim Rate Election**

Not applicable.

**Section C:    Information as to Single Bank Credit**

| Outstanding Principal Amount | Reference Date Principal | First Principal Payment | Refinanced Principal Amount | Reference Date Interest |
|---|---|---|---|---|
| Can.$2,934,492.31 | 731,123.09 | 73,112 | 2,851,380.31 | 630,959.54 |

Schedule A-24

## SINGLE BANK CREDIT INFORMATION SCHEDULE

### Section A:  Basic Information

1.  **Bank:**  BANKERS TRUST COMPANY

2.  **Currency of Credit:**  U.S. Dollar

3.  **Existing Agreement Identification:**
    Eurodollar Credit Agreement
    C.P.A. Indre S.A.R.C., as Borrower
    Dated as of December 30, 1971
    U.S. $2,000,000

### Section B:  Information as to Interim Rate Election

4.  The Interim Rate Election has been made for all Credits listed on this Credit Information Schedule.

### Section C:  Information as to Single Bank Credit

| Outstanding Principal Amount | Reference Date Principal | First Principal Payment | Refinanced Principal Amount | Reference Date Interest |
|---|---|---|---|---|
| 1,060,664.42 | 1,060,664.42 | 106,066 | 954,598.42 | 257,661.26 |

Schedule A-25

## SINGLE BANK CREDIT INFORMATION SCHEDULE

### Section A: Basic Information

1. Bank: BARCLAYS BANK INTERNATIONAL LIMITED
2. Currency of Credit: U.S. Dollars
3. Existing Agreement Identification:
   Credit Agreement
   Dated October 1, 1976
   Republic of Zaire, as Borrower
   U.S.$6,100,000

### Section B: Information as to Interim Rate Election

4. The Interim Rate Election has been made for all Credits listed on this Credit Information Schedule.

### Section C: Information as to Single Bank Credit

| Outstanding Principal Amount | Reference Date Principal | First Principal Payment | Refinanced Principal Amount | Reference Date Interest |
|---|---|---|---|---|
| 6,100,000 | 6,100,000 | 610,000 | 5,490,000 | 1,435,750 |

Schedule A-26

## SINGLE BANK CREDIT INFORMATION SCHEDULE

### Section A: Basic Information

1. Bank: CITIBANK, N.A.

2. Currency of Credit: U.S. Dollars

3. Existing Agreement Identification
   Eurodollar Credit Agreement
   Dated as of April 8, 1974
   Republic of Zaire, as Borrower
   U.S.$7,419,300

### Section B: Information as to Interim Rate Election

4. The Interim Rate Election has not been made for all Credits
   listed on this Credit Information Schedule.

### Section C: Information as to Single Bank Credit

| Outstanding Principal Amount | Reference Date Principal | First Principal Payment | Refinanced Principal Amount | Reference Date Interest (A) |
|---|---|---|---|---|
| 5,516,790 | 5,516,790 | 551,679 | 4,965,111 | 354,884.05 |

Note: (A)  The Reference Date Interest set forth in this Credit Information Schedule has been reduced by the
   amount of a payment received on February 6, 1980 and thus reflects the net amount due under
   Section 2.01 of the Agreement.  The payment on February 6, 1980 covered an interest payment
   due on August 30, 1979, and the Reference Date Interest so set forth is interest accrued as of
   January 31, 1980 minus the interest received on February 6, 1980.

Schedule A-27

## SINGLE BANK CREDIT INFORMATION SCHEDULE

**Section A: Basic Information**

1. Bank: LLOYDS BANK INTERNATIONAL LIMITED

2. Currency of Credit: Swiss Francs

3. Existing Agreement Identification
Divers Billets à Ordre
Société National d'Electricité, as Borrower
Dated 23 Mars 1973 to 15 September 1973
Swiss Francs 5,433,712.97

**Section B: Information as to Interim Rate Election**

Not applicable.

**Section C: Information as to Single Bank Credit**

| Outstanding Principal Amount | Reference Date Principal | First Principal Payment | Refinanced Principal Amount | Reference Date Interest |
|---|---|---|---|---|
| Sw.Fr. 2,789,429.17 | 2,789,429.17 | 278,943 | 2,510,486.17 | 637,629.08 |

## PARIS CLUB SUMMARY

This schedule summarizes the principal features of the agreement reached in Paris on the 10th and 11th of December with the creditor countries ("Paris Club") for the rescheduling of the official bilateral debt of Zaire. This agreement will be formally implemented by subsequent individual bilateral agreements signed by each creditor government and Zaire. These agreements will come into force subject to certain conditions being met, including the continued eligibility of Zaire to make drawings under the existing stand-by agreement with the International Monetary Fund ("IMF").

In assessing the results of the Paris Club rescheduling it should be noted that governments follow a procedure of rescheduling official debt in arrears and debt maturing (principal and interest) only for the period encompassed by the IMF Stand-By Program. The Government of Zaire recognises that the members of the Paris Club made a concerted effort to acknowledge Zaire's severe economic problems by rescheduling Zaire's official debt on terms more favorable than either of the two previous Paris Club reschedulings. Moreover, these terms are believed to be more favorable than any granted to a developing country since 1970. In addition, the creditor governments accepted the principle that a further Paris Club meeting be held to consider maturities falling due in 1981 and 1982, provided that there is an IMF program in effect at that time.

The principal categories of debt dealt with under the Paris Club Agreement and the main terms of that agreement are as follows:

(a)   U.S.$ 505 million of maturities relating to debt not previously rescheduled falling due between 1st July 1979 and 31st December 1980 are to be rescheduled as to 90 percent, over ten years with a grace period of 4-1/2 years. The balance of 10 percent would be paid over the grace period in four equal annual payments beginning 30th June 1980.

(b)   U.S.$ 472 million of arrears of principal and interest not previously rescheduled and falling due before 30th June 1979 are to be rescheduled as to 80 percent, over ten years with 4-1/2 years grace. The balance would be paid in successive annual instalments of 2 percent, 4 percent, 6 percent and 8 percent, during the grace period starting 30th June 1980.

(c)   U.S.$ 92 million of debt which had been rescheduled at previous Paris Club meetings, comprising arrears to 30th June 1979 and payments due and not paid in the second half of 1979. Payment of these amounts is to be made in two instalments, 33 percent on 30th June 1980 and 67 percent on 31st January 1981.

