UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x
                                                    :
THEMIS CAPITAL and                                  :
DES MOINES INVESTMENTS LTD.,                         :        No. 09 Civ. 1652 (GBD)
                                                    :
                          Plaintiffs,               :
                                                    :
              v.                                    :
                                                    :
DEMOCRATIC REPUBLIC OF CONGO                         :
and CENTRAL BANK OF THE                              :
DEMOCRATIC REPUBLIC OF THE                           :
CONGO,                                              :
                                                    :
                          Defendants.               :
                                                    :
------------------------------------------------------------x

## MEMORANDUM OF LAW IN SUPPORT OF
## DEFENDANTS' OBJECTION TO THE
## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION
## OF NOVEMBER 1, 2010

Carmine D. Boccuzzi
Christopher P. Moore
CLEARY GOTTLIEB STEEN & HAMILTON LLP
One Liberty Plaza
New York, NY 10006

Nady Mayifuila
EMERY MUKENDI WAFWANA & ASSOCIATES, P.C.
250 Park Avenue, 7th Floor
New York, NY 10177

*Attorneys for the Democratic Republic of the Congo and
the Central Bank of the Democratic Republic of the Congo*

Dated: January 21, 2011

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ............................................................................................ ii

PRELIMINARY STATEMENT ...................................................................................... 1

BACKGROUND ............................................................................................................ 3

I.      The Parties .......................................................................................................... 3

II.     The Credit Agreement.......................................................................................... 4

III.    Procedural History .............................................................................................. 6

ARGUMENT ................................................................................................................. 10

I.      Standard Of Review............................................................................................ 10

II.     The Credit Agreement Does Not Provide For Interest on Overdue
        Interest To Be Compounded ................................................................................ 11

III.    Plaintiffs Are Not Entitled To "Interest on Interest on Overdue
        Principal" Because No Demand for "Interest on Overdue Principal"
        Has Been Made.................................................................................................... 15

IV.     Other Calculations In The Report Are Not Supported By
        Sufficient Evidence.............................................................................................. 17

        A.      The Report Should Adopt The Servicing Bank's LIBO Rate From
                April 2009 To Present.............................................................................. 17

        B.      The Amounts Awarded For Out-Of-Pocket Expenses
                Are Excessive and Unreasonable.............................................................. 18

CONCLUSION.............................................................................................................. 20

ADDENDUM A............................................................................................................. 21

ADDENDUM B............................................................................................................. 22

## TABLE OF AUTHORITIES

**Page(s)**

**Rules and Statutes**

N.Y. Gen. Obl. Law § 5-527(1) ............................................................................................ 12

Fed. R. Civ. P. 72(b)(3) ......................................................................................................... 11

**Cases**

Arbor Hill Concerned Citizens Neighborhood Ass'n v. County of Albany,
522 F.3d 182 (2d Cir. 2008) ................................................................................................. 18

Arista Records, LLC v. Doe 3,
604 F.3d 110 (2d Cir. 2010) ................................................................................................. 11

Colavito v. Hockmeyer Equip. Corp.,
605 F. Supp. 1482 (S.D.N.Y. 1985) ..................................................................................... 18

Elliott Assocs., L.P. v. Banco de la Nacion,
194 F.R.D. 116 (S.D.N.Y. 2000) .......................................................................................... 13

F. H. Krear & Co. v. Nineteen Named Trustees,
810 F.2d 1250 (2d Cir. 1987) ............................................................................................... 18

Giventer v. Arrow,
37 N.Y.2d 305 (1975) ........................................................................................................... 11

Gulf Ins. Co. v. Transatlantic Reinsurance Co.,
886 N.Y.S.2d 133 (1st Dep't 2009) ...................................................................................... 14

Hirschfeld v. Board of Elections in City of New York,
984 F.2d 35 (2d Cir. 1993) ................................................................................................... 18

In re City of New York,
No. 35057/04, 2006 WL 2446140 (N.Y. Sup. Kings County Aug. 24, 2006),
aff'd sub nom. In re West Bushwick Urban Renewal Area Phase 2,
855 N.Y.S.2d 582 (2d Dep't 2008) ....................................................................................... 12

In re Rosner,
48 B.R. 538 (Bankr. E.D.N.Y 1985) ..................................................................................... 11

In re Schuster's Will,
3 N.Y.S.2d 702 (Sur. Ct. 1938), aff'd 12 N.Y.S.2d 20 (2d Dep't 1939) ............................. 11

**Page(s)**

In re West Bushwick Urban Renewal Area Phase 2,
855 N.Y.S.2d 582 (2d Dep't 2008)......................................................................................... 11

Matter of Estate of Jackson,
508 N.Y.S.2d 671 (3d Dep't 1986)......................................................................................... 11

Rourke v. Fred H. Thomas Assocs.,
627 N.Y.S.2d 831 (3d Dep't 1995)......................................................................................... 12

Scholastic, Inc. v. Harris,
259 F.3d 73 (2d Cir. 2001)...................................................................................................... 12

Transbel Inv. Co. v. Roth,
36 F. Supp. 396 (S.D.N.Y. 1940) .......................................................................................... 11

Travelers Cas. & Sur. Co. of America v. Pacific Gas and Elec. Co.,
549 U.S. 443 (2007)................................................................................................................. 18

United Fire & Cas. Co. v. Arkwright Mut. Ins. Co.,
53 F. Supp. 2d 632 (S.D.N.Y. 1999)..................................................................................... 14

Utilisave Corp. v. Benjamin Shapiro Realty Co., L.P.,
723 N.Y.S.2d 669 (1st Dep't 2001) ...................................................................................... 13

**Other Authorities**

DAVID L. SCOTT, WALL STREET WORDS: AN A TO Z GUIDE TO INVESTMENT
TERMS FOR TODAY'S INVESTOR 74 (3d ed. 2003) ................................................................. 8

Gordon Brown, The Chancellor Of The Exchequer, Speech at the United
Nations General Assembly Special Session on Children, *Financing A World
Fit For Children* (May 10, 2002)........................................................................................... 4

International Monetary Fund and International Development Association Report,
*Democratic Republic of the Congo, Decision Point Document for the Enhanced
Heavily Indebted Poor Countries (HIPC) Initiative*, 03/267 (July 14, 2003) .................... 3

International Monetary Fund and International Development Association Report,
*Heavily Indebted Poor Countries (HIPC) Initiative: Status of Implementation*
(Sept. 23, 2002)....................................................................................................................... 4

**Page(s)**

John B. Taylor, Under Secretary Of Treasury For International Affairs,
Speech at the Conference on Sovereign Debt Workouts: Hopes And
Hazards, Institute For International Economics, *Sovereign Debt
Restructuring: A U.S. Perspective*, (April 2, 2002) ........................................................... 4

Press Release, Office of the High Commissioner for Human Rights,
*'Vulture Funds' – UN expert on foreign debt welcomes landmark
law to address profiteering* (Apr. 20, 2010) ...................................................................... 4

Reuven Glick, *Country Crises and Corporate Failures: Lessons for Prevention
and Management?*, FRBSF Economic Letter 2002-18, at 2 (June 14, 2002)..................... 4

.

