UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------------------X
                                                              :
THEMIS CAPITAL, LLC and DES MOINES           :
INVESTMENTS LTD.,                                         :
                                                              :         09 Civ. 1652 (PAE)
                                  Plaintiffs,              :
              -v-                                          :         OPINION & ORDER
                                                              :
DEMOCRATIC REPUBLIC OF CONGO and CENTRAL :
BANK OF THE DEMOCRATIC REPUBLIC OF THE   :
CONGO,                                                     :
                                                              :
                                  Defendants.           :
                                                              :
-----------------------------------------------------------------------X

PAUL A. ENGELMAYER, District Judge:

        Plaintiffs Themis Capital, LLC and Des Moines Investments, Ltd. (collectively,

"plaintiffs") bring this claim for breach of contract under New York law against the Democratic

Republic of the Congo and the Central Bank of the Democratic Republic of the Congo

(collectively, "defendants").  Plaintiffs have moved for pre-discovery summary judgment.  For

the reasons that follow, that motion is denied, without prejudice to plaintiffs' right to re-file after

a period of limited discovery in accordance with this Opinion & Order.

I.      **Factual Background**[1]

---

[1] The following facts are drawn from a variety of sources, including: plaintiffs' Amended
Complaint ("Am. Compl.") (Dkt. 5); defendants' Answer to the Amended Complaint ("Answer")
(Dkt. 70); plaintiffs' Memorandum of Law in Support of the Motion for Summary Judgment
("Pls. Mot.") (Dkt. 63); plaintiffs' Rule 56.1 Statement ("Pls. Statement") (Dkt. 64); defendants'
Opposition to the Motion for Summary Judgment ("Defs. Opp'n") (Dkt. 67); defendants' Rule
56.1 Counter Statement ("Defs. Statement") (Dkt. 69); plaintiffs' Reply Brief ("Pls. Reply")
(Dkt. 71); Declaration of Dennis H. Hranitzky ("Hranitzky Decl.") (Dkt. 62); Declaration of
Nady Mayifuila (Dkt. 68); plaintiffs' Supplementary Brief ("Pls. Supp.") (Dkt. 80); and
defendants' Supplementary Brief ("Defs. Supp.") (Dkt. 81).

On March 31, 1980, the Republic of Zaire, a sovereign state in Central Africa, and the Bank of Zaire, Zaire's national bank, entered into a Refinancing Credit Agreement with various creditors and agents, including Citibank N.A. ("Credit Agreement" or "Agreement").  *See* Hranitzky Decl. Ex. A.  Under the Credit Agreement, the Bank of Tokyo Trust Company was identified as the servicing bank.  The Credit Agreement restructured various debts that Zaire owed to its creditors.  The creditors were listed in a "Credit Information Schedule" attached to the Credit Agreement.  *See id.* at R-1 to R-2.

Themis Capital ("Themis") and Des Moines Investments, LLC ("Des Moines") are the assignees of all rights, title, interest, benefits, and obligations in the debt owed to the creditors under the Credit Agreement.[2]  Under the Credit Agreement, defendants owed $9,562,500 in principal to Citibank, and $459,999.67 in principal to Bayerische Vereinsbank International S.A.  *See* Pls. Mot. 3.  Following the execution of a deed of assignment, effective August 5, 2008, Themis is the successor-in-interest to these two debts, for a total of $10,022,499.67 in principal.  Hranitzky Decl. Ex. B at 1; *id.* Ex. C at 2.  Additionally, under the Credit Agreement, defendants owed: $487,900.00 in principal to Citibank N.A. under Schedule A-1; $308,463.08 in principal to Banque Bruxelles-Lambert S.A. ("Bruxelles-Lambert") under Schedule A-2; $483,125.00 in principal to Electro Banque under Schedule A-14; $1,449,375.00 in principal to Citibank N.A. under Schedule A-14; $254,472.50 in principal to Bruxelles-Lambert under Schedule A-19; $308,451.77 in principal to Bruxelles-Lambert under Schedule A-21; and $4,689,271.00 in principal to Citibank N.A. under Schedule A-26.  *See* Pls. Mot. 3; Hranitzky Decl. Exs. D–H (deeds of assignment).  Following the execution of a deed of assignment, effective February 2,

---

[2] Defendants do not dispute these facts.

2009, Des Moines is the successor-in-interest to these seven debts, for a total of $7,981,058.35 in principal.  Hranitzky Decl. Ex. D at 1.

Under the Credit Agreement, Zaire was obliged to pay each contracting bank: "(a) The First Principal Payment of each Credit of such Bank, (b) The Reference Date Interest on each Credit of such Bank, and (c) all costs and expenses payable pursuant to Section 12.05 which shall have been notified to the [Republic of Zaire] by the Servicing Bank."  Agreement § 2.01. Zaire was required to make such payments periodically on specified payment dates, the last of which was April 2, 1990.  *Id.* § 4.01(f); Pls. Mot. 4.  The Credit Agreement further provided that the Bank of Zaire was "irrevocably and unconditionally instruct[ed]" to make all such payments on behalf of the Zaire to the banks, subject to the availability to the Bank of Zaire of sufficient foreign currency.  Agreement §§ 8.03, 9.01(c); Defs. Opp'n 3.

In the years following the execution of the 1980 Credit Agreement, Zaire was plagued with political and social instability.  *See* Defs. Opp'n 14 n.7.[3]  In May 1997, following 32 years of rule by authoritarian leader Joseph-Désiré Mobutu, Mobutu was overthrown in a coup led by Laurent-Désiré Kabila, who subsequently named himself president and changed the name of the country from Zaire to the Democratic Republic of the Congo ("DRC").  The Court assumes for the purpose of this motion, and defendants do not dispute, that defendants DRC and Central Bank of the DRC ("Central Bank") are successors in interest to the Republic of Zaire and the Bank of Zaire.

Plaintiffs allege that defendants failed to pay any outstanding principal or corresponding interest due under the 1980 Credit Agreement to plaintiffs' predecessors-in-interest, or to plaintiffs themselves.  Am. Compl. ¶¶ 20, 23; Pls. Statement ¶ 7.  Defendants do not dispute that

---

[3] Plaintiffs do not dispute these facts.

no such payment has been made.  Defs. Statement ¶ 7.  It is also undisputed that this is the first lawsuit to raise such claims, *i.e.*, that the original creditors, prior to transferring their rights to Themis and Des Moines, did not bring a claim against defendants alleging a breach of the Credit Agreement.

Important here, in 2003, a single-page document that referenced the 1980 Credit Agreement was circulated between Citibank and individuals in the DRC.  *See* Hranitzky Decl. Ex. N ("2003 Letter").  The 2003 Letter, dated February 25, 2003, provided:

> The Democratic Republic of Congo and the Central Bank of Congo hereby refer to the Refinancing Credit Agreement dated as of March 21, 1980 among the Democratic Republic of Congo (formerly known as the Republic of Zaire), the Central Bank of Congo (formerly known as the Bank of Zaire), the Banks and Agents party thereto and the Bank of Tokyo-Mitsubishi Trust Company (formerly known as Bank of Tokyo Trust Company), as Servicing Bank.
>
> The Democratic Republic of Congo and the Central Bank of Congo hereby acknowledge and confirm as of the date hereof their respective obligations with respect to the principal and interest unpaid under such Refinancing Credit Agreement consisting, in the case of interest, both of interest accrued on principal installments prior to the maturity and interest accrued on overdue principal and interest, and all other obligations arising under such Refinancing Credit Agreement in accordance with the terms thereof.

2003 Letter at 1.  The Letter specifically provided that it was intended to overcome any concerns that the DRC's and Central Bank's debts were no longer collectible, including based on the New York statute of limitations applicable to breach of contract claims:

> It is the intention of the Democratic Republic of Congo and the Central Bank of Congo in executing and delivering this acknowledgment formally to recognize and confirm all such obligations in order to eliminate any concerns any person holding claims under such Refinancing Agreement may have due to any possible application or any principles of prescription, including without limitation, those established by the New York statute of limitations, which might lead any person in refraining from acting to enforce such claims might have an adverse effect on the ultimate enforceability of such claims.

*Id.*  A header at the top of the Letter read: "Fax reçu de: 212 559 0979," which, in English, translates to "fax received from 212 559 0979," and the date stamp "20/03/03 17:47."  *Id.*  The

[4]

Letter also contained stamps at the top of the page that stated: "Received"; "Citibank, N.A.";

"Democratic Rep. of Congo"; and "2003 Feb 27."  *Id.*

The 2003 Letter was signed by Leonard Luongwe Kabule ("Luongwe"), who at the time

was the DRC's interim Minister of Finance and Budget, and Jean-Claude Masangu Mulungo

("Masangu"), the Central Bank's Governor.  The Letter was not signed by representatives of any

of the creditors under the 1980 Credit Agreement.

