UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------- x
THEMIS CAPITAL and                                    :
DES MOINES INVESTMENTS LTD.,          :        No. 09 Civ. 1652 (PAE)
                                                              :
                      Plaintiffs,                      :
v.                                                           :
                                                              :        **PLAINTIFFS' PROPOSED FINDINGS OF**
DEMOCRATIC REPUBLIC OF CONGO     :        **FACT AND CONCLUSIONS OF LAW**
and CENTRAL BANK OF THE                    :
DEMOCRATIC REPUBLIC OF THE            :
CONGO,                                                  :
                                                              :
                      Defendants.                    :
                                                              :
------------------------------------------------------- X

 

 

 

        Plaintiffs Themis Capital and Des Moines Investments Ltd. ("Plaintiffs") respectfully

submit their Proposed Findings of Fact and  Proposed Conclusions of Law.

        1.        Attached hereto as Exhibit A is Plaintiffs' Proposed Findings of Fact.

        2.        Attached hereto as Exhibit B is Plaintiffs' Proposed Conclusions of Law.

Dated: New York, New York
November 12, 2013     Respectfully submitted,

           DECHERT LLP

           By: /s/ *Dennis H. Hranitzky*
             Dennis H. Hranitzky
             Debra D. O'Gorman
           1095 Avenue of the Americas
           New York, New York 10036
           (212) 698-3500 (phone)
           (212) 698-3599 (facsimile)

           *Attorneys for Plaintiffs Themis Capital and Des Moines Investments Ltd.*

2

EXHIBIT A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------ x
THEMIS CAPITAL and                                    :
DES MOINES INVESTMENTS LTD.,                           :    No. 09 Civ. 1652 (PAE)
                                                      :
                      Plaintiffs,                     :
v.                                                    :    **PLAINTIFFS' PROPOSED**
                                                      :    **FINDINGS OF FACT**
DEMOCRATIC REPUBLIC OF CONGO                           :
and CENTRAL BANK OF THE                                :
DEMOCRATIC REPUBLIC OF THE                             :
CONGO,                                                 :
                                                      :
                      Defendants.                     :
------------------------------------------------------ X

Plaintiffs Themis Capital ("**Themis**") and Des Moines Investments Ltd. ("**Des Moines**,"

and together with Themis, "**Plaintiffs**") respectfully submit their proposed findings of fact.

## I.    TERMS OF THE REFINANCING CREDIT AGREEMENT

1.    The Democratic Republic of the Congo ("**DRC**") and the Central Bank of the
Democratic Republic of the Congo ("**Central Bank**")[1] entered into a Refinancing Credit
Agreement, dated as of March 31, 1980 with certain bank creditors of the DRC, certain agents,
and the Bank of Tokyo Trust Company as Servicing Bank ("**Credit Agreement**").  Defs.'
Response to Statement No. 1 in Rule 56.1 Statement, Ex. 87; July 26, 2012 Opinion and Order at
p. 2; DRC000001-190, Ex. 9; UB00000617-803, Ex. 10.

2.    Section 1.01 of the Credit Agreement provides:

"SECTION 1.01. Certain Defined Terms. As used in this Agreement, the following terms
shall have the following meanings (such meanings to be equally applicable to both the
singular and plural forms of the terms defined):"  Credit Agreement § 1.01.

"'Agent'  means, with respect to each Syndicate, the institution designated as Agent on
the Credit Information Schedule on which the Syndicate Members of such Syndicate are
identified and, with respect to each Credit, the institution designated as Agent on the
Credit Information Schedule in which such Credit is listed."  Credit Agreement § 1.01.

---

[1]    In their Proposed Conclusions of Law and the Proposed Findings of Fact, Plaintiffs use the term
"DRC" to refer both to the Republic of Zaire and the Democratic Republic of Congo and use the term
"Central Bank" to refer both to the Central Bank of the Republic of Zaire/Bank of Zaire and the Central
Bank of the Democratic Republic of Congo.

1

"'<u>Applicable Margin</u>' means (i) 1 7/8 per cent (1.875%) for the period from the date of this Agreement to the last day of the Month in which occurs the fifth anniversary of the date of this Agreement and (ii) two per cent (2%) for the period from the last day of the Month in which occurs the fifth anniversary of the date of this Agreement to payment in full of the Credits."  Credit Agreement § 1.01.

"'<u>Assets</u>' means assets of any kind whatsoever, including without limitation revenues and rights to receive income or other payments."  Credit Agreement § 1.01.

"'<u>Bank</u>' means each bank listed under the heading "Banks" on the signature pages hereof and the successors and permitted assigns of each such bank."  Credit Agreement § 1.01.

"'<u>Bank of Zaire</u>' means Banque du Zaire, as the central bank of the Republic of Zaire, and any successor thereto which operates as the central bank of the Republic of Zaire."  Credit Agreement § 1.01.

"'<u>Business Day</u>' means a day of the year on which dealings are carried on in the London interbank market and banks are open for domestic and international business in London and New York City."  Credit Agreement § 1.01.

"'<u>Canadian Dollars</u>' refers to lawful money of Canada."  Credit Agreement § 1.01.

"'<u>Credit</u>' means, as the context may require, (i) each separate credit heretofore extended by a Bank and listed in a Credit Information Schedule or (ii) the unpaid principal amount of any such credit outstanding from time to time (both before and after the Effective Date). No credit heretofore extended by any Bank is a Credit subject to this Agreement unless such credit is listed in a Credit Information Schedule."  Credit Agreement § 1.01.

"'<u>Credit Information Schedule</u>' means each of Schedules A-1 to A-27 on which certain information is set forth. Certain terms used in the Credit Information Schedules are defined in this Agreement and are used in the Credit Information Schedules with such defined meanings."  Credit Agreement § 1.01.

"'<u>Dollars</u>' and the sign '<u>$</u>' refer to lawful money of the United States of America"  Credit Agreement § 1.01.

"'<u>Effective Date</u>' means the day on which all of the conditions specified in Section 6.01 shall have been satisfied in accordance with such Section or waived pursuant to Section 12.01."  Credit Agreement § 1.01.

"'<u>Event of Default</u>' means any of the events or conditions described in Section 10.01."  Credit Agreement § 1.01.

"'<u>Existing Agreement</u>' means, with respect to each Credit, each existing credit agreement, promissory note, guaranty and other documentation (other than this Agreement), as amended prior to the date of this Agreement, which sets forth the payment obligations of the Obligor and other provisions governing the terms of such Credit, which Existing Agreement, as so amended, is identified on the Credit Information

Schedule on which such Credit is described by title, date and the parties thereto, including reference to all amendments prior to the date of this Agreement."  Credit Agreement § 1.01.

"'Existing Rate' means, with respect to each Credit, the interest rate or rates applicable to such Credit from time to time during the period from the Reference Date to the Reconciliation Date pursuant to the interest provisions of the Existing Agreement applicable to such Credit, all of which provisions (including any provisions for alternate interest rates) are incorporated herein by reference for the purpose of this definition.  The Existing Rate for each Credit shall be determined in accordance with such interest provisions, it being understood that any such Existing Rate which consists of a stated margin over a referenced rate (such as LIBO, PIBO, prime rate or base rate, etc.) shall continue to be determined for the periods permitted or contemplated by such interest provisions; provided that for each Credit the determination of such referenced rate for the last such period beginning before the Reconciliation Date shall be for a period ending on the Reconciliation Date."  Credit Agreement § 1.01.

"'External Indebtedness' of any Person means (i) each obligation of such Person to repay a loan, deposit, advance or similar extension of credit (including without limitation any extension of credit under a refinancing or rescheduling agreement or an acceptance facility), (ii) each obligation of such Person evidenced by a note, bond, debenture or similar written evidence of indebtedness and (iii) each Guarantee by such Person of an obligation constituting External Indebtedness of another Person; provided in each case that such obligation is (A) denominated in a Foreign Currency or (B) payable at the option of the payee in a Foreign Currency."  Credit Agreement § 1.01.

"'Foreign Currency' means any currency other than the lawful money of the Republic of Zaire."  Credit Agreement § 1.01.

"'Guilders' refers to lawful money of The Kingdom of the Netherlands."  Credit Agreement § 1.01.

"'Interest Payment Date' means the Reconciliation Date and thereafter the last day of each Interest Period.  Credit Agreement § 1.01.

"'Interest Period' has the meaning set forth in Section 3.04."  Credit Agreement § 1.01.

"'Interim Rate' means a per annum rate of interest which is the sum of the Applicable Margin and a LIBO Rate calculated for a period from the date of this Agreement to the Reconciliation Date.  The Reference Banks have heretofore advised to the Servicing Bank the information necessary in order to calculate such LIBO Rate and the Interim Rate."  Credit Agreement § 1.01.

"'Interim Rate Election' means an election with respect to all Credits listed on a Credit Information Schedule that the interest rate applicable to such Credits during the period from the date of this Agreement to the Reconciliation Date shall be determined in accordance with Section 3.02(b)(ii)(A) rather than in accordance with Section 3.02(b)(ii)(B).  Any Interim Rate Election with respect to such Credits shall be made on

3

the Credit Information Schedule for such Credits by completing Section B of such Credit Information Schedule with the statement 'The Interim Rate Election has been made for all Credits listed on this Credit Information Schedule.' If the Interim Rate Election is not made in such manner, Section B of such Credit Information Schedule shall be completed with the statement 'The Interim Rate Election has not been made for all Credits listed on this Credit Information Schedule.'" Credit Agreement § 1.01.

"'International Monetary Assets' means all (i) gold, (ii) Special Drawing Rights, (iii) Reserve Positions in the Fund and (iv) Foreign Exchange which is owned or held by the Obligor or the Bank of Zaire. For purposes of this definition, the terms 'Special Drawing Rights', 'Reserve Positions in the Fund' and 'Foreign Exchange' have, as to the types of assets included, the meanings given to them in the IMF's publication entitled 'International Financial Statistics' dated December 1979 or such other meanings as shall be formally adopted by the IMF from time to time." Credit Agreement § 1.01.

"'LIBO Rate' means, with respect to each Interest Period or Overdue Period, the average (rounded upward, if necessary, to the nearest whole multiple of 1/16 of 1% per annum) of the rate per annum at which deposits in Dollars are offered to each of the Reference Banks by prime banks in the London interbank market at 11:00 A.M. (London time) two Business Days before the first day of such period for a period equal thereto and in an amount equal to $5,000,000." Credit Agreement § 1.01.

"'Lien' means any lien, mortgage, deed of trust, charge, pledge, security interest or other encumbrance on or with respect to, or any preferential arrangement which has the practical effect of constituting a security interest with respect to the payment of any obligation with or from the proceeds of, any Asset." Credit Agreement § 1.01.

"'London Process Agent' has the meaning set forth in Section 12.07." Credit Agreement § 1.01.

"'Majority Agents' means at any time Agents acting for Syndicate Members holding more than 51% in the then outstanding aggregate principal amount of all Credits which are not Single Bank Credits." Credit Agreement § 1.01.

"'Month' means any monthly period beginning on the first Business Day of a calendar month and ending on the first Business Day of the next calendar month." Credit Agreement § 1.01.

"'New York Process Agent' has the meaning set forth in Section 12.07." Credit Agreement § 1.01.

"'Outstanding Principal Amount' means, with respect to each Credit, the total unpaid principal amount of such Credit outstanding on the Reference Date irrespective of whether such principal amount is due and payable on the Reference Date, as such Outstanding Principal Amount is set forth in the Credit Information Schedule for such Credit." Credit Agreement § 1.01.

"'Overdue Period' has the meaning set forth in Section 3.05(b)."  Credit Agreement § 1.01.

"'Payment Date' means the date upon which the Obligor pays in full the aggregate First Principal Payments due on all Credits under Section 2.01(a)."  Credit Agreement § 1.01.

"'Person' means an individual, corporation, partnership, joint venture, trust, unincorporated organization or any other juridical entity, including without limitation a government or governmental body or any agency, instrumentality or official thereof or any international organization or agency."  Credit Agreement § 1.01.

"'Principal Payment' means, with respect to each Credit, each of (i) the First Principal Payment, (ii) the Second Principal Payment, (iii) the Third Principal Payment, (iv) the Fourth Principal Payment, (v) the Fifth Principal Payment and (vi) each Subsequent Principal Payment, as each such term is defined below:

> (i) 'First Principal Payment' means, with respect to each Credit, ten per cent (10%) of the Reference Date Principal of such Credit (rounded to the nearest integral currency unit), as such First Principal Payment is set forth in the Credit Information Schedule for such Credit.

> (ii) 'Second Principal Payment' means, with respect to each Credit, five per cent (5%) of the Reference Date Principal of such Credit (rounded to the nearest Dollar).

> (iii)'Third Principal Payment' means, with respect to each Credit, three per cent (3%) of the Reference Date Principal of such Credit (rounded to the nearest Dollar).

> (iv)'Fourth Principal Payment' means, with respect to each Credit, three per cent (3%) of the Reference Date Principal of such Credit (rounded to the nearest Dollar).

> (v) 'Fifth Principal Payment' means, with respect to each Credit, three per cent (3%) of the Reference Date Principal of such Credit (rounded to the nearest Dollar).

> (vi) 'Subsequent Principal Payment' means, with respect to each Credit, each of eleven approximately equal principal installment payments, each in the amount of one eleventh (1/11th) of such Credit outstanding on the last day of the Month in which the fifth anniversary of the date of this Agreement occurs (excluding from the calculation of the Credit outstanding on such day, any amount which is then past due)." Credit Agreement § 1.01.

"'Principal Payment Date' means each of the dates specified in Section 4.01 on which a payment of principal of the Credits is due."  Credit Agreement § 1.01.

"'<u>Process Agent</u>' has the meaning set forth in Section 12.07(a)."  Credit Agreement § 1.01.

"'<u>Rabomerica</u>' means Rabomerica International Bank N.V., a banking institution organized under the laws of The Kingdom of the Netherlands."  Credit Agreement § 1.01.

"'<u>Reconciliation Date</u>' means September 2, 1980."  Credit Agreement § 1.01.

"'<u>Reference Banks</u>' means the principal London offices of (i) Bankers Trust Company, (ii) Grindlays Bank Limited, and (iii) The Fuji Bank Limited."  Credit Agreement § 1.01.

"'<u>Reference Date</u>' means January 31, 1980."  Credit Agreement § 1.01.

"'<u>Reference Date Interest</u>' means, with respect to each Credit, the total accrued and unpaid interest with respect to such Credit as of the Reference Date, calculated in accordance with the terms of the Existing Agreement applicable to such Credit on the Outstanding Principal Amount of such Credit to the Reference Date and irrespective of whether such interest is due and payable on the Reference Date, all as such Reference Date Interest is set forth in the Credit Information Schedule for such Credit."  Credit Agreement § 1.01.

"'<u>Servicing Bank</u>' means The Bank of Tokyo Trust Company when acting in its capacity as Servicing Bank hereunder, through its office at 100 Broadway, New York, New York 10005, U.S.A. or such other office as it shall hereafter designate for the purpose by notice to the other parties hereto, and any permitted successor."  Credit Agreement § 1.01.

"'<u>Single Bank Credit</u>' means any Credit listed on Credit Information Schedules A-23 to A-27."  Credit Agreement § 1.01.

"'<u>Swiss Francs</u>' refers to lawful money of the Swiss Confederation."  Credit Agreement § 1.01.

"'<u>Syndicate</u>' means all Banks listed as Syndicate Members on each separate Credit Information Schedule. A Bank is a member of each Syndicate for which it is listed as a Syndicate Member on a Credit Information Schedule."  Credit Agreement § 1.01.

"'<u>Syndicate Member</u>' means each Bank listed as a Syndicate Member holding a Credit on each separate Credit Information Schedule."  Credit Agreement § 1.01.

"'<u>United States</u>' and '<u>U.S.</u>' each means the United States of America."  Credit Agreement § 1.01.

3.     The Credit Agreement contained Defendants' unconditional promise to pay certain amounts of principal, which were listed in Credit Information Schedules, identified as A-1 through A-26 (each a "Schedule"), plus interest on principal, interest on any amounts of interest due and unpaid, and any out-of-pocket expenses incurred in an effort to collect outstanding amounts, to the creditors listed in the Schedules.   Credit Agreement §§  2.01, 3.02-3.05, 4.01, 5.02(c), and 12.05(a)(iv); July 26, 2012 Opinion and Order at p. 2.

4.      Under the Credit Agreement, the DRC was obligated to make periodic payments of principal and interest to the creditors (or their assigns), and to repay all principal and interest on or before April 2, 1990.  Defendants' Response to Statement No. 5 in Rule 56.1 Statement; Credit Agreement §§ 2.01, 3.02-3.05, 4.01 and 5.02(c).

5.      Section 2.01 of the Credit Agreement provides:

 "SECTION 2.01.  Agreement to Pay Certain Amounts.  On or before the eighth Business Day after the signature of this Agreement by all parties hereto and on the terms and conditions of this Agreement, the Obligor shall pay for the account of each Bank all of the following amounts:

(a)      The First Principal Payment of each Credit of such Bank,

(b)      The Reference Date Interest on each Credit of such Bank, and

(c)      all costs and expenses payable pursuant to Section 12.05 which shall have been notified to the Obligor by the Servicing Bank on or prior to the day occurring 2 Business Days after the signature of this Agreement by all parties hereto; provided that if any such amount shall be otherwise paid to the parties entitled thereto the Obligor shall be relieved of its obligations under this Section 2.01 to the extent of such other payment.  Each Agent and each Bank having a Single Bank Credit agrees to notify the Obligor and the Servicing Bank of any such other payment so received (x) in the case of each Agent, for the account of all Syndicate Members for which such Agent acts and (y) in the case of each Bank having a Single Bank Credit, for the account of such Bank.  The Servicing Band may rely conclusively on any such notice received by it.

The payment of each such amount shall be applied by the Servicing Bank and the appropriate Bank to satisfy each payment obligation with respect to such amount under this Agreement and the applicable Existing Agreement."  Credit Agreement § 2.01.

6.      Section 3.02 of the Credit Agreement provides:

"SECTION 3.02.  Interest from the Reference Date to the Reconciliation Date. (a) Payment Obligation. The Obligor shall pay interest on each Credit from the Reference Date to the Reconciliation Date at the interest rates applicable to such Credit as specified in subsection (b) below, such interest to be due and payable on the Reconciliation Date and to be payable on the Outstanding Principal Amount of such Credit during the period from the Reference Date to the Payment Date and on the Refinanced Principal Amount of Credit from the Payment Date to the Reconciliation Date.

(b)      Interest Rates.  The interest rates specified below shall apply for the periods indicated:

(i)      During the period from the Reference Date to the date of this Agreement, the Existing Rate shall apply to each Credit.

(ii)      During the period from the date of this Agreement to the Reconciliation Date,

(A)      the Interim Rate shall apply to each Credit for which the Interim Rate Election has been made, and

(B)      the Existing Rate shall apply to each Credit for which the Interim Rate Election has not been made <u>provided</u> that any component of an Existing Rate which is a margin over any referenced rate (such as LIBO, PIBO, prime rate, base rate, etc.) shall be the Applicable Margin.  It shall be the responsibility of each Agent and each Bank having a Single Bank Credit to make the calculations of interest required by Section 3.07(b) in accordance with this <u>proviso</u>."  Credit Agreement § 3.02.

7.      Section 3.03 of the Credit Agreement provides:

"SECTION 3.03.  <u>Interest from the Reconciliation Date</u>. The Obligor shall pay interest on each Credit from the Reconciliation Date to the final Principal Payment Date at an interest rate per annum equal at all times during each Interest Period to the sum of the Applicable Margin and the LIBO Rate for such Interest Period, such interest to be due and payable on the last day of each Interest Period for interest accrued during such Interest Period."  Credit Agreement § 3.03.

8.      Section 3.04 of the Credit Agreement provides:

"SECTION 3.04.  <u>Interest Periods</u>.  The period from the Reconciliation Date to the final Principal Payment Date shall be divided into successive Interest Periods. The first Interest Period shall begin on the Reconciliation Date and end on the last day of the Month in which occurs the first anniversary of the date of this Agreement. Each subsequent Interest Period shall be a period of six Months and shall begin on the last day of the immediately preceding Interest Period."  Credit Agreement § 3.04.

9.      Section 3.05 of the Credit Agreement provides:

"SECTION 3.05.  <u>Interest on Overdue Principal</u>.  (a) In the event that any principal amount of any Credit is not paid when due after the Effective Date, the Obligor shall pay interest on such unpaid principal amount from the date such principal amount is due to the date such principal amount is paid in full, payable on demand, at an interest rate per annum equal at all times during each Overdue Period to the sum of one percent (1%) plus the Applicable Margin plus the LIBO Rate for such Overdue Period. If the Servicing Bank receives notice from two or more Reference Banks that deposits in Dollars are not being offered to them by prime banks in the London interbank market for the applicable Overdue Period or in the applicable amounts, then the interest rate for the purposes of this section (a) shall be the sum of one percent (1%) plus the Applicable Margin plus the cost to each Bank (as set forth in the certificate referred to in subsection (c) below) of obtaining, from time to time, funds for such Overdue Period in the amount equal to the overdue principal amount owed to such Bank.

(b)      For purposes of determining the interest rate pursuant to subsection (a) above, the period between the date the principal amount referred to therein is due and the date such principal amount is paid in full shall be divided into Overdue Periods of one Month (each

8

of which other than the first shall begin on the last day of the next preceding Overdue Period).

(c)      Without prejudice to the rights of any Bank under the foregoing provisions of this Section 3.05, the Obligor shall indemnify each Bank against any loss or expense which it may sustain or incur as a result of the failure by the Obligor to pay when due any principal of any Credit, to the extent that any such loss or expense is not recovered pursuant to such foregoing provisions but excluding any loss of profits. A certificate of any such Bank setting forth the basis for the determination of the interest due on overdue principal and of the additional amounts necessary to indemnify such Bank pursuant to this subsection (c) in respect of such loss or expense, submitted to the Obligor, shall be conclusive and binding for all purposes in the absence of manifest error.

(d)      To the extent permitted by law, the Obligor further agrees to pay interest as provided in subsections (a) and (b) above on all interest which is not paid when due hereunder after the Effective Date, such interest is to be payable on demand, to accrue from the due date of such interest until payment in full thereof and to be calculated on the basis of successive Overdue Periods of one Month."  Credit Agreement § 3.05.

10.      Section 3.07 of the Credit Agreement provides:

"SECTION 3.07.  Miscellaneous Interest Provisions.  (a) Determination of Interest Rates. The interest rate and the LIBO Rate for the Interim Rate and each Interest Period and Overdue Period shall be determined by the Servicing Bank on the basis of applicable quotations for the LIBO Rate furnished to and received by the Servicing Bank from the Reference Banks prior to 3:00 P.M. (New York City time) two Business Days prior to the first day of the applicable period.  Each Reference Bank agrees to advise the Servicing Bank at such times forthwith by telephone, telex, telegram or cable of the applicable rate, if any, offered to it at 11:00 A.M. (London time) on each such day.  If any one or more of the Reference Banks shall not so furnish a Quotation of the applicable rate to the Servicing Bank for any such period, the interest rate for such period shall be based upon the quotations furnished to the Servicing Bank by the other Reference Banks.  Not later than one Business Day prior to each Interest Period and Overdue Period, the Servicing Bank shall give telex notice to the Obligor, each Agent and each Bank of the interest rate determined for each Interest Period and Overdue Period as hereinabove provided and the applicable rate quoted by each Reference Bank, and such notice shall be conclusive and binding for all purposes in the absence of manifest error.

(b)  Calculations of Interest.  Each interest rate specified in this Agreement is a per annum percentage rate. All computations of interest shall be made on the basis of a year of 360 days for the actual number of days (including the first day but excluding the last day) occurring in the period for which interest is payable. Each Agent shall advise the Servicing Bank by telex or cable, at least 90 days before each Interest Payment Date, of the aggregate amount of interest payable by the Obligor hereunder on such Interest Payment Date to the Syndicate Members of each Syndicate of such Agent. Simultaneously, each Agent shall advise by telex or cable each such Syndicate Member of the amount of interest payable to it on such Interest Payment Date.  Each Bank which

9

has a Single Bank Credit shall advise the Servicing Bank by telex or cable, at least 90 days before each Interest Payment Date, of the amount of interest payable by the Obligor hereunder on such Interest Payment Date to such Bank with respect to such Single Bank Credit.  On the basis of the information received by it the Servicing Bank shall advise the Obligor by telex or cable at least 60 days before each Interest Payment Date of the aggregate amount of interest payable to the Banks hereunder on such Interest Payment Date, which advice shall be conclusive and binding for all purposes in the absence of manifest error.

With respect to interest payable on the Reconciliation Date, the foregoing provisions shall apply to the extent practicable.  Otherwise the notifications by each Agent, each Bank having a Single Bank Credit and the Servicing Bank shall be made as soon as the interest payable on the Reconciliation Date can be determined by the appropriate Agent or Bank."  Credit Agreement § 3.07.

11.     Section 4.01 of the Credit Agreement provides:

"SECTION 4.01.  Scheduled Payments.  The Obligor shall repay the Outstanding Principal Amount of each Credit as follows:

(a)     The First Principal Payment shall be repaid as provided in Section 2.01(a).

(b)     The Second Principal Payment shall be repaid on the last day of the Month in which the first anniversary of the date of this Agreement occurs.

(c)     The Third Principal Payment shall be repaid on the last day of the Month in which the second anniversary of the date of this Agreement occurs.

(d)     The Fourth Principal Payment shall be repaid on the last day of the Month in which the third anniversary of the date of this Agreement occurs.

(e)     The Fifth Principal Payment shall be repaid on the last day of the Month in which the fourth anniversary of the date of this Agreement occurs.

(f)     Thereafter, each Credit shall be repaid in eleven approximately equal semi-annual installments in an amount equal to a Subsequent Principal Payment on each of the last eleven Interest Payment Dates, commencing with the Interest Payment Date which is the last day of the Month in which the fifth anniversary of the date of this Agreement occurs and ending with the Interest Payment Date which is the last day of the Month in which the tenth anniversary of the date of this Agreement occurs, provided that the last such installment shall repay in full the remainder of each Credit then outstanding."  Credit Agreement § 4.01.

12.     Section 5.05 of the Credit Agreement provides:

 "SECTION 5.05.  Evidence of Debt.  Each Bank, with respect to Credits owed to it, each Agent, with respect to Credits of its Syndicates, and the Servicing Bank, with respect to all the Credits, shall maintain on its books control accounts setting forth the amounts of

principal, interest and other sums paid and payable by the Obligor from time to time hereunder with respect thereto.  In case of any dispute, action or proceeding relating to any Credit, the entries in each such account shall be prima facie evidence of the amount of such Credit and of such amounts paid and payable.  In case the entries in such accounts are not identical, each Agent's account shall be considered correct in the absence of manifest error with respect to Credits of its Syndicates, and the account of each Bank having a Single Bank Credit shall be considered correct in the absence of manifest error with respect to such Single Bank Credit."  Credit Agreement § 5.05.

13.    Section 6.01(b) of the Credit Agreement provides:

"SECTION 6.01.  Conditions Precedent to the Effective Date. The Effective Date shall be the day on which all of the following conditions shall have been satisfied:

* * *

 (b)    The Servicing Bank shall have received five executed originals for distribution to the Servicing Bank, three Agents (as designated by the Majority Agents) and counsel for the Agents (with sufficient photocopies for distribution to each Agent and its Syndicate Members) of each of the following, each dated in accordance with the relevant Exhibit hereto:

(i)     a certificate of the Director of the Office of the Presidency of the Republic of Zaire in substantially the form of Exhibit 1 certifying the receipt of all government approvals related hereto;

(ii)    a certificate of the Director of Office of the Presidency of the Republic of Zaire in substantially the form of Exhibit 2 as to the incumbency and true signatures of (A) the officials of the Obligor authorized to execute and deliver the Agreement on behalf of the Obligor and the other documents required to be delivered on behalf of the Obligor hereunder and (B) the Governor of the Bank of Zaire;

(iii)   a certificate of the Governor of the Bank of Zaire in substantially the form of Exhibit 3 with respect to the incumbency and true signatures of the officials of the Bank of Zaire authorized to execute and deliver this Agreement;

(iv)    a certificate of the Commissaire d'Etat aux Finances et Budget or any other authorized official of the Obligor in substantially the form of Exhibit 4 as to the accuracy of the representations and warranties contained in Section 7.01;

(v)     a certificate of the Governor of the Bank of Zaire in substantially the form of Exhibit 5 as to the accuracy of the representations and warranties contained in Section 9.02;

(vi)    a letter from the New York Process Agent in substantially the form of Exhibit 6;

(vii)   a letter from the London Process Agent in substantially the form of Exhibit 7;

(viii)     an opinion of the Director of the Office of the Presidency of the Republic of Zaire as counsel to the Obligor and the Bank of Zaire, in substantially the form of Exhibit 8;

(ix)     an opinion of Messrs. White & Case, special United States counsel to the Obligor and the Bank of Zaire, in substantially the form of Exhibit 9;

(x)     an opinion of Cabinet Robert Serlippens, special Zaire counsel to the Agents, in substantially the form of Exhibit 10;

(xi)     an opinion of Messrs. Slaughter and May, special English counsel to the Agents, in substantially the form of Exhibit 11; and

(xii)     an opinion of Messrs. Shearman & Sterling, special United States counsel to the Agents, in substantially the form of Exhibit 12.

The final proviso of Section 12.01 sets forth the circumstances in which documentation which varies from the above requirements may be accepted in satisfaction of the conditions precedent to the Effective Date set forth in this Section 6.01(b)."  Credit Agreement § 6.01.

14.     Section 7.01(a-d) of the Credit Agreement provides:

"SECTION 7.01.  Representations and Warranties of the Obligor.  The Obligor represents and warrants to each other party to this Agreement as follows:

(a)     The Obligor has full power and authority to execute this Agreement, to repay all Credits and pay interest thereon as primary obligor as provided in this Agreement and otherwise to perform and observe the provisions of this Agreement on its part to be performed or observed.

(b)     The execution, delivery and performance by the Obligor of this Agreement have been (or prior to the Effective Date will have been) duly authorized by all necessary legislative, administrative and other governmental action in the Republic of Zaire, and do not contravene (i) the Constitution of the Republic of Zaire, (ii) any treaty, law, rule, regulation, order, decree, writ, judgment, award, injunction or similar legal restriction applicable to the Obligor or this Agreement in the Republic of Zaire or (iii) any contractual restriction contained in any loan or credit agreement, guaranty or other agreement or instrument which binds or affects the Obligor or any of its Assets.

(c)     No authorization or approval (including exchange control approval) or other action by, and no notice to or filing with, any governmental authority or regulatory body is required under law applicable to this Agreement in the Republic of Zaire for the due execution, delivery and performance by the Obligor of this Agreement except for the approval of the Bank of Zaire which has been duly obtained and is in full force and effect by virtue of the execution of this Agreement by the Bank of Zaire and except for those listed in Exhibit 1, all of which either have been duly obtained or made or will be duly obtained or made prior to the Effective Date and all of which will be in full force and effect on the Effective Date.

12

(d)       This Agreement has been duly executed and delivered by the Obligor and is the legal, valid and binding obligation of the Obligor enforceable against the Obligor in accordance with its terms." Credit Agreement §7.01(a-d).

15.       Section 8.01 of the Credit Agreement provides "<u>Affirmative covenants of the Obligor</u>.  So long as any credit shall remain outstanding, the Obligor will:"

***

"(b) Duly obtain and maintain in full force and effect all governmental approvals (including any exchange control approvals) which may be necessary under the law of the Republic of Zaire for the execution, delivery and performance of this Agreement by the Obligor or for the validity or enforceability hereof and duly take all necessary and appropriate governmental and administrative action in the Republic of Zaire in order to make all payments to be made hereunder as required by this Agreement."  Credit Agreement § 8.01(b).

16.       Section 8.03 of the Credit Agreement provides:

"SECTION 8.03.  <u>Instruction of the Obligor</u>.  The Obligor hereby irrevocably and unconditionally instructs the Bank of Zaire, for the benefit of each Bank, to make all payments required by this Agreement as contemplated by clause (ii) of Section 9.01(c)." Credit Agreement § 8.03.

17.       Section 9.01 of the Credit Agreement provides:

"SECTION 9.01.  <u>Foreign Exchange Undertaking</u>.  The Bank of Zaire irrevocably and unconditionally states and agrees for the benefit of each Bank that:

(a)       All payments of principal, interest and other amounts required under this Agreement are irrevocably authorized by all action required in the Republic of Zaire so that such payments can be made in the currency and manner and at the time required by the terms of this Agreement.  The Bank of Zaire will maintain in full force and effect all authorizations necessary to make all such payments as so required.

(b)       The Bank of Zaire will use its best efforts to ensure that the Obligor and the Bank of Zaire will maintain sufficient Dollars or other Foreign Currency so that all such payments will be made as so required.

(c)       Subject to the availability to the Bank of Zaire of Dollars or other Foreign Currency and pursuant to the instructions of the Obligor contained in Section 8.03, the Bank of Zaire will either (i) make available to the Obligor sufficient Dollars or other Foreign Currency to enable the Obligor to make each such payment as so required or (ii) on behalf of the Obligor make each payment as so required."  Credit Agreement § 9.01.

18.       Section 9.02 of the Credit Agreement provides:

13

"SECTION 9.02.  Representations and Warranties of the Bank of Zaire.  The Bank of Zaire represents and warrants as follows:

(a)      It is duly organized and validly existing under the laws of the Republic of Zaire as the central bank and monetary authority of the Republic of Zaire and as such exercises, with the Obligor, full power and control over the International Monetary Assets of the Republic of Zaire.

(b)      It has full power and authority under the law of the Republic of Zaire to execute and deliver this Agreement and to perform and observe the provisions of this Agreement on its part to be performed and observed.

(c)      The execution, delivery and performance of this Agreement by it have been duly authorized by all necessary legislative, administrative and other governmental action under the charter ('statuts') of the Bank of Zaire or under the law of the Republic of Zaire and do not contravene law or any contractual restriction which binds or affects the Bank of Zaire or any of its Assets.

(d)      This Agreement has been duly executed and delivered by the Bank of Zaire and is the legal, valid and binding obligation of the Bank of Zaire enforceable against the Bank of Zaire in accordance with its terms.

(e)      Neither the Bank of Zaire nor any of its Assets has any immunity from the jurisdiction of any court or from any legal process in the Republic of Zaire or under its laws. The execution and delivery of this Agreement by the Bank of Zaire and the performance of its obligations hereunder constitute private and commercial acts of the Bank of Zaire."  Credit Agreement § 9.02.

19.      Section 9.03 of the Credit Agreement provides:

 "SECTION 9.03.  Covenants of the Bank of Zaire.  So long as any Credit shall remain outstanding, the Bank of Zaire will:

(a)      Not create or permit to be created and continue any Lien on its Assets which the Obligor agrees in Section 8.02(a) that it will not permit to be created.

(b)      Not enter into any credit agreement or other contract for External Indebtedness which grants by contract to any other Person any right of set off, banker's lien, counterclaim or similar contractual right."  Credit Agreement § 9.03.

20.      Section 10.01 of the Credit Agreement provides:

" SECTION 10.01.  Event of Default Defined.  Each of the following events or conditions shall be an 'Event of Default':

(a)      The Obligor shall fail to pay when due under this Agreement any amount of principal of any Credit or the Obligor shall fail to pay any interest due under this Agreement on any Credit within fifteen days after the due date thereof;

14

(b)      Any representation, warranty or certification (other than those contained in subsection (g) of Section 7.01) made by the Obligor or the Bank of Zaire (or by any of their respective officials) herein or in any certificate delivered pursuant hereto shall prove to have been incorrect in any material respect when made;

(c)      The Obligor shall fail to perform or observe any of its covenants contained in. Sections 4.02, 8.01(b), 8.01(c) or 8.02 or the Bank of Zaire shall fail to perform or observe any of its covenants contained in Sections 9.01(a) or 9.03;

(d)      The Obligor or the Bank of Zaire shall fail to perform or observe any term, covenant or agreement contained in this Agreement on its part to be performed or observed (other than those covered by subsections (a), (b) or (c) above) and any such failure shall remain unremedied for 30 days after written notice thereof shall have been given to the Obligor, or to the Bank of Zaire with a copy to the Obligor, as may be appropriate, by the Servicing Bank or any Agent;

(e)      The Obligor, the Bank of Zaire or any Governmental Agency or Governmental Enterprise shall fail to pay (i) any External Indebtedness (other than in respect of any Credit) of the Obligor, the Bank of Zaire or such Governmental Agency or Governmental Enterprise (as the case may be), or any interest or premium thereon, or (ii) any sum, not constituting External Indebtedness, owing to any Bank with respect to any such External Indebtedness (other than in respect of any Credit and other than any sum guaranteed or insured by any governmental credit export agency), whether or not such External Indebtedness remains outstanding, in each case when due (whether at scheduled maturity or by required prepayment, acceleration, demand or otherwise) and such failure shall continue after the applicable grace period, if any, specified in the agreement or instrument relating to such External Indebtedness; provided that with respect to any such External Indebtedness or any such sum outstanding on the date hereof, any such non-payment when due shall not constitute an Event of Default under this subsection (e) until the day on which any refinancing or rescheduling agreement with respect to such currently outstanding External Indebtedness or such sum becomes effective in accordance with its terms and such External Indebtedness or such sum shall not be paid when due in accordance with the terms of such refinancing or rescheduling agreement, after any applicable grace period provided therein; and provided further that the foregoing proviso shall not apply to any such External Indebtedness, interest, premium or sum with respect to which any creditor initiates legal proceedings or takes any other action or exercises any other contractual or legal remedy in order to receive payment of such External Indebtedness, interest, premium or sum rather than refinance or reschedule such External Indebtedness, interest, premium or sum on payment terms no more favorable to such External Indebtedness, interest, premium or sum than this Agreement is to the Credits;

(f)      External Indebtedness of the Obligor, the Bank of Zaire or any Governmental Agency or Governmental Enterprise exceeding in the aggregate $1,000,000 (or its equivalent in other currencies) during any period of twelve consecutive months shall be declared to be due and payable, or required to be prepaid (other than by a regularly scheduled required prepayment) prior to the stated maturity thereof; provided that with respect to any such.  External Indebtedness outstanding on the date hereof, any such

declaration or requirement shall not constitute an Event of Default under this subsection (f) unless it is made pursuant to any refinancing or rescheduling agreement entered into after the date of this Agreement with respect to such currently outstanding External Indebtedness; and provided further that the foregoing proviso shall not apply to any such currently outstanding External Indebtedness with respect to which any creditor initiates legal proceedings or takes any other action or exercises any other contractual or legal remedy in order to receive payment of such External Indebtedness rather than refinance or reschedule such External Indebtedness on payment terms no more favorable to such External Indebtedness than this Agreement is to the Credits;

(g)      The Obligor shall cease to be a member, or shall cease to be entitled to use the general resources, of the IMF;

(h)      The Obligor shall cease to be a member of or shall be suspended from membership in the IBRD, and the Majority Banks or all Agents shall determine in their sole discretion that such cessation or suspension shall constitute an Event of Default;

(i)      The Bank of Zaire shall not at all times remain the central bank of the Republic of Zaire;

(j)      The Bank of Zaire shall not at all times hold substantially all of (i) the International Monetary Assets and (ii) the gold owned by the Obligor, the Bank of Zaire and the Governmental Agencies;

(k)      The validity of this Agreement shall be contested by the Obligor or the Bank of Zaire, or the Obligor or the Bank of Zaire shall deny liability hereunder (whether by a general suspension of payments or a moratorium on the payment of External Indebtedness or otherwise), or any change in any treaty, law, regulation, communique, decree, ordinance or policy of the Obligor or the Bank of Zaire shall occur which purports to render any material provision of this Agreement invalid or unenforceable or which purports to prevent or materially delay the performance or observance by the Obligor or the Bank of Zaire of their respective obligations hereunder;

(l)      The payment terms of any refinancing or rescheduling of any Other Credit shall provide more favorable payment to other creditors than the payment terms of this Agreement provide with respect to the Credits, and the Majority Banks or all Agents shall determine in their sole discretion that such condition shall constitute an Event of Default; or

(m)      Any event or condition (including, without limitation, any material adverse change in the economic or financial condition of the Obligor or the Bank of Zaire) shall occur which gives reasonable grounds to conclude that the Obligor or the Bank of Zaire will not pay any amount when it becomes due under this Agreement."  Credit Agreement § 10.01.

21.      Section 10.02(c) of the Credit Agreement provides:

"SECTION 10.02.  Effects of Events of Default.

16

\*\*\*

(c)      Action by Bank Raving a Single Bank Credit.  If (i) any Event of Default referred to in Section 10.01 shall occur and be continuing at any time after the Effective Date and (ii) any Credit of any Bank is the subject of a Declaration given pursuant to Section 10.02(b), such Bank may, by notice to the Obligor, declare the entire unpaid principal amount of each Single Bank Credit of such Bank, all interest accrued and unpaid thereon and all other amounts payable under this Agreement with respect to such Credit to be forthwith due and payable, whereupon such Credit, all such accrued interest and all such amounts shall become and be forthwith due and payable, without presentment, demand, protest or further notice of any kind, all of which are hereby expressly waived by the Obligor; provided that no such notice of any declaration (a "Declaration") under this subsection (c) shall be effective with respect to any Single Bank Credit until the Declaration referred to in clause (ii) of this subsection (c) is effective in accordance with the proviso of Section 10.02(b).  Each Bank shall give immediate notice of any Declaration to each Bank, each Agent and the Servicing Bank, but failure to give such notice shall not affect the effectiveness of such Declaration."  Credit Agreement § 10.02(c).

22.      Section 12.02 of the Credit Agreement provides:

"SECTION 12.02. Notices, Etc.  All notices and other communications … be in writing … and mailed or sent or delivered (a) as to each of the Obligor, the bank of Zaire …, (b) as to each Bank … and (c) as to each party…. All such notices and communications shall be effective, when delivered by hand, or when deposited in the mails, air mail, postage prepaid, and, in the case of telegraph or cable, when sent addressed as set forth above, and, in the case of telex, when the telex is sent and the appropriate answerback is received. All notices, communications and other documents delivered hereunder shall, unless submitted in the English language, be accompanied by a certified English translation thereof."  Credit Agreement § 12.02.

23.      Section 12.05(a)(iv) of the Credit Agreement provides:

"SECTION 12.05. Costs and Expenses. (a) The Obligor agrees to pay, in the currency in which incurred:

\*\*\*

(iv)  to each Bank and Agent upon its demand all out-of-pocket expenses (including, without limitation, all counsel fees and court costs, stamp taxes, duties and fees) incurred in connection with investigating any Event of Default or enforcing this Agreement or suing for or collecting any overdue amount payable by the Obligor hereunder or otherwise protecting its rights in the event of any failure by the Obligor or Bank of Zaire to comply with the provisions hereof . . . ."  Credit Agreement § 12.05(a)(iv).

24.      Section 12.07 of the Credit Agreement provides:

"SECTION 12.07.  Consent to Jurisdiction; Waiver  of Immunities.

(a) The Obligor and the Bank of Zaire each hereby irrevocably submits to the non-exclusive jurisdiction of the High Court of Justice in London and any New York State or United States Federal court sitting in the Borough of Manhattan of New York City and any appellate court from any thereof in any action or proceeding arising out of or relating to this Agreement, and the Obligor and the Bank of Zaire each hereby irrevocably agrees that all claims in respect of any such action or proceeding may be heard and determined in the High Court of Justice in London or such New York State court or, to the fullest extent permitted by law, such United States Federal court or any such appellate court. The Obligor and the Bank of Zaire each hereby irrevocably appoints (i) The Law Debenture Corporation, Limited (the 'London Process Agent'), with an office on the date hereof at Estates House, 66 Gresham Street, London EC2V 7HX, England, as its agent to receive on behalf of it and its property service of copies of the summons and complaint and any other process which may be served in any such action or proceeding before the High Court of Justice in London and (ii) CT Corporation System (the 'New York Process Agent', and together with the London Process Agent being collectively the 'Process Agents' and each a 'Process Agent'), with an office on the date hereof at 277 Park Avenue, New York, New York 10017, United States, as its agent to receive on behalf of it and its property service of copies of the summons and complaint and any other process which may be served in any such action or proceeding before any such New York State or United States Federal Court.  Such service may be made by delivering a copy of such process to the Obligor or the Bank of Zaire, as the case may be, in care of the appropriate Process Agent at such Process Agent's address, and the Obligor and the Bank of Zaire each hereby irrevocably authorizes and directs each Process Agent to accept such service on its behalf.  The Obligor and the Bank of Zaire agree that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

(b)     Nothing in this Section 12.07 shall affect the right of any Bank or Agent or the Servicing Bank to serve legal process in any other manner permitted by law or affect the right of any Bank or Agent or the Service Bank to bring any action or proceeding against the Obligor or the Bank of Zaire or their respective property in the courts of other jurisdictions.

(c)     To the extent that the Obligor or the Bank of Zaire may be entitled, in any jurisdiction in which any suit, action or proceeding may at any time be commenced with respect to this Agreement or any judgment based on its obligations hereunder, to claim for itself or its Assets or the Assets of any Governmental  Agency immunity from suit, from the jurisdiction of any Court (including without limitation any court of the United States of America, the State of New York or the United Kingdom), from attachment prior to judgment, from attachment in aid of execution on a judgment, from execution on a judgment or from the giving of any other relief or issue of any process, or to the extent that in any such jurisdiction there may be attributed such an immunity (whether or not claimed), the Obligor and the Bank of Zaire each irrevocably agrees not to claim and irrevocably waives any and all such immunity to the fullest extent now or hereafter permitted under the laws of the jurisdiction in which any such suit, action or proceeding may be commenced and (without limiting the generality of the foregoing) consents

generally for the purposes of the State Immunity Act of 1978 of the United Kingdom to the giving of any relief or the issue of any process. Credit Agreement § 12.07.

25.     Section 12.09(b)(ii-iii) of the Credit Agreement provides:

"SECTION 12.09. <u>Lending Office; Assignments</u>.

***

(b) <u>Assignment by any Bank</u>.  Any Bank may at any time after the Effective Date assign its rights and obligations under this Agreement with respect to each Credit of such Bank as a whole to another bank or financial institution (an 'Assignee'); <u>provided</u> that

***

(ii) the Obligor, the Servicing Bank and each Agent of such Bank may continue (A) to treat such Bank as a Bank named herein for all purposes hereof (including payments) until the Obligor, the Servicing Bank and each such Agent shall have received written notice of such assignment signed by such Bank and (B) to treat such Bank as a Bank named herein for all purposes hereof (other than payments) until the Obligor, the Servicing Bank and each such Agent shall have received an agreement (in form satisfactory to the Servicing Bank and each such Agent) signed by the Assignee that the Assignee is bound by this Agreement as fully and to the same extent as if originally named as a Bank herein; and

(iii) upon compliance with subclause (A) of clause (ii) above, all payments in respect of the Credit assigned shall be made to the Assignee and upon compliance with subclause (B) of clause (ii) above, the Assignee shall become a 'Bank' for all purposes hereof with respect to the rights and obligations assigned to it and the rights and obligations of the assigning Bank shall terminate."  Credit Agreement §12.09(b)(ii-iii).

26.     Section 12.09(d) of the Credit Agreement provides:

"(d) <u>Special Definitions</u>.  As used in this Section, 'assign' means assign or otherwise transfer; 'rights' means any rights or other benefits; and "Controlled Affiliate" of a Bank means any corporation directly or indirectly controlled by, controlling or under common control with such Bank.  For purposes of the foregoing definition, a Person 'controls' a corporation if such Person beneficially owns more than 50% of the capital stock or equity interest having voting power under ordinary circumstances in such corporation."  Credit Agreement § 12.09(d).

27.     Section 12.10 of the Credit Agreement provides:

"SECTION 12.10.  <u>Governing Law</u>.  This Agreement has been negotiated, prepared, executed and delivered in several jurisdictions.  Furthermore, the Servicing Bank, the Agents and the Banks are organized under the laws of various jurisdictions different from that of the Obligor and the Bank of Zaire.  Accordingly, in order to establish a certain body of well-developed commercial law to govern this Agreement, the parties hereto

19

have expressly agreed that this Agreement shall be governed by, and construed in accordance with, the laws of the State of New York, United States of America, without giving effect to the principles of choice of laws thereof." Credit Agreement § 12.10.

28.     Exhibit 1 to the Credit Agreement is a document titled "FORM OF CERTIFICATION OF GOVERNMENT APPROVALS" which is a form letter addressed to "the Banks, Agents and Servicing Bank parties to the Refinancing Credit Agreement referred to below" and is meant to be signed by Director of the Office of the Presidency of the Republic of Zaire.  The form letter in Exhibit 1 reads:

"Gentlemen:

Annexed hereto is a photocopy. of Ordonnance No. _____ of the President of the Republic of Zaire (together with an accurate and complete English translation thereof), which is in full force and effect on the date hereof and constitutes the sole legislative, administrative or other governmental authorization or approval necessary with respect to the execution, delivery and performance by the Republic of Zaire (the 'Obligor') and the Bank of Zaire of the Refinancing Credit Agreement dated as of March 31, 1980 among the Obligor, the Bank of Zaire; and each of you, including without limitation the making, at the time and place required, of all payments by the Obligor thereunder in the currency specified therein for each such payment." Credit Agreement, Exhibit 1.

29.     Exhibit 2 to the Credit Agreement is a document titled "FORM OF INCUMBENCY CERTIFICATE FOR THE OBLIGOR AND THE GOVERNOR OF THE BANK OF ZAIRE" which is a form statement meant to be signed by Director of the Office of the Presidency of the Republic of Zaire.   The form statement in Exhibit 2 reads:

"I, Maitre Nimy Mayidika Ngimbi, Director of the Office of the Presidency of the Republic of Zaire, in connection with the execution, delivery and performance by the Republic of Zaire (the 'Obligor') and the Bank of Zaire of the Refinancing Credit Agreement dated as of March 31, 1980 (the 'Agreement') among the Obligor, the Bank of Zaire and the Banks, Agents and Servicing Bank parties thereto, DO HEREBY CERTIFY:

1.     That the below named person on the date hereof is the duly appointed Commissaire d'Etat aux Finances et Budget of the Obligor, is duly authorized to execute the Agreement and the other documents to be delivered thereunder on behalf of the Obligor, and has signed this Certificate in the space below opposite his name with his true signature:

M. Namwisi Ma Koyi _____

2.     That the below named person on the date hereof is the duly appointed Governor of the Bank of Zaire and has signed this certificate in the space below opposite his name with his true signature:

M. Emony Mondanga _____

20

IN WITNESS WHEREOF I have hereunder affixed my signature as of the date set forth above." Credit Agreement, Exhibit 2.

## II.    PROOF OF PLAINTIFFS' OWNERSHIP/STANDING

30.    On February 16, 2007, Mick Karima and Michel Losembe of Citibank wrote a letter to Marco Banguli, the Minister of Finance, copying Jean Claude Masangu Mulongo ("Masangu") as Governor of the Central Bank, regarding "London Club – Consent request for debt assignment," (the "**February 16, 2007 Letter**").  DRC00004127, Ex. 77.

31.    The February 16, 2007 Letter reads:

"The purpose of this letter is to inform you of Citibank N.A.'s intent to assign its rights and obligations on its debts on the Democratic Republic of Congo in the context of the London Club, in accordance with the terms of the March 31, 1980 Credit Refinancing Agreement.

Indeed, the Agreement provides for the possibility that the signatories might transfer all or part of their debt to another institution which thenceforth would take its place in all of its rights and obligations and commit itself to respect the terms of the Agreement.

As such, Citibank N.A. would like to transfer its debts of 1[scribble],387,500.00 (credit information schedule A7) in principal plus accumulated interest, to the company RED BARN CAPITAL LLC.

The Agreement stipulates that the Democratic Republic of Congo be notified of any transfer (both the Central Bank of Congo and the Ministry of Finance) and that consent be obtained. You will find said notification attached, together with the formal consent request written in English, the language of the Agreement.

We hope that you will kindly consider our request and that you will have a favorable reply."  DRC00004127, Ex. 77

32.    The February 16, 2007 Letter attaches a document entitled "Request for Consent" that is sent by Citibank to Marco Banguli, the Minister of Finance and Masangu, the Governor of the Central Bank, copying Red Barn Capital LLC as assignee regarding "Refinancing Credit Agreement dated as of March 31, 1980, among the Republic of Zaire (now the Democratic Republic of the Congo) as Obligor, Bank of Zaire as the Central Bank of Zaire (now the Central Bank of the Democratic Republic of the Congo), the Agent banks named therein, the creditor Banks named therein and the Bank of Tokyo Trust Company (now delegated to the Union Bank of California) as Serving Bank (the "Agreement"), (the "**February 16, 2007 Request**"). DRC00004129, Ex. 77.

33.    The February 16, 2007, Request reads:

"1. WE REFER TO SECTION 12.09 OF THE AGREEMENT. TERMS USED HEREIN SHALL HAVE THE SAME MEANING AS USED THEREIN.  2. CITIBANK, N.A ADVISES YOU OF ITS INTENT TO ASSIGN ITS RIGHTS AND TRANFER ITS

21

OBLIGATIONS IN RESPECT OF US $13,387,500.00 PRINCIPAL UNDER CREDIT INFORMATION SCHEDULE A7 TO THE ABOVE AGREEMENT, PLUS ALL ACCRUED AND UNPAID INTEREST THEREON, TO RED BARN CAPITAL LLC, A LIMITED LIABILITY COMPANY ESTABLISHED UNDER THE LAWS OF THE STATE OF DELAWARE, USA"  DRC00004129, Ex. 77.

34.    On May 15, 2007, Mick Karima and Michel Losembe of Citibank wrote a letter to Masangu, copying Athanase Matenda, Minister of Finance regarding "London Club – notification of assignment of debt," (the "**May 15, 2007 Letter**").  DRC00004122, Ex. 77.

35.    The May 15, 2007 Letter reads:

"We are pleased to send you herein an original copy of the notification of assignment of debt between Citibank NA and Standard Bank Plc, relative to the London Club credit information schedules A1, A26 and A14A. This document is being sent to you as a guarantor to within the March 31, 1980 Credit Refinancing Agreement of.

Indeed, as you were informed by our consent request from last February 16th (a copy of which is attached), on March 14, 2007, Citibank NA finalized the assignment of debt on the Democratic Republic of Congo for . . .  in accordance with Section 12.09 of the Agreement. Standard Bank plc, thenceforth took the place of Citibank NA in all rights, titles, interests and obligations as of March 14, 2007.

We remain entirely at your disposal for any further information that you might need on the preceding.

We hope for safe receipt of this letter and we send you, Mr. Governor, our highest regards."  DRC00004122, Ex. 77.

36.    A copy of the May 15, 2007 Letter was sent to Mr. Athanase Matenda, Minister of Finance of the DRC  DRC00004123, Ex. 77.

37.    Plaintiffs acquired the Defendants' debt from original creditors in the secondary market, as reflected in the final deeds of assignments, dated August 5, 2008, as to plaintiff Themis, and February 2, 2009, as to Plaintiff Des Moines.  These deeds identify the former owners of the debt and trace the various transfers from those owners, through other banks, and ultimately, to Themis and Des Moines. The deeds reflect that Red Barn Capital, LLC, assigned its interest to Themis, and that Main Street Capital, LLC, assigned its interest to Des Moines. April 18, 2013 Court Opinion at p. 2.

38.    The August 5, 2008 Themis deed of assignment  (the "**August 5, 2008 Themis Deed**") reads in, in part:

"DEED OF ASSIGNMENT (this 'Deed of Assignment'), dated as of August 5, 2008, between Red Barn Capital, LLC, as assignor (the 'Assignor'), and Themis Capital, as assignee (the 'Assignee') . . . .

1. <u>Assignment and Transfer of the Transferred Interests</u>. Effective as of the date hereof, the Assignor hereby transfers, conveys and assigns to the Assignee the following assets, interests and obligations (collectively, the-'<u>Transferred Interests</u>'), free and clear of any claims, pledges, liens, adverse claim's or other encumbrances:

(i) All rights, title, interest and obligations of the Assignor under or pursuant to the Credit Agreement and/or the 1972 Existing Agreement insofar as they relate to payment obligations of the Republic owing to the Assignor in the principal amount equal to US$9,562,500.00, together with all unpaid and accrued interest and/or other related payment obligations under the Credit Agreement and/or the 1972 Existing Agreement (the '1972 Existing Agreement Transferred Interests'); and

(ii) All rights, title and interest and obligations of the Assignor under or pursuant to the Credit Agreement and/or the 1973 Existing Agreement insofar as they relate to payment obligations of the Republic owing to the Assignor in the principal amount equal to US$459,999,97, together with all unpaid and accrued interest and/or other related payment obligations under the Credit Agreement and/or the 1973 Existing Agreement (the '1973 Existing Agreement Transferred interests') . . . .

2. <u>Assumption of Certain Obligations by the Assignee</u>. The Assignee hereby agrees to become a beneficiary of, and agrees to be bound by, the provisions of the Credit Agreement to the same extent as if it were a party to the Credit Agreement in respect of its interest in the Transferred Interests, . . ."  PLAINTIFFS0000495-98, Ex. 55.

39.     The August 5, 2008 Themis Deed was signed by Beth Peoples, Manager of Red Barn Capital, LLC, sealed and delivered in the presence of Michelle Dreyer and Suzanne Hay, and signed by N.D. Nominees Ltd. And Mourant Cayman Corporate Services, Ltd. for Themis Capital.  PLAINTIFFS0000495-98, Ex. 55.

40.     Attached to August 5, 2008 Themis Deed is an ACKNOWLEDGEMENT OF CONVEYANCE. PLAINTIFFS0000499, Ex. 55.

41.     On August 5, 2008, a notice of assignment (the "**August 5, 2008 Themis Notice of Assignment**") was sent to the Democratic Republic of Congo (Attn: Commissaire D'Etat Aux Finances et Budget), The Central Bank of Congo (Attn: Governor), Union Bank, as Servicing Bank (Attn: Hugo Gindraux), Red Barn Capital, LLC as Assignor and Agent Bank (Attn: Karen Severino), and Themis Capital (Attn: The Directors) with the subject line "Refinancing Credit Agreement, dated as of March 31, 1980, among the Republic of Zaire (now the Democratic Republic of Congo) as Obligor, Bank of Zaire as the Central Bank of the Republic of Zaire (now the Central Bank of the Democratic Republic of Congo), the Agent banks named therein, the creditor Banks named therein, and the Bank of Tokyo Trust Company (now delegated to the Union Bank of California) as Servicing Bank (the "Agreement")."  The August 5, 2008 Themis Notice of Assignment was signed by Beth Peoples for Red Barn Capital and N.D. Nominees Ltd., Director for Themis Capital. PLAINTIFFS0000500, Ex. 56.

42.     The August 5, 2008 Themis Notice of Assignment reads, in part:

"2. This constitutes notice to each of you, pursuant to Section 12.09 of the Agreement, of the assignment by Red Barn Capital, LLC (the 'Assignor') to Themis Capital (the 'Assignee') of all the Assignor's rights, title: interest, benefits and obligations under the Agreement and in the Credit(s) described below owing to the Assignor under the Agreement (collectively, the 'Transferred Interests'):

(i) Currency USD Principal amount assigned 9,562,500.00 (together with all unpaid and accrued interest thereon)

This Credit is further identified as follows: Credit Information Schedule A-7; original Agent Citibank, N.A..; Existing Agreement identified as Credit Agreement, dated August 25, 1972, The Republic of Zaire, U.S.$50,000,000. For the avoidance of doubt, this Credit does not include (a) the partial Credit corresponding to a sub-participation in a principal amount equal to US $1,912,500.00 under Schedule A-7 which sub-participation was granted to Sumitomo Bank,. Ltd, by Citibank, N.A. on or about February 28, 1973, or (b) the partial Credit corresponding to a sub-participation in a principal amount equal to US $1,912,500.00 under Schedule A-7, which sub-participation, together with the corresponding partial Credit, was purportedly assigned to Belgolaise Bank by ANZ Grindlay's Bank plc on or about December 2, 1992; and

(ii) Currency USD Principal amount assigned 459,999.97 (together with all unpaid and accrued interest thereon)

This Credit is further identified as follows: Credit Information Schedule A-16; original Agent Grindlays Brandts Limited, successor Belgolaise Bank; Existing Agreement identified as Agreement, dated July 23, 1973, The Republic of Zaire, U.S.$60,000,000.

3. Request for consent to the assignment of the Transferred Interests between the Assignor and the Assignee was delivered via DHL to the Democratic Republic of Congo, Department Des Finances et Budget, Ministere des Finances, on June 27, 2008, and such consent was deemed given on July 29, 2008.

4. The assignment of the Transferred Interests between the Assignor and the Assignee shall become effective as of August 5, 2008. As of such date, the Assignee shall succeed to all the Assignor's rights, title and interests in and to the Transferred Interests as fully and to the same extent as if it were an original Bank party to the Agreement in respect of the Transferred Interests.

5. In accordance with the provisions of Section 12.09 of the Agreement and in consideration of your treating the Assignee as having the same rights in respect of the Transferred Interests as it would have had, had it been an original Bank party to the Agreement in respect of the Transferred Interests, the Assignee hereby agrees for the benefit of the parties to the Agreement that it is bound by the obligations of the Assignor under the Agreement with respect to the Transferred Interests as fully and to the same extent as if it were an original Bank party to the Agreement in respect of the Transferred Interests." PLAINTIFFS0000500-02, Ex. 56.

24

43.     The February 2, 2009 Des Moines deed of assignment (the "**February 2, 2009 Des Moines Deed**") reads, in part:

"DEED OF ASSIGNMENT (this 'Deed of Assignment'), dated as of February 2, 2009, between Main Street Capital, LLC, as assignor (the 'Assignor'), and Des Moines Investments Ltd., as assignee (the 'Assignee') . . . .

1. Assignment and Transfer of the Transferred Interests. Effective as of the date hereof, the Assignor hereby transfers, conveys and assigns to the Assignee the following assets, interests and obligations (collectively, the 'Transferred Interests'), free and clear of any claims, pledges, liens, adverse claims or other encumbrances:

(i) All rights, title, interest and obligations of the Assignor under or pursuant to the Credit Agreement and/or the A-1 Agreement insofar as they relate to payment obligations of the Republic owing to the Assignor in the principal amount equal to US$487,900.00, together with all unpaid and accrued interest and/or other related payment obligations under the Credit Agreement and/or the A-1 Agreement (the 'A-1 Agreement Transferred Interests');

(ii) All rights, title, interest and obligations of the Assignor under or pursuant to the Credit Agreement and/or the A-2 Agreement insofar as they relate to payment obligations of the Republic owing to the Assignor in the principal amount equal to US$308,463.08, together with all unpaid and accrued interest and/or other related payment obligations under the Credit Agreement and/or the A-2 Agreement (the 'A-2 Agreement Transferred Interests');

(iii) All rights, title, interest and obligations of the Assignor under or pursuant to the Credit Agreement and/or the A-14 Agreement insofar as they relate to payment obligations of the Republic owing to the Assignor in the principal amount equal to US$483,125.00, together with all unpaid and accrued interest and/or other related payment obligations under the Credit Agreement and/or the A-14 Agreement (the 'Electro Banque A-14 Agreement Transferred Interests')

(iv) All rights, title, interest and obligations of the Assignor under or pursuant to the Credit Agreement and/or the A-14 Agreement insofar as they relate to payment obligations of the Republic owing to the Assignor in the principal amount equal to US$1,449,375.00, together with all unpaid and accrued interest and/or other related payment obligations under the Credit Agreement and/or the A-14 Agreement (the 'Citibank A-14 Agreement Transferred Interests');

(v) All rights, title, interest and obligations of the Assignor under or pursuant to the Credit Agreement and/or the A-19 Agreement insofar as they relate to payment obligations of the Republic owing to the Assignor in the principal amount equal to US$254,472.50, together with all unpaid and accrued interest and/or other related payment obligations under the Credit Agreement and/or the A-19 Agreement (the 'A-19 Agreement Transferred Interests');

25

(vi) All rights, title, interest and obligations of the Assignor under or pursuant to the Credit Agreement and/or the A-21 Agreement insofar as they relate to payment obligations of the Republic owing to the Assignor in the principal amount equal to US$308,451.77, together with all unpaid and accrued interest and/or other related payment obligations under the Credit Agreement and/or the A-21 Agreement (the 'A-21 Agreement Transferred Interests'); and

(vii) All rights, title, interest and obligations of the Assignor under or pursuant to the Credit Agreement and/or the A-26 Agreement insofar as they relate to payment obligations of the Republic owing to the Assignor in the principal amount equal to US$4,689,271.00, together with all unpaid and accrued interest and/or other related payment obligations under the Credit Agreement and/or the A-26 Agreement (the 'A-26 Agreement Transferred Interests') . . .

2. Assumption of Certain Obligations by the Assignee. The Assignee hereby agrees to become a beneficiary of, and agrees to be bound by, the provisions of the Credit Agreement to the same extent as if it were a party to the Credit Agreement in respect of its interest in the Transferred Interests, . . ."  PLAINTIFFS0000446-50, Ex. 57.

44.    The February 2, 2009 Des Moines Deed was signed by Kari Johnson, Manager of Main Street Capital, LLC, and signed by Gwenyth Vanterpool of Westlaw Limited and Janice Beazer of Torman Limited for Des Moines Investments Ltd.  PLAINTIFFS0000450, Ex. 57.

45.    Attached to the February 2, 2009 Des Moines Deed is an "ACKNOWLEDGEMENT OF CONVEYANCE". PLAINTIFFS0000451, Ex. 58.

46.    On February 2, 2009, four separate Notices of Assignment were sent to the Democratic Republic of Congo (Attn: Commissaire D'Etat Aux Finances et Budget), The Central Bank of Congo (Attn: Governor), Union Bank, as Servicing Bank (Attn: Hugo Gindraux), Main Street Capital, LLC as Assignor and Agent Bank (Attn: Kari Johnson), and Des Moines Investments Ltd. (Attn: Gwenyth Vanterpool) all with the subject line "Refinancing Credit Agreement, dated as of March 31, 1980, among the Republic of Zaire (now the Democratic Republic of Congo) as Obligor, Bank of Zaire as the Central Bank of the Republic of Zaire (now the Central Bank of the Democratic Republic of Congo), the Agent banks named therein, the creditor Banks named therein, and the Bank of Tokyo Trust Company (now delegated to the Union Bank of California) as Servicing Bank (the "Agreement") (the "**February 2, 2009 Des Moines Notices of Assignment**").  Each of these notices was signed by Kari Johnson for Main Street Capital and signed by Gwenyth Vanterpool of Westlaw Limited and Janice Beazer of Torman Limited for Des Moines Investments Ltd. PLAINTIFFS0000452-66, Ex. 58.

47.    Each of the February 2, 2009 Des Moines Notices of Assignment reads, in part:

  "2. This constitutes notice to each of you, pursuant to Section 12.09 of the Agreement, of the assignment by Main Street Capital, LLC (the 'Assignor') to  Des Moines Investments Ltd. (the 'Assignee') of all the Assignor's rights, title: interest, benefits and

obligations under the Agreement and in the Credit(s) described below owing to the Assignor under the Agreement (collectively, the 'Transferred Interests'):

***

3. Request for consent to the assignment of the Transferred Interests between the Assignor and the Assignee was delivered via DHL to the Democratic Republic of Congo, Department Des Finances et Budget, Ministere des Finances, on January 6, 2009, and such consent was deemed given on January 28, 2009.

4. The assignment of the Transferred Interests between the Assignor and the Assignee shall become effective as of January 28, 2009. As of such date, the Assignee shall succeed to all the Assignor's rights, title and interests in and to the Transferred Interests as fully and to the same extent as if it were an original Bank party to the Agreement in respect of the Transferred Interests.

5. In accordance with the provisions of Section 12.09 of the Agreement and in consideration of your treating the Assignee as having the same rights in respect of the Transferred Interests as it would have had, had it been an original Bank party to the Agreement in respect of the Transferred Interests, the Assignee hereby agrees for the benefit of the parties to the Agreement that it is bound by the obligations of the Assignor under the Agreement with respect to the Transferred Interests as fully and to the same extent as if it were an original Bank party to the Agreement in respect of the Transferred Interests." PLAINTIFFS0000452-66, Ex. 58.

48.     In each of the February 2, 2009 Des Moines Notices of Assignment, the Transferred Interests are defined as follows:

"(i)     Currency        Principal amount assigned
         USD             1,836,875.00 (together with all unpaid and accrued interest
                         thereon)

This Credit is further identified as follows: Credit Information Schedule A-14(A); original Agent Credit Commercial de France, successor Agent Red Barn Capital, LLC; Existing Agreement identified as Convention de Pret, dated June 28, 1974, Republique du Zaire, U.S. $20,000,000;

(ii)     Currency        Principal amount assigned
         USD             95,625.00 (together with all unpaid and accrued interest thereon)

This Credit is further identified as follows: Credit Information Schedule A-14(B); original Agent Credit Commercial de France, successor Agent Red Barn Capital, LLC; Existing Agreement identified as Convention de Pret, dated June 28, 1974, Republique du Zaire, U.S. $20,000,000;

(iii)    Currency        Principal amount assigned
         USD             308,451.77 (together with all unpaid and accrued interest thereon)

27

This Credit is further identified as follows: Credit Information Schedule A-21; original Agent Societe Generale de Banque S.A., successor Agent Red Barn Capital, LLC; Existing Agreement identified as Convention de Credit, dated August 29, 1972, Republique du Zaire, U.S. $20,000,000 . . . ." PLAINTIFFS0000453, Ex. 58.

***

"(i)     Currency          Principal amount assigned
         USD               4,689,271.00 (together with all unpaid and accrued interest thereon)

This Credit is further identified as follows: Credit Information Schedule A-26; original Agent Citibank, N.A.; Existing Agreement identified as Eurodollar Credit Agreement, dated April 8, 1974, Republic of Zaire, as Borrower, U.S. $7,419,300 . . . ." PLAINTIFFS0000457, Ex. 58.

***

"(i)     Currency          Principal amount assigned
         USD               254,472.50 (together with all unpaid and accrued interest thereon)

This Credit is further identified as follows: Credit Information Schedule A-19; original Agent Morgan Guaranty Trust Co. of New York (now JPMorgan Chase); Existing Agreement identified as Loan Agreement, dated July 20, 1971, The Democratic Republic of the Congo U.S. $30,000,000 . . . ." PLAINTIFFS0000461, Ex. 58.

***

"(i)     Currency           Principal amount assigned
         USD                487,900.00 (together with all unpaid and accrued interest thereon)

This Credit is further identified as follows: Credit Information Schedule A-1; original Agent Bankers Trust Co. (now Deutsche Bank); Existing Agreement identified as Eurodolar Loan Agreement, dated October 30, 1970, the Democratic Republic of Congo, U.S. $25,000,000;

(ii)     Currency          Principal amount assigned
         USD               308,463.08 (together with all unpaid and accrued interest thereon)

This Credit is further identified as follows; Credit Information Schedule A-2; Bankers Trust Co. (now Deutsche Bank); Existing Agreement identified as Eurodolar Loan Agreement, dated February 16, 1972, Air Zaire, as Borrower, the Republic of Zaire, as Guarantor, U.S. $20,000,000 . . . ." PLAINTIFFS0000464, Ex. 58.

49.     On August 5, 2008, a Notice of Assignment was sent to the DRC Department Des Finances et Budget, Ministere des Finances, Attn: Commissaire D'Etat Aux Finances et Budget

regarding the assignment of Schedule A-7 and A-16 of the Credit Agreement from Red Barn Capital, LLC to Themis Capital.  PLAINTIFFS0000060-63, Ex. 81.

50.    The August 5, 2008 Themis Notice of Assignment constituted proper notice of the assignment of the interests described therein.  The DRC and the Central Bank received proper notice of these assignments.

51.    On August 13, 2008 a FedEx shipment containing the August 5, 2008 Themis Notice of Assignment was sent from Red Barn to "Commissaire D'Etat Aux Finances et The Democratic Republic of Congo and Gouverneur, Central Bk Democratic Repub. Congo" and was delivered to and received by this office.  PLAINTIFFS0000091-99, Ex. 82.

52.    On February 2, 2009 four separate Notices of Assignment were sent to the DRC Department Des Finances et Budget, Ministere des Finances, Attn: Commissaire D'Etat Aux Finances et Budget regarding the assignment of Schedule A-1, A-2, A-14A&B, A-19, A-21 and A-26 of the Credit Agreement from Main Street Capital, LLC to Des Moines Investments Ltd. PLAINTIFFS0000045-59, Ex. 83.

53.    The February 2, 2009 Des Moines Notices of Assignment constituted proper notice of the assignment of the interests described therein. The DRC and the Central Bank received proper notice of these assignments.

54.    On February 4, 2009 a FedEx shipment containing the February 2, 2009 Des Moines Notice of Assignment was sent from Main Street Capital to "Commissaire Detat Aux Fin. Budget, the Democratic Republic of Congo and Governeur, Central Bk Democratic Repub. Congo" and was delivered to and received by this office.  PLAINTIFFS0000656-659 , Ex. 84.

55.    On February 4, 2009 a FedEx shipment containing the February 2, 2009 Des Moines Notice of Assignment was sent from Main Street Capital to "Commissaire Detat Aux Fin. Budget, the Democratic Republic of Congo" and was delivered and received and signed for by M. Aseke.  PLAINTIFFS0000003, Ex. 85.

56.    On May 22, 2009, Themis and Des Moines filed a document titled "Amended Complaint" in this action (the "**Amended Complaint**").  Amended Complaint, Ex. 6.

57.    On January 28, 2012, the Defendants filed a document titled "Proposed Answer" in response to the Plaintiffs' Amended Complaint, (the "**Answer**").  Answer, Ex. 7.

58.    In the Amended Complaint at Paragraph 18, Plaintiffs allege that "Themis is the assignee of all rights, title, interest, benefit and obligations under the Credit Agreement corresponding to an aggregate outstanding principal amount of $10,022,499.97 (the "**Themis Interests**")."  Amended Complaint ¶ 18, Ex. 6.

59.    In the Answer, Defendants state that "Defendants admit the allegation of paragraph 18 of the Amended Complaint."  Answer ¶ 18, Ex. 7.

60.    In the Amended Complaint at Paragraph 15, Plaintiffs allege that "Des Moines is the assignee of all rights, title, interest, benefits, and obligations under the Credit Agreement

corresponding to an aggregate outstanding principal amount of $7,981,058.35 (the "**Des Moines Interests**")."  Amended Complaint ¶15, Ex. 6.

61.     In the Answer, Defendants state that "Defendants admit the allegation of paragraph 15 of the Amended Complaint."  Answer ¶ 15, Ex. 7.

62.     In the Amended Complaint at Paragraph 20, Plaintiffs allege that "[N]one of the outstanding principal amount of the Themis Interests has been paid, nor have any corresponding amounts accrued and compounded interest due and owing by Defendants been paid since at least April 2, 1990."  Amended Complaint ¶20, Ex. 6.

63.     In the Answer, Defendants state that "Defendants admit the allegation of paragraph 20 of the Amended Complaint."  Answer ¶20, Ex. 7.

64.     In the Amended Complaint at Paragraph 17, Plaintiffs allege that "[N]one of the outstanding principal amount of the Des Moines Interests has been paid, nor have any corresponding amounts accrued and compounded interest due and owing by Defendants been paid since at least April 2, 1990."  Amended Complaint ¶17, Ex. 6.

65.     In the Answer, Defendants state that "Defendants admit the allegation of paragraph 17 of the Amended Complaint."  Answer ¶17, Ex. 7.

66.     Defendants have not paid any portion of the principal amounts owed to Plaintiffs, and they have not paid any interest to Plaintiffs or their predecessors-in-interest since April 2, 1990.  Defs.' Response to Statement No.7 in Plaintiffs' Rule 56.1 Statement, Ex. 87; July 26, 2012 Opinion and Order at p. 3-4.

67.     Defendants have not paid any interest on overdue amounts or any portion of Plaintiffs' out-of-pocket expenses incurred because of Defendants' default.  Defs.' Response to Statement No.7 in Plaintiffs' Rule 56.1 Statement, Ex. 87

68.     No evidence has been presented that any other person or entity has sued to recover or has recovered on the interests Plaintiffs' claims are based on.

69.     The amounts of principal and interest owed by Defendants to Themis on the debts at issue in this action are set forth in the spreadsheet listed on Plaintiffs' Exhibit List as Exhibit 91.

70.     The amounts of principal and interest owed by Defendants to Des Moines on the debts at issue in this action are set forth in the spreadsheet listed on Plaintiffs' Exhibit List as Exhibit 92.

71.     The amount of legal fees and costs owed by Defendants to Plaintiffs, through October 31, 2013, is approximately $3 million.

72.     The amounts of principal and interest owed by Defendants as of September 30, 2013, pursuant to credit information schedules A-7, A-14(a), A-14(b) and A-21 to the Credit Agreement are set forth in the spreadsheet created by Red Barn Capital, LLC, as Agent Bank for

syndicates A-7, A-14(s), A-14(b) and A-21.  Ex. 105.

## III.   CHRONOLOGY OF FACTS RELEVANT TO APPARENT AUTHORITY AND RATIFICATION

73.   The Commissioner of Finance and Budget of the former Republic of Zaire had authority to bind the DRC to the Credit Agreement.  Defs.' Response to Plaintiffs' Request for Admission  22, Ex. 89.

74.   The Governor of the Central Bank of Zaire signed the Credit Agreement on behalf of the Central Bank.  Defs.' Response to Plaintiffs' Request for Admission 38, Ex. 89.

75.   The Governor of the Central Bank of Zaire had authority to bind the Central Bank to the Credit Agreement. Defs.' Response to Plaintiffs' Request for Admission 39, Ex. 89.

76.   It was a generally recognized duty of the Minister of Finances and Budget of the DRC to acknowledge and renew the obligations of the DRC under the Credit Agreement from the time the Credit Agreement was executed through at least February 25, 2003.

77.   It was a generally recognized duty of the Governor of the Central Bank to acknowledge and renew the obligations of the Central Bank under the Credit Agreement from the time the Credit Agreement was executed through at least February 25, 2003.

78.   The amounts owed by the DRC under the Credit Agreement constitute "London Club" debt.  Defs.' Response to Plaintiffs' Request for Admission 57, Ex. 89.

79.   In 1984, Defendants entered into a "Gentleman's Agreement" and agreed to reschedule the amounts due under the Credit Agreement.  Defs.' Response to Plaintiffs' Request for Admission 49, Ex. 89.

80.   In 1989, Defendants entered into a "Gentleman's Agreement" and agreed to reschedule the amounts due under the Credit Agreement.  Defs.' Response to Plaintiffs' Request for Admission 50, Ex. 89.

81.   In 1991, the Bank of Tokyo retained counsel and initiated efforts to commence a lawsuit against Zaire for non-payment of amounts due under the Credit Agreement. UB00002452-60, Ex. 11.

82.   On March 13, 1991, Ms. Kristy Yee of the Bank of Tokyo administration sent a Memorandum to Mr. Yutaka Saito, S.V.P.  of the Trust and Fiduciary Group of the Bank of Tokyo and Mr. Josefino Y. Bugay, V.P. of the Corporate Trust Department of the Bank of Tokyo, copying Ms. Nancy Coplar, Ms. Jenna Rossheim and Mr. Koichi Fujimoto regarding "The Republic of Zaire Refinancing Credit Agreement dated March, 13, 1991," (the  "**March 13, 1991 Memo**").  UB00002452-60, Ex. 11.

83.   The first paragraph of the March 13, 1991 Memo reads:

"As reported in the last update on the above loan, the Steering Committee (the "Committee") has been trying to obtain an acknowledgement from the Republic of Zaire and Banque du Zaire ("Zaire") of payments due in order to avoid any risk that the six year prescription period established by the New York Statute of Limitations would apply to payments now in default.  The Committee is trying to obtain the debt acknowledgement prior to March 29, 1991.  The following two meetings were held relating to this matter.  A summary of the topics discussed is detailed below for your information."  UB00002452, Ex. 11.

84.     The second page of the March 13, 1991 Memo summarizes a March 12, 1991 meeting attended by Mr. Mitchell Hedstrom and Ms. Chika Kuno of Citibank, Mr. Alfred Mudge of Shearman & Sterling, Mr. Herbert Thornhill of the Bank of Tokyo Legal Department, Ms. Nancy Coplar and Ms. Kristy Yee.  UB00002453, Ex. 11.

85.     The summary of the March 12, 1991, meeting in the March 13, 1991 memo reads:

"Mr. Hedstrom briefed the group on the past events that occurred which have resulted in the Committee decision to take legal action against Zaire.  He noted that payments have been in default since 1982 and that the largest amount falling due in April, 1985 would soon apply to the six-year prescription period established by the New York Statute of Limitations.  Although there has been informal Gentlemen's Agreements made in the past between the Committee and Zaire whereby partial payments by Zaire were resumed for a short period of time, their efforts in renegotiating a new refinancing agreement appear to be fruitless. . . .

The Committee has requested that BOTT [Bank of Tokyo Trust], as Servicing Bank, institute the litigation on behalf of 15 Agent Banks and approximately 72 syndicate members. . . .

The Committee is optimistic that they will obtain the acknowledgement from Zaire at their meeting in Paris during the law week of March; and that any litigation against Zaire would be of the last resort."  UB00002453-54, Ex. 11.

86.     On March 22, 1991, Mr. Pay-Pay wa Syakassighe, the Governor of the Central Bank of Zaire, sent a letter (the "**March 22, 1991 Letter**") to Mr. Jad Khallouf of Crédit Commercial de France. UB000015-16, Ex. 12.

87.     The March 22, 1991 Letter reads:

" Further to the contacts you have had with the Zairian Government Auditors and your correspondence of March 15, 1991, I hereby send you, duly signed by the Zairian Authorities, the document acknowledging the debt of Zaire to the London Club. I will contact you again in the coming days to set the time for the meeting that should be devoted to establishing the guidelines for our future relations."  UB000015-16, Ex. 12

88.     The March 22, 1991 Letter attached a copy of a French translation of a March 20, 1991 acknowledgment letter that was signed, on behalf of Zaire, by the Minister of Finances and Budget, Mr. Bombito Botomba and, on behalf of the Central Bank, by the Governor of the

32

Central Bank of Zaire, Mr. Pay-Pay wa Syakassighe (the "**1991 Acknowledgement Letter**"). UB000015-16, Ex. 12.

89.     There is also an executed English version of the 1991 Acknowledgment Letter CITI0003701-02, Ex. 17.

90.     The 1991 Acknowledgment Letter reads:

"To all parties to the Refinancing Credit Agreement dated as of March 31, 1980 among the Republic of Zaire, Bank of Zaire, the Banks and Agents party thereto and the Bank of Tokyo Trust Company, as Servicing Bank.

The Republic of Zaire and the Bank of Zaire hereby refer to the Refinancing Credit Agreement dated as of March 31, 1980 among the Republic of Zaire, Bank of Zaire, the Banks and Agents party thereto and The Bank of Tokyo Trust Company, as Servicing Bank. The Republic of Zaire and the Bank of Zaire hereby acknowledge and confirm that Schedule 1 hereto sets forth the amounts of past due principal and past due interest as of April 2, 1990 for each Credit Information Schedule under such Refinancing Credit Agreement. The past due interest on principal consists of both interest accrued on principal installments prior to their maturity (regular interest) and interest accrued on overdue principal. The Republic of Zaire and the Bank of Zaire further acknowledge and confirm their respective obligations with respect to such indebtedness and other obligations arising under such Refinancing Credit Agreement. It is the intention of the Republic of Zaire and the Bank of Zaire in executing and delivering this acknowledgement formally to recognize and confirm all such obligations in order to eliminate any concerns any Bank holding any such indebtedness may have due to any possible application of any principals of prescription, including without limitations, those established by the New York statute of limitations, which might lead any Bank to conclude that the forbearance demonstrated to date by such Bank in refraining from acting to enforce any rights it may have to collect such indebtedness might have an adverse effect on the ultimate collectability of such indebtedness." CITI0003701-02, Ex.17

91.     Mr. Masangu identified the 1991 Acknowledgement Letter (Exhibit 4T) in his deposition and confirmed he had seen it before.  Masangu Dep. at 87:18-88:6; CITI0003701-02, Ex.17.

92.     The 1991 Acknowledgement Letter includes an attachment entitled: "Refinancing Credit Agreement Dated as of March 31, 1980 Past Due Principal Past Due Interest on Principal As of April 2, 1990" which lists amounts of past due principal, regular interest and interest on overdue principal owed under various Credit Information Schedules attached to the Credit Agreement.  CITI 0003703, Ex. 17.

93.     Ms. Cecilia Bartner of Citibank ("**Bartner**") identified the 1991 Acknowledgement Letter and attachment (Bartner Ex. 4) in her deposition.  Bartner Dep. 62:16-63:18; CITI0003701-02, Ex.17.

94.     The Defendants produced a copy of the 1991 Acknowledgement Letter during discovery in this litigation.  DRC00003577; Ex. 27.

95.     The DRC, as principal, engaged in conduct which caused the Plaintiffs' predecessors-in-interest to believe that Mr. Bombito Botomba had authority to sign and bind the DRC to the 1991 Acknowledgement Letter.

96.     The Central Bank, as principal, engaged in conduct which caused the Plaintiffs' predecessors-in-interest to believe that Mr. Pay-Pay wa Syakassighe had authority to sign and bind the Central Bank to the 1991 Acknowledgement Letter.

97.     Based on the totality of the circumstances, it was reasonable for Plaintiffs' predecessors-in-interest to rely on the apparent authority of the Minister of Finances and Budget to bind Zaire to the 1991 Acknowledgement Letter.

98.     Based on the totality of the circumstances, it was reasonable for Plaintiffs' predecessors-in-interest to rely on the apparent authority of the Governor of the Central Bank to bind the Central Bank to the 1991 Acknowledgement Letter.

99.     Zaire intended for Plaintiffs' predecessors-in-interest to rely on the validity of the 1991 Acknowledgement Letter and forego suing to enforce their rights under the Credit Agreement.

100.    The Central Bank intended for Plaintiffs' predecessors-in-interest to rely on the validity of the 1991 Acknowledgement Letter and to forego suing to enforce their rights under the Credit Agreement.

101.    Plaintiffs' predecessors-in-interest in fact relied on the apparent authority of the signatories to the 1991 Acknowledgement Letter by foregoing bringing a suit to enforce their rights under the Credit Agreement.

102.    Plaintiffs' predecessors-in-interest's detrimental reliance on the apparent authority of the signatories to the 1991 Acknowledgement Letter is demonstrated by the fact that the debt under the Credit Agreement would no longer be valid absent a finding that the signatories to the 1991 Acknowledgement Letter did have authority to bind the Defendants.

103.    Those with authority to ratify the signature of the Minister of Finances and Budget on the 1991 Acknowledgement Letter had actual or imputed knowledge of all material facts regarding the 1991 Acknowledgement Letter.

104.    Those with authority to ratify the signature of the Governor of the Central Bank on the 1991 Acknowledgement Letter had actual or imputed knowledge of all material facts regarding the 1991 Acknowledgement Letter.

105.    The Defendants accepted the benefits of the 1991 Acknowledgement Letter, including avoiding having to defend against a lawsuit by Plaintiffs' predecessors-in-interest to enforce their rights under the Credit Agreement between March 20, 1991 and March 7, 1997.

106.    Those with authority to ratify the signature of the Minister of Finances and Budget on the 1991 Acknowledgement Letter implicitly evidenced an intention to ratify that signature by their silence and acceptance of the benefits of the 1991 Acknowledgement Letter.

107.    Those with authority to ratify the signature of the Governor of the Central Bank on the 1991 Acknowledgement Letter implicitly evidenced an intention to ratify that signature by their silence and acceptance of the benefits of the 1991 Acknowledgement Letter.

108.    Those with authority to ratify the signature of the Minister of Finances and Budget on the 1991 Acknowledgement Letter engaged in acts and conduct that demonstrated an intention to ratify that signature.

109.    Those with authority to ratify the signature of the Governor of the Central Bank on the 1991 Acknowledgement Letter engaged in acts and conduct that demonstrated an intention to ratify that signature.

110.    On March 25, 1991, ANZ Bank of London sent a letter to Kristy Yee Bank of Tokyo Trust Company, New York, (the "**March 25, 1991 Letter**").  UB00002448-50, Ex. 13.

111.    The March 25, 1991, Letter reads:

"THE UNDERSIGNED BANK HEREBY GRANTS TO THE BANK OF TOKYO TRUST COMPANY, AS SERVICING BANK UNDER THE 1980 ZAIRE REFINANCING CREDIT AGREEMENT, THE AUTHORITY TO PREPARE AND INSTITUTE THE LITIGATION REQUESTED IN THE TELEX DATED MARCH 18, 1991 FROM AUSTRALIA AND NEW ZEALAND BANKING GROUP LIMITED, CITIBANK N.A, AND CREDIT COMMERCIAL DE FRANCE. THE UNDERSIGNED UNDERSTANDS AND ACKNOWLEDGES THAT IT WILL BE BOUND BY SUCH TELEX AND BY ANY JUDGMENT ISSUED AS THE RESULT OF SUCH LITIGATION.  THE UNDERSIGNED BANK ALSO AUTHORIZES AUSTRALIA AND NEW ZEALAND BANKING GROUP LIMITED, CITIBANK, N A. AND CREDIT COMMERCIAL DE FRANCE TO ADVISE THE BANK OF TOKYO TRUST COMPANY IF SUCH THREE BANKS SHALL HAVE RECEIVED A DEBT ACKNOWLEDGEMENT SATISFACTORY TO SUCH THREE BANKS SO AS TO MAKE SUCH LITIGATION UNNECESSARY AT THIS TIME.

(THIS TELEX IS SENT IN OUR CAPACITY AS AGENT FOR THE SYNDICATE FOR CREDIT INFORMATION SCHEDULE A16 UNDER THE 1980 ZAIRE REFINANCING AGREEMENT). (THIS TELEX IS BEING COPIED TO EACH BANK WHICH ACTS AS AGENT FOR US UNDER THE 1980 ZAIRE REFINANCING AGREEMENT)

BY AUSTRALIA AND NEW ZEALAND BANKING GROUP LTD."  UB00002449-50, Ex. 13

112.    On March 28, 1991, ANZ Bank of London sent a letter to Kristy Yee of Bank of Tokyo Trust Company, New York, (the "**March 28, 1991 Letter A**"). UB00002448, Ex. 13.

35

113.   The March 28, 1991 Letter A reads:

"WE REFER TO THE TELEX DATED MARCH 18, 1991 FROM AUSTRALIA AND NEW ZEALAND BANKING GROUP LIMITED, CITIBANK, N.A., AND CREDIT COMMERCIAL DE FRANCE TO THE AGENTS AND BANKS PARTY TO THE ZAIRE REFINANCING CREDIT AGEEMENT AS OF MARCH 31, 1980.

THIS COMMUNICATION IS TO ADVISE YOU THAT WE HAVE RECEIVED A DEBT ACKNOWLEDGEMENT SATISFACTORY TO THE THREE BANKS SENDING SUCH TELEX SO AS TO MAKE THE LITIGATION DESCRIBED IN SUCH TELEX UNNECESSARY AT THIS TIME.

THIS IS SUBJECT TO YOUR RECEIVING TELEXES IN SAME TERMS FROM CCF AND CITIBANK."  UB00002448, Ex. 13.

114.   On March 28, 1991, Credit Commercial De France, Paris sent a letter to Kristy Yee of Bank of Tokyo Trust Company, New York, (the "**March 28, 1991 Letter B**") UB00002767, Ex. 14.

115.   The March 28, 1991 Letter B reads:

"WE REFER TO THE TELEX DATED MARCH 18, 1991 FROM AUSTRALIA AND NEW ZEALAND BANKING GROUP LIMITED, CITIBANK, N.A., AND CREDIT COMMERCIAL DE FRANCE TO THE AGENTS AND BANKS PARTY TO THE ZAIRE REFINANCING CREDIT AGREEMENT DATED AS OF MARCH 31, 1980. THIS COMMUNICATION IS TO ADVISE YOU THAT WE HAVE RECEIVED A DEBT ACKNOWLEDGMENT FROM THE ZAIREAN AUTHORITIES.  AFTER CONSULTATION AMOUNG THE THREE BANKS, AND . . . THIS DOCUMENTATION IS CONSIDERED  SATISFACTORY TO THE THREE BANKS SENDING SUCH TELEX SO AS TO MAKE THE LITIGATION DESCRIBED IN SUCH TELEX UNNECESSARY AT THIS TIME."  UB00002767, Ex. 14.

116.   On March 28, 1991, Mitchell Hedstrom from Citibank sent a letter to Kristy Yee of Bank of Tokyo Trust Company, New York, (the "**March 28, 1991 Letter C**")  UB00002768, Ex. 14.

117.   The March 28, 1991 Letter C reads:

"WE REFER TO THE TELEX DATED MARCH 18, 1991 FROM AUSTRALIA AND NEW ZEALAND BANKING GROUP LIMITED, CITIBANK, N.A., AND CREDIT COMMERCIAL DE FRANCE TO THE AGENTS AND BANKS PARTY TO THE ZAIRE REFINANCING CREDIT AGREEMENT DATED AS OF MARCH 31, 1980. THIS COMMUNICATION IS TO ADVISE YOU THAT WE HAVE RECEIVED A DEBT ACKNOWLEDGMENT SATISFACTORY TO THE THREE BANKS SENDING SUCH TELEX SO AS TO MAKE THE LITIGATION DESCRIBED IN SUCH TELEX UNNECESSARY AT THIS TIME."  UB00002768, Ex. 14.

36

118.    On March 29, 1991, Kristy Yee of Bank of Tokyo Trust Company, New York, faxed copies of the March 28, 1991 Letters A, B & C to Davis, Markel & Edwards attn. Mr. George Hritz and Ms. Ellen Parker as well as the Legal Department of the Bank of Tokyo Trust attn Mr. Herber Thornhill.  The fax cover sheet reads, "REPUBLIC OF ZAIRE PLEASE FIND ATTACHED THE CONFIRMATION FROM THE STEERING COMMITTEE TO CEASE ANY LITIGATION AGAINST ZAIRE AT THIS TIME.  THANKS VERY MUCH FOR YOUR ASSISTANCE."  UB00002765, Ex. 14.

119.    Citibank, N.A., Credit Commercial De France, Paris and Australia and New Zealand Banking Group Ltd. relied on the validity of the 1991 Acknowledgment Letter in foregoing bringing a lawsuit to enforce their rights as creditors under the Credit Agreement. Exs. 13 & 14.

120.    On May 28, 1991, the Bank of Zaire sent a message to  Kristy Yee of Bank of Tokyo Trust Company that reads: "CONFIRMING RECIEPT OF YOUR TELEX DATED APRIL 29, 1991, IN WHICH YOU HAVE COMMUNICATED TO ME THE MARGIN APPLIED OVER LIBOR FOR THE CALCULATION OF DIFFERENT INTERESTS STOP HAVE TAKEN NOTE OF THE COMMUNICATION WHILE WAITING FOR FURTHER NEGOTIATIONS FROM THE LONDON CLUB STEERING COMMITTEE ON THE NEW AGREEMENT STOP VERY BEST REGARDS STOP NYEMBO SHABANI GOVZAIREBANK FULLSTOP"  UB00002900, Ex. 15.

121.    In 1997, Cecilia Bartner worked as an executive in the debt restructuring department at Citibank.  She was the chief of staff for William Rhodes, a senior official at Citibank, until 2006. She sat on various bank advisory committees, also called steering committees, and supported the administration of interests in sovereign debt.  At some point she was the only employee left in the debt restructuring department and was given the file regarding the Credit Agreement and statute of limitations.  She received Citibank's file relating to the Credit Agreement prior to 1997 and was aware of the 1991 Acknowledgement Letter.  Bartner Dep. at 21:18-43:7.

122.    Ms. Bartner testified that prior to March 1997 she took over the responsibility for obtaining an acknowledgement of the Defendants' obligations under the Credit Agreement from the Bank of Tokyo, the servicing bank, because the Bank of Tokyo had not been paid and refused to obtain that letter. Bartner Dep. at 44:12-45:19.

123.    Ms. Bartner testified that she had seen the Credit Agreement (Bartner 1) at some point during her employment with Citibank.  Bartner Dep. at 42:21-43:7.

124.    On March 7, 1997, an acknowledgment letter was signed by Mr. Marco Banguli Nsambwe, Minister of Finances and Budget of the DRC and Mr. Djamboleka Lona Okitongono, Governor of the Central Bank, (the "**1997 Acknowledgment Letter**").  CITI0003699, Ex. 17.

125.    The 1997 Acknowledgement Letter reads:

"To: All persons holding claims under the Refinancing Credit Agreement dated as of March 31, 1980 among the Republic of Zaire, the Bank of Zaire, the Banks and Agents

37

party thereto and the Bank of Tokyo-Mitsubishi Trust Company (formerly known as Bank of Tokyo Trust Company), as Servicing Bank

The Republic of Zaire and the Bank of Zaire hereby refer to the Refinancing Credit Agreement dated as of March 31, 1980 among the Republic of Zaire, the Bank of Zaire, the Banks and Agents party thereto and the Bank of Tokyo-Mitsubishi Trust Company (formerly known as Bank of Tokyo Trust Company), as Servicing Bank.

The Republic of Zaire and the Bank of Zaire hereby acknowledge and confirm as of the date hereof their respective obligations with respect to the principal and interest unpaid under such Refinancing Credit Agreement consisting, in the case of interest, both of interest accrued on principal installments prior to the maturity and interest accrued on overdue principal and interest, and all other obligations arising under, such Refinancing Credit Agreement in accordance with the term thereof.

It is the intention of the Republic of Zaire and the Bank of Zaire in executing and delivering this acknowledgement formally to recognize and confirm all such obligations in order to eliminate any concerns any person holding claims under such Refinancing Credit Agreement may have due to any possible application of any principles of prescription, including without limitation, those established by the New York statute, of limitations, which might lead any such person to be concerned that the forbearance demonstrated to date by such person in refraining from acting to enforce such claims might have an adverse effect on the ultimate enforceability of such claims." CITI0003699, Ex. 17.

126.    The Defendants produced a copy of the 1997 Acknowledgement Letter during discovery in this litigation.  DRC00003580, Ex. 27.

127.    Ms. Bartner sought assistance from Belgolaise Bank to obtain the 1997 Acknowledgement Letter.  Bartner Dep. 47:13-48:13.

128.    Ms. Bartner prepared the 1997 Acknowledgement Letter in consultation with Casey Dwyer, an attorney at Shearman & Sterling.  Ms. Bartner then sent the 1997 Acknowledgement Letter to Mr. Masangu, who was at Citibank at the time, to get it signed.  Ms. Bartner testified the 1997 Acknowledgement Letter was based on the 1991 Acknowledgement Letter, with the exception that the 1997 Acknowledgment Letter did not contain a reconciliation of the amounts then due under the Credit Agreement. Bartner Dep. 52:18-55:3; 55:8-11; 57:9-59:11; 70:17-20; 71:17-21.

129.    In his deposition, Mr. Masangu was shown the 1997 Acknowledgement Letter and identified the signatories as Djamboleke, Governor of the Central Bank, and Marco Bonguli, the Minister of Finance.  Mr. Masangu acknowledged that he was working at Citibank in March 1997, and that he was involved in getting the document signed.  Mr. Masangu stated, "I was the chief executive officer of Citibank, and on behalf of my bank, Citibank, and the other creditors, members of the London Club, I am the one who introduced the document for acknowledgment of the debt in reference to the credit refinancing group."  Mr. Masangu was asked if he had any responsibilities for overseeing the debt, and he responded, "My responsibility was to inform the

authority of the deadline of the agreement."  Mr. Masangu was also asked if he had conversations with anyone in the Ministry of Finance and if he discussed the need to get the acknowledgement signed, and he responded that he met with both the signatories and informed them of the need to get the 1997 Acknowledgement Letter signed.  Masangu Dep. 100:25-103:8.

130.    On March 7, 1997, Mr. Masangu, at that time a Vice-President of Citibank in Kinshasa, wrote a note to Ms. Bartner on his personal Citibank stationery, (the, "**March 7, 1997 Note**").  CITI00003698, Ex. 16.

131.    The March 7, 1997 Note reads: "Cecilia Here is the Acknowledgement of Debt signed by the minister of finances was signed by Marco Banguli Nsambwe  Regards [signature]" CITI00003698, Ex. 16.

132.    In his deposition, Mr. Masangu identified the March 7, 1997 Note and agreed that he forwarded the fully executed 1997 Acknowledgement Letter with the March 7, 1997 Note. Mr. Masangu said that, based on past experience, he did not believe it was necessary to conduct any inquiry into whether the signatories to the 1997 Acknowledgment Letter had authority to bind the DRC and the Central Bank, respectively, to the Acknowledgment.  Masangu Dep. 103:9-105:2.

133.    In her deposition, Ms. Bartner identified the 1997 Acknowledgement Letter and said that, after she received it, she would have a sent a copy to the Bank of Tokyo and filed it. Bartner Dep. at 73:22-74:21.

134.    Ms. Bartner testified that no one from the DRC told her the Minister of Finance was not the proper person to sign the 1997 Acknowledgement Letter.  Moreover, no one ever told her that they heard the DRC say that the Minister of Finance was not the proper person to have signed the 1997 Acknowledgement Letter.  Bartner Dep. 128:6-129:2.

135.    On March 13, 1997, Ms. Bartner sent a letter to Robert Ashbaugh of Bank of Tokyo-Mitsubishi Trust Company (the "**March 13, 1997, Letter**").  UB000017, Ex. 18.

136.    The March 13, 1997, Letter reads:

"ROB, ATTACHED PLEASE FIND A COPY OF ZAIRE'S ACKNOWLEDGMENT OF DEBT DULY SIGNED BY THE BANK OF ZAIRE AND THE MINISTRY OF FINANCE FOR YOUR RECORDS.  REGARDS"  UB000017, Ex. 18.

137.    Attached to the March 13, 1997 letter is an executed copy of the 1997 Acknowledgment Letter.  UB00017-18, Ex. 18.

138.    On May 23, 1997, Robert Ashbaugh, Assistant Vice President at Bank of Tokyo-Mitsubishi Trust Company, sent Eric Schumann of Credit Lyonnais a fax with a message that reads, "Attached is a copy of the Debt Acknowledgment.  It was signed by Marco Banguli Nsambwe (Minister of Finance) and Mr. Djamoleka (Governor of the Central Bank).  Let me know if you have any questions."  UB00000540, Ex. 19.

139.    On May 23, 1997, Robert Ashbaugh, Assistant Vice President at Bank of Tokyo-Mitsubishi Trust Company sent Banque Belgolaise a fax with a message that reads, "Attached are copies of the Fee Letters that Claude Jacquemeijns asked me to forward.  I apologize for the delay."  UB00000541, Ex. 19.

140.    The DRC, as principal, engaged in conduct which caused the Plaintiffs' predecessors-in-interest to believe that Mr. Marco Banguli Nsambwet had authority to sign and bind the DRC to the 1997 Acknowledgement Letter.

141.    The Central Bank, as principal, engaged in conduct which caused the Plaintiffs' predecessors-in-interest to believe that Mr. Djamboleka Lona Okitongono had authority to sign and bind the Central Bank to the 1997 Acknowledgement Letter.

142.    Based on the totality of the circumstances, it was reasonable for Plaintiffs' predecessors-in-interest to rely on the apparent authority of the Minister of Finances and Budget to bind Zaire to the 1997 Acknowledgement Letter.

143.    Based on the totality of the circumstances, it was reasonable for Plaintiffs' predecessors-in-interest to rely on the apparent authority of the Governor of the Central Bank to bind the Central Bank to the 1997 Acknowledgement Letter.

144.    Zaire intended for Plaintiffs' predecessors-in-interest to rely on the validity of the 1997 Acknowledgement Letter and forego suing to enforce their rights under the Credit Agreement.

145.    The Central Bank intended for Plaintiffs' predecessors-in-interest to rely on the validity of the 1997 Acknowledgement Letter and forego suing to enforce their rights under the Credit Agreement.

146.    Plaintiffs' predecessors-in-interest in fact relied on the apparent authority of the signatories to the 1997 Acknowledgement Letter by foregoing bringing a suit to enforce their rights under the Credit Agreement.

147.    Plaintiffs' predecessors-in-interest's detrimental reliance on the apparent authority of the signatories to the 1997 Acknowledgement Letter is demonstrated by the fact that the debt under the Credit Agreement would no longer be valid absent a finding that the signatories to the 1997 Acknowledgement Letter did have authority to bind the Defendants.

148.    Those with authority to ratify the signature of the Minister of Finances and Budget on the 1997 Acknowledgement Letter had actual or imputed knowledge of all material facts regarding the 1997 Acknowledgement Letter.

149.    Those with authority to ratify the signature of the Governor of the Central Bank on the 1997 Acknowledgement Letter had actual or imputed knowledge of all material facts regarding the 1997 Acknowledgement Letter.

150.    The Defendants accepted the benefits of the 1997 Acknowledgement Letter, including avoiding having to defend against a lawsuit by Plaintiffs' predecessors-in-interest to enforce their rights under the Credit Agreement between March 7, 1997 and February 25, 2003.

151.    Those with authority to ratify the signature of the Minister of Finances and Budget on the 1997 Acknowledgement Letter implicitly evidenced an intention to ratify that signature by their silence and acceptance of the benefits of the 1997 Acknowledgement Letter.

152.    Those with authority to ratify the signature of the Governor of the Central Bank on the 1997 Acknowledgement Letter implicitly evidenced an intention to ratify that signature by their silence and acceptance of the benefits of the 1997 Acknowledgement Letter.

153.    Those with authority to ratify the signature of the Minister of Finances and Budget on the 1997 Acknowledgement Letter engaged in acts and conduct that demonstrated an intention to ratify that signature.

154.    Those with authority to ratify the signature of the Governor of the Central Bank on the 1997 Acknowledgement Letter engaged in acts and conduct that demonstrated an intention to ratify that signature.

155.    On June 19, 1998, Prof. Odilon Gamela, Cabinet Secretary of the Ministry of Finance and Budget of the DRC wrote a letter to the Managing Director of the General Bank of Luxembourg regarding "Announcement of the arrival of an official mission from the DRC to discuss the collateral account related to the transactions for the repurchase of debt from the London Club by the Belgolaise Bank," (the "**June 19, 1998 Letter**"). An "Advisor to the Presidency of the Republic" Mr. Nbwinga Bila, was a member of the delegation.  UB00001016, Ex. 20.

156.    The June 19, 1998 Letter reads:

"It is my honor to inform you that the Minister of Finance and the Budget of the Democratic Republic of the Congo has decided to send a team of three Congolese experts to your institution to obtain the facts in connection with the London Club case.  The Congolese delegation is composed of Mr. Gamela Nginu, Cabinet Secretary of the Ministry of Finance and Budget, Mr. Nbwinga Bila, Advisor to the Presidency of the Republic, and Mr. Boole Ndombo, Department Head at the Public Debt Management Office (see the attached mission order signed by the Minister).  Please instruct your staff to prepare all of the working documents required for the discussion with the Congolese delegation."  UB00001016, Ex. 20.

157.    On June 21, 1999, an expert team charged with analyzing a lawsuit against the DRC by Red Mountain Finance Inc. related to claims under the Credit Agreement (including team members Mukadi Mubenga, Amisi Mwepu, Tshibungu Kasenga, Ilofo Iseenteke, Mena Bernard, Fikiri Alimasi, Assambwa Boita and Ndangi Ndangani) sent a memorandum to the Minister of Finance and Budget of the DRC regarding "Results of the analysis surrounding the Red Mountain Finance Inc. lawsuit against the Democratic Republic of Congo/Central Bank of Congo and a proposed course of action, (the "**June 21, 1999 Memo**").  DRC 00004115-20, Ex. 21.

158.    The June 21, 1999 Memo reads in part:

"1. On the instruction of His Excellency Mr. Minister of Finance and Budget, the experts from the Justice and Finance Ministries, from the Central Bank of Congo and OGEDEP [Office for the Management of Public Debt], whose names are set out in an appendix, have proceeded with the analysis surrounding the above-mentioned lawsuit and herewith propose initiatives to the authorities in charge of the case that may be implemented in order to both limit the damages and lead to the best settlement of the dispute between Red Mountain and the Congolese party.

* * *

14.  . . . . Since the March 31, 1980 Refinancing Agreement reached its term in 1990, the method used to maintain cohesion within the London Club and avoid a spill-over effect in the form of individual claims is the signing of a letter in favor of the London Club member creditors.

* * *

21. The items in this case show that the legal actions brought forth by LNC and Red Mountain seem to have been carefully prepared and as such brought forth in concert. It begs the question of whether there exist invisible hands that are acting amongst these new London Club creditors, which in our opinion, would be merely shell companies.

22. Red Mountain seems to have repurchased certain loans from the London Club with the sole purpose of creating trouble for the Gouvernement Salut Public [Government of Public Safety], notably by bringing legal action against it, because RED MOUNTAIN only began its buy outs on 6/4/1997, less than one month after the liberation and specifically only a few months after another London Club member, LNC, had won a court case against the Democratic Republic of Congo and its judgment was executed.

23. Because the London Club debts were easily transferrable to the secondary market, the experts whether are invisible hands of former politicians or others, who could purchase them on behalf of a shell company whose intention was to constantly damage the [Congo's] credibility and interests. It is therefore important that the Congolese authorities establish contact with the Steering Committee as soon as possible, with the objective set forth in point 25.

24. Strategically, discussions with the London Club Steering Committee have the advantage of renewing contact with the London Club and culminating, after account reconciliation, in the signing of a letter of recognition of debt by the Democratic Republic of Congo in order to provide certainty to the London Club member creditors and to lead them to respect the provisions of the March 31, 1980 agreement.  In this manner, we would be able to strategically halt the spillover effect of actions from London Club creditors and get Red Mountain and LNC to ascribe to the logic of the overall framework surrounding the settlement of arrears by various external creditors.

25. In addition, the Democratic Republic of Congo should avoid any vexatious actions, namely those initiated by the Commission for the Suppression of Economic Crimes, because they hinder the proper function of strategies to be implemented within the scope of the Red Mountain and LNC cases, which are 78.70% underwritten by Belgolaise for the claimed principal loans.

PROPOSED COURSE OF ACTION

26. Given the gravity of the preceding, the experts recommend that two delegations be dispatched at the same time: . . .

2)      To the Steering Committee in Paris in order to renew contacts with the London Club and to prepare negotiations between said Committee and the Minister of Finance and Budget and the Director of the Cabinet of the Head of State, the Governor of the Central Bank of Congo and the President and Managing Director of OGEDEP.

This mission will be undertaken by experts possessing a thorough understanding of the London Club case. For this reason, the three experts whose names are listed in the second proposed mission order are suggested as those who would undertake this very important mission." DRC 00004117-18, Ex. 21.

159.      Mr. Masangu testified that he was the Governor of the Central Bank in June of 1999 and acknowledged that the June 21, 1999 Memo was prepared by a team made up of experts from the Central Bank of Congo and the DRC's Office de Gestion de la Dette Publique ("**OGEDEP**") charged by the Minister of Finance and Budget of the DRC with the analysis of the Red Mountain Finance Inc. case. Mr. Masangu indicated that he appointed the team and they were to report to him and he would have been kept informed of the work of the expert team. Masangu Dep. at 90:2-95:4.

160.      On July 7, 1998, Prof. Odilon Gamela, Cabinet Secretary of the Ministry of Finance and Budget, wrote a letter to the President of Bank of Tokyo-Mitsubishi regarding "Reminder announcement of the arrival of an official mission from the DRC to discuss the London Club case," (the "**July 7, 1998 Letter**"). UB00001015, Ex. 20.

161.      The July 7, 1998 Letter reads:

"Further to my letter – Our Ref.: 2214/CAB/MIN/FIN/NJ/98 – of June 19, 1998 announcing the dispatch of an official mission from the Democratic Republic of the Congo to your institution, and to which no reply has been received, it is my honor to inform you that the Congolese delegation hopes to arrive in New York as of July 14, 1998. Please instruct your staff to prepare all of the working documents related to the debt situation of the Democratic Republic of the Congo with respect to the various London club creditors." UB00001015, Ex. 20.

162.      On July 23, 1998, Atoki Ileka, "Counselor" to the DRC sent a fax to Kenichi Tanaka, Vice President and Manager of Bank of Tokyo-Mitsubishi Trust Company regarding a "Meeting with officials of the Bank of Tokyo-Mitsubishi Trust Company," (the "**July 23, 1998 Fax**"). UB00001012, Ex. 20.

163.    The July 23, 1998 Fax reads:

"I have the honor to bring to your attention that by letters dated 19 June 1998 and 07 July 1998 (see attached faxes), The Congolese Ministry of Finance and Budget had informed you of the coming of a delegation to hold some discussions with you in regard of the LONDON CLUB. This delegation is presently in New York, and has expressed the wish to hold those talks as soon as possible. In that regard, I would appreciate if we can convey a meeting this Friday 24 July 1998 in the morning. Thank you for your cooperation on that matter."  UB00001012, Ex. 20.

164.    The July 23, 1998 Fax attaches a July 22, 1998 document entitled: "Reference terms for the mission of the Republique Democratique of Congo to the Bank of Tokyo in New York" that was signed by Mongo Y'Engondo, of the Central Bank, and Tshibungu Kasenga, of the Ministry of Finance and Budget, (the "**July 22, 1998 Document**"). UB00001013-18, Ex. 20.

165.    The July 22, 1998 Document reads, in part:

"In preparation for the discussions with the creditors members of the London Club in Belgium, the Ministre of Finance and Budget of the Republique Democratique of Congo has decided to send a mission to Bank of Tokyo.  The discussions with Bank of Tokyo should permit the Republique Democratique of Congo to discuss on the following aspects:

1.    Evolution of the debt for the creditor members of the London Club from 1987 to 1997.

2.    Confirmation of the list of creditor members of the London Club and the debt status as of July 31, 1998.

3.    Current status of the fees due to the Bank of Tokyo from the Republique Democratique of Congo.

4.    Compare the payments made from the Republique Democratique of Congo to the interest applied, from November 1987 to December 1990.

5.    Payments made from the Republique Democratique of Congo for principal and interest from 1980 to 1987.

6.    Establish an understanding, through the process of evaluating the past due interest from the Bank of Tokyo with regard to the debt of the Republique Democratique of Congo at the London Club."  UB00001013-18, Ex. 20.

166.    Mr. Luongwe Kabule Mulungo ("**Luongwe**") was duly appointed as the Vice-Minister of Finance of the DRC on or about April 2001.  Defs.' Response to Plaintiffs' Request for Admission 27, Ex. 89.

44

167.     Beginning in November 2002 and continuing into 2003, the DRC was engaged in communications with holders of the London Club debt to discuss the debt and the creditor's position regarding the debt.  Defs.' Response to Plaintiffs' Request for Admission 58, Ex. 89.

168.     Ms. Bartner testified there were discussions between Citibank, the DRC and other banks about restructuring DRC's debt obligations under the Credit Agreement in 2002 & 2003. Bartner Dep. 103:21-104:22.

169.     The 2002-2003 Annual Report of the Central Bank of Congo (the "**2002-2003 Annual Report**") contains a letter signed by Mr. Masangu to "His Excellency the President of the Republic" with the subject line "Presentation of the Annual Report for the Central Bank of Congo for the Years 2002 and 2003."  The letter reads, in part: "I am pleased to present the Annual Report for the Central Bank of the Congo for the 2002 Fiscal Period to you, pursuant to the statutory provisions of the issuing institution . . ." DRC000508, Ex. 94.

170.     The 2002-2003 Annual Report is or was publicly available. Exs. 93 & 94.

171.     The 2002-2003 Annual Report contains the following statement:

"Negotiations with [the London & Kinshasa] Clubs should commence at the beginning of 2003, in order to obtain from the member creditors cancellation conditions comparable to those granted by the Paris Club." DRC000630, Ex. 93.

172.     The 2002-2003 Annual Report states that, as of 2002, the Central Bank held foreign currency reserves worth over 25 billion Congolese Francs – or approximately $66.7 million at the then-current exchange rate. DRC000742-743, Ex. 94.

173.     There was no indication in the 2002-2003 Annual Report's section on the DRC's external debt that the debt under the Credit Agreement was time barred or otherwise unenforceable. Exs. 93 & 94.

174.     Ms. Bartner testified that, while she was the person at Citibank New York who was most involved with the acknowledgement of the debt, Michel Losembe of Citibank Kinshasa was also involved and the Kinshasa office was making the decisions.  Bartner Dep. 108:7-109:12.

175.     On October 2, 2002, Michel Losembe of Citibank sent an email to Ms. Bartner and copied Austine Ometoruwa of Citibank regarding "DR Congo – London Club Debt," (the "**October 2, 2002 Email A**").  CITI0000107-08, Ex. 90.

176.     The October 2, 2002 Email A reads:

"Nice coincidence indeed. Masangu is still Governor of the Central Bank and has good chance to be maintained in the job for another 5 years. We should take advantage of this to renew the acknowledgement of debt. Could you please fax me a copy of the last acknowledgement and possibly an up to date schedule of outstanding principal and interests amounts ? - fax nr is +243(88)04156. Mr. Henry Laloux is currently in Congo as MD for Banque Commerciale du Congo (Belgolaise affiliate). He will soon let me know

the new persons in charge of this file in Brussels. To his knowledge the structure has not changed since 1996, whereby Belgolaise still holds 90-95% of the debt. I do not have any idea on how much is the DRC debt traded currently, but, further to a discussion with Masangu, he mentioned IMF/WB are pressing them to find a solution to commercial debt (London Club, Kinshasa Club and Commercial Arrears). They are ready to Consider solutions up to the redemption DCR obtained on Paris Club, i.e. 67% (Naples Terms). The issue is the Gvt is unable to reconcile the London Club debt, and asked us to help them doing so. Do you have any idea ? As per the documentation I have, Bank of Tokyo was the servicing bank. I copied Austine Omeretuwa, Corporate Finance Head for North-West Africa cluster, as we are at the preliminary stages of looking for a possibility to get out of this debt, possibly through a debt/equity scheme. Thanks for your kind assistance." CITI0000107-08, Ex. 90

177.    On October 2, 2002, Ms. Bartner sent an email to Michel Losembe regarding "DR Congo – London Club Debt," (the "**October 2, 2002 Email B**").  CITI0000107, Ex. 90.

178.    The October 2, 2002 Email B reads:

"Michel,

I will update and send you the acknowledgement of debt. It is a blanket acknowledgement that applies to the Refinancing Agreement and will not state any amounts of principal or interest due. FYI - Principal is 359,5MM. Reconciling this debt is not going to be easy and will most likely take time and the payment of some fees to the Agents to get the job done. Looking at my notes, Bank of Tokyo as servicing agent (they really do not have real functions) had requested back in 1997/98 that all Agents (9 or 10) prepare principal and interest o/s for the Central Bank. I am pretty sure that Citibank complied with the request and my question is whether the Central Bank may have this information in their records so Agents would not have to redo. That would be a good first step. Can you have someone in your staff check with the Central Bank?

Also, I do not believe current documentation permits debt equities. At some point in time the Steering Committee had suggested language to include but it did not go anywhere. Regards," CITI0000107, Ex. 90.

179.    Ms. Bartner identified the October 2, 2002 Emails A & B (Bartner Ex. 8) in her deposition. Bartner Dep. at 79:14-79:22.

180.    Ms. Bartner testified that she was aware that Mr. Masangu was the Governor of the Central Bank of the DRC at least of as October 2002.  She also testified that she was aware that Mr. Losembe had dealings with Mr. Masangu in getting the 2003 Acknowledgement Letter signed.  Bartner Dep. at 91:3-91:10.

181.    On November 26, 2002, Mr. Masangu wrote a letter to Cecilia Bartner regarding "Invitation to London Club Agent Bank members meeting on December 7, 2002 in Paris," (the "**November 26, 2002 Letter**").  CITI0000204, Ex. 22.

182.    The November 26, 2002 Letter reads:

"The Central Bank of the Congo plans to organize an informal meeting with all of the Agent Banks that are members of the Club, including yours. This meeting will allow us to assess our relationships, particularly with respect to the treatment of the accumulated arrears on your loans (Gentlemen's Agreement of June 24, 1989) and the definition of the new cooperation agreement with the London Club.

I propose that this informal meeting, which I will personally chair and in which I invite your bank to take part, be held on December 7, 2002 in Paris, as a side event to the creditors' meeting planned for December 4-6 in the same city. Accordingly, please be so kind as to confirm your participation as soon as possible.

Please find attached the list of the other Agent Banks, most of which have already expressed an interest in participating in this meeting."  CITI0000204, Ex. 22.

183.   On November 28, 2002, Mr. Masangu wrote a letter to Thierry Desjardins of BNP Paribas regarding "Invitation to London Club Agent Bank members' meeting on December 7, 2002 in Paris," (the "**November 28, 2002 Letter**").  UB00001622, Ex. 23.

184.   The November 28, 2002 Letter reads:

"The Central Bank of the Congo plans to organize an informal meeting with all of the Agent Banks that are members of the Club, including yours. This meeting will allow us to assess our relationships, particularly with respect to the treatment of the accumulated arrears on your loans (Gentlemen's Agreement of June 24, 1989) and the definition of the new cooperation agreement with the London Club.

I propose that this informal meeting, which I will personally chair and in which I invite your bank to take part, be held on December 7, 2002 in Paris, as a side event to the creditors' meeting planned for December 4-6 in the same city. Accordingly, please be so kind as to confirm your participation as soon as possible.

Please find attached the list of the other Agent Banks, most of which have already expressed an interest in participating in this meeting."  UB00001622, Ex. 23.

185.   On November 29, 2002, Mr. Masangu, as Governor of the Central Bank, issued a document titled "COMMUNICATION FROM THE GOVERNOR OF THE CENTRAL BANK OF CONGO TO THE LONDON CLUB AGENT BANKS," (the "**November 29, 2002 Communication**").  CITI0000187-93, Ex. 24.

186.   The  November 29, 2002 Communication reads:

"This letter summarizes the evolution of the recent economic situation and the progress made in the dialogue with the lenders. [This letter] aims to open back up the dialogue with the London Club in light of settling the arrears issue, as well as defining a new cooperation framework. . . .

## II. THE DRC'S RELATIONS WITH THE LONDON CLUB

5. The first refinancing bank debt agreement signed by the DRC with its London Club partners is dated March 31, 1980. This agreement covered a refinanced debt of 402 million USD for a duration of 10 years, with an end date of March 31, 1990.

6. Because of coming up against payment difficulties, the DRC did not completely honor its engagements, which led it to negotiate and arrive at rescheduling agreements in the form of "Gentlemen Agreements" in May 1984 and June 1989 respectively.

7. These two agreements were not honored either. On June 30, 1991, at the time when the DRC was getting ready to negotiate a new global agreement to replace that which was signed in March 1980, its commitments to the London Club were reaching 490.70 million USD, broken down as follows:

  − Principal : 359.51 million USD

  − Contractual interest : 24.10 million USD

  − Late interest on the principal due : 107.90 million USD

8. It is important to note than in 1997, the DRC's debt stock with the London Club was subject to new evaluation, which was only related to the interest. Nevertheless, the data established on this occasion is not available.

Consequently, the numbers indicated at 7 points above should serve as a basis for a new evaluation. . . ."

 "III. THE DRC'S EXPECTATIONS OF THE LONDON CLUB

11. After a long period of progress within in the dialogue with other creditors, the negotiations with the London Club represent the next decisive step before the DRC's eligibility for the HIPC Initiative. In order to allow the IMF and the WB to proceed with a debt sustainability analysis, the DRC is planning to finalize negotiations with the London Club before the end of December 2002.

12. In a very clear way; the informal meeting with the London Club agent banks, organized on the sidelines of the Consulting Group's work, should allow to set a calendar of meetings, the goal of which would be:

1) to determine the actual level of its commitments to the syndicated banks, in accordance with prior agreements;

2) to determine the actual level of the DRC's commitments to the Bank of Tokyo in terms of service commission;

3) the composing of a new coordination committee with current agent banks at the lenders meeting;

4) the discussion of facilities that should be granted to the DRC as compared to the conditions set by the Paris Club on September 13, 2002;

5) the determining of a agreement negotiation calendar to be signed between the DRC and the London Club, replacing the Refinancing Agreement enacted March 31, 1980.

Attachment : outstanding debt on April 2, 1990." CITI0000187-93, Ex. 24.

187.    The November 29, 2002 Communication attached a document entitled "Attachment: Outstanding debt on April 2, 1990." The attachment sets forth amounts of principal contractual interest and interest due on principal under various credit information schedules to the 1980 Credit Agreement. CITI0000187-93, Ex. 24.

188.    Ms. Bartner identified the November 29, 2002 Communication during her deposition. Bartner Dep. 116:4-14; 118:5-10.

189.    Ms. Bartner testified at her deposition that it was her understanding that the November 29, 2002 Communication was prepared to encourage discussion or resolution of restructuring the debt under the Credit Agreement. Bartner Dep. at 119:9-22.

190.    Ms. Bartner testified at her deposition that it was her understanding that the DRC wanted to finalize the negotiations with the creditors so it could be considered a highly indebted poor country ("HIPC") and obtaining financing from the IMF or World Bank. Bartner Dep. at 121:15-123:18.

191.    Ms. Bartner testified at her deposition that it was also her understanding that the Defendants were seeking to restructure the debt because they believed they had a continuing obligation under the Credit Agreement and they would not have sought to restructure the debt if they did not think they were obligated under it. Bartner Dep. at 124:4-19.

192.    On December 4, 2002, Fikiri Alimasi Wa Asani, Director of Studies, wrote to Cecilia Bartner, copying Mr. Masangu, (the "**December 4, 2002 Letter**"). CITI0000186, Ex. 24.

193.    The December 4, 2002 Letter reads:

 "The governor of the Central Bank of Congo has asked me to inform you that for reasons of the State, he can no longer travel to Paris. However, he has just informed his colleagues, namely the Director of Studies, Mr. Dieudonné FIKIRI and the Advisor Artistide KASONGO, to organize an information meeting this Friday 12/06/02 at 6:00 PM, at the World Bank located at no. 66 Avenue Iéna, 16th Arrondissement Paris, regarding the work product document drawn up to this effect, which was sent to you as an attachment, as a prerequisite examination. The Governor would like to pardon the confusion and will set a later meeting with you, the date of which will be communicated to you. Would you please accept, Madame, my highest regards." CITI0000186, Ex. 24.

194.    On January 16, 2003, Ms. Bartner sent Michel Losembe an email, regarding "DRC-Acknowledgement of Debt," (the, "**January 16, 2003 Lette**r"). CITI0000109, Ex. 25.

49

195.    The January 16, 2003 Letter reads:

"It was a pleasure meeting you yesterday. I hope both the conference and your time in NY and DC were fruitful. I am enclosing the document I gave you in case you may need to print it again. The person who should sign it on behalf of the Government should be the Minister of Finance. It would need to be signed before March 7. Please let me know whether you encounter any problems getting it signed. Thanks for your help." CITI0000109, Ex. 25.

196.    The January 16, 2003 Letter attached an unsigned, undated draft of the 2003 Acknowledgement Letter.  CITI0000109-10, Ex. 25.

197.    Ms. Bartner identified the January 16, 2003 letter (Bartner Ex. 12) and attachment in her deposition.  She testified that her purpose in sending the document to Michel Losembe was to get him to facilitate acknowledgement of the DRC debt.  She testified that she left it up to Mr. Losembe to get the document signed.  She said the Minister of Finance should sign it because of the Minister of Finance signing the prior acknowledgement.  Bartner Dep. at 125:6-127:20.

198.    On February 5, 2003, Michel Losembe sent an email to Ms. Bartner regarding "Follow-up," (the "**February 5, 2003 Email A**"). CITI0000113, Ex. 26.

199.    The February 5, 2003 Email A reads:

"Cecilia,

Sorry for this long silence. Since I came, I was unable to meet with the Min Fin. Between travels and Budget session in front of Parliament (based in Lubumbashi), we did not had a chance to organize a meeting. He however promised to see me this week. The external debt management has been officially removed from Central Bank ifo MinFin... Masangu will only be willing to countersign. I'll keep you posted. Regards." CITI0000113, Ex. 26.

200.    On February 5, 2003, Ms. Bartner sent an email to Michel Losembe regarding "Follow-up," (the "**February 5, 2003 Email B**"). CITI0000113, Ex. 26.

201.    The February 5, 2003 Email B reads:

"Thanks for your email. When you see the MinFin mention to him that the acknowledgement is a formality but if the Banks don't have it, they would need to sue the country so that the statute of limitations on the debt does not run out. I am sure you will have a nicer way to say this to him if he gives you the runaround but in a nutshell that is what it is. I would hope that we have it signed as soon as possible. Thanks for your help." CITI0000113, Ex. 26.

202.    Ms. Bartner identified the February 5, 2003 Emails A & B (Bartner Ex. 14) in her deposition. Bartner Dep. at 131:23-25.

203.    Ms. Bartner testified at her deposition that her understanding of the February 5, 2003 Email A was that responsibility for managing the debt under the Credit Agreement transferred from the Central Bank to the Ministry of Finance.  She testified that the February 5, 2003 Email A contained language that Mr. Masangu would only be willing to countersign and it was her understanding that he was no longer responsible for the external debt management.  She also testified that it was her understanding that Mr. Masangu would sign the acknowledgement letter if the Ministry of Finance signed. Bartner Dep. at 132:16-133:2; 133:10-20.

204.    On February 11, 2003, Christian Kamanz and Michel Losembe of Citibank wrote a letter Mr. Matungulu, the Minister of Finances and Budget, copying Mr. Masangu, who was then the Governor of the Central Bank, regarding "March 31, 1980 Credit Refinancing Agreement," (the "**February 11, 2003 Letter**").  DRC00003575, Ex. 27.

205.    The February 11, 2003 Letter reads:

"We have the honor of sending herewith a draft recognition of debt document, written in English (French copy enclosed for your information) to be signed by the Democratic Republic of Congo and the Central Bank of Congo for the Lending Banks and Agent Banks of the Democratic Republic of Congo within the context of the London Club, in accordance with the provisions of the March 31, 1980 Credit Refinancing Agreement.

The signing of this document will extend for six (6) years the validity of the credit refinancing agreement on the 31st of next March, the date of expiration of the last extension. It is understood that failure to sign the aforementioned document at its maturity by the Democratic Republic of Congo could lead creditors to seek forced recovery of their loans based on the law applicable to this Agreement.

Indeed, the agreement is governed by the laws of the State of New York, United States and has a validity of six years. The latest extensions, copies attached, were signed on March 20, 1991 and March 7, 1997 by the Ministers of Finance and Governors of the Central Bank who held those offices on those dates.

Citibank Congo acts on behalf of all banks and signatory agents of the Agreement and the Recognition of Debt, duly signed, will be sent to the servicing bank designated by the Agreement, the Bank of Tokyo- Mitsubishi Trust Company, in New York, which will communicate it to all lenders. In this way, the Democratic Republic of Congo can continue to manage the outstanding London Club loans within in a well-defined framework.

We hope you receive this note and as we look forward to your reply, please receive Mr. Minister, our highest consideration." DRC00003575, Ex. 27.

206.    The February 11, 2003 Letter enclosed a draft copy of the 2003 Acknowledgment Letter.  DRC00003579, Ex. 27.

207.    Ms. Bartner testified at her deposition that it was her intention the 2003 Acknowledgement Letter be executed in English because the prior acknowledgements were executed in English as was the Credit Agreement.  She testified that the 1997 and 2003

Acknowledgement Letters were considered "duly signed" by Citibank Kinshasa, and that she believed that Citibank was acting on behalf of all banks and signatory agents to the Credit Agreement in obtaining the 2003 Acknowledgement Letter.  Bartner Dep. at 139:22-143:1.

208.     On February 17, 2003 at 6:47PM Michel Losembe of Citibank Kinshasa wrote an email to Michel Accad and Kandolo Kasongo with the subject line "Minister of Finance Resignation," (the "**February 17, 2003 A Email**"). CITI0000126, Ex. 28.

209.     The February 17, 2003 A Email reads:

"Just to inform you of an important event on the market. Mr. Ilankir Matungulu, Minister of Finance resigned today from his functions. The later was apparently requested to endorse some extra-budgetary (political) expenses what he refused to do. This wouldn't have any kind of importance if the International Financial Community (WB, IMF) had not consequently decided to suspend execution of programs until solid explanations on the motivations are presented, and eventually receive the resume of a viable successor. Indeed, Mr. Matungulu is a former IMF executive (Cameroon Resident Representative) and his strictness was highly appreciated in Washington, ...and very controversial in Kinshasa! Will keep you posted."  CITI0000126, Ex. 28.

210.     On February 17, 2003, at 7:36 PM Michel Losembe wrote an email to Lionel Johnson of Citibank with the subject line "Minister of Finance Resignation," (the "**February 17, 2003 B Email**"). CITI0000126, Ex. 28.

211.     The February 17, 2003 B Email reads:

"Lionel, Hi, hope it is not too cold in DC. Here temperature and climate gets hotter further following announcement. Apparently IMF and WB decided to temporarily suspend the disbursements as 'their guy' was dismissed. Can't cross-check locally. Any chance to give a buzz for me at your contacts over there ? Thanks. Emmanuel Mbi is responsible for Great Lakes region at WB. Wouldn't be a too good at all for us if the info is correct. Awaiting your input,"  CITI0000126, Ex. 28.

212.     On February 17, 2003, Michel Losembe wrote an email to Ms. Bartner with the subject line "Minister of Finance Resignation," (the "**February 17, 2003 C Email**") forwarding the  February 17, 2003 A Email. CITI0000125-26, Ex. 28.

213.     The February 17, 2003 C Email reads:

"Cecilia, As you can read, this won't help our case either  . . . Acknowledgement was not yet signed! Will keep you informed,"  CITI0000125-26, Ex. 28.

214.     On February 18, 2003, Ms. Bartner wrote an email to Michel Losembe with the subject line "Minister of Finance Resignation,"  (the "**February 18, 2003 A Email**"). CITI0000125, Ex. 28.

215.     The February 18, 2003 A Email reads:

"How about the Deputy to MinFin? I suppose we could wait for a few days if we knew there was an appointment forthcoming but we really do not have the luxury of time. Could Masangu give us a hand talking to him?"  CITI0000125, Ex. 28.

216.    Mr. Bartner testified she suggested the Deputy Minister of Finance of the DRC sign the acknowledgement letter because Mr. Losembe indicated that he had replaced the Minister of Finance.  Bartner Dep. at 148:19-149:14.

217.    On February 18, 2003, Michel Losembe wrote an email to Ms. Bartner of Citibank with the subject line "Minister of Finance Resignation," (the "**February 18, 2003 B Email**"). CITI0000125, Ex. 28.

218.    The February 18, 2003 B Email reads:

"Cecilia, Just talked with Masangu, he will help us out with the Deputy MinFin. I'll follow up with the later tomorrow. I hope to have this through before month-end. Talked to Belgolaise who is ready to add a push if necessary."  CITI0000125, Ex. 28.

219.    Ms. Bartner identified the February 17-18, 2003 email exchange (including, the February 17, 2003 A, B & C Emails and the February 18, 2003 A & B Emails) with Michel Losembe (Bartner Exhibit 16) in her deposition.  CITI0000125-27, Ex. 28; Bartner Dep. at 147:3-9; 147:14-18.

220.    In his deposition, Mr. Masangu was shown the February 17-18, 2003 email exchange and confirmed that he did interact with the Deputy Minister of Finance in connection with the 2003 Acknowledgement Letter.  Mr. Masangu testified that the interaction was to explain the importance of the agreement, and agreed that at some point after Mr. Masangu provided the Deputy Minister of Finance with the explanation, he signed the 2003 Acknowledgement Letter.  Masangu Dep. at 105:3-109:9.

221.    On February 20, 2003 Christian Kamanzi and Michel Losembe, of Citibank, wrote a letter to Mr. Luongwe with the subject line "March 31, 1980 Credit Refinancing Agreement, (the "**February 20, 2003 Letter**").  DRC00004140, Ex. 76.

222.    The February 20, 2003 Letter reads:

"We have the occasion to congratulate you on your new responsibilities in the Ministry of Finance and Budget, which are key departments at the current stage of the Democratic Republic of Congo's economic growth. You will find attached a copy of correspondence that we addressed to the Ministry on February 11, 2003, related to the above subject, for which we request your special attention, given the importance of the issues involved. Indeed, the legal validity of the Credit Refinancing Agreement signed between the Democratic Republic of Congo, the Central Bank of Congo and the creditor Banks and Agents of the DRC within the scope of the London Club, arrive at their maturity next March 31. The only way to extend its validity is to sign a debt recognition in the attached format. This document has already been signed various times by the DRC (copies of the 1991 and 1997 extensions are attached). It is understood that that failure to sign said document could lead the creditors to a forced recovery of their loans based on the

agreement's applicable laws. We hope that you will kindly consider our request and that you will follow up on it at your earliest convenience. We hope for safe receipt of this letter and that you will accept, Mr. Vice Minister, our highest regards." DRC00004140, Ex. 76.

223.   In his deposition, Mr. Masangu identified the February 20, 2003 Letter and confirmed that it was his understanding that the statute of limitations on any claims under the Credit Agreement were due to expire on March 31, 2003 as stated in the February 20, 2003 Letter.  Mr. Masangu confirmed that Citibank was saying that the only way to extend its validity is to sign a debt recognition in the attached format, and that there was a draft acknowledgement attached to the February 20, 2003 Letter.  Mr. Masangu confirmed that the February 20, 2003 Letter reads, "It is understood that the failure to sign said document could lead the creditors to a forced recovery of their loans based on the agreement's applicable laws."  Mr. Masangu stated that his understanding of this sentence was that the creditors could take actions, and agreed that bringing a lawsuit to enforce the debt was one of those actions. Masangu Dep. 64:19-72:5.

224.   On February 25, 2003, an Acknowledgment Letter was signed by Mr. Luongwe, who at the time was the DRC's acting Minister of Finances and Budget and Mr. Masangu who at the time was Governor of the Central Bank (the "**2003 Acknowledgement Letter**"). CITI0000202, Ex. 22.

225.   The 2003 Acknowledgement Letter reads:

"To:  All persons holding claims under the Refinancing Credit Agreement dated as of March 31, 1980 among the Democratic Republic of Congo (formerly known as the Republic of Zaire), the Central Bank of Congo (formerly known as the Bank of Zaire), the Banks and Agents party thereto and the Bank of Tokyo- Mitsubishi Trust Company (formerly known as Bank of Tokyo Trust Company), as Servicing Bank

The Democratic Republic of Congo and the Central Bank of Congo hereby refer to the Refinancing Credit Agreement dated as of March 31, 1980 among the Democratic Republic of Congo (formerly known as the Republic of Zaire) and the Central Bank of Congo (formerly known as the Bank of Zaire), the Banks and Agents party thereto and the Bank of Tokyo-Mitsubishi Trust Company (formerly known as Bank of Tokyo Trust Company), as Servicing Bank.

The Democratic Republic of Congo and the Central Bank of Congo hereby acknowledge and confirm as of the date hereof their respective obligations with respect to the principal and interest unpaid under such Refinancing Credit Agreement consisting, in the case of interest, both of interest accrued on principal installments prior to the maturity and interest accrued on overdue principal and interest, and all other obligations arising under such Refinancing Credit Agreement in accordance with the terms thereof.

It is the intention of the Democratic Republic of Congo and the Central Bank of Congo in executing and delivering this acknowledgement formally to recognize and confirm all such obligations in order to eliminate any concerns any person holding claims under such Refinancing Agreement may have due to any possible application or any principles of

prescription, including without limitation those established by the New York statute of limitations, which might lead any such person to be concerned that the forbearance demonstrated to date by such person in refraining from acting to enforce such claims might have an adverse effect on the ultimate enforceability of such claims." CITI0000202, Ex. 22.

226.    On  February 25, 2003, Mr. Luongwe held the position of acting Minister of Finance and Budget of the DRC.  Defs.' Response to Request for Admission 29., Ex. 89.

227.    On February 25, 2003, Mr. Masangu held the position of Governor of the Central Bank.  Masangu Dep. at 13:3-13.

228.    On February 26, 2003 Ms. Bartner wrote an email to Michel Losembe with the subject line "Minister of Finance Resignation," (the "**February 26, 2003 A Email**"). CITI0000041, Ex. 30.

229.    The **February 26, 2003 A Email** reads:

"Hi Michel, Any progress? It's getting to the point where if they do not sign we will need to get lawyers involved to look into suing the country to preserve the creditors' rights. I am sure there is goodwill to sign, they just need to get it done."  CITI0000041, Ex. 30.

230.    Ms. Bartner identified the February 26, 2003 A Email (Bartner Exhibit 17) in her deposition.  CITI0000041, Ex. 30; Bartner Dep. at 150:16-25.

231.    On February 26, 2003 at 2:37 PM Michel Losembe sent an email to Ms. Bartner, and copied Michel Accad, Mabanzi Meti and Austine Ometoruwa, all of Citibank, with the subject line "London Club – DRC Debt Acknowledgement," (the "**February 26, 2003 B Email**"). CITI0000930-39, Ex. 38.

232.    The February 26, 2003 B Email reads:

"Good news! Just hung up the phone with Deputy Min Fin. He confirms having signed the Acknowledgement of Debt that will allow rollover of the March 31st, 1980 Refinancing Credit Agreement for another 6 years. The Governor of the Central Bank co-signed the document. I should receive the letter tomorrow, and will fax it right away, so no need to 'release' the lawyers as yet. Should I send the original to your office ?" CITI0000931, Ex. 38.

233.    Ms. Bartner identified the February 26, 2003 B Email (Bartner Exhibit 18) in her deposition.  CITI0000930, Ex. 38; Bartner Dep. at 152:7-13.

234.    Ms. Bartner testified that, after hearing from Mr. Losembe that the Deputy Minister of Finance confirmed he would sign the acknowledgement letter and the Governor would cosign, the question of the acknowledgement was resolved from her point of view. Bartner Dep. at 152:15-153:16; CITI0000930-31, Ex. 38.

235.    On February 26, 2003 at 7:42 PM Ms. Bartner sent an email to Michel Losembe and copied Michel Accad, Mabanzi Meti and Austine Ometoruwa, all of Citibank, with the subject line "London Club – DRC Debt Acknowledgement, " (the "**February 26, 2003 C Email**"). CITI0000931, Ex. 38.

236.    The February 26, 2003 C Email reads:

"Congratulations on getting the acknowledgement of debt signed. It could not have been done without you! Many thanks for the time you took to get it done. You could send me the original and I will deliver it to Bank of Tokyo Mistsubishi." CITI0000931, Ex. 38.

237.    On February 27, 2003, Michel Losembe sent a fax to Ms. Bartner regarding "DRC DEBT ACKNOWLEDGEMENT," (the "**February 27, 2003 Fax**") CITI0000201, Ex. 22.

238.    The February 27, 2003 Fax reads:

"Cecilia, As per our conversation yesterday, here is copy of the document duly signed by the Deputy Minister of Finance, Mr Luongwe and the Governor of the Central Bank, Jean-Claude Masangu, extending the validity of the March 31, 1980 Credit Refinancing Agreement between DRC and its London Club Creditors. I'll forward the original copy by DHL to your attention today, thanks to acknowledge receipt by email." CITI0000201, Ex. 22.

239.    The February 27, 2003 Fax attaches a copy of the 2003 Acknowledgment Letter, CITI0000202, Ex. 22.

240.    Ms. Bartner identified the February 27, 2003 Fax in her deposition (Exhibit 20). Bartner Dep. at 155:2-16.

241.    On February 27, 2003, Mr. Luongwe wrote a letter to the Vice-President of Citibank Congo, copying the Governor of the Central Bank and President and CEO of OGEDEP regarding, "Prorogation of the Refinancing Credit Agreement with the London Club Banks," (the "**February 27, 2003 Letter**"). CITI0000196, Ex. 33.

242.    The February 27, 2003 Letter reads:

"I have the honor of confirming receipt of your letter no. CB/CCO/CK-MBL/033/03 dated  February 20, 2003 by which you sent me, for signature, the draft prorogation document of the refinancing credit Agreement dated March 31, 1980 with the London Club Banks.

And following suit, I return it to you duly reflecting the authorized signatures. As this document constitutes a recognition of debt, I request the Central Bank of Congo and the OGEDEP who are copied herein, to take it into consideration, each [body] insofar as it is concerned, in the daily keeping of the great book of the public debt.

I hope that you will accept, Mr. Vice-President, my highest regards." CITI0000196, Ex. 33.

243.    The Defendants produced a signed copy of the 2003 Acknowledgement Letter during discovery in this litigation. DRC00003539, Ex. 60.

244.    BNP Paribas, one of the creditor banks, produced a copy of the 2003 Acknowledgement Letter in discovery in this litigation.  B-0002, Ex. 29.

245.    Ms. Bartner identified the BNP Paribas copy of the 2003 Acknowledgement Letter (Bartner Exhibit 28) in her deposition. She testified that she faxed the 2003 Acknowledgement Letter to Véronique Lebault of BNP Paribas. B-0002; Bartner Dep. 195:11-196:15.

246.    Ms. Bartner testified at her deposition that the 2003 Acknowledgement Letter, like the 1997 Acknowledgement Letter, was a blanket acknowledgement of the debt and did not include or attach any reconciliation schedule.  Bartner Dep. 130:14-21.

247.    Mr. Masangu identified his signature on the 2003 Acknowledgement Letter and the signature of Mr. Luongwe in his deposition and testified that the signatures were genuine. Masangu Dep. at 12:21-14:7.

248.    Mr. Masangu testified at his deposition that he signed the 2003 Acknowledgement Letter at the request of Mr. Luongwe. Masangu Dep. at 24:2-18.

249.    Mr. Masangu testified at his deposition that he signed the 2003 Acknowledgement Letter on behalf of the Central Bank as the Governor of the Central Bank.  Masangu Dep. at 24:2-18.

250.    Mr. Masangu testified at his deposition that his understanding of the 2003 Acknowledgement Letter was "the recognition of debt."  Masangu Dep. at 28:6-9.

251.    Mr. Masangu responded affirmatively when asked at his deposition if the 2003 Acknowledgement Letter was beneficial for the Central Bank and DRC.  Masangu Dep at 28:10-29:19.

252.    Mr. Masangu indicated at his deposition that he understood the purpose of the Credit Agreement.  Masangu Dep at 38:16-39:13.

253.    A copy of the Credit Agreement was maintained in the files of Citibank in Kinshasa.  DRC00004121, Ex. 77.

254.    On December 29, 2011, Mr. Losembe wrote to Masangu stating "we have found a copy of the first agreement from March 31, 1980 . . . Should this version interest you, we can send a copy upon request."  DRC00004121, Ex. 77.

255.    The individuals at Citibank overseeing Citibank's interests under the Credit Agreement were familiar with the terms of the Credit Agreement at all times up through the signing of the 2003 Acknowledgement Letter.

256.    Ms. Bartner testified at her deposition that no one ever told her the DRC said that the acting Minister of Finances and Budget of the DRC was not the proper person to have signed the 2003 Acknowledgement Letter.  Bartner Dep. 128:6-129:2.

257.    Ms. Bartner testified at her deposition that she was never told that the DRC claimed the signatures on the 2003 Acknowledgement Letter were not authorized signatures. Bartner Dep. at 166:2-8.

258.    Ms. Bartner testified at her deposition that once she obtained the signed acknowledgement letters it was her understanding that there would be another six years to resolve the debt.  She testified that negotiations between the DRC and Citibank and other banks on behalf of the London Club took place soon after the 2003 Acknowledgement Letter was signed. She did not participate in the meetings but recalls a meeting with junior people from the Central Bank or Ministry of Finance the purpose of which was to reconcile the debt.  She testified that she does not believe there was any resolution during the meeting nor were there any other discussions of the debt in 2003. She also testified that no one from the DRC or elsewhere ever told her that the debt was no longer enforceable. She also testified that there was never any claim by the DRC that the statute of limitations on the Credit Agreement had run. Bartner Dep. at 156:20-159:1.

259.    Ms. Bartner testified at her deposition that she was never told by the DRC that it had no obligation to repay the debt under the Credit Agreement.  She was also never told by the DRC that the 1991, 1997 or 2003 acknowledgement were not legally valid or binding on the DRC.  Bartner Dep. 101:17-102:4.

260.    The DRC, as principal, engaged in conduct which caused the Plaintiffs' predecessors-in-interest to believe that Mr. Luongwe had authority to sign and bind the DRC to the 2003 Acknowledgement Letter.

261.    No matter how extensive the Plaintiffs' predecessors-in-interest's inquiry into the authority of the signatories to the 2003 Acknowledgement Letter had been, there is very little chance they would have ever found out that Mr. Masangu and Mr. Luongwe lacked actual authority to bind the Defendants to the 2003 Acknowledgment Letter, assuming they lacked such authority.

262.    Based on the totality of the circumstances, it was reasonable for Plaintiffs' predecessors-in-interest to rely on the apparent authority of the acting Minister of Finances and Budget of the DRC to bind the DRC to the 2003 Acknowledgement Letter.

263.    Based on the totality of the circumstances, it was reasonable for Plaintiffs' predecessors-in-interest to rely on the apparent authority of the Governor of the Central Bank to bind the Central Bank to the 2003 Acknowledgement Letter.

264.    The DRC intended for Plaintiffs' predecessors-in-interest to rely on the validity of the 2003 Acknowledgement Letter and forego suing to enforce their rights under the Credit Agreement.

265.    The Central Bank intended for Plaintiffs' predecessors-in-interest to rely on the validity of the 2003 Acknowledgement Letter and forego suing to enforce their rights under the Credit Agreement.

266.    Plaintiffs' predecessors-in-interest in fact relied on the apparent authority of the signatories to the 2003 Acknowledgement Letter by foregoing bringing a suit to enforce their rights under the Credit Agreement.

267.    Plaintiffs' predecessors-in-interest's detrimental reliance on the apparent authority of the signatories to the 2003 Acknowledgement Letter is demonstrated by the fact that the debt under the Credit Agreement would no longer be valid absent a finding that the signatories to the 2003 Acknowledgement Letter did have authority to bind the Defendants.

268.    Through its numerous expressions, between March 7, 1997 and February 25, 2003, of its intent to discuss with creditors restructuring its obligations under the Credit Agreement, Zaire and the DRC communicated to creditors the message that it considered the 1997 Acknowledgement Letter to be valid and its debt obligations under the Credit Agreement to be enforceable during that period.

269.    The Council of Ministers of the DRC had actual or imputed knowledge of all material facts regarding the 2003 Acknowledgement Letter.

270.    Those with authority to ratify the signature of the Governor of the Central Bank on the 2003 Acknowledgement Letter had actual or imputed knowledge of all material facts regarding the 2003 Acknowledgement Letter.

271.    The Defendants accepted the benefits of the 2003 Acknowledgement Letter by avoiding having to defend against a lawsuit by Plaintiffs' predecessors-in-interest to enforce their rights under the Credit Agreement.

272.    The Council of Ministers of the DRC implicitly evidenced an intention to ratify the 2003 Acknowledgement Letter by its silence and acceptance of the benefits of the 2003 Acknowledgement Letter.

273.    The Central Bank implicitly evidenced an intention to ratify the 2003 Acknowledgement Letter by its silence and acceptance of the benefits of the 2003 Acknowledgement Letter.

274.    The Council of Ministers of the DRC engaged in acts and conduct that demonstrated an intention to ratify the 2003 Acknowledgement Letter.

275.    Those with authority to ratify the signature of the Governor of the Central Bank on the 2003 Acknowledgement Letter engaged in acts and conduct that demonstrated an intention to ratify that signature.

276.    The "State Commissioner General of Finances" referred to in Ordinance No. 80-073 of April 21, 1980 is equivalent to the position of Minister of Finances and Budget between March 20, 1991 and February 25, 2003.  Exs. 121-23; Chikuru Dep. at 10:17-11:11, 77:3-13, 85:18-86:8.

277.    On March 4, 2003 Ms. Bartner wrote an email to Michel Losembe of Citibank with the subject line "Acknowledgement of Debt," (the "**March 4, 2003 Email**"). CITI0000051, Ex. 31.

278.    The March 4, 2003 Email reads:

" Michel, Just wanted to let you know that I received the acknowledgement of debt. Thanks again! Question: Citibank International is agent for Sudan and they will have to go through the same process prior to September of this year. Who do you suggest we contact at Citi now that Sudan's office is closed?   I appreciate your help.  Hope all is well." CITI0000051, Ex. 31.

279.    Ms. Bartner identified the March 4, 2003 email (Bartner Exhibit 19) in her deposition.  CITI0000051, Ex. 31; Bartner Dep. at 153:22-24.

280.    Ms. Bartner testified at her deposition that Sudan and Liberia has similar debt statute of limitations issues as the DRC.  She testified that Citibank was an agent to Sudan and Citibank in London, and obtained a second acknowledgement letter from Sudan that tolled the statute of limitations of its debt.  Ms. Bartner testified she was involved in making sure that that the Sudan acknowledgement was obtained.  She was not involved in obtaining the acknowledgement by Liberia, rather it was Chase Manhattan Bank who would update Citibank. Bartner Dep. at 83:13-87:8.

281.    Ms. Bartner testified at her deposition that Sudan signed a debt acknowledgement letter similar to the 2003 Acknowledgement Letter, in 2003.  Bartner Dep. at 154:3-20.

282.    The fact that other sovereign states, including Sudan and Liberia, executed debt acknowledgment letters similar to the 2003 Acknowledgement letter under similar circumstances, and that the Defendants issued such Acknowledgement Letters in 1991 and 1997, demonstrates that these types of transactions are neither novel nor extraordinary.

283.    On March 13, 2003 Mr. Luongwe wrote a letter to the Managing Director of Citibank Congo, copying the Governor of the Central Bank and President and CEO of OGEDEP, regarding, "The London Club Case," (the "**March 13, 2003 Letter**"). CITI0000195, Ex. 33.

284.    The March 13, 2003 Letter reads:

"Mr. Managing Director, Within the context of an analysis of the sustainability of the DRC's external debt and in light of said debt's imminent eligibility for the Heavily Indebted Poor Countries initiative, I invite you to meet with the Ministry of Finance and Budget's experts, from the Central Bank of Congo and from the OGEDEP, at your convenience.

In view of the above, it would be a question of outlining your Institution's position regarding its debt on the DRC within in the context of the London Club. I await a diligent follow up, and I beg you, Mr. Managing Director, to accept my highest regards." CITI0000195, Ex. 33.

285.     On March 13, 2003 Véronique Lebault of BNP Paribas sent a fax to Cecilia Bartner with the subject line "Ex. ZAIRE," (the "**March 13, 2003 Fax**").  B-0001, Ex. 32.

286.     The March 13, 2003 Fax reads:

"Dear Cecilia, I was extremely pleased to meet you the other day at the Paris Club meeting after all these years. Would you be so kind as to give me further details regarding the acknowledgment of debt you managed to obtain from Congo. From what I gathered from you, then, you managed to have an acknowledgment of debt duly signed by the Congolese. Who are the people I should get in touch with in Democratic Republic of Congo to have the acknowledgment signed? Could you confirm me the various contact details you managed to get at the Agent's? Should not it be the role of the Agent to make all necessary steps to acknowledge the debt and not the 'subagents'? What is the contact name you got at the Agency? Thanks so much in advance."  B-0001, Ex. 32.

287.     Ms. Bartner identified the March 13, 2003 Fax (Bartner Ex. 21) in her deposition. She testified she recalled meeting Ms. Lebault at the Paris Club meeting organized by the Institution of International Finance to discuss issues pertaining to countries in general. She also testified that the DRC was not one of those countries. Ms. Bartner testified that she had discussions with Ms. Lebault, from BNP Paribas, regarding the DRC and how Ms. Lebault was confused as to whether she needed to obtain her own acknowledgement letter as well. Bartner Dep. at 160:5-161:13.

288.     In the March 13, 2003 Fax, Ms. Lebault asked Ms. Bartner "[c]ould you confirm me the various contact details you managed to get at the agents."  B-0001, Ex. 32.  Ms. Bartner testified at her deposition that Ms. Lebault did not speak English very well and it was her understanding that Ms. Lebault meant to inquire about the DRC and not the agents.  Ms. Bartner testified that in response to the March 13, 2003 Fax she provided Ms. Lebault with information that the acknowledgement of the debt was signed and that Ms. Lebault did not need to do anything further. Bartner Dep. at 194:3-195:8.

289.     On March 24, 2003, Michel Losembe sent a fax to Ms. Bartner of Citibank with the subject line "DRC – London Club Debt", transmitting two letters from the DRC Ministry of Finance, including a copy of the February 27, 2003, Fax and 2003 Acknowledgement Letter, (the "**March 24, 2003 Fax**").  CITI0000194, Ex. 33.

290.     The March 24, 2003 Fax reads:

"Cecilia, You'll find attached 2 letters from MINFIN. One is just the transmission letter for the Debt Acknowledgement you received last month. The second one is an invitation to meet the Central Bank, the MinFin and the Ogedep (Office de Gestion de la Dette Publique), to discuss of Citibank International's position on its receivable. It is in fact the meeting missed in Paris last December. To my knowledge Belgolaise already had a

separate meeting with the same group. I'll call you later today, to have your views on what position should be maintained during that meeting." CITI0000194, Ex. 33.

291.    Ms. Bartner identified the March 24, 2003 Fax (Bartner Ex. 22) in her deposition. She testified that the purpose of the fax concerned an invitation to meet the Central Bank, The Minister of Finance, and OGEDEP to discuss Citibank International's position on its receivables. She testified that she did not attend the meeting in Paris that she was invited to by Mr. Losembe. She testified that Michel Losembe attended on behalf of Citibank. Bartner Dep. at 161:17-163:22

292.    On March 26, 2003, Christian Kamanzi and Michel Losembe of Citibank sent a letter to Luhongwe Kabule Mulongo, Minister of Finance and copied to the Governor of the Central Bank and the Deputy General Manager, OGEDEP, with the subject line London Club Case (the "**March 26, 2003 Letter**").  DRC00004111-12, Ex. 36.

293.    The March 26, 2003 Letter reads:

"We hereby acknowledge receipt of your above-referenced letters concerning the above matter. We thank the Ministry of Finance and the Central Bank of Congo for having kindly sent us the Recognition of Debt, the signing of which de facto extends the validity of the March 31, 1980 Refinancing Credit Agreement with the London Club Banks and Agents for six more years. We confirm that we have forwarded the document to the Servicing Bank, the Bank of Tokyo- Mitsubishi Trust Company, who will send it to all of the creditors.  We are also prepared to meet with the experts from the Ministry of Finance & Budget, the Central Bank of the Congo, and the OGEDEP to discuss Citibank's position with respect to its loan to the DRC. Accordingly, we will contact your offices to arrange a meeting.  The reopening of the Debt case will certainly help to reinforce the standing and the credibility of the Democratic Republic of the Congo with the international financial community. Please do not hesitate to contact Citibank for any further information you may require in this matter." DRC00004111, Ex. 36.

294.    On March 28, 2003, Mr. Masangu wrote a letter to Jenepher Lattibeaudiere, Vice-President, Bank of Tokyo-Mitsubishi with the subject line "London Club" (the "**March 28, 2003 Letter**").  UB00001031, Ex. 37.

295.    The March 28, 2003 Letter reads:

"The delegation of the Democratic Republic of Congo that you met on February the 27, 2003 in New York, reported to me the good spirit and readiness of the BOT-M to assist my country in re-establishing the contact with its creditors members of the London Club.

I noted in particular that service arrears due to the BOT-M amounted to USD 633,000, and that your institution will soon submit to us proposals to settle that account.

In order to help us pursue the process of our external debt restructuring that we have started since September 2002 with the Paris Club and with the perspective of the DRC eligibility to the HIPC initiative, I would appreciate a prompt information on the actual composition of the London Club as well as the following details on each creditor

- the principal due

- arrears in principal and interests

- interest on arrears

I am also requesting from you by the same token, the list of OFAC countries in order to enable us a direct contact with some of our creditors.

Finally I'll be most grateful if you could inform member banks and agents of the London Club as well as the IMF and the World Bank of the recent initiative taken by the DRC towards the BOT-M in view of reviving its relations with the London Club.

The contact person for the IMF and the World Bank is :

- Mr Jean Clément, Deputy-Director at the Africa department, IMF

- Mr Emmanuel Mbi, Director of the Africa department of the World Bank

In case it might be of any interest I would like to remind you that the relations between the DRC and the London Club are guided by the Refinancing Credit Agreement of March 31,1980 for an amount of 402 millions USD. The renegotiation of the said Agreement appears today mandatory."  UB00001031-32, Ex. 37.

296.    On April 9, 2003 Michel Losembe sent an email to Ms. Bartner, and copied Michel Accad, Emeka Emuwa, Mabanzi Meti and Austine Ometoruwa, all of Citibank, with the subject line "London Club – DRC Debt Acknowledgement," (the "**April 9, 2003 Email**"). CITI0000930, Ex. 38.

297.    The April 9, 2003 Email reads:

"I had a meeting with MinFin, Central Bank and Ogedep (Office de Gestion de la Dette Publique) last week on the London Club Debt.  The government is working on a debt sustainability program that should ultimately have DRC reach the Decision Point for eligibility to HIPC.  As part of this exercise, they need to resume relations with all their creditors and set-up agreements to settle any outstanding debt . . . . The Gvt/Central Bank envisages to hold a London Club meeting in May, once they obtain the full information from Bank of Tokyo.  They hope they will be able to reach an agreement with the Club (Belgolaise, Citibank, BNP-Paribas) during that meeting . . . . " CITI0000930, Ex. 38.

298.    Ms. Bartner identified the April 9, 2003 Email in her deposition (Bartner Ex. 18). CITI0000930, Ex. 38; Bartner Dep. at 152:7-13.

299.    On July 3, 2003, the DRC send a Letter of Intent, Memorandum of Economic and Financial Policies and Technical Memorandum of Understanding to Mr. Horst Kohler, the Managing Director of the International Monetary Fund (the "**DRC IMF Filing**").  The DRC IMF Filing is publicly available on the IMF's website.  EXPERT00000139-65, Ex. 69.

300.    The DRC IMF Filing included a Letter of Intent signed by the President of the DRC, Joseph Kabila. EXPERT00000139-41, Ex. 69.

301.    Included in the Memorandum on Economic and Financial Policies within the DRC IMF Filing is a statement that reads: "As for its commercial bank creditors, the government has contacted the Bank of Tokyo, which assists the London Club in obtaining the required statistical data on outstanding debt.   In addition, the DRC hopes to obtain external debt-service relief as quickly as possible under the enhanced HIPC Initiative." EXPERT00000146, Ex. 69.

302.    On July 16, 2003, Jenepher Lattibeaudiere, Vice-President, Bank of Tokyo-Mitsubishi wrote a letter to Mr. Masangu and copied N. Essimbo and A. Kasongo, with the subject line "The Democratic Republic of Congo (formerly Republic of Zaire) Refinancing Credit Agreement dated as of March 31, 1980," (the "**July 16, 2003 Letter**").  CITI00001108-09, Ex. 40.

303.    The July 16, 2003 Letter reads:

"As Servicing Agent on the subject transaction, it was a pleasure meeting with your delegation last February to discuss the London Club transaction. We were informed by your delegation that the Republic of Congo will commence payment of Interest and Principal in the near further [sic] . . .

Today, July 16, 2003, we confirm receipt of US$ 63,000, as partial payment of our current outstanding fees of US$ 670,000. We discussed the possibility of discounting the amount owed with your delegation and would like to propose a discount of thirty percent.

With respect to the information requested in your letter of March 28, 2003, we have attached the following information:

List of participant banks as of March 1991, along with the outstanding principal amounts as of that date. Providing current information is possible. However the process is quite lengthy, cumbersome and costly.  Payment of our fees must be discussed, before we can proceed.

List of participant banks that are currently receiving monthly notice of the applicable interest rate. As a result of the Office of Foreign Assets Control (OFAC), we are prohibited from corresponding with several of your participant banks. Please review both lists as doing so with provide an indication of the banks omitted due to OFAC's regulation . . ."  CITI00001108, Ex. 40.

304.    Attached to the July 16, 2003 Letter are the addressees of monthly Zaire message. CITI00001110-12, Ex. 40.

305.    Also attached to the July 16, 2003 Letter is a list of participant banks, as of March 31, 1991, along with the outstanding principal amounts as of that date.  CITI00001113, Ex. 40.

306.    Ms. Bartner identified the July 16, 2003 Letter and attachments (Bartner Exhibit 25) in her deposition.  CITI00001105-13, Ex. 40; Bartner Dep. at 171:19-171:4.

307.     Union Bank produced a copy of the July 16, 2003 Letter in this litigation. UB00001041-43, Ex. 70.

308.     On August 5, 2003, Jenepher Lattibeaudiere, Vice President, Corporate Trust Department, Bank of Tokyo-Mitsubishi, wrote a letter to Jean-Claude Masangu Mulongo, Governor, Central Bank of Congo, and copied N. Essimbo and A. Kasongo, with the subject line "The Democratic Republic of Congo Refinancing Agreement dated as of March 31, 1980" (the "**August 5, 2003 Letter**"). UB00001039-40, Ex. 72.

309.     The August 5, 2003 Letter reads, in part:

" . . . . With respect to continuing to act as servicing agent, subject to settlement of the outstanding fees we are prepared to so act in consideration of your payment in advance of our normal annual administrative fees of $50,000, for the period commencing on April 1, 2003 and ending March 31, 2004.  Upon such payment (and settlement of outstanding fees) we would be pleased to provide an updated account file and assist in planning for such payments as you may agree with the banks involved.  If you are prepared to agree to resolve the foregoing matters as outlined above, please sign this letter in the space indicated below and return it to us by facsimile (212-782-5900) so that we can make preparations for future activity.   In any case feel free to contact the undersigned should you have any questions."  UB00001039-40, Ex. 72.

310.     On August 22, 2003,  Mr. Masangu wrote a letter to Jenepher Lattibeaudiere, Vice-President, Bank of Tokyo-Mitsubishi (the "**August 22, 2003 Letter**").  UB00001002, Ex. 39.

311.     The August 22, 2003 Letter reads:

"We acknowledge receipt of your letter dated August 8 confirming that you have received the USD 63,000 payment made by the DRC in July 2003 as an advance payment on the outstanding fees of USD 670,000 due to your Bank . . . In this regard, the DRC agrees to pay the Bank of Tokyo USD 406,000 to clear all arrears and USD 50,000 representing the annual servicing fees for March 2003 thru April 2004 . . . .We are looking forward to hearing from you . . . ."  UB00001002, Ex. 39.

312.     On September 17-18, 2003, meetings were held between Dennis Demetroupolos and Valerie Dunbar, of Bank of Tokyo-Mitsubishi and Ndombo Boole, Numayeme Manu Essimbo, Mambu Shembe Kasongo, and Kinol'Mvul Kitebi (DRC Delegation) regarding obtaining information on the debt and payment of outstanding fees.  UB00000555, Ex. 41.

313.     On September 19, 2003, Dennis Demetroupolos, Bank of Tokyo-Mitsubishi Trust Company, wrote Aristide Kasango Mambu Shembe, Advisor to the Governor of the Central Bank of Congo, and Dieudonne Essimbo Numayeme Manu, Advisor at the Ministry of Finance, with the subject line "DRC Visit", attaching a summary of the September 17-18, 2003 meetings (the "**September 2003 Meeting Summary**").   UB00000555-57; Ex. 41.

314.     The September 2003 Meeting Summary reads:

" SUMMARY OF MEETINGS REGARDING THE DEMOCRATIC REPUBLIC OF THE CONGO DELEGATES

ATTENDEES: MR. NDOMBO BOOLE, MR. DENNIS DEMETROUPOLOS, MS. VALERIE DUNBAR, MR. NUMAYEME MANU ESSIMBO, MR. MAMBU SHEMBE KASONGO, MR. KINOL'MVUL KITEBI, DATE: September 17, 2003 . . . .

SUMMARY OF SECOND MEETING HELD September 18, 2003

BTMT and Delegates met again to answer specific questions posed by Delegates with regard to the lists noted above . . . .

Based on other questions posed, the need for BTMT to continue to contact Agent Banks for confirmation was re-affirmed. Finalization of the Agent Banks and respective Syndicate Members is required by September 25th in order for DRC to settle the re-negotiation of the debt. DRC intends to have a meeting with Agent Banks by September 26th in Brussels and has requested that BTMT attend.

DRC asked BTMT to respond to specific questions regarding out of pocket expenses and on the amount of our annual administration fee ($50,000 vs. $25,000).

A list showing all principal and past due per Agent Bank was also provided.

BTMT agreed to prepare this summary to highlight points made at said meetings." UB00000555-57; Ex. 41.

315.     On September 19, 2003 Fikiri Alimasi wa Asani, Head of the Research Department, DRC Central Bank, and Kasongo Mambu Shembe, Advisor to the Governor, DRC Central Bank, sent a fax to Ms. Bartner and Michel Losembe and copied the DRC Central Bank Governor and Vice-Governor with the subject line "London Club," transmitting an acknowledgement of debt signed by Mr. Luongwe  and Mr. Masangu (the "**September 19, 2003 Fax**").  CITI0000199, Ex. 34.

316.     The September 19, 2003 Fax reads:

"Dear Madam, Sir

In view of the global settlement of its external debt and at the end of the negotiations with its creditors members of the Paris Club, the Democratic Republic of Congo envisages to meet its creditors members of the London Club. Therefore as the execution agent of the refinancing agreement of March 30, 1980, the Central Bank of Cong has the honour to convene you to a meeting of agents banks members of the London Club aiming at:

1. - assessing the present credit of each agent bank;

2. - suggesting a consensual proposal for the settlement of the indebtness;

3. - setting a now steering committee.

The meeting will take place on Friday September 26 2003 at 10h00, hotel SOFITEL, Toison d'Or avenue n° 40 in Brussels.

The official invitation from the Governor of the Central Bank of Congo is being faxed to you." CITI0000199, Ex. 34.

317.    Ms. Bartner identified the September 19, 2003 Fax (Bartner Exhibit 30) in her deposition. CITI0000199, Ex. 34; Bartner Dep. at 212:14-213:2.

318.    Union Bank produced a copy of the September 19, 2003 Fax in this litigation. UB00001268, Ex. 35.

319.    On September 22, 2003, Michel Losembe, Citibank Congo, wrote an email to Michel Accad, and copied Emeka Emuwa and Kasongo Kandolo, with the subject line "London Club meeting," (the **"September 22, 2003 Email"**). CITI0001710, Ex. 71.

320.    The September 22, 2003 Email reads:

"Michel,

As discussed, the Central Bank and the Min Fin organize a London Club meeting in Brussels on Sep 26th, to which Citi Congo is invited as creditor. Citigroup holds USD 17mios in principal (Kinshasa, NY and CIBL) - out of a total USD 356Mios -, and about the same amount in interest and penalties... Citibank Congo has high visibility on this file, as we were able to obtain earlier this year, renewal of DRC's debt acknowledgement that extended status of limitation for the 1980 Credit Refinancing Agreement.

DRC recently paid for the USD 500M arrears owed to the Bank of Tokyo-Mitsubishi (BOTM), Service Bank for the London Club. BOTM is busy gathering information on actual creditors and agents, and will update the figures for the accurate level of DRC indebtedness in this particular file.

As per information obtained from IMF and WB representatives, objective is to buy-back all small satellite debts in order to maintain a single file within the HIPC program to which DRC was made eligible in July 03. Another small debt (Kinshasa Club) is currently being paid for, after creditors agreed to concede a significant discount to the DRC. Government target is to obtain the 'Cologne Terms' or 90% discount on face value (interest capitalized). IMF rep -off the records – would consider a refinancing from 'Naples terms' or 67% discount.

I believe we have a good chance to obtain some payment - or some Breton Woods guaranteed agreement- before year-end. Cecilia Bartner of Citi NY (Bill Rhodes office) will probably attend the meeting as well. I will let you know the outcome after the meeting." CITI0001710, Ex. 71.

321.    On September 24, 2003, Ms. Bartner, wrote an email to Aristide Kasango Mambu Shembe, Advisor to the Governor of the Central Bank of Congo, and copied Michel Losembe,

with the subject line 'DRC Call Memo,' attaching a memo (the "**September 24, 2003 Memo**."). The email reads: "Mr. Kasongo, Below please find the call memo you requested." CITI0001217, Ex. 42.

322.    The September 24, 2003 Memo was written by Ms. Bartner and addressed to the File. The subject line is "Meeting with the Democratic Republic of Congo (DRC) Delegation." CITI0001218, Ex. 42.

323.    The September 24, 2003 Memo reads:

"The undersigned met with Mr. Aristide Kasongo Mambu Shembe, Advisor to the Governor of the Central Bank of Congo and Mr. Dieudonne Essimbo Numayeme Manu, Advisor at the Ministry of Finance, on September 16th, at Citibank, N.A.'s offices at 399 Park Avenue in New York. The purpose of the meeting was their desire to meet with London Club creditors and in our case Agent of several loans within the Refinancing Agreement to discuss the London Club debt. We discussed the principal and interest reconciliation phase that Bank of Tokyo Mitsubishi is coordinating as Servicing Bank and I offered our support should they need our help in advancing the process. We also talked about their desire to discuss a deal for the London Club that would equate to their expected HIPC status, which they believe they will get in a few months. I indicated that it would be important to have a group of creditor banks meet with them in an effort to negotiate with DRC an offer that would be a win-win solution to the defaulted external debt. One where most if not all creditors would want to participate." CITI0001218, Ex. 42.

324.    Ms. Bartner identified the September 24, 2003 Memo Bartner (Bartner Ex. 26) in her deposition. She identified the meeting with Aristide Kasongo and Dieudonne Essimbo at the meeting memorialized in the September 24, 2003 Memo. She testified that the purpose of the meeting was discuss the reconciliation of the 1980 debt. Bartner Dep. at 172:14-174:9.

325.    On September 29th, 2003, Michel Losembe wrote a memorandum from Citibank Congo Sarl (for Citigroup) to DRC London Club Members, and copied the Central Bank of Congo, with the subject line "Banks Position – Brussels Meeting" (the "**September 29, 2003 Memo**"). UB00001915-16, Ex. 43.

326.    The September 29, 2003 Memo reads:

"Further to the London Club meeting held in Brussels on September 26th, Banks and Agent Banks present or represented noted the DRC's proposals (Ministry of Finance and Central Bank) and decided to hold following position:

Banks broadly agreed with updated provisional numbers presented by the Bank of Tokyo-Mitsubishi (BOTM) — as at September 1st, 2003 - on the new level of the debt Stock with following details : Past Due Principal USD 359MM; Past Due Regular Interest USD 24MM; Past Due Interest on Overdue Principal USD 450MM; or a total stock of USD 833MM . . . .

Banks noted DRC's agreement with the global amount of USD 833MM – to be fine-tuned - as being the basis of future discussion/negotiation with the Steering Committee . . . .

The March 31st 1980 Agreement will have to be amended to include Debt Forgiveness notion. The decision making process amongst members should also be reviewed (majority or unanimity), since several agents are unreachable and creditors/amounts may not be confirmed. This will require legal counsels (of all parties) to be involved as soon as possible.

DRC's Minister of Finance announced DRC's wish to dose the London Club debt before year-end, a new meeting will be scheduled once significant progress is done on the above." UB00001915-16, Ex. 43.

327.     On October 7, 2003, Michel Losembe wrote and email to Renaud Huvelle, Belgolaise, glu@belgolaise.com, Mauk Faber, Rabobank, Patrick VanLeeuwen, Rabobank, and copied Dennis Demetroupolos, Bank of Tokyo-Mitsubishi, and Ms. Bartner,  with the subject "Brussels Meeting – Banks' position," (the "**October 7, 2003 Email**").  Attached to the October 7, 2003 Email is a copy of a summary of a London Club meeting held in Brussels on September 26, 2003. CITI0001028, Ex. 44.

328.     The October 7, 2003 Email reads:

" All, Nice meeting you in Brussels last month. The Central Bank asked me to summarize banks' position after Sep 26th meeting on the London Club debt. You'll find attached the positions we expressed by then. Plse feel free to complete/correct some of the points, so as I can fwd a copy to the BCC tomorrow." CITI0001028, Ex. 44.

329.     Attached to the October 7, 2003 Email is a copy of the September 29, 2003 Memo. CITI0001029-30, Ex. 44.

330.     Ms. Bartner identified the October 7, 2003 Email (Bartner Exhibit 31) in her deposition.  She testified that the other people who received the email were persons invited to the September 26, 2003 meeting.  The e-mail from Mr. Losembe was intended to summarize the Central Bank of the Congo's position following the September 26, 2003 meeting on the London club Debt. Ms. Bartner testified that Mr. Losembe attended the meeting and that the September 26, 2003 meeting took place. She also testified that she did not recall speaking with Mr. Losembe at the meeting and that Mr. Losembe represented Citibank at the September 26, 2003 London Club meeting. Bartner Depo 214:13-216:20; CITI0001028, Ex. 44.

331.     The 2003-2004 Annual Report of the Central Bank of Congo (the "**2003-2004 Annual Report**") contains a letter signed by Mr. Masangu to "His Excellency the President of the Republic" with the subject line "Presentation of the Annual Report for the Central Bank of Congo for the Years 2003 and 2004."  The letter reads, in part: "I am pleased to present the Annual Report for the Central Bank of the Congo for the 2003 Fiscal Period to you, pursuant to the statutory provisions of the Issuing institution . . ." DRC000798-99, Ex. 96.

332.     The 2003-2004 Annual Report is or was publicly available. Ex. 95 & 96.

333.    The 2003-2004 Annual Report contains the following statement:

"The DRC resumed dialogue with the London Club in February 2003, via contacts with the servicing bank (Bank of Tokyo) and the two largest creditors, Belgolaise Bank and Citibank. It should be pointed out that the arrears for the servicing premium to the Bank of Tokyo were discharged in August 2003 and the service fees for the period from April 2003 to March 2004 were paid. In September 2003, the DRC and its main London Club creditors met in Brussels to carry out the reconciliation of the statistics for the debt to this club and to examine the terms for payment of the arrears." DRC000934, Ex. 95.

334.    The 2003-2004 Annual Report states that, as of 2003, the Central Bank held foreign currency reserves worth over 33 billion Congolese Francs – or approximately $89.8 million at the then-current exchange rate. DRC001052-1053, Ex. 96.

335.    There was no indication in the 2003-2004 Annual Report's section on the DRC's external debt that the debt under the Credit Agreement was time barred or otherwise unenforceable. Ex. 95 & 96.

336.    On June 17-18, 2004, meetings took place at the Bank of Tokyo-Mitsubishi Trust Company, New York City, and were attended by the Democratic Republic of Congo (Daniel Besa Kipasa, Kitebi Kirge Nuul, and Jean Pierre Mukadi Mubenga, for both Day 1 and Day 2), the World Bank (Ann Christine Rennie, for Day 1), the Bank of Tokyo-Mitsubishi Trust Company (Valerie Dunbar for Day 1, Charles Ryan for Day 1, and Dennis Demetroupolos for both Day 1 and Day 2) (the "**June 17-18, 2004 Meetings Summary**").  UB00000938-39, Ex. 45.

337.    The June 17-18, 2004 Meetings Summary reads:

" Day 1:

► Ms. Rennie provided information as to what the World Bank's role is in the restructuring of the external debt of DRC.

The World Bank will provide funding for advisor and legal services for the negotiation for settlement of the outstanding debt to the London Club creditors. Settlement in purchasing the outstanding debt is expected to be at a discount and the World Bank will provide the financing following certain process of formal approval . . . .

Day 2:

► DRC requested that an updated calculation of total principal and interest outstanding. Also a list of current creditors was requested and received, with the understanding that not all information is confirmed . . . .

► BTMT to advise Agent Banks of DRC intention to settle the debt of the London club with the help of the World Bank . . . ." UB00000938-39, Ex. 45.

338.    On December 10, 2004, Nelson Kercado, Trust Officer, Bank of Tokyo-Mitsubishi wrote a letter to Ms. Masangu, and copied to Union Bank of California, NA, with the

subject line 'Notice of Resignation as Servicing Agent and important account transition information BTMT Reference number: 10-PA-6', enclosing a list of creditors (the "**December 10, 2004 Letter**"), UB00003162-63, Ex. 73.

    339.   The December 10, 2004 Letter reads:

"Dear Mr. Mulongo:

Pursuant to Section 11.05 of the (Refinancing Agreement among Banque Centrale du Congo f/k/a Republic of Zaire, the agents, and Bank of Tokyo-Mitsubishi Trust Company f/k/a The Bank of Tokyo Trust Company dated as of March 31, 1980, as amended, under which we act as Servicing Agent (the 'Account'), this notify you of our decision to resign as Servicing Agent effective December 10, 2004 or as soon thereafter as a successor is appointed and assumes that function from us. We are prepared to assist in transition arrangements including preparation of appropriate documentation in the coming weeks.

You may also be aware that Bank of Tokyo-Mitsubishi Trust Company ('BTMT') has transferred substantially all of its corporate trust business to Union Bank of California, N.A. ('UBOC'), also a member of the Mitsubishi Tokyo Financial Group with effect from December 11, 2004. Pending appointment of a successor Servicing Agent following our resignation there from mentioned in the above paragraph, we wanted to inform you of certain transition arrangements relating to your Account and updated contact information

UBOC has hired our account administrators who have been handling your Account and who will be based at UBOC's New York trust office. BTMT has also arranged for UBOC to administer the Account on BTMT's behalf effective as of December 11, 2004. Under this arrangement, although BTMT will remain the named Servicing Agent (and any documents would be executed in its name), the following changes will take effect:

UBOC will maintain the books and records relating to your Account and.

UBOC, on our behalf, will handle correspondence, provide periodic interest rate information, and generally take care of all communications regarding your Account. Note that interest rate information will be provided by facsimile and not by telex (updated facsimile information has been requested by telex and UBOC will maintain complete records thereof in connection with eventual restructuring negotiations)

Updated contact and related information in connection with the foregoing are as follows:

Union Bank of California, N.A.
551 Madison Avenue
11th Floor
New York, New York 10022
Phone: (646) 452-2010
Fax: (646) 452-2000
Email: nelson.kercado@uboc.com" UB00003162, Ex. 73.

340.    On March 15, 2005, Denis Kashoba, Esq., DRC Minister of Finance, wrote a letter to Mr. Nelson, Assistant to the Vice President, Union Bank of California.  Kashoba signed the letter (the "**March 15, 2005 Letter**"), and attached an "Order for Joint Mission." UB00000957-59, Ex. 46.

341.    The March 15, 2005 Letter reads:

"Dear Sir:

In response to your letter to the Governor of the Central Bank of the Congo in December 2004, it is my pleasure to inform you of the arrival in New York of a delegation of Experts from the Government of the DRC assigned to discuss the following issues with your bank:

Briefing on the taking over of the of management of the DRC's case by your Bank, the Union Bank of California, the new servicing bank for the London Club, replacing the Bank of Tokyo.

Meeting with the London Club Project Manager at the World Bank regarding his assistance to the DRC for the payment of the balance of its debts to the London Club after relief;

Finalizing the reconciliation of figures with certain creditors previously subject to the OFAC Order prohibiting all bank and non-bank financial institutions from cooperating with the [illegible] creditors, as in the case of the Libyan Arab Foreign Bank;

The delegation will be composed of: Mr. Daniel Besa, adviser in charge of debt and the HIPC Mechanism at the Ministry of Finance;

Mr. Michel Velela Kusungama, adviser in charge of debt at the Ministry of the Budget;

Mr. Fikiri Kalimasi, Director of Research at the Central Bank of the Congo;

Mr. Boole Ndombo, Deputy Department Head at the Public Debt Management Office (OGEDEP).

Work will begin on Monday, March 21, 2005 at the headquarters of your bank in New York, in the presence of Mr. Yvan Rossignol, London Club Project Manager at the World Bank."  UB00000957-58, Ex. 46.

342.    The Order for Joint Mission, signed by Denis Kashoba, DRC Minister of Finance, and attached to the March 15, 2005 Letter reads:

"ORDER FOR JOINT MISSION No. 035 CAB/MIN/FINANCES/2005

The persons whose names and titles appear below have been assigned to carry out an official mission in the United States (New York) and in France (Paris).

They are:

• Mr. Daniel Resa-Kipasa: Adviser at the Ministry of Finance

• Mr. Michel Velala Kusungama: Adviser at the Ministry of the Budget

• Mr. Boole Ndombo Bolomele: Director of Research at OGEDEP

PURPOSE OF MISSION: - Finalize and harmonize the statistical situation of the London Club with the California Bank in New York; - Negotiate with Crédit Commercial de France in Paris.

DURATION: ten (10) days

DEPARTURE DATE: March 18, 2005

RETURN DATE: March 27, 2005

ITINERARY: Kinshasa - Paris - New York - Paris - Kinshasa

MEANS OF TRANSPORTATION: By air

MISSION COSTS : To be paid by the Treasury Department

Both the civilian and military authorities are asked to provide the assistance required for the accomplishment of their mission."  UB00000959, Ex. 46.

343.     A March 31, 2005 a memo entitled "Minutes of Meeting" summarizes meetings that  took place at Union Bank of California, New York, NY, on March 24, 29 & 31 2005, with the subject line "Refinancing Credit Agreement, Dated as of March 31, 1980" (the "**March 24, 29 & 31 2005 Meeting Minutes**").  The March 24, 29 & 31 2005 Meeting Minutes were signed on March 31, 2005 by Daniel Besa Kipasa, Michel Valela Kusungama, and Charles Ryan. UB00000950, Ex 47.

344.     According to the March 24, 29 & 31 2005 Meeting Minutes**,** attendees listed for the for the March 24, 29 & 31 2005 meetings included: for DRC, Daniel Besa Kipasa, Counselor In Charge of Public Debt to the Ministry of Finance, Michel Velala Kusungama, Counselor In Charge of Public Debt to the Ministry of Budget and Zenon Mukongo, First Counselor, Permanent Mission of the DRC to the U.N.  Attendees for Union Bank of California included: Valerie Dunbar, Vice President, Charles Ryan, Vice President and Manager, Dennis Demetroupolos, Vice President.  UB00000950, Ex. 47.

345.     The March 24, 29 & 31 2005 Meeting Minutes reads:

"MAIN TOPICS DISCUSSED

1. DRC requested and received an updated calculation of total principal and interest outstanding. Also a list of current creditors was requested and received, with the understanding that not all information is confirmed.

2. The December 2004 letter from Bank of Tokyo-Mitsubishi Trust Company giving notice of its decision to resign as Servicing Agent effective December 10, 2004 or as soon as thereafter as a successor is appointed and assumes that function. The Bank of Tokyo-Mitsubishi Trust Company has decided to no longer provide corporate trust services.

3. Until a successor is appointed, the Bank of Tokyo-Mitsubishi Trust Company has arranged for its affiliate, Union Bank of California, to provide administrative services for this account on its behalf. Under this arrangement, while the Bank of Tokyo-Mitsubishi Trust Company will remain the named Servicing Agent, Union Bank of California will maintain the records and books relating to this account and take care of all communications.

4. Union Bank of California inquired as to what steps are being taken by the DRC so that another Servicing Agent be appointed. The DRC delegation will look into this matter, after consultation with its competent authorities.

5. The Servicing Agent has attempted to contact all Agent Banks to confirm the outstanding principal and interest amounts due, and the current creditors. Several of the Agent Banks cannot provide any information as records cannot be located or an appropriate person or department could not be found that has knowledge of this account. Many of the Agent Banks over the years have gone through mergers, even multiple mergers, which makes it difficult to maintain records of many years ago.

6. Additionally, while there is reasonable confidence in the up-to-date amounts of principal and interest due, for some past transactions the Servicing Agent does not have the loan participation assignments to confirm all the current creditors. To minimize this problem there has been communication (and still continuing) with the Agent Banks, the ones that have available records to reconcile. In cases where the records of the Agent Banks and those of the Servicing Agent are not identical, the Agent Banks' records will be considered correct.

7. The Servicing Agent, upon request from DRC, has contacted the Libyan bank who is a creditor to confirm the outstanding amounts. This creditor's records confirm the outstanding principal amount, however the amount of interest due is lower in the creditor's book. The Agent Bank has agreed with the Servicing Bank's figures, until further verification of the amounts.

8. The World Bank has assigned a project coordinator to deal with the restructuring. DRC will provide further information to the World Bank to move forward in order to settle the London Club debt." UB00000950-51, Ex. 47.

346.   The 2004-2005 Annual Report of the Central Bank of Congo (the "**2004-2005 Annual Report**") contains a letter signed by Mr. Masangu to "His Excellency the President of the Republic" with the subject line "Presentation of the Annual Report for the Central Bank of Congo for the 2004-2005 Fiscal Periods."  The letter reads: "I am pleased to present the Annual

Report for the Central Bank of the Congo for the years under consideration . . ." DRC001106-07, Ex. 98.

347.     The 2004-2005 Annual Report is or was publicly available. Ex. 97 & 98.

348.     The 2004-2005 Annual Report contains the following statement:

"Debt servicing payments to the London Club stopped in 1990.

At the close of a mission carried out by the London Club Committee to meet with Belgolaise [Bank], Citibank New York and the Bank of Tokyo from September 9 to 28, 2003, the virtual debt stock due to this Club was evaluated by the servicing bank at 833.7 million USD.

During the information meeting organized by the DRC with the London Club creditors in Brussels on September 26 of the same year, the country made the commitment to implement, in cooperation with the World Bank, a refinement mechanism for these arrears after a negotiation of their value. The World Bank support would apply in three areas, namely, financing for a consulting firm specialized in the evaluation (or costing) of bonds in the securities market, the payment of legal fees incurred for the implementation of the legal framework for the operation, and the partial or total assumption of the redemption price after value negotiations.

The consultant to be recruited must, with Congolese experts, proceed with an identification of all of the creditors-members of this Club not yet listed by the servicing bank, a reconciliation of statistics with each one of them, debt relief negotiations in accordance with the Cologne terms, payment of the amount agreed with each creditor using the financial contribution from the World Bank." DRC001296-97, Ex. 97.

349.     The 2004-2005 Annual Report states that, as of 2004, the Central Bank held foreign currency reserves worth over 102 billion Congolese Francs – or approximately $230.7 million at the then-current exchange rate.   DRC001399-1400, Ex. 98.

350.     The 2004-2005 Annual Report states that, as of 2005, the Central Bank held foreign currency reserves worth over 55 billion Congolese Francs – or approximately $129 million at the then-current exchange rate. DRC001399-1400, Ex. 98.

351.     There was no indication in the 2004-2005 Annual Report's section on the DRC's external debt that the debt under the Credit Agreement was time barred or otherwise unenforceable. Ex. 97 & 98.

352.     Mr. Masangu testified at his deposition that the Defendants adopted a strategy to obtain an 80-90 percent reduction in their debt in approximately 2006-2007.  Masangu Dep. 48:24-49:6.

353.     The 2006 Annual Report of the Central Bank of Congo (the "**2006 Annual Report**") contains a letter signed by Mr. Masangu to "Mr. President of the Republic" with the subject line "Annual Report of the Central Bank of Congo." The letter reads, in part: "Please find

enclosed the Annual Report of the Central Bank of Congo for the Fiscal Year 2006  . . . ."
DRC001470-1, Ex. 48.

354.    The 2006 Annual Report is or was publicly available. Ex. 48 & 68.

355.    The 2006 Annual Report states that, as of December 31, 2006, the Central Bank
held foreign currency reserves worth over 78 billion Congolese Francs – or approximately
$182.5 million at the then-current exchange rate. DRC001698-701, Ex. 48.

356.    The 2006 Annual Report contains the following statements:

"Service with respect to the London Club was not performed this year because of the lack
of negotiations leading up to the reductions under the PPTE.  The procedure of the
buyback of this debt by the World Bank, after negotiation of the tax relief with creditors,
is in the process of realization."

* * *

 "Debt service was not paid to the London Club this year because of the failure to hold
negotiations towards debt relief pursuant to the PPTE process. The World Bank is
currently in the process of purchasing this debt, after reaching an agreement with lenders
on a discount."  Ex. 48.

357.    There was no indication in the 2006 Annual Report's section on the DRC's
external debt that the debt under the Credit Agreement was time barred or otherwise
unenforceable. Ex. 48.

358.    The 2007 Annual Report of the Central Bank of Congo (the "**2007 Annual
Report**") states in part:

"3. London Club

The debt buyback process by the World Bank is thwarted by three demands from the
institution's consultants, namely: the gentlemen's agreements, loans bought by Red
Mountain, and the Belgolaise loans.

a. Gentlemen's agreements

As a reminder, there is a discrepancy between the numbers from Congolese experts and
those from the consultants on the total debt owed to the London Club. This difference is
explained by the fact that the consultants' calculations are based on the March 1980
Refinancing Agreement whereas the Congolese parties have taken into account the four
gentlemen's agreements signed between then and 1989. In order to move forward with
this reasoning, the Congolese experts were supposed to have sent copies of said
gentlemen's agreements to the consultants. However, to date, these agreements have still
not been found within the departments that manage the DRC's debt.

76

In light of this situation, the Congolese parties have opted to subscribe to the total debt calculation as calculated by the advisers, subject to obtaining, in time, copies of the gentlemen's agreements. Indeed, considering Belgolaise [Bank]'s withdrawal, the difference between these two totals will no longer be large.

b) Loans purchased by Red Mountain

Red Mountain had acquired a significant amount of Congolese debt on the secondary market and the Democratic Republic of Congo has completely satisfied [its debts to Red Mountain]. The consultants wanted to use the original amount of this debt in order to subtract it from the outstanding London Club debt. The necessary information was submitted to BCeCo by OGEDEP so that it could be sent to the interested parties.

c) Belgolaise Loans

In a letter dated December 6, 2007, addressed to the Ministry of Finance, Belgolaise Bank has affirmed that it will no longer seek recovery of its London Club loans and that it is abandoning its role as an agent bank of the Club. The legal advisor expressed strong reservation about the legal effectiveness of this letter. In his opinion, there is a difference between waiving a loan (the loan in canceled) and waiving the recovery of a loan (the loan is deferred). The latter interpretation would not protect the Congolese State from third parties acting in bad faith to claim the payment of these loans. Following this reaction, various messages have been exchanged between the Minister of Finance and Belgolaise Bank in our to find an appropriate interpretation. Given that none of Belgolaise's letters have been met with the legal advisor's satisfaction and in order to avoid an endless exchange of messages between the DRC and Belgolaise Bank, on July 5, 2008, the Minister of Finance sent a letter to the Bank underscoring the fact that the DRC's government is acknowledging the total and definitive cancelation of this debt to Belgolaise Bank as part of the London Club. Based on this, he instructed different departments to remove the above mentioned loans from their books.

Thusly, there should no longer be anything hindering this case. However, given that these advisors' contracts expire in August 2008, the BCeCo must prepare a rider to said contracts for their extension." Ex. 107.

359.    The 2007 Annual Report contains the following statement:

"The debt buyback process by the World Bank is thwarted by three demands from the institution's consultants, namely: the gentlemen's agreements, loans bought by Red Mountain, and the Belgolaise loans." Ex. 107

360.    There was no indication in the 2007 Annual Report's section on the DRC's external debt that the debt under the Credit Agreement was time barred or otherwise unenforceable. Ex. 107.

361.    On July 4, 2007 Mr. Masangu, wrote to California Union Bank, (the "**July 4, 2007 Letter**").

77

362.    The **July 4, 2007 Letter** reads:

"Sirs, Within the context of the updating of statistics related to the DRC's external debt, I would like to ask you to communicate to the Central Bank of Congo the state of the country's obligations to the London Club as of June 30, 2007. Please accept, Sirs, my highest regards." DRC00003542, Ex. 49.

363.    A copy of the **July 4, 2007 Letter** was also produced by Union Bank in this litigation. UB00001910, Ex. 50.

364.    On July 26, 2007, Mr. Masangu wrote a letter  to California Union Bank, NY Corporate Trust Administration, to the attention of Patricia Phillips and Hugo Gindraux, (the "**July 26, 2007 Letter**").

365.    The **July 26, 2007 Letter** reads:

"Dear Sirs: Further to my letter D.19/Gov. No. 000864 of July 04, 2007, I hereby inform you that the International Institute for Africa (IIA) and Sovereign Advisers Ltd. (SAL) have received a mandate from the Congolese authorities to assist them in restructuring the Democratic Republic of the Congo's external bank debts. This project is being financed by the IDA, a subsidiary of the World Bank. Consequently, we authorize CALIFORNIA UNION BANK/NY Corporate Trust Administration to meet with Mr. Andrey Kidel, Managing Director of SAL and Ms. Jill Osborn, Senior Financial Adviser, and to provide them with the information required to fulfill their mission." UB00001911, Ex. 50.

366.    On September 4, 2007, Mobali Moluambuku, of the DRC Delegation, wrote an email to Hugo Gindraux of Union Bank, with the subject line "message," (the "**September 4, 2007 Email**"). DRC00003541, Ex. 52.

367.    The September 4, 2007 Email reads:

"Mr. Hugo Gindraux, I'm writing to you on behalf of a Congolese delegation that would like to come to Union Bank of California, in its capacity as LONDON CLUB servicing bank, to make initial contact and to conduct working sessions on the reconciliation of statistics. The team would like this work to take place anytime after September 15, according to the date that would best suit your bank.

The team is composed of:
- A representative from the Ministry of Finance;
- Mr. Boole Ndombo, Director of Research at the Office of Public Debt Management (OGEDEP);
- Mr. Mukadi Mubenga, Director of external debt at OGEDEP;
- Mr. Mobali Moluambuku, Head of Research Management at the Central Bank of Congo (CBC);
- Mr. Mukinayi, Head of Foreign Services Management at the CBC.
Please confirm which date would work best for you.
Please accept, Mr. Hugo, our highest regards." DRC00003541, Ex. 52.

368.    On October 10, 2007, each of the five members of the delegation referred to in the September 4, 2007 Email signed a document entitled "Certificate of Outstanding Democratic Republic of Congo f/k/a Republic of Zaire," including: Mpako Tokine, Boole Mdonbo B, Mukani Mubenga, Mukinan Tshimanga, Mobali Moluambuku, (the "**October 2007 Certificate**"). UB00001500, Ex. 53.

369.    The October 2007 Certificate reads:

"Union Bank of California , N.A. as Agent for Bank of Tokyo-Mitsubishi UFJ Trust Company, the Servicing Bank under that certain Refinancing Credit Agreement dated March 31, 1980 hereby confirms that the outstanding balance under said Agreement due on of November, 2007 on our books is as follows:

Principal: USD 359,517,002.16

Interest due from April 2, 1990 to November 1, 2007: USD 486,524,643.58

Total: USD 846,041,645.74" UB00001500, Ex. 53.

370.    On December 11, 2007, Banque Belgolaise wrote a letter to Union Bank of California, Attn: Mr. Charles Ryan, copying Athanase Matenda, the Minister of Finance of the Democratic Republic of Congo, and Mr. Masangu, with the subject "'London Club' Refinancing Credit Agreement dated March 31, 1980" (the "**December 11, 2007 Letter**").  The letter was signed by Jean-Francois Beyer and Michel Clerckx.  Attached to the letter is a list of the credit schedules, agents, refinance principal amount and Belgolaise registered credits.  UB00001480-82, Ex. 54.

371.    The December 11, 2007 Letter reads:

"As announced at the beginning of 2005, Fortis Group, the sole shareholder of Belgolaise Bank, conducted a strategic review of its activities, including the position of Belgolaise Bank. It was, in this context, decided to proceed to the gradual wind-down of the activities of Belgolaise Bank and to divest its shareholding interests in its African affiliate 'banks . . . As of today, the various Credits listed in Schedule 1 to the present letter are still registered in the name of Belgolaise Bank, Taking into account its own specific situation, Belgolaise Bank has decided, as far as it is concerned:

-    to renounce pursuing the recovery of any of the Credits listed in Schedule I to the

-    present letter and relating to the Agreement,,

-    to cease being a Bank Creditor under the Agreement and

-    to relinquish its Agent role for some of the Credits under the Agreement.

The Democratic Republic of the Congo as Obligor, represented by its Ministry of Finance, and the Central Bank of Congo, have been informed of the above decisions.

This letter therefore constitutes formal notice to Union Bank of California, as Servicing Bank, that :

-   Belgolaise Bank is no more a Bank Creditor of the Democratic Republic of the Congo under the Agreement and that

-   Belgolaise Bank resigns, pursuant to Section 11.06 of the Agreement, as Agent for Credit Information Schedule A-6, A-9, A-11a, A-1 lb. A-12, A-13a, A-13b, A-14a, A-14b, A-15, A-16, A-21, A-22, A-23, A-24, A-25 and A-27 of the Agreement.

Belgolaise Bank will also inform the other Agent Banks and the Syndicate Banks for which it is an Agent of its above decisions." UB00001480-81, Ex. 54.

372.    The December 11, 2007 Letter attaches a list of the credit schedules to the Credit Agreement, the refinanced principal amount and Belgolaise registered credits. UB00001482, Ex. 54.

373.    Through its numerous expressions, between February 25, 2003, and February 24, 2009, of its intent to discuss with creditors restructuring its obligations under the Credit Agreement, the DRC communicated to creditors the message that it considered the 2003 Acknowledgement Letter to be valid and its debt obligations under the Credit Agreement to be enforceable during that period.

374.    On March 27, 2009, Thierry Desjardins and Muriel Ymonet of BNP Paribas wrote a letter to Mr. Masangu, regarding "Debt recognition," (the "**March 27, 2009 Letter**"). DRC00003537, Ex. 60.

375.    The March 27, 2009 Letter reads:

"Mr. Governor, We have the honor of referring to our previous email dated March 5, 2009 by which we were informing you of the need to update the recognition of the debt detailed in attachment 1 and signed on February 25, 2004 by you yourself as Governor of the Central Bank and Minister of Finance and Budget and a representative of the Democratic Republic of Congo for the outstanding balance recorded within the context of the March 1980 Refinancing Agreement between the Republic of Zaire, the Bank of Zaire, the Agents, of which one is BNP Paribas and the original credit Banks, as well as by 'The Bank of Tokyo Trust Company' acting as Servicing Bank. Would you kindly let us know when this new Debt Recognition document could be sent to us, reminding you of course that we remain at your disposal for any further information that you might need in order to send this to us. We thank you in advance for your response and we hope that you will accept, Mr. Governor, our highest regards." DRC00003537, Ex. 60.

376.    A duplicate copy of the March 27, 2009 Letter was produced by BNP Paribas. B-0019, Ex. 59.

377.    On May 15, 2009, Muriel Ymonet of BNP Paribas sent an email to Mr. Masangu, mawakani_samba@yahoo.fr, andrey.kidel@btinternet.com, christianfrancois@msn.com and Thierry Desjardins of BNP Paribas, with the subject line "Refinancing Agreement of March 31,

1980: Recognition of Debt". This email attached three letters, including a letter dated May 15, 2009 (the "**May 15, 2009 Letter**") and the March 27, 2009 Letter. B0017, Ex. 59.

378.    The May 15, 2009 Letter was written by Thierry Desjardins and Muriel Ymonet of BNP Paribas and sent to Mr. Masangu. B0018, Ex. 59.

379.    The May 15, 2009 Letter reads:

 "Mr. Governor, We have the honor of referring to our previous letters of March 5 and 27, 2009, in which we informed you of the need to update the recognition of debt reproduced in Appendix 1 and signed by you and the Minister of Finance and Budget dated February 25, 2003, regarding the outstanding debts that were recorded in the refinancing agreement of March 31, 1980. As these letters seem not to have reached you, we are taking the liberty of sending them to you again and we thank you very much in advance for a positive reply to our request." B0018, Ex. 59.

380.    On July 15, 2009, an acknowledgment letter was signed by Mr. Masangu, as Governor of the Central Bank and Mr. Athanase Matenda, who was then Minister of Finance of the DRC, (the "**2009 Acknowledgement Letter**"). DRC00003581, Ex. 27.

381.    The 2009 Acknowledgement Letter reads:

"To: All persons holding claims under the Refinancing Credit Agreement dated as of March 31, 1980 among the Democratic Republic of Congo (formerly known as the Republic of Zaire), the Central Bank of Congo (formerly known as Bank of Zaire), the Banks and Agents party thereto and Union Bank of California as successor of the Bank of Tokyo — Mitsubishi Trust company (formerly known as Bank of Tokyo Trust company), as Servicing Bank.

The Democratic Republic of Congo and the Central Bank of Congo hereby refer to the Refinancing Credit Agreement dated as of March 31, 1980 among the Democratic Republic of Congo (formerly known as the Republic of Zaire) and the Central Bank of Congo (formerly known as the Bank of Zaire), the Banks and Agents party thereto and Union Bank of California as successor of the Bank of Tokyo — Mitsubishi Trust Company (formerly known as Bank of Tokyo Trust Company), as Servicing Bank.

The Democratic Republic of Congo and the Central Bank of Congo hereby acknowledge and confirm as of the date hereof their respective obligations with respect to the principal and interest unpaid under such Refinancing Credit Agreement consisting, in the case of interest, both of interest accrued on principal installments prior to the maturity and interest accrued on overdue principal and interest, and all other obligations arising under such Refinancing Credit Agreement in accordance with the terms thereof.

It is the intention of the Democratic Republic of Congo and the Central Bank of Congo in executing and delivering this acknowledgement formally to recognize and confirm all such obligations in order to eliminate any concerns any person holding claims under such Refinancing Agreement may have due to any possible application or any principles of prescription, including without limitation, those established by the New York statue of

limitations, which might lead any such person to be concerned that the forbearance demonstrated to date by such person in refraining from acting to enforce such claims might have an adverse effect on the ultimate enforceability of such claims." DRC00003581, Ex. 27.

382.    The 2009 Acknowledgment Letter was sent by Mr. Masangu to Thierry Desjardins and Muriel Ymonet of BNP Paribas on July 20, 2009 with a cover letter, (the "**July 20, 2009 Letter**"). B025-27, Ex. 61.

383.    The July 20, 2009 Letter reads:

"I have the honor of informing you that we updated the recognition of debt of  the Democratic Republic of Congo in the refinancing agreement entered into with a group of international commercial banks on March 31, 1980."  B025-27, Ex. 61.

384.    The Defendants produced a copy of the 2009 Acknowledgement Letter in this litigation.  Ex. 27.

385.    BNP Paribas produced a copy of the 2009 Acknowledgment Letter in this litigation.  B0026, Ex. 61.

386.    Union Bank produced a copy of the 2009 Acknowledgment Letter in this litigation.  B0010, Ex. 62.

387.    Union Bank produced a copy of the July 20, 2009 Letter in this litigation. UB000011, Ex. 62.

388.    Mr. Masangu identified his signature and the signature of Mr. Matenda, the Minister of Finance of the DRC on the 2009 Acknowledgement Letter.  Masangu Dep. at 52:20-54:15.

389.    Mr. Masangu identified the July 20, 2009 Letter, confirmed the translation of the letter was accurate and indicated that  when he wrote "we updated the recognition of debt of the Democratic Republic of Congo . . ." he meant that the DRC and the Central Bank had renewed the acknowledgement of debt. Masangu Dep. at 57:2-59:23.

390.    Mr. Masangu agreed that it was his understanding that through the 2009 Acknowledgement Letter, the DRC and the Central Bank updated the recognition of the debt. Masangu Dep. at 60:23-61:7.

391.    The DRC, as principal, engaged in conduct which caused creditors under the Credit Agreement to believe that Mr. Athanase Matenda had authority to sign and bind the DRC to the 2009 Acknowledgement Letter.

392.    The Central Bank, as principal, engaged in conduct which caused creditors under the Credit Agreement to believe that Mr. Masangu had authority to sign and bind the Central Bank to the 2009 Acknowledgement Letter.

393.    The Council of Minister of the DRC had actual or imputed knowledge of all material facts regarding the 2009 Acknowledgement Letter.

394.    Those with authority to ratify the signature of the Governor of the Central Bank on the 2009 Acknowledgement Letter had actual or imputed knowledge of all material facts regarding the 2009 Acknowledgement Letter.

395.    The Defendants accepted the benefits of the 2009 Acknowledgement Letter, including avoiding having to defend against a lawsuit by creditors under the Credit Agreement who had not yet sued to enforce their rights under that Agreement between July 15, 2009 to present day.

396.    The Council of Ministers implicitly evidenced an intention to ratify the 2009 Acknowledgement Letter by their silence and acceptance of the benefits under the 2009 Acknowledgement Letter.

397.    Those with authority to ratify the signature of the Governor of the Central Bank on the 2009 Acknowledgement Letter implicitly evidenced an intention to ratify the 2009 Acknowledgement Letter by their silence and acceptance of the benefits under the 2009 Acknowledgement Letter.

398.    The Council of Ministers engaged in acts and conduct that demonstrated an intention to ratify that signature of the Minister of Finances and Budget on the 2009 Acknowledgement Letter.

399.    Those with authority to ratify the signature of the Governor of the Central Bank on the 2009 Acknowledgement Letter engaged in acts and conduct that demonstrated an intention to ratify that signature.

400.    The fact that other sovereign states, including Sudan and Liberia, executed debt acknowledgement letters similar to the 2009 Acknowledgement Letter, under similar circumstances, and that the Defendants issued such Acknowledgement Letters in 1991, 1997 and 2003, demonstrates that these types of transactions are neither novel nor extraordinary.

401.    Over the course of 18 years, between 1991 and 2009, the Defendants never once indicated or made any suggestion that claims to recover on debt held by Plaintiffs under the Credit Agreement were time barred or that any of the Acknowledgment Letters was invalid.

402.    Over the course of 6 years, between February 25, 2003 and the commencement of this action in February 2009, neither of the Defendants ever once indicated or made any suggestion that the signatories to the 2003 Acknowledgement Letter lacked authority to bind the Defendants.

403.    On June 11, 2010, a document regarding the DRC by the International Development Association and International Monetary Fund, titled "Enhanced Heavily Indebted Poor Countries (HIPC) Initiative Completion Point Document and Multilateral Debt Relief Initiative (MDRI)" was prepared by Prepared by the Staffs of the International Development Association and the International Monetary Fund; Approved by Obiageli K. Ezekwesili and

Otaviano Canuto (IDA) Mark Plant and Christian Mumssen (IMF), (the "**June 11, 2010 Report**"). EXPERT00000107-10; Ex. 154.

404.    The June 11, 2010 Report reads, in part:

"I. Introduction 1. This paper discusses the DRC's progress under the enhanced HIPC Initiative. In the view of the staffs of the IDA and the IMF, this progress is sufficient for recommending to their respective Boards of Executive Directors the approval of the completion point for DRC under the enhanced HIPC Initiative. The authorities have fully implemented all the completion point triggers as formulated in the 2003 HIPC Decision Point document. 2. In July 2003, the Boards of Executive Directors of IDA and the IMF agreed that DRC had met the requirements for reaching the HIPC decision point. Executive Directors also determined that the floating completion point would be reached when the triggers in Box 6 of the Decision Point Document were met. The amount of debt relief committed at the decision point was US$ 6,311 million in PV terms, calculated as of end- December 2002, Such relief represented an overall reduction of 80.2 percent in the PV of all public- and publicly-guaranteed external debt as of end-December 2002 after application of traditional debt relief mechanisms. . . .

Bilateral and commercial creditors . . .

  55. Several commercial creditors have provided HIPC comparable relief in the interim period. The commercial debt has been divided into claims held by the London Club (fn 24) and non-London club creditors. Several missing claims have now been included in the debt stock as of end- December 2002 which has almost doubled from the figure that was used at Decision Point. For most of these claims the authorities have managed to obtain rescheduling on HIPC comparable terms. As of end-December 2009, the claims held by commercial creditors fell by about US$400 million to US$214 million in nominal terms. Currently the DRC is in the process of negotiating a buy-back operation supported by IDA's Debt Reduction Facility (DRF) to extinguish the remaining HIPC eligible commercial claims as of end-December 2009.  [Fn 24: 24 Claims of the London Club creditors shown in Table4 do not include claims held by the Belgolaise Bank for reasons described in Box 2.] . . . .

Box 2: DRC: The Treatment of Claims held by Belgolaise Bank. Belgolaise Bank (la Banque Belgolaise)  holds the largest share of commercial external debt claims of the DRC owed to the London Club, of which Belgolaise Bank is a member. Calculations by IMF staff based on records provided by the Union Bank of California (the Servicing Bank for London Club creditors with claims on the DRC) indicate that at end-2009 interest in arrears to London Club creditors totaled $546.3 million, implying total claims of US$897.3 million, 91 percent of which (US$816.5 million) is held by Belgolaise.

From the HIPC Completion Point perspective, the Belgolaise debt is currently being identified as 'passive debt'. In April 2008, senior officials of Belgolaise stated in a letter to the DRC authorities that Belgolaise irrevocably renounced then and in the future to pursue the recovery of their claims.  Since then, Belgolaise has continued not to bill the DRC. Thus the Belgolaise debt is being identified as 'passive'. Such issues have arisen in

84

the past under the HIPC Initiative, although this is the first time that it involves a private creditor.

Passive debt is excluded from the HIPC-eligible debt stock. The rationale for this treatment is to avoid unduly inflating the common reduction factor, which would require all creditors to provide higher debt relief on account of a debt that is not expected to be collected. The downside of such a treatment is that a passive debt can, in principle, become active again after the HIPC completion point. In such a case, the holder of the formerly passive claim would still be expected to provide HIPC debt relief. However, the debtor would not be able to get the additional relief it would have received from the other creditors had the CRF been higher in the first place.

At the HIPC decision point, Belgolaise debt was not included in HIPC-eligible debt stock because no information was available on this claim at the time. Including the Belgolaise claim in the calculations would increase the PV of debt after traditional debt relief at end-2002 from US$8,801 million to US$9,019 million, which would imply a higher common reduction factor (82.8 percent instead of 82.4 percent) in order to reduce the external debt-to-export ratio to 150 percent. The higher common reduction factor implies that the amount of assistance provided by creditors other than Belgolaise would increase from US$7,252 million to US$7,470 million (in PV terms). For the Fund and IDA, the additional effort would increase from US$2.4 million to US$4.4 million (in PV terms).

The Belgolaise claim is currently being considered in the context of on-going negotiations between the DRC authorities and Belgolaise. In September 2005, the DRC benefited from an IDA Debt Reduction Facility (DRF) Preparation Grant to finance legal and financial advisory services to assist the DRC in the preparation of an external commercial debt buyback operation. The DRF Preparation Grant reached its closing date on June 30, 2010 . . ." EXPERT00000107-10; Ex. 154.

405.    The 2011 Annual Report of the Central Bank of Congo (the "**2011 Annual Report**") contains a letter signed by Mr. Masangu to "His Excellency the President of the Republic", with the subject line "Submission of the 2011 Annual Report of the Central Bank of Congo", reads, "It is my honor to submit to you the 2011 Annual Report of the Central Bank of Congo in accordance with the applicable laws. . . ." DRC002824-25, Ex. 64.

406.    The 2011 Annual Report is or was publicly available. Exs. 64 & 65.

407.    At his deposition, Mr. Masangu confirmed that he exercised oversight in making sure that the content of the 2011 Annual Report was accurate. He also confirmed that there is a section in the 2011 Annual Report that deals with the DRC's external debt, a section on the London Club debt issued pursuant to the Credit Agreement and a table listing the amount outstanding, interest and total debt. Mr. Masangu testified the figures came from an institution called "Office de Gestion de la Dette Publique" (formerly known as "OGEDEP"), the department in charge of the management of public debt. Mr. Masangu confirmed OGEDEP is a division of the government of the DRC and falls within the auspices of the Ministry of Finance. Mr. Masangu testified that, to the best of his knowledge, there is no additional debt listed in addition to the debt under the 1980 refinancing agreement. Masangu Dep. at 146:24-154:25.

408.    Section IV.1.3 London Club of the 2011 Annual Report includes:

"The objective sought in 2011 was to reconcile the amount of the debt owed by the DRC between the Agent Banks and the Servicing Bank for the London Club (Union Bank of California, or UBOC).

To review, the remaining principal on this debt is estimated at 28.6 million USD, 18.0 million of which is held by Themis and Des Moines.

Given the unclaimed debts owed to this club, the various credit management institutions involved considered the possibility of inviting all London Club-member creditors to come forward. To that end, a deadline for the debt claims was set, after which any unclaimed debts will be canceled. Based on the above, the Directorate of Public Debt (DGDP) has estimated this debt at approximately 80.8 million USD." DRC002969-70, Ex. 65.

409.    Section IV.2 Debt Stock of the 2011 Annual Report reads:

"The stock of the external debt was evaluated at 4,517.6 million USD, of which 91.70% is medium- and long-term debt and 8.3% is short term debt. Multilateral institutions hold nearly half of the total." DRC002970, Ex. 65.

410.    The 2011 Annual Report states that, as of 2011, the Central Bank held foreign currency reserves worth over 687 billion Congolese Francs – or approximately $755 million at the then-current exchange rate.  DRC003054-3057, Ex. 65.

411.    There was no indication in the 2011 Annual Report's section on the DRC's external debt that the debt under the Credit Agreement was time barred or otherwise unenforceable. Ex. 64 &65.

412.    A summary of the level of outstanding foreign currency assets held by the Central Bank in every year from 2002-2011, as reported in the Central Bank's Annual Reports, is attached as Exhibit 114.

413.    At his deposition, Mr. Masangu confirmed that the 2011 Annual Report contained a letter to the President of the DRC, that he signed that letter and that there is a section on the London Club debt, that the section reads, "To review, the remaining principal on this debt is estimated at 28.6 million USD, 18 million of which is held by Themis and Des Moines."  He also confirmed that Themis and Des Moines are the Plaintiffs in this lawsuit, and that 18 million is the principal amount at issue.  Mr. Masangu confirmed that the amounts listed in the 2011 Annual Report came from OGEDEP, which Mr. Masangu said is now called "DGDP."  Mr. Masangu confirmed that according to DGDP there is approximately 80.8 million US dollars outstanding under the 1980 credit agreement owed to the Plaintiffs. Masangu Dep. at 157:11-162:20.

414.    On January 10, 2011 Mobali Gerard wrote an email to Hugo Gindraux  and Patricia Phillips-Coward (Union Bank), copying Jean Pierre Mukadi Kalombo and copying

Hubert Efomi, regarding "message," (the "**January 10, 2011 A Email**"). DRC00003525-26, Ex. 74.

415.    The January 10, 2011 A Email reads:

"To Mr. H. Gindraux and Ms. P. Phillips Coward

I am pleased to remind you of the letter bearing reference no.3757 CAB/MIN/FINANCES/CD/2010 from December 13, 2010 sent to you by the Minister of Finance by which he proposes a work session between the Union Bank of California, N.A. and a Congolese delegation at the beginning of February 2011.

Would you kindly set this up so as to allow us to move forward in the process of debt cancellation within the context of the achievement of the Completion Point of . . . ." DRC00003525, Ex. 74.

416.    On January 10, 2011, Patricia Phillips-Coward (Union Bank) wrote an email to Jean Pierre Mukadi Kalombo, Bureau Central de Coordination, Ministry of Finance, Mobali Gerard and Hugo Gindraux (Union Bank), copying Hubert Efomi, Jean Piere Mukadi Kalombo, and Valerie Crain (Union Bank), with the subject line "message," (the "**January 10, 2011 B Email**").  DRC00003523, Ex. 74.

417.    The January 10, 2011 B Email reads:

"Dear Mr. Jean Pierre Mukadi K.: Thank you for your notice.  Please provide Union Bank with an Agenda and the parties that will be attending.  Also, please indicate the time allotted for this meeting and will there be a translator accompanying you.  I will await your response." DRC00003525, Ex. 74.

418.    On March 14, 2011, Patricia Phillips-Coward (Union Bank) wrote an email to Jean Pierre Mukadi Kalombo, Bureau Central de Coordination, Ministry of Finance, Mobali Gerard, Valerie Crain (Union Bank) and Hugo Gindraux (Union Bank), copying Hubert Efomi, and Jean Piere Mukadi Kalombo, with the subject line "message," (the "**March 14, 2011 Email**").  DRC00003524-25, Ex. 74.

419.    The March 14, 2011 Email reads:

 "Dear Mr. Jean Pierre Mukadi K.: Thank you for the call today advising of your intentions to meet with Union Bank on March 21, 2011.  Unfortunately we are unable to meet with you due to the short notice.  The intended parties for this meeting will not be available on this date." DRC00003524-25, Ex. 74.

420.    On March 18, 2011, Patricia Phillips-Coward (Union Bank) wrote an email to Jean Pierre Mukadi Kalombo, Bureau Central de Coordination, Ministry of Finance, Mobali Gerard, Valerie Crain (Union Bank) and Hugo Gindraux (Union Bank), copying Hubert Efomi, and Jean Piere Mukadi Kalombo, with the subject line "message," (the "**March 18, 2011 Email**").  DRC00003524, Ex. 74.

421.    The March 18, 2011 Email reads:

"Dear Mr. Jean Pierre Mukadi K.: Thank you again today for the call advising again of your intentions to meet with Union Bank on March 21, 2011.  As we discussed we are unable to meet with you since we did not receive any response to our email dated January 10, 2011.  My manager Valerie Crain is out of the office on vacation and will not return until March 28, 2011.  At such time I will confirm when we can arrange to meet with you.  On Monday, March 21, 2011, I will forward an updated schedule which will detail the principal and interest payments calculations that we have on file.  Any questions please let me know." DRC00003524, Ex. 74.

422.    On March 24, 2011, Jean Pierre Mukadi Kalombo, Bureau Central de Coordination, Ministry of Finance wrote an email to Jean Pierre Mukadi Kalombo, Bureau Central de Coordination, Ministry of Finance, Mobali Gerard, Valerie Crain (Union Bank), Patricia Phillips-Coward (Union Bank) and Hugo Gindraux (Union Bank), copying Hubert Efomi, and Jean Piere Mukadi Kalombo, with the subject line "message," (the "**March 24, 2011 Email A**").  DRC00003524, Ex. 74.

423.    The March 24, 2011 Email A reads:

"Dear Patricia Phillips-Coward Thank you for your notice.  Now, Our delegation returned in Kinshasa.  I don't understand what happened because some time ago I provided you our intentions to meet with Union Bank on March, 2011.  And I indicated the time allotted for this meeting in march 2011 and the Congolese Team.  Now, we are waiting for an updated schedule which will detail the principal and interest payments calculations that you have on file.  And you must provide the time allotted for this meeting when you will be available." DRC00003524, Ex. 74.

424.    On March 24, 2011, Patricia Phillips-Coward (Union Bank) wrote an email to Jean Pierre Mukadi Kalombo, Bureau Central de Coordination, Ministry of Finance, Mobali Gerard, Valerie Crain (Union Bank) and Hugo Gindraux (Union Bank), copying Hubert Efomi, and Jean Piere Mukadi Kalombo, with the subject line "message", which reads, (the "**March 24, 2011 Email B**").  DRC00003523, Ex. 74.

425.    The March 24, 2011 Email B reads:

"Dear Mr. Jean Pierre Mukadi – On Tuesday March 22, 2011, I provided the attached schedule which outlines the principal and interest payment calculations.  Unfortunately, I will not be able to schedule a meeting until Valerie Crain returns from vacation.  On March 28, 2011 I will advise you all when we are available for a meeting.  At this time, please provide us with the following information:  -An Agenda –The parties that will attend –Indication of time to be allotted for the meeting –Confirm that a translator will accompany you. Finally, I have attached the schedule again for your review." DRC00003523, Ex. 74.

426.    On July 13, 2011, Mobali Moluambuku, Central Bank of Congo, Project Manager of the operation to reduce the external debt of the Republic of Congo, London Club, wrote an

email to Belinda Lucas, Ching Loh and Belinda Lucas, all of JPMorgan Chase, with the subject line "Visit of Congolese delegation," (the "**July 13, 2011 Email**"). DRC00003545, Ex. 75.

427.    The July 13, 2011 Email reads:

"Dear, After reaching the Completion Point on 1 July 2010, the DRC must negotiate new de- for payments of its debts with all its creditors.  This was done with the Club of Kinsh- September 2010 and Paris in February 2011.  It remains to do with the London Club. Union Bank of California (the Bank of service) gave us a list of banks that we have a- refer to the reconciliation of statistics.  Among these banks are JP Morgan Chase for – accounts of the Belgolaise and Banque Bruxelles Lambert.  Kindly give us the status of their accounts in your books." DRC00003545, Ex. 75.

428.    On September 9, 2011 Mobali Gerard Muluambuku (DRC) wrote an email to Colette Vanoosten and Eric Donormandie (Natixis), and copied Lydie Kabey, Jean-Pierre Mukadi and Henry Kipassa, with the subject line "Message,"  ("**September 9, 2011 Email**"). DRC00003569-70; Ex. 115.

429.    The September 9, 2011 Email reads:

"Hello, I am pleased to write you subsequent to our July 2011 meeting at your offices regarding the Democratic Republic of Congo's London Club debt.  As you will recall, this was regarding the files managed at the time by the former Banque Francaise du Commerce Exterieure (BFCE) as the agent bank for the London Club.  The debts concerned are particularly those of Credit Agricole CIB."  DRC00003569-70; Ex. 115.

430.    On September 13, 2011 Colette Vanoosten responded to the September 9, 2011 Email, including Miguel Folly (Natixis) in the response, which reads, "Hello, I am forwarding your request to Mr. Miguel Folly, who oversees the DRC Congo within our establishment, who will look into this matter within the appropriate area within our bank.  Enjoy the rest of the day." DRC00003570; Ex. 115.

431.    On  September 13, 2011 Mobali responded with an email, which reads, "Thank you for your message.  We will await follow-up from Mr. Folly.  You will recall that we were present at your office at Mr. Folly's specific request."  DRC00003569; Ex. 115.

432.    On September 13 Folly responded with an email, which reads, "Hello Mr. Mobali, I hope this finds you well.  I will do my best to get back to you as soon as possible.  Enjoy the afternoon."  DRC00003569; Ex. 115.

433.    On December 8, 2011, Matata Ponyo Mapon, Minister, Ministry of Finance, wrote a letter to Union Bank (London Club Servicing), C/O Hugo Gindraux and Patricia Phillips-Coward, with the subject line "Communique to all Agent Banks forming of the London Club," (the "**December 8, 2011 Letter**"). DRC00003556, Ex. 66.

434.    The December 8, 2011 Letter reads:

" Dear Sirs, After reaching, on 1 July 2010, the HIPC completion point and with a view to setting its outstanding debts owed to its creditors, especially those of the London Club, the Democratic Republic of Congo (DRC) undertook many actions in order to determine the actual amount of said debts In this regard, several messages (e-mails) were unsuccessfully sent to agent banks who are members of the London Club for reconciliation of statistics. A DRC delegation travelled to Brussels, Paris and London in July 2011 afterwards; with a view to contacting certain agent banks. On that occasion, some promise were made to provide them with the names of the persons in charge of the DRC dossier and the amounts payable to the creditor banks within a short deadline. Up to date, no feedback was received in this regard. Consequently, the DRC hereby kindly request any bank holding a debt owed by the DRC within the framework of the London Club to come forward by 30 April 2012 at the latest. Failing that, any un-declared debt shall be deemed and void." DRC00003556, Ex. 66.

435.    The 2012 Annual Report of the Central Bank of Congo (the "**2012 Annual Report**") states in part:

"IV.3.2.2. London Club

In 2012, the government continued negotiations begun well before reaching the completion point under the HIPC Initiative, particularly with the Union Bank of California. However, at end-December 2012, these negotiations proved less successful as were hoped, given the lack of response on the part of creditor members of this club.

This is the result, on the one hand, of the lack of communication between the Congolese and the London Club and, on the other hand, to the discontinuation of debt servicing in favor of these creditors for several years. It should be noted that the debt stock owed to the London Club syndicated lenders is estimated at 80.8 million USD." Ex. 1

436.    There was no indication in the 2012 Annual Report's section on the DRC's external debt that the debt under the Credit Agreement was time barred or otherwise unenforceable. Ex. 1.

437.    There is no evidence that, prior to Defendants' appearance in this litigation in December 2011, any individual purporting to speak for the DRC or the Central Bank communicated to Plaintiffs' predecessors-in-interest or any other creditors under the Credit Agreement that the Defendants' obligations under the Credit Agreement were time barred.

## IV.    CHRONOLOGY OF FACTS RELEVANT TO DISCOVERY REQUESTS AND RESPONSES

438.    On September 7, 2012, Plaintiffs served their First Requests for Production on Defendants.  Ex. 150.

439.    On October 5, 2012, Defendants served their written response to the First Requests for Production.  Ex. 151.

440.     Other than providing some DRC law provisions, Defendants' response to the majority of the categories of documents requested First Requests for Production on Defendants is that the documents are "unavailable at this time."  Ex. 151.

441.     Plaintiffs immediately began to make efforts to inform Defendants that their responses were deficient and demand a full and complete response to the discovery.

442.     On October 8, 2012, Plaintiffs counsel emailed Defendants' former counsel, Nady Mayafuila, (the "**October 8, 2012 Email**"). Ex. 158.

443.     The October 8, 2012 Email requests, in part, that Defendants:

Identify "what DRC and Central Bank offices, agencies and/or representatives were asked to search for responsive documents" and explain the reasons for the "unavailability of documents."   Ex. 158.

444.     The October 8, 2012 Email advised Defendants that Plaintiffs will "seek appropriate sanctions, including asking the Judge to make an adverse inference with respect to the unavailability of documents."   Ex. 158.

445.     On October 17, 2012, Ms. Mayafuila responded to the October 8, 2012 email, (the "**October 17, 2012 Email**"). Ex. 145.

446.     The October 17, 2012 Email stated:

 "it seems that the documents you have requested related to the February 2003 letter never existed and thus cannot be provided to you." Ex. 145.

447.     On October 26, 2012, counsel for Plaintiffs sent a letter to Ms. Mayafuila repeating the issues identified in the October 8, 2012 Email and following up on additional areas of deficiency that came to light after the 30(b)(6) depositions of Defendants' representatives.  Ex. 138.

448.     On November 2, 2012, counsel for Plaintiffs sent a letter to this Court detailing all of the discovery issues, (the "**November 2, 2012 Letter**").  Ex. 139.

449.     The November 2, 2012 Letter states:

 "We have been asking Defendants' counsel for nearly a month to describe the searches for documents that have been conducted."  Ex. 139.

450.     In the November 2, 2012 Letter, counsel for Plaintiffs asked that the Court to draw "adverse inferences . . . against defendants with respect to any issues as to which Defendants' efforts to locate and produce documents appears deficient."  Ex. 139.

451.     On November 7, 2012, Ms. Mayafuila responded to the November 2, 2012 Letter (the "**November 7, 2012 Letter**").  Ex. 140.

452.     The November 7, 2012 Letter states in part:

"The DRC does not have organized archives . . . Accordingly any search for official public documents is extremely burdensome since one would need to check every likely place or institutions that might have had a copy of such document." Ex. 140.

453.     On November 8, 2012, the Court held a telephonic conference to address the issues raised in the November 2 Letter and the November 7, 2012 Letter.  Ex. 127.  At this conference the Court acknowledged the fact that Plaintiffs might seek an adverse inference with respect to documents that Defendants failed to produce.

454.     On November 9, 2012, the decision reached during the telephonic conference on November 8 was memorialized in a Court Order, (the "**November 9, 2012 Order**").  Ex. 142. Dkt. No. 96.

455.     The November 9, 2012 Order permitted Plaintiffs' counsel to submit a "request for information" outlining the areas as to which information was requested and required that Defendants' counsel provide by December 7, 2012 "an affidavit to Plaintiffs fully and separately answering each aspect of Plaintiffs Request for Information."   The Court further ordered that the affidavit  include "highly detailed answers to every aspect of Plaintiffs' Request for Information."  It also specified  "The Court expects Defendants' Counsel to describe all searches that have been conducted, and those that remain outstanding; the identities of all individuals who have been contacted, what actions were undertaken by those individuals, and what information they provided; all document repositories (whether in hard copy or electronic form) that have been searched; and the types of documents that have been found, and those documents that Defendants have searched for but could not locate.  Defendants' Counsel should also identify all sources of information relied on in preparing the affidavit." Ex. 142; Dkt. No. 96.

456.     On November 14, 2012, Plaintiffs supplied the Request for Information to be included in Defendants Counsel' affidavit ordered by the Court, (the "**November 14, 2012 Request for Information**").  Ex. 125.

457.     In the November 14, 2012 Request for Information, under the question heading "What steps have the DRC and Central Bank taken to date to locate responsive hard copy documents," Plaintiffs requested:

"A detailed description of all of the places such documents are maintained within the DRC or the Central Bank, including but not limited to personal files, ministry files, repositories or archives, and a description of the filing or document management system utilized by each of these offices.

What offices or locations within the DRC and the Central Bank have been searched?

*Have searches been conducted for minutes or records of meetings of the Council of Ministers?*  We note that Article 21 of Decree 28/2002 contemplates that weekly meetings of the Council of Ministers be held each Friday in Kinshasa.

*Have searches been conducted for press releases or public reports of the meetings of the Council of Ministers mentioned above?*  Have searches been conducted at the Ministry of Information/Communications?  It is our understanding that this office distributes information to the public concerning meetings of the Council of Ministers, government action and the like.

Have any searches been conducted in the office of the President of the DRC?  It is our understanding that the President receives, among other things, information concerning the meetings of the Council of Ministers and his office is likely to be a source of documents." Ex. 125. (emphasis added) .

458.    On November 19, 2012, Defendants' counsel objected to the Request for Information on the grounds that the requests failed to identify the documents sought with specificity, that they are "vague, unintelligible and unduly burdensome" and that some of the information requested is protected by privilege.

459.    On November 26, 2012, the Court issued an order overruling the Defendants' objections and renewing the direction that an affidavit be supplied by December 7, 2012.  Ex. 141; Dkt. No. 100.

460.    On December 7, 2012, Defendants' former counsel, Nady Mayafuila submitted the affidavit outlining Defendants' counsel efforts taken to locate responsive documents, (the **December 7, 2012 Affidavit**").  Ex. 102.

461.    The December 7, 2012 Affidavit states, in part:

"The search conducted by Mr. Nyembo *focused on locating minutes of meetings of the Council of Ministers before 2007*. In order to undertake such a search, he requested the assistance of the librarian of the general secretariat of the government.  According to the librarian, the general secretariat of the government files from 2009 to 2011 the only, somewhat, organized files.  In his opinion, any file pertaining to 2003 and before would most likely be empty for various reasons, among which:  (i) in the 1990s, the city of Kinshasa experienced, twice, serious civil unrest, which led to riots and rampant looting. Shops, companies, residential houses, public and private offices, buildings were ransacked; & (ii) the political situation in 2003 was unstable and the DRC did not really have a very functional government."

As to the search of other departments, it is stated:

"As of this day, I have been unable to obtain a clear response from Defendants as to whether research have [sic] been conducted at the office of the President, the prime minister office, the national public television and/or the Ministry of Information/Communications."  Ex. 102 (emphasis added).

462.    On December 12, 2012, Plaintiffs' Counsel Debra O'Gorman wrote to Nady Mayafuila in response to the December 7, 2012 Affidavit (the "**December 12, 2012 Letter**"). Ex. 103.

93

463.    The December 12, 2012 Letter states, in part that, despite Plaintiffs' numerous requests, Defendants failed to search for or produce any documents from the Ministry of Information/Communications at all and, specifically, has not produced any documents relating to the publication of government decrees or other information regarding government action. Ex. 103.

464.    On December 12, 2012, while discovery was ongoing, Defendants' former counsel sought to withdraw as counsel.  Dkt. No. 106.

465.    On December 19, 2012, Plaintiffs' Counsel advised Defendants' Counsel that discovery was to continue notwithstanding the request to withdraw as counsel. Ex. 144.

466.    On January 3, 2013 Nady Mayafuila wrote a letter to Debra O'Gorman responding to the December 12, 2012 Letter (the "**January 3, 2013 Letter**"). Ex. 104.

467.    The January 3, 2013 Letter reads, in part:

"[R]ecord keeping has not been officially organized in the DRC.  Various factors, as listed in the [December 7, 2012] Affidavit, can be mentioned to explain this situation, including but not limited to lack of funds, lack of equipments, lack of infrastructures as well as lack of trained personnel. . . .

The official gazette is an entity attached to the office of the President of the DRC.  It [sic] role is limited to the publication of legal texts (Acts, Decree law, & Decrees) received from entities (Parliament, the Office of the President, Ministries, etc.) that adopt them.  It happens that such entities do not transmit a text that has been adopted, to the official gazette.

[N]o search has been conducted at the Ministry of Information/Communications. . . .

At the time when Mr. Nyembo was interviewed by a member of our firm, no search for minutes of the council [sic] of Ministers after 2007 was conducted. However, Mr. Nyembo indicated that such search would be conducted.  To date, this firm has not received further details about whether Mr. Nyembo or any other agent of the general Secretariat of the Government conducted such search or whether any responsive documents were found." Ex. 104.

468.    On January 14, 2013, counsel for Plaintiffs responded to the January 3, 2013 Letter (the "**January 14, 2013 Letter**"). Ex. 143.

469.    The January 14, 2013 Letter provides, in part:

"The January 3 Letter suggests that Defendants' counsel has not followed up with Mr. Nyembo (or anyone else from the General Secretariat) about the 2009-2011 documents since early-December.  Please provide an update."

"Ministry of Information/Communications:  It remains unclear why Defendants have not searched for documents located there.  Moreover, the January 3 Letter suggests that

94

Defendants' counsel does not intend to conduct any follow-up search for press releases or public reports. Please provide an update concerning the status of Defendants' searches for documents at the Ministry of Information/Communications.

"Office of the President of the DRC: It remains unclear why Defendants have not searched for documents located there and why they apparently have no plans to do so. Please provide an update concerning the status of Defendants' searches for documents at the Office of the President." Ex. 143.

470.    On January 25, 2013, DLA Piper entered its appearance as counsel for Defendants in this matter. Dkt. Nos. 119-122.

471.    On January 29, 2013, counsel for Plaintiffs sent a package of discovery-related materials from this action to DLA Piper, (the "**January 29, 2013 Letter**"). Ex. 135.

472.    The January 29, 2013 Letter states, in part:

"We have included the most recent case management order, discovery requests to defendants and the responses, communications with your predecessor counsel, Ms. Nady Mayafuila, regarding various discovery issues, communications with the Court regarding discovery issues and transcripts of Court conferences." Ex. 135.

473.    On January 31, 2013, the Court permitted Nady Mayafuila and the firm of Emery Mukendi Wafana & Associates to withdraw as counsel.

474.    On January 31, 2013, Sara Moghadham of DLA wrote an email to Plaintiffs' counsel, asking: "Are there any other outstanding discovery requests since we entered our appearance?" Ex. 146.

475.    On January 31, 2013, Dennis Hranitzky responded to Ms. Moghadham, reminding her: "defendants owe plaintiffs documents responsive to plaintiffs' first and second requests for production." Ex. 146.

476.    On February 1, 2013, Plaintiffs' counsel delivered additional discovery-related materials to DLA Piper. Ex. 155.

477.    On February 7, 2013, Plaintiffs' counsel sent a detailed email to DLA addressing discovery issues, (the "**February 7, 2013 Email**"). Ex. 147.

478.    The February 7, 2013 Email stated in part:

"Our letters of December 12, 2012 and January 14, 2013 to Ms. Mayafuila contain numerous detailed areas of inquiry regarding what we believe to be serious deficiencies in defendants' efforts to date to provide document discovery. As you know from the materials we supplied last week, we have received very few hard copy documents from defendants other than books, laws of the DRC and annual reports of the Central Bank. Your predecessor counsel claimed that documents were simply not available or didn't exist, yet we have received many

documents from third parties that originated from offices within the DRC and Central Bank.  There is no question that efforts to locate hard copy documents will need to begin anew and that defendants must be informed of their obligation to participate in such discovery.  With respect to electronic documents, it appears that no search for electronic documents has been conducted.  This is especially troubling in light of the information we supplied to Ms. Mayafuila on January 22 advising that documents produced by third parties indicate that Mr. Masangu has an email address that was used to conduct communications related to the 2009 tolling agreement. I encourage you to review both of our letters, as well as Ms. Mayafuila's November 7 affidavit, for a complete description of all of the outstanding discovery.  You should also be advised that we will expect a response to the January 14 letter as soon as you are up to speed on this matter." Ex. 147.

479.    On February 14, 2013, Plaintiffs' counsel reminded DLA: "as [Mr. Hranitzky] mentioned, it would be very helpful to receive from your end a report updating the status of DLA's efforts to resolve the outstanding discovery issues." Ex. 148.

480.    On February 15, 2013, DLA sent an email to Plaintiffs' counsel summarizing a call between the parties, (the "**February 15, 2013 Email**"). Ex. 149.

481.    The February 15, 2013 Email contained in part:

"As we stated during the call, in the past two weeks defense counsel have been very busy processing case files and becoming familiar with the discovery record. . .   The parties also discussed the efforts that defense counsel has undertaken in advance of our fact finding trip to Kinshasa, which is currently scheduled for the first week in March. . . ." Ex. 149.

482.    On March 28, 2013, counsel for Defendants confirmed that Defendants are not contesting the authenticity of the signatures to the 1991, 1997, 2003 and 2009 Acknowledgement Letters.  Ex. 137.

483.    On March 28, 2013, Plaintiffs' counsel agreed to withdraw discovery requests related to authenticity of signatures on the Acknowledgement Letters.

484.    Defendants never searched in the Ministry of Information/Communications for documents responsive to the discovery demands in this action.

485.    Defendants never searched in the Office of the President of the DRC for documents responsive to the discovery demands in this action.

486.    Defendants never fully searched for minutes of meetings or other documents reflecting meetings of the Council of Ministers in response to the discovery demands in this action.

## V.    FACTS RELEVANT TO WITNESS DEPOSITIONS

487.    On June 12, 2013, Mr. Jean-Claude Masangu was deposed in this action ("**Masangu Dep.**").

488.    During his deposition, Mr. Masangu identified Exhibit 37 of his deposition as an authentic copy of his Curriculum Vitae.  Masangu Dep. at 79:20-80:4, Ex. 8

489.    During his deposition, Mr. Masangu confirmed his work experience in his Curriculum Vitae and explained his role and responsibilities for each position.  Masangu Dep. at 109:10-125:2.

490.    On May 2, 2013, Ms. Bartner was deposed in this action ("**Bartner Dep.**").  Ex. 80.

491.    During her deposition, Ms. Bartner reviewed her education and work history, which included a B.A. in business administration, work as an assistant vice president at Citibank N.A. in Mexico City from 1981-1985, manager of the credit administration department at Citicorp USA from 1986-to 1987 and assistant vice president at Citibank N.A. in credit administration from 1987-1988.  Bartner Dep. at 9:14-21:17

492.    On August 30, 2013, Defendants' Expert Emmanuel Lubala was deposed in this action ("**Lubala Dep.**").  Ex. 78.

493.    Defendants rely on Decree 28/2002 as the basis for their position that neither of the signatories to the 2003 acknowledgement had actual authority under DRC law to bind their principals.

494.    There is no evidence that Decree 28/2002 was published in the Official Gazette.  Lubala Dep. at 67:14-68:16.

495.    At various times during 2002 and 2003, certain laws and decrees of the DRC were enforceable against third parties even though it was impossible for third parties to know of their existence or its contents.  Lubala Dep. at 68:23-75:4.

Dated:  New York, New York
        November 12, 2013

Respectfully submitted,

DECHERT LLP

By: */s/ Dennis H. Hranitzky*
Dennis H. Hranitzky
Debra D. O'Gorman
1095 Avenue of the Americas
New York, New York 10036
(212) 698-3500 (phone)
(212) 698-3599 (facsimile)

*Attorneys for Plaintiffs Themis Capital and Des Moines Investments Ltd.*

EXHIBIT B

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------ x
THEMIS CAPITAL and                                    :
DES MOINES INVESTMENTS LTD.,                           :        No. 09 Civ. 1652 (PAE)
                                                      :
                        Plaintiffs,                   :
v.                                                    :        **PLAINTIFFS' PROPOSED**
                                                      :        **CONCLUSIONS OF LAW**
DEMOCRATIC REPUBLIC OF CONGO                           :
and CENTRAL BANK OF THE                                :
DEMOCRATIC REPUBLIC OF THE                            :
CONGO,                                                :
                                                      :
                        Defendants.                   :
                                                      :
------------------------------------------------------ x

        Plaintiffs Themis Capital ("Themis") and Des Moines Investments Ltd. ("Des Moines,"

and together with Themis, "Plaintiffs") respectfully submit their proposed conclusions of law.

## I.      THE PARTIES

        1.      The DRC is the successor in interest to all of the rights and obligations of the

Republic of Zaire under the March 31, 1980 Refinancing Credit Agreement (the "Credit

Agreement").  Restatement (Third) of the Law of the Foreign Relations of the United States:

Succession of States §208 (1986). "Where one state has completely absorbed another, the

successor state is deemed to assume the public debt of its predecessor.  Otherwise, no source of

payment would be available to creditors, and the successor state might be unjustly enriched,

acquiring territory and other assets without corresponding obligations." *Id.* at § 209, comment c

(1986).[1]

---

[1]      In these Proposed Conclusions of Law, Plaintiffs use the term "DRC" to refer both to the
Republic of Zaire and the Democratic Republic of Congo.

2.     The Central Bank is the successor in interest to all of the rights and obligations of the Central Bank of the Republic of Zaire under the Credit Agreement.[2] *Id.*

3.     Plaintiff Themis became a valid holder of the interests under the Credit Agreement on which it seeks to recover in this action by an August 5, 2008 Deed of Assignment from Red Barn to Themis.  This Deed of Assignment establishes Themis's standing to recover on the interests it has sued upon.  April 28, 2010 Order Granting Default Judgment at 2-3; July 26, 2012 Opinion and Order at 2.

4.     Plaintiff  Des Moines became a valid holder of the interests under the Credit Agreement on which it seeks to recover in this action by a February 2, 2009 Deed of Assignment from Main Street to Des Moines.  This Deed of Assignment establishes Des Moines's standing to recover on the interests it has sued upon.  Order Granting Default Judgment dated April 28, 2010 at 2-3; Opinion and Order dated July 26, 2012 at 2.

5.     "Facts admitted by a party 'are judicial admissions that bind th[at] [party] throughout th[e] litigation.'" *Hoodho v. Holder*, 558 F.3d 184, 191 (2d Cir. 2009) (quoting *Gibbs ex rel. Estate of Gibbs v. CIGNA Corp.*, 440 F.3d 571, 578 (2d Cir. 2006)).

6.     Failure to deny an allegation set forth in the complaint in an action is deemed an admission to that allegation.  *See Guggenheim Capital, LLC v. Birnbaum*, 722 F.3d 444, 455 (2d Cir. 2013) ("a failure to deny allegations will result in those allegations (except to the extent they relate to damages) being deemed admitted."); Fed. R. Civ. P. 8(b)(6).

---

[2]     In these Proposed Conclusions of Law, Plaintiffs use the term "Central Bank" to refer both to the Central Bank of the Republic of Zaire/Bank of Zaire and the Central Bank of the Democratic Republic of Congo.

7.      Defendants are estopped from now attempting to challenge the validity of Plaintiffs' status as a holder of the interests on which Plaintiffs seek to recover in this action. April 18, 2013 Opinion and Order at p. 10-11.

8.      Defendants have waived the defense that Plaintiffs lack standing and are estopped from now attempting to challenge the validity of Plaintiffs' standing to bring this action.  April 18, 2013 Opinion and Order at p. 11; *Allan Applestein TTEE FBO D.C.A. Grantor Trust v. The Province of Buenos Aires*, 415 F.3d 242, 245 (2d Cir. 2005).

9.      In denying defendants' motion to amend their Answer, this Court has already found that "there is no non-speculative reason to believe that permitting plaintiffs' amendment would lead to a genuine issue of material fact as to plaintiffs' titles" because "defendants have not proffered any evidence tending to show that plaintiffs' titles are invalid" and "the record already reflects evidence that plaintiffs' assignments were valid."  April 18, 2013 Opinion and Order at p. 10.

## II.    LAW OF THE CASE

10.     "Under the law of the case doctrine, a decision on an issue of law becomes binding precedent in subsequent stages of the same litigation."  *Brentwood Pain & Rehabilitation Servs., P.C. v. Allstate Ins. Co.*, 508 F. Supp. 2d 278, 288 (S.D.N.Y.2007) (citation omitted).  *See also U.S. v. Quintieri*, 306 F.3d 1217, 1225 (2d Cir.2002) ("when a court has ruled on an issue, that decision should generally be adhered to by that court in subsequent stages in the same case.").

## III.   JURISDICTION AND VENUE

11.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1330 because both of the Defendants explicitly, unconditionally and irrevocably waived immunity with respect

to actions arising out of the Credit Agreement, and are therefore not entitled to immunity under the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. §§ 1605-07.  July 26, 2012 Opinion and Order at p. 10 ("the DRC's waiver of jurisdictional immunity is irrevocable, and the Court properly exercises original jurisdiction over this dispute."); 28 U.S.C. § 1330.

12.     Section 1609 of the FSIA provides that "the property in the United States of a foreign state shall be immune from attachment, arrest and execution except as provided in sections 1610 and 1611 of this chapter."

13.     28 U.S.C. § 1610(a)(1) sets forth "[e]xceptions to the immunity from attachment or execution" and provides that such an exception exists where "(1) the foreign state has waived its immunity from attachment in aid of execution or from execution either explicitly or by implication, notwithstanding any withdrawal of the waiver the foreign state may purport to effect except in accordance with the terms of the waiver."  28 U.S.C. § 1610(a)(1); July 26, 2012 Opinion and Order at p. 10-11.

14.     28 U.S.C. § 1611(b)(1) provides that "the property of a foreign state shall be immune from attachment and from execution, if — (1) the property is that of a foreign central bank or monetary authority held for its own account, unless such bank or authority, or its parent foreign government, has explicitly waived its immunity from attachment in aid of execution, or from execution, notwithstanding any withdrawal of the waiver which the bank, authority or government may purport to effect except in accordance with the terms of the waiver." 28 U.S.C. § 1611(b)(1).

15.     Defendants have irrevocably waived immunity to the fullest extent permitted  by law by agreeing in Section 12.07(c) of the Credit Agreement that:

(c) To the extent that the Obligor or the Bank of Zaire may be entitled, in any jurisdiction in which any suit, action or proceeding may at any time be commenced with respect to this Agreement or any judgment based on its obligations hereunder, to claim for itself or its Assets or the Assets of any Governmental Agency immunity from suit, from the jurisdiction of any court (including without limitation any court of the United States of America, the State of New York or the United Kingdom), from attachment prior to judgment, from attachment in aid of execution on a judgment, from execution on a judgment or from the giving of any other relief or issue of any process, or to the extent that in any such jurisdiction there may be attributed such an immunity (whether or not claimed), the Obligor and the Bank of Zaire each irrevocably agrees not to claim and irrevocably waives any and all such immunity to the fullest extent now or hereafter permitted under the laws of the jurisdiction in which any such suit, action or proceeding may be commenced and (without limiting the generality of the foregoing) consents generally for the purposes of the State Immunity Act of 1978 of the United Kingdom to the giving of any relief or the issue of any process.

16.    The Central Bank further waived any claim of sovereign immunity with respect to itself and its assets to the fullest extent permitted by law by agreeing in Section 9.02(e) that:

(e) Neither the Bank of Zaire nor any of its Assets has any immunity from the jurisdiction of any court or from any legal process in the Republic of Zaire or under its laws. The execution and delivery, of this Agreement by the Bank of Zaire and the performance of its obligations hereunder constitute private and commercial acts of the Bank of Zaire.

17.    Defendants' waivers of immunity are irrevocable and remain binding on them indefinitely.  July 26, 2012 Opinion and Order at p. 10 ("the DRC's waiver of jurisdictional immunity is irrevocable, and the Court properly exercises original jurisdiction over this dispute.").

18.    Venue is proper in this district by agreement of the parties according to the terms of the Credit Agreement and pursuant to 28 U.S.C. § 1391(f).  28 U.S.C. § 1391(f).

19.     Defendants were served with the Summons and Complaint in this action in full

compliance with the special requirements for service on a foreign sovereign set forth in the FSIA

sections 1608(a)(3) and 1608(b)(3)(B).  July 26, 2012 Opinion and Order at p. 5; 28 U.S.C. §§

1608(a)(3) and 1608(b)(3)(B).

## IV.    THE REFINANCING CREDIT AGREEMENT

20.     The Credit Agreement is a valid contract between Des Moines, as assignee, and

the DRC.  Deemed admitted because Defendants' answer contains no response to this allegation.

*See Guggenheim Capital*, 722 F.3d at 455 ("a failure to deny allegations will result in those

allegations . . . being deemed admitted."); Fed. R. Civ. P. 8(b)(6).

21.     The Credit Agreement is a valid contract between Des Moines, as assignee, and

the Central Bank.  Deemed admitted because Defendants' answer contains no response to this

allegation.  *Id.*

22.     The Credit Agreement is a valid contract between Themis, as assignee, and the

DRC.  Deemed admitted because Defendants' answer contains no response to this allegation.  *Id.*

23.     The Credit Agreement is a valid contract between Themis, as assignee, and the

Central Bank.  Deemed admitted because Defendants' answer contains no response to this

allegation.  *Id.*

24.     Themis and Des Moines, as assignees, stepped into the shoes and acquired all of

the rights of their respective assignors.  *Furlong v. Shalala*, 156 F.3d 384, 392 (2d Cir. 1998).

25.     Because the Credit Agreement is governed by New York law, the 1991

Acknowledgement Letter, the 1997 Acknowledgement Letter, the 2003 Acknowledgement

Letter and the 2009 Acknowledgement Letter (collectively, the "Acknowledgement Letters") are governed by New York law.  July 26, 2012 Opinion and Order at p. 15;  *H. Sand & Co., Inc. v. Airtemp Corp.*, 934 F.2d 450 (2d Cir. 1991).

26.     Under New York law, "to state a claim of breach of contract, the complaint must allege: (i) the formation of a contract between the parties; (ii) performance by the plaintiff; (iii) failure of defendant to perform; and (iv) damages."  July 26, 2012 Opinion and Order at p. 12. *Johnson v. Nextel Commc'ns, Inc.*, 660 F.3d 131, 142 (2d Cir. 2011); *First Investors Corp. v. Liberty Mut. Ins. Co.*, 152 F.3d 162, 168 (2d Cir. 1998).

27.     Plaintiffs' predecessors-in-interest performed the Credit Agreement simply by entering in to it.  *Wells Fargo Bank, N.A. v. Nat'l Gasoline, Inc.*, No. 10-CV-1762, 2013 WL 696651, at * 7 (E.D.N.Y. Feb. 26, 2013) ("Plaintiff fulfilled its contractual obligations by periodically advancing [defendant] funds as set forth in the Credit Agreement.").

28.     Defendants have breached the Credit Agreement by failing to pay the principal or interest or other amounts due owed to Plaintiffs or their predecessors-in-interest since at least 1985.  *See Hounddog Prods., LLC v. Empire Film Grp., Inc.*, 826 F. Supp. 2d 619, 629 (S.D.N.Y. 2011) ("[w]here, as here, 'the breach of contract was a failure to pay money, the plaintiff is entitled to recover the unpaid amount due under the contract plus interest.'") (quoting *Scholastic, Inc. v. Snap TV, Inc.*, No. 09 Civ. 4349, 2011 WL 1330246, at *3 (S.D.N.Y. Apr. 8, 2011));  *Steward Mach. Co., Inc. v. White Oak Corp.*, 462 F. Supp. 2d 251, 268 (D. Conn. 2004) (defendant "repeatedly failed to make all of the required payments, in breach of the parties' contract.").

29.     Plaintiffs have suffered damages through Defendants' breach because neither they nor their predecessors-in-interest were paid the principal, interest or other amounts owed to them under the Credit Agreement.  *Wells Fargo Bank, N.A.*, 2013 WL 696651 at * 7 ("plaintiff was damaged because it was unable to recover the remaining balance of the loan.").

30.     New York law gives secondary market purchasers such as Plaintiffs all of the rights of original creditors, including the right to enforce the full amount of the debt.  *See Travelers' Ins. Co. v. Brass Goods Mf'g Co.*, 239 N.Y. 273, 277 (1925); *see also*, *e.g.*, *Sprint Commc'ns Co., L.P. v. APCC Servs., Inc.*, 554 U.S. 269, 271-73, 292 (2008).

31.     The Central Bank is the guarantor of the DRC's obligation to pay principal, accrued interest and other amounts due under the Credit Agreement, subject only to the availability of sufficient foreign currency pursuant to Section 9.01 (c) of the Credit Agreement, which provides:

> The Bank of Zaire irrevocably and unconditionally states and agrees for the benefit of each Bank that:
>
> * * *
>
> (c) Subject to the availability to the Bank of Zaire of Dollars or other Foreign-Currency and pursuant to the instructions of the Obligor contained in Section 8.03, the Bank of Zaire will either (i) make available to the Obligor sufficient Dollars or other Foreign Currency to enable the Obligor to make each such payment as so required or (ii) on behalf of the Obligor make each payment as so required.

32.     The inclusion of consent to jurisdiction and waiver of immunity provisions on behalf of the Central Bank contained in Sections 9.02(e) and 12.07 of the Credit Agreement evidences that the parties to the Credit Agreement anticipated that the Central Bank would be liable for damages for breach of its guarantee obligations under the Credit Agreement.

## V.   INTEREST DUE UNDER THE REFINANCING CREDIT AGREEMENT

33.   Under New York law and the terms of the Credit Agreement, Plaintiffs are entitled to compound interest on a loan obligation as long as the contract provides for it.  N.Y. Gen. Oblig. Law § 5-527(1).

34.   Under New York Law, "compounding" simply means that interest accrues on unpaid interest.  N.Y. Gen. Oblig. Law § 5-527.

35.   Section 3.05(d) of the Credit Agreement expressly provides for the payment of compound interest in accordance with Section 5-527 of the General Obligations Law by providing that:

> To the extent permitted by law, the Obligor further agrees to pay interest as provided in subsections (a) and (b) above on all interest which is not paid when due hereunder after the Effective Date, such interest is to be payable on demand, to accrue from the due date of such interest until payment in full thereof and to be calculated on the basis of successive Overdue Periods of one Month.

36.   Pursuant to Section 3.04 and 3.05 of the Credit Agreement, the interest on all unpaid amounts of interest is due at the end of each "Overdue Period," regardless of whether a demand is made for it.

37.   Section 3.04, which creates "Interest Periods," provides:

> The period from the Reconciliation Date to the final Principal Payment Date shall be divided into successive Interest Periods. The first Interest Period shall begin on the Reconciliation Date and end on the last day of the Month in which occurs the first anniversary of the date of this Agreement. Each subsequent Interest Period shall be a period of six months and shall begin on the last day of the immediately preceding Interest Period.

38.   Section 3.05(b), which creates "Overdue Periods," provides:

> For purposes of determining the interest rate pursuant to subsection (a) above, the period between the date the principal amount referred to therein is due and the date such principal amount is paid in full shall be divided into Overdue Periods of

one Month (each of which other than the first shall begin on the last day of the next preceding Overdue Period).

39.     Under sections 3.04 and 3.05, interest is *due* at the end of each Overdue Period, just as it was due at the end of each Interest Period before Defendants defaulted in March 1990, without the need for the creditors and/or the Servicing Bank to issue monthly demand letters.

40.     The interest rate calculations submitted by Plaintiffs are controlling because Defendants expressly agreed that the calculations of Banks and Agents (as defined in the Credit Agreement) control over the calculations the Servicing Bank.

41.     Plaintiffs are included within the definition of "Banks" under the Credit Agreement as the valid assignee of "Banks" that were signatories to the Credit Agreement.

42.     Section 5.05 of the Credit Agreement provides:

> Each Bank, with respect to Credits owed to it, each Agent, with respect to Credits of its Syndicates, and the Servicing Bank, with respect to all the Credits, shall maintain on its books control accounts setting forth the amounts of principal, interest and other sums paid and payable by the Obligor from time to time hereunder with respect thereto. In case of any dispute, action or proceeding relating to any Credit, the entries in each such account shall be prima facie evidence of the amount of such Credit and of such amounts paid and payable. ***In case the entries in such accounts are not identical, each Agent's account shall be considered correct in the absence of manifest error with respect to Credits of its Syndicates, and the account of each Bank having a Single Bank Credit shall be considered correct in the absence of manifest error with respect to such Single Bank Credit***. (emphasis added)

43.     In addition, Section 3.05(c) of the Credit Agreement provides that:

> A certificate of any such Bank setting forth the basis for the determination of the interest due on overdue principal and of the additional amounts necessary to indemnify such Bank pursuant to this subsection (e) in respect of such loss or expense, submitted to the Obligor, shall be conclusive and binding for all purposes in the absence of manifest error.

44.     The interest rate calculations of Red Barn Capital LLC ("Red Barn") control with respect to its Syndicates because it is an "Agent."

45.     Red Barn's calculations also provide compelling evidence of the amounts that are owed for all other Syndicates because all Syndicates are similarly situated.

46.     Plaintiffs are entitled to judgment against Defendants, jointly and severally, awarding it all unpaid principal and interest, including compounded interest, due under the Credit Agreement.

## VI.   STATUTE OF LIMITATIONS

47.     The DRC has a continuing obligation under Section 8.01(b) of the Credit Agreement "so long as any Credit shall remain outstanding" to "obtain and maintain in full force and effect all governmental approvals (including any exchange control approvals) which may be necessary under the law of the Republic of Zaire for the execution, delivery and performance of this Agreement by the Obligor or for the validity or enforceability hereof and duly take all necessary and appropriate governmental and administrative action in the Republic of Zaire in order to make all payments to be made hereunder as required by this Agreement."

48.     The Central Bank has a continuing obligation to "maintain in full force and effect all authorizations necessary to make all such payments as so required" under the Credit Agreement.  Credit Agreement Section 9.01(a).

49.     Claims by holders of interests under the Credit Agreement were extended for a period of 6 years, to March 20, 1997, by an Acknowledgment Letter signed on behalf of Defendants on March 20, 1991.   N.Y. Gen. Oblig. L. § 17-103(1).

50.     Claims by holders of interests under the Credit Agreement were further extended for a period of 6 years, to March 7, 2003, by an Acknowledgment Letter signed on behalf of Defendants on March 7, 1997.  N.Y. Gen. Oblig. L. § 17-103(1).

51.     The DRC is the successor in interest to all of the rights and obligations of the Republic of Zaire under the Acknowledgment Letter signed on March 7, 1997.  Restatement (Third) of the Law of the Foreign Relations of the United States, §§ 208, 209 (1986).

52.     The Central Bank is the successor in interest to all of the rights and obligations of the Central Bank of the Republic of Zaire under the Acknowledgment Letter signed on March 7, 1997.  *Id.*

53.     Claims by holders of interests under the Credit Agreement were further extended for a period of 6 years, to February 25, 2009, by an Acknowledgment Letter signed on behalf of Defendants on February 25, 2003.  N.Y. Gen. Oblig. L. § 17-103(1).

54.     Plaintiffs' claims were timely filed because the February 25, 2003 Acknowledgment Letter re-started the six-year statute of limitations applicable to Plaintiffs' claims.  N.Y. Gen. Oblig. L. § 17-103(1).

55.     Claims by holders of interests under the Credit Agreement were revived by a July 15, 2009 Acknowledgment Letter signed on behalf of Defendants.  N.Y. Gen. Oblig. L. § 17-103(1).

56.     A claim that an action is barred by the statute of limitations is an affirmative defense, as to which the defendant bears the burden of proof.  *Matter of Baird*, 58 A.D.3d 958,

959, 871 N.Y.S.2d 755 (3d Dep't 2009); *Siegel v. Wank*, 183 A.D.2d 158, 159, 589 N.Y.S.2d

934 (3d Dep't 1992).

## VII.   ACTUAL AUTHORITY

57.     Where a commercial transaction is with a foreign state and that state is found to

have the most significant relationship to the transaction, "New York law must look to the law of

[the foreign state] to determine the actual authority of an agent of the [state's] government."  July

26, 2012 Opinion and Order at p. 17.  *Republic of Benin v. Mezei*, No. 06-cv-870, 2010 WL

3564270, at *6 (Sept. 9, 2010) (Koeltl, J.).

58.     The DRC has the most significant relationship with the transaction at issue and its

law applies to the issue of actual authority of the signatories to the 2003 Acknowledgement

Letter.  July 26, 2012 Opinion and Order at p. 18.  *Republic of Benin*, 2010 WL 3564270, at *6.

59.     The determination of foreign law is a matter of law for the Court.  *Faggionato v.

Lerner*, 500 F. Supp. 2d 237, 244 (S.D.N.Y. 2007) (citing *Rutgerswerke AG v. Abex Corp.*, No.

93-2914, 2002 WL 1203836 (S.D.N.Y. June 4, 2002)).

60.     Under Federal Rule of Civil Procedure 44.1, "[i]n determining foreign law, the

court may consider any relevant material or source, including testimony, whether or not

submitted by a party or admissible under the Federal Rules of Evidence."  Fed. R. Civ. P. 44.1.

61.     "Rule 44.1 is intended to assist the court with its work and the court is, of course,

free to enlist the parties in this effort.  Ultimately, the responsibility for correctly identifying and

applying foreign law rests with the court."  *Rationis Enters. Inc. of Panama v. Hyundai Mipo

Dockyard Co.*, 426 F.3d 580, 586 (2d Cir. 2005).

62.     On October 23, 1968, Ordinance-law No. 68/400 relating to publication and notification of official acts ("Ordinance-law No. 68/400") was enacted.  It was published in *Moniteur Congolais* No. 1 on January 1, 1969. Ex. 153.

63.     Ordinance-law No. 68/400 states, in part:

The President of the Republic,

Given the Constitution, especially article 51 and article IV of title IX ;

Given ordinance —law no. 66-534 of November 21, 1966, relating to the publication of official acts ;

On the proposal of the Minister of Justice

Orders:

Article 1       Individuals are informed of legislative and regulatory acts by means of publication.

Article 2       Legislative acts, including acts of the President of the Republic that have force of law, are published by being included in the *Moniteur Congolais*. Unless it is provided otherwise, they enter into effect thirty clear days after the date of the *Moniteur Congolais* in which they appeared.

Article 3       Regulatory acts issued by a central authority are published in the same form as legislative acts.

In emergency cases, they may be published by being posted in each district and each town, according to the methods established in article 6 below. Publication by posting does not exempt the Government from having the act included in the *Moniteur Congolais*.

Unless it is provided otherwise, the acts referred to in the current article enter into effect thirty clear days after the date of the *Moniteur Congolais* in which they appear, or the tenth day of their posting when they are published by this means . . ."

EXPERT00000001, Ex. 153.

64.     The *Journal Official* (or "Official Journal") replaced the *Moniteur Congolais* as the official means of publication of legislative and regulatory acts in Zaire.  Chikuru Rebuttal Report ¶ 12(c) n.5.

14

65.     On April 21, 1980, Order No. 80-073 "authorizing the signature of the credit refinancing agreement between the Republic of Zaire, the Bank of Zaire and private bank creditors" ("Order No. 80-73") was enacted.  It was published in the Official Journal Volume 9 on May 1, 1980.  Ex. 116.

66.     Order No. 80-073 states, in part:

> The President and Founder of the Popular Movement of the Revolution, President of the Republic,
>
> Given the Constitution, especially section 42;
>
> ORDERS:
>
> Section 1 The signature of the credit refinancing agreement between the Republic of Zaire, the Bank of Zaire and creditors from private banks shall be authorized.
>
> Section 2 The State Commissioner General of Finance and the Governor of the Bank of Zaire are responsible respectively for carrying out this Order, which takes effect on the date of its signing." Ex. 116.

67.     Order No. 80-73 empowered the Minister of Finance and Budget of Zaire (and later the Minister of Finance and Budget of the DRC) both to sign the Credit Agreement on behalf of Zaire and to carry out Zaire's (and later DRC's) obligations under the Credit Agreement on an ongoing basis.  Such obligations included, among others, its obligations under Section 8.01(b) of the Credit Agreement.  Chikuru Report ¶ 9(a)-(b).

68.     Order No. 80-73 empowered the Minister of Finance and Budget of Zaire to sign and bind Zaire to the 1991 Acknowledgement Letter and the 1997 Acknowledgement Letter, and empowered the Minister of Finance and Budget of the DRC to sign and bind the DRC to the 2003 Acknowledgement Letter.  Chikuru Report ¶9(b); Chikuru Rebuttal Report ¶ 12(c); Chikuru Dep. at 85:18-86:24.

69.     Order No. 80-73 empowered the Governor of the Bank of Zaire both to sign the Credit Agreement on behalf of the Bank of Zaire and to carry out the Bank of Zaire's (and later the Central Bank's) obligations under the Credit Agreement on an ongoing basis.  Chikuru Report ¶ 9(b); Chikuru Rebuttal Report ¶12(a); Chikuru Dep. ¶  85:18-86:24.

70.     Order No. 80-73 specifically empowered the Governor of the Bank of Zaire to sign and bind the Bank of Zaire to the 1991 Acknowledgement Letter and the 1997 Acknowledgement Letter, and empowered the Governor of the Central Bank to sign and bind the Central Bank to the 2003 Acknowledgement Letter.  Chikuru Report ¶ 9(b); Chikuru Rebuttal Report ¶12(c); Chikuru Dep at 85:18-86:24.

71.     On March 12, 2002 Decree No. 28/2002 regarding "establishing the organization and functioning of the government" ("Decree No. 28/2002") was purportedly enacted, but there is no evidence it was ever published in the Official Journal or elsewhere.  Ex. 128.

72.     Decree No. 28/2002 reads, in part:

DECREES:

PART 1: PRELIMINARY CLAUSES

Article 1: Without prejudice to provisions in other texts, constitutional or legal, of general or specific scope, this Decree sets the organization and functioning of the Government of the Democratic Republic Congo. . . .

PART II: GOVERNMENT ORGANIZATION

SECTION 1: THE PRESIDENT OF THE REPUBLIC THE HEAD OF THE GOVERNMENT

Article 4: In virtue of Article 5 of Constitutional Decree Law No. 003 of May 27, 1997 on the organization and the exercise of power in the Democratic Republic of Congo, as amended and supplemented to date, the President of the Republic, Head of State and Chief Executive, is the Head of the Government.

Article 5:  As Chief of State and Chief Executive, the President of the Republic defines and conducts the Nation's policies, sets the agenda for the Government's action, and ensures its implementation. The Chief Executive ensures, at all times, the maintaining of the integrity of the national territory, the maintenance of public order and national security, the proper functioning of the public sector, the proper functioning of the economy and other sectors of national life and the preservation of good relations with foreign powers and international and regional organizations.

Article 6: The President of the Republic exercises his prerogatives as Chief of State with the support of all members of Government, whom he directs and whose action he controls.  . . .

SECTION II: MEMBERS OF THE GOVERNMENT

Article 9: Ministers are responsible for directing the various branches of the Government's activity referred, to as "ministries" and whose number, the names and functions are set by Decree President of the Republic.  They are the heads of their Respective ministries and apply to the nation's policies to/within them, as defined by the President of the Republic [as well as] the agenda of the Government and the decisions taken by the Government. As such, they represent their ministries in their external affairs and are entitled to perform, in accordance with the Constitutional Decree-Law, the laws and regulations of the Republic and guidelines given by the President of the Republic, any act likely to ensure the smooth running of their ministries.  They are chiefly responsible for preparing and submitting to the deliberations of the Council of Ministers draft laws, decree-laws, decrees, interministerial orders, orders and other acts likely to have a budgetary or otherwise likely to affect public representatives and senior executives of the public administration or relative to public markets.  In emergencies draft acts or decisions are submitted to the President of the Republic for approval.

Article 11: In exercising their duties, Ministers, Delegate Ministers and Vice Ministers are required to comply with laws and regulations of the Republic, notably laws and regulations governing that which is the responsibility of their respective ministries. Specifically, they are strictly bound to both financial and budgetary legislation. They will ensure, for this purpose, that any bill, decree-law, decree, order or agreement, any decision that could have either an immediate or future budgetary impact, both revenue and expenditure and that any act of creation or extension of employment, resulting in a change in financial status, agents are subject to the approval notice of the Minister in charge of Finance and Budget, as well as the deliberations of the Council of Ministers or, in an emergency, the approval of the President of the Republic. They have an obligation to defend the records of their respective ministries to the Council of Ministers and, if necessary, before the Constituent and Legislative Assembly, Transitional Parliament, when required regularly and whenever matters within the functions of their ministries are discussed. . . .

17

PART III: THE FUNCTIONING OF THE GOVERNMENT

CHAPTER 1: THE COUNCIL OF MINISTERS . . .

Section 1: GENERAL DUTIES OF THE COUNCIL OF MINISTERS

Article 20: The Council of Ministers is the forum for discussion, consultation and decision-making of the Government.  It has jurisdiction to decide on all matters of authority of the Government, including

1. the conducting of the Nation's policies, as defined by the President of the Republic;

2. the enforcement of the Republic's laws and the Head of State's Decrees;

3. the consideration of any situation or exceptional circumstance leading to the declaration of war or the declaration of a state of siege or emergency;

4. draft laws, decree-laws, decrees, orders and interministerial and orders, subject to deliberation by the Council of Ministers;

5. draft treaties or international agreements and private legal agreements whose importance requires the approval of the Council of Ministers, including those relating to borrowings, loans, guarantees, grants or equity;

6. acts concerning the relationship between the Republic's institutions;

7. the decisions or measures which, by their nature or possible impact, can lead to general policy decisions and the collective responsibility of the Government;

8. decisions or any other actions on matters that are not within the jurisdiction of a single ministry, or which by their nature or importance require joint discussion of all members of government;

9. Senior administration business. . . .

SECTION 2: MEETINGS AND DELIBERATIONS OF THE COUNCIL OF MINISTERS

Article 21:

The Council of Ministers shall meet, except in special circumstances, at least once a week in Kinshasa. [Such a meeting] can also be held in another of the Republic's cities.

Regular meetings of the Council of Ministers are held each Friday of the week.

However, the Council of Ministers may be convened at any time for a special meeting. . .

18

Article 27:

The deliberations of the Council of Ministers are recorded in a minutes signed by the Spokesperson of the Government and the Secretary the Government. . .

CHAPTER II: THE ORDER AND DISCIPLINE IN THE GOVERNMENT

Article 36: Subject to paragraph 2 below, only the Minister or Delegate Minister may validly bind the Ministry in relation to third parties.

The Vice Minister may bind the Ministry vis-à-vis third parties only within the limits of the delegation of authority or other signature foreseen under Article 15 above or when he assumes [a position as] Interim or Delegate Minister.

Ex. 128.

73.     Decree 28/2002 was a regulatory act issued by a central authority within the scope of Ordinance-law 68/400.  Chikuru Rebuttal Report ¶12(c)(c).

74.     If Decree 28/2002 was not published in the Official Journal, it would not have become binding on third parties. Chikuru Rebuttal Report ¶ 12(c).

75.     The 2003 Acknowledgement Letter was not a "bill, decree-law, decree order, agreement or decision that could have an immediate or future budgetary impact" within the scope of Article 11 of Decree 28/2002.  Chikuru Rebuttal Report ¶¶ 13-16; Chikuru Dep. at 111:20-112:11.

76.     Decree 28/2002 did not abrogate the authority extended to the Minister of Finance and Budget of the DRC under Order 80-73 to sign and bind the DRC to the 2003 Acknowledgement Letter.  Chikuru Dep. at 76:25-77:13; Chikuru Rebuttal Report ¶ 12(a)

77.     Decree 28/2002 did not abrogate the authority extended to the Governor of the Central Bank under Order 80-73 to sign and bind the Central Bank to the 2003 Acknowledgement Letter.  Chikuru Rebuttal Report ¶ 12(a).

19

78.     The legal doctrine of *lex specialis derogat legi generali* is applied in the DRC. Chikuru Rebuttal Report ¶ 12(b).

79.     In the absence of controlling DRC law on a point of law, authorities under Belgian law, French law and other laws derived from the Napoleonic Code may be considered authoritative in the DRC.  Chikuru Rebuttal Report ¶ 12(b) n.1.

80.     On May 7, 2002, Act No. 005/2002 regarding "THE CONSTITUTION, ORGANIZATION AND FUNCTIONING OF THE CENTRAL BANK OF THE CONGO" ("Act No. 25/2002") was enacted.  It was published in the Official Gazette Special Issue on January 20, 2010.  Ex. 118.

81.     Act No. 005/2002 states, in part:

TITLE 1: ON THE CONSTITUTION

CHAPTER 1: NAME AND HEADQUARTERS

Article 1: The Central Bank of the Congo, "CBC" in short, hereinafter referred to as "the Bank," is a public law institution, established as a legal entity. It is governed by the provisions of this Act.

Article 2: The Bank's headquarters are located in Kinshasa. In case of emergency and in accordance with Article 18 of this Act, the Bank may temporarily relocate its headquarters to any other location. The Bank may establish or remove operational offices to or from locations within the national territory and, if need be, abroad.

CHAPTER II: OVERALL OBJECTIVE LEGAL STATUS AND CAPITAL

Article 3: The Bank is tasked with defining and implementing the country's monetary policy whose overall objective is to guarantee the stability of the general level of prices. The Bank is independent in achieving this objective. To this effect, the Bank, through its Board, namely its Governor, or through any other members of its decision making bodies, shall not present any act of a kind that may alienate this independence. Without prejudice to the overall objective of the stability of the general level of prices, the Bank supports the Government's general economic policy.

Article 4: The Bank has the capacity to enter into contract, negotiate terms, compromise, be a party to legal proceedings, acquire goods and dispose of them. The Bank, its assets, its goods, its revenues, as well as the operations and transactions authorized by this Act are exempt from any taxes, levies or dues collected by the Government and by provincial or local collectivities.

Article 6: The Bank's capital is entirely held by the Congolese State. The amount thereof and the conditions for the increase or reduction thereof shall be set out by law. . . .

Article 9: The Bank may, in addition, conduct the following operations in particular:

- Issue and redeem its own debt securities;

- Take titles and precious metals on deposit, and ensure the cashing of titles and intervene on behalf of third parties in operations involving movables, other financial instruments and precious metals;

- Carry out investment operations and financial management for its assets in foreign currencies in other external reserve elements;

- Obtain credit abroad and grant securities for this purpose. . . .

TITLE II: ORGANIZATION AND FUNCTIONING

CHAPTER 1: STRUCTURES . . . .

Article 21: The Governor and the Vice Governor are appointed by the President of the Republic. . . .

Section II: The Governor

Article 29: The Governor manages the Bank. He prepares and implements the acts of the Board.

Article 30: The Governor is vested with all of the necessary powers in order to ensure the day to day management of the Bank. The Governor shall determine the guidelines relating to such management and oversee the implementation thereof. The Governor may, within such limits as are compatible with the Bank's overall objective set out in Article 3 and in compliance with the prerogatives recognized by this Act for Bank structures, grant special powers to one or several representatives. The Governor shall set the attributes, compensation and possible allowances for such representatives.

Article 31: The Governor shall represent the Bank in all of its relationships and ties to third parties, including the government, and in this capacity, has the following powers:

a) Singlehandedly sign the banknotes and value instruments issued by the Bank, the annual reports, balance sheets and statements of results;

b) Singlehandedly or with other signatories sign contracts entered into by the Bank, Bank correspondence and other documents;

c) Sign, in accordance with the Bank's staff regulations, documents related to the hiring, promotion and dismissal of personnel;

d) Represent the Bank before the courts;

e) Delegate the powers vested in him by the provisions of Paragraphs b and d of this Article to the Bank's employees.

The Governor shall keep the Board informed on a regular basis, at least once per quarter, of changes in the country's monetary situation and changes to line items in the Bank's balance sheet.

Without prejudice to the provisions of Articles 26, 29 and 30, the Governor shall submit for approval by the Board, such proposed legislation that he deems necessary to fulfill the Bank's mission and policy objectives. . . .

TITLE III: RELATIONSHIPS WITH PUBLIC POWERS . . . .

Article 55: The Bank shall fulfill the functions of State Banker and Government Advisor in economic, monetary and financial matters. The Bank shall also fulfill the function of State Cashier in line with the agreement entered into with the Ministry of Finance. The Bank may also fulfill the functions of Cashier for decentralized administrative entities and for state institutions in application of special agreements entered into between the Bank, on the one hand, and with interested entities and bodies, on the other hand.

82.     Article 56: In application of Article 55, the Bank:

- Accepts and makes payments on behalf of the State. It may, to this end, designate Credit Institutions to act on behalf of and in the name of the Bank in locations where the Bank is not represented;

- Administers any special State account in agreement with the Ministry concerned;

- Provides the servicing for the public debt;

- Buys, sells, disburses, transfers, collects, or hold on behalf of the State, all checks, bills of exchange, securities and other titles;

22

- Collect the proceeds in principal and or in interest on the sale of any title on behalf of the State in the Banks capacity as holder of value instruments. Ex. 118.

83.     Article 31 of Act 005/2002 empowered the Governor of the Central Bank to bind the Central Bank to the 2003 Acknowledgement Letter.  Chikuru Report ¶ 47; Masangu Dep. at 129:18-129:22.

84.     On November 17, 2002, Decree No. 142/2002 regarding "APPOINTING MEM-BERS OF THE GOVERNMENT" ("Decree No. 142/2002") was enacted.  It was published in the Official Gazette Volume 1 on January 1, 2003. Ex. 129.

85.     Decree No. 142/2002 states, in part:

THE PRESIDENT OF THE REPUBLIC

Given Constitutional Decree-Law no. 003 of May 27, 1997 related to the organization and the exercise of power in the Democratic Republic of Congo, as it has been modified and amended to date, particularly articles 3, 4, 5 and 6;

Given the need and the urgency;

DECREES: . . .

Article 2: The following people are appointed Vice Ministers, as listed by name: . . . 4. Finance and Budget: Mr. Léonard Luhongwe . . . ." Ex. 129.

86.     Léonard Luhongwe became Acting Minister of Finance and Budget of the DRC upon the resignation of Mr. Mbuyanu Ilankur Matungulu from the position of Minister of Finances and Budget of the DRC, and thereby acquired all of the authority to bind the DRC to an acknowledgement of its obligations under the Credit Agreement held previously by the Minister of Finances and Budget of the DRC.  Chikuru Report ¶ 24.

87.     The fact that the 1997 Acknowledgement Letter and the 2003 Acknowledgement Letter do not bear the official seal of the DRC under the signature of the Minister of Finances

and Budget does not render those letters invalid under DRC law.  Chikuru Report ¶ 43; Lubala

Dep. at 77:22-79:18.

## VIII.  APPARENT AUTHORITY

88.     Under New York law, an agent may "bind his principal to a contract if the

principal has created the appearance of authority, leading the other contracting party to

reasonably believe that actual authority exists" (July 26, 2012 Opinion and Order at p. 19) or

when the "principal, either intentionally or by lack of ordinary care, induces a [third party] to

believe that an individual has been authorized to act on its behalf."  *Merrill Lynch Capital Servs.*

*v. UISA Fin.*, No. 09-cv-2324, 2012 WL 1202034, at *6 (S.D.N.Y. Apr. 10, 2012).  *See also*

*Goldston v. Bandwith Tech. Corp.*, 859 N.Y.S.2d  651, 655 (1st Dep't 2008).

89.     The doctrine of apparent authority is designed to provide protection to third

parties who deal with agents and it is "for the ultimate interest of persons employing agents, as

well as for the benefit of the public, that persons dealing with agents should be able to rely upon

apparently true statements by agents who are purporting to act and are apparently acting in the

interests of the principal."  *Am. Soc'y of Mech. Engr's Inc. v. Hydrolevel Corp.*, 456 U.S. 556,

567 (1982).

90.     Whether apparent authority exists is a question of fact, (s*ee Herbert Constr. Co. v.*

*Cont'l Ins.*, 931 F.2d 989, 994 (2d Cir. 1991)), that "requires a factual inquiry into the principal's

manifestations to third persons."  *First Fidelity Bank, N.A. v. Gov't of Antigua & Barbuda –*

*Permanent Mission*, 877 F.2d 189, 193 (2d Cir. 1989).

91.     "An assignee steps into the assignor's shoes and acquires whatever rights the

latter had."  *Furlong v. Shalala*, 156 F.3d 384, 392 (2d Cir. 1998).  *See also East Acupuncture,*

*P.C. v. Allstate Ins. Co.*, 61 A.D.3d 202, 211 (2d Dep't 2009) (It is a "general principle that an assignee stands in the shoes of the assignor and thus acquires no greater rights than those of its assignor.").   Consequently, an assignee acquires from the assignor the assignor's reasonable reliance on the authority of an apparent agent.

92.   An appearance of authority can arise merely from the title or position the agent holds.  For example, "the appointment of a person to a position with generally recognized duties may create apparent authority."  *First Fidelity*, 877 F.2d at 193.  *See also In re Cohen*, 422 B.R. 350, 369 (E.D.N.Y. 2010) ("the appointment of a person to a position with generally recognized duties may create apparent authority."); *Graffman v. Delecea*, No. 96 Civ. 7270, 1997 WL 620833, at *5 (S.D.N.Y. Oct. 8, 1997) ("Where the principal has voluntarily placed the agent in such a situation that a person of ordinary prudence conversant with business usages and the nature of the particular business may be justified in assuming that such agent has authority to perform a particular act there is apparent authority.").

93.   Where an agent's appearance of authority arises from the agent's position or title, "the burden is on the principal to inform third-parties of any unexpected limits on the agent's authority."  *Seetransport Wiking Trader Schiffarhtsgesellschaft MBH & Co. Kommanditgesellschaft v. Republic of Romania*, 123 F. Supp. 2d 174, 186 (S.D.N.Y. 2000).

94.   "When an act is done without authority, under an assumed agency, it is the duty of the principal to disavow and repudiate it in a reasonable time." *C.E. Towers Co. v. Trinidad and Tobago (BWIA Int'l) Airways Corp.*, 903 F. Supp. 515, 526 (S.D.N.Y. 1995).

95.    "It is a familiar principle of law, that when one has constituted and accredited another his agent to carry on a business, the authority of the agent to bind his principal continues

even after an actual revocation, until notice of the revocation is given; and, as to persons who have been accustomed to deal with such agent, until notice of the revocation is brought home to them." *Claflin v. Lenheim*, 66 N.Y. 301, 305 (1876).  *See also Parlato v. Equitable Life Assurance Soc. of the United States*, 299 A.D.2d 108, 115 (1st Dep't 2002) (noting that "[t]he Court of Appeals has held that a third party who…is known by a principal to have previously dealt with the principal through the principal's authorized agent, is entitled to assume that the agent's authority continues until the third party receives notice that the principal has revoked the agents authority.").

96.   "A state can be bound by the representative's unauthorized actions where the lack of authority is not obvious."  *First Fidelity*, 877 F.2d at 192.

97.   The content of agreements between parties is a factor to consider in determining whether a party's reliance was reasonable.  *See, e.g.*, *Emergent Capital Inv. Mgmt. LLC v. Stonepath Grp, LLC*, 343 F.3d 189, 195 (2d Cir. 2003) ("[i]n assessing the reasonableness of plaintiff's alleged reliance, we consider the entire context of the transaction, including factors such as…the content of any agreements between them."); *San Diego Cnty. Emp. Ret. Ass'n v. Maounis*, 749 F. Supp. 2d 104, 120 (S.D.N.Y. 2010) (same).  *See also DDJ Mgmt, LLC v. Rhone Grp. LLC*, 15 N.Y.3d 147, 154 (2010) ("[w]here a plaintiff has gone to the trouble to insist on a written representation that certain facts are true, it will often be justified in accepting that representation rather than makings its own inquiry.  Indeed, there are many cases in which the plaintiff's *failure* to obtain a specific, written representation is given as a reason for finding reliance to be unjustified.").

98.     It was reasonable for Plaintiffs' predecessors-in-interest to rely on the apparent authority of the Minister of Finances and Budget of the DRC to sign and bind the DRC to the 2003 Acknowledgement Letter based on the totality of the circumstances, particularly:

(1) the fact that the Minister of Finances and Budget of Zaire had actual authority to bind Zaire to the Credit Agreement;

(2) the fact that Zaire and DRC had a contractual obligation to obtain and maintain in full force and effect all government approvals necessary to maintain the performance and enforceability under the Credit Agreement while any amounts due under that agreement remained outstanding;

(3) the fact that the Minister of Finances and Budget of Zaire signed the 1991 Acknowledgement Letter and the 1997 Acknowledgement Letter, and the Minister of Finances and Budget of the DRC signed the 2003 Acknowledgement Letter after being warned that failure to do so could lead creditors under the Credit Agreement to sue;

(4) the fact that neither Zaire nor the DRC notified Plaintiffs' predecessors-in-interest that the Minister of Finances and Budget lacked authority to sign and bind the DRC to the 2003 Acknowledgement Letter; and

(5) from the time the 1991 Acknowledgement Letter was signed until at least 2011, individuals purporting to represent the DRC communicated with and held meetings with creditors under the Credit Agreement, including Plaintiffs' predecessors-in-interest, ostensibly for the purpose of negotiating a restructuring of the Defendants' obligations under the Credit Agreement – without ever indicating that it was the Defendants' position that those obligations were time-barred.

99.    It was reasonable for Plaintiffs' predecessors-in-interest to rely on the apparent authority of the Governor of the Central Bank to sign and bind the Central Bank to the 2003 Acknowledgement Letter based on the totality of the circumstances, particularly:

(1) the fact that the Governor of the Bank of Zaire had actual authority to bind Zaire to the Credit Agreement;

(2) the fact that the Bank of Zaire and the Central Bank had a contractual obligation to "maintain in full force and effect all authorizations necessary to make all . . . payments" required under the Credit Agreement;

(3) the fact that the Governor of the Bank of Zaire signed the 1991 Acknowledgement Letter and the 1997 Acknowledgement Letter, and the Governor of the Central Bank signed the 2003 Acknowledgement Letter after being warned that failure to do so could lead creditors under the Credit Agreement to sue;

(4) the fact that neither the Bank of Zaire nor the Central Bank notified Plaintiffs' predecessors-in-interest that the Governor of the Central Bank lacked authority to sign and bind the Central Bank to the 2003 Acknowledgement Letter; and

(5) from the time the 1991 Acknowledgement Letter was signed until at least 2011, individuals purporting to represent the Central Bank – including the Governor himself – communicated with and held meetings with creditors under the Credit Agreement, including Plaintiffs' predecessors-in-interest, ostensibly for the purpose of negotiating a restructuring of the Defendants' obligations under the Credit Agreement – without ever indicating that it was the Defendants' position that those obligations were time-barred.

100.    Under the doctrine of apparent authority, there is a duty to inquire into the status of an agent's authority when "(1) the facts and circumstances are such as to put the third party on inquiry, (2) the transaction is extraordinary, or (3) the novelty of the transaction alerts the third party to a danger of fraud."  July 26, 2012 Opinion and Order at p. 31.  *Republic of Benin*, 2010 WL 3564270, at *7; *C.E. Towers Co.*, 903 F. Supp. at 524.

101.    The duty to inquire "amounts to an alternative way of asking whether the third party reasonably relied on the representations of the agent that he possessed authority to bind the principal."  *Herbert Constr.*, 931 F.2d at 996.  If the facts and circumstances are neither extraordinary nor novel then no duty to inquire exists.  *See id.* at 995 ("[i]n short, a recovery based on the doctrine of apparent authority does not require that the third party have inquired into the scope of the agent's authority.").

102.    Under New York law, "a third party's reliance is reasonable when it has no duty to inquire."  *Merrill Lynch*, 2012 WL 1202034, at *20. When there is no duty to inquire, reasonable reliance may be found even if the third party did not investigate the nature of the agent's authority.  *Id.* ("[third party's] reliance was reasonable...[a]lthough there is no evidence that the [third party's] employees asked for or inspected [the principal's] bylaws, neither did they need to.").

103.    The failure of the principal to state that its agent lacked authority may support a finding of reasonable reliance.  *See Seetransport*, 123 F. Supp. 2d at 190 ("defendant's failure to make any representations during the entire course of negotiations that would at all suggest that the Finance Minister did not have such authority, made it entirely reasonable for plaintiff to have relied upon such representations.").

104.    A manifestation by a principal that leads to the apparent authorization of the actor or that affirms his actions after the fact does not need to be explicit.  "Silence may constitute a manifestation when, in light of all the circumstances, a reasonable person would express dissent to the inference that other persons will draw from silence.  Failure then to express dissent will be taken as a manifestation of affirmance."  Restatement (Third) of Agency, §§ 1.03 cmt. b; *accord*, *e.g., IBJ Schroder Bank & Trust Co. v. Resolution Trust Corp.*, 26 F.3d 370, 375 (2d Cir. 1994).

105.    Based on the totality of the circumstances – particularly the fact that the Minister of Finances and Budget of Zaire signed the 1991 Acknowledgement Letter and the 1997 Acknowledgement Letter – there was nothing extraordinary or novel about the 2003 Acknowledgement Letter or the surrounding circumstances as to require Plaintiffs' predecessors-in-interest to conduct an inquiry into the authority of the Minister of Finances and Budget of the DRC to sign and bind the DRC to the 2003 Acknowledgement Letter.

106.    Based on the totality of the circumstances – particularly the fact that the Governor of the Bank of Zaire signed the 1991 Acknowledgement Letter and the 1997 Acknowledgement Letter – there was nothing extraordinary or novel about the 2003 Acknowledgement Letter or the surrounding circumstances to require Plaintiffs' predecessors-in-interest to conduct an inquiry into the authority of the Governor of the Central Bank to sign and bind the Central Bank to the 2003 Acknowledgement Letter.

107.    It would have been unreasonable in this case for Defendants' creditors to have undertaken their own diligence to ascertain whether the signatories to the 2003 Acknowledgement Letter had actual authority because it would have been difficult, if not impossible, for creditors to ascertain the terms of the DRC law relevant to those signatories'

authority. *See C.E. Towers Co.*, 903 F. Supp. at 525 ("[e]ven if [the plaintiff] had engaged in the investigation [the defendant] suggests, there is very little chance that [plaintiff] would *ever* have found the policy statement, no matter how extensive its inquiry was.") (emphasis supplied.) "[S]ecret limitations of power cannot be expected to be found by even the most diligent third parties." *Id.*

108.   The doctrine of apparent authority applies to the acts of foreign states and their instrumentalities. July 26, 2012 Opinion and Order at p. 19-20. *Jota v. Texaco, Inc.*, 157 F.3d 153, 163 (2d Cir. 1998); *First Fidelity*, 877 F.2d at 193.

109.   "[W]here a private act by a government actor is at issue, court have consistently enforced claims of apparent authority." July 26, 2012 Opinion and Order at p. 24. *Seetransport*, 123 F. Supp. 2d at 185-86 (finding that Minister of Finance had apparent authority); *Anglo-Iberia Underwriting Mgmt. Co. v. Lodderhose*, 235 Fed. Appx. 776 (2d Cir. 2007); *First Fidelity*, 877 F.2d 189; *Skanga Energy & Marine LTD v. Arevenca S.A.*, 875 F. Supp. 2d 264, 266 (S.D.N.Y. 2012); *Bitumenes Orinoco, S.A. v. New Brunswick Power Holding Corp.*, No. 05 Civ 9485, 2007 WL 485617, at *1 n.3 (S.D.N.Y. Feb. 13, 2007); *Storr v. Nat'l Defence Sec. Council of the Republic of Indonesia*, No. 95 Civ 9663, 1997 WL 633405, at *1 (S.D.N.Y. Oct. 14, 1997).

110.   Restructuring debt is a commercial transaction and a private act. July 26, 2012 Opinion and Order at p. 26.

## IX.   RATIFICATION

111.   Under the doctrine of ratification, even when an agent lacks authority to enter into an agreement, if the principal "acquires or is charged with knowledge of an unauthorized act

undertaken by someone on its behalf, and does not repudiate that act within a reasonable time, but instead acquiesces in it, the [principal] is bound by the act." *In re Martin-Trigona*, 760 F.2d 1334, 1341 (2d Cir. 1985).  2A C.J.S. Agency § 155.

112.   Assent to the purportedly unauthorized act can be established by "*any* conduct manifesting a [principal's] consent to be a party to a transaction." *Orix Credit Alliance v. Phillips-Mahnen, Inc.*, No. 89 Civ. 8376, 1993 WL 183766, at *5 (S.D.N.Y. May 26, 1993) (emphasis supplied).

113.   "Ratification may be express, as by spoken or written words, or it may be implied from any act, words, or course of conduct on the part of the principal which reasonably tend to show an intention to ratify the unauthorized…act." *United States v. Tate & Lyle North Am. Sugars, Inc.*, 228 F. Supp. 2d 308, 323-24 (S.D.N.Y. 2002) (quoting *Capital Dist. Physician's Health Plan v. O'Higgins*, 951 F. Supp. 352, 361 (N.D.N.Y. 1997)).

114.   A principal can be bound through ratification of the acts of an apparent agent if it accepts the benefits of the agreement entered into on its behalf by the agent.  *Goldston*, 859 N.Y. S. 2d at 654-55.  *See also RLI Ins. Co. v. Athan Contracting Corp.*, 667 F. Supp. 2d 229, 236 (S.D.N.Y. 2009) ("acceptance of benefits is simply one means of evincing an intent to affirm or adopt the acts of another rather than a distinct element of a ratification test."); *ADHY Inv. Properties, LLC v. Garrison Lifestyle Pierce Hill LLC*, 44 Misc.2d 1211(A), at *4 ("circumstances that may imply ratification are the retention of the benefit of an unauthorized transaction with knowledge of the material facts of the agreement."); *Cologne Life Reins. Co. v. Zurich Reins. (North Am.), Inc.*, 286 A.D.2d 118, 127, 730 N.Y.S.2d 61, 68 (1st Dep't 2001) ("[o]f course, a principal's acceptance of benefits from a contract that was unauthorized when

32

originally executed constitutes an affirmance of the contract that, under appropriate circumstances, will give rise to a ratification.").

115.    Ratification of the unauthorized acts of an agent by the principal can "occur through intentionally accepting the benefits under the contract, by remaining silent or acquiescing in the contract for a period of time after he has the opportunity to avoid it." *In re Toscano*, 799 F. Supp. 2d 230, 243 (E.D.N.Y. 2011).

116.    "Ratification need not be explicit and can occur through inaction." *Bus. Integration Servs., Inc. v. AT&T Corp.*, No. 06-1863, 2008 WL 5159781, at *2 (S.D.N.Y. Dec. 9, 2008).

117.    "Ratification also occurs when a principal fails to object to the unauthorized act of another, despite an opportunity to do so." *Vargas Realty Enterprises, Inc. v. CFA W. 111 Street, L.L.C.*, 440 B.R. 224, 235 (S.D.N.Y. 2010); *Merex A.G. v. Fairchild Weston Sys., Inc.*, 810 F. Supp. 1356, 1370 (S.D.N.Y. 1993) ("when an act is done without authority, under an assumed agency, it is the duty of the principal to disavow and repudiate it in a reasonable time after information of the transaction if he would avoid responsibility thereof.").

118.    "Ratification may be inferred from 'knowledge of the principal coupled with a failure to timely repudiate, where the party seeking a finding of ratification has in some way relied on the principal's silence." *Velez v. Vassallo*, 203 F. Supp. 2d 312, 322 (S.D.N.Y. 2002) (quoting *Tr. of the Am. Fed. Of Musicians and Employers' Pension Fund v. Steven Scott Enters., Inc.*, 40 F. Supp .2d 503, 511 (S.D.N.Y. 1999)).

119.    A principal's silence may also be treated as an intention to ratify the purportedly

unauthorized acts of an agent.  *See RLI Ins. Co.*, 667 F. Supp. 2d at 235 ("where the principal

knows of an unauthorized act taken on his behalf and remains silent, he is deemed to have

ratified the act."); *Leser v. U.S. Bank Nat'l Ass'n*, No. 09-cv-2362, 2012 WL 4472025, at *19

(E.D.N.Y. Sept. 25, 2012) ("[t]he principal's intent to adopt the arrangement may be implied

from knowledge of the principal coupled with a failure to timely repudiate, where the party

seeking a finding of ratification has in some way relied upon the principal's silence"); *Velez*, 203

F. Supp. 2d at 322 ("Where the principal knows of an unauthorized act taken on his behalf and

remains silent, he is deemed to have ratified the act"); *Richardson Greenshields Sec., Inc. v. Lau*,

819 F. Supp. 1246, 1259 (S.D.N.Y. 1993) ("[a] failure to object over a long period of time is

evidence of acquiescence in the unauthorized activity.").

120.    "[H]aving once ratified its agents' acts, [a principal] cannot afterwards avoid the

effect of such ratification by showing that it was not acquainted with all of the facts of the

transaction ratified, when it was always in a position and was in possession of means of learning

them."  *In re Nigeria Charter Flights Contract Litig.*, 520 F. Supp. 2d 447, 467 (S.D.N.Y. 2007)

(quoting *Harvey v. J.P. Morgan & Co*, 166 Misc. 455, 464, 2 N.Y.S.2d 520, 531 (Munic. Ct.

Queens 1937)).

121.    To establish that the principal ratified the acts of an agent through silent

acquiescence, it is not necessary to demonstrate that the principal had actual knowledge of all of

the material facts; rather knowledge of the material facts may be imputed to the principal based

on the circumstances.  *See EUA Cogenex Corp. v. North Rockland Cent. Sch. Dist.*, 124 F. Supp.

2d 861, 870 (S.D.N.Y. 2000) (knowledge of material facts can be actual or imputed).

122.   A principal's full knowledge of the material facts can be inferred based merely on possession of the documents for which the principal claims it lacks knowledge.  *See, e.g.*, *Tr. of the Am. Fed'n of Musicians*, 40 F. Supp. 2d at 512 ("Despite [the principal's] assertions, knowledge of the settlement agreements is inferred from the undisputed fact that seven settlement agreements were found within plaintiff's possession.").

123.   The Council of Ministers' knowledge of the 2003 Acknowledgement Letter can be imputed from the DRC's production of that document in this action.

124.   On December 3, 2009, Decree No. 09/61 "for the creation and organisation of a public service known as the Directorate General of the National Debt abbreviated as 'DGDP'" ("Decree No. 09/61") was enacted.  It was published in the Official Journal on June 15, 2010. DRC Expert0000052-60, Ex. 101.

125.   Decree No. 09/61 states, in part:

Article 1: Within the Finance Ministry, a public service endowed with administrative and financial autonomy, known as the Directorate General of the National Debt abbreviated as 'DGDP,' herein after referred to the Directorate General is created.

Article 2: The Directorate General is placed under the direct authority of the Finance Minister.

Article 3: The centralised administrative seat of the Directorate General is located in Kinshasa. . . .

Article 4: The Directorate General is a body of counsel to the Government in matters related to the public debt. The mission of the Directorate General is to manage the public debt (both national and foreign), long-term and medium-term loans, including consolidated debt and budgetary arrears dating from more than one year.

Article 5: In application of Article 4 above, the Directorate General is responsible for the following:

- to draw up and submit to the Government in draft form a national debt policy, including proposals for improved financing;

35

- to provide a prior technical notice as to any national or foreign source of public debt to the State, public corporations and enterprises, public institutions and decentralised territorial bodies including in respect to secured loans; to prepare and participate in the negotiation of loan agreements, credit agreements, public debt agreements, as well as foreign/external claims;
- to monitor the application of financing agreements, including project grants;
- to manage the national and foreign public debt, the bonded debt, as well as cross-border claims and debt claims subject to revert orders;
- to monitor that the beneficiaries of secured loans guaranteed by the State and under reverted debt claims effectively comply with their respective obligation;
- to carry out any and all necessary analyses directly or indirectly linked to their aim and purpose;
-to mobilise and to monitor the use of all national or foreign financing that is a source of public debt, directly or indirectly, and, to this end, to approve all requests for disbursement and to ensure the monitoring of projects carried out with government funds (bonds);
- to manage, acting autonomously, all funds assigned to them by the State and having some relation to the financing of investments, and to ensure, where appropriate, their investment. . . .

Article 32: With respect to all legal and regulatory texts constituting Congolese legislation and dealing with the public debt, "Directorate General of the National Debt," abbreviated as "DGDP," shall replace "National Debt Management Office," "OGEDEP."

DRC Expert0000052-53, Ex. 101.

126.     Among the responsibilities of DGDP set forth in Decree No. 09/61 is the responsibility to keep a record of the amounts of the DRC's public debt.  Chikuru Report ¶ 33; Lubala Dep. at 97.

127.     DGDP took over the responsibilities previously held by OGDEP.  Chikuru Report ¶ 33.

128.     OGDEP was responsible for the management of the public debt of the DRC, and was responsible for communicating information regarding the public debt of the DRC.  Masangu Dep. at 152-153.

36

129.    OGDEP was and DGDP is an agent of the DRC with respect to the responsibilities delegated to it under DRC law.

130.    "Knowledge acquired by an agent acting within the scope of its agency is imputed to the principal even if the information was never actually communicated." *Meisel v. Grunberg*, 651 F. Supp. 2d 98, 110 (S.D.N.Y. 2009). *See also Center v. Hampton Affiliates, Inc.*, 66 N.Y.2d 782, 784 (1985) ("[t]he general rule is that knowledge acquired by an agent acting within the scope of his agency is imputed to his principal and the latter is bound by such knowledge although the information is never actually communicated to it.").

131.    There is a "presumption that an agent has discharged his duty to disclose to his principal all material facts coming to his knowledge with reference to the subject of his agency." *Center*, 66 N.Y.2d at 784.

132.    "There is limited authority for the proposition that ratification may be found even where the principal lacked knowledge of all the material facts when the principal is aware of its lack of knowledge and fails to investigate." *Ryan v. Prescott*, 38 Misc.3d 1234(A), at *9 (Sup. Ct. Albany Cnty. 2013) (citing *Colonge*, 286 A.D.2d at 128-29)).  This is so because "a principal cannot close his eyes and avoid investigating information within his possession and control in an effort to obtain the benefits of an unauthorized transaction while being spared its corresponding detriments."  *Id.*

133.    The Council of Ministers has imputed knowledge of the information on the DRC's public debt maintained by OGDEP and DGDP – including knowledge of the existence of the 2003 Acknowledgement Letter.

134.    The Council of Ministers' knowledge of the facts material to the 2003 Acknowledgement letter can be imputed to them based on the totality of the circumstances, including: (1) the fact that individuals purporting to represent the DRC met with representatives of creditors under the Credit Agreement on numerous occasions after March 1991 to discuss restructuring the DRC's obligations under that agreement; (2) the fact that Central Bank reported that the DRC's debt under that agreement remained outstanding in its annual reports for 2002, 2003, 2004, 2005, 2011 and 2012; (3) the fact that from 2002 until present, the DRC has formally been seeking debt relief through the Highly Indebted Poor Countries ("HIPC") debt relief program of the World Bank, in order to obtain financial support for a buyback of its debt obligations under the Credit Agreement, and that application process remains ongoing.

135.    The Council of Ministers knowledge of the facts material to the 2003 Acknowledgement Letter can be imputed to them at least from the time the DRC began to contest the validity of that letter in this litigation in December 2011.  The fact that the Central Bank Annual Reports for 2011 and 2012, both of which were published after December 2011, still refer to the Credit Agreement debt as outstanding notwithstanding the fact that the DRC are litigating over the validity of the 2003 Acknowledge in this lawsuit, itself constitutes ratification of the signatures on that letter.

136.    Under the doctrine of ratification, there is no requirement that the third party had knowledge of the specific act by which the principal ratified the contract.  Rather, all that is required is proof of the principal's knowledge.  *See EUA Cogenex Corp.*, 124 F. Supp. 2d at 871.

## X.   ESTOPPEL

137.   "The authority of an agent cannot be secretly limited by his principal so as to affect a third party dealing with such agent in ignorance of the limitation."  *Prop. Advisory Grp., Inc. v. Bevona*, 718 F. Supp. 209, 213 (S.D.N.Y. 1989).

138.   A principal may be estopped from denying the apparent authority of its agents if "(1) the principal's intentional or negligent acts, including acts of omission, created an appearance of authority in the agent, (2) on which a third party reasonably and in good faith relied, and (3) such reliance resulted in a detrimental change of position on the party of the third party."  *36 Convent Avenue HDFC v. Fishman*, No. 03 Civ. 3998, 2004 WL 1048213, at *3 (S.D.N.Y. May 7, 2004)(quoting *Tr. Of Am. Fed'n of Musicians*, 40 F. Supp. 2d at 508).

139.   Under New York law, the party seeking a finding of estoppel must demonstrate that the adverse party engaged in "(1) conduct which amounts to a false representation or concealment of material facts; (2) intention that such conduct will be acted upon by the other party; and (3) knowledge of the real facts."  *In re Vebeliunas*, 332 F.3d 85, 93-94 (2d Cir. 2003). Moreover, the partying seeking estoppel must demonstrate that it had: "(1) lack of knowledge and of the means of knowledge of the true facts; (2) reliance upon the conduct of the party to be estopped; and (3) prejudicial change in their position."  *Id.* at 94.

140.   The key behind the doctrine of equitable estoppel is that "he who, by his language or conduct, leads another to do what he would not otherwise have done, shall not subject such person to loss or injury by disappointing the expectations upon which he acted."  *See Pres. Life Ins. Co. v. Milken*, 946 F. Supp 267, 278 n.17 (S.D.N.Y. 1996) (quoting *Lukens Steel Co. v. Am. Locomotive Co.*, 197 F.2d 939, 941 (2d Cir. 1952)).

141.    Although Plaintiffs do not concede that Decree No. 28/2002 ever became binding on third parties, because Defendants claim that it did, they are estopped from arguing that Articles 21 and 27 of that Decree did not go into force.

142.    The DRC should be equitably estopped from denying the validity of the Acknowledgement Letters because:

(1)    Section 8.01(b) of the Credit Agreement required the DRC to "duly obtain and maintain in full force and effect all governmental approvals" necessary under the  laws of the DRC for the "execution, delivery, and performance" of the Credit Agreement "or for the validity or enforceability hereof;"

(2)    by appointing the signatories of these Acknowledgement Letters to the positions of Minister of Finance and Budget, it created the appearance that those individuals had authority to sign and bind Zaire and the DRC to those letters; and

(3)    The DRC was aware that Plaintiffs' predecessors-in-interest reasonably relied on the Acknowledgement Letters in deciding not to bring suit against them.

143.    The Central Bank should be equitably estopped from denying the validity of the Acknowledgement Letters because:

(1)    Section 9.01(a) of the Credit Agreement required the Central Bank to "maintain in full force and effect all authorizations necessary to make such payments as so required.";

(2)    by appointing the signatories of these Acknowledgement Letters to the position of Governor of the Central Bank, it created the appearance that those individuals had authority to sign and bind the Central Bank of Republic of Zaire/Bank of Zaire and the Central Bank to those letters; and

(3)    The Central Bank was aware that Plaintiffs' predecessors-in-interest reasonably

relied on the Acknowledgement Letters in deciding not to bring suit against them.

## XI.   ATTORNEY FEES

144.    New York law "allows parties to agree by contract that in the event of litigation

between them, the prevailing party may recover" attorneys' fees and associated costs and fees.

*Morse/Diesel, Inc. v. Trinity Indus., Inc.*, 875 F. Supp. 165, 177 (S.D.N.Y. 1994).

145.    "[I]n addressing a contractual claim for attorneys' fees, a court must determine

what constitutes 'a reasonable amount of fees.'"  *HSH Nordbank AG New York Branch v.*

*Swerdlow*, No 08-6131, 2010 WL 1141145, at *5 (S.D.N.Y. Mar. 24, 2010), *aff'd sub nom. HSH*

*Nordbank AG New York Branch v. State*, 421 F. App'x 70 (2d Cir. 2011) (quoting *McGuire v.*

*Russell Miller, Inc.*, 1 F.3d 1306, 1313 (2d Cir. 1993)).

146.    "In determining the reasonableness of attorneys' fees and associated costs in the

context of a contractual claim, a court examines a variety of factors, including 'the difficulty of

the questions involved; the skill required to handle the problem; the time and labor required; the

lawyer's experience, ability and reputation; the customary fee charged . . . for similar services;

and the amount involved.'  It is appropriate for a court to consider the amount of fees requested

in relation to the amount of damages at stake in the litigation."  *HSH Nordbank*, 2010 WL

1141145, at *6 (quoting and citing *F.H. Krear & Co. v. Nineteen Named Trustees*, 810 F.2d

1250, 1263, 1264 (2d Cir. 1987) (internal citations and footnote omitted).

147.    Plaintiffs are the prevailing party because they successfully enforced their right to

payment of principal and interest under the Credit Agreement.  As a result, Plaintiffs are entitled

to the costs of defending this litigation, including their reasonable attorneys' fees, costs and expenses.

## XII.   CONTRACT INTERPRETATION

148.   Under New York law, "if the contract is unambiguous, its meaning is likewise a question of law for the court to decide." *Napster LLC v. Rounder Records Corp*., 761 F. Supp. 2d 200, 206 (S.D.N.Y. 2011).

149.   "Under New York law a court interpreting a contract must 'give effect to the intent of the parties as revealed by the language they chose to use.'" *Reyes v. Metromedia Software, Inc*., 840 F. Supp. 2d 752, 754 (S.D.N.Y. 2012) (quoting *Seiden Assocs., Inc. v. AC Holdings, Inc*., 959 F.2d 425, 428 (2d Cir. 1992).

150.   "An interpretation of a contract that has the effect of rendering at least one clause superfluous or meaningless . . .is not preferred and will be avoided if possible." *Dixon v. NBCUniversal Media LLC*, No. 12 Civ. 7646, 2013 WL 2355521, at *6 (S.D.N.Y May. 28, 2013) (Engelmayer. J) (quoting *LaSalle Bank Nat'l Ass'n v. Nomura Asset Capital Corp*., 424 F.3d 195, 206 (2d Cir. 2005)); *Galli v. Metz*, 973 F.3d 145, 149 (2d Cir. 1992) ("Under New York law an interpretation of a contract that has 'the effect of rendering at least one clause superfluous or meaningless. . .is not preferred and will be avoided if possible.'").

151.   Defendants proposed interpretation that the Central Bank is not independently liable under Section 9.01 for all unpaid amounts due and owing under the Credit Agreement is disfavored because it would render Section 9.02(e) of the Credit Agreement superfluous.

### XIII.  ADVERSE INFERENCE / RULE 37 SANCTION

152.    "[A]n adverse inference provides the necessary mechanism for restoring evidentiary balance." *Creative Res. Grp. Of New Jersey, Inc. v. Creative Res. Grp., In*c., 212 F.R.D. 94, 107 (E.D.N.Y. 2002).

153.    "Where…the nature of the alleged breach of a discovery obligation is the non-production of evidence, a district court has broad discretion in fashioning an appropriate sanction, including…giv[ing] an adverse inference instruction." *Residential Funding Corp. v. DeGeorge Fin. Corp*., 306 F.3d 99, 107 (2d Cir. 2002).

154.    "Even if [a party] did not destroy evidence, and his failure to produce the document is viewed as just that – a failure to produce – an adverse inference instruction is still warranted." *Creative Res. Grp. Of New Jersey*, 212 F.R.D. at 106.

155.    "[D]iscovery sanctions, including an adverse inference instruction, may be imposed upon a party that has breached a discovery obligation not only through bad faith or gross negligence, but also through ordinary negligence." *Residential Funding Corp*., 306 F.3d at 113.

156.    "[T]he inference is adverse…not because of any finding of moral culpability, but because the risk that the evidence would have been detrimental rather than favorable should fall on the party responsible for its loss." *Lyondell-Citgo Refining, L.P. v. Petroleos de Venezuela, S.A*., No. 02 Civ. 0795, 2005 WL 1026461, at * 4 (S.D.N.Y. May 2, 2005).

157.    "A 'bad faith' violation of…Rule 26 is not required in order to exclude evidence pursuant to Rule 37." *Design Strategy, Inc v. Davis*, 469 F.3d 284, 296 (2d Cir. 2006).  *See also*

Fed. R. Civ. P. 37(c)(1) ("[i]f a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial…").

158.    "The range of sanctions available to a court include – but are not limited to – 'orders deeming certain facts established; permitting an adverse inference instruction; striking pleadings; prohibiting the 'disobedient' party from making specific claims or introducing certain matters into evidence; dismissing a claim or the entire action or granting a default judgment against the disobedient party; or entering an order of contempt." *Pall Corp. v. 3M Purification Inc*., 279 F.R.D. 209, 212 (E.D.N.Y. 2011).

159.    "A 'prejudiced party' will be permitted sanctions – particularly…the sanction of an inference in its favor 'so long as [it] has produced *some* evidence *suggesting* that a document or documents relevant to substantiating [its] claim would have been included among the [withheld or destroyed] files." *Linde v. Arab Bank PLC*, 269 F.R.D. 186, 196 (E.D.N.Y. 2010) (emphasis supplied) (quoting *Kronisch v. United States*, 150 F.3d 112, 126 (2d Cir. 1998).

160.    "Whether exercising its inherent power, or acting pursuant to Rule 37, a district court has wide discretion in sanctioning a party for discovery abuses." *Reilly v. Natwest Markets Grp. Inc*., 181 F.3d 253, 267 (2d Cir. 1999).

161.    "Rule 37 sanctions are intended to ensure that a party does not benefit from its failure to comply [with discovery]." *Dimensional Sound, Inc. v. Rutgers University*, No. 92 Civ.2350, 1996 WL 11244, at *3 (S.D.N.Y. Jan. 10, 1996).

162.     Because Defendants have failed to produce documents in response to Plaintiffs' request regarding meetings or minutes of the Council of Ministers, they should be estopped from introducing evidence that such meetings were held or the nature of the matters discussed or considered at such meetings.

163.     The Court should draw the adverse inference that meeting minutes or other documents reflecting the proceedings of the Council of Ministers would have been helpful to Plaintiffs and supported their position in this action.

164.     Defendants' refusal to produce documents from the Council of Ministers justifies the adverse inference that the Council of Ministers knew of the 2003 Acknowledgement Letter and authorized the Minister of Finances and Budget to sign that letter.

Dated:  New York, New York
November 12, 2013

Respectfully submitted,

DECHERT LLP

By: /s/ *Dennis H. Hranitzky*
     Dennis H. Hranitzky
     Debra D. O'Gorman
1095 Avenue of the Americas
New York, New York 10036
(212) 698-3500 (phone)
(212) 698-3599 (facsimile)

*Attorneys for Plaintiffs Themis Capital and Des Moines Investments Ltd.*