UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------x

THEMIS CAPITAL, LLC and        :
DES MOINES INVESTMENTS LTD.,   :     No. 09 Civ. 1652 (PAE)
                                    :
           Plaintiffs,       :
                                      :
             v.         :
                                      :
DEMOCRATIC REPUBLIC OF CONGO  :
and CENTRAL BANK OF THE        :
DEMOCRATIC REPUBLIC OF THE     :
CONGO,                                :
                                      :
           Defendants.     :
-------------------------------------------------------x

# PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW OF DEFENDANTS DEMOCRATIC REPUBLIC OF THE CONGO AND CENTRAL BANK OF THE DEMOCRATIC REPUBLIC OF THE CONGO

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ................................................................................................. 1

II.   FINDINGS OF FACT ......................................................................................... 5

    A.    The 1980 Credit Refinancing Agreement ............................................. 5

        1.    Overview of the Credit Agreement and the Context in Which it was Signed ......................................................................... 5

        2.    Respective Roles of Zaire and the Bank of Zaire Under the Credit Agreement ................................................................. 7

        3.    Execution of the Credit Agreement ......................................... 8

        4.    Provisions Regarding the Payment of Interest ....................... 15

    B.    Zaire's Default on the Credit Agreement .......................................... 18

    C.    The 1991 Acknowledgment of Debt .................................................. 18

    D.    The 1997 Acknowledgement of Debt ................................................ 20

        1.    Cecilia Bartner ...................................................................... 21

        2.    Bartner's Preparation of the 1997 Acknowledgement ........... 22

        3.    Finalizing the 1997 Acknowledgement ................................. 23

    E.    Events Leading Up to the 2003 Acknowledgement .......................... 25

        1.    Civil War, Regime Change and the DRC .............................. 25

        2.    Political Changes Affecting the Authority of the Minister of Finance and Budget ......................................................... 31

    F.    The 2003 Acknowledgement .............................................................. 32

        1.    Initial Citibank Communications Regarding the 2003 Acknowledgement ................................................................. 33

        2.    Citibank's Efforts to Prepare the 2003 Acknowledgement .... 35

        3.    Obtaining Signatures for the 2003 Agreement ...................... 35

        4.    Post-Signature – Citibank N.A ............................................. 38

    G.    The 2009 Acknowledgement .............................................................. 40

    H.    Since the Agreement was Effective, the Parties to the Credit Agreement Have Never  Included Compound Interest in the Calculations of the Total Debt Due and Owing .......................................... 42

# TABLE OF CONTENTS
(continued)

**Page**

III. CONCLUSIONS OF LAW ................................................................. 44

    A.    The Burden is on the Plaintiffs to Prove an Agency Relationship ..................... 44

    B.    The Signatories to the 2003 and 2009 Acknowledgements Lacked Actual Authority to Bind the DRC and Central Bank ...................................... 44

            1.    Luongwe and Matenda Lacked Actual Authority to Sign the 2003 and 2009 Acknowledgements on Behalf of the DRC ............................ 45

            2.    The Governor of the Central Bank Lacked Actual Authority to Sign the Acknowledgements on Behalf of the Central Bank ................. 50

    C.    The Legal Standard for Apparent Authority ........................................... 54

    D.    Neither Luongwe Nor Masangu Had Apparent Authority to Sign the 2003 Acknowledgement ........................................................................ 55

            1.    There Was No Relevant Conduct, Explicit or Implicit, by the DRC Prior to the 2003 Acknowledgement to Suggest That the Minister of Finance or Governor of the Central Bank Had Authority to Bind the State to the 2003 Acknowledgement Letter ..................................... 55

            2.    Citibank Did Not Reasonably Rely on the Signatures on the 2003 Acknowledgement ................................................................... 63

    E.    Neither Matenda Nor Masangu Had Apparent Authority to Sign the 2009 Acknowledgement ........................................................................ 73

    F.    The DRC Never Ratified the 2003 Acknowledgement ...................................... 74

            1.    Ratification of the 2003 Acknowledgement Can Only Be Accomplished By the Principal – The Sovereign State of the DRC ........ 75

            2.    There Is No Evidence to Suggest That the Sovereign Had Full Knowledge of the Material Facts Concerning the 2003 Acknowledgement ................................................................... 77

            3.    The DRC Took No Steps to Ratify the 2003 Acknowledgement ........... 79

    G.    Compound Interest ........................................................................ 83

            1.    Under the Express Terms of the Credit Agreement, Plaintiffs are Not Entitled to "Interest on Interest on Overdue Principal" Because No Demand for "Interest on Overdue Principal" Has Been Made ......... 84

            2.    Under No Circumstances Does the Credit Agreement Provide for the "Generation 3+" Interest the Plaintiffs Seek ...................................... 87

**TABLE OF CONTENTS**
(continued)

3.    Neither Plaintiffs' Calculations Nor Those of "Red Barn" Are Controlling ............................................................................. 89

IV.    CONCLUSION ........................................................................................... 93

Defendants the Democratic Republic of the Congo ("DRC") and the Central Bank of the Democratic Republic of the Congo ("Central Bank") hereby submit the following Proposed Findings of Fact and Conclusions of Law.

## I.     INTRODUCTION

This case arises from a sovereign debt that was initially incurred by the Republic of Zaire ("Zaire") approximately 40 years ago.  The debt was refinanced 33 years ago pursuant to a Refinancing Credit Agreement dated March 31, 1980 (the "Credit Agreement") and has been in default for well over two decades.  The debtor – now known as the DRC – is one of the world's poorest countries and currently ranks last (tied with Niger) on the Human Development Index, measuring life expectancy at birth, mean years of schooling, expected years of schooling, and gross national income per capita.[1]

At the time the debt was refinanced in 1980, Zaire already had an unsustainable debt burden and the country was run by a notorious dictator (Colonel Joseph Desiré Mobutu) whose reign of power from 1965 to 1997 was marked by widespread corruption and repressive tactics. In the turbulent years that followed, the country experienced financial collapse, a bloody civil war which led to the overthrow of Mobutu, the formation of a new government, the transition from Zaire to the DRC, the assassination of the DRC's new leader, the invasion by foreign forces and an international war that is reputed to be one of the world's deadliest conflicts and which

---

[1]     United Nations Development Programme (UNDP), "Human Development Report 2013," available at http://hdr.undp.org/en/media/HDR2013_EN_Summary.pdf (last accessed Nov. 11, 2013) (the "2013 U.N. Report").

resulted in millions of fatalities.  Abject poverty, violence and political discord continue in the DRC to this day.[2]

The Plaintiffs in this case are two vulture funds, based in Caribbean tax havens, who purport to have recently purchased an interest in the long distressed debt from certain commercial creditors who were parties to the Credit Agreement.  After purportedly obtaining their interest in the debt, the Plaintiffs promptly filed suit against the DRC and the Central Bank. Plaintiffs now request that the Court enter a $90 million judgment against both the DRC and its Central Bank.

Although the statute of limitations to sue under the Credit Agreement expired long before the Plaintiffs filed this suit, the Plaintiffs contend that their claims are timely because of an acknowledgment of debt signed by the interim Minister of Finance of the DRC and the Governor of the Central Bank on February 25, 2003 (the "2003 Acknowledgment").  Discovery has demonstrated, however, that the Acknowledgement will not bear the weight Plaintiffs attempt to place on it.  Among other things, the 2003 Acknowledgement was obtained during one of the most turbulent times in the DRC's history by a creditor who described it as a mere "formality," a creditor who had already written off its interest in the debt and who simply lobbied officials to sign the document without inquiry as to their authority to do so.  While the  lenders that entered the Credit Agreement in 1980 with Zaire undertook to perform extensive due diligence to ensure that the Agreement was legally enforceable and the signatories had the authority to bind the

---

[2]    *See id.*; *see also* Adam Nossiter, "Behind Those Fast Growth Rates, Rising Inequality," New York Times (Nov. 5, 2013) (noting that the DRC "consistently rank[s] at or near the very bottom of the United Nations Human Development Index, a comprehensive measure of economic, physical and social well-being across nearly 200 countries."); Nicholas Kulish, "A Reason for Hope in Congo's Perpetual War," New York Times (Oct. 26, 2013) ("The fighting in eastern Congo is one of the world's most intractable, prolonged and deadly conflicts, claiming millions of lives over a decade and a half.").

country, including the acquisition of various legal opinions and a Presidential Ordinance expressly authorizing the execution of the document, no such diligence was undertaken and no such assurances were obtained with respect to the 2003 Acknowledgement.

As set forth in detail below, the Plaintiffs bear the burden of proving that the 2003 Acknowledgment is legally binding on, and validly tolls the statute of limitations against, the DRC.  They cannot meet that burden because the signatories had neither actual nor apparent authority to make such a commitment on behalf of the DRC and no person or entity with such authority *and* knowledge of the document has ratified it.

First, the signatories lacked actual authority under DRC law (which governs here) and specifically Decree No. 028/2002 of March 12, 2002 (the "2002 Decree").  Pursuant to the 2002 Decree, which established greater financial accountability in the wake of the corrupt Mobutu regime, the Minister of Finance did not have authority to commit the DRC to the 2003 Acknowledgement or undertake any other decision that may have had immediate or future budgetary repercussions without first submitting the matter to the DRC's Council of Ministers for approval.  There is no evidence indicating such approval was obtained in this case.  And, under the laws governing the Central Bank, the Governor of the Central Bank was not authorized to execute the 2003 Acknowledgment without obtaining appropriate approvals from the State.

Second, there was no apparent authority with respect to the 2003 Acknowledgement.  As this Court previously noted, apparent authority exists when the principal causes a third party to reasonably rely on the representation that the agent is acting on its behalf.  Here, the State of the DRC took no action that could have led creditors to believe the Minister of Finance had unilateral authority to sign the Acknowledgement on behalf of the DRC; quite the contrary, circumstances surrounding the execution of the Credit Agreement and the subsequent issuance of

the 2002 Decree were clear indications from the State that the official did not have such authority.   Further, the record demonstrates that the creditor who obtained the 2003 Acknowledgement was singularly focused on getting the document signed, and took no steps to determine whether the signatories had the requisite authority despite significant political turmoil in the DRC (*e.g.*, the transition from Zaire to the DRC, the change in the government structure, and civil war), and other circumstances that should have signaled that such inquiries were necessary.

Finally, the Plaintiffs cannot demonstrate that any person with authority to ratify the 2003 Acknowledgement after the fact did so.   There is no evidence that the Council of Ministers knew that this document was signed, much less that they engaged in any conduct which rose to the level of ratification.   Even putting aside the policy and ethical issues implicated by this lawsuit, the purchase of a decades-old debt from a highly distressed country is unquestionably a risky investment.   Here, the Plaintiffs seek to collect $90 million under a 33 year old contract based on a single page acknowledgement about which they have no personal knowledge.   Discovery has shown that the persons signing this document did not have actual authority to do so and that the party obtaining the document ignored red flags which should have put it on notice of the need to inquire as to the signatories' authority and blindly accepted the document without conducting any due diligence whatsoever.   Although Plaintiffs seek to craft a narrative that would gloss over these fatal deficiencies, the record speaks for itself and does not support their claims. Accordingly, judgment should be entered for the Defendants.

## II.    FINDINGS OF FACT

### A.    The 1980 Credit Refinancing Agreement

#### 1.    Overview of the Credit Agreement and the Context in Which it was Signed

1.      On March 31, 1980, the Republic of Zaire ("Zaire") and the Bank of Zaire entered into a Refinancing Credit Agreement (the "Credit Agreement").

2.      The Credit Agreement refinanced a series of underlying credits previously extended to Zaire and was entered as part of a comprehensive restructuring of Zaire's debts.  Ex. P10 at UB00000624 and UB00000771-774.[3]

3.      The parties to the Credit Agreement included Zaire, the Bank of Zaire, various creditors of Zaire, agent banks and the Bank of Tokyo-Mitsubishi Trust Company (hereinafter "Bank of Tokyo") as the servicing bank.  Ex. P10 at UB00000624 and UB00000771-774.

4.      The obligations refinanced by the Credit Agreement date from 1970 to 1974.  *See* Ex. P10 at UB00000716-770.

5.      The debt that was refinanced pursuant to the Credit Agreement was incurred by Zaire during the regime of Colonel Joseph Desiré Mobutu (later known as Mobutu Sese Seko).

6.      Mobutu came to power in 1965, when Zaire was known as the Republic of Congo.  *See* Joint Stipulations of Fact at ¶ 3.

7.      Mobutu renamed the country Zaire in 1971.  *See* Joint Stipulations of Fact at ¶ 4.

8.      Mobutu remained in power until 1997, when he was overthrown as a result of a civil war.  *See* Joint Stipulations of Fact at ¶ 5.

---

[3]      In an effort to streamline the parties' pre-trial submissions, Defendants have not designated exhibits included on Plaintiffs' exhibit list.  However, Defendants reserve the right to designate any exhibit that the Plaintiffs may seek to withdraw, or that may be excluded by the Court because the Plaintiffs designated it for an improper purpose.

9.      It has been widely reported that Mobutu was a dictator, who brutally repressed the population of Zaire, and engaged in widespread corruption, including directing state revenues to personal bank accounts.  *See* Section II*, infra*, at ¶ 104.

10.      It has also been widely reported that while Mobutu amassed tremendous personal wealth during his reign over Zaire, the country suffered from extreme poverty and indebtedness. *See id*.

11.      At the time the Credit Agreement was entered, the country was facing an unsustainable external debt position and had turned to the International Monetary Fund ("IMF") for support through a Stand-By Agreement as well as to its official bilateral creditors under the framework of the Paris Club.[4]  Ex. P10 at UB00000771-774.

12.      Schedule B to the Credit Agreement summarizes the final 1979 Paris Club agreement regarding official bilateral debt relief.  *Id*.

13.      As indicated in Schedule B to the Credit Agreement, the members of the Paris Club "made a concerted effort to acknowledge Zaire's severe economic problems by rescheduling Zaire's official debt on terms more favorable" than prior Paris Club reschedulings and on terms "believed to be more favorable than any granted to a developing country since 1970."  Ex. P10 at UB00000771.

---

[4]      The Paris Club is an "informal group of official creditors whose role is to find coordinated and sustainable solutions to the payment difficulties experienced by debtor countries."  *See* Paris Club Website, available at http://www.clubdeparis.org/en/; *see also* Martin A. Weiss, "The Paris Club and International Debt Relief, Congressional Research Service, Feb. 17, 2012 ("The Paris Club is the major forum where creditor countries renegotiate official sector debts.  . . . . A Paris Club 'treatment' refers to either a reduction and/or renegotiation of a developing country's Paris Club debts."), available at www.fas.org/sgp/crs/misc/RS21482.pdf.

14.     Schedule B to the Credit Agreement also states that debt relief was limited and meant a "procedure of rescheduling official debt in arrears and debt maturing (principal and interest) only for the period encompassed by the IMF Stand-By Program."  *Id*.

15.     Schedule B to the Credit Agreement also mentions that "the creditor governments [of the Paris Club] accepted the principle that a further Paris Club meeting [would] be held to consider maturities falling due in 1981 and 1982[.]"  *Id*.

16.     Despite efforts to reschedule its debt, Zaire still faced a substantial debt burden in 1980.  According to the Credit Agreement, total external debt service post-debt restructuring remained at $470 million or at 24% of estimated export earnings for that year and was projected to rise to as much as $713 million by 1984.[5]  Ex. P10 at UB00000772-774.

17.     Accordingly, as noted above, it was assumed that further debt negotiations would be necessary in due course.  *See supra* at ¶ 15.

**2.      Respective Roles of Zaire and the Bank of Zaire Under the Credit Agreement.**

18.     Zaire was designated as the "Obligor" under the Credit Agreement and, as such, was the entity responsible for repayment of the outstanding amounts set forth therein.  Ex. P10 at UB00000624.  *See also id*. § 4.01 at UB00000643 and § 5.02 at UB00000647.

19.     The Bank of Zaire participated in the Credit Agreement as Zaire's central bank.  Ex. P10 at UB00000624.  *See also id*. at § 9.02(a) at UB00000671 (representing that the Bank of Zaire was the "central bank and monetary authority of the Republic of Zaire and as such

---

[5]      The debt sustainability framework endorsed by the World Bank and International Monetary Fund ("IMF") sets the threshold for external debt service to exports ratio at 15%.  *See* The Joint World Bank–IMF Debt Sustainability Framework for Low-Income Countries, Sept. 30, 2013, available at http://www.imf.org/external/np/exr/facts/jdsf.htm.

exercises, with the Obligor, full power and control over the International Monetary Assets of the Republic of Zaire").

20.     The Bank of Zaire agreed in the Credit Agreement that it would "use its best efforts to ensure that the Obligor and the Bank of Zaire will maintain sufficient Dollars or other Foreign Currency so that all such payments will be made as so required" and that subject to the availability to the Bank of such currency and pursuant to the Obligor's instructions as set forth in the Agreement, the Bank would "either (i) make available to the Obligor sufficient Dollars or other Foreign Currency to enable the Obligor to make each such payment as so required or (ii) on behalf of the Obligor make each payment as so required."  Ex. P10 § 9.01(b) and (c) at UB00000671.

### 3.     Execution of the Credit Agreement

21.     The Credit Agreement was executed on behalf of Zaire by Namwisi Ma Koyi, Zaire's "Commissaire d'Etat Aux Finances et Budget." Ex. P10 at UB00000693.

22.     The Credit Agreement was executed on behalf of the Bank of Zaire by Emony Mondanga, the Governor of the Bank of Zaire. *Id.*

23.     The execution of the Credit Agreement was accompanied by a number of representations and certifications affirming that the Agreement was duly authorized under the laws of Zaire and that the persons signing the Agreement on behalf of Zaire and the Bank of Zaire had been specifically authorized to sign that document.

24.     In that regard, the Credit Agreement included several representations and warranties by Zaire affirming that the document was duly executed and binding on it.

- Zaire affirmed that it "has full power and authority to execute *this Agreement*, to repay all Credits and pay interest thereon as primary obligor as provided *in this Agreement* and otherwise to perform and observe the provisions *of this Agreement*

on its part to be performed or observed."   Ex. P10 § 7.01(a) at UB00000661 (emphasis added).

- Zaire warranted that "[t]he execution, delivery and performance by the Obligor *of this Agreement* have been (or prior to the Effective Date will have been) duly authorized by all necessary legislative, administrative and other governmental action in the Republic of Zaire" and did not contravene the law of Zaire.   *Id.* (emphasis added).

- Zaire also warranted that "[n]o authorization or approval (including exchange control approval) or other action by, and no notice to or filing with, any governmental authority or regulatory body is required under law applicable *to this Agreement* in the Republic of Zaire for the due execution, delivery and performance by the Obligor *of this Agreement* except for the approval of the Bank of Zaire which has been duly obtained and is in full force and effect by virtue of the execution of this Agreement by the Bank of Zaire and except for those listed in Exhibit 1, all of which either have been duly obtained or made or will be duly obtained or made prior to the Effective Date and all of which will be in full force and effect on the Effective Date."   *Id.* (emphasis added).

25.    Under Section 8.01, Zaire agreed to "[d]uly obtain and maintain in full force and effect all governmental approvals (including any exchange control approvals) which may be necessary under the law of the Republic of Zaire *for the execution, delivery and performance of this Agreement* by the Obligor or for the validity or enforceability hereof and duly take all necessary and appropriate governmental and administrative action in the Republic of Zaire in

order to make all payments to be made hereunder *as required by this Agreement*."  Ex. P10 §
8.01(b) at UB00000666 (emphasis added).

26.     The Bank of Zaire affirmed that it had full power to execute the Credit Agreement
and that no further approvals were necessary from other branches or agencies within Zaire's
government for the Bank to fulfill its responsibilities under the Agreement.  Ex. P10 § 9.02 at
UB00000671-672.

27.     Section 6.01 of the Credit Agreement, "Conditions of Effectiveness," states that
"[t]he Effective Date [of the Credit Agreement] shall be the day on which" certain enumerated
"conditions shall have been satisfied[.]"  Ex. P10 § 6.01(a)-(b) at UB00000657-658.

28.     In order to satisfy the "Conditions of Effectiveness," Zaire was required to
provide, *inter alia*, official certifications to confirm that the persons signing the Credit
Agreement on behalf of Zaire and the Bank of Zaire were authorized to bind their principals to
their respective obligations under the Credit Agreement.  *Id.* at § 6.01(b)(i)-(v) at UB00000658;
*see also* Exs. 1-5 at UB00000777-782 (setting forth the "form" of the certifications that Zaire
and the Bank of Zaire were required to provide).

29.     These exhibits, among others, reflect the exercise of care undertaken by the
creditors to the Credit Agreement to ensure that the signatories on behalf of Zaire and the Bank
of Zaire were duly authorized.  For example, Exhibit 1 to the Credit Agreement is a "Form of
Certification of Government Approvals" which contemplates annexing as a condition precedent
to the Effective Date of the Credit Agreement an "Ordonnance of the President of the Republic
of Zaire" which "constitutes the sole legislative, administrative or other governmental
authorization or approval necessary with respect to the execution, delivery and performance by
the Republic of Zaire (the "Obligor") and the Bank of Zaire of the Refinancing Credit

Agreement . . . ." Ex. P10, Ex. 1 at UB00000777. Exhibit 2 to the Credit Agreement is a "Form of Incumbency Certificate for the Obligor and the Governor of the Bank of Zaire" in which the Director of the Office of the Presidency of Zaire is required to certify that the "the duly appointed Commissaire d'Etat aux Finances et Budget of the Obligor, is duly authorized to execute the Agreement and the other documents to be delivered thereunder on behalf of the Obligor[.]" *Id.*, Ex. 2 at UB00000778. Exhibit 2 also requires the Director of the Office of the Presidency of Zaire to certify the signature of "the duly appointed Governor of the Bank of Zaire," but not the authority of the Governor of the Bank of Zaire to take any action with regard to the Credit Agreement. *Id.*

30. In addition to these official certifications, Zaire and the Bank of Zaire were required to provide a legal opinion from their counsel in Zaire, *see* Ex. P10 § 6.01(b)(viii) at UB00000658, confirming, *inter alia*, that:

- "The execution and performance by the Obligor of the Agreement have been duly authorized by all necessary legislative, administrative and other governmental action in the Republic of Zaire, and do not contravene (i) the Constitution or (ii) any treaty, law, rule, regulation, order or decree in the Republic of Zaire or . . . any writ, judgment, award, injunction or similar legal restriction applicable to the Obligor or the Agreement in the Republic of Zaire." *Id.*, Ex. 8 at (5)(b) at UB00000788.

