UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------- x
THEMIS CAPITAL and                              :
DES MOINES INVESTMENTS LTD.,      :        No. 09 Civ. 1652 (PAE)
                                                              :
                        Plaintiffs,                   :
v.                                                           :
                                                              :
DEMOCRATIC REPUBLIC OF CONGO    :
and CENTRAL BANK OF THE                 :
DEMOCRATIC REPUBLIC OF THE         :
CONGO,                                                 :
                                                              :
                        Defendants.                 :
-------------------------------------------------- x

## PLAINTIFFS' (CORRECTED) PRETRIAL MEMORANDUM

DECHERT LLP
   Dennis H. Hranitzky
   (dennis.hranitzky@dechert.com)
   Debra D. O'Gorman
   (debra.ogorman@dechert.com)
1095 Avenue of the Americas
New York, New York  10036
(212) 698-3500

*Attorneys for Plaintiffs Themis Capital*
*and Des Moines Investments Ltd.*

Dated:  January 7, 2014

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................1

STATEMENT OF FACTS RELEVANT TO AUTHORITY ISSUES ...........................5

I.      THE CREDIT AGREEMENT ................................................................5

II.     THE DEFENDANTS' DEFAULT AND THE 1991 ACKNOWLEDGEMENT
        LETTER ..................................................................................................7

III.    THE 1997 ACKNOWLEDGEMENT LETTER, AND DEFENDANTS'
        UNDERSTANDING AND ACCEPTANCE OF ITS BENEFITS ...................8

IV.     DEFENDANTS' OVERTURES TO CREDITORS LEADING UP TO THE 2003
        ACKNOWLEDGEMENT LETTER ............................................................12

V.      THE 2003 ACKNOWLEDGMENT LETTER ...........................................14

VI.     DEFENDANTS' CAMPAIGN TO OBTAIN HIPC FUNDING, AND THEIR
        REPEATED ASSURANCES TO CREDITORS THAT THE CREDIT AGREEMENT
        REMAINED ENFORCEABLE ..................................................................16

VII.    THE 2009 ACKNOWLEDGEMENT LETTER, AND DEFENDANTS' CONTINUED
        OVERTURES AND ASSURANCES TO CREDITORS ...............................22

PROCEDURAL HISTORY AND LAW OF THE CASE ....................................26

ARGUMENT ..............................................................................................27

I.      THE SIGNATORIES TO THE 2003 ACKNOWLEDGEMENT LETTER HAD
        ACTUAL AUTHORITY TO BIND THEIR PRINCIPALS UNDER DRC LAW..........27

        A.      The Finance Minister's Authority To Sign The 2003 Acknowledgement  Letter
                On Behalf Of The DRC Came From Ordinance 80-073. ....................................28

        B.      The Governor Of The Central Bank Had Authority To Sign The 2003
                Acknowledgement Letter Under Act 005/2002. ...........................................29

        C.      Decree 28/2002 Did Not Strip The Signatories To The 2003 Acknowledgement
                Letter Of Their Authority To Bind Defendants To That Letter. .........................30

II.     THE DEFENDANTS RATIFIED EACH OF  THE ACKNOWLEDGEMENT
        LETTERS. ..............................................................................................32

        A.      At Least Five Of The Persons To Have Served As Finance Minister Since 1997
                Understood The Significance Of The Acknowledgement Letters While They
                Held That Position ...............................................................................35

        B.      The Finance Minister's Understanding Of The Acknowledgement Letters Can
                Be Imputed To The Council Of Ministers. ..............................................36

        C.      OGEDEP's Knowledge Of The Acknowledgement Letters Can Also Be
                Imputed To The Council Of Ministers.  ..................................................38

# TABLE OF CONTENTS
### (continued)

**Page**

    D.     The Council Of Ministers' Knowledge Of The Material Facts Can Be Inferred From Other Actions Of The Defendants. ..............................................................39

III.    THE SIGNATORIES TO THE 2003 ACKNOWLEDGEMENT LETTER HAD APPARENT AUTHORITY TO BIND THEIR PRINCIPALS. ......................................40

    A.     Defendants' Actions Created The Appearance That The Finance Minister And Governor Had Authority To Acknowledge The Credit Agreement, And Citibank Reasonably Relied On Those Actions. ..............................................................41

    B.     The Circumstances Surrounding The 2003 Acknowledgement Letter Did Not Give Rise To A Duty Of Inquiry. ...................................................................45

IV.    THE CENTRAL BANK CAN BE SUED TO RECOVER THE DEBT TO PLAINTIFFS OUTSTANDING UNDER THE CREDIT AGREEMENT......................47

    A.     The Central Bank's Obligation To Pay The Debt Owed Under The Credit Agreement Is Evidenced Both By The Language Of The Agreement, And By The Acknowledgement Letters.......................................................................48

    B.     The Central Bank Has Foreign Currency Sufficient To Satisfy Plaintiffs' Claims..................................................................................................52

    C.     The Defendants' Efforts To Limit The Scope Of The Central Bank's Obligations Are Unavailing ....................................................................................54

V.    PLAINTIFFS' DAMAGES INCLUDE COMPOUND INTEREST ..............................55

    A.     The Credit Agreement Provides For Compound Interest.....................................55

    B.     This Court Has Interpreted Similar Contractual Language As Providing For Compound Interest ...........................................................................59

VI.    PLAINTIFFS HAVE ESTABLISHED THEIR STANDING TO BRING THIS ACTION. .......................................................................................................61

VII.    PLAINTIFFS ARE ENTITLED TO RECOVER THEIR LEGAL FEES FROM DEFENDANTS. ................................................................................................64

CONCLUSION .......................................................................................................65

## TABLE OF AUTHORITIES

CASES

*36 Convent Avenue HDFC v. Fishman*,
No. 03 Civ. 3998 (JGK), 2004 WL 1048213 (S.D.N.Y. May 7, 2004) .................................41

*American National Fire Insurance Company v. Kenealy*, 72 F.3d 264 (2d Cir. 1995) ...............47

*Brentwood Pain & Rehabilitation Servs., P.C. v. Allstate Ins. Co.*,
508 F. Supp. 2d 278 (S.D.N.Y. 2007) .....................................................................................27

*Center v. Hampton Affiliate, Inc*,
497 N.Y.S.2d 898 (1985) ........................................................................................................37

*Chase Nat'l Bank v. Sweezy*,
281 N.Y.S. 487 (N.Y. Sup. Ct. 1931), *aff'd mem.*, 185 N.E. 803 (N.Y. 1933).......................51

*Digicon Corp. v. United States*, 56 Fed. Cl. 425 (2003) ............................................................32

*Dixon v. NBC Universal Media LLC*,
No. 12 Civ. 7646, 2013 WL 2355521 (S.D.N.Y. May 28, 2013) (Engelmayer, J.)...............50

*DynCorp v. GTE Corp.*,
215 F. Supp. 2d 308 (S.D.N.Y. 2002) .....................................................................................51

*Elliott Assocs., L.P. v. Banco de la Nacion*,
194 F.R.D. 116 (S.D.N.Y. 2000)........................................................................................59, 60

*EUA Cogenex Corp v. North Rockland Cent. Sch. Dist.*,
124 F.Supp.2d 861 (S.D.N.Y. 2000) ..................................................................................34, 38

*F.H. Krear & Co. v. Nineteen Named Trustees*,
810 F.2d 1250 (2d Cir. 1987) .................................................................................................64

*Faggionato v. Lerner*,
500 F. Supp. 2d 237 (S.D.N.Y. 2007) .....................................................................................27

*FDIC v. Providence Coll.*,
115 F. 3d 136 (2d. Cir. 1997) .................................................................................................41

*First Fidelity Bank*, *N.A. v. Gov't of Antigua & Barbuda—Permanent Mission*, 877 F.2d 189
(2d Cir. 1989) .........................................................................................................................44

*Fleishman v. Furgeson*,
119 N.E. 400 (N.Y. 1918) .......................................................................................................59

*Galli v. Metz*,
    973 F.3d 145 (2d. Cir. 1992) ........................................................................... 50

*Glover, et al. v. Costco Wholesale Corp.*,
    153 Fed. Appx. 774 (2005) ............................................................................... 34

*In re Martin-Trigona*,
    760 F.2d 1334 (2d Cir. 1985) ...................................................................... 3, 32

*In re Nigeria Charter Flight Contract Litig.*,
    520 F. Supp. 2d 447 (E.D.N.Y. 2007) ............................................................. 40

*IRB-Brazil Resseguros, S.A. v. Inepar Inv. S.A.*,
    922 N.Y.S.2d 308 (1ˢᵗ Dept. 2011) .................................................................. 32

*Kirschner v. KPMG LLP*, 938 N.E.2d 941 (N.Y. 2010) ........................................... 39

*M. W. Zack Metal Co. v. The Birmingham City*,
    291 F.2d 451 (2d Cir. 1961) ............................................................................ 63

*Mason Tenders District Council v. JNG Construction Ltd.*, No. 00 Cv. 1032 GBD, 2003 WL
    22999453 (S.D.N.Y. Dec. 19, 2003) ........................................................... 46, 47

*Merrill Lynch Capital Servs. v. UISA Fin.*,
    No. 09 Civ. 2324 (RJS), 2012 WL 1202034 (S.D.N.Y. Apr. 10, 2012) ................ 40

*Metropolitan Life Ins. Co. v. RJR Nabisco, Inc.*,
    906 F.2d 884 (2d Cir. 1990) ............................................................................ 50

*Mionis v. Bank Julius Baer & Co., Ltd.*,
    301 A.D.2d 104 (App. Div. 1st Dep't 2002) ..................................................... 58

*NML Capital v Republic of Argentina*,
    952 N.E.2d 482 (N.Y. 2011) ............................................................................ 53

*Parlato v. Equitable Life Assurance Soc. of the United States*, 749 N.Y.S.2d 216 (App. Div. 1st
    Dep't 2002) ..................................................................................................... 43

*Progressive Cas. Ins. Co. v. C.A. Reaseguradora Nacional De Venezuela*, 991 F.2d 42, 46 (2d
    Cir. 1993) ....................................................................................................... 42

*Reiss v. Societe Centrale Du Groupe Des Assurances Nationales*, 185 F. Supp. 2d 335, 338
    (S.D.N.Y. 2002) .............................................................................................. 32

*Republic of Benin v. Mezei*, No. 06 Civ. 870 (JGK), 2010 WL 3564270 (S.D.N.Y. Sept. 9,
    2010) .............................................................................................................. 47

*Residential Funding Corp., v. DeGeorge Financial Corp.*, 306 F.3d 99 (2d. Cir. 2002) .......... 34

*Seetransport Wiking Trader Schiffahrtsgesellschwft MBH & Co. Kommanditgesellschaft v. Republic of Romania*, 123 F. Supp. 2d 174, 190 (S.D.N.Y. 1990) .........................................43

*Sutton v. East River Sav. Bank*,
   435 N.E.2d 1075 (N.Y. 1982) ........................................................................59

*Terwilliger v. Terwilliger*,
   206 F.3d 240 (2d. Cir. 2000) ........................................................................50

*Themis Capital LLC v. Democratic Republic of Congo*,
   2013 WL 1687198 (S.D.N.Y. April 18, 2013).................................26, 27, 61, 63

*Themis Capital LLC v. Democratic Republic of the Congo*,
   881 F. Supp. 2d 508 (S.D.N.Y. 2012) ...................................................*passim*

*Tr. of the Am. Fed'n of Musicians and Emp'r Pension Fund v. Steven Scott Enterp.*,
   40 F.Supp.2d 503 (S.D.N.Y. 1999) .............................................................35

*U.S. v. Quinteri*,
   306 F. 3d. 1217 (2d. Cir. 2002) ..................................................................27

*Van Eck Emerging Markets Opportunity Fund, L.P. v. the Republic of Nicaragua*,
   No. 00 Civ. 5756 (WHP) (S.D.N.Y.) ...........................................................60

*Western Filter Corp. v. Argan*,
   540 F.3d 947 (9th Cir. 2008) ......................................................................51

**STATUTES**

22 U.S.C. § 288 *et seq.* ...................................................................................15

28 U.S.C. § 1605(a)(1) ....................................................................................27

N.Y. GEN. OBLIG. LAW § 5-527(1) (McKinney 2008) .................................57

Fed. R. Civ. P. 44.1 .........................................................................................28

Fed R. Evid. 803(6) .........................................................................................62

Federal Rule of Evidence 803(15)....................................................................62

Fed. R. Evid. 1006 .....................................................................................52, 53

**DRC LAW PROVISIONS**

Act 005/2002 ..............................................................................................29, 54

Constitutional Decree-law 003/1997 ...............................................................36

Decree No. 09/61 .............................................................................................24

Decree 28/2002 .......................................................................................... 30, 31, 34, 35, 36, 37, 40

Ordinance 80-073 ............................................................................. 5, 6, 28, 29, 31, 42, 45, 46

Ordinance-law 68/400 ................................................................................................. 30

**OTHER AUTHORITIES**

Am. Bar Found., *Commentaries on Model Debenture Indenture Provisions* 350 (1971) ........... 50

CARL S. BJERRE, SECURED TRANSACTIONS INSIDE OUT: NEGATIVE PLEDGE COVENANTS, PROPERTY AND PERFECTION, 84 CORNELL L. REV. 305, 311 (1999) ....................................... 50

JEREMY OSTRANDER, THE LAST BASTION OF SOVEREIGN IMMUNITY: A COMPARATIVE LOOK AT IMMUNITY FROM EXECUTION OF JUDGMENTS, 22 BERKELEY J. INT'L L. 541, 568 (2004) ...... 52

Plaintiffs Themis Capital ("**Themis**") and Des Moines Investments, Ltd. ("**Des Moines**," and together with Themis, "**Plaintiffs**"), through their attorneys, Dechert LLP, respectfully submit this Pretrial Memorandum as directed by the Court at the November 26, 2013 Pretrial Conference.  This memorandum addresses seven issues:  (1) whether the signatories to an acknowledgement letter dated February 25, 2003 (the "**2003 Acknowledgement Letter**") had actual authority under the laws of the DRC[1] to bind Defendants to that letter; (2) whether, assuming the signatories to the 2003 Acknowledgement Letter lacked actual authority to bind their principals, the Defendants ratified that letter through their subsequent actions; (3) whether the signatories to the 2003 Acknowledgement Letter had apparent authority to bind Defendants; (4) whether the Central Bank is contractually obligated to pay the debt owed to Plaintiffs under the Credit Agreement; (5) whether Plaintiffs are entitled to compound interest under the Credit Agreement; (6) whether Plaintiffs have demonstrated their standing to bring the claims asserted in this action; and (7) whether Plaintiffs are entitled to recover their legal fees from Defendants.[2]

## PRELIMINARY STATEMENT

In its July 2012 decision denying summary judgment to Plaintiffs, the Court correctly observed that, at its heart, this case turns on whether the signatories to a letter purporting to acknowledge the Defendants' respective obligations under a Credit Agreement entered into in 1980 had authority to do so on Defendants' behalf.  That issue matters because the Credit Agreement has been in default since

---

[1]   The original debtor parties under the March 31, 1980 Credit Agreement (the "**Credit Agreement**") were the Republic of Zaire and the Bank of Zaire.  In 1997, the Republic of Zaire changed its name to the Democratic Republic of Congo, and the Bank of Zaire became the Central Bank of the Democratic Republic of Congo. In this Pretrial Memorandum, Plaintiffs generally use "**DRC**" to refer both to the Republic of Zaire and to the Democratic Republic of Congo, and generally use "**Central Bank**" to refer both to the Bank of Zaire and to the Central Bank of the Democratic Republic of Congo.

[2]   Although Plaintiffs overlooked issue No 7 at the Pretrial Conference, they have claimed they are entitled to recover legal fees throughout this action (Amended Complaint at ¶ 9 (DE 5)), including in the Pretrial Order. Pffs' Proposed Findings of Fact ¶¶ 23, 71; Pffs' Proposed Conclusions of Law ¶¶ 144-147.

1990, and Plaintiffs brought this lawsuit long after any claim to enforce the Credit Agreement would have been time-barred had Defendants not acknowledged that agreement.  At the time Plaintiffs moved for summary judgment, they knew of only one acknowledgement letter, signed in February 2003.  Observing in its summary judgment decision that this was 13 years after the Credit Agreement was to be paid in full, the Court found it curious that Defendants would have "revived" their (apparently long-expired) obligations under the agreement at that time.  The Court therefore ordered discovery to flesh out the context for the 2003 Acknowledgement Letter.

Discovery has revealed that context:  and what it shows is that Defendants' acknowledgement of the Credit Agreement in 2003 was anything but an isolated incident.  To the contrary, the evidence revealed in discovery shows that the 2003 Acknowledgement Letter was the third in a chain of nearly identical acknowledgement letters—the most recent of which was signed five months *after* this lawsuit began.  The evidence shows that, like the Credit Agreement itself, each of those letters was signed on behalf of the DRC by the person in charge of the Ministry of Finance, and on behalf of the Central Bank by its Governor.  The evidence shows that from at least 1997 until long after this lawsuit began, Defendants actively sought to engage creditors in restructuring negotiations involving the Credit Agreement—and that this activity reached its high point just as the 2003 Acknowledgement Letter was signed.  The evidence shows that this flurry of activity coincided with Defendants' initial efforts to obtain debt relief through the World Bank program for Highly Indebted Poor Countries ("**HIPC**"), and that Defendants' understood that their eligibility for such relief depended, in part, on reaching a consensual restructuring of the Credit Agreement.  The evidence shows that *not once* in any of these interactions did anyone purporting to speak for the Defendants even *hint*—to creditors, to the World Bank, or to anyone else—that they consider the Credit Agreement to be time-barred.  In fact, the evidence shows that Defendants have consistently communicated the opposite message—most recently by describing the Credit Agreement as "outstanding" in the Central Bank's 2012 annual report.

Plaintiff's DRC law expert will testify that both the Finance Minister and the Governor of the Central Bank had actual authority to bind their principals to the 2003 Acknowledgement Letter pursuant to the same implementing legislation that empowered them to execute the Credit Agreement. But even if they had lacked such authority, the evidence shows that Defendants nonetheless ratified their actions by accepting the benefits of the acknowledgement letter—which included both repose from creditor litigation and increased prospects for HIPC relief—rather than repudiating the letter.  *See In re Martin-Trigona*, 760 F.2d 1334, 1341 (2d Cir. 1985) (principal can ratify agent's unauthorized acts through silent acquiescence).

The only response to this Defendants can offer is that Plaintiffs cannot prove that a body called the Council of Ministers—which Defendants claim was the only body authorized under DRC law to acknowledge the Credit Agreement on behalf of either of the Defendants in 2003—knew of the existence or significance of the 2003 Acknowledgement Letter.  What this argument overlooks is that the Finance Minister sits on the Council of Ministers, and at least three Finance Ministers since 2003 both knew about the acknowledgement letters and understood their significance while they held that position.  The evidence shows that it is inconceivable that this information was not communicated to the Council—particularly given that the Finance Minister had a duty to do so on as many as three occasions.  For this reason (and others), knowledge of the 2003 Acknowledgement Letter and its significance can be imputed to the Council in spite of Defendants' failure to search for or produce documents from the Council's files from which Plaintiffs might have proven that the Council had actual knowledge of these facts.