Schedule B, page 2

(d)   An estimated amount of U.S.$ 250 million
of short-term insured trade arrears to be rescheduled
over five years, is to be paid off in instalments of 10
percent in 1980, 15 percent in 1981 and 25 percent, in
each of the next three years.

The amount of debt rescheduled in each of the
categories discussed above will be determined as part of the
bilateral negotiations with each Government.

The interest rates which will apply to all cate-
gories will be agreed on a bilateral basis, and each credit-
or has pledged to use its best efforts to hold down interest
rates as much as possible. Zaire will seek to obtain an
overall average interest rate of 8 percent.  The following
table illustrates the estimated debt service payments due by
Zaire during the period 1980 - 1985, reflecting the 1979
Paris Club rescheduling and the proposed rescheduling for
the uninsured bank debt.

### Republic of Zaire
### Estimated External Debt Service Reflecting 1979
### Paris Club Rescheduling and proposed Rescheduling
### of uninsured bank debt
### (U.S.$ Millions)

|  | 1980 | 1981 | 1982 |
|---|---|---|---|
| Total 1979 Paris Club Rescheduling (1) | 233.23 | 222.69 | 189.40 |
| Bilateral Credits not rescheduled (2) | - | 325.33 | 281.97 |
| Previously rescheduled debt not rescheduled in 1979 (2) | 50.98 | 76.61 | 72.45 |
| Total Paris Club Debt Service | 284.21 | 624.83 | 543.82 |
| Multilateral/IMF (3) | 24.40 | 27.21 | 29.58 |
| Uninsured Bank Debt (4) | 112.17 | 86.75 | 71.83 |
| Uninsured Commercial Debt (5) | 19.28 | 18.44 | 14.28 |
| Uninsured Commercial Trade Arrears (6) | 10.00 | 20.00 | 30.00 |
| Private Debt (7) | 20.08 | 20.40 | 19.15 |
| Total Debt Service (8) (9) | 470.14 | 797.63 | 708.66 |

Schedule B, page 3

| | 1983 | 1984 | 1985 |
|---|---|---|---|
| Total 1979 Paris Club Rescheduling (1) | 190.18 | 268.69 | 191.34 |
| Bilateral Credits Not Rescheduled (2) | 237.90 | 200.63 | 161.84 |
| Previously Rescheduled Debt Not Rescheduled in 1979 (2) | 68.26 | 64.08 | 51.49 |
| Total Paris Club Debt Service | 496.34 | 533.40 | 404.67 |
| Multilateral/IMF (3) | 35.08 | 44.26 | 52.87 |
| Uninsured Bank Debt (4) | 66.26 | 64.90 | 123.71 |
| Uninsured Commercial Debt (5) | 13.48 | 10.23 | 4.53 |
| Uninsured Commercial Trade Arrears (6) | 40.00 | 50.00 | 60.00 |
| Private Debt (7) | 10.20 | 10.14 | 10.14 |
| Total Debt Service (8) (9) | 661.36 | 712.93 | 655.92 |

(1)  Assumed signing of bilateral accords for Paris Club Agreement by 30th June 1980. Interest accrued at 8 percent from 1st July 1979. Interest assumed payable on 30th June and 30th December of each year. Under this assumption, one year of interest becomes due on 30th June 1980. Amounts to be rescheduled based on figures as at 30th June 1979, verified with creditors insofar as possible. Exact amounts eligible for rescheduling to be determined through bilateral negotiations.

(2)  Amounts based on figures as at 30th June 1979, verified with creditors insofar as possible. Assumes no disbursement of undisbursed balances.

(3)  Amounts based on figures as at 30th June 1979, verified with creditors insofar as possible. Disbursement of undisbursed balances assumed. Excludes approximately U.S.$ 12 million of interest payable during 1980 on IMF Standby Facility.

(4)  Assumes signing and effective dates for bank agreement of 31st March 1980. LIBOR assumed to be 15 percent in 1980, 14 percent in 1981, and 12 percent thereafter. All interest arrears payable on Effective Date and interest payable semi-annually thereafter. 10 percent of principal arrears due on Effective Date: 5 percent of principal arrears due in 1981: 3 percent of principal arrears due 1982-1984. Remaining principal due in 11 equal semi-annual payments beginning 1985.

Schedule B, page 4

(5) Assumes payment of estimated contractual debt service, so far not verified with creditors, without taking into account any possible rescheduling or repayment of arrears.

(6) Proposed repayment of uninsured commercial trade arrears estimated at U.S.$ 450 million as at 30th June 1979. These arrears have not been verified with creditors.

(7) Assumes payment of contractual debt service, so far not verified with creditors, without taking into account any possible rescheduling or repayment of arrears.

(8) Debt service shown in 1980 does not take into account payments made by Zaire after 30th June 1979 to Paris Club creditors and uninsured bank creditors. Such payments will reduce the debt service payable during calendar 1980.

(9) Contract currencies have been converted into U.S. dollars at the rates prevailing as of 30th June, 1979.

It can be seen that the total estimated debt service for 1980 is U.S.$ 470 million. This would be the maximum debt service as it does not give effect to any payments made to Paris Club creditors or to banks occurring after 30th June 1979. Such payments will reduce the estimated debt service obligation for Zaire in 1980. Debt service of U.S.$ 470 million represents approximately 24 percent of estimated export earnings for that year.

While the above rescheduling terms represent a significant improvement in debt service, and even though governments pledged approximately U.S.$ 170 million in new aid for 1980 last November in Brussels, there remains a substantial external resource gap.

It is expected that the next meeting in the form of a consultative group under the auspices of the World Bank will be convened early this year to review Zaire's external capital requirements.

Schedule   C

Schedule of existing Liens on and other
arrangements relating to Assets of
The Republic of Zaire,
The Bank of Zaire,
Governmental Agencies and
Governmental Enterprises

Note: The inclusion of any item on this Schedule
is for the purposes of information only.  Its inclusion does
not constitute an acknowledgment or recognition by any Bank
or by the Republic of Zaire of the effectiveness, validity
or perfection of any such item.