The Democratic Republic of the Congo (the "Congo") and the Central Bank of the Democratic Republic of the Congo (the "Central Bank") submit this memorandum of law pursuant to Fed. R. Civ. P. 72(b)(2) in objection to the Report and Recommendation of the Hon. Kevin Nathaniel Fox, dated November 1, 2010 (the "Report"), determining the amounts of interest and out-of-pocket expenses to be awarded to plaintiffs Themis Capital ("Themis") and Des Moines Investments Ltd. ("Des Moines"). Defendants reserve all rights and defenses, including but not limited to any and all defenses based upon improper service and/or lack of personal or subject matter jurisdiction, as well as any and all defenses with respect to the Order Granting Default Judgment entered on April 28, 2010 (the "Order").

## PRELIMINARY STATEMENT

Plaintiffs in this case are vulture funds who seek to collect over $80 million from an impoverished, war-torn country based upon their purported beneficial interests in a Refinancing Credit Agreement (the "Credit Agreement") executed over 30 years ago between and among the Republic of Zaire ("Zaire"), the Bank of Zaire and bank creditors of the Republic of Zaire, among others. Plaintiffs were not original parties to the Credit Agreement, but instead claim to be the assignees of certain rights under that agreement. Based upon this purported assignment, plaintiffs assert they are entitled to recover approximately $18 million in principal, although they undoubtedly paid a fraction of that amount for any rights they may have acquired. In addition, plaintiffs seek more than $60 million in interest – more than three times the amount of principal to which they claim to be entitled – as well as approximately $230,000 in attorneys' fees allegedly incurred in obtaining a default judgment against the defendants, which only recently filed appearances in this action. Defendants object to the award of interest and "out-of-pocket" expenses set forth in the Report for four reasons.

First, contrary to the plain text of the Credit Agreement, well-settled New York law, and the parties' course of performance over 30 years, the Report recommends that plaintiffs be awarded approximately $15 million for so-called "Generation 3+ interest." To be clear, this category of interest sought by plaintiffs is *in addition to* approximately $47 million of "interest on principal" and "interest on interest on principal." Not surprisingly, the Credit Agreement does not permit the award of this excessive amount of interest, which would require the Court to read into the Credit Agreement the right to collect a form of compound interest for which the Credit Agreement does not provide.

Second, the calculations adopted by the Report are based upon plaintiffs' incorrect assumption that "interest on interest on overdue principal" begins to accrue automatically. In fact, the Credit Agreement provides that interest on any missed interest payment begins to accrue only as of the date on which that underlying missed interest payment was due. Because interest on principal is due and payable "on demand," interest on any such interest on overdue principal only begins to accrue after a demand for that interest on overdue principal is made. Here, plaintiffs have failed to submit any evidence that any such demand was ever made. Given that no demand has been made for interest on overdue principal, plaintiffs are not entitled to interest on that interest. The amount of interest recommended in the Report should therefore be reduced by an additional amount of approximately $20 million.

Third, there is insufficient evidence in the record to support the interest rates applied in the Report for the period following April 2009. The Court should therefore provide the parties with sufficient time to obtain that information from the designated Servicing Bank, after which the relevant interest calculations may be revised accordingly.

Fourth, $230,000 is a plainly excessive award for "out-of-pocket" expenses in a case where defendants have only recently appeared to contest the claim. In fact, a substantial portion of this sum was incurred in connection with efforts unrelated to the instant litigation. The Credit Agreement does not permit plaintiffs to recover these expenses. Accordingly, the amount of "out of pocket" expenses awarded to plaintiffs in the Report must be reduced by an additional amount of approximately $97,000.

## BACKGROUND

### I.   The Parties

The Congo is a sovereign nation located in central Africa. Throughout much of the 20th century, the Congo has been plagued by political turmoil, institutional and economic crisis, and civil unrest.[1] After decades of repressive rule at the hands of Mobutu Sese Seko – during which time the nation was known as the Republic of Zaire – Laurent Kabila became President of the country in 1997, renaming it the Democratic Republic of the Congo. The following year, in 1998, the "Second Congo War" began, involving several foreign armies and rebel factions and resulting in the deaths of more than 3.8 million people, mostly from starvation and disease brought about by one of the deadliest conflicts since World War II. President Kabila was assassinated in 2001 and was succeeded by his son, Joseph Kabila, who negotiated a peace agreement in 2002 and established a transitional government on June 30, 2003.

Plaintiff Themis is a company organized under the laws of the Cayman Islands. Plaintiff Des Moines is a limited liability company organized under the laws of the British Virgin Islands. Amended Complaint ("Am. Compl.") ¶¶ 2, 3. Plaintiffs assert that they acquired rights

---

[1]      The Congo has been recognized as a "heavily indebted poor country" by the World Bank and the International Monetary Fund. See International Monetary Fund and International Development Association Report, *Democratic Republic of the Congo, Decision Point Document for the Enhanced Heavily Indebted Poor Countries (HIPC) Initiative*, 03/267 (July 14, 2003), *available at* http://www.imf.org/external/pubs/ft/scr/2003/cr03267.pdf.

under the Credit Agreement – and thus became creditors of the defendants – through a series of

assignments in 2008 and 2009. Although plaintiffs purchased this debt at a steep discount (and

at a time it had been non-performing for nearly 20 years), they seek to recover 100% of the

principal amount – approximately $18 million – as well as an exorbitant amount of interest –

approximately $60 million.[2]

## II.    The Credit Agreement

The Credit Agreement was executed on March 31, 1980, by and among Zaire (the

"Obligor"), the Bank of Zaire, certain bank creditors of the Republic of Zaire (the "Banks"),

certain agents (the "Agents"), and the Bank of Tokyo Trust as Servicing Bank. Credit

Agreement R-1. Union Bank, N.A. (the "Servicing Bank"), subsequently replaced the Bank of

Tokyo as Servicing Bank under the Credit Agreement. See Declaration of Eric C. Kirsch, dated

February 1, 2010 ("Feb. Kirsch Decl.") Ex. C.