## II.    Procedural Background

On February 23, 2009, plaintiffs brought this lawsuit.  They allege that defendants

breached the Credit Agreement by failing to pay the outstanding principal and interest owed to

plaintiffs as assignees.  On May 22, 2009, plaintiffs filed an amended complaint.  On May 20,

2009, and again on November 19, 2009, service of the amended complaint was executed.

Defendants did not appear following such service.

On February 1, 2010, plaintiffs moved for summary judgment or, in the alternative,

default judgment.  On April 28, 2010, the Hon. George B. Daniels, to whom this case was then

assigned, entered an Order Granting Default Judgment (Dkt. 13).  On June 17, 2010, Judge

Daniels referred this case to Magistrate Judge Kevin N. Fox for a calculation of the amounts of

interest owed to plaintiffs.  On November 1, 2010, Judge Fox issued a Report and

Recommendation ("Report") that the Court adopt plaintiffs' interest calculations (Dkt. 16).  The

Report recommended that plaintiffs be awarded $18,003,558.32 in principal, $61,316,391.16 in

interest, and $228,405.24 in "out-of-pocket" expenses.  *See* Report at 6.

On November 29, 2010, defendants made their first appearance in this case, in the form

of a letter to the Court requesting additional time to object to the Report.  Plaintiffs consented to

the request.  On January 21, 2011, defendants filed their objections to the Report; on March 4, 2011, plaintiffs responded to such objections.

On April 28, 2011, defendants moved to set aside the default judgment, upon consent of the plaintiffs.  On June 3, 2011, the Court granted the unopposed motion and entered an order setting aside the default (Dkt. 38).

On June 28, 2011, Judge Daniels referred the case to Magistrate Judge Fox for the purpose of settlement.  Settlement negotiations were unsuccessful.  On October 18, 2011, following reassignment of the case, the Court directed the parties to submit a case management schedule.  The parties each submitted letters proposing summary judgment motion briefing schedules (Dkt. 54).  On October 26, 2011, the Court set a schedule for the submission of pre-motion letters and a pre-motion conference (Dkt. 55).  On December 6, 2011, the Court set a schedule for the briefing of the present summary judgment motion.  On April 3, 2012, after the motion was fully briefed by the parties, the Court requested supplemental briefing from the parties limited to the issue of whether the defendants had apparent authority to renew the 1980 Credit Agreement.

To this date, as a result of the parties' mutual belief that the plaintiffs' summary judgment motion could be resolved without discovery, no formal discovery has been taken in the case.

## III.    Legal Standard

To prevail on a motion for summary judgment, the movant must "show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The movant bears the burden of demonstrating the absence of a question of material fact.  In making this determination, the Court must view all facts "in the

light most favorable" to the non-moving party.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323

(1986); *see also Holcomb v. Iona Coll.*, 521 F.3d 130, 132 (2d Cir. 2008).

To survive a summary judgment motion, the opposing party must establish a genuine

issue of fact by "citing to particular parts of materials in the record."  Fed. R. Civ. P. 56(c)(1);

*see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009).  "A party may not rely on mere

speculation or conjecture as to the true nature of the facts to overcome a motion for summary

judgment."  *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (citation omitted).  Only disputes

over "facts that might affect the outcome of the suit under the governing law" will preclude a

grant of summary judgment.  *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 248 (1986).  In

determining whether there are genuine issues of material fact, "we are required to resolve all

ambiguities and draw all permissible factual inferences in favor of the party against whom

summary judgment is sought."  *Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012) (citing

*Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003)).

**IV.    Discussion**

The dispute in this case reaches the Court in an unusual posture:  Plaintiffs seek summary

judgment after the case has been pending for more than three years, but no formal discovery has

been taken by either party.  Plaintiffs argue that summary judgment is merited because it is

apparent on the face of the governing documents that defendants are obligated to repay all

principal and accrued interest as provided in the Credit Agreement.  Defendants argue that: (1)

this Court cannot exercise jurisdiction over the dispute because the DRC enjoys sovereign

immunity; and (2) plaintiffs' claims are time-barred under New York law.  For the following

reasons, the Court finds that it may properly exercise jurisdiction, but that discovery on discrete

topics, including relating to defendants' argument that plaintiffs' claims are time-barred, must go forward before the Court can resolve the motion for summary judgment.

### A.  Sovereign Immunity

Defendants argue that the Court lacks jurisdiction to hear the plaintiffs' claim because the DRC, as a foreign sovereign, is immune from suit.[4]  Claims of immunity of foreign states and their assets are governed by the Foreign Sovereign Immunities Act ("FSIA"), "the sole source for subject matter jurisdiction over any action against a foreign state." *Kensington Int'l Ltd. v. Itoua*, 505 F.3d 147, 153 (2d Cir. 2007) (internal quotation marks omitted).

The FSIA addresses two types of foreign sovereign immunities: (1) immunity from jurisdiction; and (2) immunity from attachment and execution of property of a foreign state.  An exception to, or waiver of, each type of immunity must be independently established.  *See Walters v. Indus. & Commercial Bank of China, Ltd.*, 651 F.3d 280, 288 (2d Cir. 2011) (citing *Restatement (Third) of Foreign Relations Law* § 456(1)(b) (1987)) ("a waiver of immunity from suit does not imply a waiver of immunity from attachment of property, and a waiver of immunity from attachment of property does not imply a waiver of immunity from suit").  Accordingly, if a sovereign waives immunity from jurisdiction and a judgment is rendered, the plaintiff can generally execute the judgment only on property with respect to which the sovereign has explicitly waived immunity.  *See Walters*, 651 F.3d at 289.

Defendants argue that they have not waived either jurisdictional immunity or immunity from attachment of the DRC's property.  For the following reasons, the Court disagrees, and finds a clear such waiver in the 1980 Credit Agreement.

---

[4] The jurisdictional argument is first raised at the summary judgment stage because defendants did not move to dismiss the Amended Complaint.

### 1.  Immunity from Jurisdiction

Under the FSIA, a "foreign state shall be immune from the jurisdiction of the courts of

the United States and of the States except as provided in" certain statutory exceptions.  28 U.S.C.

§ 1604.  Exceptions exist, *inter alia*, when a foreign state has waived immunity, and when a state

action is "based upon a commercial activity carried on in the United States."  *Id.* § 1605(a)(1),

(2).  If a foreign state is subject to a statutory exception, and thus not entitled to jurisdictional

immunity, federal courts have "original jurisdiction without regard to amount in controversy of

any nonjury civil action" against that foreign state.  *Id.* § 1330(a).

A foreign state may waive immunity "either explicitly or by implication."  *Id.* §

1605(a)(1).  The term "explicitly," in the context of such a waiver, "takes its normal meaning of

'clear and unambiguous.'"  *Capital Ventures Int'l v. Republic of Arg.*, 552 F.3d 289 (2d Cir.

2009) (citing *Libra Bank Ltd. v. Banco Nacional de Costa Rica, S.A.*, 676 F.2d 47, 49 (2d Cir.

1982)) (interpreting 28 U.S.C. § 1610(d)).  Once a foreign sovereign has waived immunity under

§ 1605(1), it may withdraw that waiver only as provided by the terms of the original waiver.  The

FSIA provides:

> A foreign state shall not be immune from the jurisdiction of courts of the United
> States or of the States in any case[:] (1) in which the foreign state has waived its
> immunity either explicitly or by implication, *notwithstanding any withdrawal of*
> *the waiver which the foreign state may purport to effect except in accordance with*
> *the terms of the waiver.*

28 U.S.C. § 1605(a)(1) (emphasis added).  Accordingly, where a proper waiver does not contain

a procedure for the future revocation of that waiver, a foreign state's waiver of jurisdictional

immunity is irrevocable.

The 1980 Credit Agreement provides:

> The [Republic of Zaire] and the Bank of Zaire each hereby *irrevocably submits to*
> *the non-exclusive jurisdiction* of the High Court of Justice in London and any

[9]

> New York State or United States Federal court sitting in the Borough of
> Manhattan of New York City and any appellate court from any thereof in any
> action or proceeding arising out of or relating to this Agreement, and the
> [Republic of Zaire] and the Bank of Zaire each hereby *irrevocably agrees that all
> claims in respect of any such action or proceeding may be heard and determined*
> in the High Court of Justice in London or such New York state court or, to the
> fullest extent permitted by law, such United States Federal court or any such
> appellate court. . . . The [Republic of Zaire] and the Bank of Zaire agree that a
> final judgment in any such action or proceeding shall be conclusive and may be
> enforced in other jurisdictions by suit on the judgment or in any other manner
> provided by law.