- "The Agreement has been duly executed and delivered by the Obligor and is the legal, valid and binding obligation of the Obligor enforceable against the Obligor in accordance with its terms." *Id.* at (5)(d) at UB00000788.

11

- "The Bank of Zaire has full power and authority under the law of the Republic of Zaire to execute and deliver the Agreement[.]"  *Id.* at (5)(g) at UB00000788; *see also id.* at (5)(h) at UB00000788 ("The execution, delivery and performance of the Agreement by the Bank of Zaire have been duly authorized by all necessary legislative, administrative and other governmental action under the charter . . . of the Bank of Zaire or under the law of the Republic of Zaire and do not contravene law in the Republic of Zaire applicable to the Bank of Zaire.").

31.     The legal opinion provided by Zaire and the Bank of Zaire's local counsel was also required to assess the enforceability of the "payment obligation of the Obligor" and the "payment obligations of the Obligor;" by contrast, there is no mention of any "payment obligation" or "payment obligations" of the Bank of Zaire.  *Compare id.* at (5)(e) and (5)(j) at UB00000788-789 *with id.* at UB00000787-790.

32.     On April 21, 1980, in accordance with the Credit Agreement, Section 6.01(b)(i) and Exhibit 1, President Mobutu signed Executive Order No. 80-073, authorizing the signing of the Credit Agreement.  Ex. D29.

33.     The text of Executive Order No. 80-073  makes clear that its limited purpose was to authorize the signing of the Credit Agreement by Zaire's State Commissioner of Finances and the Governor of the Bank of Zaire, which was a "Condition [ ] of Effectiveness" under the Credit Agreement:

> Executive Order no. 80-073 of April 21, 1980, *enacting authorization of the signing of the refinancing loan agreement* signed between the Republic of Zaire, the Bank of Zaire and private Bank creditors.

> The President and Founder of the Popular Movement of the Revolution, President of the Republic, in light of the Constitution, in particular Article 42 therein;

> HEREBY ORDERS:

Article 1

*The signing* of the refinancing loan agreement between the Republic of Zaire and the private bank creditors is hereby authorized.

Article 2

The State Commissioner of Finances and the Governor of the Bank of Zaire are each in turn assigned with the duties of implementing *the present Executive Order*, which enters into effect on the date of its signing.

Ex. D29 at 2 (emphasis added).

34.     Additional "Conditions of Effectiveness," *i.e.*, "[c]onditions [p]recedent to the Effective Date" of the Credit Agreement, included obtaining legal opinions from the Agent banks' counsel in Zaire, the United States and the United Kingdom confirming the enforceability of the Credit Agreement against Zaire and the Bank of Zaire.

35.     Similar to the opinion that Zaire and the Bank of Zaire's counsel was required to provide, as a "Condition[ ] of Effectiveness," the Agent banks' Zaire counsel was required to confirm, *inter alia*, that:

- "The execution, delivery and performance by the Obligor of the Agreement have been duly authorized by all necessary legislative, administrative and other governmental action in the Republic of Zaire and do not contravene (i) the Constitution or (ii) any treaty, law, rule, regulation, order or decree in the Republic of Zaire or . . . any writ, judgment, award, injunction or similar legal restriction applicable to the Obligor or the Agreement in the Republic of Zaire." Ex. P10 at Ex. 10 at 6(b) at UB00000794.

- "No authorization or approval (including exchange control approval) or other action by, and no notice to or filing with, any governmental authority or regulatory body is required in the Republic of Zaire for the due, execution,

13

delivery and performance by the Obligor of the Agreement, except for the approval of the Bank of Zaire which has been duly obtained and is in full force and effect by virtue of the execution of the Agreement by the Bank of Zaire and except for an Ordonnance of the President of the Republic of Zaire which was been duly obtained and is in full force and effect." *Id.* at (6)(c) at UB00000794.

- "The Bank of Zaire has full power and authority under the law of the Republic of Zaire to execute and deliver the Agreement[.]" *Id.* at (6)(g) at UB00000794; *see also id.* at (6)(h) at UB00000794 ("The execution, delivery and performance of the Agreement by the Bank of Zaire have been duly authorized by all necessary legislative, administrative and other governmental action under the charter . . . of the Bank of Zaire or under the law of the Republic of Zaire and do not contravene law in the Republic of Zaire applicable to the Bank of Zaire.").

36.    The opinion provided by the Agent banks' Zaire counsel was also required to assess the enforceability of the "payment obligation of the Obligor" and the "payment obligations of the Obligor;" again, there was no mention of any "payment obligation" or "payment obligations" of the Bank of Zaire. *Compare id.* at (6)(e) and (6)(j) at UB00000794-795 *with id.* at UB00000793-796.

37.    The opinion provided by the Agent banks' United States counsel, Sherman & Sterling, was not required to assess the authority of the signatories to bind Zaire and the Bank of Zaire to the Credit Agreement, but instead relied upon the opinion provided by Zaire counsel to the Agent banks in this regard. Ex. P10 § 6.01(b)(xii) at UB00000658 & Ex. 12 at UB00000799.

38.    The Agent banks' United Kingdom counsel also assumed, without performing any independent analysis, that the Credit Agreement was duly authorized under the laws of

14

Zaire, and similarly relied upon the opinion provided by Zaire counsel to the Agent banks in this regard.  Ex. P10, Ex. 11 at (a) at UB00000797.

39.     There is nothing in the text of the Credit Agreement or any of its exhibits that contemplates the authority of future parties to bind Zaire or the Bank of Zaire to the terms of a tolling agreement, or, indeed, to any legal documents other than the Credit Agreement and those documents that were required as "Conditions of Effectiveness" thereunder.

### 4.      Provisions Regarding the Payment of Interest

40.     Under the Credit Agreement, various debts were consolidated and restructured, and repayment of those debts was subject to a ten-year schedule.  Ex. P10 at UB00000624.

41.     Attached to the Credit Agreement were credit information schedules setting forth outstanding principal amounts.  *Id*. at UB00000718-770.  The Agreement provides for the principal to be paid in installments over an approximately ten-year period with the last principal installment scheduled for payment on March 31, 1990.  *Id*. § 4.01(f) at UB00000643.

42.     The Credit Agreement also provides for the payment of interest on the refinanced principal amounts up until the final principal payment date of March 31, 1990 ("regular interest").  *See id*. §§ 3.01-3.03 at UB00000637.  The Agreement breaks down such regular interest into three different categories and, for each, sets forth specific dates on which this form of interest was to be paid.

(a)     Interest accrued and unpaid as of January 31, 1980 ("Reference Date Interest"), *see id*. § 3.01 at UB00000637, § 2.01 at UB00000635 and at UB00000633, was to be paid "[o]n or before the eighth Business Day after the signature of th[e] Agreement."  *Id*. § 2.01 at UB00000635.

(b)     Interest from January 31, 1980 to September 2, 1980 ("Interest from the Reference Date to the Reconciliation Date"), *id*. § 3.02 at UB00000637 and at UB00000632-633,

was "to be due and payable on the Reconciliation Date [defined as September 2, 1980][.]" *Id*. at § 3.02 at UB00000637 and at UB00000632.

(c)     Interest from September 2, 1980 to March 31, 1990 ("Interest from the Reconciliation Date"), *id*. § 3.03 at UB00000637, § 4.01 at UB00000643, at UB00000631 and at UB00000632, was to "be due and payable on the last day of each Interest Period for interest accrued during such Interest Period." *Id*. § 3.03 at UB00000637.   In that regard, the Credit Agreement provides that:

> The period from the Reconciliation Date to the final Principal Payment Date shall be divided into successive Interest Periods. The first Interest Period shall begin on the Reconciliation Date and end on the last day of the Month in which occurs the first anniversary of the date of this Agreement.   Each subsequent Interest Period shall be a period of six Months and shall begin on the last day of the immediately preceding Interest Period.

*Id*. § 3.04 at UB00000638.

43.     Pursuant to the Credit Agreement, if all principal and interest amounts are paid as scheduled, then the Obligor is not required to pay any type of interest other than regular interest.

44.     In the event, however, that principal was not paid when due under the Credit Agreement, Section 3.05 also provides for two categories of late or penalty interest.

45.     *First*, Section 3.05(a) provides for interest on overdue principal to accrue from the "date such principal amount is due to the date such principal amount is paid in full." *Id*. § 3.05(a) at UB00000638.   Unlike the provisions for regular interest, however, no due date for such interest is specified.   Rather, Section 3.05(a) provides that interest on overdue principal is "payable on demand[.]" *Id*.

46.     *Second*, Section 3.05(d) provides for interest on any amounts of interest on overdue principal that are "not paid when due" with such interest to "accrue from the due date of

such interest until payment in full thereof[.]"  Again, no due date for this additional category of penalty interest is specified; rather, it is also to be "payable on demand."  *Id*. § 3.05(d) at UB00000639.[6]

47.     Because interest on overdue principal is "payable on demand", *id*. § 3.05(a) at UB00000638, such interest is not due until a demand is made.  Accordingly, interest on interest on overdue principal does not begin to accrue under Section 3.05(d) until after a demand for the interest on overdue principal is made.

48.     The record contains no evidence that any demand for interest on overdue principal was made.[7]

49.     Instead, the record clearly and consistently demonstrates that the creditors under the Credit Agreement had long recognized Zaire's inability to sustain the debt owed under the Agreement, and did not seek to enforce Zaire's obligations (much less expand them).

50.     Indeed, the record demonstrates that the creditors had long been resigned to negotiate the debt and settle it at a substantial discount.  *See* Ex. D10 at CITI0000210-211 (April 21, 2003 letter from Losembe to Luongwe indicating that Citibank was willing to negotiate the debt); Ex. P44 at CITI0001029-1030 (Minutes of September 26, 2003 meeting between DRC and London Club members, in which London Club agreed in principle to discount on the debt); Ex. D15 at CITI0000905 (Nov. 17, 2003 internal Citibank email from Michael Accad noting that

---

[6]     Specifically, Section 3.05(d) provides that, "[t]o the extent permitted by law, the Obligor further agrees to pay interest . . . . on all interest which is not paid when due hereunder . . . , such interest is to be payable on demand, to accrue from the due date of such interest until payment in full thereof and to be calculated on the basis of successive Overdue Periods of one Month."  *Id.* at UB00000639.

[7]     Any demand for interest made pursuant to Section 3.05(a) would have to comply with the requirements of Section 12.02 the Credit Agreement which governs "[a]ll notices and other communications provided for" under the Agreement. *Id.* at UB00000684.

"we'll be lucky to get 10 cents" on the dollar for the DRC debt); Ex. D13 at CITI0000904 (Dec. 11, 2003 internal Citibank email from Michel Losembe indicating that Belgolaise, another creditor, had recommended an 85% reduction in the debt, and asking if Citibank should agree to this figure).

**B.      Zaire's Default on the Credit Agreement**

51.      According to a March 13, 1991 internal memorandum from the Bank of Tokyo, Zaire first defaulted on the Credit Agreement in 1982, with a significant amount of the debt having fallen due in April 1985.  Ex. P11 at UB00002453.

52.      Zaire ceased all monthly payments on the Credit Agreement in March 1988.  Ex. D2 at UB00001051.  Payments resumed in July 1989, but ceased again in January 1990.  *Id.*

**C.      The 1991 Acknowledgment of Debt[8]**

53.      In light of Zaire's default on the debt, a determination was made by the London Club's Steering Committee that the statute of limitations to sue on the Credit Agreement was set to expire in April 1991.[9]  Ex. P11 at UB00002452-53.

---

[8]      Although discussed herein, the Defendants do not believe that the 1991 or 1997 Acknowledgements are relevant to this litigation because, *inter alia*, both of these documents pre-date the filing of this lawsuit by more than six years, and both of these documents were signed before Decree No. 028/2002 of March 12, 2002 was enacted (*see* Ex. P128 at EXPERT00000024-66), which limited the authority of the ministers who signed the 2003 and 2009 Acknowledgements that are at issue in this litigation.

[9]      According to a report by the International Monetary Fund, the "London Club" refers to "[t]he process of debt renegotiations between governments and commercial banks… Despite its name, the London Club is neither a statutory institution based in London nor a well-organized club.  Instead, the term loosely describes the case-by-case restructuring routine developed between major Western banks and developing country governments in the late 1970s and early 1980s."  Udaibir S. Das, Michael G. Papaioannou, and Christoph Trebesch, IMF WORKING PAPER: SOVEREIGN DEBT RESTRUCTURINGS 1950–2010: LITERATURE SURVEY, DATA, AND STYLIZED FACTS (2012), available at http://www.imf.org/external/pubs/ft/wp/2012/wp12203.pdf, at 16.  The "Steering Committee," in 1991, consisted of  Citibank, NY, Australia and New Zealand Bank, London, and Credit Commercial de France; the record indicates that at the time,

54.     In March 1991, the Bank of Tokyo, as the servicing bank under the Credit Agreement, along with the creditor banks, sought to obtain from Zaire an acknowledgement of debt in order to toll the six-year statute of limitations for contract actions in New York.  *Id.* at UB00002452.  These efforts had been ongoing for at least a year, as the Bank of Tokyo had met with officials from Zaire in March 1990 to discuss a new restructuring agreement and outstanding balances on the debt.  Ex. D1 at UB00002524.

55.     To this end, the Bank of Tokyo held two meetings, on March 11 and 12, 1991, to discuss efforts to obtain an acknowledgement of debt from Zaire.  Ex. P11 at UB2452-2454.

56.     On March 11, 1991, Bank of Tokyo officials met with representatives from the Bank of Zaire to discuss the Bank of Tokyo's recent reconciliation of the principal and interest owed by Zaire under the Credit Agreement.  *Id*. at UB00002452-2453.

57.     Prior to the March 11, 1991 meeting, the Bank of Tokyo provided Zaire with a schedule of amounts owed under each of the Credit Agreement's tranches and sub-tranches, for a total of approximately $359 million in past due principal and $86 million in past due interest on principal.  *Id*. at UB00002452-2453, 2460.

58.     The schedule of debts provided by the Bank of Tokyo to Zaire prior to the March 11, 1991 meeting did not include or reference interest on interest, *i.e.*, compound interest.  *Id*. at UB00002460.

59.     Officials from the Bank of Tokyo and Citibank met with  attorney Alfred Mudge from Shearman & Sterling on March 12, 1991 to discuss ongoing efforts to obtain an acknowledgement of debt from Zaire to toll the statute of limitations.  *Id*. at UB00002453-2454. At that time, it was understood that any acknowledgement obtained from Zaire and the Bank of

---

these banks constituted the agent banks for 10 out of the 22 syndicates and the majority interests (53%).  Ex. P11 at UB 0002454 and 0002455.

Zaire had to be proven satisfactory to the Steering Committee members and Shearman & Sterling. *Id*. at UB00002455-59; 0002458.

60.     The record does not contain further evidence regarding efforts to obtain an acknowledgement of debt in 1991, but on March 22, 1991, Pay-Pay wa Syakassighe, then-Governor of the Bank of Zaire, sent a signed copy of an acknowledgement of debt (the "1991 Acknowledgement") to the Bank of Tokyo.  Ex. P17 at CITI0003700.

61.     The 1991 Acknowledgement attaches a schedule of debt ("Schedule 1"), as previously reconciled by the Bank of Tokyo, which "set[] forth the amounts of past due principal and past due interest on principal as of April 2, 1990 for each Credit Information Schedule" under the Credit Agreement.  Ex. P17 at CITI0003701.

62.     As the 1991 Acknowledgement explained, past due interest on principal "consists of both interest accrued on principal installments prior to their maturity (regular interest) and interest accrued on overdue principal."  Ex. P17 at CITI0003701, 3703.  Schedule 1 listed amounts of past due principal (approximately $359 million), regular interest (approximately $24 million) and interest on overdue principal (approximately $62 million).  *Id*. at CITI00003703.

63.     No mention was made of compound interest, either in the 1991 Acknowledgement or in Schedule 1.  *Id*. at CITI0003701, 3703.

**D.     The 1997 Acknowledgement of Debt**

64.     Zaire's Minister of Finance and the Governor of the Bank of Zaire signed an additional acknowledgement letter in March 1997 (the "1997 Acknowledgement").  *Id*. at CITI0003699.

65.     Bank of Tokyo, which had obtained the 1991 Acknowledgement and compiled the reconciliation of debt for that Acknowledgement, declined involvement in obtaining the 1997 Acknowledgement because it was not going to be paid to do so.  Ex. P80 at 45:15-19; 46:12-

47:3; 57:9-18; 58:12-24.   Also, at this time, the Steering Committee was no longer in place.  *Id*. at 72:13-24.

66.    Due to the Bank of Tokyo's refusal to be involved in obtaining the 1997 Acknowledgement, Citibank N.A. decided to take the lead in obtaining the 1997 Acknowledgement from Zaire.  *Id*. at  45:15-19; 47:13-16.

### 1.    Cecilia Bartner

67.    The person at Citibank in charge of securing the 1997 Acknowledgement was Cecilia Bartner, who was in Citibank N.A.'s debt restructuring department at the time.  *Id*. at 39:18-23; 51:13-15.

68.    Bartner started her employment with Citibank in 1981.  *Id*. at 8:15-17.  Prior to that, she had worked in the restaurant industry for two years.  *Id*. at 8:18-9:13.

69.    Bartner's education consisted of a bachelor's degree in business administration relating to hotels, restaurants and hospitals.  *Id*. at 9:14-18.  Other than language training, she had no formal training or education after her bachelor's degree.  *Id*. at 10:4-8.

70.    Bartner came to Citibank, N.A. in New York in 1987.  *Id*. at 18:12-19.  She left the company in 1988 but returned in February 1989.  *Id*. at 20:25-21:24.

71.    Upon her return in 1989, Bartner entered Citibank N.A.'s debt restructuring department.  *Id*. at 22:5-7.  In that position, Bartner dealt only with sovereign debt.  *Id.* at 23:2-4.  This was Bartner's first experience with debt restructuring.  *Id.* at 22:8-10.

72.    The 1997 Acknowledgement was the first acknowledgement of debt that Bartner was involved in obtaining.  *Id.* at 193:17-194:2.  In fact, she testified that in the approximately 10 years she had previously spent in the debt restructuring department,  statute of limitations issues had never before come up.  *Id.* at 31:9-32:13; 33:14-19; 34:20-35:14.

21

73. Bartner could not recall precisely when she received Citibank's file on Zaire, but it was prior to 1997. *Id.* at 39:24-25; 41:12-15. Her supervisor gave Bartner the Zaire file, and instructed her to follow up on the statute of limitations issue. *Id.* at 35:18-25; 46:6-11. She recalled that it was a "a small file" which she kept at her desk. *Id.* at 40:14-16; 41:12-15; 74:22-25; 75:2-6.

74. At the time Bartner was given Citibank's file on Zaire, she was the only person in the debt restructuring department. *Id.* at 39:18-23; 51:13-15.

### 2. **Bartner's Preparation of the 1997 Acknowledgement**

75. In preparing the 1997 Acknowledgement, Bartner consulted with Casey Dwyer, an attorney with Shearman & Sterling. *Id.* at 50:19-23; 53:10-15; 70:17-20. However, no other attorneys at Shearman & Sterling were involved. *Id.* at 50:19:23; 73:9-12.[10]

76. Bartner used the 1991 Acknowledgement to prepare the 1997 Acknowledgement. *Id.* at 56:2-13. After Bartner prepared the initial draft of the 1997 Acknowledgement, Dwyer made changes and approved it. *Id.* at 71:5-21; 72:25-73:5.

77. As previously noted, the 1991 Acknowledgement was accompanied by Bank of Tokyo's reconciliation of the then-outstanding debt. Ex. P17 at CITI0003700-3703; Ex. P80 at 58:11-20. However, because Bank of Tokyo was unwilling to reconcile the debt in 1997 without getting paid, Bartner prepared a "blanket" acknowledgement whereby Citibank "would not have to specify specifically what debt was owed." Ex. P80 at 57:9-18.

---

[10] Alfred Mudge, the attorney who had been involved with the 1991 Acknowledgement had left the firm by the time Bartner worked on the 1997 Acknowledgement. *Id.* at 50:11-23. And, although the evidence indicates that two Citibank employees were involved in discussions regarding the acquisition of the 1991 Acknowledgement, Ex. P11 at UB00002453, each of those employees had left Citibank by the time Ms. Bartner was asked to obtain the 1997 Acknowledgement. Ex. P80 at 51:4-52:8.

78.     Bartner also testified that, in 1997, she was unaware of who specifically had signed the 1991 Acknowledgement. *Id.* at 70:9-14.[11]

79.     As previously noted, the only penalty interest referred to by the 1991 Acknowledgement was "past due principal and past due interest on principal". Ex. P17 at CITI0003701.  The 1997 Acknowledgement, however, referred to "interest accrued on overdue principal and interest . . . ." Ex. P17 at CITI0003699.

80.     Bartner testified that, to the extent the 1997 Agreement referred to interest on interest (whereas the 1991 Acknowledgement did not), it "would have been a clarification that the lawyers probably did." Ex. P80 at 180:8-17; 181:7-11.

81.     With the exception of the differences noted above, the text of the 1997 Acknowledgement was substantially similar to the text of the 1991 Acknowledgement. *Compare* Ex. P17 at CITI0003701-2 *with id.* at CITI0003699.

### 3.        Finalizing the 1997 Acknowledgement

82.     After the 1997 Acknowledgement was prepared, Bartner sent it to Citibank's office in Kinshasa to get it signed. Ex. P80 at 53:12-19.

83.     During the process of securing the 1997 Acknowledgement, Bartner had no discussions with anybody in Zaire representing the government or the Bank.  *Id.* at 59:18-22; *see also id.* at 60:23-24 ("I was not in contact with them.").

84.     Instead, Jean Claude Masangu (hereinafter "Masangu"), who was then the chief executive officer and managing director at Citibank Kinshasa, conducted discussions with Zaire

---

[11]     On its face, the 1991 Acknowledgement does not identify the title of the persons who purported to execute the document on behalf of Zaire or the Bank of Zaire. Ex. P17 at CITI0003701.

government officials. *Id.* at 59:23-25; Ex. P79 at 102:6-13; 118:15-20.  Masanagu had been employed at Citibank Kinshasa since 1988.  Ex. P79 at 112:15-20.