The evidence also shows that Citibank—which, through experienced personnel in New York and Kinshasa, acted for all creditors in obtaining the 2003 Acknowledgement Letter—relied on the apparent authority of the Finance Minister and Governor to sign that letter.  Citibank personnel knew at the time that the Finance Minister and Governor had signed the Credit Agreement and two other

acknowledgement letters prior to 2003—and that not once had Defendants claimed those indidvuals lacked authorization to do so.  Citibank knew at the time that DRC was contractually obligated under the Credit Agreement to maintain whatever governmental approvals were required under DRC law to keep the Credit Agreement from becoming time-barred.  And Citibank knew at the time that the DRC was applying for HIPC relief, and needed to show it was working towards a consensual restructuring of the Credit Agreement in order to obtain such relief.  Under the circumstances, it was entirely reasonable for Citibank to rely on these actions—all of which are attributable to the Defendants—in assuming the Finance Minister and Governor had authority to sign the 2003 Acknowledgement Letter. And having obtained virtually identical acknowledgments twice before without any indication from Defendants that they were invalid, Citibank had no basis for concluding that the surrounding circumstances necessitated further inquiry into that authority.

The Governor of the Central Bank co-signed the Credit Agreement and each of the acknowledgement letters because the Central Bank is independently responsible to satisfy the DRC's payment obligations under the agreement, subject only to the availability of sufficient foreign currency.  This fact is absolutely clear in the Credit Agreement, in which the Central Bank agrees to pay this debt, and the DRC irrevocably instructs it to do so.  And it is underscored by other provisions in the Credit Agreement which unmistakably contemplate that a money judgment might be entered against the Central Bank for failing to satisfy its payment obligations.

Finally, Plaintiffs are entitled both to legal fees and to compound interest because the Credit Agreement explicitly provides for both.  And as the Court has already ruled, the deeds of assignment proffered by Plaintiffs demonstrate their ownership of the interests they seek to enforce here, and would have conclusively established Plaintiff's right to bring this suit even if Defendants had not waived any objection to Plaintiffs' standing in their Answer to the Amended Complaint.

## STATEMENT OF FACTS RELEVANT TO AUTHORITY ISSUES[3]

## I.   THE CREDIT AGREEMENT

On March 31, 1980, the Republic of Zaire and the Bank of Zaire entered into the Credit Agreement with certain bank creditors of Zaire, certain Agent Banks, and the Bank of Tokyo Trust Company ("**BOTT**"), as Servicing Bank.  Stipulations of Fact ¶ 11.  The Credit Agreement refinanced, consolidated and restructured various debts previously extended to Zaire and was part of a comprehensive restructuring of Zaire's debts.  *Id.* ¶ 13.  The Credit Agreement was executed on behalf of Zaire by Zaire's State Commissioner of Finances and Budget, and was executed on behalf of the Bank of Zaire by the Governor of the Bank of Zaire.  *Id.*  ¶¶ 16, 17.

The execution of the Credit Agreement was accompanied by a number of representations and certifications affirming that the agreement was duly authorized under Zaire law and that the persons signing the agreement on behalf of Defendants had been specifically authorized to do so.  *Id.* ¶ 18; Credit Agreement §§ 7.01(a)-(c), 9.02(b)-(d) and Exs. 1, 2 and 3 (PX 10).  Shortly after the Credit Agreement was executed, and in accordance with its terms, Mobutu Sésé Seko, who was then President of Zaire, issued Ordinance 80-073 authorizing the signing of the Credit Agreement by the Defendants, and directing the State Commissioner of Finances and the Governor of the Bank of Zaire

---

[3]   Argument Sections I, II, and III deal with the authority of the signatories to the acknowledgement letters and involve many common facts.  Plaintiffs set forth those facts together in this Section.  The facts relevant to Argument Sections IV, V, VI and VII are unique to those sections, and Plaintiffs have incorporated the relevant facts directly into those argument sections to make them easier to follow.

to do so on Defendants' behalf.  Stipulations of Fact ¶ 3, 5, 20; Ordinance No. 80-073 (DX 29).

Defendants have admitted that the signatories to the Credit Agreement had actual authority under DRC

law to execute the Credit Agreement on behalf of their respective principals.  Defs.' Response to

Plaintiffs' Requests for Admission ¶¶ 22, 39 (PX 89).

Under Section 8.01(b) of the Credit Agreement, the DRC covenanted that as long as any

amounts due under the Credit Agreement remain unpaid, it will

> [d]uly ***obtain and maintain in full force and effect all governmental approvals . . . which may be necessary under the law of the [DRC] for the*** execution, delivery and performance of this Agreement by the [DRC] or for the validity or ***enforceability hereof*** and duly take all necessary and appropriate governmental and administrative action in the [DRC] in order to make all payments to be made hereunder as required by this Agreement.

Credit Agreement § 8.01(b) (emphasis added) (PX 10).  Plaintiffs' DRC law expert, Mr. Chikuru, was

asked to assume for the purposes of rendering his opinions that Section 8.01(b) requires the DRC to

obtain and maintain all approvals necessary under the laws of the DRC to acknowledge its debt

obligations under the Credit Agreement for as long as any debt remains outstanding under that

agreement.  Read in that context, Mr. Chikuru opined that Ordinance No. 80-073 implicitly conveyed

to the Minister of Finance of the DRC,[4] and to the Governor of the Central Bank (the "**Governor**"),

ongoing authority to acknowledge their respective principals' obligations under the Credit Agreement

until the debt owed under that agreement was paid in full.  Expert Report of Nicaise Chikuru Munyi

Ogwarha, dated July 9, 2013 ("**Chikuru Report**") ¶ 14 (PX 122); Rebuttal Expert Report of Nicaise

Chikuru Munyi Ogwarha, dated August 16, 2013 ("**Chikuru Rebuttal Report**") ¶ 12(c) (PX 123);

Chikuru Dep. at 84:4-10; 85:18-88:8; 90:19-92:14; 97:11-101:25.

---

[4]   The position of "State Commissioner of Finances and Budget" referred to in Ordinance 80-073 is equivalent to the position of "Minister of Finances and Budget" from 1991 through 2003.  Deposition of Nicaise Chikuru dated August 29, 2013 ("**Chikuru Dep.**") at 10:17-11:11; 85:18-86:8.  In the remainder of this Memorandum, Plaintiffs refer to that position as the "**Finance Minister**" and the corresponding government ministry as the "**Ministry of Finance**" or "**Finance Ministry**."

## II.    THE DEFENDANTS' DEFAULT AND THE
##         1991 ACKNOWLEDGEMENT LETTER

The DRC first failed to make a payment under the Credit Agreement when due in 1982, and

failed to do so again in April 1985.  Memorandum Regarding the Republic of Zaire Refinancing Credit

Agreement, dated March 13, 1991, at UB00002453 (PX 11).  According to an internal BOTT

memorandum, on March 12, 1991, a "Steering Committee" of Agent Banks under the Credit

Agreement composed of Citibank, ANZ Bank of London ("**ANZ**") and Crédit Commercial de France

("**CCF**") met with BOTT and its counsel to discuss the Steering Committee's efforts to obtain an

acknowledgement of Defendants' payment obligations under the Credit Agreement—and thereby

prevent any claim to recover the missed April 1985 payment from being time-barred under New

York's six-year statute of limitations.  *Id.* at UB00002452-2454 (PX 11).  The memorandum states that

the Steering Committee instructed BOTT to retain litigation counsel, and to institute collection

litigation against the Defendants on behalf of all creditors if Defendants failed to sign an

acknowledgement letter.  *Id.* at UB00002453-2454.  In response to the Committee's efforts, on March

29, 1991, the Finance Minister and Governor executed an acknowledgment of the Defendants'

obligations under the Credit Agreement (the "**1991 Acknowledgement Letter**").  1991

Acknowledgment Letter, at CITI 003701-3702 (PX 17).  Defendants admit that these individuals

signed that letter.  Transcript of November 16, 2013 Pretrial Conference, at 51:20-24; 54:15-19.

The 1991 Acknowledgment Letter reads, in relevant part:

The Republic of Zaire and the Bank of Zaire hereby refer to the Refinancing Credit
Agreement dated as of March 31, 1980 among the Republic of Zaire, Bank of Zaire, the
Banks and Agents party thereto and The Bank of Tokyo Trust Company, as Servicing
Bank.

The Republic of Zaire and the Bank of Zaire hereby acknowledge and confirm that
Schedule 1 hereto sets forth the amounts of past due principal and past due interest as of
April 2, 1990 for each Credit Information Schedule under such Refinancing Credit
Agreement.  The past due interest on principal consists of both interest accrued on
principal installments prior to their maturity (regular interest) and interest accrued on
overdue principal.  The Republic of Zaire and the Bank of Zaire further acknowledge

and confirm their respective obligations with respect to such indebtedness and other obligations arising under such Refinancing Credit Agreement.

It is the intention of the Republic of Zaire and the Bank of Zaire in executing and delivering this acknowledgement formally to recognize and confirm all such obligations in order to eliminate any concerns any Bank holding any such indebtedness may have due to any possible application of any principals of prescription, including without limitations, those established by the New York statute of limitations, which might lead any Bank to conclude that the forbearance demonstrated to date by such Bank in refraining from acting to enforce any rights it may have to collect such indebtedness might have an adverse effect on the ultimate collectability of such indebtedness.

1991 Acknowledgment Letter, at CITI 0003701-3702 (PX 17). Attached to the 1991 Acknowledgment Letter is an addendum listing the amounts of principal and interest outstanding under the Credit Agreement. *Id.* at CITI0003703.

After receiving copies of the 1991 Acknowledgement Letter, all three members of the Steering Committee informed BOTT that they considered it "satisfactory" documentation, and that it would therefore not be necessary for BOTT to bring a collection suit against the Defendants. Telex from ANZ to BOTT, dated March 28, 1991, at UB00002448 (PX 13); Telex from CCF to BOTT, dated March 28, 1991, at UB00002767 (PX 14); Telex from Citibank to BOTT, dated March 28, 1991, at UB00002768 (PX 14). In other words, the members of the Steering Committee, acting on behalf of all creditors under the Credit Agreement, relied on the 1991 Acknowledgement Letter and the authority of the signatories to that letter in electing to forego suing Defendants to recover the debt outstanding under the Credit Agreement.

## III.    THE 1997 ACKNOWLEDGEMENT LETTER, AND DEFENDANTS' UNDERSTANDING AND ACCEPTANCE OF ITS BENEFITS

The 1991 Acknowledgement Letter tolled the statute of limitations on any claim to recover the debt outstanding under the Credit Agreement for six years—until March 19, 1997. As of early 1997, various Citibank affiliates remained creditors and/or agents under the Credit Agreement. Deposition of Cecilia Bartner, dated May 2, 2013 ("**Bartner Dep.**") at 39:8-41:19. At that time, both Jean-Claude Masangu of Citibank in Kinshasa and Cecilia Bartner at Citibank in New York were involved in

performing the bank's agent functions.  Deposition of Jean-Claude Masangu, dated June 12, 2013 ("**Masangu Dep.**") at 101:22-102:20;  Bartner Dep. at 53:17-54:10.

In 1997, Ms. Bartner worked as an executive in the debt restructuring department at Citibank. Prior to 1997, she participated in several bank advisory committees and steering committees involved with the restructuring of the debt of various sovereign states.  *Id.* at 25:9-26:2; 31:9-33:12.  At some point prior to 1997, Ms. Bartner assumed primary responsibility in Citibank's New York office for the file relating to the Credit Agreement.  *Id.* at 39:18-41:19.

During her time at Citibank, Ms. Bartner was involved in obtaining acknowledgement letters from three sovereign states—the DRC, Sudan and Liberia.  *Id.* at 83:13-87:8; 154:3-20; Email from C. Bartner to M. Losembe, dated March 4, 2003 (PX 31).  In early 1997, in consultation with counsel, she prepared a new acknowledgement letter to be signed by the Finance Minister and the Governor (the "**1997 Acknowledgement Letter**"), and sent it to Mr. Masangu to get it signed.  Bartner Dep. at 52:18-54:10, 54:20-22; 70:17-20; 71:17-21.  She testified that she was familiar with the 1991 Acknowledgement Letter (*id.* at 56:3-13; 62:16-24), and that the 1997 Acknowledgement Letter was based on the 1991 letter—except that the 1997 letter did not contain a reconciliation of the amounts then due under the Credit Agreement.  *Id.* at 54:23-55:3; 55:8-11; 57:9-59:11.

Mr. Masangu was the Managing Director and CEO of Citibank's Kinshasa affiliate in March 1997.  Masangu Dep. at 118:16-20.  He was educated in the United States, holds a Masters degree in business administration, and worked in the United States for approximately ten years before joining Citibank in Kinshasa.  *Id.* at 110:21-111:09; 112:3-16.  He was Managing Director of Citibank Kinshasa from April 1993 until August 1997, and in that position, had oversight responsibility for the bank's operations, bookkeeping, financial control, human resources and marketing.  *Id.* at 118:16-119:19.  He left Citibank in Kinshasa in April 1997 to become Governor—a position he held until May 2013.  *Id.* at; 118:16-20; 133:18-21.

Mr. Masangu testified that he met with the signatories to the 1997 Acknowledgment Letter personally to explain the date by which it had to be signed and why signing it was necessary. Masangu Dep. at 100:25-103:8. He explained that he performed these actions "on behalf of my bank, Citibank, and the other creditors, members of the London Club." *Id.* at 102:6-13. He further explained that he used the term "London Club" to refer to creditors under the Credit Agreement. *Id.* at 38:20-39:3.

The 1997 Acknowledgement Letter reads, in relevant part:

The Republic of Zaire and the Bank of Zaire hereby refer to the Refinancing Credit Agreement dated as of March 31, 1980 among the Republic of Zaire, the Bank of Zaire, the Banks and Agents party thereto and the Bank of Tokyo-Mitsubishi Trust Company (formerly known as Bank of Tokyo Trust Company), as Servicing Bank.

The Republic of Zaire and the Bank of Zaire hereby acknowledge and confirm as of the date hereof their respective obligations with respect to the principal and interest unpaid under such Refinancing Credit Agreement consisting, in the case of interest, both of interest accrued on principal installments prior to the maturity and interest accrued on overdue principal and interest, and all other obligations arising under, such Refinancing Credit Agreement in accordance with the term thereof.

It is the intention of the Republic of Zaire and the Bank of Zaire in executing and delivering this acknowledgement formally to recognize and confirm all such obligations in order to eliminate any concerns any person holding claims under such Refinancing Credit Agreement may have due to any possible application of any principles of prescription, including without limitation, those established by the New York statute, of limitations, which might lead any such person to be concerned that the forbearance demonstrated to date by such person in refraining from acting to enforce such claims might have an adverse effect on the ultimate enforceability of such claims.

1997 Acknowledgement Letter, at CITI0003699 (PX 17). Mr. Masangu testified that, based on his experience, he did not believe it was necessary to conduct any further inquiry into whether the signatories to the 1997 Acknowledgment Letter had authority to bind the DRC and the Central Bank, respectively, to the 1997 Acknowledgment Letter. *Id.* at 104:6-105:2.

The existence of the 1991 and 1997 Acknowledgment Letters and their value to Defendants as a means to avoid creditor lawsuits was well-known to senior officials within the DRC, including the Finance Minister. This fact is evidenced, among other ways, by a report prepared in June 1999 by an expert team charged with advising the DRC on strategy in connection with one such lawsuit brought

by Red Mountain Finance Inc.  This expert team was assembled at the request of the Finance Minister, and was composed of representatives from the Justice and Finance Ministries, the Central Bank, and the *Office Générale de la Dette Publique* (or "**OGEDEP**").  Memorandum to the Finance Minister from expert team charged with analysis of the Red Mountain Finance Inc. case, dated June 21, 1999 (the "**Red Mountain Report**"), at DRC00004115 (PX 21).  The report was addressed to the Finance Minister personally.  *Id.*  As Governor, Mr. Masangu was kept informed of the team's work and recommendations as well.  Masangu Dep. at 90:2-95:4.

Paragraph 14 of the Red Mountain Report observes that "[s]ince the [Credit Agreement] reached its term in 1990, the method used to maintain cohesion within the London Club and avoid a spill-over effect in the form of individual claims is the signing of a letter in favor of the London Club member creditors."  Red Mountain Report, at DRC00004116 (PX 21).  In paragraph 24, the expert team went on to recommend that the Defendants continue the practice, given that:

> [s]trategically, discussions with the London Club Steering Committee have the advantage of renewing contact with the London Club and culminating, after account reconciliation, in the signing of a letter of recognition of debt by the [DRC] in order to provide certainty to the London Club member creditors and to lead them to respect the provisions of the [Credit Agreement].  In this manner, we would be able to strategically halt the spillover effect of actions from London Club creditors and get Red Mountain and LNC[5] to ascribe to the logic of the overall framework surrounding the settlement of arrears by various external creditors.

*Id.* at DRC00004118.

The involvement of OGEDEP in preparing the Red Mountain Report—and in the Defendants' subsequent restructuring discussions with creditors—is significant, because between September 1976 (when it was created), and December 2009 (when, as discussed at p. 24-25 below, its responsibilities were handed over to a successor organization), OGEDEP was the government agency charged under DRC law with managing the DRC's public debt.  OGEDEP was a division of the Ministry of Finance,

---

[5]    LNC is another creditor that sued Defendants to enforce the debt owed to it under the Credit Agreement.  *Id.* at DRC00004116.

the responsibilities of which included maintaining information about the public debt, communicating that information to other government agencies, developing national public debt policy, and proposing such policy to other branches of the DRC government.  Chikuru Report ¶¶ 33, 34 (PX 122); Masangu Dep. at 152:24-153:18.  As the agency responsible for keeping the government informed about the DRC's public debt, the information OGEDEP (and after 2009, its successor organization) maintained on that debt can be imputed to the government as a whole.  *See* Argument Section II.C., *infra*.

The Finance Minister's knowledge of the Red Mountain Report and the benefits to Defendants of acknowledging the Credit Agreement is also significant, because the Finance Minister was a member of the "Council of Ministers"—which Defendants claim was the only body authorized under DRC law to acknowledge the Credit Agreement on Defendants' behalf.  Plaintiffs explain below that as a member of the Council of Ministers, the Finance Minister's knowledge of these matters can be imputed to the Council of Ministers.  *See* Argument Section II.B., *infra*.