(A)  The following items constitute existing Liens
(as defined in Section 1.01 of the Refinancing Credit
Agreement to which this Schedule is attached):

1.  Liens relating to mineral products within
the framework of the Convention de Finance-
ment dated February 18, 1975 between Société
Générale des Minerais and Société Zairoise de
Commercialisation des Minerais ("Sozacom")
and related agreements.

2.  Assignments of claims relating to letter
agreement dated April 6, 1978 between Banque
Belgo-Zairoise S.A. and Sozacom.

3.  Assignments of claims relating to letter
agreement dated March 28, 1979 between Banque
Belgo-Zairoise S.A. and Sozacom.

(B)  The following payment facility arrangements
constitute arrangements relating to assets which may consti-
tute Liens (as so defined):

1.  Trust Deed dated September 15, 1975 among
Bank of Zaire, La Générale des Carrières et
des Mines, Sozacom and UBAF Limited.

2.  Payment Facility Agreement dated as of
October 18, 1976, as amended, among Société
Nationale d'Electricité ("SNEL"), Sozacom,
Bank of Zaire, Republic of Zaire, Manufactur-
ers Hanover Trust Company, Private Export
Funding Corporation, Export-Import Bank of
the United States and Manufacturers Hanover
Trust Company, as depositary.

3.  Accord du Mecanisme de Paiement dated
October 19, 1979 among SNEL, Sozacom, Bank of
Zaire, Republic of Zaire, Sadelmi Cogepi
Compagnia Generale Progettazioni e Installa-
zioni S.p.A., G I E Gruppo Industrie Elettro-
meccaniche Per Impianti All'Estero, and Banca
Nazionale del Lavoro, as depositary.

Schedule D

## Required Information Concerning the
### Republic of Zaire
### for the Previous Calendar Year and Six-Month Period

1.  Balance of Payments

2.  International Reserves

3.  Public Sector Finances

4.  Consumer Prices in Kinshasa

5.  Value, Volume and Unit Price of Principal
    Exports and (to the extent reasonably avail-
    able) Imports

6.  External Debt Structure

7.  Projected External Debt Service Payments

EXHIBIT 1
(Section 6.01(b)(i))


FORM OF CERTIFICATION
OF GOVERNMENT APPROVALS


(Dated no more than 20
days before the Effec-
tive Date)


To the Banks, Agents and Servicing
    Bank parties to the Refinancing
    Credit Agreement referred to below


Gentlemen:

    Annexed hereto is a photocopy of Ordonnance No. _____
of the President of the Republic of Zaire (together with an
accurate and complete English translation thereof), which is
in full force and effect on the date hereof and constitutes
the sole legislative, administrative or other governmental
authorization or approval necessary with respect to the
execution, delivery and performance by the Republic of Zaire
(the "Obligor") and the Bank of Zaire of the Refinancing
Credit Agreement dated as of March 31, 1980 among the
Obligor, the Bank of Zaire, and each of you, including
without limitation the making, at the time and place requir-
ed, of all payments by the Obligor thereunder in the curren-
cy specified therein for each such payment.


                              Very truly yours,



                              Title:  Director of the Office of
                                      the Presidency of the
                                      Republic of Zaire

EXHIBIT 2
(Section 6.01(b)(ii))


FORM OF INCUMBENCY CERTIFICATE
FOR THE OBLIGOR AND THE GOVERNOR OF
THE BANK OF ZAIRE

(Dated no more than 20
days before the Effec-
tive Date)


I, Maître Nimy Mayidika Ngimbi, Director of the Office of the Presidency of the Republic of Zaire, in connection with the execution, delivery and performance by the Republic of Zaire (the "Obligor") and the Bank of Zaire of the Refinancing Credit Agreement dated as of March 31, 1980 (the "Agreement") among the Obligor, the Bank of Zaire and the Banks, Agents and Servicing Bank parties thereto, DO HEREBY CERTIFY:


1.   That the below named person on the date hereof is the duly appointed Commissaire d'Etat aux Finances et Budget of the Obligor, is duly authorized to execute the Agreement and the other documents to be delivered thereunder on behalf of the Obligor, and has signed this Certificate in the space below opposite his name with his true signature:


M. Namwisi Ma Koyi        _____


2.   That the below named person on the date hereof is the duly appointed Governor of the Bank of Zaire and has signed this certificate in the space below opposite his name with his true signature:


M. Emony Mondanga         _____


IN WITNESS WHEREOF I have hereunder affixed my signature as of the date set forth above.


Title:  Director of the Office of
        the Presidency of the
        Republic of Zaire

EXHIBIT 3
(Section 6.01(b)(iii))

FORM OF INCUMBENCY CERTIFICATE
FOR THE BANK OF ZAIRE

(Dated no more than 20
days before the Effec-
tive Date)

I, Emony Mondanga, Governor of the Bank of Zaire,
in connection with the execution, delivery and performance
by the Bank of Zaire of the Refinancing Credit Agreement
dated as of March 31, 1980 (the "Agreement") among the
Republic of Zaire, the Bank of Zaire, and the Banks, Agents
and Servicing Bank parties thereto, DO HEREBY CERTIFY that
the below named persons at the date hereof (i) have been and
are duly appointed officials of the Bank of Zaire holding
the respective offices set forth below, (ii) are (in addi-
tion to the undersigned) duly authorized to execute the
Agreement and the other documents to be delivered thereunder
on behalf of the Bank of Zaire and (iii) have signed this
certificate in the space below opposite their names with
their true signatures:

Any one of the following:

Naele Ekofo Anyenge
Vice-Governor                        _____

Mamoudou Toure
Principal Director                   _____

Any two of the following:

Mawakani Samba
Head of the Department               _____
of Exchange Control
Regulations and Inter-
national Agreements

Mwasaka Nata Liyenge
Assistant Head of the                _____
Department of Exchange
Control Regulations and
International Agreements

Lundu Mpongo Ntueto
Head of the Department               _____
of Exchange Control

Salemani Mwana Yile
Assistant Head of the
Department of Exchange               _____
Control

Exhibit 3, p. 2

IN WITNESS WHEREOF I have hereunder affixed my signature as of the date set forth above.