---

[2]     The United States has noted that the litigation tactics of vulture funds such as the plaintiffs here are "particularly disruptive" to the efforts of sovereign nations to restructure unsustainable debt. See Reuven Glick, *Country Crises and Corporate Failures: Lessons for Prevention and Management?*, FRBSF Economic Letter 2002-18, at 2 (June 14, 2002), *available at* http://www.frbsf.org/publications/economics/letter/2002/el2002-18.pdf; see also International Monetary Fund and International Development Association Report, *Heavily Indebted Poor Countries (HIPC) Initiative: Status of Implementation*, at 76 (Sept. 23, 2002), *available at* http://www.imf.org/external/np/hipc/2002/status/092302.pdf (noting international consensus that litigation campaigns waged by "vulture funds" "jeopardize[] the achievement of debt sustainability" for poor countries like Congo); John B. Taylor, Under Secretary Of Treasury For International Affairs, Speech at the Conference on Sovereign Debt Workouts: Hopes And Hazards, Institute For International Economics, *Sovereign Debt Restructuring: A U.S. Perspective* (April 2, 2002), *available at* https://ustreas.gov/press/releases/po2056.htm (Former Undersecretary of the Treasury John Taylor expressing support for plan that would prevent "a small minority can prevent a restructuring that the majority of bondholders feel is in their best interests."); Gordon Brown, The Chancellor Of The Exchequer, Speech at the United Nations General Assembly Special Session on Children, *Financing A World Fit For Children* (May 10, 2002), *available at* http://www.hm-treasury.gov.uk./newsroom_and_speeches/press/2002/press_46_02.cfm ("We particularly condemn the perversity where Vulture Funds purchase debt at a reduced price and make a profit from suing the debtor country to recover the full amount owed – a morally outrageous outcome."); Press Release, Office of the High Commissioner for Human Rights, *'Vulture Funds' – UN expert on foreign debt welcomes landmark law to address profiteering* (Apr. 20, 2010), *available at* http://www2.ohchr.org/english/issues/development/debt/docs/vulture_funds_20Apr2010.pdf (last visited Jan. 19, 2011) ("[T]he profiteering of 'vulture funds' [has been] at the expense of both the citizens of distressed debtor countries and the taxpayers of countries that have supported international debt relief efforts . . . . 'Vulture funds' have exploited the voluntary nature of international debt relief schemes by acquiring defaulted sovereign debt at deeply discounted prices and then seeking repayment of the full value of the debt through litigation, seizure of assets or political pressure.").

The Credit Agreement provides for the refinancing of certain amounts referred to as "Credits" owed by Zaire to the Banks, which are organized into various groups called "Syndicates." Credit Agreement R-1. The Credit Agreement sets forth a schedule for the repayment of the principal owed by Zaire, starting on April 10, 1980, and ending on March 31, 1990. See id. § 4.01.

Interest on principal amounts due under the Credit Agreement accrue from the beginning of the Credit Agreement until the final Principal Date, scheduled to take place on March 31, 1990. See Credit Agreement §§ 3.03, 4.01(f). The Credit Agreement sets forth specific dates on which this form of interest becomes due and payable. See, e.g., id. § 3.04 (providing that between September 2, 1980, and March 31, 1990, such interest payments were due and payable on a semi-annual basis). If all principal and interest amounts are paid as scheduled, then this is the only category of interest required under the Credit Agreement.[3]

In addition, in the event that a principal payment is not made as scheduled, the Credit Agreement provides for two categories of additional interest: (i) interest on that overdue principal amount from the "date such principal amount is due" until such principal amount is paid in full, which amount of interest is "payable on demand," Credit Agreement § 3.05(a), and (ii) interest on any amounts of interest due under Section 3.05(a) that are not paid on demand. See id. § 3.05(d).[4] Under these provisions, interest on the interest on overdue principal begins to

---

[3]       The Credit Agreement provides for interest on principal to be paid during three periods: (1) past due interest that becomes payable together with the first payment of principal ("Reference Date Interest"), Credit Agreement § 3.01, (2) interest that accrues between the Reference Date (January 31, 1980) and September 2, 1980 ("Interest from the Reference Date to the Reconciliation Date"), id. § 3.02, and (3) interest that accrues from September 2, 1980 until the last scheduled payment of the principal ("Interest from the Reconciliation Date"), id. § 3.03.

[4]       Section 3.05(d) provides that "the Obligor further agrees to pay interest . . . on all interest which is not paid when due hereunder . . . , such interest is to be payable on demand, to accrue from the due date of such interest until payment in full thereof and to be calculated on the basis of successive Overdue Periods of one Month."

5

accrue only following a demand for the interest on overdue principal. There is otherwise no

provision for the accrual of interest on interest. Furthermore, a demand for interest on overdue

principal must be made pursuant to Section 12.02 of the Credit Agreement.

Interest rates are determined by the Servicing Bank based on market quotations

and formulas provided by the Credit Agreement. Credit Agreement § 3.07(a). The Servicing

Bank's determination of the interest rate is "conclusive and binding for all purposes in the

absence of manifest error." Id. Based on the rate communicated to them by the Servicing Bank,

Agents advise the Servicing Bank of the amount of interest payable to the Banks in the Syndicate

for which the Agent is acting. Id. § 3.07(b). Thereafter, the Servicing Bank informs the Obligor

of the aggregate amount of interest payable to all the Banks, "[o]n the basis of" the information

provided to it by the Agents. Id. As with its determination of the interest rate, the Servicing

Bank's advice to the Obligor as to the amount of interest is "conclusive and binding for all

purposes in the absence of manifest error." Id.