Agreement § 12.07(a) (emphasis added). By entering into this provision, the DRC explicitly

waived jurisdictional immunity in accordance with section 1605(a)(1) for "any action or

proceeding arising out of or relating to" the Credit Agreement. The Agreement does not provide

a procedure for revoking that waiver. Thus, the DRC's waiver of jurisdictional immunity is

irrevocable, and the Court properly exercises original jurisdiction over this dispute.

## 2. Immunity from Execution

Defendants also argue that the Central Bank lacks sufficient foreign currency to satisfy

their obligation under the Credit Agreement or to cover a judgment on the order that plaintiffs

seek (approximately $80 million in principal and interest). *See* Defs. Statement ¶ 9; Declaration

of Kabeya Ndaya Lydie ¶¶ 5–8 (at Mayifuila Decl. Ex. G). The Court construes this argument as

arising under § 9.01(c) of the Credit Agreement, and under § 1610 of the FSIA, both of which

require plaintiffs to identify specific assets held by a sovereign's agency or instrumentality that

fall within the statutory exceptions to execution immunity.

The FSIA affords assets of sovereign states immunity from attachment and execution.

Section 1609 provides that "the property in the United States of a foreign state shall be immune

from attachment arrest and execution except as provided in" certain statutory exceptions. 28

U.S.C. § 1609.  One such exception applies when a foreign sovereign or its instrumentality has waived such immunity as to that asset.  *Id.* § 1610 (a)(1).  *See Walters*, 651 F.3d at 289.

Once a foreign state has waived immunity from execution under § 1610, withdrawal of that waiver requires an affirmative act in accordance with the terms of the original waiver.  The FSIA provides that

> any property in the United States of an agency or instrumentality of a foreign state engaged in commercial activity in the United States shall not be immune from attachment in aid of execution, or from execution, upon a judgment entered by a court of the United States or of a State after the effective date of this Act, if (1) the agency or instrumentality has waived its immunity from attachment in aid of execution or from execution either explicitly or implicitly, *notwithstanding any withdrawal of the waiver the agency or instrumentality may purport to effect except in accordance with the terms of the waiver.*

*Id.* § 1610 (b)(1) (emphasis added).  Accordingly, where there is no provision contemplating the future revocation of a waiver as to attachment of property, a state's waiver is irrevocable.

Here, the Credit Agreement unambiguously waived immunity of defendants' property from execution:

> To the extent that the [Republic of Zaire] or the Bank of Zaire may be entitled . . . to claim for itself or its Assets or the Assets of any Governmental Agency immunity from suit, from the jurisdiction of any court . . . , from attachment prior to judgment, from execution on a judgment or from the giving of any other relief or issue of any process, or to the extent that in any such jurisdiction there may be attributed such an immunity (whether or not claimed), the [Republic of Zaire] and the Bank of Zaire each *irrevocably agrees not to claim and irrevocably waives any and all such immunity to the fullest extent now or hereafter permitted* under the laws of the jurisdiction in which any such suit, action or proceeding may be commenced . . . .

Credit Agreement § 12.07(c) (emphasis added).  This provision does not provide a procedure for revocation of that waiver.  Thus, in accordance with the FSIA, the DRC's waiver of immunity from attachment is, also, irrevocable.

[11]

Accordingly, regardless of whether the underlying contract claim under the Agreement is time-barred—a separate question that turns on the 2003 Letter, *see infra*, Section IV.C—the waiver of sovereign immunity as to both jurisdiction and execution is extant today and covers plaintiffs' present claims.

### B.  Statute of Limitations

Under New York law, "to state a claim of breach of contract, the complaint must allege: (i) the formation of a contract between the parties; (ii) performance by the plaintiff; (iii) failure of defendant to perform; and (iv) damages."  *Johnson v. Nextel Commc'ns, Inc.*, 660 F.3d 131, 142 (2d Cir. 2011).  In addition, plaintiffs must demonstrate that the claim is timely.

The applicable statute of limitations for breach of contract in New York is six years.  *See* N.Y. C.P.L.R. § 213(2).  Important here, under New York law, an acknowledgement of a debt is sufficient to renew a time-barred obligation and restart the running of the statute of limitations:

> A promise to waive, to extend, or not to plead the statute of limitation applicable to an action arising out of a contract . . . if made after the accrual of the cause of action and made . . . in a writing signed by the promisor or his agent is effective, according to its terms, to prevent interposition of the defense of the statute of limitation in an action or proceeding commenced within the time that would be applicable if the cause of action had arisen at the date of the promise . . . .

N.Y. Gen. Obl. L. § 17-103(1).  Such an acknowledgment or promise must (1) be in writing, (2) be signed by the debtor party, (3) recognize an existing debt, and  (4) "contain nothing inconsistent with an intention on the part of the debtor to pay it."  *Falkner v. Arista Records*, 797 F. Supp. 2d 299, 312 (S.D.N.Y. 2011) (citing *GP Hemisphere Assocs., LLC v. Republic of Nicar.*, No. 99-cv-10302, 2000 WL 1457025, at *3 (S.D.N.Y. Sept. 28, 2000)) (internal quotation marks omitted) (interpreting New York law).

Defendants argue that plaintiffs' motion for summary judgment must be denied, and their claims dismissed, because those claims are time-barred.  Were it not for the 2003 Letter, that

argument would prevail:  Because the final payment required under the 1980 Credit Agreement was to be made in 1990, for a claim under the Credit Agreement to be timely, plaintiffs' predecessors in interest would have had to bring a claim no later than 1996, six years after the final breach.  Plaintiffs' lawsuit, brought in 2009, would therefore be untimely.

However, plaintiffs argue that the 2003 Letter satisfies § 17-101 of the New York General Obligations Law, so as to renew defendants' liability under the Credit Agreement, and restart the running of the statute of limitations for all claims arising out of a breach of that contract.  Under this theory, the statute of limitations restarted on February 25, 2003, making plaintiffs' present lawsuit, filed on February 23, 2009, timely.

The Court therefore examines whether it can be determined, as a matter of law, that the 2003 Letter satisfied § 17-101.

### C.  Analysis

Plaintiffs argue that the 2003 Letter, bearing the apparent signatures of Leonard Luongwe Kabule, the interim Minister of Finance and Budget of the DRC, and Jean-Claude Masangu Mulongo, the Governor of the Central Bank of the DRC, acknowledges and revives defendants' obligations under the 1980 Credit Agreement.  Defendants argue otherwise, for several reasons.  First, defendants deny, factually, that Mr. Luongwe and Mr. Masangu in fact signed the 2003 Letter.  Second, defendants deny that, even if Mr. Luongwe and Mr. Masangu did sign the Letter, they had actual authority to bind the country under DRC law.  Third, defendants argue that even if the DRC and the Central Bank can be bound by Mr. Luongwe and Mr. Masangu under a theory of apparent authority, here there are unresolved questions of fact bearing on whether these officials in fact had apparent authority to bind the DRC and the Central Bank.  The Court evaluates these arguments in turn.

[13]

### 1.  Authenticity of the Signatures on the 2003 Letter

Although the 2003 Letter purports to be signed by Mr. Luongwe and Mr. Masangu, and although there is circumstantial evidence supporting this claim, defendants dispute that the two officials signed the Letter.  *See* Defs. Statement ¶ 12; Answer ¶ 13.

Ordinarily, a party's conclusory denial of a material fact is insufficient to establish a factual dispute so as to survive an adversary's motion for summary judgment.  A party opposing a motion for summary judgment "may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment."  *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (citation omitted); *see also FDIC v. Great Am. Ins. Co.*, 607 F.3d 288, 292 (2d Cir. 2010) ("[T]he non-moving party must do more than simply show that there is some metaphysical doubt as to the material facts, and may not rely on conclusory allegations or unsubstantiated speculation.") (citation and internal quotation marks omitted).

In this case, however, there has been no discovery.  Although defendants have not pointed to any record (or non-record) evidence corroborating their conclusory denial of the authenticity of the two signatures, the record at this stage consists of little more than the parties' pleadings and legal memoranda, and the parties have not explored the circumstances surrounding the execution of the 2003 Letter.  The only evidence before the Court relevant to this issue is a copy of the Annual Report of the Central Bank of the DRC.  The Annual Report also indicates that it was signed by Mr. Masangu, and it contains a signature that appears to be almost identical to the purported signature of Mr. Masangu in the 2003 Letter.  *Compare* Report Annuel 2006, Banque Centrale du Congo, Hranitzky Decl. Ex. M at viii, *with* 2003 Letter at 1.  The signature boxes in the 2003 Letter add circumstantial support to plaintiffs' claim of authenticity, but absent an opportunity for the parties to adduce testimony or other evidence illuminating the

[14]

circumstances under which the 2003 Letter came to be issued, the Court is unprepared to grant summary judgment on this issue.