85.    After receiving the draft acknowledgement from Bartner, Masangu met with the Minister of Finance and Governor of the Bank of Zaire, informed them that they needed to sign the Acknowledgement, and obtained their signatures. *Id.* at 102:18-20; 103:2-8.

86.    Mr. Masangu testified that he did not remember conducting any investigation as to whether the signatories to the 1997 Acknowledgement had authority to bind Zaire and the Bank of Zaire to the acknowledgement. *Id.* at 104:18-24.

87.    Bartner received the 1997 Acknowledgement from Masangu on March 7, 1997. Ex. P16 at CITI0003698; Ex. P80 at 68:19-24; Ex. P79 at 103:18-104:5.

88.    Bartner did not know what Masangu did to get the 1997 Acknowledgement signed.  Ex. P80 at 60:1-9.

89.    Bartner had little recollection of her communications with Masangu, and had no specific recollection of ever meeting with him. *Id.* at 61:4-12; 181:18-21.

90.    Bartner testified that she has "very little recollection of the 1997 acknowledgement of debt, only that [Citibank] received it." *Id.* at 67:24-68:5.

91.    Bartner testified that she never asked anyone to undertake any steps to verify the authority of Zaire's Minister of Finance or the Governor of the Bank of Zaire to sign the 1997 Acknowledgement, nor was she aware of anyone taking such steps. *Id.* at 227:23-228:3; 228:4-9; 227:6-22.

92.    Bartner testified that she did not undertake any efforts to determine whether the signatories to the 1997 Acknowledgement had authority to bind Zaire and the Bank of Zaire because "[t]hat was not part of my job." *Id.* at 228:10-14.

24

93.     On March 13, 1997, Bartner then faxed the 1997 Acknowledgement to Robert Ashbaugh of the Bank of Tokyo.  Ex. P18 at UB000017-18.

94.     Bartner does not recall any of the bank creditors inquiring as to the 1997 Acknowledgement after she received it.  Ex. P80 at 77:12-22.  After receiving the 1997 Acknowledgement, Bartner testified that she did not recall having any discussions with anyone regarding the DRC until it came time to seek a new acknowledgement.  *Id.* at 78:13-22.

### E.     Events Leading Up to the 2003 Acknowledgement

#### 1.     Civil War, Regime Change and the DRC

95.     Before the creditors to the Credit Agreement raised the statute of limitations again, Zaire went through a well-documented period of war, turmoil and change, from which it emerged as the DRC.  *See, e.g.*, Congo (Kinshasa), U.S. Department of State, Apr. 13, 2011 (the "2011 State Dep't Rpt."), available at  http://www.state.gov/outofdate/bgn/congokinshasa/174912.htm.[12]

#### a.     From Independence Through The Mobutu Regime

96.     By way of background, the DRC traces its history back to the Berlin Conference of 1885 when European nations agreed on boundaries for colonies in Africa.  *See* Joint Stipulations of Fact at ¶ 1.  At that time, King Leopold II of Belgium established a colony personally owned by him and known as the Congo Free State in Central Africa.  *Id.*  That territory roughly corresponds to the modern-day DRC.  *Id.*

97.     Congo remained a Belgian colony until 1960, when it became independent.  *See* Joint Stipulations of Fact at ¶ 2; Ex. P79 at 109:15-18.

---

[12]     As discussed in Section III, *infra*, at note 35, the Court may take judicial notice of political and historical facts and publicly available information, including newspaper articles and facts contained in government documents.

98.     Mobutu seized power of the country in 1965, installed himself as dictator, and began an era of widely documented corruption that lasted for more than 30 years.  *See* 2011 State Dep't Rpt. at History, "The Mobutu Era."

99.     "During the 1980s, Mobutu continued to enforce his one-party system of rule." *Id.*

100.    Political turmoil within the DRC increased as the Cold War came to a close: "internal and external pressures on Mobutu increased.  In late 1989 and early 1990, Mobutu was weakened by a series of domestic protests, heightened international criticism of his regime's human rights practices, and a faltering economy." *Id.*

101.    Between May and August 1994, a civil war and genocide took place in Rwanda, which borders the DRC (then Zaire) to the east.  The genocide in Rwanda claimed 800,000 lives. *See* Anniversary of the Rwandan Genocide,  U.S. Dep't of State (April 7, 2010), available at http://www.state.gov/p/af/rls/prsrl/2010/139578.htm.    In 1994, "the war and genocide in neighboring Rwanda had spilled over to Zaire."  2011 State Dep't Rpt. at History, "The Mobutu Era."

102.    In October 1996, "Rwandan troops (RPA) entered Zaire, simultaneously with the formation of an armed coalition led by Laurent-Desire Kabila known as the Alliance des Forces Democratiques pour la Liberation du Congo-Zaire (AFDL).  With the goal of forcibly ousting Mobutu, the AFDL, supported by Rwanda and Uganda, began a military campaign toward Kinshasa." *Id.*

103.    In May 1997, Mobutu was overthrown as the result of the Laurent-Desire Kabila-led forces.  *See* Joint Stipulations of Fact at ¶ 6; *see also* 2011 State Dep't Rpt. at History, "The Mobutu Era."

104.    The widespread corruption of the Mobutu regime (1965-1997) in the DRC was widely reported in the press prior to Citibank's efforts to obtain the 2003 Acknowledgment.  *See*, *e.g*., Norimitsu Onishi, "Congo's Weary Masses Lose Faith in Once Popular Rebel," The New York Times, May 24, 1999, at A-3 (describing Mobutu's rule as a "31-year reign… remembered most for its staggering corruption and brutality."); "Zaire's Mobutu Buried Quietly in Morocco", New York Times, Sept. 14, 1997 (noting that after Mobutu's death in September 1997, "the news media in Kinshasa, the capital of Congo, paid tribute to Mr. Mobutu for maintaining his country's territorial integrity, but criticized him for amassing a huge personal fortune, persistently hampering democratic reform and allowing corruption to become the norm."); J.Y. Smith, "Congo Ex-Ruler Dies in Exile," Washington Post, Sept. 8, 1997, at A-1 ("Mobutu fled his capital, Kinshasa, on May 16, one day before a powerful rebel force led by Laurent Kabila marched into the city to claim victory in a seven-month civil war and supplant a reign of corruption that had made Mobutu a billionaire and left Africa's third-largest country and its 48 million people in poverty and chaos."); Lynn Duke, "Zaire's Mobutu Cedes Power, Flees Capital", Washington Post, May 17, 1997, at A-1 ("The long, corrupt reign of Mobutu Sese Seko has made the citizens of a mineral-rich nation among the poorest people in the world."); James Rupert, "Once Wealthy Zairean Leader Said to Be Out of Cash," Washington Post, April 6, 1997, at A-21 ("President Mobutu Sese Seko, who for years has been widely regarded as one of the world's most corrupt and wealthy men, appears to have run out of cash…").

105.    In addition, the fact that Mobutu was forcibly ousted from power in 1997 by Kabila's forces was also widely reported in the press.  *See, e.g.,* Hrvoje Hranjski, "Lightning rebellion raises more questions than it answers," Associated Press, Aug. 17, 1998 ("In late 1996, leaders of Rwanda and Uganda used Mobutu's persecution of ethnic Tutsis and his tolerance of

the sprawling refugee camps in border areas in the former Zaire that housed Hutu rebels as a pretext for intervening to support Kabila's rebels."); Lynne Duke, "Congo rebellion spurs fear of wider conflict," Chicago Sun-Times, Aug. 11, 1998 ("Rwanda spearheaded the 1996-97 anti-Mobutu revolt to gain security on its western border. Ethnic Hutu insurgents from Rwanda, who were responsible for the 1994 anti-Tutsi slaughter of 500,000 Rwandans, were using bases in Zaire to launch raids across the border against Rwanda's Tutsi-led government. Rwanda also hoped to install a leader in Zaire who would bring some economic stability to the chaotic region.").

### b.    Post-Mobutu Political Turmoil And War

106.    The years between 1997 and 2003 were a particularly volatile period  in the long and troubled history of the DRC.

107.    After Mobutu's overthrow in 1997, Congolese rebel groups led by Laurent Kabila took over the country and changed the name of Zaire to the Democratic Republic of the Congo. Laurent Kabila became the new country's first President.  2011 State Dept. Rpt. at History, "From Dictatorship to Disintegration."

108.    "In July 1998, Kabila ordered all foreign troops to leave the DRC.  Most refused to leave.  On August 2, [1998], nationwide fighting erupted as Rwandan troops in the DRC 'mutinied,' and fresh Rwandan and Ugandan troops entered the country." *Id.*

109.    By 1999, "the DRC was divided de facto into three segments—one controlled by Laurent Kabila, one controlled by Rwanda, and one controlled by Uganda—and the parties had reached military deadlock." *Id.*

110.    On January 16, 2001, Laurent Kabila was assassinated. *Id.*, Joint Stipulations of Fact at ¶ 7.

111.   Laurent Kabila was succeeded by his son, Joseph Kabila.  2011 State Dept. Rpt. at History, "From Dictatorship to Disintegration;" Joint Stipulations of Fact at ¶ 7.

112.   By May 2003, the foreign troops participating in the internal fighting within the DRC, including troops from Rwanda and Uganda, had withdrawn.  2011 State Dept. Rpt. at History, "From Dictatorship to Disintegration."

113.   The period of war within the DRC that lasted from 1998 through 2003 also coincided with, and exacerbated, a general economic collapse in the DRC.   Ex. P24 at CITI0000187-188.

114.   This period of war, which resulted in millions of deaths and the destabilization of the DRC government, was widely reported in the press prior to the signing of the 2003 Acknowledgment.  *See Themis Capital, LLC v. Dem. Rep. Congo*, 881 F. Supp. 2d 508, 531 (S.D.N.Y. 2012) ("the Court takes judicial notice of the fact that, as of 2003, the severe political turmoil plaguing the DRC and lack of a functioning government were widely known."); *see also* "U.N. Extends Inquiry Into Looting of Congo," The New York Times, Jan. 25, 2003 (UN reports "systematic pillaging of Congo was continuing unabated despite progress toward ending the country's four-year civil war."); "Congo: Thousands Flee New Fighting," The New York Times, Jan. 3, 2003 ("Tens of thousands of people have been displaced as fighting has flared in [the DRC's] northeast Ituri region despite a truce signed there this week by three rebel groups."); Emily Wax, "Power-Sharing Arrangement Aims to End 4-Year Civil War," Washington Post, Dec. 18, 2002 ("The government of Congo reached a peace agreement today with its military and political opponents in an attempt to end a four-year civil war that has killed an estimated 2 million people in one of Africa's most volatile regions."); Rachel L. Swarns, "Congo and Its Rebels Sign Accord to End War,"  The New York Times, Dec. 18, 2002 ("At its height, the

Congo war embroiled about six African nations in what was called Africa's first world war. About two million people are believed to have died since fighting began in Congo in 1998."); Mark Lacey, "International Aid Groups Fear New Crisis in Eastern Congo,"  The New York Times, Oct. 19, 2002 ("Leaders across Africa are warning that the situation in Congo, where war has been waged since 1998, could deteriorate even more under the militias than it did under the foreign troops, who sided with either the Kinshasa government or various rebel groups."); "At last, a sort of peace to keep," The Economist, Oct. 10, 2002 ("For the past four years, [the DRC] has been torn and eviscerated by its smaller neighbours, but has been too weak to beat them off. At various times, no fewer than eight African states have sent their armies to take part in Congo's civil war… Congo's fighting has claimed an estimated 3m lives, mostly through war-induced disease and starvation."); Henri E. Cauvin, "Rwanda and Congo Sign Accord to End War," New York Times, July 31, 2002 ("The war, which began almost four years ago, has ravaged Congo, killing more than 2.5 million people, many of them combatants but many more civilians who died of starvation or disease, cut off from food and medicine."); Barbara Crossette, "War Adds 1.7 Million Deaths In Eastern Congo, Study Finds."  The New York Times, June 9, 2000 ("Two years of war have caused the deaths of more than 1.7 million people in eastern Congo, where people who manage to flee the fighting often die of hunger and malaria while hiding in impenetrable forests, a leading refugee agency said today."); Hrvoje Hranjski, "Rwanda, Uganda Play Key Role in Congo Rebellion,"  Associated Press, Oct. 13, 1998 ("both Rwanda and Ugamda are playing a pivotal role in the two-month rebellion to oust President Laurent Kabila.  . . .  Both countries say they have legitimate security interests in eastern Congo and accuse Kabila of failing to rid the common border area of  Rwandan and Ugandan rebels."); John Chiahemen, "Hutus and Sudan Raise Stakes in Congo War."  Reuters, Sept. 24, 1998

(discussing involvement of Sudan, Rwanda, Uganda, Angola, Zimbabwe and Namibia in Congo War); John Chiahemen, "Foreign Forces Complicate Balance of Power in Congo," Reuters, Aug. 23, 1998 (discussing the August 1998 intervention of Rwanda and Uganda into the DRC, and listing other participants, including DRC rebel forces, Zimbabwe, and Angola); Lynne Duke, "Congo Rebellion Spurs Fear of Wider Conflict," Chicago Sun-Times, Aug. 11, 1998 (noting a new anti-government revolt in the DRC lead by Rwanda, and "fighting that raged in several parts of the country last week.").

### 2. Political Changes Affecting the Authority of the Minister of Finance and Budget

115.    In the midst of war and in the wake of the fall of the Mobutu regime and the assassination of Laurent Kabila, President Joseph Kabila passed Decree No. 028/2002 of March 12, 2002, which set forth the organization and functioning of his new DRC Government.  Ex. P128 at EXPERT00000045-65; *see also* Ex. P78 at 60:24-61:12 (testifying that "each time a new [DRC] Government is put in place there will be an act organizing the Government and the various functions of the various ministers which will define the[ir] competence in detail.").

116.    In the wake of years of widely reported corruption of the Mobutu regime, Decree No. 028/2002 established greater financial accountability within the government through Article 11, which  provides:

> In carrying out their duties, Ministers, Delegated Ministers and Vice Ministers are required to obey the laws and regulations of the Republic, particularly the laws and regulations governing the matters that come under their respective ministries.
>
> More particularly, *they are required to comply strictly with the financial and budgetary laws*.  For this purpose, they will make sure that any legislative bill, executive order, decree, order or agreement, *any decision that may have immediate or future budgetary repercussions* both with respect to revenue and expenses . . .  is submitted for the prior opinion of the Minister responsible for Finance and Budget and *for deliberation by the Council of Ministers or, in case of emergency, the approval of the President of the Republic*.

Ex. D28 at 5 (emphasis added).

117.   Article 53 of Decree No. 028/2002 required all DRC ministers to comply with Article 11 when committing the state to private law agreements.  Ex. D28 at 18.[13]

### F.   The 2003 Acknowledgement

118.   Assuming (without conceding) that the 1997 Acknowledgement validly tolled the statute of limitations, the statute would have expired on or about March 7, 2003.

119.   By 2003, Bartner had changed positions and was serving as chief of staff to William Rhodes, Citibank NA's senior international officer.  Ex. P80 at 23:21-24:7.[14]

120.   In her capacity as chief of staff to Mr. Rhodes, Ms. Bartner described herself as a "jack of all trades" who "looked at his mail, prepared information for him, made calls on his behalf, sent e-mails on his behalf, traveled with him, [and] arranged for meetings."  *Id.* at 37:4-17.

121.   Bartner had a calendar and a file called "statute of limitations" that she looked at "once in a while" that reminded her that she had to do something about renewing the 1997 Acknowledgement.  *Id.* at 83:13-21.

122.   Bartner became aware that Zaire had changed to the DRC some time prior to January 16, 2003.  Id. at 186:10-20.

123.   She did not specifically understand why the country's name had changed, and could only remember that it was due to "[s]ome political issue."  *Id.* at 186:2-24.

---

[13]   *See also* Ex. P121 at 131:11-19 (acknowledging that the Credit Agreement is a "private law agreement.").

[14]   Bartner testified that she began working in the chief of staff position in 1999 or 2000, after the restructuring department had "finished restructuring the countries that we were restructuring."  Ex. P80 at 36:7-37:2.  She remained in her capacity as Rhodes' chief of staff until she left Citibank in 2006.  *Id.* at 24:18-22; 36:21-37:2.

124.    Bartner indicated that "the change from Zaire to DRC" was the impetus for discussions to secure a new acknowledgement of debt regarding the Credit Agreement in 2003. *Id*. at 79:1-4.

### 1.    Initial    Citibank    Communications    Regarding    the    2003 Acknowledgement

125.    At some point shortly before or on October 2, 2002, Bartner had a conversation with Michel Losembe, an employee at Citibank Kinshasa, about the need for a renewed acknowledgement of debt from the DRC.  *Id*. at 80:6-20; 83:2-5.  Bartner could not specifically recall the circumstances of that conversation.  *Id*. at 82:13-20.

126.    Bartner and Losembe were the only employees from Citibank who worked on the 2003 Acknowledgement.  *Id*. at 108:7-18.

127.    Although Bartner testified that Losembe ultimately made the decisions as to the Acknowledgement, and that her office in New York provided only advisory services, *id*. at 109:5-12, that testimony is directly contradicted by the documents which demonstrate that Bartner was directing Losembe with respect to the 2003 Acknowledgement and Losembe, in turn, reported to Bartner.[15]  *See* Ex. P90 at CITI0000107 (Jan. 16, 2003 email from Bartner to Losembe, "I am enclosing the [draft 2003 Acknowledgement]… The person who should sign it on behalf of the Government should be the Minister of Finance.  It would need to be signed before March 7."); Ex. P26 at CITI000113 (Feb. 5, 2003 email from Bartner to Losembe; "When you see the [Minister of Finance] mention to him that the acknowledgement is a formality but if the Banks don't have it, they would need to sue the country so that the statute of limitations on the debt does not run out… I would hope that we have it signed as soon as possible."); Ex. P28 at

---

[15]    As a result, it was Bartner's understanding that she would learn whatever Losembe learned. Ex. P80 at 108:22-109:4.

CITI0000125 (Feb. 18, 2003 email from Bartner to Losembe suggesting that the Deputy Minister of Finance sign the Acknowledgement, and recommending to Losembe that Masangu "give us a hand talking to him."); Ex. P30 at CITI0000041 (Feb. 26, 2003 email from Bartner to Losembe, asking if there is "any progress" in getting the Acknowledgement signed, and emphasizing that "they just need to get it done.").

128.    After his initial conversation with Bartner, Losembe learned that Masangu had been appointed as the Governor of the Central Bank.[16]  Ex. P90 at CITI 0000107.

129.    Masangu continued to serve as the Governor of the Central Bank of the DRC until May 14, 2013.  Ex. P79 at 133:19-22.

130.    Losembe emailed Bartner on October 2, 2002 to tell her that Masangu was the Governor of the Central Bank, noting that "[w]e should take advantage of this to renew the acknowledgement of debt."  Ex. P90 at CITI 0000107.

131.    In his October 2, 2002 email to Bartner, Losembe also requested a copy of the 1997 Acknowledgement, along with an up-to-date schedule of outstanding principal and interest amounts on the debt.  *Id.*

132.    Bartner responded to Losembe's October 2, 2002 email the same day, indicating that she would send Losembe the 1997 Acknowledgement and that the outstanding principal was $359.5 million.  Ex. P90 at CITI 0000107.  She also noted, however, that "[r]econciling this debt is not going to be easy and will most likely take time and the payment of some fees to the Agents to get the job done."  *Id.*; Ex. P80 at 202:17-203:2.

---

[16]    Masangu became Governor of the Bank of Zaire in August 1997, shortly after the 1997 Acknowledgement was signed.  Ex. P117 (Decree No. 013 of August 8, 1997); Ex. P79 at 121:7-18.

### 2.   Citibank's Efforts to Prepare the 2003 Acknowledgement

133.   In preparing the 2003 Acknowledgement, it was Bartner's intention that it would take the same form as the 1997 Acknowledgement.  Ex. P80 at 97:16-25.

134.   Bartner did not consult with any legal counsel in preparing the 2003 Acknowledgement.  *Id*. at 97:3-11; 135:2-5.[17]

135.   Further, when Bartner prepared the draft 2003 Acknowledgement, she did nothing to determine whether the laws of the Republic of Zaire had changed, despite the fact that the country had become the Democratic Republic of the Congo.  *Id*. at 187:12-17.  Nor did she do anything to determine whether there were now any laws restricting the Minister of Finance's ability to sign the new Acknowledgement.  *Id*. at 187:18-22.

136.   At some point during the process, Bartner spoke with a representative at Belgolaise, then a holder of some of the debt under the Credit Agreement, to ascertain whether they had a contact at the Ministry of Finance or the Central Bank.  *Id*. at 92:2-19.  However, she could not recall any communications with other creditor banks regarding the 2003 Acknowledgement nor could she recall if Belgolaise provided any contact information.  *Id*. at 92:20-21; 96:8-13.

### 3.   Obtaining Signatures for the 2003 Agreement

137.   On January 15, 2003, Bartner met with Losembe in the United States to discuss efforts to secure a new acknowledgement of debt from the DRC.  Ex. P25 at CITI0000109; Ex.

---

[17]   Although Bartner consulted with Shearman & Sterling in drafting the 1997 Acknowledgement, she did not do so in connection with the 2003 Acknowledgement.  By 2003, Casey Dwyer, the Shearman & Sterling attorney with whom she spoke regarding the 1997 Acknowledgement, had passed away.  *Id*. at 96:20-22.  Bartner also had no interaction with Citibank in-house counsel, or any other counsel, in drafting the 2003 Acknowledgement.  *Id*. at 97:3-15.   Nor did she communicate with any other attorneys concerning the 2003 Acknowledgement.  *Id*. at 135:2-5.

P80 at 126:6-12.    During that meeting, Bartner asked Losembe to get the 2003 Acknowledgement signed.  Ex. P80 at 126:6-19.  This is the only in-person meeting concerning the 2003 Acknowledgement that Bartner recalls having with Losembe.  *Id*. at 132:11-15.