## IV.   DEFENDANTS' OVERTURES TO CREDITORS LEADING UP TO THE 2003 ACKNOWLEDGEMENT LETTER

In the six-year period during which the statute of limitations was tolled by the 1997 Acknowledgement Letter, representatives of the Defendants tried repeatedly to initiate restructuring negotiations with London Club creditors.  Some of these efforts involved senior governmental officials—including the Head of OGEDEP, and agents of the Finance Minister and President.  *See* June 19, 1998 Letter from O. Gamela to General Bank of Luxembourg at UB00001016 (announcing delegation to the General Bank of Luxembourg composed of the Cabinet Secretary of the Ministry of Finance, an Advisor to the President, and the Department Head of OGEDEP) (PX 20); July 23, 1998 Letter from A. Ileka to BOTT, at UB 00001012-1018 (announcing similar delegation to BOTT's New York offices "in preparation for discussions with the creditor members of the London Club.") (PX 20).

In November of 2002, Mr. Masangu wrote to Citibank and other agent banks to announce that "the Central Bank of the Congo plans to organize an informal meeting with all of the Agent Banks that

are members of the Club, including yours." November 26, 2002 letter from J-C. Masangu to C. Bartner, at CITI0000204 (PX 22); November 28, 2002 letter from J-C. Masangu to T. Desjardins, at UB00001622 (PX 23). In preparation for that meeting, Mr. Masangu prepared a "COMMUNICATION FROM THE GOVERNOR OF THE CENTRAL BANK OF CONGO TO THE LONDON CLUB AGENT BANKS," the stated objective of which was to "open back up the dialogue with the London Club in light of settling the arrears issue, as well as defining a new cooperation framework." Communication from J-C. Masangu to Agent Banks, dated November 29, 2002, at CITI0000187 (PX 24). In Section III of his "Communication," entitled "THE DRC'S EXPECTATIONS OF THE LONDON CLUB," Mr. Masangu explains that restructuring its debt obligations under the Credit Agreement was a condition to the DRC becoming eligible for debt relief through the World Bank's debt relief program for Highly Indebted Poor Counties ("**HIPC**"):

> 11. After a long period of progress within in the dialogue with other creditors, the negotiations with the London Club represent the next decisive step before the DRC's eligibility for the HIPC Initiative. In order to allow the IMF and the [World Bank] to proceed with a debt sustainability analysis, the DRC is planning to finalize negotiations with the London Club before the end of December 2002.

> 12. In a very clear way, the informal meeting with the London Club agent banks, organized on the sidelines of the Consulting Group's work, should allow to set a calendar of meetings, the goal of which would be:

> 1) to determine the actual level of its commitments to the syndicated banks, in accordance with prior agreements;

> *          *          *

> 5) the determining of a agreement negotiation calendar to be signed between the DRC and the London Club, replacing the Refinancing Agreement enacted March 31, 1980.

*Id.* at CITI0000191-0192. Tellingly, nowhere in the memo does Mr. Masangu even suggest that either of the Defendants considered their obligations under the Credit Agreement to be time-barred.

Ms. Bartner recalled at her deposition receiving Mr. Masangu's "Communication" to Agent Banks. Bartner Dep. at 116:4-14; 118:5-10. She testified that it was her understanding that the memo

was prepared to encourage discussion of restructuring the debt under the Credit Agreement (*id.* at 119:9-22), and that the DRC wanted to finalize such negotiations with creditors so it could qualify for financing through the HIPC program.  *Id.* at 121:15-123:18.

## V.    THE 2003 ACKNOWLEDGMENT LETTER

The 1997 Acknowledgement Letter extended the statute of limitations on claims to recover under the Credit Agreement until March 6, 2003.  By early 2003, Ms. Bartner had become chief of staff for William Rhodes, Citibank's "senior international officer . . . in charge of [Citibank's] relationships with governments around the world"—a position she held until 2006.  Bartner Dep. at 23:12-24:20.  Notwithstanding her change in position, it was Ms. Bartner's responsibility to obtain a renewal of the 1997 Acknowledgement Letter from Defendants.  *Id.* at 108:7-108:13.  However, because Mr. Masangu had by then left Citibank to become Governor, Ms. Bartner looked to Michel Losembe at Citibank in Kinshasa, to assist her in that effort.  *Id.* at 125:6-23; Email Exchange between C. Bartner and M. Losembe, dated October 2, 2002 at CITI0000107-0108 (PX 90); Email from C. Bartner to M. Losembe, dated January 16, 2003 (PX 25).  Ms. Bartner testified that she asked Mr. Losembe to obtain the Finance Minister's signature on the new acknowledgment because the Finance Minister signed the 1997 Acknowledgement Letter on behalf of the DRC.  Bartner Dep. at 127:8-20.

At Ms. Bartner's urging, Mr. Losembe wrote to the Finance Minister, Ilankir Mbuyamu Matungulu, on February 11, 2003 to transmit a draft of the 2003 Acknowledgement Letter for his signature.  Letter from M. Losembe and C. Kamanz (both of Citibank) to I. Matungulu, dated February 11, 2003 (PX 27).  In that letter Mr. Losembe explained to the Finance Minister that

> [t]he signing of this document will extend for six (6) years the validity of the [Credit Agreement] . . . It is understood that failure to sign the aforementioned document at its maturity by the [DRC] could lead its creditors to seek forced recovery of their loans . . .

*Id.*  Less than two weeks later, after learning that Mr. Matungulu had stepped down as Finance Minister and that the former Assistant Minister Leonard Luongwe had become Deputy Finance

Minister to fill the vacancy created by Mr. Matungulu's departure, Mr. Losembe wrote a similar letter—containing a similar warning—to Mr. Luongwe.  *See* Letter from M. Losembe and C. Kamanz to L. Luongwe, dated February 20, 2003 (attaching draft of 2003 Acknowledgement Letter, explaining that the letter would extend the validity of the Credit Agreement, and repeating warning that failure to sign could "lead the creditors to [seek] a forced recovery of their loans") (PX 76).[6]

Mr. Masangu testified that he understood at the time that the statute of limitations on claims to enforce the Credit Agreement was about to expire, and that he assisted Mr. Losembe in persuading Mr. Luongwe to sign a new debt acknowledgment by "explain[ing] the importance of the agreement" to Mr. Luongwe.  Masangu Dep. at 69:2-7; 108:5-109:9.  He understood when he signed the 2003 Acknowledgment Letter that it extended the validity of the Credit Agreement for another six years, and that Citibank warned that it could take legal action if Defendants failed to sign it.  *Id*. at 69:2-70:14; 70:23-72:5.  And on February 25, 2003, both he and Mr. Luongwe signed the 2003 Acknowledgment Letter—which is materially identical to the 1997 version.  *Compare* 1997 Acknowledgement Letter, at CITI003699 (PX 17) *with* 2003 Acknowledgement Letter, at CITI0000202 (PX 22).  Mr. Masangu testified that he signed the letter on behalf of the Central Bank in his capacity as Governor (*id*. at 13:3-13; 24:2-18), and that "one of the responsibilities of the Governor [of the Central Bank] is to sign contracts concluded by the Bank."  *Id*. at 129:3-22.  Defendants have admitted that Mr. Luongwe held the position of Deputy Finance Minister when he signed the 2003 Acknowledgment Letter (Defs' Response to Requests for Admission ¶ 29 (PX 89)), and their expert on DRC law has conceded that as Deputy Finance Minister, Mr. Luongwe's authority to act on behalf of the DRC was identical to that of the Finance Minister he succeeded, Mr. Matungulu.  Lubala Dep. at 33:2-7.

---

[6]   Mr. Losembe resides in the DRC, outside of the reach of the Court's subpoena power, and the Court would not compel Citibank N.A. to produce him for deposition.  Transcript of November 28, 2012 Telephonic Conference (DE 103) at 10:3-14.  Plaintiffs understand that Mr. Luongwe is deceased, and that Mr. Matungulu works at the IMF—which enjoys immunity from discovery under the International Organizations Immunities Act, 22 U.S.C. § 288 *et seq.*

On February 26, 2003, Mr. Losembe wrote to Ms. Bartner reporting that the 2003 Acknowledgment letter had been signed, and therefore there was "no need to 'release' the lawyers." February 26, 2003 email from M. Losembe to C. Bartner, at CITI0000931 (PX 38). This resolved the question of the acknowledgement from Ms. Bartner's point of view. Bartner Dep. at 152:15-153:16. Ms. Bartner testified that she has never heard that the DRC claimed Mr. Luongwe was not the proper person to sign the 2003 Acknowledgment Letter (*id.* at 128:6-129:2), that the DRC claimed the signatures on that letter were not authorized (*id.* at 166:2-7), that the DRC claimed the debt under the Credit Agreement was unenforceable (*id.* at 158:11-159:2), or that any of the acknowledgement letters were not legally valid and binding on Defendants. *Id.* at 101:17-102:4; 128:6-129:2.

On February 27, 2003, Mr. Luongwe sent the fully-executed 2003 Acknowledgment Letter to Mr. Losembe, Mr. Masangu and the President and CEO of OGEDEP. Letter from L. Luongwe to M. Losembe, J-C. Masangu, and the President and CEO of OGEDEP, dated February 27, 2003, at CITI0000196 (PX 33-A). In that letter, Mr. Luongwe directed both the Central Bank and OGEDEP "to take [the letter] into consideration . . . insofar as [each of those entities] is concerned in the daily keeping of the great book of the public debt." *Id.*

## VI.   DEFENDANTS' CAMPAIGN TO OBTAIN HIPC FUNDING, AND THEIR REPEATED ASSURANCES TO CREDITORS THAT THE CREDIT AGREEMENT REMAINED ENFORCEABLE

Immediately after the 2003 Acknowledgement Letter was signed, representatives of Defendants began meeting with BOTT, Citibank and other London Club creditors in an attempt to reach an agreement to restructure the Credit Agreement. On February 27, 2003, a delegation from the DRC met with BOTT to discuss how BOTT could assist the DRC "in re-establishing [] contact with . . . members of the London Club." Letter from J-C. Masangu to J. Lattibeaudiere, dated March 28, 2003, at UB00001031 (PX 37). Following that meeting, Mr. Masangu wrote to BOTT personally to request "prompt information" on the identity of the London Club creditors and the amounts owed to them. *Id.*

In the same letter, Mr. Masangu asked BOTT to "inform member banks and agents of the London Club as well as the IMF and World Bank of the recent initiative undertaken by the DRC towards [BOTT] in view of reviving its relations with the London Club." *Id.* at UB00001032.  In closing, Mr. Masangu wrote that "relations between the DRC and the London Club are guided by the [Credit Agreement] for an amount of 402 millions USD.  The renegotiation of said Agreement appears today mandatory." *Id.*

In early April 2003, Mr. Losembe met with representatives of the Ministry of Finance, the Central Bank and OGEDEP to discuss the Defendants' arrears to Citibank under the Credit Agreement. Email from M. Losembe to C. Bartner, dated April 9, 2003, at CITI00000930 (PX 38); Bartner Dep. at 161:17-162:20; 163:10-22.  In his letter to Ms. Bartner reporting on that meeting, Mr. Losembe reported that the DRC "is working on a debt sustainability program that should ultimately reach the Decision Point for eligibility to HIPC.  As part of this exercise, they need to resume relations with creditors and set-up agreements to settle any outstanding debt."  Email from M. Losembe to C. Bartner, dated April 9, 2003, at CITI00000930 (PX 38).

At the same time it was making these overtures to creditors, the DRC was applying for debt relief through the HIPC program.  On July 3, 2003, the President of the DRC wrote to the Managing Director of the IMF expressing the DRC's intent to seek such relief.  Letter of Intent from L. Kabila to Horst Koehler, dated July 3, 2003, at EXPERT00000139-0141 (PX 69).  In the "Memorandum on Economic and Financial Policies within the DRC" attached to President Kabila's letter, the DRC reported that "[a]s for its commercial creditors, the government has contacted [BOTT], which assists the London Club in obtaining the required statistical data on outstanding debt.  In addition, the DRC hopes to obtain external debt-service relief as quickly as possible under the enhanced HIPC initiative." *Id.* at EXPERT00000146.  The DRC's Letter of Intent and attachments are available on the IMF's

website.[7]   Nowhere in either document does the DRC even hint that it considered its debt obligations to London Club creditors to be time-barred.

Between July and September 2003, Mr. Masangu and other representatives of the Defendants communicated regularly with BOTT, Citibank and other London Club creditors in the hope of moving restructuring discussions forward.  These communications involved identifying the current creditors under the Credit Agreement and reconciling the amounts owed to each, composing a new steering committee to represent creditors in restructuring negotiations, and discussing the terms of a possible restructuring.  *See, e.g.*, Letter from J. Lattibeaudiere (BOTT) to J-C. Masangu, dated July 16, 2003, at CITI0001108-1109 (providing list of creditor banks as of March 1991) (PX 40); Summary of Meeting Regarding the Democratic Republic of the Congo Delegates, dated September 17, 2003 (summarizing meeting between BOTT and representatives of the DRC at which BOTT provided a list of agent banks, information on amounts outstanding to Banque Belgolaise, and interest rate information) (PX 41); Letter from F.A. wa Asani and K.M. Shambe (both from the Central Bank) to C. Bartner and M. Losembe, dated September 19, 2003 (inviting Citibank to attend a meeting to discuss restructuring the Credit Agreement in Brussels on September 26, 2003) (PX 33-C); Memorandum from C. Bartner to File, dated September 24, 2003 (reporting on her September 16, 2003 meeting with advisors to Mr. Masangu and to the Finance Minister to discuss reconciliation of the amounts outstanding under the Credit Agreement and ways to move restructuring discussions forward) (PX 42); Bartner Dep. at 172:14-174:9 (same); Memorandum from Citibank Congo to DRC London Club Members, with copy to Central Bank, dated September 29, 2003 (reporting on September 26, 2003 meeting in Brussels of representatives of the Ministry of Finance and Central Bank, Agent Banks and creditors to discuss reconciliation and possible restructuring terms) (PX 43).

---

[7]   http://www.imf.org/external/np/loi/2003/cod/02/index.htm (last visited Dec. 30, 2013).

One issue requiring resolution at this time was the payment of over $500,000 in administrative fee arrears owed to BOTT by the DRC.  *See* Letter from L. Lattibeaudiere to J-C. Masangu, dated July 16, 2003, at UB00001041-1042 (PX 70) (discussing BOTT arrears); Letter from J. Lattibeaudiere to J-C. Masangu, dated August 5, 2003, at  UB00001003 (same) (PX 39).  To address this issue, in August 2003 the DRC offered to pay BOTT $406,000 in settlement of the arrears, and to pay an ***additional*** $50,000 to cover BOTT's administrative fees ***through April 2004***.  Letter from J-C. Masangu to J. Lattibeaudiere, dated August 22, 2003, at UB00001002 (PX 39).

In its Annual Report for 2003-2004, the Central Bank reported to the public that these meetings with London Club creditors had taken place, that the BOTT arrears issue has been resolved, and that the DRC hoped soon to restructure its debt under the Credit Agreement:

> The DRC resumed dialogue with the London Club in February 2003, via contacts with the servicing bank [BOTT] and the two largest creditors, Belgolaise Bank and Citibank. It should be pointed out that the arrears for the servicing premium to [BOTT] were discharged in August 2003 and the service fees for the period from April 2003 to March 2004 were paid.  In September 2003, the DRC and its main London Club creditors met in Brussels to carry out the reconciliation of the statistics for the debt to this club and to examine the terms for payment of the arrears.

2003-2004 Annual Report of the Central Bank, at DRC000934 (PX 96).  Like all of the Central Bank's Annual Reports,[8] the 2003-2004 report begins with a letter from the Governor presenting the report to the President of the DRC.  *Id.* at DRC000798-0799.  Nowhere in the section of the report dealing with the London Club debt does the report state that either of the Defendants considered that debt to be time-barred or unenforceable.  *Id.* at DRC000934-0935.

---

[8]    *See also, e.g.*, 2002-2003 Annual Report of the Central Bank, at DRC000508 (PX 94); 2004-2005 Annual Report of the Central Bank, at DRC001106-1107(PX 98); 2006 Annual Report of the Central Bank, at 0048.0006 (PX 48); 2007 Annual Report of the Central Bank, at DRC00003589-3590 (PX 106); 2008 Annual Report of the Central Bank, at DRC001761 (PX108); 2009 Annual Report of the Central Bank, at DRC002068-2069 (PX 110); 2010 Annual Report of the Central Bank, at DRC002407-2408 (PX 112); 2011 Annual Report of the Central Bank, at DRC002824-2825 (PX 65); 2012 Annual Report of the Central Bank, at 0001.0002-0001.0003 (PX 1).

Nor was there any indication that Defendants considered the London Club debt to be time-barred in the Central Bank's Annual Report for 2004-2005.  Rather, the Section in that report discussing the London Club states

> At the close of a mission carried out by the London Club Committee to meet with Belgolaise [Bank], Citibank New York and the [BOTT] from September 9 to 28, 2003, the virtual debt stock due to this Club was evaluated by the servicing bank at 833.7 million USD.
>
> During the information meeting organized by the DRC with the London Club creditors in Brussels on September 26 of the same year, the country made the commitment to implement, in cooperation with the World Bank, a refinement mechanism for these arrears after a negotiation of their value.  The World Bank support would apply in three areas, namely, financing for a consulting firm specialized in the evaluation (or costing) of bonds in the securities market, the payment of legal fees incurred for the implementation of the legal framework for the operation, and the partial or total assumption of the redemption price after value negotiations.
>
> The consultant to be recruited must, with Congolese experts, proceed with an identification of all of the creditors-members of this Club not yet listed by the servicing bank, a reconciliation of statistics with each one of them, debt relief negotiations in accordance with the Cologne terms, payment of the amount agreed with each creditor using the financial contribution from the World Bank.

2004-2005 Annual Report of the Central Bank, at DRC001296-1297 (PX 98).

The Defendants efforts to obtain HIPC debt relief and to restructure their obligations under the Credit Agreement continued during 2004 and 2005.  Representatives of the DRC, the World Bank and BOTT met at BOTT's New York offices in June 2004 to discuss reconciliation of the London Club debt, and "the World Bank's role [] in restructuring the external debt of the DRC."  Summary of Meetings, June 17-18, 2004, at UB00000938 (PX 45).  And in March of 2005, the Finance Minister issued an "Order for a Joint Commission," appointing Advisors to the Finance and Budget Ministries and an OGEDEP representative to meet with BOTT's successor as Servicing Bank, Union Bank of California ("**UB**") at its New York offices, and then to travel to Paris to meet with CCF—all to discuss reconciliation and restructuring of the London Club debt.  *See* Letter from D. Kashoba (Finance Minister) to Mr. Nelson (of UB) (notifying UB of the joint mission's intention to meet with UB on

March 21, 2005, and attaching the Finance Minister's "ORDER FOR JOINT COMMISSION"

authorizing the trip) (PX 46); Minutes of Meeting, March 24, 29 and 31, 2005 (reporting on meetings)

(PX 47).