Governor of the Bank of Zaire

EXHIBIT 4
(Section 6.01(b)(iv))


FORM OF CERTIFICATE OF THE OBLIGOR
AS TO THE ACCURACY OF REPRESENTATIONS


I, Namwisi Ma Koyi, Commissaire d'Etat aux
Finances et Budget of the Republic of Zaire (the "Obligor"),
DO HEREBY CERTIFY that the representations and warranties
set forth as to the Obligor in Section 7.01 of the Refinanc-
ing Credit Agreement dated as of March 31, 1980 among
the Republic of Zaire, the Bank of Zaire, and the Banks,
Agents and Servicing Bank parties thereto would be accurate
in all respects if repeated on the date hereof with refer-
ence to the facts now existing.


IN WITNESS WHEREOF, I have hereunto set my hand
as of this _____ day of _____, 1980.*


Title:  Commissaire d'Etat aux
        Finances et Budget


_____

*   Insert a date not more than 4
    days before the Effective Date.

EXHIBIT 5
(Section 6.01(b)(v))


FORM OF CERTIFICATE OF THE BANK OF ZAIRE
AS TO THE ACCURACY OF REPRESENTATIONS


I, Emony Mondanga, Governor of the Bank of Zaire,
DO HEREBY CERTIFY that the representations and warranties
set forth as to the Bank of Zaire in Section 9.02 of the
Refinancing Credit Agreement dated as of March 31, 1980
among the Republic of Zaire, the Bank of Zaire and the
Banks, Agents and Servicing Bank parties thereto would be
accurate in all respects if repeated on the date hereof with
reference to the facts now existing.

IN WITNESS WHEREOF, I have hereunto set my hand as
of this_____ day of _____, 1980*

_____
Governor of the Bank of Zaire

_____

\* Insert a date not more than 4
   days before the Effective Date

EXHIBIT  6
(Section  6.01(b)(vi))


FORM OF ACCEPTANCE
OF
APPOINTMENT OF NEW YORK PROCESS AGENT

(Insert Date)


To The Republic of Zaire, the
   Bank of Zaire and the Banks,
   Agents and Servicing Bank
   parties to the Refinancing Credit
   Agreement referred to below


Gentlemen:

        Reference is made to that certain Refinancing
Credit Agreement dated as of March 31, 1980 (said Agree-
ment, as it may have been or hereafter be amended, supple-
mented or otherwise modified from time to time, being the
"Agreement", the terms defined therein being used herein
with the same meaning) among each of you.  Pursuant to
Section 12.07 (a) of the Agreement, the Obligor and the Bank
of Zaire each has appointed the undersigned (with an office
on the date hereof at 277 Park Avenue, New York, New York
10017, United States) as New York Process Agent to receive
on behalf of it and its property service of copies of the
summons and complaint and any other process which may be
served in any action or proceeding in any New York State or
United States Federal court sitting in the Borough of
Manhattan of New York City arising out of or relating to the
Agreement.

        The undersigned hereby accepts such appointment
as New York Process Agent and agrees with you that (i)
the undersigned will maintain an office in New York City
during such appointment and will give you prompt notice of
any change of address of the undersigned, (ii) the under-
signed will perform its duties as New York Process Agent in
accordance with Section 12.07 (a) of the Agreement and (iii)
the undersigned will forward forthwith to the Obligor and/or
the Bank of Zaire, as the case may be, at its address
specified in Section 12.02 of the Agreement copies of any
summons, complaint and other process which the undersigned
receives in connection with its appointment as New York
Process Agent.

Exhibit 6, p. 2

This acceptance and agreement shall be binding
upon the undersigned and all successors of the undersigned.

Very truly yours,

C T CORPORATION SYSTEM

By _____
     Title:

EXHIBIT 7
(Section 6.01(b)(vii)

FORM OF ACCEPTANCE OF
APPOINTMENT OF LONDON PROCESS AGENT

(Insert Date)

The Law Debenture Corporation, Limited
Estates House
66, Gresham Street
London EC2V 7BX

Dear Sirs:

We refer to the Refinancing Credit Agreement
dated as of March 31, 1980, among the Republic of Zaire,
the Bank of Zaire and the Banks, Agents and Servicing Bank
parties thereto (said Agreement, as it may be amended,
supplemented or otherwise modified from time to time, being
the "Agreement").

You have been irrevocably appointed by each of
the Republic of Zaire and the Bank of Zaire under Section
12.07(a) of the Agreement to receive service of process in
the High Court of Justice in London in any action or pro-
ceeding arising out of or relating to the Agreement.

Your duties under this arrangement will solely
be as follows:

1. You will maintain an office in London, England
during such appointment and you will give the Servicing
Bank and the undersigned prompt notice of any change in
your address.

2. Upon receipt of any such process addressed
to either of us, you will on our behalf accept service
thereof and will immediately notify each of us by telex
or cable to the effect that you have accepted service
of process on our behalf.

3. You will immediately confirm this by letter to
each of us, at our respective addresses specified in
Section 12.02 of the Agreement, enclosing the documents
which you have received in connection with service of
such process.

In consideration of your accepting this appoint-
ment, we severally agree to indemnify you upon first written
demand from and against all costs, charges and expenses
whatsoever incurred by you in performance of your duties

Exhibit 7, p. 2

hereunder and agree that we shall have no right of action against you for any failure to perform any of such duties, except where such failure is due to your negligence or wilful default or that of your officers or agents.

Yours faithfully,
REPUBLIC OF ZAIRE

By _____
   Title: _____

BANK OF ZAIRE

By _____
   Title: _____

We hereby acknowledge receipt of a letter dated _____, 1980 from the Republic of Zaire and the Bank of Zaire, of which the above is a true copy, and we agree to the terms of the arrangements expressed therein. This acceptance and agreement shall be binding upon the undersigned and all successors of the undersigned.