## III.    Procedural History

Plaintiffs brought suit on February 23, 2009, alleging that the Congo and the

Central Bank had breached the agreement for failing to make any payments of outstanding

principal and corresponding amounts of interest due and owed to plaintiffs as assignees.

Although a claim based upon a 30-year old Credit Agreement (that plaintiffs had never

previously sought to enforce) would typically be time-barred, plaintiffs allege that the Congo and

the Central Bank "revived" and assumed tens of millions of dollars of debt due under that Credit

Agreement by executing a one-page document in February 2003, at a time when the country was

in the midst of a major political changeover preceding the formal establishment of a transition

6

government in June 2003.  Defendants reserve any and all rights to challenge the validity of this document at a later date.

The original complaint was never served on defendants.  On May 22, 2009, plaintiffs filed an amended complaint, which they purportedly served on CT Corporation, the designated agent for service under the Credit Agreement.  Credit Agreement § 12.07.  However, CT Corporation returned the papers to plaintiffs, explaining that they had no record of ever being appointed as agents for service of process.  Feb. Kirsch Decl. Ex. O.  On November 16, 2009, the Clerk of the Court dispatched mail service purportedly to the Congolese Minister of Foreign Affairs and the Governor of the Central Bank.  However, plaintiffs have not provided evidence sufficient to identify the person to whom those documents were purportedly delivered.  See Transcript of Proceedings Held on April 27, 2010 before Judge George B. Daniels, at 4:14-25.  Defendants reserve any and all rights to challenge the validity of service of process.

Plaintiffs moved for summary judgment and in the alternative for a default judgment on February 1, 2010.  Defendants appeared after an entry of default and this Court had granted plaintiffs' motion for default judgment.  See generally Order.  In granting that motion, the Court held that the Congo and the Central Bank owed plaintiffs $18,003,558.32 in principal plus "interest on principal, interest on all amounts of interest due and unpaid, and all out-of-pocket expenses."  Id. ¶ 10.[5]  The Court ordered plaintiffs to submit a proposed judgment containing "current interest" calculations and a statement of their costs, and thereafter referred to Magistrate Judge Fox the calculation of the appropriate amount of interest and out-of-pocket expenses to be awarded to plaintiffs.  Report at 2.

---

[5]     Because of an error in plaintiffs' submissions, the Court mistakenly found in its judgment that Themis was owed $7,981,058.35 in principal and Des Moines was owed $10,022,499.97 in principal, rather than vice versa.  Order ¶ 10.  The Report recommends that this Court amend its order to correct this error by reversing the numbers of principal owed.  Report at 2-3, 6.

7

Plaintiffs submitted calculations of interest based primarily on spreadsheets that they had prepared themselves. Plaintiffs' calculations included: (1) principal, (2) interest on overdue principal, (3) interest on interest on overdue principal (i.e., interest on the amount of interest due under Section 3.05(a)), and (4) a category of interest vaguely referred to by plaintiffs as "Generation 3+ interest." Declaration of Eric C. Kirsch, dated June 15, 2010 ("June Kirsch Decl.") Exs. D, E. As to the fourth category, plaintiffs clarified that they were claiming not just interest on interest, but also interest on interest on interest, and interest on interest on interest on interest, and "all further generations of interest on unpaid interest," *ad infinitum*. Transcript of Telephonic Conference before the Hon. Magistrate Judge Fox, September 13, 2010 ("Sept. 13, 2010 Tr.") at 4:13-15; see also id. at 3:13-15 (explaining that "Generation 3+ interest" is plaintiffs' designation for the infinite sum of the "second and all further generations of interest on unpaid interest."). Plaintiffs acknowledged that they were, in effect, arguing that the Credit Agreement provides not only for interest on interest on overdue principal, but that such interest itself is to be compounded on a monthly basis. Id. at 2:11-3:7.[6]

Plaintiffs' submission to Magistrate Judge Fox was inconsistent with their prior submission to this Court. In their earlier submission, plaintiffs provided records from the Servicing Bank under the Credit Agreement – an entity with no financial stake in the method by which interest is calculated – which indicated that Congo owed only 1) overdue principal and 2) interest on that overdue principal. See Feb. Kirsch Decl. Ex. J. The Servicing Bank's calculations did not provide for interest on interest, let alone anything resembling plaintiffs' current demand for so-called "Generation 3+ interest." Id.

---

[6] Compound interest is "[i]nterest paid both on principal and on interest earned during previous compounding periods. Essentially, compounding involves adding interest to the sum of principal and any previous interest in order to calculate interest in the next period." DAVID L. SCOTT, WALL STREET WORDS: AN A TO Z GUIDE TO INVESTMENT TERMS FOR TODAY'S INVESTOR 74 (3d ed. 2003).

Notably, prior to submitting the evidence they obtained from the Servicing Bank, plaintiffs had tried to persuade the Servicing Bank to change its method of calculation, writing to it in May 2009 and urging it to "correct" its records to conform with the interest amounts plaintiffs now seek. See Declaration of Christopher P. Moore ("Moore Decl.") Ex. A. Plaintiffs' request was apparently rejected by the Servicing Bank.

In an attempt to avoid the methodology applied by the Servicing Bank that was originally submitted to this Court, plaintiffs obtained and submitted to Magistrate Judge Fox new and different calculations. These calculations were based on those of a purported Agent under the Credit Agreement called Red Barn Capital LLC ("Red Barn"). Plaintiffs claim that Red Barn appointed itself as Agent for the A-7 Syndicate on March 13, 2008. June Kirsch Decl. Ex. B. At the time it did so, it held Credits under Syndicate A-7 as well as Syndicate A-16. Feb. Kirsch Decl. Ex. I. Red Barn sold $10 million worth of its Credits in Syndicate A-7 *to Themis* on August 5, 2008, but continues to be a creditor under that Syndicate for $3.825 million. Id. Ex. B; see also id. Ex. I. Thus, in addition to purporting to act as plaintiffs' Agent for Syndicate A-7, Red Barn is itself a creditor with substantial interests under the Credit Agreement and has a demonstrated prior financial relationship with plaintiff Themis.