To be clear, if the discovery process yields no additional information giving rise to inferences of authenticity or inauthenticity, the existing record would appear to support entry of summary judgment for plaintiffs on this point, *i.e.*, that the signatures are what they are purported to be—authentic signatures of Mr. Luongwe and Mr. Masangu.  However, in an abundance of caution, and in order to enable defendants to adduce evidence (if it exists) that the two signatures were fabricated, the Court will permit very limited discovery on the issue of the authenticity of the signatures in the 2003 Letter.

### 2.  Actual Authority

Even if the signatures of Mr. Luongwe and Mr. Masangu are authentic, defendants contend that the 2003 Letter does not satisfy § 17-103(1) because Mr. Luongwe and Mr. Masangu lacked authority to renew the 1980 Credit Agreement.  The Credit Agreement provides that it "shall be governed by, and construed in accordance with, the laws of the State of New York, United States of America."  Agreement ¶ 12.10.  It follows that whether the 2003 Letter purporting to renew the Credit Agreement is legally effective to do so is also governed by New York law.  *See, e.g.*, *H. Sand & Co., Inc. v. Airtemp Corp.*, 934 F.2d 450 (2d Cir. 1991) (applying New York law to purported renewal agreement where underlying contract was governed by New York law); *Reznor v. J. Artist Mgmt., Inc.*, 365 F. Supp. 2d 565, 578 (S.D.N.Y. 2005) (same).

"Under New York law, an agent has actual authority if the principal has granted the agent the power to enter into contracts on the principal's behalf, subject to whatever limitations the principal places on this power, either explicitly or implicitly."  *Highland Capital Mgmt. v.*

[15]

*Schneider*, 607 F.3d 322, 327 (2d Cir. 2010) (citing *Ford v. Unity Hosp.*, 32 N.Y.2d 464 (1973)).

Actual authority "may be express or implied," and in both cases "exists only where the agent

may reasonably infer from the words or conduct of the principal that the principal has consented

to the agent's performance of a particular act." *Minskoff v. Am. Express Travel Related Servs.*,

98 F.3d 703, 708 (2d Cir. 1996). Regardless, "[t]he existence of actual authority depends upon

the actual interaction between the putative principal and agent, not on any perception a third

party may have of the relationship." *Merrill Lynch Capital Servs. v. UISA Fin.*, No. 09-cv-2324,

2012 WL 1202034, at *6 (S.D.N.Y. Apr. 10, 2012). "[T]he extent of the agent's actual authority

is interpreted in the light of all circumstances attending those manifestations, including the

customs of business, the subject matter, any formal agreement between the parties, and the facts

of which both parties are aware." *Peltz v. SHB Commodities, Inc.*, 115 F.3d 1082, 1088 (2d Cir.

1997) (internal quotation marks omitted).

 Defendants argue that New York choice of law rules require that the law of the DRC be

applied to determine whether Mr. Luongwe and Mr. Masangu had actual authority to bind the

DRC to a commercial contract. *See* Defs. Opp'n 9–10. Plaintiffs do not address this choice of

law issue. *See* Pls. Br. 12 (stating only that the 2003 Letter, "when read together with the Credit

Agreement, provides *prima facie* evidence that its signatories had actual authority to enter into

the Renewal Agreement"). The Court agrees with defendants' argument as to choice of law.

 "If the law of more than one jurisdiction is potentially applicable to a contract dispute,

New York courts undertake 'grouping of contacts' analysis to determine the governing law."

*Int'l Bus. Machs. Corp. v. Liberty Mut. Ins. Co.*, 363 F.3d 137, 143 (2d Cir. 2004) (citing *Zurich

Ins. Co. v. Shearson Lehman Hutton, Inc.*, 84 N.Y.2d 309, 317 (1994)). This entails

"endeavor[ing] to apply the law of the jurisdiction having the 'most significant relationship to the

[16]

transaction and parties.'"  *See id.*; *see also Restatement (Second) Conflict of Laws* § 292(1)

(1971) (choice of law questions related to actual authority are subject to "most significant

relationship" test).  In general, this test is fact-intensive, centering on the circumstances of the

particular transaction.  In the particular context at hand, where a foreign state or its

instrumentality has defaulted on its commercial obligations, and a court is called upon to

determine whether a jurisdiction in the United States has any interest in a transaction with a

foreign sovereign, "an act has a direct effect in the United States if the defaulting party is

contractually obligated to pay in this country."  *Rogers v. Petreleo Brasileiro, S.A.*, 673 F.3d

131, 139 (2d Cir. 2012) (citing *Republic of Arg. v. Weltover, Inc*., 504 U.S. 607, 618 (1992), and

*Comm. Bank of Kuwait v. Rafidain Bank*, 15 F.3d 238, 241 (2d Cir. 1994)).

 Where a commercial transaction is with a foreign state and that state is found to have the

most significant relationship to the transaction, "New York law must look to the law of [the

foreign state] to determine the actual authority of an agent of the [state's] government."

*Republic of Benin v. Mezei*, No. 06-cv-870, 2010 WL 3564270, at *6 (Sept. 9, 2010) (Koeltl, J.).

Applying this principle, courts in this district have consistently applied the laws of foreign states

to evaluate claims of actual authority.  *See Skanga Energy & Marine Ltd. v. Arevenca S.A.*, No.

11-cv-4296, 2012 WL 2433518, at *4 n.3 (S.D.N.Y. June 21, 2012) (Cote, J.) (court applies the

"most significant relationship" test, and holds that "the question of whether [a Venezuelan

government instrumentality] may be held liable for the acts of [government officials] on an

agency theory may ultimately be determined with reference to the Venezuelan law of agency");

*Republic of Benin*, 2010 WL 3564270, at *6 (citation omitted); *Anglo-Iberia Underwriting*

*Mgmt. v. PT Jamsostek*, No. 97-cv-5116, 1998 WL 289711, at *3 (S.D.N.Y. June 4, 1998)

(finding that, under Indonesian law, "Indonesia did not confer actual authority"), *aff'd in relevant*

[17]

*part sub nom Anglo-Iberia Underwriting Mgmt. v. Lodderhose*, 235 F. App'x 776 (2d Cir. 2007);

*Storr v. Nat'l Def. Sec. Council of the Republic of Indon.*, No. 95-cv-9663, 1997 WL 633405, at

*3 (S.D.N.Y. Oct. 14, 1997) (finding no actual authority under Indonesian law).

Based on the undisputed facts contained in the parties' submissions, the DRC has the

most significant relationship with the transaction at issue.  Simply put, plaintiffs' claims, if

successful, will expose the DRC and its instrumentalities to up to $80 million in liabilities.  *See*

Report at 6 (Magistrate Judge Fox's inquest prior to defendants' appearance in the case).

Consistent with the decisions above, the law of the DRC thus appropriately governs whether Mr.

Luongwe and Mr. Masangu had actual authority to bind the DRC and the Central Bank.

Although the need to resolve the issue of actual authority may become moot if the Court finds

that Mr. Luongwe and Mr. Masangu had apparent authority, *see infra*, there appear to be factual

(and possibly legal) issues that must be resolved before any determination as to actual authority

can be made.[5]

---

[5] Defendants have presented the Court with an excerpt of the law of the DRC which, they claim, bears on whether actual authority exists in instances where a government official acts to bind the country in commercial contracts.  *See* Defs. Opp'n 9–10.  Specifically, a DRC national decree, dated March 12, 2002, provides:

> Ministers, Minister-Delegates and Deputy Ministers are required to . . . . ensure that, any proposed bill, decree-law, decree, order or agreement, and decision that may impact any current or future budget, both in revenue and expenditures, and any action . . . amending the financial status of the agents are subject to prior notice to the Minister having Finance and Budget within its powers, and to the deliberations of the Council of Ministers or, if case of an emergency [sic], to the approval of the President of the Republic.