138.    The following day, January 16, 2003, Bartner emailed Losembe and directed him to have the "Minister of Finance" sign the 2003 Acknowledgement by March 7.  Ex. P25 at CITI0000109 ("I am enclosing the document I gave you in case you may need to print it again. The person who should sign it on behalf of the Government should be the Minister of Finance.  It would need to be signed before March 7."); Ex. P80 at 125:10-126:9.  She also attached an unsigned copy of the proposed 2003 Acknowledgement.  Ex. P25 at CITI0000110.  The text of the draft Acknowledgement differed from that of the 1997 Acknowledgement only in that it recognized that the country's name was now the DRC, and that the Bank of Zaire was now known as the Central Bank of the DRC.  *Id*. at CITI0000110; Ex. P80 at 186:3-9.

139.    Bartner testified that she told Losembe that the Minister of Finance should sign the new acknowledgment based only on the fact that Zaire's Minister of Finance had signed the 1997 Acknowledgement.  Ex. P80 at 127:15-20; 185:15-21.  She never spoke with anyone at the DRC to determine whether, six years later and after a period of substantial political change and turmoil, the Minister of Finance was the appropriate person to sign the document in 2003.  *Id*. at 128:15-21.

140.    On January 17, 2003, Losembe emailed Bartner and said that he doubted the Minister of Finance would sign anything unless Citibank first reconciled the debt.  Ex. D6 at CITI0000111.

141.    Bartner next communicated with Losembe on February 4, 2003, when she emailed him to check on the status of the new acknowledgement.  Ex. P26 at CITI0000113.  On

February 5, Losembe responded and said that he had not yet been able to organize a meeting, but that "external debt management has been officially removed from the Central Bank [to the Ministry of Finance].  Masangu will only be willing to countersign."  *Id.*

142.  Bartner emailed Losembe on February 5, 2003, instructing him that when he met with the Minister of Finance, "mention to him that the acknowledgement is a formality but if the Banks don't have it, they would need to sue the country so that the statute of limitations on the debt does not run out."  Ex. P26 at CITI0000113.

143.  Losembe sent a letter to the Minister of Finance on February 11, 2003, enclosing a draft of the 2003 Acknowledgement, as well as copies of the 1991 and 1997 Acknowledgements.  Ex. P27 at DRC00003575.  Losembe advised the Minister of Finance that when signed, the document would extend the statute of limitations for six years, and that failure to sign could lead the creditors under the Credit Agreement to seek forced recovery on the loans.  *Id.*

144.  On February 17, 2003, Losembe emailed Bartner to inform her that Ilankir Matungulu, the DRC's Minister of Finance, had resigned his post because he refused to endorse "extra-budgetary (political) expenses."  Ex. P28 at CITI0000125-126.  Losembe also reported that "Matungulu [was] a former IMF executive . . . [whose] strictness was highly appreciated in Washington, . . . and very controversial in Kinshasa!"  *Id.*  In a subsequent email sent by Losembe to Bartner on the same day, Losembe indicated that Matungulu's resignation "won't help our case" and added that the 2003 Acknowledgement had not yet been signed.  *Id.*

145.  In response, Bartner emailed the following day, February 18, 2003, and suggested to Losembe that the Deputy Minister of Finance sign the 2003 Acknowledgement, given that "we really do not have the luxury of time."  *Id*. at CITI0000125.  Bartner also asked whether

Masangu could "give us a hand in talking to him." *Id.* Bartner explained in her deposition that she meant that Masangu should talk to the Deputy Minister of Finance, "[o]r *whoever at the Ministry.*" Ex. P80 at 149:18-25 (emphasis added).

146.    Losembe responded the same day and indicated that he had just talked to Masangu, who would help Citibank in speaking to the Deputy Minister of Finance, Luongwe Kabule Mulungo (hereinafter "Luongwe"). Ex. P28 at CITI0000125.

147.    Losembe also sent a letter to Luongwe on February 20, 2003, congratulating him on his new position and attaching the February 11, 2003 correspondence to former Minister Matungulu. Ex. D7 at 1. Losembe informed Luongwe that the legal validity of the Credit Agreement was set to expire on March 31, 2003, and that the only way to extend it was to sign the draft of the enclosed 2003 Acknowledgement. *Id.* Losembe further advised Luongwe that his predecessors had signed similar agreements in 1991 and 1997, and that failure to sign could lead the creditors to initiate litigation under the terms of the Credit Agreement. *Id.*

148.    On or about February 25, 2003, interim Minister of Finance and Budget Luongwe and Governor of the Central Bank Masangu signed the 2003 Acknowledgement. Ex. P22 at CITI0000202; Ex. P79 at 13:3-9 and 13:14-14:7.

149.    Like the 1997 Acknowledgement, the 2003 Acknowledgement was a blanket acknowledgement of debt. Ex. P22 at CITI0000202; Ex. P80 at 130:14-18. Citibank never reconciled its portion of the debt prior to the signing of the 2003 Acknowledgement. Ex. P80 at 130:11-13.

### 4.    Post-Signature – Citibank N.A.

150.    On February 26, 2003, Bartner emailed Losembe again, inquiring as to whether there had been progress on getting the acknowledgement signed and adding that "they just need to get it done." Ex. P30 at CITI0000041.

151.    The same day, Losembe responded to Bartner, informing her that he had just spoken with the Minister of Finance, who confirmed that he had signed the 2003 Acknowledgement, and that Masangu had "co-signed."  Ex. P38 at CITI0000931.  Losembe added that he expected to receive the 2003 Acknowledgement the following day, and would fax it to Bartner.  *Id*.

152.    Bartner responded by email, indicating that Losembe should send the original Acknowledgement to her and that she would deliver it to the Bank of Tokyo.  *Id*.

153.    On February 27, 2003, Losembe faxed a copy of the 2003 Acknowledgement to Bartner and, on March 4, 2003, Bartner emailed Losembe to confirm its receipt.  Ex. P22 at CITI0000201-202; Ex. P80 at 155:9-16; Ex. P31 at CITI0000051.  The 2003 Acknowledgement was dated February 25, 2003.  Ex. P22 at CITI0000202.

154.    Bartner testified that she believed that the 2003 Acknowledgment was duly signed.  Ex. P80 at 141:24-142:7.  However, the basis for Bartner's understanding that the signatures of Luongwe and Masangu were authorized was simply "[t]hat they signed."  *Id*. at 165:15-21; *see also id.* at 232:13-15 ("The Minister and the Governor signed.  If they were not the persons that they claim to be, why did they sign?").

155.    Bartner never undertook any steps to determine whether Luongwe had the authority to sign the 2003 Acknowledgement.  *Id*. at 230:25-231:4.  She indicated that she did not do so because "[i]t wasn't part of my job."  *Id*. at 231:6-9.

156.    Bartner is not aware of anyone undertaking any steps to verify whether the Minister of Finance or the Governor of the Central Bank had authority to sign the 2003 Acknowledgement.  *Id*. at 228:23-229:14; 230:20-24.

G.      **The 2009 Acknowledgement**

157.    On December 24, 2008, the DRC passed Ordinance No. 08/73 regarding the organization and operation of the Government.  Like Decree No. 028/2002 before it, Article 74 of Ordinance No. 08/73 states that "[w]*ith the agreement of the Council of Ministers,* agreements for lending, borrowing, or gifts that are binding on the state may be negotiated and signed by the Ministers responsible for Finance, the Budget, and the Plan." Ex. P120, Art. 74 (emphasis added).

158.    Assuming that the 2003 Acknowledgement was valid and effectively tolled the statute of limitations, the six-year statute of limitations for bringing suit under the Credit Agreement expired on February 25, 2009 – or 6 years from the date of the 2003 Acknowledgement.  Ex. P22 at CITI0000202.

159.    By 2009, Citibank had apparently sold all of its interests in the Credit Agreement, *see, e.g.,* Exs. P55 at PLAINTIFFS0000495 and P57 at PLAINTIFFS0000446-447, and another agent bank, BNP Paribas, undertook to obtain an acknowledgement of debt in 2009.  Ex. D24 at UB00001931.

160.    There is little evidence in the record regarding BNP Paribas' efforts to obtain a new acknowledgement, but the evidence indicates that BNP did not even contact the DRC or Central Bank regarding the need to update the 2003 Acknowledgement until after the statute of limitations would have expired.  Specifically, BNP Paribas sent a letter to Masangu on March 5, 2009, along with a copy of the 2003 Acknowledgement and a draft of a new Acknowledgement, asking Masangu to sign the new acknowledgement.  Ex. D21 at B-003-6 (March 5, 2009 email from BNP Paribas to Central Bank attaching letter addressed to the Masangu and acknowledgements).  BNP sent similar correspondence to Masangu on March 27 and May 15. Ex. D22 at B-0009-12; Ex. P59 at B-0017-24.

161.    On or about July 15, 2009, DRC Minister of Finance Athanase Matenda Kyelu and Governor of the Central Bank Masangu signed a new acknowledgement of debt regarding the Credit Agreement (the "2009 Acknowledgment").   Ex. D24 at UB00001933; Ex. P79 at 53:16-23; 54:4-15.

162.    At certain times, the DRC and Zaire have made a distinction between the Minister of the Budget and the Minister of Finance.  Ex. P78 at 58:4-13.  July 15, 2009, the date on which the 2009 Acknowledgment was signed, was one such time.

163.    Accordingly, while the State Commissioner of Finance and Budget of Zaire signed the Credit Agreement on behalf of the Republic of Zaire and the Interim Minister of Finance and Budget of the DRC signed the 2003 Acknowledgment, the 2009 Acknowledgment was signed by only the Minister of Finance of the DRC.   *Compare* Ex. P29 (the 2003 Acknowledgment) *with* Ex. D24 at UB00001933 (the 2009 Acknowledgement).

164.    Aside from the date, the names of the signatories, the title of one of the signatories, and the designation of Union Bank of California as successor of the Bank of Tokyo, the 2009 Acknowledgement is identical to the 2003 Acknowledgement.  Ex. P29; Ex. D24 at UB0001933.

165.    On July 20, 2009, Masangu forwarded the 2009 Acknowledgement, along with a confirmatory letter to BNP Paribas.  Ex. D24 at UB0001932-1933; Ex. P79 at 57:19-60:15.

166.    BNP Paribas then sent the 2009 Acknowledgement to Union Bank on August 27, 2009.  Ex. D24 at UB00001931-1933.[18]  In the letter, BNP Paribas requested that Union Bank, as successor to the Bank of Tokyo, forward a copy of the acknowledgement to each agent of the

---

[18]    Union Bank replaced Bank of Tokyo as servicing bank under the Credit Agreement on December 10, 2004.  Ex. P47 at UB00000950.

Credit Agreement, and ask them to forward a copy to each bank in their syndicate.  Ex. D24 at UB00001931.

167.    At the conclusion of the August 27, 2009 letter to Union Bank, BNP Paribas cautioned that "*we are neither in a position to check the signatures nor the powers of the signatories of this acknowledgement of debt.  We invite you and every Agent and/or Bank to make in case of need your own independent investigation regarding the validity of this document*."  Ex. D24 at UB00001931 (emphasis supplied).

### H.    Since the Agreement was Effective, the Parties to the Credit Agreement Have Never Included Compound Interest in the Calculations of the Total Debt Due and Owing.

168.    The record contains evidence of communications among the various parties to the Credit Agreement, including the servicing bank charged with responsibility for administering the Agreement, reconciling the debt, and setting forth interest amounts owed.   These communications include instances in which the parties discussed and attempted to reconcile the unpaid debt under the Credit Agreement.  *See, e.g.,* Ex. P11 at UB00002452-53, 2460 (schedule of amounts owed under the Credit Agreement, provided by Bank of Tokyo to Zaire during March 1991 meeting, for a total of approximately $359 million in past due principal and $86 million in past due interest on principal); Ex. D11 at CITI0000810-818 and Ex. D12 at CITI0000819 (September 24, 2003 email from Janet Wallace of Citibank to Dennis Demetropolous of Bank of Tokyo, with attached spreadsheet containing past due principal and interest on credit schedules A7 and A8 of the Credit Agreement); Ex. D23 at UB00001349-1351 (May 5, 2009 from Dennis Hranitzky to P. Phillips Coward discussing prior spreadsheet not reflecting compound interest calculations sent on April 17, 2009 by Union Bank to Dechert).

169.    None of these communications included a demand for interest on overdue principal.  And, none of these communications included any suggestion that compound interest

(*i.e.*, interest on interest) should be included in the total stock of debt due and owing under the Credit Agreement.  Stated otherwise, the parties' consistent course of dealing demonstrates a universal understanding that compound interest was not due and owing under the Credit Agreement.

170.   That compound interest was excluded from the debt the parties deemed due and owing is perhaps most concisely demonstrated by a September 29, 2003 memorandum to London Club members prepared by Citibank's Michel Losembe which summarized the "commercial banks' position" after a September 26, 2003 meeting regarding the debt.  Ex. D14 at CITI0001760-1762.   Among other things, the memorandum noted that the banks "broadly agreed with" the numbers presented by the Bank of Tokyo regarding unpaid principal and interest and those numbers did not include compound interest.  *Id.* at CITI0001761.

171.   Specifically, the September 29, 2003 memorandum prepared by Michel Losembe stated that the "Banks approved [Bank of Tokyo's] interests' computation methodology, *i.e., no interest on interest should be considered in the numbers*" and that such agreement was "*consistent with all numbers communicated to agents since the Agreement is effective*[.]"    *Id.* (emphasis added).[19]

---

[19]     As discussed in Section III, *infra*, at note 42, in 2003 Citibank held title to almost all of the debt that the Plaintiffs seek to enforce in this case.

III.    CONCLUSIONS OF LAW

    A.    <u>The Burden is on the Plaintiffs to Prove an Agency Relationship.</u>

    1.    Under New York law, the burden is on the plaintiff to establish an agency relationship.[20]   *See Enter. Press Inc. v. Fresh Fields Mkts., Inc.*, 13 F. Supp. 2d 413, 415 (S.D.N.Y. 1998).

    2.    In particular, the "burden upon the plaintiff…is to produce factual support sufficient to establish the existence of an agency relationship." *Id.* at 415.

    3.    Regardless of whether a plaintiff asserts a theory of actual authority, apparent authority, or ratification to establish an agency relationship, "[t]he burden of proof is upon the plaintiff." *Merex A.G. v. Fairchild Weston Sys., Inc.*, 810 F. Supp. 1356, 1369 (S.D.N.Y. 1993). If the plaintiff cannot meet his burden of proof, the principal cannot be held liable under an agency theory. *Rice v. NAACP*, 477 N.Y.S.2d 434, 435 (2d Dep't 1984) (citations omitted).

    B.    <u>The Signatories to the 2003 and 2009 Acknowledgements Lacked Actual Authority to Bind the DRC and Central Bank.</u>

    4.    The question of whether the signatories to the Acknowledgement Letters had actual authority to bind the DRC and the Central Bank must be answered pursuant to Congolese law. *Themis Capital, LLC v. Dem. Rep. Congo*, 881 F. Supp. 2d 508, 520 (S.D.N.Y. 2012) ("Defendants argue that New York choice of law rules require that the law of the DRC be applied to determine whether Mr. Luongwe and Mr. Masangu had actual authority to bind the

---

[20]    To the extent that Plaintiffs argue that it is Defendants' burden to establish a statute of limitations defense, that burden has already been satisfied.  As this Court noted in its July 26, 2012 Summary Judgment Opinion, "Were it not for the 2003 Letter, [a statute of limitations defense] would prevail: Because the final payment required under the 1980 Credit Agreement was to be made in 1990, for a claim under the Credit Agreement to be timely, plaintiffs' predecessors in interest would have had to bring a claim no later than 1996, six years after the final breach. Plaintiffs' lawsuit, brought in 2009, would therefore be untimely." *Themis Capital*, 881 F. Supp. 2d at 518. It is now Plaintiffs' burden to demonstrate that a valid agency relationship existed with regard to the 2003 Acknowledgement.

DRC to a commercial contract. . . . The Court agrees with defendants' argument as to choice of law.").

5.      Pursuant to Federal Rule of Civil Procedure 44.1, "[i]n determining foreign law, the court may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence.   The court's determination must be treated as a ruling on a question of law."  *See* Stipulated Conclusions of Law at ¶ 8.

6.      Pursuant to the DRC laws in effect at the time the 2003 and 2009 Acknowledgements were signed, the signatories to the 2003 and 2009 Acknowledgments did not have actual authority to bind the DRC and the Central Bank to the terms of those acknowledgments.

### 1.      Luongwe and Matenda Lacked Actual Authority to Sign the 2003 and 2009 Acknowledgement on Behalf of the DRC.

7.      The authority of interim Minister of Finance and Budget Luongwe to sign and commit the DRC to the 2003 Acknowledgement Letter is governed by Decree No. 028/2002 of March 12, 2002 Concerning the Organization and Functioning of the Government (the "2002 Decree").  Ex. P124 at ¶ 15; *see also* Ex. P78 at 61:7-11 ("[E]ach time a new Government is put in place there will an act organizing the Government and the various functions of the various ministers which will define the competence in detail.").

8.      Article 11 of the 2002 Decree provides that:

In carrying out their duties, Ministers, Delegated Ministers and Vice Ministers are required to obey the laws and regulations of the Republic, particularly the laws and regulations governing the matters that come under their respective ministries.

More particularly, *they are required to comply strictly with the financial and budgetary laws*.  For this purpose, they will make sure that any legislative bill, executive order, decree, order or agreement, *any decision that may have immediate or future budgetary repercussions* both with respect to revenue and expenses . . .  is submitted for the prior

opinion of the Minister responsible for Finance and Budget and *for deliberation by the Council of Ministers or, in case of emergency, the approval of the President of the Republic.*

Ex. D28, Art. 11 (emphasis added); *see also* Ex. P124 at ¶ 16.

9.     Article 11's application to the facts of this case is made clear by Article 53 of the 2002 Decree.  In particular, Article 53 provides that:

> Ministers, Delegated Ministers and, where applicable, Vice Ministers can validly commit the State in private law agreements *only in compliance with the provisions of articles 11 and 41 above.*

Ex. D28, Art. 53 (emphasis added); Ex. P124 at ¶ 17.  Article 53 of the 2002 Decree appears in Section 2 (governing Private Law Agreements) of Title IV (governing the Procedure for Negotiating and Signing Treaties and International Agreements as Well as Private Law Agreements) of the 2002 Decree.  Ex. D28.

10.     Article 20 of the 2002 Decree, concerning the Council of Ministers, further provides that the Council is the "discussion, consultation and decision-making authority of the Government[,]" and

> is "competent to discuss all issues coming within the competence of the government, particularly  .  .  .   5.   proposed treaties or international agreements and private law agreements whose importance requires the authorization of the Council of Ministers, *particularly those concerning borrowing*, granting loans, guarantees, subsidies or acquisitions of equity interests; [and] . . . 7. *decisions or measures that, by their nature or their possible repercussions, may result in general policy decisions and the collective liability of the Government*[ ] . . . ."

Ex. D28, Art  20 (emphasis added).

11.     Pursuant to the foregoing provisions, the Interim Minister of Finance and Budget could not commit the DRC to the 2003 Acknowledgement Letter without first submitting the matter to the Council of Ministers for approval.  Ex. P124 at ¶¶ 18-21.[21]

12.     The decision to execute the 2003 Acknowledgement Letter was one having "immediate or future budgetary repercussions" (Ex. 28D, Art. 11) for the DRC as its purported

---

[21]     While the Plaintiffs now appear to suggest that the 2002 Decree may not have been enforceable prior to the signing of the 2003 Acknowledgment because there is no evidence that it was published in the Official Gazette, their own expert, Mr. Chikuru, relied on Section 1, Article 50 of the 2002 Decree in opining that the signatures on the 2003 Acknowledgement were duly authorized.  *See* Ex. P122 at ¶¶ 9(d), 38, 41-42.  It was only after Mr. Chikuru was forced to acknowledge that his reliance on Section 1, Article 50 was incorrect, that he "questioned" the enforceability of the Decree due to an alleged lack of publication in the DRC's Official Gazette.  *See* Ex. P123 at 9; *see also id.* ¶ 10 (acknowledging that Defendants' expert, Emmanuel Lubala, was "correct" in pointing out that Article 50 of the Decree was inapplicable) and Ex. P121 at 79:11-19 (testifying that he was "wrong" in originally opining that Article 50 gave the Minister of Finance authority to bind the DRC); 80:7-20 (same); 95:12-14 (same); 83:3-11 (testifying that he learned he was wrong about his opinions concerning the application of Article 50 by "reading this Decree again in the light of the opinion of Mr. Lubala").

As Mr. Lubala testified, many laws and regulations of the DRC are not published in the Official Gazette—a fact which is true especially in times of war and crisis, as was the case at the time the 2002 Decree was enacted.  Ex. P78 at 68:23-71:23.  In such times of war and crisis, the DRC lacked the resources to publish the Official Gazette and laws and decrees were alternatively published through the "written press, radio, TV, through the media."  *Id.* at 74:12-75:16.  The absence of publication in the Official Gazette does not preclude a law from being enforced by Congolese courts.  *Id.* at 68:23-71:23 ("There have been years, for instance, and everyone knows about this, when the Official Gazette was not published for a full year or a full period of time[.] . . .  The Code that we use today in the Congo . . . contain[s] a great many number of texts that were never published [in the Official Gazette], yet they are being applied by the judge, the lawyers and legal practitioners all the same and no one can say that they are not applicable  . . . because any practitioner is fully aware of this and of what happened for a good many years in our country.").

Mr. Lubala also testified that, based on his experience as a practicing lawyer in the DRC, the certification at the conclusion of the 2002 Decree indicates that it was deemed to have been made available to the public on March 12, 2002, and became effective that same day.  Ex. P78 at 76:23-79:18; *see also id.* at 79:25-80:10.  There is no testimony in the record to refute this conclusion.  Moreover, many of DRC laws enacted between June 2002 and January 2003 expressly cite to, and rely upon, the 2002 Decree, *see* Exs. D3-D5, belying any suggestion that this Decree—*which organized the functioning of Joseph Kabila's Government*—was somehow unknown or unenforced at the time of that the 2003 Acknowledgment was signed.