At some point between March 2005 and the end of 2007, the Defendants' efforts to obtain

World Bank funding and to restructure the Credit Agreement stalled. The reasons for this are

explained in the section on the London Club debt in the Central Bank's Annual Report for 2007:

> 3. London Club
>
> The debt buyback process by the World Bank is thwarted by three demands from the institution's consultants, namely: the gentlemen's agreements, loans bought by Red Mountain, and the Belgolaise loans.
>
> a. Gentlemen's agreements
>
> As a reminder, there is a discrepancy between the numbers from Congolese experts and those from the consultants on the total debt owed to the London Club. This difference is explained by the fact that the consultants' calculations are based on the [Credit Agreement] whereas the Congolese parties have taken into account the four gentlemen's agreements signed between then and 1989. . . .
>
>           \*         \*        \*
>
> b) Loans purchased by Red Mountain
>
> Red Mountain had acquired a significant amount of Congolese debt on the secondary market and the [DRC] has completely satisfied [its debts to Red Mountain]. The consultants wanted to use the original amount of this debt in order to subtract it from the outstanding London Club debt. The necessary information was submitted to BCeCo by OGEDEP so that it could be sent to the interested parties.
>
> c) Belgolaise Loans
>
> In a letter dated December 6, 2007, addressed to the Ministry of Finance, Belgolaise Bank has affirmed that it will no longer seek recovery of its London Club loans and that it is abandoning its role as an agent bank of the Club. The legal advisor expressed strong reservation about the legal effectiveness of this letter. . . . Given that none of Belgolaise's letters have been met with the legal advisor's satisfaction and in order to avoid an endless exchange of messages between the DRC and Belgolaise Bank, on July 5, 2008, the Minister of Finance sent a letter to the Bank underscoring the fact that the DRC's government is acknowledging the total and definitive cancelation of this debt to Belgolaise Bank as part of the London Club. Based on this, he instructed different departments to remove the above mentioned loans from their books.

2007 Annual Report of the Central Bank, at DRC00003714-3715 (PX 107).  Again, there is no mention in the section discussing the London Club debt that Defendants considered that debt to be time-barred or unenforceable.  Indeed, the decision of the Finance Minister to remove the debt owed to Belgolaise under the Credit Agreement, but not the debt owed to any other creditors, communicates the opposite message:  i.e., that the Defendants continued to recognize their debt under the Credit Agreement to all creditors other than Belgolaise.

In July 2007, the DRC granted a "mandate" to the International Institute for Africa and Sovereign Advisors Limited "to assist in the restructuring of the DRC's external debt—with the cost of the advisors' services to be borne by the World Bank.  Letter from J-C. Masangu to UB, dated July 26, 2007 (PX 51).  Later that year, a delegation composed of representatives of the Finance Ministry, OGEDEP and the Central Bank met with BOTT in to New York to discuss debt reconciliation.  In the course of those meetings with BOTT, *all five* members of the DRC delegation counter-signed a document signed by a representative of UB entitled "Certificate of Outstanding [Debt] Democratic Republic of Congo f/k/a Republic of Zaire" certifying that the amount of principal outstanding under the Credit Agreement was $359,517,002.16.  The impression these five counter-signatures was obviously intended to convey was that the Defendants' stood behind their debt obligations under the Credit Agreement.  Certificate of Outstanding [Debt] Democratic Republic of Congo f/k/a Republic of Zaire, dated October 10, 2007 (PX 53).

## VII.   THE 2009 ACKNOWLEDGEMENT LETTER, AND DEFENDANTS' CONTINUED OVERTURES AND ASSURANCES TO CREDITORS.

On July 15, 2009, the Finance Minister and Mr. Masangu, who remained Governor at that time, executed yet another Acknowledgment Letter (the "**2009 Acknowledgement Letter**") in materially identical form to the 1997 and 2003 Acknowledgement Letters.  2009 Acknowledgement Letter, at

DRC00003581 (PX 27).[9]  Mr. Masangu understood that the 2009 Acknowledgment Letter renewed the acknowledgement of the Credit Agreement when he signed the Letter.  Masangu Dep. at 58:22-59:14.  As with each of the prior acknowledgement letters, Defendants have admitted that the Finance Minister and the Governor signed the 2009 Acknowledgement Letter.  Transcript of November 16, 2013 Pretrial Conference, at 51:20-24; 54:15-19.  Unlike the 1997 and 2003 Acknowledgement Letters, the 2009 letter was obtained by BNP Paribas rather than Citibank.  *See* Letter from J-C. Masangu to T. Desjardins and M. Ymonet (of BNP Paribas), dated July 20, 2009 (transmitting 2009 Acknowledgement Letter) (PX 61).

On December 8, 2011, the Finance Minister sent UB a document entitled "Communiqué to all Agent Banks forming of the London Club"—with instructions that it be distributed to all of the Agent Banks, and then to all creditors.  In announcing that the Defendants would consider the debt held by any creditor that did not come forward to declare themselves before April 30, 2012 to be void, the Finance Minister clearly communicated to creditors that Defendants would consider all such claims enforceable at least until that time, and that the claims of any creditor that did come forward would continue to be recognized after that date:

> Dear Sirs,
>
> After reaching, on 1 July 2010, the HIPC completion point and with a view to setting its outstanding debts owed to its creditors, especially those of the London Club, the Democratic Republic of Congo (DRC) undertook many actions in order to determine the actual amount of said debts.
>
> In this regard, several messages (e-mails) were unsuccessfully sent to agent banks who are members of the London Club for reconciliation of statistics.
>
> A DRC delegation travelled to Brussels, Paris and London in July 2011 afterwards; with a view to contacting certain agent banks.  On that occasion, some promise [sic] were made to provide them with the names of the persons in charge of the DRC dossier and the amounts payable to the creditor banks within a short deadline.  Up to date, no

---

[9]   Plaintiffs learned of the existence of the 1991, 1997 and 2009 Acknowledgement Letters in the course of the discovery ordered by the Court in its decision denying Plaintiffs' prior motion for summary judgment.

feedback was received in this regard.

> *Consequently, the DRC hereby kindly request any bank holding a debt owed by the DRC within the framework of the London Club to come forward by 30 April 2012 at the latest.  Failing that, any un-declared debt shall be deemed and [sic] void.*

Letter from Finance Minister to UB, dated December 8, 2011 (emphasis added) (PX 66).

In its Annual Report for 2011, in addition to reporting on the Defendants' ongoing efforts to restructure the London Club debt, the Central Bank *expressly acknowledged the debt to Plaintiffs at issue in this lawsuit:*

> The objective sought in 2011 was to reconcile the amount of the debt owed by the DRC between the Agent Banks and the Servicing Bank for the London Club (Union Bank of California, or UBOC).
>
> *To review, the remaining principal on this debt is estimated at 28.6 million USD, 18.0 million of which is held by Themis and Des Moines.*
>
> Given the unclaimed debts owed to this club, the various credit management institutions involved considered the possibility of inviting all London Club-member creditors to come forward.  To that end, a deadline for the debt claims was set, after which any unclaimed debts will be canceled.  Based on the above, the Directorate of Public Debt (DGDP) has estimated this debt at approximately 80.8 million USD.

2011 Annual Report of the Central Bank, at 0065.0014-0015 (emphasis added) (PX 65).  The source of these figures as the *Direction Générale de la Dette Publique* (or "**DGDP**")—the agency that took over responsibility for managing the DRC's public debt in 2009.  *Id.* at 0065.0014.  Mr. Masangu corroborated this fact at his deposition.  Masangu Dep. at 157:11-162:20.  Notably, this acknowledgement by the Central Bank and DGDP that Defendants' debt to Plaintiffs remained outstanding was released more than a year after Defendants' belated appearance in this lawsuit.  *See Themis Capital LLC v. Democratic Republic of the Congo*, 881 F. Supp. 2d 508, 514 (S.D.N.Y. 2012) ("On November 29, 2010, defendants made their first appearance in this case . . .").

Like OGEDEP before it, DGDP is part of the Finance Ministry.  Decree No. 09/61 of December 3, 2009, Art. 1 (PX 101).  And like OGEDEP before it, DGDP serves as counsel to the government as a whole on matters related to public debt—including maintaining information about the

public debt and communicating that information to other government agencies.  Articles 4 and 5 of the

Decree that created DGDP describe its primary functions:

Article 4:

**The [DGDP] is a body of counsel to the Government in matters related to the public debt**.

The mission of the [DGDP] is to manage the public debt (both national and foreign), long-term and medium-term loans including consolidated debt and budgetary arrears dating from more than one year.

Article 5:

In application of Article 4 above, the [DGDP] responsible for the following:

- to draw up and submit to the Government in draft form a national debt policy, including proposals for improved financing;
- *to provide a prior technical notice as to as to any national or foreign source of public debt to the State . . .*;
- to prepare and participate in the negotiation of loan agreement, credit agreements, public debt agreements, as well as foreign/external claims;
- *to monitor the application of financing agreements*, including project grants;
- to manage the national and foreign public debt, the bonded debt, as well as cross-border claims and debt claims subject to revert orders;

                    *          *          *

- *to carry out any and all necessary analyses directly or indirectly linked to their aim and purpose*;
- to mobilize and monitor the use of all national or foreign financing that is a source of public debt, directly or indirectly, and to this end, approve all requests for disbursement and to ensure the monitoring of projects carried out with government funds (bonds) . . .

*Id.* Arts. 4, 5 (emphasis added).

Finally, in its Annual Report for 2012 (which became available only recently), the Central

Bank again acknowledged the continued viability of the London Club debt in the section devoted to the

DRC's public indebtedness:

IV.3.2.2. London Club

In 2012, the government continued negotiations begun well before reaching the completion point under the HIPC Initiative, particularly with the Union Bank of California.  However, at end-December 2012, these negotiations proved less successful as were hoped, given the lack of

response on the part of creditor members of this club.

This is the result, on the one hand, of the lack of communication between the Congolese and the London Club and, on the other hand, to the discontinuation of debt servicing in favor of these creditors for several years. *It should be noted that the debt stock owed to the London Club syndicated lenders is estimated at 80.8 million USD.*

2012 Annual Report of the Central Bank, at 0001.0007 (emphasis added) (PX 1).  As with the 2011 report, the source of the London Club debt figures was DGDP.  *Id.* at 0001.0008.  Nothing in that section indicated that either of the Defendants considered the London Club debt to be time-barred.

## PROCEDURAL HISTORY AND LAW OF THE CASE

This action has been pending since February 23, 2009.   After Defendants were served and failed to appear, Plaintiffs moved for a default judgment, which was granted on April 28, 2010.  Order Granting Default Judgment (DE 13).  The matter was referred to Magistrate Judge Fox for a determination of damages, and on November 1, 2010, he issued a report and recommendation awarding $44 million to Themis and $35 million to Des Moines.  Report and Recommendation (DE 16).  With Plaintiffs' consent, the default was vacated in June 2011.  Order Vacating Default (DE 37).  On December 23, 2011, Plaintiffs moved for summary judgment on the merits (DE 61), which the Court denied without prejudice on July 26, 2012.  *Themis Capital LLC v. Democratic Republic of the Congo,* 881 F. Supp. 2d 508 (S.D.N.Y. 2012).  In its opinion denying Plaintiffs' motion, the Court directed that discovery be taken into "communications leading up to the 2003 Letter," "internal communications among [creditors] with respect to the initiation, drafting, or development of the 2003 Letter," "communications within the DRC and the Central Bank with respect to these subjects," "any evidence that rebuts the presumption that the signatures on the 2003 Letter are, in fact, authentic," and "evidence as to actual authority."  *Id*. at 531.  Defendants subsequently moved for leave to amend their answer, and the Court denied that motion in an opinion dated April 18, 2013.  *Themis Capital LLC v. Democratic Republic of Congo*, 2013 WL 167198 (S.D.N.Y. April 18, 2013).  Discovery concluded in September 2012, and the matter is now scheduled for a trial beginning on February 11, 2014.

"Under the law of the case doctrine, a decision on an issue of law becomes binding precedent in subsequent stages of the same litigation." *Brentwood Pain & Rehabilitation Servs., P.C. v. Allstate Ins. Co.*, 508 F. Supp. 2d 278, 288. (S.D.N.Y. 2007) (citation omitted); *see also U.S. v. Quinteri*, 306 F.3d 1217, 1225 (2d. Cir. 2002) ("when a court has ruled on an issue, that decision should generally be adhered to by that court in subsequent stages of the same case."). In the course of this action, the Court has made at least four rulings that constitute law of the case:

- Defendants were served with the Amended Complaint. *Themis Capital LLC*, 881 F. Supp. 2d at 514.

- "[In Section 12.07(a) of the Credit Agreement], the DRC explicitly waived jurisdictional immunity in accordance with [28 U.S.C. § 1605(a)(1)] for 'any action arising out of or relating to' the Credit Agreement. The Agreement does not provide a procedure for revoking that waiver. Thus, the DRC's waiver of jurisdictional immunity is irrevocable, and the court properly exercises original jurisdiction over this dispute." *Themis Capital LLC*, 881 F. Supp. 2d at 517;[10]

- "[Section 12.07(c) of] the Credit Agreement unambiguously waived immunity of [D]efendants' property from execution. . . . [Section 12.07(c)] does not provide a procedure for revocation of that waiver. Thus, in accordance with the [Foreign Sovereign Immunities Act], the DRC's waiver of immunity from attachment is, also, irrevocable." *Id.*, 881 F. Supp. 2d at 517-518; and

- "[G]iven defendants' conduct of this litigation, they are estopped from . . . attempting to inject a challenge to plaintiffs' assignment." *Themis Capital LLC*, 2013 WL 1687198 at *6.

## ARGUMENT

## I.   THE SIGNATORIES TO THE 2003 ACKNOWLEDGEMENT LETTER HAD ACTUAL AUTHORITY TO BIND THEIR PRINCIPALS UNDER DRC LAW.

The law of the DRC governs whether the signatories to the acknowledgement letters had actual authority to bind Defendants. *Themis Capital LLC*, 881 F. Supp. 2d at 521. This determination of foreign law is a matter of law for the court. *Faggionato v. Lerner,* 500 F. Supp. 2d 237, 244 (S.D.N.Y.

---

[10]   Although the Court did not expressly extend this ruling to the Central Bank's waiver of immunity from jurisdiction, the Court's reasoning with respect to the DRC's waiver of immunity from jurisdiction applies with equal force to the Central Bank's waiver. Similarly, the reasoning underlying Court's ruling that the DRC's waiver of immunity with respect to its assets is irrevocable and binding applies with equal force to the waiver of immunity with respect to the assets of the Central Bank.

2007).  "In determining foreign law, the court may consider any relevant material or source, including

testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence."

Fed. R. Civ. P. 44.1.

> **A.     The Finance Minister's Authority To Sign The 2003 Acknowledgement
>         Letter On Behalf Of The DRC Came From Ordinance 80-073.**

Under Section 8.01(b) of the Credit Agreement, the DRC is required to obtain and maintain all

approvals necessary under the laws of the DRC to enter into, perform and maintain the enforceability

of the agreement.  *See* Credit Agreement § 8.01(b) (requiring the DRC to "[d]uly obtain and maintain

in full force and effort all government approvals . . . which may be necessary under the law of the

[DRC] for the execution, delivery and performance of [the Credit Agreement] by the [DRC] or for the

validity or enforceability [thereof].") (PX 10).  In compliance with that Section (as well as Section

6.01(b)(i) and Exhibit 1), on April 21, 1980 the President issued Ordinance 80-073—which authorizes

the Defendants to sign the Credit Agreement, and directs the Finance Minister and the Governor of the

Central Bank to do so on their behalf.  Ordinance 80-073 (DX 29).

Plaintiffs' expert on DRC law will testify that Ordinance 80-073 has an implicit meaning

beyond its express terms, and that to understand that meaning it must be read in context with the Credit

Agreement to which it explicitly refers.  Chikuru Dep. at 90:19-91:20.  He will further testify that by

authorizing the Finance Minister and Governor to sign the Credit Agreement on behalf of the DRC and

the Central Bank, respectively, Ordinance 80-073 implicitly empowered the individuals holding those

positions to carry out their respective principals' obligations under that agreement going forward.

Chikuru Dep. at 84:4-10; 96:12-20.  In the Finance Minister's case, this included the power to perform

the DRC's obligations under Section 8.01(b).  Chikuru Dep. at 85:18-86:24.  In short, it is Mr.

Chikuru's opinion that Ordinance 80-073 vested the Finance Minister with ongoing authority to take

all actions necessary under DRC law to maintain the enforceability of the Credit Agreement, and that

this ongoing authority empowered the Finance Minister to bind the DRC to each of the 1991, 1997 and

2003 Acknowledgement Letters.  Chikuru Report ¶¶ 9(b), 14, 20; Chikuru Rebuttal Report ¶ 12(c);

Chikuru Dep. at 86:25-88:8; 90:19-92:14; 93:4-15; 97:11-101:25.

Mr. Chikuru will also testify that by authorizing the Finance Minister to enter into the Credit

Agreement on behalf of the DRC, Ordinance 80-073 implicitly authorized the individual holding that

position to renew the DRC's obligations under that agreement until the authorization was revoked.

Chikuru Report ¶¶ 40, 41; Chikuru Rebuttal Report ¶ 12(c).  As discussed in Section I.D. below, Mr.

Chikuru will testify that this authorization remained in effect through the date the 2003

Acknowledgement Letter was signed.

### B. The Governor Of The Central Bank Had Authority To Sign The 2003 Acknowledgement Letter Under Act 005/2002.

Act 005/2002 prescribes the powers of the Central Bank's Governor under DRC law.  Since at

least May 7, 2002 when that Act went into force, the Governor has been authorized to enter into

contracts on the bank's behalf.  This power derives from Article 31 of the Act, which provides:

> The Governor shall represent the Bank in all of its relationships and ties to third parties,
> including the government, and in this capacity, has the following powers:
>
>        *      *      *
>
> b) Singlehandedly or with other signatories sign contracts entered into by the Bank,
> Bank correspondence and other documents.

Act 005/2002, Art. 31 (PX 118).  Mr. Masangu, who served as Governor for 15 years, corroborated

this fact.  Masangu Dep. at 129:18-129:22.  Mr. Chikuru will testify at trial that Article 31 of Act

005/2002 empowered the Governor to bind the Central Bank to the 2003 Acknowledgement Letter.

Chikuru Report ¶ 47.  He will also testify that by authorizing the Governor to sign the Credit

Agreement for the Central Bank, Ordinance 80-073 implicitly empowered the Governor to

acknowledge the bank's obligations under the Credit Agreement.  Chikuru Report ¶ 40; Chikuru Dep.

at 86:14-24; 96:12-20.  Finally, he will testify that the 2003 Acknowledgement Letter did not create a

new guarantee obligation, and therefore did not implicate Article 16 of the Act, which limits the
Central Bank ability to guarantee the obligations of the DRC.