Yours truly,

FOR AND BEHALF OF
THE LAW DEBENTURE CORPORATION, LIMITED

EXHIBIT 6
(Section 6.01(b)(viii))

FORM OF OPINION OF
COUNSEL TO THE OBLIGOR AND THE BANK OF ZAIRE

(Dated no more than
20 days before the
Effective Date)

To the Banks, Agents and
    Servicing Bank parties
    to the Refinancing Credit
    Agreement referred to
    below

Gentlemen:

I am the Director of the Office of the Presidency of the Republic of Zaire (the "Obligor") and have acted as counsel to the Obligor and the Bank of Zaire in connection with (i) the Refinancing Credit Agreement dated as of March 31, 1980 (the "Agreement") among the Obligor, the Bank of Zaire and the Banks, Agents and Servicing Bank parties thereto and (ii) certain documentation delivered pursuant to Section 6.01(b) of the Agreement.  Terms defined in the Agreement are used herein as therein defined

In that connection I have examined:

(1)   An executed counterpart of the Agreement;

(2)   The documents furnished by the Obligor and the Bank of Zaire pursuant to Section 6.01(b)(i) through (v) of the Agreement;

(3)   The Constitution of the Republic of Zaire (the "Constitution");

(4)   The charter ("statuts") of the Bank of Zaire; and

(5)   Such matters of law and other documents and materials as have appeared to me to be necessary in order to render my opinions expressed below.

Based upon the foregoing, I am of the opinion that:

(a)   The Obligor has full power and authority to execute the Agreement, to repay all Credits and pay interest thereon as primary obligor as provided in the Agreement, and to perform and observe the provisions of the Agreement on its part to be performed or observed.

(b)   The execution, delivery and performance by the Obligor of the Agreement have been  duly authorized by all necessary legislative, administrative and other governmental action in the Republic of Zaire, and do not contravene (i) the Constitution or (ii) any treaty, law, rule, regulation, order or decree in the Republic of Zaire or, to my knowledge, any, writ, judgment, award, injunction or similar legal restriction applicable to the Obligor or the Agreement in the Republic of Zaire.

(c)   No authorization or approval (including exchange control approval) or other action by, and no notice to or filing with, any governmental authority or regulatory body is required in the Republic of Zaire for the due execution, delivery and performance by the Obligor of the Agreement, except for the approval of the Bank of Zaire which has been duly obtained and is in full force and effect by virtue of the execution of the Agreement by the Bank of Zaire and except for an Ordonnance of the President of the Republic of Zaire, which has been duly obtained and is in full force and effect.

(d)   The Agreement has been duly executed and delivered by the Obligor and is the legal, valid and binding obligation of the Obligor enforceable against the Obligor in accordance with its terms.

(e)   The Agreement and each payment obligation of the Obligor thereunder is a direct, unconditional and general obligation of the Obligor as primary obligor.

(f)   The Bank of Zaire is duly organized and validly existing under the law of the Republic of Zaire as the central bank of the Republic of Zaire and as such exercises, with the Obligor, full power and control over the International Monetary Assets of the Republic of Zaire.

(g)   The Bank of Zaire has full power and authority under the law of the Republic of Zaire to execute and deliver the Agreement and to perform and observe the provisions of the Agreement on its part to be performed and observed.

(h)   The execution, delivery and performance of the Agreement by the Bank of Zaire have been duly authorized by all necessary legislative, administrative and other governmental action under the charter ("statute") of the Bank of Zaire or under the law of the Republic of Zaire and do not contravene law in the Republic of Zaire applicable to the Bank of Zaire.

(i)   The Agreement has been duly executed and delivered by the Bank of Zaire and is the legal, valid, and binding obligation of the Bank of Zaire

enforceable against the Bank of Zaire in accordance
with its terms.

(j)  The payment obligations of the Obligor
under the Agreement rank at least pari passu in pri-
ority of payment with all other External Indebtedness
of the Obligor.  Pari passu is understood to refer to
the order of priority of payment and not to the pres-
ence or absence of security.

(k)  To my knowledge, there is no pending or
threatened action or proceeding affecting the Obligor,
the Bank of Zaire or any Governmental Agency or any of
their respective Assets before any court, governmental
agency or arbitrator which would, if adversely deter-
mined, materially adversely affect the ability of the
Obligor to comply with its payment obligations under
the Agreement or which purports to affect the legality,
validity or enforceability of the Agreement.

(l)  The Obligor and the Bank of Zaire are subject
to civil and commercial law with respect to their
respective obligations under the Agreement.  Neither
the Obligor nor the Bank of Zaire nor any of their
respective Assets has any immunity from jurisdiction of
any court, attachment prior to judgment, attachment in
aid of execution, execution upon a judgment or other
legal process in the Republic of Zaire or under its
laws with respect to their respective obligations under
the Agreement.  The execution and delivery of the
Agreement by the Obligor and the Bank of Zaire and the
performance of their respective obligations thereunder
constitute private and commercial acts rather than
public or governmental acts.  The Republic of Zaire is
not a party to any treaty or other agreement with the
United States of America or England which relates to
any immunity from jurisdiction of any court or from any
legal process in such jurisdictions which could be
deemed applicable to any transaction contemplated by
the Agreement.

(m)  There is no tax, levy, impost, deduction,
charge or withholding imposed by the Republic of
Zaire or any political subdivision or taxing authority
thereof or therein (i) on or by virtue of the execution
or delivery of the Agreement or any other document to
be furnished thereunder or (ii) on any payment to be
made by the Obligor pursuant to the Agreement; provi-
ded that any Credits carried as assets on the books of,
and any payments made in respect of any such Credits
to, any Lending Office or other branch of a Bank
located in the Republic of Zaire are subject to taxa-
tion in accordance with the laws of the Republic of
Zaire.

(n)  To ensure the enforceability or admissibility
in evidence of the Agreement in the Republic of Zaire,
it is not necessary that the Agreement or any other

Exhibit 8, p. 4

document be filed or recorded with any court or other
authority in the Republic of Zaire or that any stamp or
similar tax be paid on or in respect of the Agreement.

(o)    If the Agreement were sued upon before a
court in the Republic of Zaire, such court would
give effect to the selection of the law of the State of
New York, United States of America, as the governing
law under Section 12.10 of the Agreement.

I am a member of the Bar of Kinshasa, Zaire and
express no opinion as to matters governed by any laws other
than the laws of the Republic of Zaire. I do not purport to
be expert on the laws of the State of New York or of the
United States of America and to the extent such laws may be
relevant to any opinion herein expressed, I have, without
making any independent investigation with respect thereto,
relied upon, and my opinion is subject to the qualifications
and limitations set forth in the opinion of Messrs. White
and Case, delivered to you pursuant to the Agreement.