Red Barn's calculations, prepared shortly before plaintiffs' submission to the Magistrate Judge, see June Kirsch Decl. Ex. C (detailing Red Barn's calculations of the amount of interest owed as of June 30, 2010), pertained to only one of nine of plaintiffs' Syndicates. Id. Ex. B. However, in all other respects, Red Barn's calculations of interest conformed to the method of calculation urged by plaintiffs – and apparently rejected by the Servicing Bank in 2009 – including so-called "Generation 3+ interest." See id. Ex. C; see also June Kirsch Decl.

9

¶ 8 (noting that Red Barn's calculations are "identical" to those of plaintiffs). Plaintiffs did not provide Agent calculations for any of the other Syndicates to which they belong.

Magistrate Judge Fox initially recognized that the interest presented by plaintiffs – particularly the so-called "Generation 3+ interest" – "doesn't seem to square with the language of the order that Judge Daniels issued in April." Sept. 13, 2010 Tr. at 5:11. Nevertheless, the Report awards that category of interest based on Magistrate Judge Fox's determination to accept the spreadsheets submitted by plaintiffs as "prima facie evidence" of the interest owed to them. Report at 2 (emphasis in original). Accordingly, the Report recommends an award of interest that includes not only interest on principal, and "interest on interest on principal," but also successive generations of additional "interest on interest." Id. at 6.

In addition to an amount of principal of $18,003,558.32, the Report recommends that plaintiffs be awarded $61,316,391.16 in interest and $228,405.24 of "out-of-pocket" expenses. Id. For the reasons set forth below, defendants respectfully request that the recommended amount of interest be reduced by an aggregate amount of $34,890,813.54, and that the recommended amount of out-of-pocket expenses be reduced by $96,612.73.

## ARGUMENT

## I.    Standard Of Review

Defendants object to the Magistrate's Report under Fed. R. Civ. P. 72(b)(2).[7]

Under Rule 72(b)(3), "[t]he district judge must determine de novo any part of the magistrate judge's disposition that has been properly objected to. The district judge may accept, reject, or modify the recommended disposition; receive further evidence; or return the matter to the

---

[7]    Although defendants did not make submissions to Magistrate Judge Fox, plaintiffs have conceded that defendants should be entitled to raise objections to the Report. See Letter of D. Hranitzky to the Court, dated December 6, 2010. Indeed, by Order dated December 30, 2010, this Court extended the deadline for defendants to file an objection to the Report to January 21, 2011 in order to provide them with sufficient time to do so.

magistrate judge." See also Arista Records, LLC v. Doe 3, 604 F.3d 110, 116 (2d Cir. 2010)

("As to a dispositive matter, any part of the magistrate judge's recommendation that has been

properly objected to must be reviewed by the district judge *de novo*."). A review of the Report

demonstrates that the judgment sought by plaintiffs vastly overstates any entitlement that may

exist under the Credit Agreement.

## II.     The Credit Agreement Does Not Provide For Interest On Overdue Interest To Be Compounded

In the event that a principal payment is not made as scheduled, the Credit

Agreement provides for only two categories of interest:  (1) "interest on overdue principal,"

Credit Agreement § 3.05(a), and (2) interest on any amounts of interest due under Section

3.05(a) that are not paid on demand, id. § 3.05(d).  According to the Report, these two categories

of interest amount to $47 million.  Report at 2-3.  But the Report does not stop there, and instead

adopts plaintiffs' theory that it is entitled to an additional $15 million in the form of plaintiffs'

so-called "Generation 3+ interest."  Id.  There is no provision for awarding this additional

category of interest.

Plaintiffs' claim for "Generation 3+ interest" is tantamount to a claim that interest

on overdue interest, itself a form of compound interest, be further compounded on a monthly

basis.  It is well settled in New York that any species of compound interest is available only

where the parties' agreement expressly provides for it.[8]  See In re West Bushwick Urban

Renewal Area Phase 2, 855 N.Y.S.2d 582, 583 (2d Dep't 2008) (because "the mortgage

---

[8]       Historically, compound interest has been disfavored by New York courts and was consistently found to be void as against public policy.  See Matter of Estate of Jackson, 508 N.Y.S.2d 671, 673-74 (3d Dep't 1986); In re Rosner, 48 B.R. 538, 558 (Bankr. E.D.N.Y 1985) ; Giventer v. Arrow, 37 N.Y.2d 305, 308 (1975); Transbel Inv. Co. v. Roth, 36 F.Supp. 396, 398 (S.D.N.Y. 1940); In re Schuster's Will, 3 N.Y.S.2d 702, 702 (Sur. Ct. 1938), aff'd 12 N.Y.S.2d 20 (2d Dep't 1939).  Indeed, this was the well-settled law in New York at the time the Credit Agreement was executed in 1980.  In 1989, the New York legislature adopted a provision to make a "loan or other agreement providing for such compound interest" enforceable.  See N.Y. Gen. Obl. Law § 5-527(1).

agreement and note at issue did not include a provision expressly authorizing it to compound

interest . . . compound interest is not recoverable."); Rourke v. Fred H. Thomas Assocs., 627

N.Y.S.2d 831(3d Dep't 1995) (requiring proof of existence of express agreement to charge

compound interest); In re City of New York, No. 35057/04, 2006 WL 2446140, at *2 (N.Y. Sup.

Kings County Aug. 24, 2006), aff'd sub nom. In re West Bushwick Urban Renewal Area Phase

2, 855 N.Y.S.2d 582 ("compound interest is recoverable only where the agreement at issue

specifically sets forth plaintiff's entitlement to interest compounded annually.").[9]

        Section 3.05(d), which provides for interest on overdue interest, does not provide

that such interest be compounded. Instead it states simply that such interest is "to accrue from

the due date of such interest until payment in full thereof." Credit Agreement § 3.05(d). While

3.05(d) requires that such interest be "calculated on the basis of successive Overdue Periods of

one Month," id., the Credit Agreement elsewhere makes clear that "Overdue Periods" are to be

used only "for purposes of determining the interest rate" to be applied. Id. § 3.05(b) (emphasis

added). There is no suggestion in Section 3.05(d) that such interest on overdue interest is to be

added back to the sum of principal and used as a basis for calculating additional future interest,

and indeed is not payable on a monthly basis but rather is due and payable "on demand."[10]

Courts have routinely found that similar provisions, which provide for a periodic calculation of

interest, but do not provide that the calculation be compounded, are *not* "express" agreements for

compound interest. See, e.g., In re City of New York, 2006 WL 2446140, at *1 (provision

---

[9]     Even if the interpretation of Section 3.05(d) urged by plaintiffs were reasonable – it is not – that would at
most render that section ambiguous and hence, not express. See Scholastic, Inc. v. Harris, 259 F.3d 73, 82 (2d Cir.
2001) (a contract provision is "ambiguous" where it "suggest[s] more than one meaning when viewed objectively by
a reasonably knowledgeable person who has examined the context of the entire integrated agreement." (citation
omitted)); In re West Bushwick Urban Renewal Area Phase 2, 855 N.Y.S.2d at 583 (finding that an agreement must
expressly provide for compound interest).