*Id.* at 10–11 (quoting DRC Decree No. 028.2002).  Defendants claim that the 2003 Letter was not submitted to the Council of Ministers for approval before it was signed by Mr. Luongwe and Mr. Masangu.  Defendants therefore argue that Mr. Luongwe and Mr. Masangu did not possess actual authority to bind the DRC, a sovereign, or the Central Bank, the sovereign's instrumentality, when they signed the 2003 Letter.  Pending a submission by plaintiffs on this point, and potentially the submission of evidence bearing on whether the events within the DRC

[18]

### 3.  Apparent Authority

If an agent lacks actual authority, he may still be imbued with the authority to bind the

principal through the doctrine of apparent authority.  It is well settled under New York law that

an agent may "bind his principal to a contract if the principal has created the appearance of

authority, leading the other contracting party to reasonably believe that actual authority exists."

*Highland Capital*, 607 F.3d at 328; *see also Goldston v. Bandwith Tech. Corp.*, 859 N.Y.S.2d

651, 655 (1st Dep't 2008) ("[A]n agreement entered into within the exercise of a corporate

officer's apparent authority is binding on the corporation without regard to the officer's lack of

actual authority.").  Under New York law, courts find that apparent authority authorizes an agent

to bind its principal when the "principal, either intentionally or by lack of ordinary care, induces

a [third party] to believe that an individual has been authorized to act on its behalf."  *Merrill*

*Lynch*, 2012 WL 1202034, at *6 (citing *Highland Capital* 607 F.3d at 328 (citation omitted)); *see*

*also Reiss v. Societe Central du Groupe Des Assurances Nationales*, 235 F.3d 738, 748 (2d Cir.

2000) ("apparent authority depends on some conduct by the principal, communicated to a third

party, which reasonably gives the appearance that the agent has authority to conduct a particular

transaction").

Defendants dispute that, under the New York law of agency, apparent authority suffices.

They argue that actual authority is required to bind a sovereign.  *See* Defs. Opp'n 9–10.

However, the Second Circuit has several times held that the doctrine of apparent authority

applies to the acts of foreign states and their instrumentalities.  *See Jota v. Texaco, Inc.*, 157 F.3d

153, 163 (2d Cir. 1998) (holding, under New York law, that the parties "were entitled to rely on

[Ecuador's ambassador's] representations unless they were actually aware that [the ambassador]

satisfied the governing standard for actual authority, it is premature for the Court to resolve this
question.

lacked such authority"); *First Fidelity Bank v. Gov't of Antigua*, 877 F.2d 189, 194 (2d Cir. 1989) ("The appointment of a person to a position with generally recognized duties may create apparent authority.") (internal quotation marks omitted).

In *First Fidelity*, the Second Circuit held that a promissory note obligating the government of Antigua, signed *ultra vires* by its ambassador to the United Nations, would bind the government of Antigua if it had invested the ambassador with apparent authority to enter into the note. *See First Fidelity*, 877 F.2d at 195 (remanding for further factual findings). Following *First Fidelity*, Courts in this district have applied the doctrine of apparent authority to determine whether foreign states are bound under agreements executed by their agents. *See, e.g.*, *Skanga*, 2012 WL 2433518, *5 (noting that "a finding of authority must be predicated either on manifestations from the principal to the agent [actual authority] *or from the principal to the plaintiff* [apparent authority]") (emphasis added); *Bitumenes Orinoco, S.A. v. New Brunswick Power Holding Corp.*, No. 05-cv-9385, 2007 WL 485617, at *1 n.3 (S.D.N.Y. Feb. 13, 2007) (Preska, J.) (denying summary judgment based on a finding that "issues of material fact exist as to whether [a Venezuelan instrumentality] had actual *or apparent authority* to enter into the alleged [agreement]" (emphasis added)); *Seetransport Wiking Trader Schiffarhtsgesellschaft MBH & Co. Kommanditgesellschaft v. Republic of Romania*, 123 F. Supp. 2d 174, 185–86 (S.D.N.Y. 2000) (finding that the Minister of Finance had apparent authority to enter into a settlement agreement on behalf of the government); *Storr*, 1997 WL 633405, at *3–4 (applying the doctrine of apparent authority to disputed promissory notes signed by an instrumentality of the Indonesian government).

To be sure, other federal courts of appeals have taken varying positions on whether—and if so, when—a foreign government may be bound on a theory of apparent authority. *See, e.g.*,

[20]

*Velasco v. Gov't of Indon.*, 370 F.3d 392, 400 (4th Cir. 2004) (explicitly rejecting *First Fidelity*, and holding that "the commercial activity exception [to the FSIA] may be invoked against a foreign state only when its officials have actual authority"); *Phaneuf v. Republic of Indon.*, 106 F.3d 302, 308 n.4 (9th Cir. 1997) (explicitly rejecting *First Fidelity*, noting that the Second Circuit "assumed the appropriateness of invoking the commercial activity exception based on apparent authority," but "gave no analysis or explanation"); *Dale v. Colagiovanni*, 443 F.3d 425, 429 (5th Cir. 2006) (holding that "an agent's acts conducted with the apparent authority of the state [are] insufficient to trigger the commercial exception to FSIA"); *but see Mamani v. Berzain*, 654 F.3d 1148 (11th Cir. 2011) (applying apparent authority to extrajudicial killings in Bolivia); *Aquamar S.A. v. Del Monte Fresh Produce N.A.*, 179 F.3d 1279, 1299 n.42 (11th Cir. 1999) (rejecting *First Fidelity*'s inquiry under state agency law and instead applying federal and international law principles, but arriving at a similar conclusion that "courts should accept ambassadors' authority absent 'obvious' evidence that they lack it"). Courts in this district have noted these conflicting lines of authority, and have attempted to untangle doctrine in this area. *See Republic of Benin v. Mezei*, No. 06-cv-870, 2010 WL 3564270, *6 (S.D.N.Y. Sept. 9, 2010) (Koeltl, J.) ("In general, apparent authority is insufficient in dealing with federal or state governments.") (citing *Fed. Crop Ins. Corp. v. Merrill*, 332 U.S. 380, 384 (1947); *Velasco*, 370 F.3d 392; *Phaneuf*, 106 F.3d 302; and *Dale*, 443 F.3d 425).

Although this Court is under no illusion that it can fully harmonize the decisions in this area, it appears to the Court that the broad pronouncements in some of these cases as to whether apparent authority may bind a sovereign have swept beyond the specific context presented. In fact, notwithstanding this broad language, it appears that the actual outcomes in these cases are largely consistent with one another. Specifically, the outcomes in these cases appear to turn on

whether the specific legal commitment made by a government official on apparent behalf of the foreign government was (1) a public act, in which case apparent authority has generally been held unavailable, except in the discrete context presented by waivers of sovereign immunity by ambassadors; or (2) a private act, in which case apparent authority has generally been held available.

This distinction—between public and private acts—is a familiar one under the FSIA. Actions that subject foreign sovereigns to the jurisdiction and authority of the courts of the United States, for example, such as waivers of sovereign immunity pursuant to the FSIA, are public acts, whereas actions binding a state to a commercial transaction are private in nature.  In enacting the FSIA, Congress emphasized this difference—between "a foreign state's public acts (*jure imperii*)" and "its commercial or private acts (*jure gestionis*)."  H.R. Rep. No. 1487, 94th Cong., 2d Sess. 16 (1976), *reprinted in* 1976 U.S.C.C.A.N. 6604, 6605.  The FSIA expressly carved out from the immunity it confers upon foreign states, *see* 28 U.S.C. § 1604 (providing for sovereign immunity), the area of private acts by those states which are carried out in the United States, *see id.* § 1605(a)(2) (providing, however, that "[a] foreign state shall not be immune from the jurisdiction . . . in any case in which the action is based upon a commercial activity carried on in the United States").  *See also Rogers*, 673 F.3d 131 at 139 (examining the reach of the commercial activity exception to sovereign immunity); *Guirlando v. T.C. Ziraat Bankasi A.S.*, 602 F.3d 69, 74 (2d Cir. 2010) (discussing the "different categories of conduct [described by § 1605(a)(2)] for which the foreign state is denied immunity").

There is ample case law differentiating between these two categories of acts.  "To determine the nature of a sovereign's act, we ask whether the particular actions that the foreign state performs (whatever the motive behind them) are the *type* of actions by which a private party

[22]

engages in trade and traffic or commerce." *NML Capital, Ltd. v. Repub. of Argentina*, 680 F.3d 254, 258 (2d Cir. 2012) (internal quotation marks and citation omitted) (emphasis in original). "[A] state engages in commercial activity . . . where it exercises 'only those powers that can also be exercised by private citizens,' as distinct from those 'powers peculiar to sovereigns.'" *Saudi Arabia v. Nelson*, 507 U.S. 349, 360 (1993) (quoting *Republic of Argentina v. Weltover*, 504 U.S. 607, 614 (1992)). Careful attention must be paid to the particular governmental act in question to which the issue of apparent authority relates. A transaction may involve commercial activity, for example, but the discrete issue at hand may be a waiver by the sovereign government participating in that transaction of sovereign immunity, which is a public act. Thus, in determining the nature of a state act, "the relevant inquiry concerns the power that is exercised," not the state's "motive for its exercise." *NML Capital*, 680 F.3d at 259.