47

purpose was to confirm the DRC's commitment to be bound by the Republic of Zaire's obligations under a 23-year-old Refinancing Agreement entered into by Zaire during the Mobutu regime, and to toll the statute of limitations and thereby allow creditors to file future lawsuits seeking to enforce the debt, including interest which would continue to accrue thereunder. *See* Ex. P124 at ¶ 19; *see also* Ex. P121 at 155:3-24 (acknowledging that the signing of the 2003 Acknowledgement, and this corresponding litigation, had budgetary repercussions for the DRC); *id.* at 162:8-163-10 (same).[22]

---

[22]   Plaintiffs' expert, Mr. Chikuru, originally opined that the Interim Minister of Finance and Budget had the authority to bind the DRC to the 2003 Acknowledgement pursuant to the 2002 Decree, Section 1 ("Treaties and international agreements"), Article 50. *See* Ex. P122 at 9(d), 38, 41-42. However, as noted above, after Mr. Chikuru reviewed Mr. Lubala's report he was forced to admit that his conclusions were incorrect because, *inter alia*, the Credit Agreement and Acknowledgments were not "treaties and international agreements" governed by Section 1, Article 50, but rather "private law agreements," governed by Section 2 ("Private law agreements"), Article 53. *See, e.g.,* Ex. P121 at 79:11-19; 80:7-24; 83:3-11; 95:12-14; 131:11-19. Once Mr. Chikuru acknowledged that he had cited to the wrong provision of the 2002 Decree, he argued that the 2002 Decree was completely irrelevant to the issue of actual authority and, as mentioned above, questioned whether the 2002 Decree was ever enforceable because he could not find it in the Official Gazette.

Having acknowledged his reliance on the wrong article of the 2002 Decree, Mr. Chikuru argued that Ordinance No. 80-073 of April 21, 1980—authorizing the signatures of the State Commissioner of Finance and the Governor of the Bank of Zaire *to the Credit Agreement*—was sufficient, by itself, to authorize the signing of the 2003 Acknowledgement, notwithstanding the passage of 23 years, two historic wars, and a change in the State from Zaire to the DRC. *See, e.g.,* Ex. P121 at 85:18-86:24. Even in making this argument, however, *Mr. Chikuru was forced to acknowledge that the text of Ordinance No. 80-73 did not grant any authority to sign any document other than the Credit Agreement itself*:

Q: "Do you agree that the text of Ordinance 80/73 provides only the authority to the State Commissioner of Finances and the Governor of the Bank of Zaire to sign the 1980 Refinancing Agreement?" A: "In itself, yes." [Ex. P121 at 90:4-8];

Q: "You stated [that] Executive Order 80/73 in itself only provides the authority to the State Commissioner of Finances and the Governor of the Bank of Zaire to sign the 1980 Refinancing Agreement on behalf of the [Government] of the DRC and the Central Bank of Zaire; is that correct" A: "Yes, it is authorized to sign the Agreement." [*id.* at 90:19-91:4];

13.     Yet, Plaintiffs have produced no evidence that the 2003 Acknowledgement was ever submitted to the Council of Ministers for approval.

14.     With respect to the 2009 Acknowledgement, Order No. 08/073 of December 24, 2008 regarding the organization and functioning of the Government similarly restricts the Minister of Finance's authority.[23]  Ex. P124 at ¶¶ 26-28.

---

"Q: "Does Ordinance 80/73 refer to the signing of any other documents other than the 1980 Refinancing Agreement?" A: "No, it is not referring to another document other than signing the Credit Agreement." [*id.* at 101:20-25].

*See also* Ex. D29, Art. 1 ("The signing of the refinancing loan agreement between the Republic of Zaire, the Bank of Zaire and the private bank creditors *is hereby authorized*.") (emphasis added); Ex. P78 at 49:3-50:4 (Ordinance 80-73 "authorized the Minister of Finance and the Governor of the Central Bank to sign, and only to sign the Credit Agreement[.]").

After withdrawing his reliance on Article 50 of the 2002 Decree, Mr. Chikuru's opinion that the 2003 Acknowledgment was duly authorized was based on two unsupported conclusions: (1) Ordinance 80-73 authorized the State Commissioner of Finance and the Governor of the Bank of Zaire to *implement* the Credit Agreement—despite no such language appearing in the Ordinance itself; and (2) the provisions of the Credit Agreement required, *inter alia*, the DRC to acknowledge its debts until they were fully repaid.  *See, e.g.,* Ex. P122 at ¶¶ 9(d), 41-42; Ex. P123 at ¶¶ 10-12; Ex. P121 at 97:11-98:11.  However, *during his deposition, Mr. Chikuru repeatedly admitted that the Credit Agreement was not a law of the DRC and, therefore, he was not qualified to interpret it.*  *See e.g.,* Ex. P121 at 98:12-104:23 (admitting that he was not qualified to opine, as he did in his expert report, that certain provisions of the Credit Agreement "gave the unconditional authority" to the Minister of Finance and the Governor of the Central Bank to "acknowledge, reaffirm and/or renew the obligations of the DRC and the Central Bank" under the Credit Agreement); *see also id.* at 116:5-12; Ex. P122 at ¶ 10 ("Because the Credit Agreement is governed by New York law I express no opinion as to the interpretation or enforceability of any provision in that Agreement . . . .").  Therefore, Mr. Chikuru's opinion that the 2003 Acknowledgment was duly authorized—which relies entirely on his unqualified interpretation of the Credit Agreement, rather than DRC law—has no probative value.

However, even if Mr. Chikuru were correct—he is not—and Ordinance 80-73, read in conjunction with the Credit Agreement, provided authority in perpetuity to the State Commissioner of Finances of Zaire and the Governor of the Bank of Zaire to sign acknowledgements of debt relating to the Credit Agreement, the 2002 Decree abrogated that authority.  *See* Ex. P124 at ¶¶ 24-25; Ex. P78 at 40:4-41:16.

[23]     The 2009 Acknowledgement was signed more than six years after the 2003 Acknowledgement was signed; therefore, even if the 2003 Acknowledgment was valid—it is

15.     Order No. 08/073, Art. 74 states: "With the agreement of the Council of Ministers, agreements for lending, borrowing or gifts that are binding on the State may be negotiated and signed by the Ministers responsible for Finance, the Budget and the Plan. . . . . *Borrowing, lending or gift agreements that are binding on the State must be entered into in accordance with the law respecting finance. Those agreements take effect only after they have been approved by an order of the President of the Republic after deliberation by the Council of Ministers*." Ex. P20, Art. 74 (emphasis added).

16.     Yet Plaintiffs have produced no evidence to demonstrate that the 2009 Acknowledgment was ever "approved by an order of the President of the Republic after deliberation by the Council of Ministers." *Id.*[24]

### 2.     The Governor of the Central Bank Lacked Actual Authority to Sign the Acknowledgements on Behalf of the Central Bank.

17.     As there is no evidence in the record that the requisite approvals were ever obtained in connection with the execution of the 2003 and 2009 Acknowledgements, Plaintiffs

---

not—all creditors' claims under the Credit Agreement were unquestionably time barred between February 24, 2009 and July 14, 2009. *See* Ex. P121 at 108:3-17. Plaintiffs' expert, Mr. Chikuru, acknowledged that under such circumstances, the signing of the 2009 Acknowledgement "could create new obligations for DRC, brand new obligations," *id.* at 141:20-143:2, therefore requiring the Acknowledgement to be submitted to the Council of Ministers for approval.

[24]     The Plaintiffs have not submitted credible information to establish that the signatures on the 2009 Acknowledgment were duly authorized to bind the DRC or the Central Bank. The only materials that the Plaintiffs have produced on this point are the expert reports of Mr. Chikuru; however, Plaintiffs have since acknowledged that they will not rely on Mr. Chikuru's opinions to prove this point; thus, Plaintiffs have failed their burden of proof with respect to establishing the actual authority of the signatories to the 2009 Acknowledgment. *See* Ex. D27 (Email exchange between D. Mateyaschuk, Esq. and D. Hranitzky, Esq., dated Nov. 11, 2013); *see also* Ex. P121 at 122:6-7 ("The 2009 letter doesn't concern the Plaintiffs in this case"), 122:13-16 ("the Plaintiffs . . . are not concerned with the 2009 Acknowledgment Letter[.]"), 124:3-6 ("As I said, the 2009 Acknowledgment Letter doesn't concern the Plaintiffs in this case, and I gave my opinion in consideration with the Plaintiffs rights concerning the case.").

have failed to satisfy their burden of proving that Ministers Luongwe or Matenda had actual authority to sign those documents on behalf of the DRC.

18. Under the laws governing the Central Bank at the time the 2003 and 2009 Acknowledgments were signed, the Governor of the Central Bank was not authorized to execute those documents on behalf of the Central Bank without first obtaining the appropriate approvals from the State. Ex. P124 at ¶¶ 29-34. This requirement is consistent with the Central Bank's relationship *vis-à-vis* the country and its limited role under the Credit Agreement.[25]

19. Specifically, the preamble to Act No. 005/2002 of May 7, 2002 governing the Constitution, Organization and Functioning of the Central Bank affirms that the independence of the Central Bank:

> does not call into question the principle of uniqueness of the sequencing center granted to the Ministry of Finance in accordance with the Finance Act, the

---

[25] Contrary to the Plaintiffs' contention, the Central Bank is not a guarantor of the DRC's obligation to pay principal or any other amounts under the Credit Agreement. Indeed, the Agreement defines the "Obligor" as only the Republic of Zaire and does not define the Bank of Zaire as the "guarantor." Ex. P10 at UB00000624. Rather, under the Agreement, the State was required to make payments in dollars, *see id*. at § 5.02 at UB00000647, and the Agreement makes clear that the Bank's obligations were limited to a "Foreign Exchange Undertaking" pursuant to which it agreed to use best efforts to ensure that sufficient dollars or other foreign currency was maintained so that payments could be made as required. *Id*. § 9.01(b) at UB00000671. Consistent with this undertaking, the Bank did not agree to independently guarantee the State's obligations to pay, but rather agreed only that, subject to the availability of foreign currency, it would "*either* make available to the Obligor sufficient Dollars or other Foreign Currency *to enable the Obligor* to make each such payment as so required *or* (ii) *on behalf of the Obligor* make each payment as so required." *Id*. § 9.01(c) at UB00000671 (emphasis added). Thus, the Bank committed only to serve as State cashier and there is no evidence that the Bank breached its obligation in that respect. *Pisani v. Weschester Cnty. Health Care Corp*., 424 F. Supp .2d 710, 719 (S.D.N.Y. 2006) ("Under New York law, to recover for breach of contract a plaintiff bears the burden of proving by a preponderance of the evidence: (1) the existence of an enforceable contract; (2) performance by one party; (3) breach by the other party; and (4) damages.") (citing *Harasco Corp. v. Segui*, 91 F.3d 337, 348 (2d Cir. 1966)). Pursuant to the express terms of the Agreement, the Bank would have fulfilled its obligation by making "available to the Obligor sufficient Dollars or other Foreign Currency to enable the Obligor to make each such payment as so required" and there is no evidence that it failed to do so. Ex. P10 § 9.01(c) at UB00000671.

General Regulations on Public Accounting and the State Cashier Agreement, or the requirement for prior approval by the Budget Ministry as instituted by the various budgetary laws.

Ex. P118 at EXPERT00000083.

20.     Act No. 005/2002 further provides that, in accomplishing its role of State Cashier, the Central Bank cannot make any State expense that has not been in advance decided by the Government, approved by the Ministry of Budget and approved by the Ministry of Finance.  Ex. P118 at EXPERT00000083.

21.     Article 16 of Act No. 005/2002 further provides that the Bank is prohibited from "[g]uarantee[ing] the State's debts and commitments." *Id.* at EXPERT00000087.

22.     Title III (Relationships with the Public Powers), and Article 55 of Act No. 005/2002, provides that the "Bank shall fulfill the functions of State Banker and Government Advisor in economic, monetary and financial matters" as well as the "function of State Cashier in line with the agreement entered into with the Ministry of Finance." Ex. P118 at EXPERT00000093.

23.     Taken together, the Credit Agreement and Act No. 005/2002 make clear that the Central Bank could not make any commitment with respect to an obligation of the DRC without first obtaining the appropriate approvals from the DRC.  Stated otherwise, the Governor of the Central Bank was not authorized to sign the 2003 or 2009 Acknowledgements without first obtaining the approval of a duly authorized Minister of Finance.

24.     Because the Minister of Finance did not obtain the appropriate approvals in order to bind the DRC to the 2003 or 2009 Acknowledgement Letters, it necessarily follows that the Central Bank could not be bound.  To hold otherwise – *i.e.*, to permit the Governor of the Central Bank to unilaterally sign documents committing the treasury of the State to third parties – would

entirely undermine the purpose of the 2002 Decree in requiring budgetary approvals of the Council of Ministers.[26]

25.      The record confirms the Central Bank's limited role vis-à-vis the Credit Agreement, *see* Findings of Fact ¶¶ 19-20, *supra*, and the inability of its Governor to sign the Acknowledgement Letters without the prior signature of an authorized DRC official. *See, e.g.,* Ex. P80 at 188:18-189:4 (testifying that the Governor of the Central Bank told a creditor under the Credit Agreement that he would "only be willing to countersign" the 2003 Acknowledgement document); Ex. P79 at 14:8-15:5 (explaining that the Minister of Finance is "the one who gets the document, signs it, and then pass it on to the governor of the Central Bank" and that his role as Governor of the Central Bank in relation to the Credit Agreement was "to accompany the government in to fulfilling its obligation"). *See also id.* at 24-25 (testifying that the Central Bank gets involved in "servicing debts" because "the Ministry of Finance is in charge of delivery, the payment orders, and the Central Bank is in charge of executing the orders received by the Ministry of Finance"); Ex. P78 at 51:19-52:4 ("Whenever an Agreement commits the Congolese Government to effecting a payment, even if this Agreement has not been signed by the Minister of Finance, it is only normal that when the time comes to actually hand in the money, the Ministry of Finance and/or the Governor of the Central Bank should be involved, because there is no way such payments could be made without first the approval of the Minister of Finance and, secondly, the money coming out of the Central Bank."); 52:14-17 ("Any time

---

[26]      *See* Ex. P121 at 171:13-172:3 (stating that without the authority provided by Ordinance 80/73, the signatures of the State Commissioner of Finance and Budget and the Governor of the Bank of Zaire on the Credit Agreement would be unauthorized); 169:8-22 ("The Governor of the Central Bank is not in the executive government of the DRC. He is the Governor of the Central Bank. He is not, I can say the decider, the decision maker for the Republic of the DRC. The decision makers are the ministers and other persons empowered to represent the Republic, the Government who are empowered by the Constitution and by specific administrative acts.").

there is a payment that has to be made on behalf of the State it has to be instructed by the Minister of Finance and paid up by the Central Bank"); 53:8-12 ("I said each and every time that there is an agreement involving the payment on behalf of the DRC it is up to the Minister of Finance to order the payment and up to the Central Bank to make sure that the payment is made.").

## C.   The Legal Standard for Apparent Authority

26.     Under New York law, "[a] principal may be bound by the actions of an agent on the basis of apparent authority only where it is shown that a third party …reasonably relied upon the misrepresentation of the agent 'because of some misleading conduct on the part of the *principal*.'"  *Stichting Ter Behartiging Van De Belangen Van Oudaadeelhouders In het Kapitaal Van Saybolt Int'l B.V. v. Schreiber*, 407 F.3d 34, 56 (2d Cir. 2005) (internal quotations omitted) (emphasis added in original).   Therefore, "irrespective of the representations made by the agent… and relied upon by the third party … there must also be demonstrated some reliance nexus between the principal… and that third party."  *Id.*   In its previous decision on summary judgment, this Court established that, for purposes of the apparent authority analysis, the DRC is the principal, and the DRC's ministers are the agents.  *See Themis Capital*, 881 F. Supp. 2d at 526 ("Apparent authority exists when the principal (here, a state) causes third parties to reasonably rely on the representation – explicit or implicit – that the agent (here, a government official) is acting on behalf of the state."). [27]

27.     In particular situations, courts will find that a third party has a duty to inquire into the agent's apparent authority.  This duty is a proxy for reasonable reliance; if the duty exists,

---

[27]     This Court previously held that "apparent authority can bind foreign governments whose acts are private, including enter[ing] into commercial transactions on apparent behalf of a sovereign state."  *Themis Capital*, 881 F. Supp. 2d at 526.  Defendants acknowledge this holding reflects the law of the case but respectfully reserve all rights on appeal with respect to this issue.

courts will evaluate whether, based on the circumstances of the transaction, the person relying on an agent's apparent authority fulfilled his duty of inquiry. *Id.* (citing *First Fid. Bank, N.A. v. Gov't of Antigua & Barbuada-Permanent Mission*, 877 F.2d 189, 193-94 (2d Cir. 1989)).

**D.    Neither Luongwe Nor Masangu Had Apparent Authority to Sign the 2003 Acknowledgement.**

28.    Plaintiffs cannot meet their burden of showing that interim Minister of Finance and Budget Luongwe or Governor Masangu had apparent authority to sign the 2003 Acknowledgement.

29.    In particular, none of the elements of the apparent authority doctrine is satisfied with respect to the 2003 Acknowledgement, because (1) there was no relevant conduct by the state of Zaire or the DRC representing to third parties that either the Minister of Finance or the Governor of the Central Bank had the authority to sign acknowledgements of debt; (2) even if there were any such relevant conduct, the evidence demonstrates that Citibank N.A. did not rely upon it; and (3) even if there was relevant conduct and reliance, such reliance would not have been reasonable because Citibank N.A. had a duty to inquire into Luongwe and Masangu's authority, and made no effort to do so.   Accordingly, Plaintiffs' apparent authority argument fails.

**1.    There Was No Relevant Conduct, Explicit or Implicit, by the DRC Prior to the 2003 Acknowledgement to Suggest That the Minister of Finance or Governor of the Central Bank Had Authority to Bind the State to the 2003 Acknowledgement Letter.**

30.    As an initial matter, precision is vital in evaluating whether Citibank, N.A. reasonably relied on conduct by the DRC that might have suggested that Luongwe and Masangu were acting on behalf of the State in signing the 2003 Acknowledgement.  Here, the principal in the alleged agency relationship is *the sovereign state of the DRC*, and not any of its individual ministries, agencies, or offices.  *See Themis Capital*, 881 F. Supp. 2d at 526 (stating that

"[a]pparent authority exists when the principal (here, a state) causes third parties to reasonably rely on the representation ... that the agent (here, a government official) is acting on behalf of the state."); *Bank of Am., N.A. v. Terra Nova Ins. Co. Ltd.*, No. 01-CIV-0646(LMM), 2005 WL 1560577, at \*5 (S.D.N.Y. June 30, 2005) ("[t]he apparent authority for which the principal may be held liable *must be traceable to him*; it cannot be established by the unauthorized acts, representations or conduct of the agent.") (citations omitted) (emphasis added).  As discussed above, ministers could only bind the DRC to an agreement after the Council of Ministers had discussed and approved it.

31.   This distinction is important, because prior to the signing of the 2003 Acknowledgement, all of the conduct that the third parties could have conceivably relied upon to ascertain the authority of the Minister of Finance and/or the Governor of the Central Bank was carried out by either the Minister of Finance or the Governor of the Central Bank, the purported agents, and not the DRC itself, the principal.[28]  Plaintiffs cannot now retroactively bootstrap conduct or representations of the principal (Zaire/the DRC) from the conduct of its agents (Minister of Finance and Governor of the Central Bank).  *See Stichting Ter Behartiging,* 407 F.3d at 56 ("[I]rrespective of the representations made by the agent... and relied upon by the third party... there must also be demonstrated some reliance nexus between the principal... and that third party.").  Consequently, the conduct of the Ministry of Finance, the Central Bank, and

---

[28]    To the extent that Plaintiffs suggest that Luongwe and Masangu were endowed with apparent authority to sign the 2003 Acknowledgement by any conduct that took place *after* the 2003 Acknowledgement was signed, that argument is unavailing.   In accepting the 2003 Acknowledgement, Citibank N.A. could not possibly have relied on events that postdated the processing and signature of the Acknowledgement.  *See Muscletech Research & Dev., Inc. v. E. Coast Ingredients, L.L.C.*, No 00-CV-0753A(F), 2004 WL 941815, at \*31 (W.D.N.Y. Mar. 25, 2004) (finding no reasonable reliance because, *inter alia*, there was no evidence that plaintiff was made aware of and relied on information conveyed by defendant as to agent's management position *prior* to its decision to accept defendant's proposals).

their respective officers or agents is irrelevant to whether Luongwe or Masangu had apparent authority to bind the DRC under the 2003 Acknowledgement.

**a.    The 1991 and 1997 Acknowledgements Do Not Constitute Conduct by the State.**

32.    First, the 1991 and 1997 Acknowledgements do not constitute any conduct by the *State* on which Citibank could have relied.  In that regard,  there is no evidence to suggest that the state of Zaire authorized or endorsed the signing of either document.

33.    With respect to the 1991 Acknowledgement, there is no evidence in the record demonstrating who signed this document on behalf of Zaire and little evidence regarding the circumstances that led up to or immediately followed it.[29]   The only record of communication regarding the acknowledgement prior to its signing is the minutes of a March 11, 1991 meeting between Bank of Tokyo officials and representatives of the Bank of Zaire; there is no indication that the State was involved.  Ex. P11 at UB00002452-2453.  *See also* Ex. P17 at CITI00003701, 3703, 3704 (showing the signed document was transmitted by the Governor of the Bank of Zaire).

34.    The evidence regarding the 1997 Acknowledgement is similarly sparse.  Cecilia Bartner, who was the lone employee in Citibank N.A.'s debt restructuring department, indicated that she had no discussions with anyone in the DRC government regarding the 1997 Acknowledgement.  Ex. P80 at 59:18-22; 60:23-24.  Instead, Masangu, then managing director at Citibank Kinshasa, assumed that responsibility, and he only spoke with the Minister of Finance and the Governor of the Central Bank who signed the Acknowledgement.  Ex. P80 at 59:23-25; Ex. P79 at 102:6-13, 102:18-20, 103:2-8, 118:15-20.  In short, the record regarding the 1991 and

---

[29]    Ms. Bartner testified that, at the time she obtained the 1997 Acknowledgement, she was not aware of who signed the 1991 Acknowledgement.  Ex. P80 at 70:9-14.

1997 Acknowledgements reflect conduct only by the *agents* at issue, not the State. Thus, these documents do not support the Plaintiffs' apparent authority claim.