>     **C.      Decree 28/2002 Did Not Strip The Signatories
>              To The 2003 Acknowledgement Letter Of Their
>              Authority To Bind Defendants To That Letter.**

Defendants contend that at the time the 2003 Acknowledgement Letter was signed, the only
entity with authority under DRC law to acknowledge the Defendants' obligations under the Credit
Agreement was a body composed of the heads of each of the DRC government ministries called the
Council of Ministers.  Defs' Proposed Conclusions of Law ¶¶ 7-11.  In support of this contention,
Defendants cite Article 11 of Decree 28/2002—pursuant to which any "decision that may have
immediate or future budgetary repercussions" must be deliberated on and approved by the Council.
*Id.*; Decree 28/2002 Art. 11 (DX 29).   But as Mr. Chikuru will testify at trial, Decree 28/2002 cannot
be invoked against third parties like Plaintiffs because there is no evidence that the contents of that law
were ever made available to the public in the manner required under the constitution and laws of the
DRC.  Chikuru Dep. 114:6-12.

Under Ordinance-law 68/400—the relevant law in effect in February 2002 when Decree
28/2002 was signed—any decree issued by a central governmental authority must be published in the
Congolese "Official Journal" before it can be enforced against private parties.  Ordinance-law 68/400
(PX 153); Chikuru Rebuttal Report ¶ 12(c).[11]  As there is no evidence that Decree 28/2002 was
published in compliance with these laws, it is Mr. Chikuru's opinion that invoking that Decree against
any private person or entity violates Ordinance-law 68/400 and the DRC constitution—which protects
individuals' right to due process, including the right to notice of the contents of the any law that may

---

[11]   The Official Journal replaced the *Moniteur Congolais* as the official means of publication of the laws of the
      DRC after Ordinance-law 68/400 was enacted.  Chikuru Rebuttal Report ¶12(c) n.5.

be enforced against the individual.  Chikuru Rebuttal Report ¶ 12(c); *see also* Lubala Dep. 67:21-68:4 (conceding that he could not confirm Decree 28/2002 was published in the Official Journal).

Mr. Chikuru will also testify that even if Decree 28/2002 had been published in the Official Journal, it did not abrogate Ordinance 80-073.  First, because the two laws deal with different subject matters—Ordinance 80-073, with execution and performance of the Credit Agreement, and Decree 28/2002 with the organization and functioning of the government—Decree 28/2002 did not supersede Ordinance 80-073.  Chikuru Rebuttal Report ¶ 12(a).  Second, under the civil law principle *lex specialis derogat lege generali,* a general provision of law (*lex generalis*) will not be construed as having abrogated a specific provision (*lex specialis*) unless the intent to do so is clear from the general provision.  Because Ordinance 80-073 deals with a particular subject matter and Decree 28/2002 deals with a general one, and because there is no indication that Decree 28/2002 was intended to abrogate Ordinance 80-073, Ordinance 80-073 survived the enactment of Decree 28/2002.  *Id.* ¶ 12(b).

Finally, Mr. Chikuru will testify that the 2003 Acknowledgement Letter was not an "agreement or decision that could have [had] an immediate or future budgetary impact" requiring the approval of the Council of Ministers under Article 11 of Decree 28/2002.  Mr. Chikuru interprets the phrase "immediate or future budgetary impact"—which is defined nowhere in DRC law—as applying only to those agreements or decisions that "would have consequences for the way the State would allot funds for a given period."  Chikuru Rebuttal Report ¶ 15; Chikuru Dep. at 111:20-112:11.  The 2003 Acknowledgement Letter could not have met this definition because, according to Mr. Chikuru, it is well known that the DRC has not made a budgetary allocation to pay any of what it owes under the Credit Agreement for decades, and there is no reason to presume that its acknowledgement of that debt would have caused it to depart from this long-standing practice—in 2003, or at any other time.  *Id.* ¶ 16.  To the contrary, Mr. Chikuru will testify that the 2003 Acknowledgement Letter was intended to

*avoid* the budgetary impact of having to defend against the creditor litigation that likely would have resulted if Defendants had not signed that letter.  *Id.*   Chikuru Dep. at 144:22-145:21.

## II.   THE DEFENDANTS RATIFIED EACH OF THE ACKNOWLEDGEMENT LETTERS.

Under the doctrine of ratification, even if an agent lacks authority to commit an act on behalf of its principal, if the principal "acquires or is charged with knowledge of [the] unauthorized act . . . and does not repudiate that act within a reasonable time, but instead acquiesces in it, the [principal] is bound by the act."  *In re Martin-Trigona*, 760 F.2d at 1341.  The doctrine applies to sovereign parties. *See Reiss v. Societe Centrale Du Groupe Des Assurances Nationales*, 185 F. Supp. 2d 335, 338 (S.D.N.Y. 2002) (sovereign can ratify unauthorized acts of agent);  *Digicon Corp. v. United States*, 56 Fed. Cl. 425 (2003) (United States ratified unauthorized acts through silent acceptance of benefits).

 As discussed in the preceding section, Defendants claim that only the Council of Ministers could have ratified the actions of the signatories to the 2003 Acknowledgement Letter.  Although Plaintiffs dispute this contention, if it is taken as true, Plaintiffs can establish that Defendants ratified the 2003 Acknowledgement Letter by showing that the Council of Ministers had knowledge of the facts material to that acknowledgement and yet failed to repudiate it within a reasonable time.

Given that there is no evidence of Defendants even ***hinting*** that the Credit Agreement might be time-barred before they appeared in this lawsuit in late 2010, it is beyond dispute that they failed to repudiate any of the acknowledgement letters within a reasonable period of time.  Instead, the record is replete with evidence that the Defendants willingly accepted the benefits of those letters.  *See IRB-Brazil Resseguros, S.A. v. Inepar Inv. S.A.*, 922 N.Y.S.2d 308 (1st Dept. 2011) (principal can ratify unauthorized acts by accepting benefits of those acts).  These benefits were not limited to repose from creditor litigation, but also included improved prospects for obtaining HIPC debt relief—which, as Defendants have understood for years, is contingent on Defendants' working in good faith towards a consensual restructuring of the Credit Agreement.  *See* Communication from J-C. Masangu to Agent

Banks, dated November 29, 2002, at CITI0000187 ("negotiations with the London Club represent the next decisive step before the DRC's eligibility for the HIPC Initiative") (PX 24).

Therefore, the only genuine question for the Court is whether the Council of Ministers had knowledge of the material facts—i.e., whether they knew about and understood the significance of the 2003 Acknowledgement Letter.  Regrettably, Plaintiffs efforts to obtain direct proof that the Council of Ministers was informed of and approved (or disapproved) that letter were thwarted by the Defendants' refusal to comply with discovery.  Although Plaintiffs requested that Defendants search the files of the Council of Ministers for any documents that might have shed light on these issues—and in spite of the Court's later ruling that Defendants **must** search those files and produce any responsive documents found there—Defendants appear never to have searched, and produced no documents from, those files.[12]  A proper sanction for their refusal to do so would be to draw an adverse inference that, had those files been searched, the responsive documents produced to Plaintiffs would have revealed that

---

[12]   Plaintiffs' first document requests contained a request for "All documents Concerning the [2003 Acknowledgment Letter], including but not limited to Documents Concerning discussions, Communications or negotiations leading up to the [2003 Acknowledgement Letter]." Pffs' First Requests for Production, No. 1 (PX 150).  On November 14, 2012, at the Court's instruction, Plaintiffs served Defendants with a "Request for Information" inquiring whether the files of the Council of Ministers had been searched for documents responsive to Plaintiffs' requests.  Plaintiffs' Request for Information, dated November 14, 2012 (DE 99).  On November 26, 2012, the Court ordered Defendants to submit an attorney affidavit which, among other things, answered that question.  Order, dated November 26, 2012 (DE 100).  On December 7, 2012, counsel for Defendants submitted an affidavit in which she reported that Defendants were unable to obtain assistance from the librarian responsible for maintaining Council of Ministers' records (who is also a government employee) in identifying or reviewing files from the Council of Ministers dating from before 2007.  The librarian reportedly speculated that documents from 2003 may not even exist, but there is no indication that Defendants undertook to confirm that fact.  Affidavit of Nady Mayifuilla, dated December 7, 2012 ("**Mayifuila Aff.**"), at 6 (PX 102).  Despite repeated requests to Defendants' counsel that such searches be made, the Council of Ministers' files from before 2007 appear never to have been searched.  As an alternative method of locating documents related to Council of Ministers meetings, Plaintiffs also sought documents from the Ministry of Communications —which Plaintiffs understand is responsible for publicizing minutes of Council of Ministers meetings, and could therefore be expected to be in possession of such meeting minutes.  Plaintiffs' Request for Information, dated November 14, 2012 (DE 99).  Ms. Mayafuila's affidavit states that she was unable to determine from Defendants' representatives whether any search of the files of the Ministry of Communications had been conducted.  Mayifuila Aff. at 7 (PX 102).

the Council of Ministers was aware of the relevant facts and decided to accept the benefits of the 2003 Acknowledgement Letter rather than to repudiate it.[13]

But the Court need not impose such a sanction in order to find for Plaintiffs, because a party seeking to establish ratification need not prove that the principal had actual knowledge of the material facts where, as here, knowledge of those facts can be imputed to the principal based on the circumstances. *EUA Cogenex Corp v. North Rockland Cent. Sch. Dist.*, 124 F. Supp. 2d 861, 870 (S.D.N.Y. 2000). As shown below, the evidence from which knowledge of the facts material to the 2003 Acknowledgement Letter can be imputed to the Council of Ministers is substantial. The evidence shows that at least five of the individuals to have served as Finance Minister since 1997 understood the significance of the acknowledgement letters while they held that office. The Finance Minister sits on the Council of Ministers, and the evidence shows that he could not have avoided communicating this information to the Council of Ministers at some point. (Indeed, if Defendants' interpretation of Decree 28/2002 is accepted, he had a ***duty*** to do so on at least three occasions.) The evidence shows that OGEDEP and DGDP—which were required under DRC law to maintain information on the public debt and provide it to other government agencies—was also in possession of all of the material facts. And the evidence shows it is public knowledge in the DRC that the Central Bank and DGDP consider the Credit Agreement to remain enforceable decades after it was executed—which could only be the case if it had been acknowledged repeatedly—and that this information was communicated to the

---

[13] Where, as here, a party's failure to produce evidence can be characterized as grossly negligent, the missing evidence should be considered relevant and prejudicial to the innocent party's claim or defense—i.e., an adverse inference instruction should be given with respect to that evidence. *Residential Funding Corp., v. DeGeorge Financial Corp.*, 306 F.3d 99, 106-107 (2d. Cir. 2002). Thus, in *Glover, et al. v. Costco Wholesale Corp.*, 153 Fed. Appx. 774 (2005), the Second Circuit affirmed an adverse inference instruction where the district court found that the missing inspection log would have been highly probative and the fact that it was missing prejudiced the plaintiffs. The same is true here. Defendants' entire case turns on their argument that Plaintiffs have been unable to demonstrate that the Council of Ministers approved the 2003 Acknowledgement Letter. The significance placed on this missing evidence establishes that any available evidence of meetings of the Council of Ministers, whether from the Council of Ministers itself or the Ministry of Communications, would be highly probative, and the Defendants failure to conduct a thorough search for these materials must therefore inure to its detriment.

President (who presides over the Council of Ministers) directly.[14] *See* Decree 28/2002, Art. 22, Art. 23 (President presides over and sets agenda for Council meetings).

Finally, if the Court concludes that the Central Bank has the power to ratify the Governor's acknowledgement without the approval of the Council of Ministers, then the evidence shows that it did so in its annual reports for 2007, 2011 and 2012—each of which reports that Defendants' debt under the Credit Agreement remains outstanding.  2007 Annual Report of the Central Bank, at DRC00003714-3715 (PX 107); 2011 Annual Report of the Central Bank, at 0065.0014-0015 (PX 65); 2012 Annual Report of the Central Bank, at 0001.007 (PX 1).

> **A.      At Least Five Of The Persons To Have Served As Finance Minister Since 1997 Understood The Significance Of The Acknowledgement Letters While They Held That Position.**

One need understand only two things to appreciate the significance of the acknowledgement letters: *first*, Defendants' payment obligations under the Credit Agreement would have become unenforceable by operation of the New York statute of limitations without the acknowledgement, and *second*, creditors might have sued to enforce their claims under the Credit Agreement if Defendants had failed to acknowledge those obligations in a timely fashion.  Both of these facts are spelled out expressly in the acknowledgement letters themselves, each of which contains the following statement:

> It is the intention of the [Defendants] in executing and delivering this acknowledgement formally to recognize and confirm all such obligations in order to eliminate any concerns any Bank holding any such indebtedness may have due to any possible application of any principals of prescription, including without limitations, those established by the New York statute of limitations, which might lead any Bank to conclude that the forbearance demonstrated to date by such Bank in refraining from acting to enforce any rights it may have to collect such indebtedness might have an adverse effect on the ultimate collectability of such indebtedness.

---

[14]   Knowledge of the contents of each of the acknowledgment letters, and of the Red Mountain Report, can also be imputed to Defendants based on their production of those documents in this litigation.  *See Tr. of the Am. Fed'n of Musicians and Emp'r Pension Fund v. Steven Scott Enterp.*, 40 F.Supp.2d 503, 512 (S.D.N.Y. 1999) (principal's knowledge of contents of documents can be inferred from their presence in its files); 1991 Acknowledgement Letter, at DRC00003577 (PX 27); 1997 Acknowledgement Letter, at DRC00003580 (PX 27); 2003 Acknowledgement Letter, at CITI0000202 (PX 22).

1991 Acknowledgement Letter, at CITI 0003701-3702 (PX 17); 1997 Acknowledgement Letter, at CITI0003699 (PX 17); 2003 Acknowledgement Letter, at CITI0000202 (PX 22); 2009 Acknowledgement Letter, at DRC00003581 (PX 27).  It can therefore reasonably be assumed that each of the four Ministers of Finance who signed an acknowledgement letter understood the material facts before doing so.  Furthermore, any doubt as to whether the Finance Ministers who signed the 1997 or 2003 letters understood what they were signing was dispelled by Mr. Masangu, who testified that he understood the significance of the acknowledgement letters perfectly, (Masangu Dep. at 58:22-59:14; 64:19-67:25; 69:2-70:14; 70:23-72:5; 72:12-72:14), and that he explained that significance to each of those individuals.  *Id.* at 69:2-7; 100:25-103:8; 108:5-109:9.

In addition, both the individual who served as Finance Minister in June 1999, and Mr. Matungulu, did so just before Mr. Luongwe took the position over in February 2003, were informed of the significance of the acknowledgement letters while they were in office:  the former, by the Red Mountain Report, and the latter, in a warning letter he received from Citibank on February 11, 2003.  Red Mountain Report, at DRC00004115 (PX 21); Letter from M. Losembe and C. Kamanz to I. Matungulu, dated February 11, 2003, at DRC00003575 (PX 27).

## B.  The Finance Minister's Understanding Of The Acknowledgement Letters Can Be Imputed To The Council Of Ministers.

The Council of Ministers has been in existence at least since May 1997.  *See* Constitutional Decree-law 003/1997, dated May 27, 1997, Art. 9 (providing for a Council of Ministers) (PX 134).  As a government minister, the Finance Minister is a member of the Council.  Decree 28/2002, Art. 19 (DX 28).  Whether or not the 2003 Acknowledgement Letter had "an immediate or future budgetary impact" as Defendants claim—thereby requiring the Finance Minister to submit it to the deliberations of the Council of Ministers before signing it—it can hardly be disputed that the Defendants' debt to the London Club was a matter of sufficient state interest that the Finance Minister would have felt it necessary to discuss the consequences of acknowledging that debt with the Council before doing so.  It

is therefore all but certain that the Finance Minister informed the Council of Ministers of the acknowledgement letters' existence and significance at some point between May 1997 and the Defendants' appearance in this lawsuit.

Furthermore, if the Court were to find that the 2003 Acknowledgement Letter had "either an immediate or future budgetary impact" as Defendants contend, then the Finance Minister would have had a ***duty*** under Decree 28/2002 to submit the letter "to the deliberations of the Council of Ministers" before he signed it.  Decree 28/2002, Art. 9 (DX 28).[15]  Under the same reasoning, the Finance Minister would have been duty-bound to inform the Council of the significance of the 2009 Acknowledgement Letter before he signed it in July 2009.  Had he done so on either occasion, he could not have discharged his responsibilities as an officer of the government without explaining the letter's significance to the Council.  *See Center v. Hampton Affiliate, Inc*, 497 N.Y.S.2d 898 (1985) (person with duty to disclose information to another presumed to have discharged duty).  In this sense, the 2009 Acknowledgment Letter itself was a ratification of the 2003 Acknowledgment Letter.

Finally, toward the end of 2003, the DRC paid BOTT hundreds of thousands of dollars in administrative fee arrears, plus $50,000 to cover such fees ***through April 2004***.  *See* Letter from J-C. Masangu to J. Lattibeaudiere, dated August 22, 2003, at UB00001002 (offering to settle arrears issue and pay BOTT's fees through June 2004) (PX 39); 2003-2004 Annual Report of the Central Bank, at DRC000934 (PX 96) (reporting that fees had been paid).  As these fees were actually paid, the decision to make the disbursement unquestionably had a budgetary impact—and therefore only could have been made by the Council of Ministers.  Decree 28/2002, Art. 11 (DX 28).  Even in the implausible event that the Finance Minster had failed to consult with the Council before signing the 2003 Acknowledgement Letter, he could not have avoided disclosing the fact that the DRC remained

---

[15]   While Decree 28/2002 cannot be enforced against private parties, as an administrative provision it was binding on governmental officials while it was in force.  Chikuru Report ¶ 42.

bound under the Credit Agreement during the Council's deliberations on whether to approve this payment to BOTT—the obvious purpose of which was to keep BOTT functioning as Servicing Bank to assist Defendants in reconciling the amounts outstanding under the Credit Agreement. There would have been no point in paying BOTT to provide this service if the Credit Agreement was time-barred. Furthermore, the very fact that these fees were paid at all constituted ratification of the 2003 Acknowledgment Letter by the Council of Ministers.

This court imputed knowledge to a principal to find that it ratified the unauthorized acts of its agent under similar circumstances in *EUA Cognerex Corp v. North Rockland Cent. Sch. Dist.*, 124 F. Supp. 2d 861 (S.D.N.Y. 2000). In that case, the plaintiff entered into a construction contract with a school district which was approved by the district's board in compliance with state law. Later, plaintiff and district's facilities director executed an amendment to the contract. It was undisputed that the individual board member lacked actual authority to bind the district. *Id.*, 124 F. Supp. 2d at 865-67. In finding that the district ratified the acts of the individual board member, this court noted that the district made payments pursuant to the amendment, and on that basis imputed knowledge of the amendment's existence and significance to the board as a whole. *Id.*, 124 F. Supp. 2d at 871. Similarly, since the 2003 Acknowledgement Letter was signed, Defendants have paid over $400,000 in administrative fees to BOTT—at least $50,000 of which accrued *after* the letter was signed. These facts, when considered together with all of the other evidence indicating that the Finance Minister must have discussed the acknowledgement letters with the Council of Ministers, are a more than sufficient basis to impute the Finance Minister's knowledge of these issues to the Council of Ministers.