Very truly yours,

EXHIBIT 9
(Section 6.01(b)(ix))

FORM OF OPINION OF
WHITE & CASE
SPECIAL UNITED STATES COUNSEL TO THE OBLIGOR
AND THE BANK OF ZAIRE

(Dated no more than 20
days before Effect-
tive Date)

To the Banks, Agents and
    Servicing Bank parties to
    the Refinancing Credit
    Agreement referred to
    below

Gentlemen:

        We have acted as special United States counsel to
the Republic of Zaire (the "Obligor") and the Bank of Zaire
in connection with the Refinancing Credit Agreement dated as
of March 31, 1980 (the "Agreement") among the Obligor,
the Bank of Zaire and the Banks, Agents and Servicing
Bank parties thereto, pursuant to which the Banks and the
Obligor have agreed to the refinancing of the Credits
subject to the Agreement, all as provided therein.   Terms
defined in the Agreement are used herein as therein defined.

        In connection with the preparation of this
opinion, we have examined an executed counterpart of the
Agreement; the opinion of the Director of the Office of the
Presidency of the Republic of Zaire, as counsel to the
Obligor and the Bank of Zaire, delivered pursuant to Section
6.01(b)(viii) of the Agreement; and executed counterparts or
copies, certified or otherwise identified to our satisfac-
tion, of such other documents as we have deemed relevant to
rendering this opinion.

        In such examination we have assumed that all such
documents have been duly authorized, executed and delivered
by or on behalf of each of the parties thereto, that all
signatures on all such documents are genuine and that copies
of all documents submitted to us are complete and conform to
the original documents.

Exhibit 9, p. 2

We are members of the bar of the State of New York and we do not express herein any opinion as to any matters governed by any law other than the laws of the State of New York and the Federal laws of the United States of America. We do not purport to be experts on the laws of the Republic of Zaire and, to the extent such laws may be relevant to this opinion, we have with your permission, but without making any independent investigation with respect thereto, relied upon, and our opinion is subject to the qualifications and limitations set forth in, the opinion referred to above of counsel to the Obligor and the Bank of Zaire.

Based upon the foregoing, we are of the opinion that the Agreement constitutes a valid and binding agreement of the Obligor and the Bank of Zaire, except that we express no opinion as to:

(i)   whether any determination by the Servicing Bank, any Agent or any Bank, if not made in good faith, would be conclusive absent manifest error,

(ii)   the binding effect of Section 12.07(c) of the Agreement to the extent it purports to waive any immunity (a) with respect to property of the Obligor or the Bank of Zaire in the United States of America which is not used for a commercial activity in the United States of America within the meaning of the United States Foreign Sovereign Immunities Act of 1976 or (b) with respect to the attachment prior to the entry of judgment of property of the Bank of Zaire held for its own account,

(iii)   the binding effect of any provision of the Agreement to the extent that it could result in the receipt of interest in violation of the provisions of the New York Penal Law relating to usury by a recipient to which such provisions are applicable,

(iv)   the effect of the law of any jurisdiction (other than the State of New York) in which any Agent, Bank or Lending Office may be located,

(v)   the binding effect of Section 12.06(b), or

(vi)   whether a United States Federal court would have jurisdiction in a suit, action or proceeding brought by one or more foreign plaintiffs against the Obligor or the Bank of Zaire.

Very truly yours,

EXHIBIT 10
(Section 6.01(b)(x))

FORM OF OPINION OF
SPECIAL ZAIRE COUNSEL TO THE AGENTS

(Dated no more than 20
days before the Effec-
tive Date)

To the Banks, Agents and
    Servicing Bank parties to
    the Refinancing Credit
    Agreement referred to
    below

Gentlemen:

        We have acted as special Zaire counsel to the
Agents in connection with (i) the Refinancing Credit
Agreement dated as of March 31, 1980 (the "Agreement")
among the Republic of Zaire, the Bank of Zaire and the
Banks, Agents and Servicing Bank parties thereto and (ii)
certain documentation delivered pursuant to 6.01(b) of the
Agreement.  Terms defined in the Agreement are used herein
as therein defined.

        In that connection we have examined:

        (1)  An executed counterpart of the Agreement;

        (2)  The documents furnished by the Obligor
and the Bank of Zaire pursuant to Section 6.01(b)(i)
through (v) of the Agreement;

        (3)  The Constitution of the Republic of Zaire
(the "Constitution");

        (4)  The charter ("statuts") of the Bank of
Zaire;

        (5)  The Ordonnance Loi No. 61 dated December 5,
1969;  and

        (6)  Such matters of law and other documents and
materials as we have deemed necessary in order to render our
opinions expressed below.

        Based upon the foregoing, we are of the opinion
that:

        (a)  The Obligor has full power and authority
to execute the Agreement, to repay all Credits and pay
interest thereon as primary obligor as provided in the
Agreement, and to perform and observe the provisions of
the Agreement on its part to be performed or observed.

(b)   The execution, delivery and performance by the Obligor of the Agreement have been  duly authorized by all necessary legislative, administrative and other governmental action in the Republic of Zaire, and do not contravene (i) the Constitution or (ii) any treaty, law, rule, regulation, order or decree in the Republic of Zaire or, to my knowledge, any writ, judgment, award, injunction or similar legal restriction applicable to the Obligor or the Agreement in the Republic of Zaire.

(c)   No authorization or approval (including exchange control approval) or other action by, and no notice to or filing with, any governmental authority or regulatory body is required in the Republic of Zaire for the due execution, delivery and performance by the Obligor of the Agreement, except for the approval of the Bank of Zaire which has been duly obtained and is in full force and effect by virtue of the execution of the Agreement by the Bank of Zaire and except for an Ordonnance of the President of the Republic of Zaire which has been duly obtained and is in full force and effect.

(d)   The Agreement has been duly executed and delivered by the Obligor and is the legal, valid and binding obligation of the Obligor enforceable against the Obligor in accordance with its terms.

(e)   The Agreement and each payment obligation of the Obligor thereunder is a direct, unconditional and general obligation of the Obligor as primary obligor.