[10]    See also infra, n.12.

stating that interest "be computed . . . at the rate of [13%] per annum, and to be paid   . . .
monthly . . . until . . . the unpaid principal and interest should become due and payable did not
constitute agreement to pay compound interest"); Utilisave Corp. v. Benjamin Shapiro Realty
Co., L.P., 723 N.Y.S.2d 669, 670 (1st Dep't 2001) ("the provision indicating that interest would
'accrue' at a rate of 1.5% per month did not constitute agreement to pay compound interest").[11]

        Plaintiffs argued to the Magistrate that 3.05(d) requires compounding of interest
on interest because it obligates defendants to pay interest "on *all* interest which is not paid when
due." Letter of Dennis Hranitzky to Hon. Magistrate Judge Fox, dated September 29, 2010
("Sept. 29, 2010 Letter"), at 2 (emphasis in original). According to plaintiffs, Section 3.05(d)
does not just provide for interest on overdue interest on principal, but it also provides for
successive generations of interest on top of interest on top of interest. See id. Such a reading of
Section 3.05(d) is implausible. If the parties had intended the Credit Agreement to provide for
compounding of all interest on a monthly basis, it would have been far simpler and clearer just to
say so. They did not. In fact, the term "all" in Section 3.05(d) simply refers to those categories
of interest that are in fact provided for by the Credit Agreement, i.e., interest on principal, see
Credit Agreement §§ 3.01-3.03, and interest on overdue principal, see id. § 3.05(a). The plain

---

[11]      The Report cites to NYGOL § 5-527(1) in support of its finding that the Credit Agreement provides for
interest on overdue interest to be compounded. However, Section 5-527(1) provides only that agreements providing
for compound interest are enforceable under New York law. Because the Credit Agreement does not provide that
interest on overdue interest under Section 3.05(d) be compounded, § 5-527(1) is not applicable. Similarly, the
Report's reliance on Elliott Assocs., L.P. v. Banco de la Nacion, 194 F.R.D. 116, 121-22 (S.D.N.Y. 2000), is
misplaced. In that case the parties apparently agreed that their agreement provided for a certain calculation of
compound interest "to the extent permitted by applicable law," and the only issue was whether § 5-527, which
permits compound interest but was passed after the agreement was made, provided for "retroactive application" to
such an agreement. Id. at 122. The court determined that it did. Id. Here, by contrast, the dispute is whether the
Credit Agreement provides for interest to be compounded at all.

meaning of Section 3.05(d) provides for a single generation of interest on overdue interest, not the successive generations of interest on interest on interest that plaintiffs claim.[12]

Indeed, in the course of fulfilling its obligations under the Credit Agreement, the Servicing Bank has calculated interest in a manner consistent with defendants' interpretation. "'[T]he practical interpretation of a contract by the parties to it for any considerable period of time before it comes to be the subject of controversy is deemed of great, if not controlling, influence." Gulf Ins. Co. v. Transatlantic Reinsurance Co. , 886 N.Y.S.2d 133, 143-44 (1st Dep't 2009) (citation omitted); see also United Fire & Cas. Co. v. Arkwright Mut. Ins. Co., 53 F. Supp. 2d 632, 641-42 (S.D.N.Y. 1999). Plaintiffs concede that the Servicing Bank's chart they submitted to this Court was "made at or near the time by, or from information transmitted by, a person with knowledge" and was "kept in the course of a regularly conducted business activity," and that "it was the regular practice of [the Servicing Bank] to make the chart." Feb. Kirsch Decl. ¶ 12. These contemporaneous records show amounts due for principal and interest on principal, but nothing remotely resembling plaintiffs' "Generation 3+ interest." See Feb. Kirsch Decl. Ex. J. These records, kept by an institution with no financial stake in this conflict, are strong evidence of how the parties to the Credit Agreement understood interest to be calculated prior to the commencement of this litigation.

Plaintiffs' reliance upon Red Barn's calculations is misplaced. First, the calculations were prepared shortly before and apparently solely for the purpose of this litigation. Second, Red Barn, which appears itself to own millions of dollars of Credits, is a self-interested

---

[12]     Plaintiffs' argument also presupposes that interest accruing under Section 3.05(d) becomes due on a monthly basis, and thereby becomes the basis for a successive generation of interest on interest. See Sept. 29, 2010 Letter at 2 ("for each subsequent month . . . , an additional generation of interest became due"). Plaintiffs do not and cannot cite a provision of the Credit Agreement providing for such monthly due dates, because it does not exist. In fact, interest on overdue interest under Section 3.05(d) only becomes due "on demand." Credit Agreement § 3.05.

14

party and thus it has an incentive to inflate interest calculations by providing for a new,

previously unforeseen category of interest.  Third, Red Barn's calculations have no bearing on

the interest calculations for any of the other eight syndicates at issue here, as it purports to have

appointed itself Agent of only one of those Syndicates.  See June Kirsch Decl. Ex. C.[13]  Fourth,

whatever an Agent's responsibility may be with respect to maintaining records concerning

amounts owed to Banks within its Syndicates, that responsibility cannot as a matter of law entitle

it to create a new category of interest to which plaintiffs are not entitled under the plain language

of the Credit Agreement.  Such an invention by the Agent would plainly constitute "manifest

error."  An Agent's records are to be considered "correct . . . with respect to Credits of its

Syndicates," but only in the absence of "manifest error."  See Credit Agreement § 5.05.