A review of the decisions in this area reveals that where a public act by a governmental actor is at issue, courts have declined to enforce claims of apparent authority. *See, e.g.*, *Phaneuf*, 106 F.3d at 307, 308 n.4 (addressing "whether an agent of a foreign state must have acted with *actual* authority to invoke the commercial activity exception [of the FSIA] against a foreign state, or whether *apparent* authority suffices,"; the Ninth Circuit explained that its decision conflicted with *First Fidelity* only as to its "conclusion that the commercial activity exception may be invoked against a foreign state only when its agents have acted with actual authority"); *Velasco*, 370 F.3d at 400 (rejecting *First Fidelity* only with respect to application of apparent authority to the commercial activity exception to the FSIA; the Fourth Circuit stated "that a foreign official's manifestation of authority to bind the sovereign is insufficient to bind the sovereign"); and *Dale*, 443 F.3d at 428–29 (rejecting *First Fidelity*, the Fifth Circuit held that "an agent's acts conducted with the apparent authority of the state is insufficient to trigger the

[23]

commercial exception to FSIA").  Only where the public act at issue involved an *ambassador*'s jurisdictional acts have courts found apparent authority available.  *See, e.g.*, *Aquamar*, 179 F.3d at 1299 (holding "that, under the FSIA, courts should assume that an ambassador possesses the authority to appear before them and waive sovereign immunity absent compelling evidence making it 'obvious' that he or she does not"); *Jota*, 157 F.3d at 163 (holding that the Ecuadorian ambassador "enjoyed apparent authority, and [defendant] and the District Court were entitled to rely on his representations unless they were actually aware that he lacked such authority").

By contrast, where a private act by a government actor is at issue, courts have consistently enforced claims of apparent authority.  *See, e.g.*, *Anglo-Iberia*, 235 F. App'x 776 (dispute arose out of insurance contracts issued by officials of an Indonesian government agency); *First Fidelity*, 877 F.2d 189 (separate acts by the Antiguan ambassador to the United Nations were at issue: (1) a loan agreement, a quintessentially private act; and (2) a settlement agreement to resolve a breach of the original loan agreement, which also waived Antigua's sovereign immunity, a public act); *Skanga*, 2012 WL 2433518, at *1–2 (act at issue involved a fuel purchase agreement between officials of a Venezuelan government agency and a Nigerian company); *Bitumenes Orinoco*, 2007 WL 485617, at *1 n.3 (act at issue involved a fuel purchase agreement between officials of a Venezuelan government agency and a Canadian company); *Seetransport*, 123 F. Supp. 2d 174 (act at issue involved the authority of Romanian government officials to enter into a settlement agreement resolving an underlying commercial dispute relating to breach of an agreement to purchase seafaring vessels); *Storr*, 1997 WL 633405, at *1 (act at issue involved promissory notes issued by Indonesian government instrumentality); *see also Nelson*, 507 U.S. at 360 (when a state enters into a contract or purchases a product, the nature of

its act is private, not public).  This Court is unaware of any case finding apparent authority unavailable in the context of a foreign state's private acts.

Notably, in each of the three appellate decisions (out of the Fourth, Fifth, and Ninth Circuits) that commented negatively on the Second Circuit's holding in *First Fidelity* that apparent authority can bind foreign states, the context at issue involved a quintessentially public act—a commitment by a government official to waive sovereign immunity government.  *See Velasco*, 370 F.3d at 400; *Phaneuf*, 106 F.3d at 308; *Dale*, 443 F.3d at 428–29.  To be sure, in each of these cases, the governmental official was engaged in a commercial transaction, but the specific act in question was the public one of apparently waiving sovereign immunity.[6]

In *Republic of Benin v. Mezei*, the Hon. John G. Koeltl, noting these out of circuit cases expressly rejecting or criticizing *First Fidelity*, stated that "[a] person who contracts with a government agent purporting to act on behalf of the government does so at the individual's peril if the agent is unauthorized."  *Republic of Benin*, 2010 WL 3564270, at *6.  In this Court's view, that statement has resonance, but not in all contexts:  Based on the outcomes of the cases, as canvassed above, it does not appear to be the case that apparent authority is inadequate where private acts of a sovereign are at issue.

For these reasons—*i.e.*, based on Second Circuit authority as reinforced by its synthesis of the case law—the Court finds that apparent authority can bind foreign governments whose

---

[6] Distinguishable from these cases are those, like *Aquamar* and *Jota*, in which courts have found apparent authority sufficient to support jurisdictional acts—*i.e.*, waivers of sovereign immunity or representations on behalf of foreign governments in courts of the United States—by foreign ambassadors, because of "the traditional authority of ambassadors to represent the state's position before foreign courts."  *Jota*, 157 F.3d at 163; *see also Aquamar*, 179 F.3d at 1299 n.42 (citing *Lehigh Valley R.R. v. State of Russia*, 21 F.2d 396, 400 (2d Cir. 1927)) (stating that federal courts apply a "presumption that an ambassador has authority to represent his or her state in legal proceedings").

acts are private, including enter into commercial transactions on apparent behalf of a sovereign state.

### 4.   Application of Apparent Authority Doctrine

In this case, the governmental act in question is quintessentially private.  The DRC entered into the Credit Agreement to restructure various debts owed to its country's creditors. The obligations assumed by the DRC and the Central Bank when their representatives executed this agreement were commitments to pay various private creditors.  Restructuring debt is a commercial transaction, a paradigmatically private act.  The 2003 Letter renewing the DRC's obligation to make payments under the original agreement—to which the issue of apparent authority relates—is, equally, a private act.  *See id.* at 258.  The governmental act in question here is, clearly, an exercise of power "that can also be exercised by private citizens."  *Nelson*, 507 U.S. at 360.

Having determined that the apparent authority of a government official is sufficient to bind a foreign sovereign in the context of private acts undertaken in commercial transactions, the Court examines whether, as plaintiffs' claim, Mr. Luongwe and Mr. Masangu possessed apparent authority to bind the DRC or its instrumentalities.  Defendants counter that these two officials lacked apparent authority to do so.  For the reasons that follow, the Court concludes that, until the parties have had an opportunity to take targeted discovery on this issue, it is premature to resolve these claims.

Apparent authority exists where, first, "a principal causes his agent to have apparent authority by conduct which, reasonably interpreted, causes third persons to believe that the principal consents to have an act done on his behalf"; and second, where, based on "the circumstances of the transaction[,] . . . the person relying on the apparent authority fulfilled his

'duty of inquiry.'" *First Fidelity*, 877 F.2d at 193–94.  The Court evaluates these two

requirements in turn.

### a.  Principal's Conduct

Apparent authority exists when the principal (here, a state) causes third parties to

reasonably rely on the representation—explicit or implicit—that the agent (here, a government

official) is acting on behalf of the state.  "[R]easonable reliance is often a question of fact for the

jury rather than a question of law for the court."  *STMicroelectronics, N.V. v. Credit Suisse Secs.

(USA) LLC*, 648 F.3d 68, 81 (2d Cir. 2011).  Whether a party reasonably relied on a

representation by the principal may turn heavily on the circumstances surrounding both the

representation and the reliance, and "requires a factual inquiry into the principal's manifestations

to third persons."  *First Fidelity*, 877 F.2d at 193 (citing *General Overseas Films, Ltd. v. Robin

Int'l, Inc.,* 542 F. Supp. 684, 689 (S.D.N.Y. 1982), *aff'd*, 718 F.2d 1085 (2d Cir. 1983)).  This

maxim applies equally to representations made by foreign states:  "[A]n ambassador's actions

under color of authority do not, as a matter of law, automatically bind the state that he represents.

The facts of a given case must be examined . . . ."  *First Fidelity*, 877 F.2d at 193.  Accordingly,

in assessing whether an act of a government official binds a sovereign on the basis of apparent

authority, courts must consider "whether the affected parties reasonably considered the action to

be official."  *Id.* (quoting *Restatement (Third) of Foreign Relations* § 712(2) cmt. h).

In this inquiry, one relevant issue is the position held by the government official.  That is

because, for a principal to be held liable on an agent's acts under an apparent authority theory,

the principal must be "responsible for the appearance of authority in the agent," *Meisel v.