> **b.    There Was No Relevant Conduct by Zaire or the DRC Between the 1997 and 2003 Acknowledgements Relating to the Authority of the Minister of Finance or the Governor of the Central Bank.**

35.    Nor is there any relevant evidence as to any conduct or representations by Zaire and/or the DRC between 1997 and 2003 that might have suggested that the Minister of Finance or Governor of the Central Bank had the unilateral authority to sign acknowledgements of debt. Indeed, Bartner testified that Citibank N.A. had no communications with the DRC in the period between the signing of the 1997 Acknowledgement and the negotiations concerning the 2003 Acknowledgement.  Ex. P80 at 78: 13-22.  During this period, the only known communications regarding the Credit Agreement took place in 1998 and 2002, none of which mention the 1991 or 1997 Acknowledgements or the possibility of another such document.  Ex. P20 at UB00001012-1018 and Ex. P23 at UB00001613-1621.  Moreover, again, these communications were from agents of the Ministry of Finance and the Governor of the Central Bank, respectively.  There is no evidence as to communications between 1997 and 2003 by the principal – the State – that could have suggested the Ministry of Finance had the unilateral authority to sign the Acknowledgement on behalf of the state.[30]

---

[30]    To the extent the Plaintiffs seek to rely on documents indicating that representatives of the Ministry of Finance and/or the Central Bank were communicating with creditors regarding the debt as evidence that they had authority to sign legal documents regarding the debt, the Plaintiffs' reliance is misplaced.  New York courts have previously recognized a distinction between authority to negotiate and authority to sign a document in the apparent authority context.  *See Kleine v. City of New York*, 547 F. Supp. 2d 315, 319 (S.D.N.Y. 2008) (cautioning against conflating a "clear manifestation of… authority to engage in negotiations with the distinct and materially different manifestation of authority to execute or agree to a specific settlement on [defendants'] behalf.... The former does not necessarily evidence the latter....") (quoting *Johnson v. Schmitz*, 237 F. Supp. 2d 183, 192 (D. Conn. 2002)).

36.     To the contrary, the evidence shows that, in the year prior to the 2003 Acknowledgement, the state took official action demonstrating that the Minister of Finance did *not* have such unilateral authority.  Specifically, on or about March 12, 2002, the DRC passed the 2002 Decree, discussed *supra*, which specifically limited the Minister of Finance's authority to execute documents with potential budgetary repercussions for the DRC, such as the one at issue, and required that the matter first be submitted to the Council of Ministers.

37.     Finally, with respect to the communications leading directly up to the 2003 Acknowledgement, there is no evidence the state of the DRC made any representations to anyone that Luongwe or Masangu had the authority to sign it.  The first evidence of direct communications as to the 2003 Acknowledgement originating from the DRC to Citibank N.A. is Losembe's February 18, 2003 discussion with Masangu (then Governor of the Central Bank), who agreed to talk to Deputy Minister of Finance Luongwe to get the acknowledgement signed. Ex. P28 at CITI0000125.  Losembe also wrote two letters to the DRC's Ministry of Finance on February 11 and February 20, 2003 regarding the 2003 Acknowledgement, but there is no indication that he received any immediate response.  *See* Ex. P27 at DRC00003575, Ex. D7.  As was the case with the 1997 Acknowledgement, the  Minister of Finance and Governor of the Central Bank signed the 2003 Acknowledgement.  Further, any communications from DRC entities to the Bank of Tokyo or Citibank N.A. in the immediate aftermath of the signing of the 2003 Acknowledgement – *e.g.*, the February 2003 meeting between Central Bank officials and the Bank of Tokyo, and the April 2003 meeting between DRC representatives and Citibank N.A. – involved only the Ministry of Finance and/or the Central Bank.  *See* Ex. P37 at UB00001031; Ex. D8; *see also* note 28, *supra* (noting, in any event, that conduct subsequent to the execution of

the Acknowledgement is irrelevant).  In short, all of the foregoing conduct is wholly attributable

to the positions of the Minister of Finance and the Governor of the Central Bank.

> **c.** **The Only Relevant Conduct Attributable to the State of Zaire or the DRC Is Insufficient to Satisfy the Apparent Authority Doctrine.**

38.    To the extent that the record reflects any action taken by the DRC or its

predecessor State leading up to the 2003 Acknowledgement, that conduct is either insufficient to

satisfy the apparent authority doctrine or demonstrates why Plaintiffs' reliance on that theory is

flawed.

> **i.** **Any Authority Provided by Zaire's Ordinance No. 80-073 Was Confined to the Credit Agreement Itself.**

39.    In connection with the execution of the Credit Agreement, the State of Zaire

issued Ordinance 80-073 which gave Zaire's then State Commissioner of Finance and the then

Governor of the Bank of Zaire authority to execute the Credit Agreement.  Even assuming

anyone relied on this Act in obtaining the 2003 Acknowledgement – and there is no evidence

that they did – it would not support the existence of any official's authority twenty three years

later to sign an acknowledgement of debt.  Ordinance 80-073, which was issued by Zaire's then-

President Mobutu, conveyed only very discrete authority which was explicitly limited to the

execution of the Credit Agreement.  In that regard, the Ordinance simply states that "[t]he

signing of the refinancing loan agreement between the Republic of Zaire, the Bank of Zaire and

the private bank creditors is hereby authorized." Ex. D29, Art. 1, 2.

40.    Notably, the Ordinance did not refer to any document other than the Credit

Agreement and did not convey authority to the State Commissioner of Finances or the Governor

of the Bank of Zaire regarding anything other than the "signing of the refinancing loan

agreement."  It certainly says nothing about whether either official or their future successors

would have the capacity — at some unspecified and distant point in the future – to sign acknowledgements of debt that waive the statute of limitations for actions brought under the Credit Agreement.  Indeed, the fact that the Ordinance was required to authorize the execution of Credit Agreement by the state's finance official and the Governor of the Bank negates, rather than supports, the appearance that these officials had the unilateral authority to sign such documents.  Quite simply, there was nothing stemming from Zaire's conduct in passing Ordinance No. 80-073 upon which Citibank N.A. could have relied in obtaining the 2003 Acknowledgment.[31]

> ii.    **Absent Additional Evidence, the Mere Appointment of Luongwe and Masangu to Their Positions Did Not Convey Apparent Authority to Them.**

41.    Nor can the appointment of Luongwe and Masangu to the positions of Minister of Finance and Governor of the Central Bank, respectively, satisfy the apparent authority doctrine. Although the Second Circuit has recognized that "[t]he appointment of a person to a position with generally recognized duties may create apparent authority", this principle is still subject to a factual inquiry.  *First Fidelity*, 877 F.2d at 193-194.  This Court previously noted in its July 26, 2012 summary judgment opinion that "it would be presumptuous to assume, without allowing discovery on the point, that [Luongwe and Masangu's] responsibilities had been publicly described so as to appear to embrace the official actions at issue here."  *Themis Capital*, 881 F. Supp. 2d at 528.  In seeking resolution as to public understanding of Luongwe and Masangu's

---

[31]    Even assuming that Ordinance 80-073 could be interpreted to suggest that, twenty years later, the Minister of Finance of the DRC and the Governor of the Central Bank had authority to execute legal documents relating to the Credit Agreement, then, in that case, the Ordinance would have been superseded by the 2002 Decree, which stated that any agreements affecting the budget of the DRC had to be submitted to the Council of Ministers. Ex. P124 at 7.  Therefore, to the extent that Ordinance No. 80-073 might have caused a perception that the Minister of Finance had authority to bind the country to private law agreements, that perception was nullified as of March 12, 2002.

responsibilities, this Court further noted that the generally recognized duties of the Minister of Finance and the Governor of the Central Bank must have been "explicitly or implicitly represented *by the DRC*." *Id.* (emphasis added).

42.     Plaintiffs still cannot cite to any evidence of any conduct *by the DRC* that suggested that the generally recognized duties of either the Minister of Finance or the Governor of the Central Bank included unilaterally signing acknowledgments of debt having the effect of extending the statute of limitations for a private law agreement.  As noted above, the 1980 Ordinance and the 2002 Decree do not help Plaintiffs here and virtually all of the evidence that the Plaintiffs rely upon as suggesting that the Minister of Finance or the Governor of the Central Bank had such authority derives from the conduct of those agencies and their representatives, and not the state of the DRC.  This falls well short of the example cited by this Court in its summary judgment opinion, *Seetransport Wiking Trader Schiffarhtsgesellschaft MBH & Co. Kommanditgesellschaft v. Rep. of Rom.*, 123 F. Supp. 2d 174 (S.D.N.Y. 2000).

43.     In *Seetransport*, the court found that the Romanian finance minister had apparent authority to bind Romania to a settlement agreement, but relied on the fact that Romania's prime minister had made express statements to that effect.  *Seetransport*, 123 F. Supp. 2d at 190; *see also Themis Capital*, 881 F. Supp. 2d at 527-28.  No such direct link between the statements of an official representing the state and the authority of Luongwe and Masangu to sign the 2003 Acknowledgement exists here.   Absent such evidence, simply citing the appointment of Luongwe and Masangu to their positions is insufficient to satisfy the apparent authority doctrine. *See Storr v. Nat'l Def. Sec. Council of the Rep. of Indon.*, No. 95-CIV-9663(AGS), 1997 WL 633405 at *3 (S.D.N.Y. Oct. 14, 1997) (holding no apparent authority by Indonesian officials to sign promissory notes, because Plaintiff simply relied on the officials' appointment, and offered

"no evidence to the effect that the 'generally recognized duties' of the deputy or of the ambassador included issuing and/or confirming promissory notes."). Accordingly, there was no conduct or representation by Zaire or the DRC that conveyed apparent authority to Luongwe or Masangu to sign the 2003 Acknowledgement. Plaintiffs' apparent authority argument fails on these grounds alone.

44. The fact that a finance officer and the Governor of the Bank of Zaire signed the Credit Agreement is similarly unhelpful to the Plaintiffs' cause given that the record demonstrates that those officials needed *specific authorization* from the President of Zaire in order for their signatures to effectively bind the principals. Stated otherwise, the circumstances under which Zaire's finance officer and the Governor of the Bank of Zaire signed the Credit Agreement do not support the notion that the authority to execute such documents was one of their generally recognized duties. Again, those circumstances demonstrate that they were <u>not</u> alone empowered to unilaterally execute the Credit Agreement and needed to obtain a specific grant of authority to do so.

## 2. <u>Citibank Did Not Reasonably Rely on the Signatures on the 2003 Acknowledgement</u>

45. Even if Plaintiffs were able to demonstrate some conduct or representation by the state of Zaire or the DRC to suggest that the Luongwe or Masangu had authority to sign the 2003 Acknowledgement, they cannot demonstrate that Citibank reasonably relied on such conduct or representations.

46. In the first instance, there is no evidence that anyone at Citibank actually relied on any conduct by the state of Zaire or the DRC in accepting the 2003 Acknowledgement. To the contrary, Ms. Bartner testified that she understood the signatories to the 2003 Acknowledgement were authorized to sign the document based on nothing more than the fact "[t]hat they signed."

Ex. P80 at 165:15-21.  Notably too, Bartner testified that she had "very little" familiarity with the Credit Agreement.  Ex. P80 at 42:21-43:4.[32]

47.     And, even assuming that there was some conduct or representation by the state of Zaire or the DRC and that Citibank did in fact rely on it, Plaintiffs cannot demonstrate that any such reliance was reasonable.  *See In re Elsa Designs, Ltd.*, 155 B.R. 859, 868 (S.D.N.Y. 1993) (noting that "[a] third party with whom the agent deals may rely on the appearance of authority only to the extent that such reliance was reasonable" and that "[t]he third party claiming reliance on an agent's apparent authority must not fail to heed warning or inconsistent circumstances.") (citing *Gen. Overseas Films, Ltd. v. Robin Int'l. Inc.*, 542 F. Supp. 684, 684, 695 (S.D.N.Y. 1982).  Under New York law, a proxy for reasonable reliance is whether a plaintiff has fulfilled its duty of inquiry.  *See Themis Capital*, 881 F. Supp. 2d at 528 ("the duty of inquiry amounts to an alternative way of asking whether the third party reasonably relied on the representations of the agent that he possessed authority to bind the principal.") (quoting *C.E. Towers Co. v. Trinidad & Tobago (BWIA Int'l) Airways Corp.*, 903 F. Supp. 515, 525 (S.D.N.Y. 1995).

48.     Given the extraordinary nature of the 2003 Acknowledgement, as well as the events in Zaire and the DRC which led up to the execution of that Acknowledgement,  Citibank N.A. clearly had a duty to inquire into the authority of Luongwe and Masangu.  It failed that duty when its lone employee managing the 2003 Acknowledgement, Cecilia Bartner, conducted no due diligence whatsoever to verify the authority of the signatories.

---

[32]     Plaintiffs do not purport to have held any interest in the debt in 2003 and they were not party to any communications leading up to the 2003 Acknowledgement.  Any evidence that they now seek to proffer as evidence supporting the existence of apparent authority is irrelevant absent a showing that Citibank relied upon it. *See In re Cohen*, 422 B.R. 350, 370-71 (E.D.N.Y. 2010) (finding no apparent authority because, although the principal had authorized the agent and its employees to execute various documents over the course of five years, there were no allegations that the third parties "were party to, or even aware of, any of those transactions" prior to the transaction at issue, and therefore the third parties could not rely upon them).

### a.   Citibank Had a Duty to Inquire Into the Signatures on the 2003 Acknowledgement.

49.   Under the New York apparent authority doctrine, the duty of inquiry arises when "(1) the facts and circumstances are such as to put the third party on inquiry, (2) the transaction is extraordinary, or (3) the novelty of the transaction alerts the third party to a danger of fraud." *FDIC v. Providence Coll.*, 115 F.3d 136, 141 (2d Cir. 1997).   The need for Citibank N.A. to inquire as to the authority of Luongwe and Masangu to sign the 2003 Acknowledgement is easily satisfied here because the 2003 Acknowledgement was an extraordinary transaction conducted under extraordinary circumstances which should have put Citibank on inquiry.

### i.   The 2003 Acknowledgement Was an Extraordinary Transaction.

50.   To begin with, Citibank N.A. had a duty to conduct due diligence because of the extraordinary nature of the 2003 Acknowledgement.   When evaluating whether a transaction is extraordinary under New York's apparent authority doctrine, "the question is whether the particular transaction falls within the range of transactions in which [the principal] or similarly situated institutions normally engage." *FDIC*, 115 F.3d at 142.   As with all other aspects of an agency theory of liability, the plaintiff bears the burden of establishing that a transaction was neither extraordinary nor novel.   *Id*.   Plaintiffs cannot meet this burden here, as there are numerous reasons why the 2003 Acknowledgement was an extraordinary transaction, including, (1) the fact that these acknowledgements are not common documents and, indeed, Citibank's Cecilia Bartner had no prior experience in obtaining them; (2) the uncertainty concerning amounts owed under particular schedules of the Credit Agreement; and (3) the fact that the purpose of the Acknowledgement was to extend by six years the statute of limitations to sue on an exorbitant amount of total debt.

51.     *First*, there is no evidence that acknowledgements of debt fall within the "range of transactions in which [Citibank] or similarly situated institutions normally engage." *FDIC*, 115 F.3d at 142.  Rather, Bartner testified that during almost 10 years of experience in Citibank's sovereign debt restructuring department, statute of limitations issues had never previously come up and the 1997 Acknowledgement was the first document of this type she had been involved in obtaining.  Ex. P80 at 193:17-194:2.  She explained that this was because other countries "were paying the debt, for the most part, or they had not come to the place where they needed to be the statute- of-limitations issue." *Id.* at 34:20-35:14.[33]  Given that Bartner had not had occasion to deal with a single acknowledgement letter over the course of working at one of the world's largest financial institutions for almost a decade, it necessarily follows that the situation in which Citibank found itself in 2003 – where it was seeking a third acknowledgement of debt 23 years after the underlying debt instrument had been executed – was quite extraordinary.

52.     *Second*, there was significant uncertainty as to the amounts owed by the DRC under the Credit Agreement's individual credit schedules.  As Bartner testified, the Bank of Tokyo had refused to reconcile the debt for either the 1997 or 2003 Acknowledgements, due to the DRC's failure to pay servicing fees under the Credit Agreement.  *Id.* at 45:15-19; 46:12-47:3; 58:21-23.  Consequently, Bartner prepared "blanket" acknowledgements of debt, whereby Citibank would not have to specifically state what was owed.  *Id.* at 57:9-18; 59:5-11; 130: 14-18.  These acknowledgements were necessary because of the lack of precision in the various

---

[33]     While Bartner testified that the statute of limitations subsequently arose with respect to Sudan and Liberia, she also testified that she was not involved in obtaining the acknowledgements for either country and she did not know who signed them on behalf of the countries.  *Id.* at 193:23-194:2 (affirming that she was not involved in getting the Sudan acknowledgement signed); 84:6-85:8 (same); 85:17-87:8 (testifying that she had "no[]" role with respect to the Liberia acknowledgement which was handled by another bank and she didn't remember who signed the documents on behalf of Liberia or Sudan).

banks' records as to debt owed; as Bartner herself recognized in an email to Losembe on October 2, 2002, reconciling the debt and accounting for all of the various credit schedules to the debt would not be an easy task.  Ex. P90 at CITI0000107; Ex. P80 at 202:17-203:2.

53.    *Third*, the stakes were potentially very significant.   The purpose of the acknowledgement was to toll the statute of limitations, thereby preserving the creditors' right to sue and enforce claims under the Credit Agreement for *hundreds of millions of dollars* in principal and interest.   As already noted, an estimate of the exact amount owed was not calculated at the time the 2003 Acknowledgement was signed.  However, a reconciliation of the DRC's London Club debt, performed just seven months after the 2003 Acknowledgement was signed, established that the DRC owed approximately $833 million.  Ex. P43 at UB00001915. This exorbitant amount, by itself, rendered the signing of any acknowledgement of debt an extraordinary transaction and one that would have warranted a level of due diligence that was not present here.[34]

ii.    **The Facts and Circumstances of the 2003 Acknowledgement Should Have Put Citibank N.A. on Notice**

54.    Even if the 2003 Acknowledgement Letter did not otherwise constitute an extraordinary transaction, there are at least two other facts and circumstances surrounding its execution which should have put Citibank on notice of the need to inquire as to the authority of the signatories to bind the country and the Central Bank.

---

[34]    The lack of due diligence in connection with the 2003 Acknowledgement stands in marked contrast to the due diligence conducted in connection with the Credit Agreement where multiple certifications, a Presidential ordinance, and legal opinions from several separate law firms were obtained to establish the validity of the document.  *See* Ex. P10 at Exs. 1-12 at UB00000777-803. *See also supra* at Findings of Fact ¶¶ 23-35.  By 2003, however, more than 20 years had passed since the debt had been refinanced under the Credit Agreement, the State had been in default for more than a decade, and Citibank had long since written off the debt.  Ex. P79 at 82:9-14 (testifying debt was written off by Citibank in or before 1997).

55.     First, the fact that the Credit Agreement required implementing legislation – *i.e.*, Ordinance No. 80-073 of April 21, 1980 – should have indicated to Citibank that written authorization from the DRC government was necessary for the Minister of Finance and the Governor of the Central Bank to sign any further agreements relating to the debt.  As already discussed, Ordinance No. 80-073 was passed to specifically validate the authority of the Minister of Finance and the Governor of the Central Bank to execute the Credit Agreement.  *See Benin v. Mezel*, No. 06-Civ-870(JGK), 2010 WL 3564270, at *7 (S.D.N.Y. Sept. 9, 2010) (finding that defendants had a duty to inquire as to diplomat's authority to convey property, when previous deed made it clear that written authorization to convey property would be necessary, and diplomat later conveyed property without such written authorization).

56.     Second, and even more importantly, the extraordinary political chaos which characterized the DRC in  late 2002 and early 2003 should have put Citibank on notice of the need to inquire as to the authority of the signatories to the 2003 Acknowledgement.

57.     This Court previously took judicial notice of the fact that "as of 2003, the *severe political turmoil* plaguing the DRC *and lack of a functioning government* were widely known." *Themis Capital*, 881 F. Supp. 2d at 531 (emphasis added).  Bartner, who was the only person in Citibank N.A.'s debt restructuring department, and the only person from Citibank N.A. who worked on the 2003 Acknowledgement, was aware of this political turmoil.  She admitted that the change from Zaire to DRC was the impetus for her efforts to secure a new acknowledgement of debt, and knew that the country was experiencing political issues at the time. Ex. P80 at 79:1-4; 186:21-24.

58.     The circumstances of this political turmoil were extensive, extraordinary and widely reported.  *See Themis Capital,* 881 F. Supp. 2d at 531; Findings of Fact, ¶¶ 105, 114,

68

*supra*.[35]  Between 1997 and 2003, the DRC experienced financial collapse, a civil war, the fall of the infamously corrupt Mobutu regime, an attempt to create a democracy, the formation of a new government and the renaming of the country, invasion by numerous foreign powers, and an international war that caused approximately four million deaths.  In February 2003, when the 2003 Acknowledgement was signed, the Second Congo War was still ongoing and would not end until July 2003.  More importantly, the country was still undergoing a political transition from the Mobutu era.  Even though Mobutu left office in 1997, the first President of the DRC, Laurent Kabila, had been assassinated in 2001 and his successor, Joseph Kabila, while already President in February 2003, would not be democratically elected until 2006.

59.     As this Court previously recognized, these combined circumstances:

> *arguably enhanced any duty plaintiffs had to inquire, for the political chaos may have created an outsized risk of officials (whether recently ousted from power, or otherwise), acting outside the scope of their authority of individuals claiming to act on behalf of the government.*

---

[35]     Pursuant to Federal Rule of Evidence 201, a "court may judicially notice a fact that is not subject to reasonable dispute because it (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."  Courts may take judicial notice of many types of facts, including "matters of political history," *Shahar v. Bowers*, 120 F.3d 211, 214 (11th Cir. 1997), and facts contained in government documents, *Abely v. Aeterna Zentaris Inc.*, No. 12 Civ. 4711(PKC), 2013 WL 2399869, at *21 (S.D.N.Y. May 29, 2013) (holding that government documents, available on government agency website, "are published by government sources from which the Court may appropriately take judicial notice.").  Courts may also take judicial notice of "facts that various newspapers, magazines, and books were published solely as an indication of information in the public realm at the time, not whether the contents of those articles were, in fact, true." *Id.* at 299  (quoting 1–4 WEINSTEIN'S EVIDENCE MANUAL § 4.02); *Gonzalez v. Nat'l Westminster Bank PLC*, 847 F. Supp. 2d 567, 569 n.2 (S.D.N.Y. 2012) ("Court may take judicial notice of publicly available information including newspaper articles and other public disclosures.").