### C.    OGEDEP's Knowledge Of The Acknowledgement Letters Can Also Be Imputed To The Council Of Ministers.

The evidence shows that OGEDEP knew of the acknowledgement letters and their utility to Defendants in avoiding creditor litigation. The committee that wrote the Red Mountain Report included OGEDEP representatives. Red Mountain Report, at DRC00004115 (PX 21). Mr. Luongwe

sent a copy of the 2003 Acknowledgement Letter to OGEDEP shortly after it was signed with an instruction that it should be "take[n] into consideration . . . insofar as [OGEDEP was] concerned in the daily keeping of the great book of public debt."  Letter from L. Luongwe to M. Losembe, J-C. Masangu and the President and CEO of OGEDEP, dated February 27, 2003, at CITI0000196 (PX 33-A).  And the information on the London Club debt published in the Central Bank's annual reports came from OGEDEP and DGDP.  Masangu Dep. at 159:19-161:13; 2011 Annual Report of the Central Bank, at 0065.0015 (PX 65);2012 Annual Report of the Central Bank, at 0001.0004 (PX 1).

It is a hornbook principle of agency law that knowledge acquired by an agent acting within the scope of its agency is imputed to its principal, and the latter is bound by such knowledge—even if the information is not communicated to the principal.  *Kirschner v. KPMG LLP*, 938 N.E.2d 941, 951 (N.Y. 2010).  As the agency charged under DRC law with maintaining information about the public debt and disseminating that information, the information OGEDEP maintained about the acknowledgment letters and their significance can thus be imputed to the government as a whole.

### D.  The Council Of Ministers' Knowledge Of The Material Facts Can Be Inferred From Other Actions Of The Defendants.

Finally, the fact that OGEDEP, DGDP and the Central Bank consider the Credit Agreement to remain enforceable has been in the public domain in the DRC at least since the Central Bank's Annual Report for 2007 was published.  The section of that report discussing the London Club debt refers specifically to the fact that it originated in a "March 1980 Refinancing Agreement."  2007 Annual Report of the Central Bank, at DRC00003714 (PX 107).  And although the annual reports from 2011 and 2012 do not expressly repeat the connection between the 1980 Credit Agreement and the London Club debt, both of those reports also refer to the London Club debt as outstanding.  *See* 2011 Annual Report of the Central Bank, at 0065.0015 ("the remaining principal on [the London Club] debt is estimated at 28.6 million USD, 18.0 million of which is held by Themis and Des Moines."); (PX 65)

-39-

2012 Annual Report of the Central Bank, at 0001.0007 ("the debt stock owed to the London Club syndicated lenders is estimated at 80.8 million USD.") (PX 1).

In other words, it has been publicly available information in the DRC for years that the DRC continues to owe tens of millions of dollars in principal (plus any accrued interest) under a credit agreement executed *over 33 years ago*. At a bare minimum, the presence of this information in the public domain was sufficient to put the Council of Ministers on inquiry notice of the fact that—at least in the view of the Central Bank, OGEDEP and DGDP—the Defendants' obligations under this very old Credit Agreement had been renewed at some point. Indeed, this information was communicated directly to the President of the DRC, who presides over the Council of Ministers. *See* Decree 28/2002, Art. 22, Art. 23; Discussion at p. 19 & n. 8, *supra* (noting that each annual report of the Central Bank was addressed to the President). For this additional reason, knowledge of the fact that the Credit Agreement was renewed should be imputed to the Council of Ministers. *In re Nigeria Charter Flight Contract Litig.*, 520 F. Supp. 2d 447, 467 (E.D.N.Y. 2007) (facts known to agent will be imputed to principal if principal "was in a position to acquire such knowledge").

## III.   THE SIGNATORIES TO THE 2003 ACKNOWLEDGEMENT LETTER HAD APPARENT AUTHORITY TO BIND THEIR PRINCIPALS.

Under the doctrine of apparent authority, an agent may "bind his principal to a contract if the principal has created the appearance of authority leading the other contracting party to believe that actual authority exists," (*Themis Capital LLC*, 881 F. Supp. 2d at 522), or when the principal, "either intentionally or by lack of ordinary care, induces a third party to believe that the [apparent agent] has been authorized to act on its behalf." *Merrill Lynch Capital Servs. v. UISA Fin.*, 2012 WL 1202034 at *6 (S.D.N.Y. Apr. 10, 2012). The doctrine applies to acts undertaken on behalf of foreign states and their instrumentalities. *Themis Capital LLC*, 881 F. Supp. 2d at 522.

A party seeking to establish an agent's apparent authority must show that the principal's intentional or negligent acts, including acts of omission, created an appearance of authority in the agent

on which the invoking party reasonably relied. *36 Convent Avenue HDFC v. Fishman*, 2004 WL 1048213 at * 3 (S.D.N.Y. May 7, 2004).  The Court must then determine whether the facts and circumstances surrounding the transaction were novel, extraordinary, or indicative of fraud, or otherwise gave rise to a duty to inquire into the scope of the agent's authority. *FDIC v. Providence Coll.*, 115 F. 3d 136, 147 (2d. Cir. 1997).

In this case, Citibank undertook to obtain the 2003 Acknowledgment Letter as agent on behalf of all creditors. *See* Letter from M. Losembe and C. Kamanz (both of Citibank) to I. Matungulu, dated February 11, 2003 (noting that "Citibank Congo acts for all Banks and Agent Banks signatory [to] the [Credit] Agreement") (PX 27).  Consequently, whether Plaintiffs can invoke apparent authority to bind Defendants to the 2003 Acknowledgment Letter turns on whether Citibank reasonably relied on the apparent authority of the signatories to that letter, and whether the surrounding facts and circumstances imposed a duty of inquiry on Citibank.

### A.   Defendants' Actions Created The Appearance That The Finance Minister And Governor Had Authority To Acknowledge The Credit Agreement, And Citibank Reasonably Relied On Those Actions.

In concluding that the Finance Minister and Governor had apparent authority to sign the 2003 Acknowledgement Letter on Defendants' behalf, Citibank reasonably relied on the facts:  (1) that the DRC vested the Finance Minister and Governor with authority to execute the Credit Agreement in 1980, and was required under that agreement to maintain any governmental authorizations necessary under DRC law to prevent it from becoming unenforceable—which in 2003, required acknowledging the agreement; (2) that the Finance Minister and Governor signed acknowledgement letters in 1991 and 1997, and Defendants never once claimed that those individuals lacked authority to do so; and (3) that Defendants were applying for HIPC relief, in part, to relieve themselves of their obligations under the Credit Agreement—which would have been unnecessary if the agreement had been unenforceable.

Section 8.01(b) of the Credit Agreement requires the DRC to "obtain and maintain in full force and effect all governmental approvals . . . which may be necessary under the law of the [DRC] for the execution, delivery and performance of this Agreement by the [DRC] or for the validity or enforceability hereof." Credit Agreement § 8.01(b) (PX 10). This provision (among others) obligated the DRC to issue Ordinance 80-073 authorizing the Finance Minister and the Governor to execute the Credit Agreement on behalf of the Defendants. Decree 80-073 (DX 29). After the Credit Agreement had been in default for over six years, it then obligated the DRC to obtain and maintain whatever governmental authorizations were necessary under DRC law to acknowledge the debt—which was the only way to prevent the agreement from becoming unenforceable.

Taking on these obligations was obviously an act attributable to Defendants. Furthermore, as a creditor and Agent Bank with rights and obligations under the Credit Agreement, and which drafted the template for the 2003 Acknowledgement Letter in consultation with counsel, Citibank is presumed to have been aware of this obligation. *See Progressive Cas. Ins. Co. v. C.A. Reaseguradora Nacional De Venezuela*, 991 F.2d 42, 46 (2d Cir. 1993) (sophisticated party to a contract assumed to be familiar with its terms); Bartner Dep. at 72:25-73:5 (Bartner sought advice of counsel when drafting 1997 Acknowledgement Letter). Indeed, Defendants themselves acknowledge this fact in their Proposed Conclusions of Law. *See* Defs' Proposed Conclusions of Law ¶ 55 (acknowledging that knowledge of requirement in Credit Agreement that Ordinance 80-073 be issued to authorize Finance Minister and Governor to execute Credit Agreement is imputable to Citibank). Furthermore, the evidence shows that Citibank did, in fact, rely on the fact that the Finance Minister and Governor had continuing authority to acknowledge the agreement on behalf of Defendants. Bartner Dep. at 127:8-20. Under the circumstances, such reliance was entirely reasonable.

The Finance Minister and Governor also executed acknowledgement letters on Defendants' behalf in 1991 and 1997.[16]  As discussed above, knowledge of this fact can be imputed to the DRC (through the Council of Ministers) and to the Central Bank (through the Governor himself).  *See* Argument Section II, *supra*.  Never once in the 12 years that those acknowledgement letters were in effect did Defendants communicate to Citibank—or to any other creditor—that the signatories to those letters lacked authority to sign those letters.  Bartner Dep. at 128:6-129:2.  Rather, from Citibank's perspective they represented an unbroken chain of acknowledgements—each executed by the same government officials to have executed the Credit Agreement on Defendants' behalf pursuant to an explicit grant of authority.  *See* Masangu Dep. at 104:18-105:2 (based on "past experience," Masangu believed it unnecessary to inquire into the authority of signatories to acknowledgement letters).

The evidence shows that Citibank relied on the fact that the Finance Minster and the Governor had signed acknowledgement letters in 1991 and 1997 in assuming that the chain of those officials' authority was unbroken as of February 2003.  Bartner Dep. at 127:8-20; 185:10-19.  And again, such reliance was reasonable under the circumstances.  Indeed, having created the impression that the authority of the Finance Minister and the Governor to acknowledge the Credit Agreement continued throughout this 12-year period, it was Defendants' responsibility to notify creditors that that authority had been revoked at some point before the 2003 Acknowledgement Letter was signed.  *See Parlato v. Equitable Life Assurance Soc. of the United States*, 749 N.Y.S.2d 216, 222 (App. Div. 1st Dep't 2002) ("[A] third party . . . known by a principal to have previously dealt with the principal through the principal's authorized agent, is entitled to assume the agent's authority continues until the third party receives notice that the principal has revoked the agent's authority."); *Seetransport Wiking Trader Schiffahrtsgesellschwft MBH & Co. Kommanditgesellschaft v. Republic of Romania*, 123 F. Supp. 2d

---

[16]  Notably, Defendants have offered no evidence to indicate who, if not the signatories themselves, had actual authority to bind their principals to the 1991 and 1997 Acknowledgement Letters.

174, 190 (S.D.N.Y. 1990) (sovereign's failure to disavow authority of agent at any time during negotiation of settlement agreement made it entirely reasonable for plaintiffs to rely on such authority).

The evidence shows that, in February 2003, Defendants had begun the process of seeking HIPC assistance in repaying their debt under the Credit Agreement. *See* Communication from J-C. Masangu to Agent Banks, dated November 29, 2002, at CITI0000187 (reporting Defendants hoped to become "eligibil[e] for the HIPC Initiative") (PX 24). As even Defendants would have to agree, it would have been altogether *unreasonable* for Citibank to assume that the DRC's application for such relief was not sanctioned by whoever had authority under the laws in effect at the time to sanction it. Citibank knew that the DRC was seeking such relief at the time the 2003 Acknowledgement Letter was signed. Communication from J-C. Masangu to Agent Banks, dated November 29, 2002, at CITI0000187 (PX 24); Bartner Dep. at 119:9-119:22; 121:15-123:18. And this fact further justified Citibank's reliance on the apparent authority of the Finance Minister and the Governor to execute the 2003 Acknowledgement Letter on Defendants' behalf.

Finally, the fact that the signatories to the 2003 Acknowledgement Letter held the titles of "Finance Minister" and "Governor," respectively would have, by itself, justified Citibank's belief that the persons holding these positions had authority to acknowledge the Credit Agreement. The title of "Finance Minister" denotes the head of financial matters for the state. *See* Wordnet, http://wordnetweb.princeton.edu/perl/webwn?s=finance%20minister (defining Finance Minister as "the minister responsible for state finances."). Similarly, "Governor" denotes the Chief Executive of the Central Bank, and chief executives typically have plenary authority to enter into contracts on behalf of the organizations over which they preside. The fact that the individuals who signed the acknowledgement letters held these titles further justified Citibank's belief that the Finance Minister and Governor had authority to bind the Defendants to the 2003 Acknowledgement Letter. *See First Fidelity Bank*, *N.A. v. Gov't of Antigua & Barbuda—Permanent Mission*, 877 F.2d 189, 195 (2d Cir.

1989) (the scope of authority implicit in an individual's title can justify reliance on the individual's

apparent authority).

> **B.     The Circumstances Surrounding The 2003 Acknowledgement
> Letter Did Not Give Rise To  A Duty Of Inquiry.**

In their Proposed Conclusions of Law, Defendants identify four "facts" allegedly known to

Citibank at the time the 2003 Acknowledgement Letter was signed which, they contend, gave rise to a

duty of inquiry into the authority of the Finance Minister and the Governor to sign that letter on

Defendants' behalf:  (1) that acknowledgement letters "are not common documents;" (2) that there was

uncertainty as to the total amount of debt outstanding under the Credit Agreement in February 2003;

(3) that creditors insisted that the DRC issue Ordinance 80-073 empowering the Finance Minister and

the Governor to execute the Credit Agreement as a condition to that agreement going into force; and

(4) that in February 2003, the DRC was experiencing an "extensive, extraordinary and widely

reported" period of turmoil.  Defs' Proposed Conclusions of Law ¶¶ 50-58.  None of these "facts"

justifies imposing a duty of inquiry on Citibank.

The first of Defendants' contentions is simply wrong.  The evidence shows that as of February

2003, Defendants had already executed two acknowledgement letters, and Ms. Bartner was obtaining a

similar document from Sudan.  Email from C. Bartner to M. Losembe, dated March 4, 2003 (PX 31).

Citibank resolved the second "issue" in 1997 by revising the form of acknowledgement so as not to

require any reconciliation of the debt.  Unlike the form of acknowledgement used in 1991, which

required a reconciliation of the amounts outstanding under the Credit Agreement, the 1997 and 2003

Acknowledgement Letters simply acknowledged whatever amounts were outstanding at the time—

thereby sidestepping reconciliation altogether.  Moreover, as of February 2003, when Citibank's

supposed duty of inquiry would have been triggered in Defendants' view, the 1997 Acknowledgement

Letter—which also  employs a "blanket" acknowledgement—had been in effect for six years, with no

indication from Defendants (or anyone else) that it was in any way defective.

The fact that creditors required the DRC to issue Ordinance 80-073 as a condition to the Credit Agreement going into force does not help Defendants' case either—because, as discussed above, the Credit Agreement also includes a requirement that the DRC maintain in full force and effect all governmental approvals necessary to prevent the agreement from becoming time-barred.  Credit Agreement § 8.01(b).  Clearly, one of the reasons the parties chose to impose this duty on Defendants was so that the Agent Banks would not be forced to ascertain for themselves what approvals might be required in order for Defendants to maintain the enforceability of the Credit Agreement at some point in the future—a daunting task in a country like the DRC even in relatively peaceful times.  Having bargained for a provision that explicitly excuses them from having to do so, the Agent Banks should not be burdened with a duty to make this inquiry anyway.

For similar reasons, the fact that the DRC was experiencing serious political turmoil in early 2003 did not give rise to a duty of inquiry on Citibank's part.  No doubt in the expectation that the DRC would experience periods of such turmoil before the Credit Agreement was paid in full, Section 8.01(b) protects the Agent Banks from having to determine, in the midst of such turmoil, who in the DRC government has authority to do what.  And in any case, the DRC was also experiencing turmoil when the 1997 Acknowledgement Letter was signed—yet by 2003, Citibank had heard no indication from Defendants that the signatures on that letter were not authorized.

To impose a duty of inquiry on a party relying on the acts of an apparent agent under New York law, courts require circumstances far more extraordinary or suspicious than those present here.  For example, *Mason Tenders District Council v. JNG Construction Ltd.*, 2003 WL 22999453 (S.D.N.Y. Dec. 19, 2003), involved a series of "red flags" indicating that an individual purporting to sign a collective bargaining agreement on behalf of the defendant lacked authority to do so.  In particular, "instead of signing the agreement when first given to him, [the agent] allegedly [claimed] that he had to take the [agreement] to his 'bosses'"—a statement clearly indicative of his lack of

authority to sign it himself.   And when the plaintiff later asked the agent whether he was an officer or principal of the defendant, the agent refused to answer.  *Id.* 2003 WL 22999453 at \*4.  Similarly, *Republic of Benin v. Mezei*, 2010 WL 3564270 (S.D.N.Y. Sept. 9, 2010), involved a transfer of real property in which the attorney for the defendant knew that written authorization that the purported agent had authority to affect the transfer was essential, yet never received such authorization. This court held that because "the defendants were . . . on notice [of the need for authorization, and yet it] was not forthcoming, they should [have] inquired as to [the purported agent's] authority." *Id.,* 2010 WL 3564270 at \*7.  By contrast, in *American National Fire Insurance Company v. Kenealy*, 72 F.3d 264 (2d Cir. 1995), which involved an insurance policy modified by a third party agent in violation of a provision in the policy expressly prohibiting agents from modifying the policy without the insurer's authorization, the Second Circuit refused to impose a duty of inquiry on the defendant, noting that "only in cases where seemingly actual authority is placed in doubt by a transaction that is 'extraordinary' or patently fraudulent does a duty to inquire into the state of that authority arise." *Id.* at 268.

## IV.     THE CENTRAL BANK CAN BE SUED TO RECOVER THE DEBT TO PLAINTIFFS OUTSTANDING UNDER THE CREDIT AGREEMENT.

The Central Bank agreed to pay the debt owed by the DRC under the Credit Agreement, subject only to the availability of foreign currency sufficient to cover such payments.  The parties' intent that the Central Bank could be sued to recover that debt if this condition is met is clear from the language of the Credit Agreement—and is underscored by the parties' course of performance, as evidenced in the acknowledgement letters.  Furthermore, the record is clear that foreign currency sufficient to satisfy the DRC's debt to Plaintiffs has been available to the Central Bank at least since 2002—the earliest date for which Plaintiffs' have been able to obtain evidence of the Central Bank's foreign currency holdings.  Plaintiffs are therefore entitled to a money judgment for the full amount owed to them jointly and severally against both the DRC and the Central Bank.