(f)   The Bank of Zaire is duly organized and validly existing under the law of the Republic of Zaire as the central bank of the Republic of Zaire and as such exercises, with the Obligor, full power and control over the International Monetary Assets of the Republic of Zaire.

(g)   The Bank of Zaire has full power and authority under the law of the Republic of Zaire to execute and deliver the Agreement and to perform and observe the provisions of the Agreement on its part to be performed and observed.

(h)   The execution, delivery and performance of the Agreement by the Bank of Zaire have been duly authorized by all necessary legislative, administrative and other governmental action under the charter ("statute") of the Bank of Zaire or under the law of the Republic of Zaire and do not contravene law in the Republic of Zaire applicable to the Bank of Zaire.

(i)   The Agreement has been duly executed and delivered by the Bank of Zaire and is the legal, valid and binding obligation of the Bank of Zaire enforceable against the Bank of Zaire in accordance with its terms.

(j)  The payment obligations of the Obligor under the Agreement rank at least _pari passu_ in priority of payment with all other External Indebtedness of the Obligor.  _Pari Passu_ is understood to refer to the order of priority of payment and not to the presence or absence of security.

(k)  The Obligor and the Bank of Zaire are subject to civil and commercial law with respect to their respective obligations under the Agreement.  Neither the Obligor nor the Bank of Zaire nor any of their respective Assets has any immunity from jurisdiction of any court, attachment prior to judgment, attachment in aid of execution, execution upon a judgment or other legal process  in the Republic of Zaire or under its laws with respect to their respective obligations under the Agreement.  The execution and delivery of the Agreement by the Obligor and the Bank of Zaire and the performance of their respective obligations thereunder constitute private and commercial acts rather than public or governmental acts.  The Republic of Zaire is not a party to any treaty or other agreement with the United States of America or England which relates to any immunity from jurisdiction of any court or from any legal process in such jurisdictions which could be deemed applicable to any transaction contemplated by the Agreement.

(l)  There is no tax, levy, impost, deduction, charge or withholding imposed by the Republic of Zaire or any political subdivision or taxing authority thereof or therein (i) on or by virtue of the execution or delivery of the Agreement or any other document to be furnished thereunder or (ii) on any payment to be made by the Obligor pursuant to the Agreement;  provided that any Credits carried as assets on the books of, and any payments made in respect of any such Credits to, any Lending Office or other branch of a Bank located in the Republic of Zaire are subject to taxation in accordance with the laws of the Republic of Zaire.

(m)  To ensure the enforceability or admissibility in evidence of the Agreement in the Republic of Zaire, it is not necessary that the Agreement or any other document be filed or recorded with any court or other authority in the Republic of Zaire or that any stamp or similar tax be paid on or in respect of the Agreement.

(n)  If the Agreement were sued upon before a court in the Republic of Zaire, such court would give effect to the selection of the law of the State of New York, United States of America, as the governing law under Section 12.10 of the Agreement.

Exhibit 10, p. 4

We are members of the Bar of Kinshasa, Zaire and express no opinion as to matters governed by any laws other than the laws of the Republic of Zaire. We do not purport to be expert on the laws of the State of New York or of the United States of America and to the extent such laws may be relevant to any opinion herein expressed, we have, without making any independent investigation with respect thereto, relied upon, and our opinion is subject to the qualifications and limitations set forth in the Opinion of Messrs. Shearman and Sterling, delivered to you pursuant to the Agreement.

Very truly yours,

EXHIBIT 11
(Section 6.01(b)(xi))


FORM OF OPINION OF

SPECIAL ENGLISH COUNSEL TO THE AGENTS


(Dated no more than 20
days before the Effec-
tive Date)


To the Banks, Agents and
    Servicing Bank parties to
    the Refinancing Credit
    Agreement referred to
    below

Dear Sirs:


        We have acted as special English counsel to the
Agents in connection with the Refinancing Credit Agree-
ment dated as of March 31, 1980 (the "Agreement") among
the Republic of Zaire, the Bank of Zaire and the Banks,
Agents and Servicing Bank parties thereto.   Terms defined
in the Agreement are used herein as therein defined.


        In that connection we have examined the execution
form of the Agreement, including the form of the letter
attached as Exhibit 7 to the Agreement from the Obligor and
the Bank of Zaire to the London Process Agent, and such
matters of law and other documents and materials as we have
deemed necessary in order to render our opinion below.

        On the assumptions that:

        (a) the Agreement was duly executed by the
parties thereto and that the Obligor and the Bank of
Zaire have transmitted to the London Process Agent a
letter in the form of Exhibit 7 to the Agreement and
that the London Process Agent has accepted and agreed
to the arrangement expressed therein; and

        (b) the Agreement is valid and binding against the
Obligor and the Bank of Zaire under the laws of the
Republic of Zaire and the State of New York, United
States of America, by which laws it is expressed to be
governed;

Exhibit 11, p. 2

We are of the opinion that:

(a) the submission by the Obligor and the Bank of Zaire to the non-exclusive jurisdiction of the High Court of Justice in London and any appellate court therefrom and the waivers of immunity with respect thereto contained in Section 12.07 of the Agreement are valid, binding and effective in accordance with Section 12.07; and

(b) the appointment in Section 12.07 of the Agreement by each of the Obligor and the Bank of Zaire of The Law Debenture Corporation, Limited as its agent for the service of process in England is valid and effective.

We express no opinion as to any law save that of England.

This opinion is given only to you in connection with the Agreement and should not be relied upon as constituting a representation or other statement to any other person or for any other purpose.

Yours faithfully,

EXHIBIT 72
(Section 6.01(b)(xii))


FORM OF OPINION OF
SHEARMAN & STERLING
SPECIAL UNITED STATES COUNSEL TO THE AGENTS


(Effective   Date)


To the Banks, Agents and
    Servicing Bank parties to
    the Refinancing Credit
    Agreement referred to
    below


Gentlemen:

        We have acted as special United States counsel to
the institutions which are the Agents parties to the
Refinancing Credit Agreement dated as of March 31, 1980
(the "Agreement") among the Republic of Zaire, the Bank of
Zaire and the Banks, Agents and Servicing Bank parties
thereto in connection with (i) the preparation, execution
and delivery of the Agreement and (ii) the review of docu-
mentation submitted pursuant to Section 6.01 (b) of the
Agreement and certain other matters related to the occur-
rence of the Effective Date under the Agreement.   Terms
defined in the Agreement are used herein as therein defined.