Put simply, what plaintiffs claim and what the Report has granted is contrary to

the law, the plain language of the Credit Agreement, and the parties' course of performance over

30 years.  The Credit Agreement does not permit plaintiffs to recover the category of so-called

"Generation 3+" interest.  The amount of interest recommended by the Report should be reduced

by $14,693,255.82 for this reason alone.  See Report at 3.

## III.    Plaintiffs Are Not Entitled To "Interest on Interest on Overdue Principal" Because No Demand For "Interest on Overdue Principal" Has Been Made

The Credit Agreement provides that interest only accrues on "interest which is not

paid when due."  Credit Agreement § 3.05(d) (emphasis added); see also Order ¶ 10 (holding

plaintiffs entitled to an award of approximately $18 million in principal plus "interest on

principal, interest on all amounts of interest due and unpaid, and 'all out-of-pocket expenses'"

---

[13]     Section 5.05 provides that the Agent keeps books only "with respect to Credits of *its* Syndicates," while the Servicing Bank keeps books "with respect to *all* the Credits" (emphasis added).  Similarly, Section 3.07(b) provides that the Agent advises only its "Syndicate Member of the amount of interest payable to it on such Interest Payment Date," while the Servicing Bank advises the Obligor of the "aggregate amount of interest payable to the Banks . . . which advice shall be conclusive and binding."

(emphasis added)).  Because interest on overdue principal is "payable on demand," id. § 3.05(a),

that interest is not due until a demand for it is made, and thus any additional interest on that

category of interest only begins to accrue after a demand for such interest is made.  Plaintiffs

have provided no evidence that any such demand was ever made.  Because interest under Section

3.05(a) was not demanded, no interest under Section 3.05(d) (which consists of interest due on

amounts due under Section 3.05(a)) has accrued.

   Plaintiffs' calculation improperly assumes that interest on overdue principal

becomes due and payable automatically on a monthly basis rather than "on demand."  See June

Kirsch Decl. Exs. D, E; see also Sept. 13, 2010 Tr. at 5:6-8 (asserting that "each month that

Congo fails to pay the interest that came due the preceding month an additional generation of

interest is added to the calculation.").  There is no such provision in the Credit Agreement.[14]

Rather, under Section 3.05(a), interest due on overdue principal becomes due and payable "on

demand."[15]  While Section 3.05(d) refers to the calculation of interest "on the basis of successive

Overdue Periods of one Month," Section 3.05(b) makes clear that it is the only interest rate that

is to be determined on a monthly basis.  Nowhere in the Credit Agreement does it suggest that

such interest is payable on a monthly basis, as plaintiffs suggest.

   The fact that no interest on interest on overdue principal has accrued is further

demonstrated by the calculations of the Servicing Bank, which is compelling evidence of the

course of performance under the Credit Agreement.  See supra at 14.  The Servicing Bank's

calculations show a provision only for simple interest on principal, and no provision for any

---

[14] Pursuant to Section 3.05(b), the interest rate for interest provided in Section 3.05(a) shall be calculated on a monthly basis, but this provision does not provide a specific time when the accrued interest becomes due and payable.

[15] And even if any interest under Section 3.05(a) had accrued, any interest due on those amounts under Section 3.05(d) would likewise be due "on demand," not on a monthly basis.

interest on interest. See Feb. Kirsch Decl. Ex. J. It was thus an error for the Report to

recommend any award for "interest on interest." See Report at 3. The amount of interest

recommended by the Report should be reduced by \$20,197,557.72 for this reason alone. See

Report at 3.

## IV.   Other Calculations In The Report Are Not Supported By Sufficient Evidence

### A.   The Report Should Adopt The Servicing Bank's LIBO Rate From April 2009 To Present

The Report notes that "[t]he Court could not verify the interest rates proffered [by

plaintiffs], owing to the manner in which the LIBO Rate is calculated under the Credit

Agreement."[16] Report at 3 n.1. Instead, the Report accepted the rates proffered by plaintiffs

after April 2009 based on the provision of the Credit Agreement that information received by a

Bank "shall be prima facie evidence of the amount of such Credit and of such amounts paid and

payable." Report at 2 (quoting Credit Agreement § 5.05). Plaintiffs do not explain why they did

not submit the authoritative interest rates from the Servicing Bank, which is "conclusive and

binding for all purposes in the absence of manifest error." Credit Agreement § 3.07(a). Instead

of adopting the interest rates proffered by plaintiffs or its Agent with an interest in this matter,

the Court should provide the parties with sufficient time to obtain from the Servicing Bank the

appropriate LIBO rates for all applicable periods, including the period after April 2009, after

which the relevant interest calculations may be revised accordingly.

---

[16]      "LIBO Rate" means "with respect to each Interest Period or Overdue Period, the average (rounded upward,
if necessary, to the nearest whole multiple of 1/16 of 1% per annum) of the rate per annum at which deposits in
Dollars are offered to each of the Reference Banks by prime banks in the London interbank market at 11:00 A.M.
(London time) two Business Days before the first day of such period for a period equal thereto and in an amount
equal to \$5,000,000." Credit Agreement § 1.01.

**B.    The Amounts Awarded For Out-Of-Pocket Expenses Are Excessive and Unreasonable**

The recommended amount of out-of-pocket expenses in the Report is unreasonable and excessive, and should be substantially reduced. The general rule in New York is that each party must pay for its own attorneys fees and may not recover those fees from an adversary absent statutory authority or contractual agreement.[17] While Section 12.05(a)(iv) of the Credit Agreement provides that "each Bank" may receive "all out-of-pocket expenses . . . incurred in connection with . . . enforcing this Agreement or suing for or collecting any overdue amount payable," any such right should be narrowly applied. Specifically, courts must ensure that any such awards are "not unreasonable." F. H. Krear & Co. v. Nineteen Named Trustees, 810 F.2d 1250, 1263 (2d Cir. 1987). A district court should consider all necessary "case-specific variables" in determining whether rates are reasonable. These factors include, *inter alia,* the time and labor required, novelty and difficulty of legal questions, and level of skill required to perform the legal service. Arbor Hill Concerned Citizens Neighborhood Ass'n v. County of Albany, 522 F.3d 182, 183-84 (2d Cir. 2008).