Grunberg*, 651 F. Supp. 2d 98, 110 (S.D.N.Y. 2009), and a principal can, explicitly or implicitly,

create the appearance of an agent's authority, and of limitations on that authority, through the

[27]

particular position held by the agent.  *See Highland Capital Mgmt.*, 607 F.3d at 327.  The explicit and implicit representations made by foreign states as to the level and scope of the authority to bind the state of the official in question are, therefore, important components of the apparent authority inquiry.

On this point, *First Fidelity* is instructive.  At issue there was a loan agreement entered into by the Antiguan ambassador to the United Nations.  In determining whether the ambassador had apparent authority, the Court relied on the fact that under international law, the "powers of an ambassador may include the authority to conclude international agreements."  Noting that "[i]nternational agreements have considerably more dignity than . . . purely commercial transactions," under some circumstances, the Court held that such an ambassador could have apparent authority to enter into a commercial transaction, because the state can be seen to have "cause[d] third persons to believe that the [state] consents to having an act done on its behalf." *First Fidelity*, 877 F.2d at 192, 193 (citing *Restatement (Third) of Foreign Relations* §§ 207, 311).  The Court found highly relevant that the signatory of a loan agreement, the stated purpose of which was "to pay for the renovations of Antigua's Permanent Mission to the United Nations in New York," was an ambassador, *First Fidelity*, 877 F.2d at 191, noting that "heads of diplomatic missions and representatives accredited to international organizations are regarded as possessing powers to negotiate agreements on matters within their jurisdictions."  *Id.* at 192 (citing *Restatement (Third) of Foreign Relations* § 311 cmt. b).  Agency law, it added, was "flexible enough so that the fact that a person is an ambassador can be given its appropriate weight in determination the extent of his apparent authority."  *Id.* at 194.  *First Fidelity*'s analysis thus turned not only on the official's title ("ambassador"), but the responsibilities and

level of authority generally attributed to persons in that position to enter into agreements on behalf of the government.

Here, the document in dispute—the 2003 Letter—was signed by Mr. Luongwe, the interim Minister of Finance and Budget of the DRC, and Mr. Masangu, the Governor of the Central Bank.  It is, therefore, important to understand (1) what the general responsibilities were of the persons holding those domestic-government positions at the time of the 2003 Letter, and (2) how these responsibilities were communicated to persons outside of the DRC, including counterparties in commerce transactions.

In assessing the questions, decisions in this district involving non-ambassador officials of a government are illuminating.  These decisions hold that such officials have apparent authority to bind foreign sovereigns when the obligation to which by the official committed is of the sort of commitment that such an official ordinarily has the authority to make.  Sometimes these cases have turned on an express representation as to authority.  In *Seetransport*, for example, the court held that the Romanian Minister of Finance had apparent authority to enter into a settlement agreement on behalf of the Romanian state, because the Romanian Prime Minister—the top diplomatic official in Romania—represented that the Minister of Finance "ha[d] the capacity to . . . finalize the case, and to sign the settlement."  *Seetransport*, 123 F. Supp. 2d at 190.  "[G]iven the representation by [the Minister's] principal," the *Seetransport* Court stated, "no further inquiry in this matter was necessary, and accordingly the Romanian state is bound by the settlement contract as executed by this agent."  *Id.* at 190.  In other cases, courts have closely examined the principal's conduct and the implicit message it sent as to an agent's apparent authority.  *See, e.g.*, *Storr*, 1997 WL 633405 at *3 (inquiring whether there was "specific conduct on the part of the [state or an instrumentality of the state] which would lead third

[29]

persons to believe that the signatories of the notes had the authority to issue them"); *Anglo-Iberia*, 1998 WL 289711 at *3 (inquiring whether additional notifications were provided to officials as to decision-making authority in the government, and if so, whether those communications shed light on whether the decision-maker knew that the purported agent was attempting to act on behalf of the state).

Here, given that "[t]he appointment of a person to a position with generally recognized duties *may* create apparent authority," *First Fidelity*, 877 F.2d at 194 (emphasis added), and the line of cases deciding this question based on a close review of the attendant circumstances the Court believes additional discovery is merited before it can reliably resolve the issue of apparent authority. The Court is hopeful that such evidence may illuminate whether the "generally recognized duties" of the interim Minister of Finance and Budget of the DRC and the Governor of the Central Bank, as explicitly or implicitly represented by the DRC, included entering into and/or renewing financial obligations on behalf of the DRC and the Central Bank. To be sure, these titles certainly suggest that these position holders had weighty duties, and provide a solid basis on which plaintiffs' predecessors in interest could infer in 2003 that Mr. Luongwe and Mr. Masangu had apparent authority to bind their principles. But it would be presumptuous to assume, without allowing discovery on the point, that these responsibilities had been publicly described so as to appear to embrace the official actions at issue here. Accordingly, the Court authorizes limited discovery into what a third party—in the position of plaintiffs' predecessors in interest who engaged with defendants' representatives leading up to the 2003 Letter—would reasonably believe was the scope of the authority of Mr. Luongwe, as interim Minister of Finance and Budget of the DRC, and Mr. Masangu, as the Governor of the Central Bank.

[30]

### b.  Duty to Inquire

Under the doctrine of apparent authority, there is a duty to inquire into the status of an agent's authority when "(1) the facts and circumstances are such as to put the third party on inquiry, (2) the transaction is extraordinary, or (3) the novelty of the transaction alerts the third party to a danger of fraud."  *Benin*, 2010 WL 3564270, at *7 (citing *FDIC v. Providence Coll.*, 115 F.3d 136, 141 (2d Cir. 1997)).  "[T]he duty of inquiry amounts to an alternative way of asking whether the third party reasonably relied on the representations of the agent that he possessed authority to bind the principal."  *C.E. Towers Co. v. Trinidad and Tobago (BWIA Int'l) Airways Corp.*, 903 F. Supp. 515, 525 (S.D.N.Y. 1995) (quoting *Herbert Constr. Co. v. Cont'l Ins. Co.*, 931 F.2d 989, 995–96 (2d Cir. 1991)).

Because "reasonable reliance is often a question of fact for the jury rather than a question of law for the court," *STMicroelectronics*, 648 F.3d at 81, the Court is unwilling, without giving the defendants the opportunity to test the point in discovery, to resolve whether plaintiffs had a duty to inquire into Mr. Luongwe and Mr. Masangu's authority before accepting and relying on 2003 Letter which the two officials signed, purportedly on behalf of the DRC and the Central Bank.  On the facts known to the Court, there are certainly bases, set forth immediately below, on which a fact-finder might conclude that the circumstances of this transaction were unusual, so as to put plaintiffs on notice that an inquiry into authority was merited.  In particular, the Court welcomes additional evidence on the following points, without limitation.

First, plaintiffs allege that defendants, on behalf of a cash-poor country, renewed a financial obligation, now totaling approximately $80 million, against which claims were long barred by the statute of limitations, and evidently for no consideration whatsoever.  Although New York General Obligations Law § 17-103(1) does not require consideration before accepting

a renewal of a time-barred obligation, the circumstances of the renewal here are, arguably, sufficiently improbable to have merit further inquiry by plaintiffs' predecessors in interest at the time, including as to authority.

Second, plaintiffs have not alleged any communications leading up to, or context for, the 2003 renewal by representatives of the DRC and Central Bank.  Given the size of the financial undertaking which the 2003 renewal represented, it would be extraordinary if, leading up to it, no such communications had occurred between plaintiffs' predecessors in interest, on the one hand, and defendants, on the other, before the 2003 Letter issued.  The circumstances preceding this seemingly highly material transaction are potentially highly relevant to the issue of apparent authority—and potentially the actual authority—of Mr. Luongwe and Mr. Masangu.

Third, defendants persuasively argue that, in absence of other evidence regarding the 2003 renewal, there is benefit to discovery regarding the 2003 Letter itself.  Defendants have raised fair questions about that document.  First, it is in English, not in French, the national language of the DRC; defendants suggest that a French-language "original" may exist.  *See* Defs. Opp'n 16.  Second, defendants query why, if the underlying contract itself was drafted outside of the DRC, the 2003 Letter was faxed from the DRC, by government officials, to plaintiffs' predecessors in interest.  Third, defendants note, the 2003 Letter is signed only by representatives of the DRC and the Central Bank, *not* by representatives of plaintiffs' predecessors in interest; although cross-signatures are not required to renew an obligation under § 17-103(1), given the financial impact of the 2003 Letter, the absence of counterparty signatures legitimately raises questions.  Fourth, defendants note that the 2003 Letter itself is short—just one page in length—and lacks the formality that is generally associated with documents effectively committing the signatory to pay tens of millions of dollars.  The 2003 Letter, for

[32]

example, lacks any official national seal or letterhead, and seems to contain multiple typefaces. More substantively, it fails to detail the nature of the renewal of the obligation, fails to identify the beneficiaries of the renewed obligations, and is silent as to the procedure for repayment.