*Themis Capital*, 881 F. Supp. 2d at 531 (emphasis added).   Quite simply, given the deteriorating situation in the DRC in early 2003, and absent additional inquiry, it was impossible for Citibank N.A. to know who had authority to sign another acknowledgement of debt.

60.      In summary, leading up to the signing of the 2003 Acknowledgement, Citibank N.A. was well aware of the political turmoil in the DRC, change in responsibility of ministers, and other circumstances which should have put it on notice that further inquiry into Luongwe's and Masangu's respective authority was necessary.   Given the extraordinary nature of the 2003 Acknowledgement, as well as the extraordinary circumstances leading up to its execution, Citibank  N.A. had a clear duty to inquire as to the authority of Luongwe and Masangu before relying upon and accepting their signatures on the 2003 Acknowledgement.

### b.      Citibank Made No Effort to Satisfy Its Duty of Inquiry.

61.      Despite the numerous circumstances requiring Citibank N.A. to inquire into the authority of Luongwe and Masangu, the evidence shows that Bartner, the only Citibank N.A. employee to work on the 2003 Acknowledgement, conducted little to no due diligence in obtaining the signatures.

62.      Under New York law, once the duty to inquire has been established, the party assertion apparent authority "must conduct a reasonable inquiry into circumstances surrounding the action."   *In re Cohen*, 422 B.R. 350, 369-370 (E.D.N.Y. 2010) (finding no apparent authority because, *inter alia*, the record did not show that "mortgagees made any inquiry whatsoever into the scope of [an agent's] authority" to sign certain deeds).

63.      As previously noted, Bartner was aware that there had been political problems in Zaire, and that the name had changed to the DRC at some point prior to her initial conversations with Losembe in late 2002.   Despite this, Bartner ignored several opportunities to exercise due

diligence in drafting the 2003 Acknowledgement and obtaining signatures. Essentially, confronted by the aforementioned circumstances, Bartner did nothing. This lack of due diligence is fatal to Plaintiffs' apparent authority argument.

64.    *First*, it is important to recognize that any previous due diligence that Bartner had conducted for the 1997 Acknowledgement was already lacking. When preparing the 1997 Acknowledgement, Bartner did not discuss who should sign the document with counsel. Ex. P80 at 72:25-73:12. And, Bartner took no steps to ascertain whether the Minister of Finance and the Governor of the Central Bank were the appropriate signatories. Nor did she ask anyone to take such steps. *Id*. at 226:14-25; 227:23-228:9. Bartner felt that these responsibilities were "not part of my job." *Id*. at 228:10-14. In obtaining signatures from Zaire officials, Bartner had no direct discussions with anyone from the government, *id*. at 59:18-25, 60:23-24, and had no follow-up conversations with Masangu regarding his efforts to get the 1997 Acknowledgement signed. *Id*. at 60:1-9.

65.    *Second*, Bartner made no efforts to determine whether the laws of the DRC had changed, given the political transition. Notably, unlike the 1997 Acknowledgement, which she prepared with at least some input from counsel, *see, e.g.*, *id*. at 70:17-20, Bartner neither sought nor obtained legal advice throughout the process of obtaining the 2003 Acknowledgement, *id*. at 97:3-15, 135:2-5, despite a radical political and legal transformation in the intervening six years since the 1997 Acknowledgement. Nor did Bartner make any such inquiries into DRC law on her own. *Id*. at 187:12-22.

66.    *Third*, despite the fact that Bartner directed Losembe to have the Minister of Finance sign the 2003 Acknowledgement, Bartner made little to no effort to determine if Luongwe (or Masangu) were the appropriate signatories. When the Minister of Finance

71

resigned, Bartner quickly instructed Losembe to have the Deputy Minister of Finance, "or whoever at the Ministry" sign  – despite the fact that Bartner had conducted no inquiry into whether such persons were appropriate signatories.  *Id*. at 149:18-25.

67.    The documentary evidence clearly demonstrates that Bartner's focus was on getting the 2003 Acknowledgment signed with a complete disregard of whether the persons signing had the appropriate authority to do so.  Bartner further admitted that aside from the 1997 Acknowledgement, she had no basis for believing that the Minister of Finance was competent to sign, and she could not recall from where she had gained the understanding that the Deputy Minister of Finance had the authority to sign.  *Id*. at 127:15-20; 185:15-21; 190:4-14.  Indeed, she never took any steps to determine whether Luongwe had authority to sign the 2003 Acknowledgement, because she testified that it "wasn't part of my job."  *Id*. at 230:25-231:4; 231:6-9.  Nor did anyone else from Citibank conduct such due diligence.  *Id*. at 228:23-229:14; 230:20-24.

68.    *Finally*, Bartner's lack of due diligence regarding the 2003 Acknowledgement is epitomized by her uncritical acceptance of Luongwe and Masangu's signatures after the fact. She stated that she believed the Acknowledgement had been duly signed, but admitted that her basis for this belief was merely "[t]hat they signed."  *Id*. at 165:15-21.  Incredibly, Bartner admitted that she saw no reason whatsoever to conduct any due diligence.  *Id*. at 232:13-15 ("The Minister and Governor signed.  If they were not the persons that they claim to be, why did they sign?").

69.    Nothing in the record excuses Bartner's failure to conduct due diligence or suggests that her conduct was reasonable.   To the contrary, the record unequivocally demonstrates that extensive due diligence was undertaken in connection with the Credit

Agreement to ensure that the signatories to that Agreement had the requisite authority. *See Findings of Fact*, ¶¶ 23-35, *supra*. More recently, BNP Paribas specifically noted that such diligence was appropriate by explicitly advising creditors that it was "neither in a position to check the signatures nor the powers of the signatories of this [2009] acknowledgement of debt[,]" and cautioning them "to make in case of need your own independent investigation regarding the validity of this document." Ex. D24 at UB00001931. Such an investigation was all the more appropriate in 2003 when "political chaos may have created an outsized risk of officials (whether recently ousted from power, or otherwise), acting outside the scope of their authority . . .." *Themis*, 881 F. Supp. 2d at 531.

70.    Bartner's failure to conduct due diligence cannot be characterized as merely substandard or simple carelessness. Rather, given the extraordinary circumstances surrounding the 2003 Acknowledgement, Bartner's cursory efforts represented an abject failure of Citibank's responsibility to ascertain whether Luongwe or Masangu had authority to bind the DRC. Given Plaintiffs' burden to establish due diligence, this complete failure to investigate cannot satisfy the element of reasonable reliance *See In re Cohen*, *supra*. Accordingly, Plaintiffs' apparent authority theory fails.

**E.    Neither Matenda Nor Masangu Had Apparent Authority to Sign the 2009 Acknowledgement.**

71.    For all of the reasons discussed above, Plaintiffs similarly fail to satisfy their burden of proving that the signatories to the 2009 Acknowledgement had apparent authority to sign that document on behalf of the DRC and Central Bank. As with the 2003 Acknowledgement, there is no evidence of any conduct by the State on which any one could have relied in connection with the 2009 Acknowledgement.

73

72.     Nor is there evidence of any reliance.  Notably, the Plaintiffs had already filed this litigation before the 2009 Acknowledgement was signed and only learned about the document's existence through discovery.[36]    And again, BNP Paribas – the bank who obtained the 2009 Acknowledgement – specifically disclaimed any reliance on any appearance of authority by the signatories.  This disclaimer belies any claim of apparent authority.

### F.     The DRC Never Ratified the 2003 Acknowledgement.

73.     Finally, Plaintiffs cannot demonstrate that the sovereign state of the DRC ratified the 2003 Acknowledgement.

74.     Under New York law, "[r]atification is the express or implied adoption, *i.e.*, recognition and approval, of the unauthorized acts of another."  *Vargas Realty Enterprises, Inc. v. CFA W. 111 Street, L.L.C.*, 440 B.R. 224, 235 (S.D.N.Y. 2010) (citations omitted).

75.     "Ratification is the affirmance of a prior act done by a principal, whereby the prior act is given effect as if done by an agent acting with actual authority." *In re First Rep. Group Realty,* 421 B.R. at 682 (citing Restatement (Third) of Agency, § 4.01 (2006)) (emphasis added); *see also Reiss v. Societe Centrale du Groupe des Assurances Nationales*, 246 F. Supp. 2d 273, 283 (S.D.N.Y. 2003) ("Ratifying conduct occurs subsequent to the original act by the agent and cures any defect in actual authority at the time of the engagement."); Restatement (Third) of Agency, § 4.02 ("[R]atification retroactively creates the effects of actual authority"). One who ratifies a contract is held to its terms as if she had originally made the contract herself. *Id.*

---

[36]     *See* Transcript of November 8, 2012 Hearing at 15:4-10 (Dennis Hranitzky noting Plaintiffs "learned late last week that DRC and the Central Bank apparently entered into a renewed tolling agreement in early 2009") (ECF No. 112).

74

76.     In order to ratify a previously unauthorized act, however, a principal must have "full knowledge of the material facts". *Cnty of Monroe v. Raytheon Co.*, 48 A.D.3d 1237, 1239 (4th Dept. 2008).   Once this knowledge is established, a party can ratify a contract "by intentionally accepting benefits under the contract, by remaining silent or acquiescing in the contract for a period of time after he has the opportunity to avoid it, or by acting upon it, performing under it, or affirmatively acknowledging it."  *U. S. v. Twenty Miljam-350 IED Jammers*, 669 F.3d 78, 89 (2d Cir. 2011) (citations omitted).

77.     New York law is clear that the burden of proof rests upon the party asserting ratification.  *Ryan v. Presco*tt, No. 5466–11, 2013 WL 1150216, at \*8 (N.Y. Sup. Ct. Feb. 24, 2013).  Parties failing to present sufficient and persuasive evidence as to ratification will not meet this burden.  *See Playboy Enters. Inc. v. Dumas*, 960 F. Supp. 710, 722 (S.D.N.Y. 1997) (plaintiff failed to prove ratification because, among other factors, plaintiff "points to no persuasive evidence that [principal] knew that his agents" signed various agreements).   That is the case here, as Plaintiffs cannot cite to any conduct by the sovereign state of the DRC, or parties authorized to act on its behalf, that demonstrate a ratification of the 2003 Acknowledgement.

## 1.     Ratification of the 2003 Acknowledgement Can Only Be Accomplished By the Principal – The Sovereign State of the DRC.

78.     As is the case for the apparent authority doctrine, precision is important in analyzing whether the sovereign state of the DRC subsequently ratified the 2003 Acknowledgement.  Under New York law, the party ratifying an agreement must have the power to ratify, and "[r]atification must be made by the person intended as principal." 24 N.Y. Jur. 2d Agency § 189 (2013).  Stated differently, an agent cannot ratify his own unauthorized act.  *See Council Commerce Corp. v. Sterling Navigation*, 444 F. Supp. 1043, 1049 (S.D.N.Y. 1977)

(citing *Giebler Mfg Co. v. Kranenberg*, 92 N.Y.S. 843 (2d Dept. 1905) (finding where an individual "was the very person personally liable for the loan and as such he 'could not effect a corporate ratification of his own unauthorized act by further action of his own, unknown to the company he purports to represent.'").

79.     Similarly, in the context of ratification by governments, it has been held that "[o]nly a government employee with actual authority can make an otherwise unauthorized agreement binding by ratifying it."  *Adamowicz v. U. S.*, 101 Fed. Cl. 485, 490 (2011) (citing *Winter v. Cath-DR/Balti Joint Venture*, 497 F.3d 1339, 1346–47 (Fed. Cir. 2007)); *see also Budge v. Town of Millinocket*, 55 A.3d 484, 491-92 (Me. 2012) (finding no ratification when town council, which had sole authority through town charter to authorize payments to employees, never did so, because "when a principal is a government, the government can only ratify through a legally operative action."); *Harbert/Lummus Agrifuels Projects v. U. S.*, 142 F.3d 1429, 1433–34 (Fed. Cir. 1998) ("Agreements made by government agents without authority to bind the government may be subsequently ratified by those *with authority* if the ratifying officials have actual or constructive knowledge of the unauthorized acts....") (citing *U.S. v. Beebe*, 180 U.S. 343, 354 (1901)) (emphasis added); Restatement (Third) of Agency § 3.04 cmt. d (2006) ("the legally operative actions that may be taken by governments and subdivisions of governments are often specified by statute, constitution, or charter," and this "limits a governmental principal's capacity to authorize agents.").

80.     Put simply then, only those ministries or governmental bodies within the DRC having authority to bind the state could have ratified the 2003 Acknowledgement after the fact. Given the budgetary implications of the Acknowledgement, only the Council of Ministers could have done so.  *See* Conclusions of Law ¶¶ 7-12, *supra.*.

81.     As discussed below, there is no record of the Council of Ministers, or any other DRC agency capable of binding the state, engaging in any conduct after 2003 that reflected any awareness of the 2003 Acknowledgement, much less any intent to ratify it.

**2.     There Is No Evidence to Suggest That the Sovereign Had Full Knowledge of the Material Facts Concerning the 2003 Acknowledgement.**

82.     Plaintiffs' argument is fatally flawed, because they have no evidence to demonstrate the most fundamental requirement of the ratification doctrine – namely, that the principal, the sovereign state of the DRC through those ministries or governmental bodies having authority to bind it, had *full material knowledge of the 2003 Acknowledgement*.  To ratify an agreement, a principal must have "full knowledge of the material facts relating to the transaction, and the assent must be clearly established and may not be inferred from doubtful or equivocal acts or language."  *Cnty. of Monroe*, 48 A.D.3d at 1239.[37] The "burden of establishing that a ratification was made with knowledge is on the party attempting to establish that ratification occurred."  24 N.Y.  Jur. 2d Agency §  192 (citing RESTATEMENT (THIRD) OF AGENCY  §  4.06, comment b).

83.     Material facts are those "which substantially affect the existence or extent of the obligations involved in the transaction, as distinguished from those which affect the values or inducements involved in the transaction."  RESTATEMENT (SECOND) OF CONTRACTS § 91

---

[37]     To the extent that Plaintiffs attempt to argue that an agent's knowledge as to his or her unauthorized actions can be imputed to the principal for purpose of satisfying the knowledge requirement of a ratification theory, that effort misses the mark.  Such a finding would obviate the need for a ratification theory entirely, as knowledge of an agent's unauthorized acts could always be imputed to the principal, and therefore establish ratification.  *See Long Island City Sav. & Loan Ass'n v. Skow*, 25 A.D.2d 880, 882 (N.Y.A.D. 1966) (finding it unreasonable "impute the knowledge of… an agent, to [the principal] for the purpose of making out a ratification… for then it would have to be said that principals necessarily ratify all unauthorized conduct.").

(1958).  New York courts typically define material facts as including knowledge of the agent's conduct.  *See Matter of N.Y. State Med. Transporters Ass'n*, 77 N.Y.2d  at 130  (finding a government agency did not have full knowledge of the material facts of its agents who were acting outside of the law because "there has been no showing that respondent knew of and intentionally condoned its agent's practice").

84.   If the principal is unaware of his lack of knowledge of material facts, he is not bound by a ratification.  *In re Motors Liquidation Co.*, 486 B.R. 596, 636 (S.D.N.Y. 2013).

85.   There is no evidence that the one body capable of ratifying the 2003 Acknowledgement – *i.e.*, the Council of Ministers – ever did so.[38]  Although there were post-2003 communications from various DRC officials discussing the London Club debt, these communications originated from either the Ministry of Finance or the Central Bank.  *See, e.g.,* Ex. P37 at UB00001031-1032 (March 28, 2003 letter from Masangu to Bank of Tokyo), Ex. P40 at CITI0001108-1113 (February-March 2003 meeting and follow-up correspondence between Central Bank and Bank of Tokyo); Ex. P41 at UB00000556-557 (September 2003 meetings between Central Bank and Bank of Tokyo); Ex. P42 at CITI0001218 (September 2003 meeting between Central Bank and Citibank); Ex. P35 at UB00001268, Ex. P43 at UB00001915 (September 2003 meeting between Central Bank and London Club); Ex. P45 at UB00000938-939 (June 2004 meetings with World Bank); Ex. P47 at UB00000950-951 (March 2005 meetings between Ministry of Finance, Ministry of Budget and Union Bank); Ex. P53 at UB00001500

---

[38]   It is Defendants' understanding that Plaintiffs plan to argue that because the 2003 Acknowledgement was produced in discovery, that "proves" that the Council of Ministers, the only body capable of ratifying it, had knowledge of the Acknowledgement and therefore silently acquiesced to it after the fact.  This theory requires the Court to assume that documents produced from the ministry that signed the Acknowledgement were somehow known to the Council of Ministers this entire time.  Needless to say, this theory is based on absolutely no evidence in the record and cannot satisfy the Plaintiffs' burden to demonstrate that the principal, the Council of Ministers, had full knowledge of the material facts relating to the 2003 Acknowledgement.

(Certificate of Outstanding Debt signed by representatives from Central Bank); Ex. P74 at DRC00003523-3526, Ex. P75 at DRC00003545-3546, Ex. P66 at DRC00003556, and Ex. P115 at DRC00003569-3570 (2011 correspondence between Ministry of Finance, Central Bank, Union Bank, and London Club creditors); Ex. P106 at DRC00003714-3717, Ex. P65 (excerpts from 2007 and 2011 Annual Reports of the Central Bank).

86.     Moreover, even if any of these communications could somehow evidence knowledge on the part of the DRC, none of them mention or discuss the 2003 Acknowledgement in any way.  This deficiency is fatal to Plaintiffs' argument, because *a showing of material knowledge requires clear evidence of knowledge of the agent's specific act.  See Matter of New York State Med. Transporters Ass'n*, 77 N.Y.2d at 131  (finding a government agency did not have full knowledge of the material facts of its agents who were acting outside of the law because "there has been no showing that the respondent knew of and intentionally condoned *its agent's practice.*") (emphasis added).   Put simply, there is no document in the record indicating that anyone outside the Ministry of Finance or Central Bank was aware of the 2003 Acknowledgement.   Absent material knowledge on the part of the Council of Ministers, Plaintiffs' ratification argument fails.

<h3 style="text-align:center">3.     The DRC Took No Steps to Ratify the 2003 Acknowledgement.</h3>

87.     Even if Plaintiffs could somehow demonstrate that the Council of Ministers had full knowledge of the material facts as to the 2003 Acknowledgement – which they cannot – their ratification theory still fails, because they must demonstrate some conduct by the DRC that approved Luongwe's and Masangu's signatures on the 2003 Acknowledgement.  Under New York law, full knowledge of the material facts must be accompanied by either conduct affirming the agent's action, or a timely failure to repudiate relied upon by the other party to the contract. *36 Convent Avenue HFDC v. Fishman*, No. 03 Civ 3998 (JGK), 2004 WL 1048213, at *5

(S.D.N.Y. May 7, 2004).   Therefore, any conduct suggesting ratification of debt obligations under the Credit Agreement, as opposed to the 2003 Acknowledgement's extension of the statute of limitations, is irrelevant to whether the DRC ratified the 2003 Acknowledgement.

88.     As an initial matter, it is questionable whether, under New York law, a government actor can ratify a contract by simply accepting benefits or remaining silent.   In *Elia v. Highland School Dist*., 78 A.D.3d 1265, 1269-1270 (3d Dept. 2010), which involved a dispute over an agreement as to employee health insurance benefits, a New York state appellate court found that a local school board had not ratified the extension of such benefits to current and retired employees, because (1) only the School Board had the power to enter agreements to provide such benefits, and the Board did not do so; and (2) the Board took no subsequent action that was "specifically grounded upon [the] written agreements" which would constitute a ratification.   *Id.*.

89.     In other words, under New York law, for a government actor to ratify an unauthorized agreement, it must take affirmative action *pursuant to some language within the contract itself.  See also East Hampton Union Free School Dist. v. Sandpebble Builders, Inc*., 90 A.D.3d 815, 817 (2d Dept. 2011) (holding that contracts "not approved by a relevant municipal or governmental body, as required by law, rule or regulation, may be ratified by the municipality or government body by subsequent conduct, such as by making payments pursuant to the contract.").   Under this analysis, the first two means of ratification – acceptance of benefits and silence – are simply not relevant in the context of a government actor.

90.     However, regardless of the appropriate standard for a government actor, Plaintiffs cannot establish ratification by the DRC.   As discussed above, a principal may typically ratify an agent's unauthorized act by accepting benefits under the agreement, remaining silent or

acquiescing to the transaction in question, or performing under the conditions of the agreement. No such conduct can be attributed to the DRC here.

> **a.   The DRC Accepted No Benefits Under the 2003 Acknowledgement.**

91.    Even if the DRC, a government actor, could have ratified the 2003 Acknowledgement by mere acceptance of benefits, Plaintiffs cannot meet their burden to show that such an acceptance occurred.   More specifically, the DRC could not have accepted any benefits under the 2003 Acknowledgement, as there were no such "benefits" allotted to the DRC. The 2003 Acknowledgement refers only to the respective obligations of the DRC and the Central Bank.   Ex. P22 at CITI0000202.   And, the Acknowledgement was not signed by any creditor. Certainly, nothing in the text indicates that there was any benefit promised to the DRC.

92.    Nor were any benefits realized.   While Plaintiffs have suggested that the DRC benefited by avoiding litigation, the record does not support that claim.   As Mr. Masangu discussed in his deposition, it was the DRC's understanding that there was never supposed to be litigation originating from the London Club under the Credit Agreement.   Ex. P79 at 41:10-18.[39] Moreover, the instant suit is proof that any protection afforded to the DRC from suit by the 2003 Acknowledgement was illusory at best.   Accordingly, there was no "benefit" gained by the DRC from the 2003 Acknowledgement, and Plaintiffs' ratification theory cannot be satisfied by any acceptance of such purported benefits.