**A.    The Central Bank's Obligation To Pay The Debt Owed Under
The Credit Agreement Is Evidenced Both By The Language
Of The Agreement, And By The Acknowledgement Letters.**

The main provisions of the Credit Agreement defining the Central Bank's payment obligations

under that agreement are Sections 9.01 and 8.03.  Section 9.01 reads, in relevant part:

> The Bank of Zaire irrevocably and unconditionally states and agrees *for the benefit of
> each Bank* that. . .
>
> (a) All payments of principal, interest and other amounts required under this Agreement
> are irrevocably authorized by all action required in the Republic of Zaire so that such
> payments can be made in the currency and manner and at the time required by the terms
> of this Agreement.
>
> *          *          *
>
> (c) Subject to the availability to the Bank of Zaire of Dollars or other Foreign Currency
> and pursuant to the instructions of the Obligor contained in Section 8.03, the Bank of
> Zaire will either (i) make available to the Obligor sufficient Dollars or other Foreign
> Currency to enable the Obligor to make each such payments as so required or (ii) on
> behalf of the Obligor make each payment as so required.

Credit Agreement § 9.01 (emphasis added) (PX 10).  Section 8.03 of the Credit Agreement, in turn,

contains the DRC's irrevocable and unconditional instruction to the Central Bank "*for the benefit of*

*each Bank*, to make all payments required by this Agreement as contemplated by clause (ii) of Section

9.01(c)."  *Id.* § 8.03 (emphasis added).  When read together, it is apparent that these provisions

obligate the Central Bank to pay the creditors under the agreement (i.e. the "Banks")[17] subject only to

the availability of sufficient foreign currency.

The Central Bank agreed to carry out its obligations under Section 9.01 "for the benefit of each

Bank."  The substance of the Central Bank's obligations to creditors is then described in Section

9.01(c), in which the Central Bank promises that it will, subject to the DRC's instruction, either

provide the DRC with funds sufficient to pay creditors what they are owed, or make those payments

---

[17]  "Bank" is defined in the Credit Agreement as "each bank listed under the heading 'Banks' on the signature
pages hereof and the successors and permitted assigns of each such bank," and refers to the original lenders
under the Credit Agreement. *Id.* §1.01, p. 1-1.

itself.  In Section 8.03, the DRC irrevocably and unconditionally instructs the Central Bank to do the latter.  And the language "for the benefit of each Bank" in both of these provisions makes clear the parties' intent that the Central Bank would be answerable to creditors themselves if it failed to do so.

The parties' intent that the Central Bank could be sued directly by creditors to recover the outstanding debt under the Credit Agreement is further evidenced by Section 12.07 of that agreement, under which the Central Bank consented to be sued in this Court in any action arising out of or relating to the Credit Agreement, waived any claim of sovereign immunity from such a lawsuit—and most revealingly, waived and agreed not to assert any claim of sovereign immunity that its assets might enjoy from enforcement of any resulting money judgment against the Central Bank.  Credit Agreement § 12.07 (PX 10).  Inclusion of this explicit waiver language would only make sense if the parties contemplated that the Central Bank could be sued for breach of the Credit Agreement, and that a money judgment could be entered against it as a result of such a suit.

In a similar vein, the Credit Agreement includes two so-called "negative pledge" provisions which, subject to certain exceptions, prohibit the Defendants from creating or permitting the existence of any lien or other form of security interest in the assets of the Central Bank for the benefit of other creditors.  The DRC's negative pledge is set forth in Section 8.02, and the Central Bank's negative pledge appears in Section 9.03(a).[18]  The purpose of including a negative pledge provision in a loan agreement is to protect creditors' ability to enforce a money judgment against the debtor.  As one author has explained, negative pledge covenants

> are common in unsecured loan agreements because they address one of the most
> fundamental concerns of the unsecured lender:  that the borrower's assets will become

---

[18]   *See* Credit Agreement § 8.02(a)(i) and (ii) (prohibiting "any Lien for any purpose with respect to (A) any International Monetary Assets or (B) any Foreign Exchange or gold owned or held by . . . the Bank of Zaire" or "any Lien upon or with respect to any Asset of the Bank of Zaire . . . to serve or provide for the payment of [certain foreign currency-denominated obligations]."); *id* § 9.03 (prohibiting the Central Bank from "creat[ing] or permit[ting] to be created and continue any Lien or its Assets which the [DRC] agrees in Section 8.02 that it will not permit to be created) (PX 10). *Id.*

unavailable to repay the loan, because the borrower will have both granted a security interest in those assets to a second lender and dissipated the proceeds of the second loan.

Carl S. Bjerre, *Secured Transactions Inside Out: Negative Pledge Covenants, Property and Perfection*, 84 CORNELL L. REV. 305, 311 (1999); *accord Metropolitan Life Ins. Co. v. RJR Nabisco, Inc.*, 906 F.2d 884 (2d Cir. 1990) (purpose of negative pledge clauses is to prevent other creditors from obtaining priority over assets of an unsecured debtor); Am. Bar Found., *Commentaries on Model Debenture Indenture Provisions* 350 (1971) (same).

Finally, under Section 10.01 of the Credit Agreement, it is an event of default if (1) the Central Bank shall cease to hold substantially all of the country's monetary reserves and gold; (2) the Central Bank shall contest or deny its liability under the Credit Agreement; or (3) there is a material adverse change in the Central Bank's financial condition. Credit Agreement § 10.01(j), (k) and (m) (PX 10). If any of these events were to come to pass, it would cast doubt on the ability of creditors to collect the amounts owed to them from the assets of the Central Bank. Making each of them an event of default under the Credit Agreement therefore further evidences the parties' intent that creditors could reach the assets of the Central Bank if the amounts owed to them under the Credit Agreement were not paid.

Under New York law, it is a cardinal principle of contract construction that "an interpretation of a contract that has the effect of rendering at least one clause superfluous or meaningless. . . is not preferred and will be avoided if possible." *Galli v. Metz*, 973 F.3d 145, 149 (2d. Cir. 1992); *see also Dixon v. NBC Universal Media LLC*, No. 12 Civ. 7646, 2013 WL 2355521, at *6 (S.D.N.Y. May 28, 2013) (Engelmayer, J.) (same). "[T]he entire contract must be considered, and all parts of it reconciled, if possible, to avoid an inconsistency." *Terwilliger v. Terwilliger*, 206 F.3d 240, 245 (2d. Cir. 2000). Yet if Defendants' position were accepted and the Court were to construe the Credit Agreement as imposing the obligation to pay principal and interest only on the DRC, Section 9.03

would be entirely superfluous, and Sections 8.02, 10.01 and 12.07 would be superfluous to the extent that they apply to the Central Bank or its assets.[19]

The language used in the acknowledgement letters also demonstrates that the parties understood the Central Bank to have its own obligation to pay the debt owed under the Credit Agreement.  In the 1991 Acknowledgement Letter, the DRC and the Central Bank "acknowledge and confirm *their respective obligations with respect to such indebtedness* and other obligations arising under [the Credit Agreement]."  1991 Acknowledgement Letter, at CITI0003701-3702 (PX 17) (emphasis added).  And in the 1997 and 2003 Acknowledgement Letters, the Defendants "acknowledge and confirm as of the date hereof *their respective obligations with respect to the principal and interest unpaid under [the Credit Agreement]* . . . and all other obligations arising under [the Credit Agreement]."  1997 Acknowledgement Letter, at CITI0003699 (PX 17); 2003 Acknowledgement Letter (PX 29) (emphasis added).

Finally, interpreting Section 9.01 as imposing a direct payment obligation on the Central Bank comports with industry practice and common sense.  At her deposition, Ms. Bartner testified that, with respect to restructuring agreements, "the central bank of a country is . . . normally [and] historically a

---

[19]   The obligation to pay creditors principal, interest and other amounts owed to them by the DRC is the only contractual obligation of the Central Bank for which a money judgment is even arguably a suitable remedy.  All of the Central Bank's contractual obligations that survived closing are set forth in Article IX of the Credit Agreement.  Section 9.02 contains the Central Bank's representations and warranties as of closing, the remedy for breach of which is not damages, but either rescission or injunctive relief.  *DynCorp v. GTE Corp.*, 215 F.Supp.2d 308, 324 (S.D.N.Y. 2002) (citing *Bridgestone/Firestone, Inc. v. Recovery Credit Services, Inc.*, 98 F.3d 13, 20 (2d Cir. 1996)); *see also Western Filter Corp. v. Argan*, 540 F.3d 947, 952 (9th Cir. 2008) ("Unless the parties agree to a survival clause—extending the representations and warranties past the closing date—the breaching party cannot be sued for damages post-closing for their later discovered breach.").  And Section 9.03 contains the Central Bank's "negative pledge" not to create or permit the creation of liens or other security interests in its assets for the benefit of other creditors.  *See supra*, at 49-50.  The remedy for breach of a negative pledge provision is either a money judgment for the amount of the underlying payment obligation, or equitable relief to enforce the negative pledge.  *See Chase Nat'l Bank v. Sweezy*, 281 N.Y.S. 487, 491 (N.Y. Sup. Ct. 1931) (injunction is proper remedy for violation of negative pledge), *aff'd mem.*, 185 N.E. 803 (N.Y. 1933)); Bjerre, *supra* at 50, at 318 (courts historically award, as remedy for breach of negative pledge, an injunction to enforce the provision, an equitable lien on property pledged in violation of the provision, or a money judgment for the amount of the underlying obligation as damages for tortious interference).

party to the agreement." Bartner Dep. at 176:17-23.  It makes perfect sense that creditors would

demand such protection when agreeing to restructure a sovereign's debt obligations following an

actual or threatened default, because states commonly maintain substantial assets in the name of their

central bank.  *See* Jeremy Ostrander, *The Last Bastion of Sovereign Immunity:  A Comparative Look at*

*Immunity from Execution of Judgments*, 22 BERKELEY J. INT'L L. 541, 568 (2004) (A central bank is

"likely both to hold the assets of its home government and to have those funds present in many foreign

countries in the course of its regular business."); *accord* Credit Agreement 10.01(j) (it shall be an event

of default if "the [Central Bank] shall not at all times hold substantially all of the (i) International

Monetary Assets and (ii) the gold owned by the [DRC], the [Central Bank] and the Governmental

Agencies.") (PX 10).  Insisting that central banks be subject to suit to recover on the state's debt

obligations meaningfully increases creditors' protections in the event of another default—a matter of

particular interest to creditors in a restructuring situation.

### B. The Central Bank Has Foreign Currency Sufficient To Satisfy Plaintiffs' Claims.

The uncontroverted evidence also shows that the only condition to the Central Bank's payment

obligation—*i.e.*, that sufficient foreign currency to satisfy the DRC's obligations to Plaintiffs be

available to the Central Bank—is also satisfied.  According to the Central Bank's own annual reports,

it has held foreign currency reserves exceeding the amount of Plaintiffs' claims continuously since at

least 2002.  *See* Overview of Currency Reserves from 2002-2012 (PX 114) (summarizing reserve

levels reported in Central Bank Annual Reports from 2002 to 2012).[20]  As of December 31, 2012—the

last date for which figures are available—the Central Bank's foreign currency reserves exceeded $1.1

---

[20] Plaintiffs offer PX 114 as summary evidence of the reserve levels reported in the Central Bank's Annual Reports for 2002-2003 (PX 94), 2003-2004 (PX 96), 2004-2005 (PX 98), 2006 (PX 48), 2007 (PX 113), 2011 (PX 65) and 2012 (PX 1).  *See* Fed. R. Evid. 1006 ("The proponent may use a summary, chart, or calculation to prove the content of voluminous writings, recordings, or photographs that cannot be conveniently examined in court.").

billion.  2012 Annual Report of the Central Bank at DRC00004424-4426 (PX 1).  By contrast, as of October 1, 2013, the total amount Plaintiffs seek to recover in this action was just over $87.3 million.  Spreadsheets Showing Principal and Interest for Plaintiffs Themis and Des Moines (PX 91, PX 92).[21]

Although Defendants did not make this argument in their Proposed Conclusions of Law, in January 2012 they took the position that the Central Bank's payment obligations under Section 9.01 could be satisfied if, ***after setting aside*** the amount of foreign currency deemed necessary to hold in reserve "[a]ccording to international standards," the Central Bank had enough foreign currency ***left over*** to satisfy Plaintiffs' claims.  Declaration [of] Kabeya Ndaya Lydie, dated January 28, 2012, ¶¶ 5-10 (DE 68-7).  Because they contended that the Central Bank had only $162 million in reserves available to it as of 2006,[22] and based on their claim (unsupported by any admissible evidence) that "international standards" required the Central Bank to maintain reserves substantially in excess of that amount, Defendants argued that the Central Bank was not liable to Plaintiffs.  *Id.*

Even if the Defendants had offered admissible evidence to support their nebulous contention that "international standards" require the Central Bank to maintain a particular amount of reserves, that evidence could not justify writing this additional condition into the Credit Agreement.  In the words of New York's highest court, "[i]t is the role of the courts to enforce the agreement made by the parties— not to add, excise or distort the meaning of the terms they chose to include, thereby creating a new contract under the guise of construction."  *NML Capital v Republic of Argentina*, 952 N.E.2d 482, 489-

---

[21]  Plaintiffs offer PX 91 and PX 92 to demonstrate the amount of interest that has accrued on their claims under their interest calculation methodology—not to establish their entitlement to such interest.  PX 91 and PX 92 are therefore admissible as demonstrative evidence under Fed. R. Evid. 1006.

[22]  It is unclear why the Defendants relied on the 2006 figure in 2012.  But in any case, this figure is at odds with the reserve figures set forth in the Central Bank's Annual Report for 2006.  *See* 2006 Annual Report of the Central Bank at DRC001698-701 (reporting reserves of $182.5 million as of December 31, 2006) (PX 48).  It is even more at odds with the reserve figures set forth in the Central Bank's Annual Report for 2011.  *See* 2011 Annual Report of the Central Bank at DRC003054-57 (reporting reserves of $755 million as of December 31, 2011) (PX 65).

90 (N.Y. 2011).  Nothing in the language of Section 9.01(c)—pursuant to which the Central Bank

agreed to pay creditors subject only "to the availability to the [Central Bank] of Dollars or other

Foreign Currency—warrants reading the additional condition urged by Defendants into that Section.

> **C.   The Defendants' Efforts To Limit The Scope Of**
> **The Central Bank's Obligations Are Unavailing.**

The Defendants attempt to circumscribe the Central Bank's obligations under Section 9.01 in

two ways.  First, they contend that under DRC law, the Central Bank cannot guarantee the DRC's debt

obligations—and therefore the Credit Agreement cannot be interpreted to impose any such obligation

on the Central Bank.  Lubala Report ¶ 31 (PX 124).  Second, they argue that the Central Bank could

fully discharge its obligations under Section 9.01 merely by "mak[ing] available to the [DRC]

sufficient Dollars or other foreign currency to enable the [DRC] to make each [] payment" required

under the Credit Agreement—whether or not the DRC used the funds made available to it by the

Central Bank to make such payments.  Defendants' Proposed Conclusion of Law, ¶ 18, n. 25 (DE 170).

Neither argument has merit.

Defendants' DRC law-based arguments fail for the obvious reason that the Credit Agreement is

governed by the law of New York.  Credit Agreement §12.10 (PX 10).  And even if DRC law appled,

the provision of DRC law Defendants' expert cites as the basis for his opinion that the Central Bank

cannot guarantee the debts of the DRC was enacted in 2002—decades after the Central Bank entered

into the Credit Agreement.   *See* Lubala Report ¶ 31 (PX 124) (citing Act No. 005/2002 (PX 118)).

Defendants' second argument fails because it ignores Section 8.03—under which the DRC

"irrevocably and unconditionally instruct[ed] the [Central Bank], for the benefit of each [creditor] to

make all payments required by [the Credit Agreement] as contemplated by clause (ii) of Section

9.01(c)."  Credit Agreement § 8.03 (PX 10).  And as explained above, Section 9.01(c)(ii) obligates the

Central Bank "on behalf of the [DRC to] make each payment" required under the Credit Agreement.

*Id.* §9.01(c)(ii).  In the face of this irrevocable and unconditional instruction made for the creditors'

benefit, where, as here, the DRC failed to pay what it owes to plaintiffs, the Central Bank could not discharge its obligations under Section 9.01 without making those payments itself.[23]

## V.   PLAINTIFFS' DAMAGES INCLUDE COMPOUND INTEREST.

Plaintiffs are entitled to compound interest—that is, interest on any amounts of interest not paid when due—because Section 3.05(d) of the Credit Agreement expressly provides for it, and such interest is enforceable under New York law.  The only meaningful difference in the parties' respective positions on how such interest is to be calculated turns on when interest on past due principal and interest comes "due"—and therefore begins, itself, to accrue interest.  Defendants' position—that such interest comes due whenever a creditor demands payment—both requires the Court to read a term into the Credit Agreement, and leads to absurd and burdensome results.  By contrast, Plaintiffs' interpretation—under which such interest comes due every month—avoids such results, and fits cleanly with the mechanism created in the Credit Agreement whereby post-default interest is divided into successive month-long "Overdue Periods."

### A.   The Credit Agreement Provides For Compound Interest.

The Credit Agreement provides for four types of interest.  The first type is interest that accrued between the "Reference Date" (January 31, 1980) and the "Reconciliation Date" (September 2, 1980), and is governed by Section 3.02.  The second is interest that accrued on principal before the Defendants went into default, and is governed by Sections 3.03 and 3.04.  The third is interest that accrued on principal after Defendants failed to pay such principal when it came due (i.e., after

---

[23] Defendants may argue that Plaintiffs reading of Sections 8.03 and 9.01 renders Section 9.01(c)(i) superfluous in violation of New York principles of contract construction.  Such an argument overlooks the fact that the irrevocable instruction in Section 8.03 was given "for the benefit of creditors," and therefore is only material to the extent that creditors are injured by the Central Bank's failure to perform.  If the Central Bank had complied with Section 9.01(c)(i) and the DRC had then *paid* Plaintiffs with the funds made available to it by the Central Bank, Plaintiffs would have suffered no injury—rendering the instruction in Section 8.03 unnecessary.  Section 9.01(c)(i) therefore has a purpose under Plaintiffs' reading as long as the DRC is meeting its payment obligations under the Credit Agreement.

Defendants defaulted), and is governed by Section 3.05(a) and (b).  And the fourth is interest on unpaid amounts of interest, which is governed by Section 3.05(d).

Interest in the first category came due on the Reconciliation Date—which is defined in the Credit Agreement as September 2, 1980.  *Id.* §3.01.  Thereafter, for as long as the Defendants were making timely payments of principal under the Credit Agreement, interest of the second type accrued during—and came due at the end of—each successive six-month "Interest Period":

> SECTION 3.03.  <u>Interest from the Reconciliation Date</u>. The Obligor shall pay interest on each Credit from the Reconciliation Date to the final Principal Payment Date at an interest rate per annum equal at all times during each Interest Period to the sum of the Applicable Margin and the LIBO Rate for such Interest Period, such interest to be ***due and payable*** on the last day of each Interest Period for interest accrued during such Interest Period."