        In connection with this opinion, we have examined
an executed copy of the Agreement, the documents listed on
Schedule I hereto and originals or copies, certified or
otherwise identified to our satisfaction, of such other
documents, certificates, governmental records and other
instruments as we have deemed necessary for purposes of this
opinion.

        In our examination of the documents referred to
above, we have assumed the authenticity of all such docu-
ments submitted to us as originals, the genuineness of all
signatures, the due authority of the parties executing such
documents, and the conformity to the originals of such
documents submitted to us as copies.   We have relied, as to
all factual matters, on the documents we have examined.   We
also have assumed that the Banks, the Agents and the
Servicing Bank have each duly executed and delivered the
Agreement pursuant to due authorization.

Exhibit 12, p.2

We understand from the Servicing Bank that it has received (i) payment of all amounts required to be paid to it under Section 6.01(a)(x) of the Agreement and (ii) the confirmation of receipt of payment of certain non-Dollar amounts required under Section 6.01(a)(y) of the Agreement.

Based upon the foregoing, and having regard for legal considerations which we deem relevant, we are of the opinion that:

1. The Agreement constitutes a valid and binding agreement of the Obligor.

2. The documents listed on Schedule I hereto are substantially responsive to the requirements of Section 6.01(b) of the Agreement.

3. The conditions of the Effective Date have been satisfied and the Effective Date occurred on the date hereof.

4. A notification by the Servicing Bank to the Obligor and the Agents that such conditions have been satisfied and that the Effective Date occurred on the date hereof would be in accordance with the terms of Section 6.02 of the Agreement.

Our opinion is subject to the following qualifications:

(a) The enforceability of the Obligor's obligations under the Agreement may be subject to the application of equitable principles in any proceeding (legal or equitable) involving the enforcement of any of the provisions of the Agreement. Such equitable principles are of general application, and in applying such equitable principles a court, among other things, might not allow a creditor to accelerate maturity of a debt upon the occurrence of a default deemed immaterial or might decline to order the Obligor to perform covenants where the court considers the creditor to have another adequate remedy (such as acceleration or money damages). The equitable principles applied by a court might include a requirement that the creditors act with reasonableness and good faith. Such a requirement might be applied, among other situations, to the provisions of the Agreement purporting to authorize conclusive determinations by the Servicing Bank, or any Agents or Bank.

(b) The enforceability in the United States of the waiver by the Obligor of its immunities from court jurisdiction and from legal process, as set forth in Section 12.07(d) of the Agreement, is subject to the limitations imposed by the United States Foreign Sovereign Immunities Act of 1976.

Exhibit 12, p. 3

(c) We express no opinion as to the enforceability of Section 12.06 of the Agreement providing for the Obligor's indemnity to any Bank, any Agent or the Servicing Bank against any loss in obtaining Dollars from a court judgment in another currency.

(d)   We express no opinion as to the binding effect or enforceability of any provision of the Agreement to the extent that it could result in the receipt of interest in violation of the provisions of the New York Penal Law relating to usury by a recipient to which such provisions are applicable.

(e) We are qualified to practice law in the State of New York and we do not purport to be experts on, or to express any opinion herein concerning, any law other than the law of the State of New York and the Federal law of the United States.  We do not purport to be experts on the laws of the Republic of Zaire and, to the extent such laws may be relevant to this opinion, we have with your permission, but without making any independent investigation with respect thereto, relied upon, and our opinion is subject to the qualifications and limitations set forth in the opinion of special Zaire counsel to the Agents (Item ____ on Schedule I hereto).  With respect to the submission by the Obligor to the non-exclusive jurisdiction of the High Court of Justice in London, the appointment by the Obligor of the London Process Agent and the waiver of immunity with respect thereto, we have relied for the purposes of our opinion upon the opinion of special English counsel to the Agents (Item ____ on Schedule I hereto).  Further, we express no opinion as to the effect of the law of any jurisdiction other than the State of New York wherein any Bank, Lending Office, Agent or the Servicing Bank may be located or wherein enforcement of the Agreement may be sought which limits the rates of interest legally chargeable or collectible.

Very truly yours,

SHEARMAN & STERLING

Schedule I to
Shearman & Sterling Opinion dated _____, 1980 re
The Refinancing Credit Agreement dated as of _____, 1980 for
The Republic of Zaire

[1]   a certificate dated _____, 1980 of
_____, delivered pursuant to Section 6.01(b)(i) of
the Agreement;

[2]   a certificate, dated _____, 1980 of
_____, delivered pursuant to Section 6.01(b)(ii) of
the Agreement;

[3]   a certificate dated _____, 1980 of
_____, delivered pursuant to Section 6.01(b)(iii) of
the Agreement;

[4]   a certificate dated _____, 1980 of
_____, delivered pursuant to Section 6.01(b)(iv) of
the Agreement;

[5]   a certificate dated _____, 1980 of
_____, delivered pursuant to Section 6.01(b)(v) of
the Agreement;

[6]   a letter dated _____, 1980 from the CT Corpora-
tion System, delivered pursuant to Section 6.01(b)(vi)
of the Agreement;

[7]   a letter dated _____, 1980 from the Obligor and
the Bank of Zaire to The Law Debenture Corporation,
Limited, acknowledged by The Law Debenture Corporation,
Limited and delivered pursuant to Section 6.01(b)(vii)
of the Agreement;

[8]   an opinion dated _____, 1980 of
_____, delivered pursuant to Section 6.01(b)(viii) of
the Agreement;

[9]   an opinion dated _____, 1980 of White & Case,
special United States counsel to the Obligor and the
Bank of Zaire, delivered pursuant to Section
6.01(b)(ix) of the Agreement;

[10]  an opinion dated _____, 1980 of _____
_____, special Zaire counsel to the Agents,
delivered pursuant to Section 6.01(b)(x) of the Agree-
ment; and

[11]  an opinion dated _____, 1980 of _____
_____, special English counsel to the Agents,
delivered pursuant to Section 6.01(b)(xi) of the
Agreement.