An award of legal expenses of nearly $230,000 to seek a default judgment in which defendants have only recently appeared is not "reasonable." Plaintiffs admit that their costs are "higher than what might generally be expected in a default proceeding." Plaintiffs' Letter to Judge George B. Daniels, dated June 15, 2010, at 2. Plaintiffs explain that they have incurred unusually high expenses because, "[i]n order to ensure their ability to enforce a judgment anywhere in the world, Plaintiffs undertook an extensive review of both the facts underlying their case and the law of both the United States and other jurisdictions." June Kirsch

---

[17]    See, e.g., Travelers Cas. & Sur. Co. of America v. Pacific Gas and Elec. Co., 549 U.S. 443, 448 (2007) (stating the "American rule"); Hirschfeld v. Board of Elections in City of New York, 984 F.2d 35, 40 (2d Cir. 1993); Colavito v. Hockmeyer Equip. Corp., 605 F. Supp. 1482, 1488 (S.D.N.Y. 1985).

18

Decl. ¶ 16. This includes fees for press monitoring and for local counsel. Declaration of Eric C. Kirsch, dated September 29, 2010 ("Sept. Kirsch Decl.") ¶¶ 7-8.

It is inappropriate for plaintiffs to seek recovery of costs not incurred "in connection with" this litigation. Credit Agreement § 12.05(a)(iv). At most, plaintiffs may seek expenses incurred in connection with obtaining a default judgment, and not costs associated with plaintiffs' evaluation of their prospects for enforcing a judgment abroad. Nor should defendants be held responsible for costs that plaintiffs admit "did not directly advance the litigation," Sept. Kirsch Decl. ¶ 6, such as "(a) completion of certain reports for auditors, and (b) preparing responses to various press inquiries and stories concerning our clients." Id. In fact, of the $228,405.24 in out-of-pocket expenses sought by plaintiffs, approximately $96,612.73 is unrelated to plaintiffs' effort to obtain a default judgment and, accordingly, any judgment amount should be reduced by this amount as well. See Moore Decl. Ex. B.[18] In the alternative, defendants should be permitted to take discovery on this issue in order to challenge plaintiffs' position that it was reasonable to incur more than $230,000 in expenses when litigating against absent defendants.

---

[18]     This calculation is based on an examination of plaintiffs' records. See Sept. Kirsch Decl. Exs. A-C. Defendants prepared a chart categorizing certain tasks undertaken by plaintiffs into one of five categories not related to this litigation: (1) the preparation of unspecified reports for auditors ("Audit"); (2) the evaluation of plaintiffs' ability to enforce any judgment obtained in certain foreign jurisdictions ("Enforcement Abroad"); (3) efforts to retain, and other communications with, local counsel in certain foreign jurisdictions ("Local Counsel"); (4) preparation of responses to various press inquiries and stories concerning plaintiffs ("Press"); and (5) monitoring press concerning the Congo ("Press Monitoring"). See Moore Decl. Ex. B. With respect these five categories, Dechert billed $88,412.49, Fasken billed $45,590.62, and Mayer Brown HK billed $10,915.98, for a total of $144,919.09. See Addendum B. Applying the one-third discount plaintiffs have voluntarily agreed to apply yields $96,612.73. See id.

## CONCLUSION

For the foregoing reasons, the Report and Recommendation of Magistrate Judge

Fox dated November 1, 2010, should be modified consistent with the objections set forth above.

Dated: New York, New York
          January 21, 2011

Respectfully submitted,

CLEARY GOTTLIEB STEEN & HAMILTON LLP

By: _____
          Carmine D. Boccuzzi (cboccuzzi@cgsh.com)
          Christopher P. Moore (cmoore@cgsh.com)

One Liberty Plaza
New York, New York 10006
(212) 225-2000

EMERY MUKENDI WAFWANA & ASSOCIATES, P.C.
Nady Mayifuila (mayifuila@cabemery.org)
250 Park Avenue, 7th Floor
New York, NY 10177

*Attorneys for the Democratic Republic of the Congo and
the Central Bank of the Democratic Republic of the Congo*

## ADDENDUM A

### Summary of Interest Calculations

| | Magistrate Report | Defendants' Objections | Difference |
|---|---|---|---|
| (A) Principal | $18,003,558.32 | NONE * | $ 0 |
| (B) Interest on Principal | $26,785,577.62 | NONE * | $ 0 |
| (C) Interest on Overdue Interest | $20,197,557.72 | Section 3.05(d) provides that interest on overdue interest only accrues on "interest which is not paid when due." Section 3.05(a) provides that interest on overdue principal is "payable on demand." No demand for interest on principal has been made and thus no interest on overdue interest is due.<br><br>See Point III. | $20,197,557.72 |
| (D) Additional Generations of Interest | $14,693,255.82 | The Credit Agreement does not expressly provide for successive generations of interest on interest. See Point II. | $14,693,255.82 |
| **TOTAL** | **$79,679,949.48** | **$44,789,135.94** | **$34,890,813.54** |

* Defendants reserve any and all rights to challenge the validity, or to seek vacatur, of any default judgment awarding any amounts of principal and/or interest on principal at a later date.

21

**ADDENDUM B**

**Fees Unrelated To This Litigation**

*(All figures in USD)*

| | Des Moines | Themis | Total |
|---|---|---|---|
| Unrelated Dechert Fees | | | |
| Audit | 825.00 | 675.00 | 1,500.00 |
| Enforcement Abroad | 19,173.32 | 19,185.67 | 38,358.99 |
| Local Counsel | 10,431.05 | 10,431.05 | 20,862.10 |
| Press | 10,817.50 | 10,817.50 | 21,635.00 |
| Press Monitoring | 3,028.20 | 3,028.20 | 6,056.40 |
| *Total Dechert Fees* | *44,275.07* | *44,137.42* | *88,412.49* |
| | | | |
| *Fasken Fees* | *22,795.31* | *22,795.31* | *45,590.62* |
| *Mayer Brown (HK) Fees* | *5,457.99* | *5,457.99* | *10,915.98* |
| | | | |
| **Total unrelated fees** | **72,528.37** | **72,390.72** | **144,919.09** |
| **Total unrelated fees (1/3 discount)** | **48,352.25** | **48,260.48** | **96,612.73** |