To be sure, there are credible counterarguments, some of which the Court can deduce and some suggested by plaintiffs.  Plaintiffs argue that other contracts entered into by defendants and other creditors, which they have put before the Court, serve as evidence that documents of this type are regularly used to obligate defendants.  The fact that defendants entered into agreements with some similar features, plaintiffs assert, argues against finding a duty to inquire.  Plaintiffs refer, specifically, to copies of nine separate agreements which the DRC entered into with other creditors (the "credit agreements").  *See* Hranitzky Decl. Ex. S.  Each has features in common with the 2003 Letter, including the lack of an official DRC letterhead, brief length (just a few pages), and the appearance of manual signature over the signature block.  *See* Pls. Mot. 6–7.[7]

These letters are indeed relevant—and they are compelling proof of the value to the Court of meaningful discovery.  These letters assist plaintiffs' cause on this point, but there are also obvious points of difference with the 2003 Letter.  First, each of the credit agreements is in French, the national language of the DRC, not English, the language of the 2003 Letter.  Second, each agreement bears a title: all but one are entitled "Protocole D'Accord," or, "Memorandum of Understanding"; and one is entitled "Proces Verbal de la Rencontre du Club de Kinshasa Tenue a Kinshasa les 28 et 29 Septembre 2010 Entre les Creanciers Membres du Club de Kinshasa et le

---

[7] Because the documents contained in Exhibit S are not consecutively paginated, they will be cited according to the page numbers assigned by ECF.  Plaintiffs refer to the "ten" agreements included in Exhibit S, however upon review of the documents, it appears that pages 1–2 are exact copies of pages 17–18, and the latter pages are the first two pages of a four-page agreement entitled "Proces Verbal de la Rencontre du Club de Kinshasa Tenue a Kinshasa les 28 et 29 Septembre 2010 Entre les Creanciers Membres du Club de Kinshasa et le Gouvernement Congolais."  Hranitzky Decl. Ex. S. at 17–20; *see id.* at 1–2.  Accordingly, the Court understands Exhibit S to include nine distinct agreements.

Gouvernement Congolais," or, "Minutes of the Meeting of the Club of Kinshasa Held in Kinshasa on 28 and 29 September 2010 Between the Creditors of the Club of Kinshasa and the Congolese Government." *See* Hranitzky Decl. Ex. S. at 3, 5, 7, 9, 11, 13, 15, 21; *id.* at 17.  The 2003 Letter, by contrast, does not.  Third, unlike the 2003 Letter, each of the documents entitled "Protocole D'Accord" included, in large print in the header, the text: "Document Confidentiel Transmis Uniquement Pour Negociation," or, "Confidential Document Transmitted Only for Negotiation." *Id.*  Last, and perhaps most important, there is an obvious difference in the method by which the credit agreements and the 2003 Letter are authorized.  Each credit agreement appears to be signed by both a representative of the DRC and a representative of the creditor entity.[8]  The 2003 Letter, by contrast, is signed by two representatives of the DRC, and by no representative from plaintiffs' predecessors in interest.  *See* Hranitzky Decl. Ex. N.  All these are valid points for explanation in discovery.  It is also of interest to the Court that, under DRC Decree No. 028.2002, contracts binding the country must be executed in French and on national letterhead.  If this Decree was known to the DRC's counterparties in 2003, arguably, an inquiry should have been made as to this apparent deficiency and whether it suggested a lack of authority.  The extremely limited record raises too many unanswered questions to counsel resolving the merits of this dispute without meaningful discovery.

---

[8] Six of the nine credit agreements in Exhibit S are clearly signed by both a representative of the DRC and a representative of the creditor entity.  *See id.* at 4, 6, 10, 12, 14, 16.  Two of the agreements that do not show a creditor's signature are redacted to such a degree, and contain remnants of a signature box and an apparent official seal, that the Court infers that the document was in fact signed by a creditor at the time of its execution.  *See id.* at 8, 22.  The only document that does not include a signature box for a representative of the creditor includes the words "Les créanciers," or, "Creditors," to the right of the DRC signature box, and under those words there are no less than a half dozen handwritten, illegible signatures and initials.

Finally, the Court takes judicial notice of the fact that, as of 2003, the severe political turmoil plaguing the DRC and lack of a functioning government were widely known.  As defendants describe the political and social instability of the time:

> The DRC gained its independence in 1960.  In 1965, Colonel Joseph Mobutu seized power in a coup and declared himself president. . . . In 1997, Mobutu was ousted by a coup lead by Laurent Desire Kabila . . . . [who] was assassinated in January 2001 and his son, Joseph Kabila, was named head of state.  A transitional government was set up in 2003, after a peace agreement was reached with rebel[] groups, the political opposition[,] and the civil society.

Defs. Opp'n 14 n.7.  This turmoil, too, arguably enhanced any duty plaintiffs had to inquire, for the political chaos may have created an outsized risk of officials (whether recently ousted from power, or otherwise), acting outside the scope of their authority of individuals claiming to act on behalf of the government.

For all these reasons, discovery into additional facts and circumstances relating to the 2003 Letter is necessary to enable the Court to determine, reliably, whether plaintiffs had a duty to inquire into Mr. Luongwe and Mr. Masangu's authority.  Accordingly, plaintiffs' claim for summary judgment is premature on this point.

### 5.  Directions for Limited Discovery

In sum, the Court finds that there are substantial issues unexplored by the parties that may bear on "whether the affected parties reasonably considered the action to be official."  *First Fidelity* at 193.  The Court wishes to receive additional information, as suggested in the foregoing, to help it evaluate the various open issues in this case, and especially (a) whether Mr. Luongwe and Mr. Masangu had apparent authority to enter into a contract on behalf of the DRC and the Central Bank renewing the 1980 Credit Agreement, and (b) whether plaintiffs were obligated to inquire into the scope of their authority.  The following is a non-exhaustive list of areas of discovery which the Court believes would be fruitful.

First, the parties should pursue discovery on all communications leading up to the 2003 Letter between (1) representatives of the DRC and the Central Bank, and (2) plaintiffs or their predecessors in interest.  These communications should include, *inter alia*, communications bearing on the authority of Mr. Luongwe and Mr. Masangu with respect to the renewal of defendants' obligations.

Second, the parties should pursue discovery on non-privileged internal communications among predecessor entities, or any other relevant successors in interest to the original creditors, with respect to the initiation, drafting, or development of the 2003 Letter.

Third, the parties should pursue discovery on non-privileged internal communications within the DRC and the Central Bank with respect to these subjects.

Fourth, defendants may pursue discovery on whether there exists any evidence that rebuts the presumption that the signatures on the 2003 Letter are, in fact, authentic.  On the present record, the Court expects that it would find those signatures to be authentic, but it will afford defendants an opportunity to produce non-conclusory evidence to the contrary.

Finally, the Court will entertain evidence as to actual authority.

Absent application by the parties, the Court does not envision needing discovery on subjects other than those addresses in this Opinion and Order.  Although the Court is aware of the unique challenges of conducting discovery with a sovereign state and an instrumentality of that state, the Court is also eager to move this case forward.  Defendants, who joined plaintiffs' request for the Court to set a briefing schedule for this motion last fall, are largely responsible for the awkward procedural posture of this case and the long delay in litigating it.  Defendants are, therefore, directed to notify the relevant government officials from whom discovery is sought

that further delay or obstruction will not be tolerated by the Court. Defendants should not expect extensions to the discovery schedule.

## CONCLUSION

For the reasons stated herein, the Court holds that it may properly exercise jurisdiction over the claims alleged in the Amended Complaint. Plaintiffs' motion for summary judgment is hereby denied, without prejudice to re-filing after a period for discovery on the issues identified herein. The Clerk of Court is directed to terminate the motion at docket item 61.

The parties are directed to submit a proposed case management plan, in accordance with the Court's individual rules, by August 3, 2012. Although the parties shall meet and confer as to the intermediate discovery deadlines, the deadline for completion of all discovery will be four months from the date that this Court issues the case management plan.

SO ORDERED.

*Paul A. Engelmayer*

Paul A. Engelmayer
United States District Judge

Dated: July 26, 2012
      New York, New York

[37]