---

[39]    It is also far from clear that there was ever any real threat of litigation at the time the 2003 Acknowledgement was signed.   Ex. P80 at 96:14-25; 97:3-15; 135:2-10 (when asked "am I correct that had they refused to sign you would have brought suit", Bartner responded: "No. We would have had to convene meetings of banks to determine that"). With less than two weeks remaining before the statute of limitations would have run out on the 1997 Acknowledgement (assuming its validity), Bartner had not spoken to an attorney. *Id*.

      **b.**      **There Is No Evidence Of Informed Silence or Acquiescence by the DRC.**

93.    Nor can Plaintiffs establish the DRC's ratification of the 2003 Acknowledgement through silence or acquiescence.  First, absent clear evidence of awareness of the 2003 Acknowledgement by the Council of Ministers – and such evidence does not exist – Plaintiffs cannot establish that any "silence" on the part of the DRC has any relevance to this case.  As explained above, the only competent organ of the State that could have authorized the 2003 Acknowledgment was the Council of Ministers.  Yet the Council of Ministers never authorized the 2003 Acknowledgement nor was it aware of its existence.  The DRC, through the Council of Ministers, could not ratify by silence a document of which it was unaware.

94.    Moreover, in complex circumstances, such as the political circumstances in the DRC both before and after the 2003 Acknowledgment was signed, the DRC's silence as to the 2003 Acknowledgement cannot be presumed to ratify the Acknowledgement.  Silence in complex circumstances is insufficient to constitute ratification.  *See In re Adelphia Recovery Trust*, 634 F.3d 678, 693-94 (2d Cir. 2011) ("[w]here the allegedly ratifying party's silent acquiescence to a transaction credibly appears to have resulted from the complexity of the situation rather than intent, ratification does not occur.").  Moreover, as already stated, under New York law, government actors cannot ratify an unauthorized act by subsequent silence.  *Elia*, 78 A.D.3d at 1269-1270.  Accordingly, Plaintiffs cannot establish ratification of the 2003 Acknowledgement through the DRC's silence.

      **c.**      **The DRC Did Not Perform Under the 2003 Acknowledgement.**

95.    Finally, while it is clear under *Elia* that government performance pursuant to a disputed  contract can establish ratification of a government agent's action under New York law, there was no such performance here.  First, as already discussed, the 2003 Acknowledgement is a

one-sided agreement, whereby Luongwe and Masangu simply recognized the DRC's outstanding debt and agreed to extend the statute of limitations.  Ex. P22 at CITI0000202.  The 2003 Acknowledgement says nothing about additional obligations by the DRC.  Quite simply, there was nothing additional for the DRC to "perform" under the 2003 Acknowledgement once it was signed.

96.     Because Plaintiffs cannot meet their burden to establish material knowledge of the 2003 Acknowledgement by the Council of Ministers, or any informed affirmative conduct suggesting a ratification of the 2003 Acknowledgement by the Council of Ministers, their ratification theory fails.

### G.     Compound Interest

97.     Even assuming that the Plaintiffs could establish that their suit was timely filed and that the DRC can be held liable in this action, their request for damages should be denied to the extent they seek any form of compound interest (i.e., interest on interest).

98.     There is no dispute that because the DRC failed to make payments of principal when due, interest on that overdue principal began to accrue under Section 3.05(a) of the Credit Agreement.  Ex. P10 § 3.05(a) at UB00000638 (providing for the payment of interest on unpaid principal from "the date such principal amount is due to the date such principal amount is paid in full").  Plaintiffs, however, seek not only to recover more than $46 million in principal *and* interest on that overdue principal, but another *$41 million in additional interest* consisting of: (1) interest *on interest* on overdue principal; and (2) interest *on interest on interest*, interest *on interest on interest on interest* and so on *ad infinitum* (or, what they refer to, as Generation 3+ interest). *See* Exs. P91 & P92. In seeking these latter two forms of interest, Plaintiffs substantially overreach and demonstrate a fundamental misunderstanding of the Credit Agreement and the parties' course of dealing for the last three decades.

    1.    **Under the Express Terms of the Credit Agreement, Plaintiffs are Not Entitled to "Interest on Interest on Overdue Principal" Because No Demand for "Interest on Overdue Principal" Has Been Made.**

99.    To the extent permitted by law, the Credit Agreement provides for the payment of interest on interest on overdue principal. Ex. P10 § 3.05(d) at UB00000639.[40] Such interest, however, only accrues on "interest which is not paid *when due*." *Id*. (emphasis added). Unlike the various categories of regular interest for which the Credit Agreement provides specific due dates, *see id*. §§ 3.01-03 at UB00000637, no due date is specified for interest on overdue principal. Rather, such interest is "payable on demand[.]" *Id*. § 3.05(a) at UB00000638. It necessarily follows that interest on any such interest does not accrue until after such a demand is made.

100.    There is no evidence that Plaintiffs' predecessors in interest ever made a demand for interest on overdue principal and, without such a demand, no additional interest on that category of interest could accrue under Section 3.05(d).[41]

---

[40]    Historically, compound interest has been disfavored under New York law and courts consistently found agreements for such interest to be void as against public policy. *See In re Chateaugay Corp.*, 170 B.R. 551, 555 (Bankr. S.D.N.Y. 1994) (citations omitted). *See also Matter of Estate of Jackson*, 508 N.Y.S.2d 671, 673-74 (3d Dep't 1986); *In re Rosner*, 48 B.R. 538, 558 (Bankr. E.D.N.Y. 1985); *Giventer v. Arrow,* 37 N.Y.2d 305, 308 (1975). This was the law in New York at the time the Credit Agreement was executed in 1980. In 1989, however, the New York legislature enacted General Obligations Law Section 5-527 which, in certain cases, provides that a "loan or other agreement providing for such compound interest" is enforceable. *See* N.Y. Gen. Obl. Law § 5-527(1).

[41]    Plaintiffs' calculations improperly assume that interest on overdue principal becomes automatically due and payable on a monthly basis, rather than "on demand." See Exs. P91 & P92. *See also* Transcript of Telephonic Conference before the Hon. Magistrate Judge Fox, September 13, 2010 Tr. at 5:6-8 (asserting that "each month that Congo fails to pay the interest that came due the preceding month an additional generation of interest is added to the calculation"). The Credit Agreement, however, says no such thing. To the contrary, under Section 3.05(a), interest on overdue principal becomes due and payable "on demand". In an effort to find textual support for their flawed assumption, Plaintiffs point to Section 3.05(b) which creates "Overdue Periods of one Month" and argue that interest is due at the end of each

101.   The record provides a compelling explanation for the absence of such a demand —*i.e.*, a general recognition dating as far back as 1980 that the country's debt burden was unsustainable and a consistent understanding for more than two decades that the debt would need to be negotiated.   Presumably for this reason, there is no evidence that Plaintiffs' predecessors sought to trigger yet an additional category of penalty interest by making a formal demand for interest on overdue principal.

102.   The conclusion that interest on interest on overdue principal has not accrued is consistent with the parties' course of dealing over the last 30 years.   In that regard, the record does not contain any evidence indicating that any of the original parties to the Credit Agreement or any bank, outside of litigation, included compound interest in their calculation of amounts owed under the Credit Agreement.    Similarly, the servicing bank did not include compound interest in its interest calculations either.   This is reflected by numerous discussions between the parties, as well as spreadsheets and charts, which discuss principal and interest, but omit any reference to compound interest.   *See* Ex. P11 at UB00002460 (March 1991 Union Bank schedule of amounts owed); Ex. P17 at CITI0003701; 3703 (1991 Acknowledgement and attached Schedule 1); Ex. P40 at CITI0001108-1113 (July 2003 correspondence and attached spreadsheet from Bank of Tokyo); Ex. D18 at UB0001517-1520 (faxed letter from Union Bank to DRC, with

---

Overdue Period.  This argument is flawed for at least two reasons.  First, Plaintiffs' argument is belied by Section 3.05(b) which makes clear that  "Overdue Periods" are to be used only "for purposes of *determining the interest rate*" to be applied.  *See* Ex. P10 § 3.05(b) at UB00000638. ("*For purposes of determining the interest rate* pursuant to subsection (a) above, the period between the date the principal amount referred to therein is due and the date such principal amount is paid in full shall be divided into Overdue Periods of one Month[.]") (emphasis added). Second, if the parties had intended to make interest due at the end of each Overdue Period, they could have clearly said so.  Indeed, Section 3.03 of the Agreement – dealing with regular interest – specifically provides that "such [contractual] interest [is] to be due and payable on the last day of each Interest Period."  *See* Findings of Fact ¶ 42(c), *supra*.  Importantly, no such language appears in Section 3.05 with respect to "Overdue Periods."

accompanying spreadsheet of amounts owed); Ex. D19 at UB00000980-982 (Union Bank spreadsheet of amounts owed as of April 1, 2005); Ex. P53 at UB00001500 (November 2007 certificate of total outstanding debt under the Credit Agreement); Ex. D20 at UB00001958 (April 2008 email from Gindraux to Central Bank with total amounts owed); Ex. D23 at UB00001349 (discussion of April 17, 2009 correspondence from Union Bank to Dechert, with no calculation of compound interest).

103.    Most tellingly, at a September 2003 London Club meeting of banks which were party to the Credit Agreement, those banks agreed with provisional numbers compiled by the Bank of Tokyo as to outstanding principal and interest.   These numbers did not include compound interest.  Ex. D14 at CITI00001761.

104.    At the September 2003 meeting, the banks also specifically "approved [Bank of Tokyo's] interests' computation methodology – i.e., *no interest on interest should be considered in the numbers*."  *Id.* (emphasis added).  The minutes of the meeting, taken by Citibank's Michel Losembe, noted that this agreed upon methodology "remains is [sic] consistent with all numbers communicated to agents *since the Agreement is effective*."  *Id.* (emphasis added).[42]

105.    Thus, pursuant to the terms of the Credit Agreement and the longstanding practice of the parties to that Agreement, the Plaintiffs are not entitled to interest on interest on overdue principal.  *See Gulf Ins. Co. v. Transatlantic Reinsurance Co.*, 886 N.Y.S.2d 133, 143-44 (1st Dep't 2009) ("[T]he practical interpretation of a contract by the parties to it for any considerable period of time before it comes to be the subject of controversy is deemed of great, if not controlling, influence.");  *United Fire & Casualty Co. v. Arkwright Mut. Ins. Co.*, 53 F. Supp. 2d

---

[42]    Notably, of the approximately $18 million in principal that Plaintiffs claim title to under the Credit Agreement, they purport to have acquired approximately 90 percent of their interest in such debt from Citibank.   Ex. P55 at PLAINTIFFS0000495-99;  Ex. P57 at PLAINTIFFS0000446-66.

632, 640-41 (S.D.N.Y. 1999) ("[T]he parties' course of performance of a contract is relevant to understanding the contract *even if the contract is unambiguous*… An interpretation of the contract in practice, prior to litigation, can constitute evidence of the parties' intent.") (emphasis added) (citations omitted).

### 2.   Under No Circumstances Does the Credit Agreement Provide for the "Generation 3+" Interest the Plaintiffs Seek.

106.    In addition to seeking interest on interest on overdue principal, Plaintiffs also seek yet an *additional* form of compound interest which they would not be entitled to under *any* circumstances.  Specifically, in addition to overdue principal, interest on overdue principal *and* interest on interest on overdue principal, Plaintiffs claim that they are entitled to an additional $18 million which they call "Generation 3+ interest."  Even assuming a demand had been made for interest on overdue principal and Plaintiffs were entitled to interest on such interest, there is no provision in the Credit Agreement which would entitle them to this additional "Generation 3+ interest".

107.    The Plaintiffs' claim for "Generation 3+ interest" amounts to a claim that interest on overdue interest, itself a form of compound interest, should then be further compounded on a monthly basis.  Thus, the so-called "Generation 3+ interest" requested by Plaintiffs is yet an additional form of compound interest which the agreement does not provide for.  For this reason, it should be denied because, under New York law, compound interest is available only where the parties' agreement expressly authorizes it.  *See, e.g., In re West Bushwick Urban Renewal Area Phase 2*, 855 N.Y.S.2d 582, 583 (2d Dep't 2008) (where the "agreement and note at issue did not include a provision expressly authorizing it to compound interest . . . compound interest is not recoverable").

108.    Section 3.05(d) provides for interest on overdue interest; it does not, however, provide that such interest itself should then be compounded.  Rather, it says only that such interest is "to accrue from the due date of such interest until payment in full thereof."  Ex. P10 § 3.05(d) at UB00000639.  While Section 3.05(d) also provides that such interest "be calculated on the basis of successive Overdue Periods of one Month[,]" *id.,* the Credit Agreement makes clear that "Overdue Periods" are to be used only "[*f*]*or purposes of determining the interest rate*" to be applied to such interest calculations.  *Id*. § 3.05(b) at UB00000638 (emphasis added).  *See also* note 41, *supra*.  Nowhere does Section 3.05(d) state that interest on overdue interest is to be added back to the sum of principal and used as a basis for calculating additional future interest. Further, such interest is not payable on a monthly basis, but rather, pursuant to the express terms of the Agreement, is due and payable "on demand." [43]   Courts have routinely found that similar provisions which provide for the periodic calculation of interest, but which do not provide that the calculation be compounded, are not "express" agreements for compound interest.  *See, e.g., In re City of New York*, No. 35057/04, 2006 WL 2446140, at *1 (N.Y. Sup. Kings County, Aug. 24, 2006), *aff'd sub nom. In re West Bushwick Urban Renewal Area Phase 2*, 855 N.Y.S.2d 582 (provision stating that interest 'be computed . . . at the rate of [13%] per annum, and to be paid . . . monthly . . . until . . . the unpaid principal and interest should become due and payable" did not constitute agreement to pay compound interest); *Utilisave Corp. v. Benjamin Shapiro Realty Co., L.P.*, 723 N.YS.2d 669, 670 (1st Dep't 2001) ("the provision indicating that interest would 'accrue' at a rate of 1.5% per month did not constitute agreement to pay compounded interest").

---

[43]    Plaintiffs' claim for "Generation 3+ interest" assumes that interest accruing under Section 3.05(d) becomes due on a monthly basis, and thus becomes the basis for a successive generation of interest on interest.  Exs. P91 & P92.  This assumption cannot withstand Section 3.05 which specifically provides that interest on overdue interest is payable "on demand."  Ex. P10 § 3.05(d) at UB00000639.

109.    In support of their claim that interest on interest should be further compounded, Plaintiffs have noted that Section 3.05(d) provides for interest "on *all* interest which is not paid when due hereunder" and argued that "all" such interest itself includes compound interest and thus provides for successive generations of interest on top of interest on top of interest.  Ex. P10, § 3.05(d) at UB00000639 (emphasis added).  This interpretation is both circular and unreasonable.  If the parties to the Credit Agreement had intended to provide for compounding of all interest on a monthly basis, they could have simply said so.  Tellingly, they did not.  Instead, the reference to "all interest . . . due hereunder" simply refers to interest provided for elsewhere in the Agreement – *e.g.*, interest on overdue principal, *id.* § 3.05(a) at UB00000638. Accordingly, Section 3.05(d) cannot be read to call for anything other than a single generation of interest on overdue interest.

### 3.    Neither Plaintiffs' Calculations Nor Those of "Red Barn" Are Controlling.

110.    In support of their damages claim, Plaintiffs rely solely on interest calculations purportedly prepared on their behalf and calculations purportedly prepared by supposed agent "Red Barn Capital LLC".[44]   Exs. P91, P92 & P105.   Plaintiffs' reliance on each of these calculations is misplaced.

111.    First, Plaintiffs have not produced any evidentiary foundation for any of the calculations they rely on.  Accordingly, these calculations constitute unauthenticated hearsay and are inadmissible.

---

[44]    "Red Barn" is the entity from whom Themis Capital purportedly obtained its interest in the debt.  See Ex. P55.  Aside from their own calculations and the virtually identical calculations of Red Barn – both of which were prepared after this litigation was filed and for the apparent purpose of being submitted in support of the Plaintiffs' claims –  Plaintiffs offer no other calculations or records from any agent bank in support of their claim for compound interest.

112.    Second, even assuming that these calculations are admissible, none are credible. All of the calculations relied upon by the Plaintiffs were clearly prepared after this litigation began and solely for the purpose of this litigation.   Neither Plaintiffs nor "Red Barn" were original parties to the Credit Agreement.   According to their own submissions, Themis Capital received its purported interest in the debt (from "Red Barn") just months before filing suit and Des Moines Investments, Ltd. received its purported interest mere days before filing suit.   To the extent that the Plaintiffs now claim they are entitled to recover not only $46 million in principal and late interest, but also more than $40 million in various forms of compound interest, their sweeping calculations are inconsistent with the extended course of performance between the servicing bank and other parties to the Credit Agreement which specifically excluded compound interest from the calculations of outstanding debt.

113.    Notwithstanding all of the foregoing facts, Plaintiffs claim that their proffered interest calculations and the strikingly similar calculations of Red Barn are controlling under Section 5.5(d) of the Credit Agreement and should trump all other evidence, including the historical records and calculations of the servicing bank, which demonstrate that they are not entitled to compound interest. [45]   That claim fails.

114.    Section 5.05 provides that each Bank (with respect to Credits owed to it), each Agent (with respect to Credits of its Syndicates) and the Servicing Bank (with respect to all Credits) "*shall maintain on its books control accounts* setting forth the amounts of principal, interest and other sums paid and payable by the Obligor from time to time hereunder."  Ex. P10 § 5.05 at UB00000650 (emphasis added).  Section 5.05 provides that, in the event of a dispute, such control accounts are to constitute "prima facie evidence of the amount of such Credit and of

---

[45]    Notably, the so-called "Red Barn" calculations appear to have been generated at the same time and by the same source that generated the Plaintiffs' calculations.

such amounts paid and payable." *Id.* In case of a discrepancy, it provides that "each Agent's account shall be considered correct in the absence of manifest error with respect to Credits of its Syndicates[.]" *Id.*[46]

115. As an initial matter, then, neither Plaintiffs' nor Red Barn's calculations are controlling under Section 5.05 because they reflect "manifest error" in that, to the extent they include compound interest, they cannot be reconciled with the express terms of the Credit Agreement and the parties' course of performance thereunder.

116. Furthermore, Section 5.05 was clearly intended to assign some credibility and evidentiary weight to historical accounting records or "control accounts" of the parties to the Credit Agreement. The calculations upon which Plaintiffs rely do not constitute such "control accounts", but rather unauthenticated spreadsheets generated during the pretrial process and apparently for the sole purpose of advancing the litigation position of two vulture funds who purchased the debt after it had been in default for more than two decades. Notably too, to the extent they include compound interest, the calculations submitted by Plaintiffs and Red Barn are inconsistent with the records of Citibank, from whom Plaintiffs purport to have obtained most of their interest in the debt and in whose shoes the Plaintiffs now purport to stand. *See* Exs. D11, D12 and D14 at CITI0001761. Section 5.05 cannot be reasonably interpreted to allow Plaintiffs or "Red Barn" to manufacture interest calculations out of whole cloth solely for the purpose of

---

[46]  Even assuming the so-called "Red Barn" calculations were admissible and entitled to any evidentiary weight (which they are not), the calculations on their face appear to be limited only to the Syndicate under Credit Schedule A-21. *See* Ex. P105. Only Plaintiff Des Moines purports to hold any interest in that Schedule and that interest amounts to only a small fraction of the total amount of the principal Des Moines purports to hold. Red Barn's calculations have no bearing on the calculations for any of the other syndicates for which it does not serve as Agent. *See* Ex. P10 § 5.05 at UB00000650 (providing that the Agent keeps books only "with respect to Credits of *its* Syndicates" while the Servicing Bank keeps books "with respect to *all* the Credits") (emphasis added).

advancing a damages claim that is inconsistent with the overwhelming weight of evidence and then deem those calculations to be binding.[47]

117.    In summary, the Plaintiffs' claim for compound interest cannot be reconciled with the law, the express terms of the Credit Agreement and the course of performance of the parties to that Agreement for over 30 years.  For all of these reasons, the Plaintiffs are not entitled to recover interest on any interest under the Credit Agreement.

---

[47]    Plaintiffs also rely on Section 3.05(c) in claiming that their interest rate calculations are controlling.  Their reliance on this provision is similarly misplaced.  Section 3.05(c) – which precedes the discussion of compound interest in Section 3.05(d) – provides that:

> Without prejudice to the rights of any Bank under the foregoing provisions of this Section 3.05, the Obligor shall indemnify each Bank against any loss or expense which it may sustain or incur as a result of the failure by the Obligor to pay when due any principal of any Credit, to the extent that any such loss or expense is not recovered pursuant to such foregoing provisions but excluding any loss of profits.  A certificate of any such Bank setting forth the basis for the determination of *the interest due on overdue principal* and of the additional amounts necessary to indemnify such Bank pursuant to this subsection (c) in respect of such loss or expense, submitted to the Obligor, shall be conclusive and binding for all purposes in the absence of manifest error.

Ex. P10, §3.05(c) at UB00000638 (emphasis added).    Again, Plaintiffs' calculations are not conclusive and binding under Section 3.05(c) because their calculations demonstrate "manifest error" in that they cannot be reconciled with the terms of the Credit Agreements or the parties' course of dealing thereunder.  Further, Section 3.05(c) is also inapposite to the Plaintiffs' claim for compound interest as the only interest it refers to is "the interest due on overdue principal" and not interest on interest.

## IV.    CONCLUSION

For all of the foregoing reasons, the Plaintiffs' claims should be dismissed and judgment

entered in favor of the Defendants.

Respectfully submitted,

DLA PIPER LLP

By: _____/s/_____

Dated:  New York, New York
        November 12, 2013

Douglas Walter Mateyaschuk
1251 Avenue of the Americas
New York, NY 10020-1104
(212) 335-4984 (phone)
(212) 884-8455 (fax)
douglas.mateyaschuk@dlapiper.com

Tara M. Lee
DLA Piper LLP (US)
One Fountain Square
Suite 300
Reston, Virginia 20910-5602
(703) 773-4150 (phone)
(703) 773-5150 (fax)
tara.lee@dlapiper.com

Sara Moghadam
DLA Piper LLP (US)
500 Eighth Street, NW
Washington, DC 20004
(202) 799-4512 (phone)
sara.moghadam@dlapiper.com

*Attorneys for Defendants Democratic Republic of Congo and Central Bank of the Democratic Republic of the Congo*