> SECTION 3.04.  <u>Interest Periods</u>.  The period from the Reconciliation Date to the final Principal Payment Date shall be divided into successive Interest Periods. The first Interest Period shall begin on the Reconciliation Date and end on the last day of the Month in which occurs the first anniversary of the date of this Agreement. Each subsequent Interest Period shall be a period of six Months and shall begin on the last day of the immediately preceding Interest Period."

*Id.* §§ 3.03 and 3.04 (emphasis added).  Inclusion of the word "due" before "and payable" in Section 3.03 makes clear that each such amount came due at the end of its corresponding Interest Period.

A different scheme—based on so-called "Overdue Periods" of one month rather than the six-month "Interest Periods" created by Section 3.04—went into effect after the Defendants ceased making timely payments of principal and interest.  This scheme, which applies both to interest on unpaid principal and to interest on unpaid interest, is governed by Section 3.05.  Confusingly, unlike Sections 3.02 and 3.03, Section 3.05 does not explicitly state when such interest is due.  The relevant provisions of that Section are the following:

> SECTION 3.05.  <u>Interest on Overdue Principal</u>.  (a) In the event that any principal amount of any Credit is not paid when due after the Effective Date, the [DRC] shall pay interest on such unpaid principal amount from the date such principal amount is due to the date such principal amount is paid in full, ***payable on demand***, at an interest rate per annum equal at all times during each Overdue Period to the sum of one percent (1%) plus the Applicable Margin plus the LIBO Rate for such Overdue Period. . .

(b)     For purposes of determining the interest rate pursuant to subsection (a) above, the period between the date the principal amount referred to therein is due and the date such principal amount is paid in full shall be divided into Overdue Periods of one Month (each of which other than the first shall begin on the last day of the next preceding Overdue Period).

*          *          *

(d)     To the extent permitted by law, ***the [DRC] further agrees to pay interest*** as provided in subsections (a) and (b) above ***on all interest which is not paid when due*** hereunder after the Effective Date, such interest is to be ***payable on demand***, to accrue from the due date of such interest until payment in full thereof and to be calculated on the basis of successive Overdue Periods of one Month."

*Id.* §3.05 (emphasis added).

Defendants appear to agree, as they must, that Section 3.05(d) explicitly contemplates the accrual of interest on unpaid interest to the extent permitted under New York law.[24]  Furthermore, Defendants cannot seriously dispute that New York law allows for the accrual of interest on unpaid interest— otherwise known as "compound" interest[25]—regardless of when the agreement calling for the accrual of such interest went into force.  *See* N.Y. GEN. OBLIG. LAW § 5-527(1) (McKinney 2008) ("A loan or other agreement providing for compound interest shall be enforceable notwithstanding the date that such loan or other agreement providing for such compound interest shall have been executed.").

The only difference in the parties' respective interpretations of Section 3.05 relates to when interest that accrues under that section comes ***due***.  Defendants argue that the word "due" should be read into the language in Sections 3.05(a) and (d) providing that interest is "payable on demand." Thus, according to Defendants, even though the drafters of the Credit Agreement chose in some places to use the words "due and payable," yet in others used "payable" by itself, the Court should

---

[24]  The acknowledgement letters also contemplate accrual of interest on unpaid interest.  *See, e.g.*, 2003 Acknowledgement Letter, at CITI0000202 (referring to "interest accrued on overdue principal and interest . . .") (PX 22).

[25]  The New York Legislature defined "compound interest" as the "accruing of interest upon unpaid interest irrespective of whether such unpaid interest is added to the principal debt."  N.Y. GEN. OBLIG. LAW § 5-527(1) (McKinney 2008).

nonetheless interpret "payable" to mean "due and payable" wherever it appears in Section 3.05. Interpreting Section 3.05 as Defendants propose would violate a fundamental principal of contract interpretation:  i.e., that to the extent possible, the Court must give meaning to all of the terms that the parties included in the Credit Agreement.  *See Mionis v. Bank Julius Baer & Co., Ltd.*, 301 A.D.2d 104, 109 (App. Div. 1st Dep't 2002) ("Courts are obliged to interpret a contract so as to give meaning to all of its terms.").

Furthermore, Defendants' construction of the Credit Agreement would lead to the bizarre result that creditors would control how often interest compounds after a default.  If "payable on demand" is read to mean "due on demand," a creditor could cause interest to be compounded as frequently as it liked—simply by making repeated demands for payment.  Thus, interest could be demanded—and therefore compounded—weekly, daily, or even ***hourly***.  Moreover, creditors could elect to compound interest at different or irregular intervals, thereby imposing a huge administrative burden on the Agents, the Servicing Bank and Defendants themselves—all of which are required under the Credit Agreement (or in Defendants case, by DRC law) to keep a record of how much is owed to each creditor at any given time.

The more natural reading of Section 3.05(a) and (d) is that interest that accrues pursuant to those provisions comes due at the end of each Overdue Period—just as it came due at the end of each Interest Period before Defendants ceased making timely payments of principal.  Of course, since that time, creditors have had the right ***to be paid*** the accrued interest ***on demand***.  But that does not mean that creditors had to make such a demand in order for interest to become ***due***.  Reading Section 3.05 in this way fits comfortably with the mechanism set up under that section whereby interest "is to be calculated on the basis of successive Overdue Periods of one Month" (Credit Agreement §3.05(d) (PX 10)), and mirrors the scheme set up in Section 3.03 for accrual of interest prior to Defendants default— pursuant to which interest came due at the end of each Interest Period.  *Id.* §3.03.  It also avoids the

absurd and burdensome results yielded by Defendants' proposed interpretation—instead providing a straightforward and relatively simple basis for calculating interest that applies to all creditors at all times since Defendants' default.

Defendants may argue that Plaintiffs' proposed interpretation requires the Court to read a term into the contract in violation of general principles of contract construction. *See* pp. 53-54, *supra*. However, it is entirely proper for courts to read implied terms into a contract to the extent necessary to give effect to the parties' intent. *See Sutton v. East River Sav. Bank*, 435 N.E.2d 1075, 1078 (N.Y. 1982) ("[N]ot merely literal language, but whatever may be reasonably implied therefrom must be taken into account [in determining the probable intent of the parties]."). Here, the fact that the parties intended for creditors to be entitled to compound interest is manifest from the fact that Section 3.05(d) expressly provides for it. And it is natural to imply from the fact that interest is calculated on the basis of month-long Overdue Periods in that section that the parties intended such interest to come due on a monthly basis as well. By contrast, under the "well established canon of interpretation that . . . the fact a construction contended for would make the contract unreasonable [justifies rejecting that construction]," the Court should reject Defendants' position that interest under Section 3.05 comes due only on demand —because the consequences that would flow from such an interpretation would be entirely "unreasonable." *Fleishman v. Furgeson*, 119 N.E. 400, 402 (N.Y. 1918).

### B.   This Court Has Interpreted Similar Contractual Language As Providing For Compound Interest.

This court has awarded compound interest based upon contractual terms similar to those in Section 3.05 Credit Agreement in at least two other actions—one involving debt issued by Peru, and the other involving debt issued by Nicaragua. In *Elliott Assocs., L.P. v. Banco de la Nacion*, 194 F.R.D. 116, 121-22 (S.D.N.Y. 2000), this court awarded compound interest notwithstanding the defendants' contention that such interest was not permitted under the contracts, and despite the fact

that no demand for payment of "interest on interest" was made on the debtor.  Section 2(b) of the

Letter Agreement at issue in that case provided, in relevant part:

> [Peru] will pay interest on the unpaid principal amount . . . until such principal amount
> is paid in full, payable as follows: . . . quarterly on the last day of each calendar quarter
> and on the date of final payment in full of such principal amount of such Affected Item,
> **but payable on demand in the case of interest on any overdue principal amount**, at a
> fluctuating interest rate. . . .

> If [Peru] shall fail to pay any amount of interest payable hereunder. . . when due, [it]
> shall, to the extent permitted by applicable law, pay interest on such overdue interest **on
> demand** from the date when due until payment thereof in full at the rate that would be
> applicable hereunder to such amount of interest if it constituted overdue principal . . .

Declaration of Eric C. Kirsch, dated March 4, 2011, ("Kirsch Decl"), Ex. G, at 2 (Peru Letter

Agreement) (emphasis added) (DE 29-7).  The plaintiff's expert, John D. Finnerty, interpreted these

terms to provide that interest on overdue principal became due quarterly—even though the contract in

question provided only that such interest was "payable on demand" and did not specify when it was

"due."  *Id*. Ex. I, at 17-26 (DE 29-9).  In adopting the plaintiff's expert's calculations, this court

observed that "[t]he Letter Agreements provide for compound interest 'to the extent permitted by

applicable law'"—thereby concluding that the agreements provided for quarterly compounding of

interest, with the only limit being whether New York law permitted them to do so.  *Elliott Assocs.,

L.P.*, 194 F.R.D. at 122.  This court could not have reached that conclusion without interpreting the

provision in question as providing that interest on overdue principal came "due" every quarter.

In *Van Eck Emerging Markets Opportunity Fund, L.P. v. the Republic of Nicaragua*, No. 00

Civ. 5756 (WHP) (S.D.N.Y.), a contract similar in many ways to the Credit Agreement was construed

to provide for compound interest, despite the fact that the contract failed to provide explicitly for

interest on unpaid interest, and that no demand for payment of such interest was made.  Like the Credit

Agreement, the Nicaragua agreement provided for "Interest on Overdue Principal":

> In the event that any principal amount . . . is not paid when due, [Nicaragua] shall pay
> interest on such unpaid principal amount from the date such principal amount is due
> until the date such principal amount is paid in full, **payable on demand**, at an interest

rate per annum equal, for each day of each period selected by the Servicing Bank under
subsection (b) of this Section.

Kirsch Decl. Ex. J (Nicaragua agreement) § 2.07(a) (DE 29-10).  Also like the Credit Agreement, the

Nicaragua agreement provided for consecutive overdue periods for the purpose of calculating interest

on unpaid principal:

> For purposes of determining the interest rate pursuant to subsection (a) of this Section,
> the period between the date the principal amount referred to therein is due and the date
> such principal amount is paid in full shall be divided into successive periods (each of
> which other than the first shall begin on the last day of the next preceding period, unless
> such preceding period was one day) of one day, one week, one month or three months,
> as the Servicing Bank may from time to time select.

*Id.* § 2.07(b).  Unlike the Credit Agreement, however, the Nicaragua agreement did not explicitly

provide for interest on unpaid interest.  Nevertheless, the parties interpreted the agreement to provide

for it.  Kirsch Decl. Ex. K (Declaration of Willem J. Humes) ¶ 6(c) ("[The] interest amount [accruing

on unpaid interest] is calculated by compounding the respective interest amounts on a quarterly

basis.")  (DE 29-11).  This court accepted that interpretation of the agreement and entered judgment in

the amount requested by the plaintiff—$62.47 million.  *Compare id.* Ex. L (DE 29-12) (judgment

awarding $62.47 million) *with id.* Ex. K at ¶¶ 6(c), 10 (DE 29-11) (stating that total principal and

interest due is $62.47 million).  The only term in the contract from which this court could have inferred

a right to compound interest is the provision for consecutive overdue periods.

## VI.   PLAINTIFFS HAVE ESTABLISHED THEIR STANDING TO BRING THIS ACTION.

The Court has already determined that Plaintiffs presumptively demonstrated their status as

rightful holders of the debt they seek to recover in this action through the assignment documents by

which they acquired that debt.  *Themis Capital LLC*, 2013 WL 167198 at *6.  Defendants have come

forward with no evidence to rebut Plaintiffs' evidence, which therefore definitely establishes Plaintiffs'

standing as the proper parties in interest to this suit.

Plaintiffs were not original lenders under the Credit Agreement.  Rather, as is common among holders of distressed debt, they acquired debt at issue by purchasing it in the so-called "secondary market" from predecessor holders—who assigned their debt interests to Plaintiffs.  This is contemplated in the Credit Agreement, which states that "[a]ny Bank may at any time . . . assign its rights and obligations under the Agreement with respect to each Credit of such Bank as a whole to another Bank or financial institution." Credit Agreement §12.09(b) (PX 10).

Themis's interests under the Credit Agreement consist of the right to receive $9,562,500.00 in principal (together with corresponding interest) originally owed to Citibank under Schedule A-7, and the right to receive $459,999.67 in principal (together with corresponding interest) originally owed to Bayerische Vereinsbank International S.A. under Schedule A-16.  Themis also acquired all of the obligations corresponding to those rights.  Each step in the chain of assignments that ultimately led to Themis is evidenced by the final deed of assignment in the chain (the "**Themis Final Deed**").  Deed of Assignment from Red Barn to Themis, dated August 5, 2008 (PX 55).[26]

Des Moines holds the right to recover $7,981,058.35 in principal, (together with corresponding interest and obligations) under seven Schedules to the Credit Agreement.  Each step in the chain of assignments that ultimately led to Des Moines is evidenced by the final deed of assignment in the chain (the "**Des Moines Final Deed**").  Deed of Assignment from Main Street to Des Moines, dated February 2, 2009 (PX 57).

---

[26]   Defendants object on hearsay grounds to Plaintiffs' use of PX 55 as evidence of the complete chain of assignments.  However, PX 55 is evidence of the truth of all matters asserted therein under Fed R. Evid. 803(6) because it is a record kept in the course of regularly conducted business.  *See* Affidavit of Michael McDonald, dated October 18, 2013 (attesting to business record status of PX 55) (PX 100).  PX 55 is also admissible evidence of the complete chain of assignments under Federal Rule of Evidence 803(15), which creates an exception to the rule against hearsay for "[a] statement contained in a document purporting to establish or affect an interest in property if the matter stated was relevant to the purpose of the document, unless dealings with the property since the document was made have been inconsistent with the truth of the statement or the purport of the document."  Fed. R. Evid. 803(15).  This same analysis applies to PX 57 (discussed in the next paragraph), which has been attested to as a business record in the declaration of Monique Adams (PX 99).

Under Section 12.09(b)(i) of the Credit Agreement, a creditor seeking to assign its rights and obligations under the Credit Agreement to another person must notify the DRC and request its consent to the assignment.  Credit Agreement §12.09(b)(i) (PX 10).  If the DRC fails to reply to a request for consent within 15 days, its consent "shall be deemed to have been given. . . ."  *Id*.  Here, Plaintiffs have submitted evidence that Red Barn notified Defendants of the assignment of its debt interests to Themis on August 5, 2008, and that Main Street notified Defendants of the assignment of its debt interests to Des Moines on February 2, 2009.  *See* Notice of Assignment, dated August 5, 2008 (notifying Defendants of assignment from Red Barn to Themis) (PX 56); Notice of Assignment, dated February 2, 2009 (notifying Defendants of assignment from Main Street to Des Moines) (PX 58).  Plaintiffs have also submitted evidence that these notices of assignment were delivered the Defendants.  *See* FedEx Shipping Detail, dated August 13, 2008 (Red Barn to Themis) (PX 82); FedEx Tracking Chart, dated February 2, 2009 (Main Street to Des Moines) (PX 85).  Defendants never responded to these notices, and are therefore deemed to have consented to the assignments under Section 12.09(b).

Defendants have offered no evidence to rebut Plaintiffs' evidence of any of the steps in the chains of assignment that led to Plaintiffs—even though Defendants would be in the best position of anyone to know if any other creditor was claiming to hold any of the debt Plaintiffs now seek to recover.  As unrebutted evidence of the chain of assignments that led to Plaintiffs, the Themis and Des Moines Final Deeds therefore establish Plaintiffs' standing.  *Cf. M. W. Zack Metal Co. v. The Birmingham City*, 291 F.2d 451, 453 (2d Cir. 1961) (party had standing notwithstanding "fail[ure] to show in full detail the chain of title leading to its acquisition").[27]

---

[27]  In any case, Defendants are barred from challenging Plaintiffs' standing in light of their admissions in their Answer, their Response to Plaintiffs Rule 56.1 Statement, and the Central Bank's 2011 Annual Report.  *Themis Capital LLC*, 2013 WL 1687198 at *6.

## VII.   PLAINTIFFS ARE ENTITLED TO RECOVER
##        THEIR LEGAL FEES FROM DEFENDANTS.

"As a general matter of New York law. . . when a contract provides that in the event of litigation the losing party will pay the attorneys' fees of the prevailing party, the court will order the losing party to pay whatever amounts have been expended by the prevailing party, so long as those amounts are not unreasonable." *F.H. Krear & Co. v. Nineteen Named Trustees*, 810 F.2d 1250, 1263 (2d Cir. 1987).  Under Section 12.05(a)(iv) of the Credit Agreement, Plaintiffs are entitled to

> [a]ll out-of-pocket expenses (including, without limitation, all counsel fees and court costs, stamp taxes, duties and fees) incurred in connection with . . . enforcing [the Credit Agreement] or suing for or collecting any overdue amount payable by the Obligor hereunder or otherwise protecting its rights in the event of any failure by the Obligor or Bank of Zaire to comply with the provisions [of the Credit Agreement].

Credit Agreement 12.05(a)(iv) (PX 10).  In addition, Section 3.05(c) provides that "the [DRC] shall indemnify each Bank against any loss or expense which it may sustain or incur as a result of the failure by the Obligor to pay when due any principal of any Credit. . . ." *Id.* §3.05(c).  Plaintiffs' claim to recover such expenses cannot be challenged absent manifest error.  *Id.*  In their Memorandum of Law in Support of Defendants' Objection to the Magistrate Judge's Report and Recommendation of November 1, 2010 (DE 24), Defendants implicitly acknowledged that Plaintiffs are entitled under these provisions to recover fees and costs reasonably incurred in connection with this lawsuit, and only contested the "reasonableness" of the fees and costs Plaintiffs sought to recover at that stage.  *See id.* at 18-19 (arguing the amounts awarded for out-of-pocket expenses were excessive and unreasonable, but not contesting Plaintiffs' entitlement to such fees).

The Court will determine reasonableness of the fees and costs sought by Plaintiffs at the conclusion of this litigation when those amounts can be calculated.  However, Plaintiffs respectfully request that in its opinion resolving Plaintiffs claims, the Court find that Plaintiffs are contractually entitled to recover the fees and costs reasonably incurred in connection with this action.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that judgment for the full amount of principal, interest, legal fees and related costs owed to them under the Credit Agreement jointly and several against the DRC and the Central Bank.

Dated: New York, New York
     January 7, 2014             Respectfully submitted,

                                    DECHERT LLP

                                    By:  /s/ Dennis H. Hranitzky
                                        Dennis H. Hranitzky
                                        Debra D. O'Gorman
                                    1095 Avenue of the Americas
                                    New York, New York 10036
                                    (212) 698-3500 (phone)
                                    (212) 698-3599 (facsimile)

                                    *Attorneys for Plaintiffs Themis Capital*
                                    *and Des Moines Investments Ltd.*