UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------x

THEMIS CAPITAL, LLC and                  :
DES MOINES INVESTMENTS LTD.,             :      No. 09 Civ. 1652 (PAE)
                                         :
            Plaintiffs,                   :
                                         :
            v.                            :
                                         :
DEMOCRATIC REPUBLIC OF CONGO             :
and CENTRAL BANK OF THE                   :
DEMOCRATIC REPUBLIC OF THE               :
CONGO,                                    :
                                         :
            Defendants.                   :
------------------------------------------------------x


**PRETRIAL BRIEF OF DEFENDANTS DEMOCRATIC REPUBLIC OF THE CONGO
AND CENTRAL BANK OF THE DEMOCRATIC REPUBLIC OF THE CONGO**

# TABLE OF CONTENTS

**Page**

I.      PRELIMINARY STATEMENT ................................................................... 1

II.     FACTUAL BACKGROUND ..................................................................... 5

III.    LEGAL ARGUMENT .............................................................................. 5

    A.      The Signatories To The 2003 Acknowledgment Lacked Actual Authority To Bind The DRC And The Central Bank................................................ 5

        1.      Interim Minister of Finance Luongwe Lacked Actual Authority to Sign the 2003 Acknowledgement on Behalf of the DRC ........................ 7

        2.      The Governor of the Central Bank Lacked Actual Authority to Sign the 2003 Acknowledgment Letter on Behalf of the Central Bank ........................................................................................... 14

        3.      Plaintiffs' Theory Of "Implied" Actual Authority Is Unavailing ........... 16

    B.      The DRC Never Ratified the 2003 Acknowledgement ...................................... 20

        1.      No Authorized Party Was Aware Of, Or Took Steps To Ratify, The 2003 Acknowledgment .................................................................... 22

        2.      There Is No Basis To "Impute" Knowledge Of The 2003 Acknowledgment To Authorized Parties Or Issue An Adverse Inference On This Issue ................................................................ 25

        3.      Even If Plaintiffs Could Establish Knowledge Of The 2003 Acknowledgment By Authorized Parties, They Have Failed To Prove That Such Parties Ratified Its Signing .......................................... 30

    C.      Neither Luongwe Nor Masangu Had Apparent Authority to Sign the 2003 Acknowledgement. ............................................................................... 33

        1.      The Record Demonstrates the Absence of |Any Misleading State Conduct or Reasonable Reliance ............................................................ 35

        2.      Plaintiffs Cannot Establish Reasonable Reliance Because The Extraordinary Circumstances Surrounding the 2003 Acknowledgement Imposed a Duty to Inquire on Citibank Which it Failed to Fulfill ............................................................................... 41

            a.      The 2003 Acknowledgement Was an Extraordinary Transaction Which Imposed a Duty of Inquiry on Citibank........ 42

            b.      The 1980 Ordinance Was a Fact Which Imposed a Duty of Inquiry on Citibank .................................................................. 44

            c.      The Historical Context Surrounding the 2003 Acknowledgement Was Extraordinary and Imposed a Duty of Inquiry on Citibank N.A ...................................................... 45

            d.      Citibank Made No Effort to Satisfy Its Duty of Inquiry ............. 47

-i-

# TABLE OF CONTENTS
(continued)

**Page**

D.   The Plaintiffs Have Failed to Prove Any Facts Sufficient to Render the Central Bank Liable for Breach of Contract ........................................................ 50

E.   The Plaintiffs Are Not Entitled to Compound Interest ........................................ 53

  1.   The Relevant Contractual Provisions........................................................ 54

  2.   Under the Express Terms of the Credit Agreement, Plaintiffs are Not Entitled to "Interest on Interest on Overdue Principal" Because No Demand for "Interest on Overdue Principal" Has Been Made .......... 56

  3.   The Plaintiffs' Proposed Interpretation of Section 3.05 is Untenable ................................................................................................ 58

  4.   Only the Defendants' Interpretation is Supported by the Parties' Course of Performance .......................................................................... 61

IV.   CONCLUSION.................................................................................................... 65

# TABLE OF AUTHORITIES

**Page(s)**

**FEDERAL CASES**

*Abely v. Aeterna Zentaris Inc.*,
   No. 12 Civ. 4711(PKC), 2013 WL 2399869 (S.D.N.Y. May 29, 2013) ...............................46

*Adamowicz v. U. S.*,
   101 Fed. Cl. 485 (2011) .................................................................................................22

*Am. Nat'l Fire Ins. Co. v. Kenealy*,
   72 F.3d 264 (2d Cir. 1995).............................................................................................47

*Benin v. Mezel*,
   No. 06-Civ-870(JGK), 2010 WL 3564270 (S.D.N.Y. Sept. 9, 2010) .............................44, 47

*Chesapeake Energy Corp. v. Bank of New York Mellon Trust Co., N.A.*,
   -- F. Supp. 2d --, No. 13 Civ. 1582 (PAE), 2013 WL 1890278 (S.D.N.Y. May 8,
   2013) ................................................................................................................58, 61

*Council Commerce Corp. v. Sterling Navigation*,
   444 F. Supp. 1043 (S.D.N.Y. 1977).............................................................................22, 26

*Curcio v. Roosevelt Union Free Sch. Dist.*,
   283 F.R.D. 102 (E.D.N.Y. 2012) .....................................................................................28

*Devine v. U.S.*,
   202 F.3d 547 (2d Cir. 2000)............................................................................................18

*Doe v. U.S.*,
   58 Fed. Cl. 479 (2003) ..................................................................................................21

*Effie Film, LLC v. Pomerance*,
   909 F. Supp. 2d 273 (S.D.N.Y. 2012).............................................................................46

*Elliott Assocs., L.P. v. Banco de la Nacion*,
   194 F.R.D. 116 (S.D.N.Y. 2000) .....................................................................................60

*EUA Cogenex Corp. v. N. Rockland Ctr. Sch. Dist.*,
   124 F. Supp. 2d 861 (S.D.N.Y. 2000).........................................................................25, 26

*FDIC v. Providence Coll.*,
   115 F.3d 136 (2d Cir. 1997)........................................................................................41, 42

*First Fidelity Bank N.A. v. Gov't Antigua & Barbuda-Permanent Mission*,
   877 F.2d 189 (2d Cir. 1989)............................................................................................40

*Gill v. Arab Bank, PLC,*
    893 F. Supp. 2d 542 (E.D.N.Y. 2012) ................................................................26

*Gonzalez v. Nat'l Westminster Bank PLC,*
    847 F. Supp. 2d 567 (S.D.N.Y. 2012) ...............................................................46

*Harbert/Lummus Agrifuels Projects v. U.S.,*
    142 F.3d 1429 (Fed. Cir. 1998).....................................................................22, 23

*Hogan v. Bellsouth Corp.,*
    396 F. Supp. 2d 1333 (N.D. Ga. 2004) .............................................................29

*In re Adelphia Recovery Trust,*
    634 F.3d 678 (2d Cir. 2011)..........................................................................30, 32

*In re Chateaugay Corp.,*
    170 B.R. 551 (Bankr. S.D.N.Y. 1994) ...............................................................56

*In re Cohen,*
    422 B.R. 350 (E.D.N.Y. 2010) ..........................................................................47

*In re Elsa Designs, Ltd.,*
    155 B.R. 859 (Bankr. S.D.N.Y. 1993)................................................................36

*In re Motors Liquidation Co.,*
    486 B.R. 596 (Bankr. S.D.N.Y. 2013) ...............................................................22

*In re Rosner,*
    48 B.R. 538 (Bankr. E.D.N.Y. 1985) .................................................................56

*Jorgensen v. United Comm. Group Ltd. Partnership,*
    No. 8:10–cv–00429–AW, 2013 WL 1726703 (D. Md. Apr. 19, 2013)...................26

*Karaha Bodas Co., L.L.C. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara,*
    313 F.3d 70 (2d Cir. 2002)..................................................................................12

*Kawa v. U.S.,*
    86 Fed. Cl. 575 (2009) ................................................................................21, 30

*Keeney v. U.S.,*
    218 F.2d 843 (D.C. Cir. 1954) ...........................................................................10

*Kuwait Airways Corp. v. Am. Security Bank, N.A.,*
    890 F.2d 456 (D.C. Cir. 1989) ...........................................................................30

*Mason Tenders District Council v. JNG Construction Ltd.,*
    No. 00cv1032 (GBD), 2003 WL 22999453 (S.D.N.Y. Dec. 19, 2003)...................47

*Pisani v. Weschester Cnty. Health Care Corp.*,
    424 F. Supp. 2d 710 (S.D.N.Y. 2006)................................................................51

*Playboy Enters. Inc. v. Dumas*,
    960 F. Supp. 710 (S.D.N.Y. 1997) ................................................................20

*Progressive Cas. Ins. Co. v. CA Reaseguradora Nacional de Venezuela*,
    991 F.2d 42 (2d Cir. 1993)................................................................36

*Sanders v. Madison Square Garden, L.P.*,
    525 F. Supp. 2d 364 (S.D.N.Y. 2007)................................................................24

*Seetransport Wiking Trader Schiffarhtsgesellschaft MBH & Co. Kommanditgesellschaft*
    *v. Rep. of Romania*,
    123 F. Supp. 2d 174 (S.D.N.Y. 2000)................................................39, 40

*Shahar v. Bowers*,
    120 F.3d 211 (11th Cir. 1997) ................................................................46

*States v Great N. Ry. Co.*,
    343 U.S. 562 (1952)................................................................19

*Steingut v. Guaranty Trust Co. of New York*,
    161 F.2d 571 (2d Cir. 1947)................................................................56, 57

*Stichting Ter Behartiging Van de Belangen Van Oudaadeelhouders In Het Kapitaal Van*
    *Saybolt Int'l B.V. v. Schreiber*,
    407 F.3d 34 (2d Cir. 2005)................................................................33

*Storr v. Nat'l Def. Sec. Council of the Rep. of Indon.*,
    No. 95-CIV-9663(AGS), 1997 WL 633405 (S.D.N.Y. Oct. 14, 1997)................................40

*Themis Capital, LLC v. Dem. Rep. Congo*,
    881 F. Supp. 2d 508 (S.D.N.Y. 2012)................................................ passim

*U. S. v. Twenty Miljam-350 IED Jammers*,
    669 F.3d 78 (2d Cir. 2011)................................................................21

*United Fire & Cas. Co. v. Arkwright Mut. Ins. Co.*,
    53 F. Supp. 2d 632 (S.D.N.Y. 1999)................................................................61

*U.S. v. Pink*,
    315 U.S. 203 (1942)................................................................12

*Van Eck Emerging Markets Opportunity Fund, L.P. v. Republic of Nicaragua*,
    No. 00 Civ 5756 (WHP) (S.D.N.Y.)................................................................60

*Vargas Realty Enters., Inc. v. CFA W. 111 Street, L.L.C.,*
    440 B.R. 224 (Bankr. S.D.N.Y. 2010) ...................................................................20

*Veiga v. World Meterological Org.,*
    568 F. Supp. 2d 367 (S.D.N.Y. 2008) ..................................................................10

*Weber v. Fujifilm Med. Sys. USA,*
    No. 3:10 CV 401(JBA), 2011 WL 3163597 (D. Conn. July 27, 2011) .................29

*Zubulake v. UBS Warburg*
    LLC, 229 F.R.D. 422 (S.D.N.Y. 2004) ...........................................................27, 28

OTHER CASES

*Budge v. Town of Millinocket,*
    55 A.3d 484, 491-92 (Me. 2012) ........................................................................22

*Center v. Hampton Affiliates, Inc.,*
    497 N.Y.S.2d 898 (1985) ....................................................................................26

*Cnty. of Monroe v. Raytheon Co.,*
    48 A.D.3d 1237 (4th Dep't 2008) ........................................................................20

*E. Hampton Union Free Sch. Dist. v. Sandpebble Builders, Inc.,*
    90 A.D.3d 815 (2d Dep't 2011) .....................................................................21, 31

*Elia v. Highland Ctr. Sch. Dist.,*
    78 A.D.3d 1265 (3d Dep't 2010) ...................................................................21, 31

*Giventer v. Arrow,*
    37 N.Y.2d 305 (1975) .........................................................................................56

*Gulf Ins. Co. v. Transatlantic Reinsurance Co.,*
    886 N.Y.S.2d 133 (1st Dep't 2009) ....................................................................61

*Kirschner v. KPMG LLP,*
    938 N.E.2d 941 (N.Y. 2010) ...............................................................................25

*Long Island City Sav. & Loan Ass'n v. Skow,*
    25 A.D.2d 880 (N.Y.A.D. 1966) .........................................................................25

*Matter of Estate of Jackson,*
    508 N.Y.S.2d 671 (3d Dep't 1986) .....................................................................56

*Matter of N.Y. State Med. Transporters Ass'n,*
    77 N.Y.2d 126 (1990) ...................................................................................20, 23

*Parlato v. Equitable Life Assurance Soc. of the U. S.,*
    749 N.Y.S.2d 216 (1st Dep't 2002) ....................................................................39

*Rhee v. Dahan,*
  457 N.Y.S.2d 684 (1982) ........................................................................................10

*Robinson v. Day,*
  960 N.Y.S.2d 397 (1st Dep't 2013) ........................................................................30

*Ryan v. Prescott,*
  No. 5466–11, 2013 WL 1150216 (N.Y. Sup. Ct. Albany Cnty., Feb. 14, 2013) ...................20

**FEDERAL STATUTES**

22 U.S.C. § 288D(b) ................................................................................................10

**OTHER STATUTES**

N.Y. Gen. Obl. Law § 5-527(1) ................................................................................56

**RULES**

Federal Rule of Civil Procedure 44.1 ........................................................................6

Federal Rule of Evidence 201 ..................................................................................47

**OTHER AUTHORITIES**

24 N.Y. Jur. 2d Agency § 192 ..................................................................................24

24 N.Y. Jur. 2d Agency § 189 (2013) ........................................................................23

Restatement (Second) of Contracts § 91 (1958) ........................................................20

Restatement (Third) of Agency § 3.04 cmt. d (2006) ..............................................22, 23

Defendants the Democratic Republic of the Congo ("DRC") and the Central Bank of the Democratic Republic of the Congo ("Central Bank") hereby submit the following pretrial brief in support of their case-in-chief and in opposition to Plaintiffs' [Corrected] Pretrial Memorandum ("Pl. Br."), filed on January 7, 2014.

## I.   <u>PRELIMINARY STATEMENT</u>

> *"[W]e are neither in a position to check the signatures nor the powers of the signatories of this acknowledgment of debt. We invite you and every Agent and/or Bank to make in case of need your own independent investigation regarding the validity of this document."*[1]

Plaintiffs in this case are two vulture funds, based in Caribbean tax havens, that are engaged in the risky trade of buying distressed-debt at heavily reduced prices from institutional creditors with the hope of realizing massive returns on their investment through the use of American courts. In this case, Plaintiffs purchased debts incurred by the Republic of Zaire in the *1970s*, refinanced in *1980*, in *default for decades* and *written off* the books of the original lenders at the time of sale. Despite the passage of decades since Zaire defaulted on its obligations under the underlying refinancing agreement with commercial creditors (the "Credit Agreement"), the Plaintiffs contend that their claims for breach of contract against the DRC (as the successor state to Zaire) and the Central Bank (as the successor bank to the Bank of Zaire) are timely because of the existence of a single page English language document prepared by a creditor party to the Credit Agreement and signed by the Interim Minister of Finance of the DRC and the Governor of the Central Bank in 2003 (the "2003 Acknowledgment").

---

[1]   Ltr. from BNP Paribas to Union Bank of California, dated Aug. 27, 2009, enclosing a debt acknowledgment signed by the then-Minister of Finance of the DRC and the then-Governor of the Central Bank on July 15, 2009 (the "2009 Acknowledgment"), submitted as Ex. D24. This disclaimer of reliability by BNP and related concessions made by their own expert on DRC law during his deposition apparently caused Plaintiffs to waive their reliance on the 2009 Acknowledgment, which, as discussed herein, is substantially similar to an acknowledgment of debt from 2003 that remains at the center of this case. *See* Ex. D27.

Relying on the 2003 Acknowledgment, Plaintiffs now seek to recover more than $90 million from the DRC and Central Bank, representing $18 million in overdue principal that Zaire was obligated to pay under the now 34-year-old Credit Agreement, $28.5 million in interest on overdue principal and an additional $41 million that Plaintiffs claim they are entitled to  pursuant to a creative theory of compounding interest that cannot be reconciled with either the express terms of the Credit Agreement or the consistent course of performance of the parties to that Agreement.

For the better half of the last century, the DRC has endured political instability, war, extreme poverty and economic collapse.  It currently ranks last (tied with Niger) on the Human Development Index, measuring life expectancy at birth, mean years of schooling, expected years of schooling, and gross national income per capita.[2]  At the time that Zaire entered into the Credit Agreement, it already had an unsustainable debt burden and was run by one of the world's most infamous dictators, Colonel Joseph Desiré Mobutu, whose reign of power from 1965 to 1997 was marked by widespread corruption and repression.   In the tumultuous years that followed the signing of the Credit Agreement, Zaire experienced invasion by foreign forces, one of the deadliest conflicts in world history, economic disintegration, the violent overthrow of its dictator, Mobutu, the formation of a new government, the transition from Zaire to the DRC, and the assassination of the DRC's first leader.  Abject poverty, violence and political discord in the DRC continue to be the subject of routine reporting.[3]

---

[2]     United Nations Development Programme (UNDP), "Human Development Report 2013," available at http://hdr.undp.org/en/content/human-development-report-2013 (last accessed Feb. 3, 2014) (the "2013 U.N. Report").

[3]     *See id.*; *see also* Kenny Katombe and Chrispin Mvano, "Congo army attacks Ugandan Islamist rebels in lawless east," Reuters (Jan. 17, 2014); Mark Tran, "DRC conflict: children live in fear of violence as clashes continue," The Guardian (Jan. 14, 2014) (discussing "the violence that has killed and displaced millions of people for more than 20 years in the DRC."); Adam Nossiter, "Behind Those Fast Growth Rates, Rising Inequality," New York Times (Nov. 5, 2013) (noting that the DRC "consistently rank[s] at or near the very

Whatever the reason the Plaintiffs chose to set their sights on the DRC, discovery has shown that their risky gamble was a bad bet.  The validity of their claim depends entirely on the 2003 Acknowledgment Letter, which purports to confirm *the DRC's obligation to pay hundreds of millions of dollars (or billions of dollars*, according to Plaintiffs' theory of multiple generations of compounding interest).  However, neither the Interim Minister nor the Governor were properly authorized to sign the 2003 Acknowledgment, a fact made plain by DRC Decree No. 028/2002 (the "2002 Decree"), which President Joseph Kabila signed on March 12, 2002 (following the assassination of the DRC's first president, Laurent-Désiré Kabila, in 2001) and used to organize his new DRC government, define the competencies of his ministers and deputy ministers, and enact financial reforms, *particularly with respect to limiting the unilateral authority of DRC officials to enter agreements on behalf of the DRC that may have an immediate or future impact on the budget of the DRC.*  The 2002 Decree required the DRC's Council of Ministers to approve the 2003 Acknowledgment—approval which was neither sought nor provided—and the Governor could only counter-sign the 2003 Acknowledgment if the DRC first authorized its signing—authorization which was neither sought nor provided.  For these reasons, and those stated herein, the Plaintiffs cannot meet their burden of proof on their actual authority liability theory – a fact that Plaintiffs effectively conceded when they initially waived this theory after the close of fact and expert discovery.

Unable to prove actual authority, Plaintiffs offer two additional theories of liability:  (i) that the signatories to the 2003 Acknowledgment possessed "apparent authority"; and (ii) the Council of Ministers, as the body empowered to authorize the signing of documents that may

bottom of the United Nations Human Development Index, a comprehensive measure of economic, physical and social well-being across nearly 200 countries."); Nicholas Kulish, "A Reason for Hope in Congo's Perpetual War," New York Times (Oct. 26, 2013) ("The fighting in eastern Congo is one of the world's most intractable, prolonged and deadly conflicts, claiming millions of lives over a decade and a half.").

have budgetary or liability implications for the DRC, otherwise ratified the unauthorized signing of the 2003 Acknowledgment Letter.  Neither of these theories can survive scrutiny.

To prove apparent authority, Plaintiffs must demonstrate by a preponderance of the evidence, *inter alia*, that the DRC caused third parties to reasonably rely on a representation that the signatories to the 2003 Acknowledgment Letter were acting with authority to bind the DRC. Not only was no such representation made here, the DRC enacted financial reforms prior to the signing of the 2003 Acknowledgment to specifically limit the authority of its agents to sign such agreements.  Moreover, the record demonstrates that the creditor who obtained the 2003 Acknowledgement treated the signing of the document as a "mere formality," and, in its haste to "just get it done," failed to conduct any due diligence or inquiry into the legal authority of the signatories to bind the DRC and Central Bank despite compelling notice events that should have prompted such diligence and inquiry, such as the "widely known" fact that the DRC was in the midst of "severe political turmoil" with a "lack of a functioning government" at the time. *Themis Capital, LLC v. Dem. Rep. Congo*, 881 F. Supp. 2d 508, 531 (S.D.N.Y. 2012).  For these reasons, and those stated herein, Plaintiffs cannot meet their burden of proof on their apparent authority liability theory.

To prove ratification, Plaintiffs must demonstrate by a preponderance of the evidence, *inter alia*, that the Council of Ministers, as the body empowered to authorize the signing of the 2003 Acknowledgment on behalf of the State of the DRC, knew of the existence of the 2003 Acknowledgment and affirmed its signing.  However, because Plaintiffs concede that there is no such evidence in the record, and for the additional reasons stated herein, Plaintiffs cannot meet their burden of proof on their ratification theory of liability.

Because Plaintiffs cannot meet their burden of proof on their actual authority, apparent authority or ratification theories of liability, their attempt to extract $90 million from one of the most impoverished countries in the world must be rejected.  Accordingly, Defendants respectfully request that this Court enter judgment in their favor.

## II.    FACTUAL BACKGROUND

For the sake of judicial efficiency, the factual background of this case, covering a period of more than 30 years, has been set forth in detail in the Defendants' Proposed Findings of Fact ("Def. Findings"), and is respectfully incorporated by reference herein.  Def. Findings ¶¶ 1-171.

## III.    LEGAL ARGUMENT

### A.    The Signatories To The 2003 Acknowledgment Lacked Actual Authority To Bind The DRC And The Central Bank.

On October 5, 2013, upon the conclusion of expert discovery, Plaintiffs unequivocally waived their actual authority theory of liability.  Plaintiffs then suddenly withdrew their waiver after considering Defendants' argument that such waiver was fatal to their ratification theory of liability.  Although the Court allowed Plaintiffs to retract their waiver, Plaintiffs candidly told the Court during an October 22, 2013 teleconference that they were still unsure about the state of Congolese law after 2002 – the law that is central to the issue of actual authority that they are asking this Court to decide.  *C.f., Themis Capital,* 881 F. Supp. 2d at 520 (agreeing "that New York choice of law rules require that the law of the DRC be applied to determine whether Mr. Luongwe and Mr. Masangu had actual authority to bind the DRC to a commercial contract.").

Plaintiffs now devote a scant two pages of their 65-page pre-trial brief to the issue that is at the heart of this case:  whether the signatories to the 2003 Acknowledgment were authorized

to bind the DRC and the Central Bank.[4] *See* Pl. Br. at 28-29.  Neither the Plaintiffs' initial waiver of their actual authority theory of liability, their admitted lack of confidence about this issue of Congolese law *after the close of expert discovery and more than four years of litigation*, or their attempt to gloss over this theory now are surprising; it is clear that under applicable provisions of Congolese law the signatories to the 2003 Acknowledgment lacked authority to bind their principals.

Pursuant to Federal Rule of Civil Procedure 44.1, "[i]n determining foreign law, the court may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence.  The court's determination must be treated as a ruling on a question of law."  *See* Stipulated Conclusions of Law at ¶ 8.  While Plaintiffs initially agreed to submit this case on the papers, upon withdrawing their waiver of actual authority they also reversed course in this regard and have decided to bring their DRC law expert, Nicaise Chikuru, to testify at trial.  Plaintiffs' pretrial brief, however, reveals that Mr. Chikuru's expected trial testimony is nothing more than a repetition of those portions of his expert reports that he has not already retracted after reviewing the contrary opinions of Defendants' DRC law expert, Emmanuel Lubala, but nonetheless lack credibility.

Defendants respectfully submit that the text of the relevant DRC statutes, the contents of the expert report and deposition testimony of Mr. Lubala, and the concessions made by Mr. Chikuru during his deposition, clearly demonstrate that the signatories to the 2003 Acknowledgment were not authorized.

---

[4]    As Plaintiffs previously acknowledged, whether the signatories to the 2003 Acknowledgment had authority to bind their principals was one of the "two main areas for discovery" identified by the Court in its July 26, 2012 decision on Plaintiffs' pre-discovery summary judgment motion.  *See* Ltr. from D. Hranitzky, Esq. to Hon. Paul A. Engelmayer, dated July 24, 2013 (requesting permission to move for summary judgment) (ECF No. 156).  Plaintiffs subsequently withdrew their request to move for summary judgment.

### 1. Interim Minister of Finance Luongwe Lacked Actual Authority to Sign the 2003 Acknowledgement on Behalf of the DRC.

As Mr. Lubala testified, "each time a new [DRC] Government is put in place there will be an act organizing the Government and the various functions of the various ministers which will define the[it] competence in detail." Ex. P78 at 60:24-61:12. The 2002 Decree, "Concerning the Organization and Functioning of the Government," organized Joseph Kabila's government and, *inter alia*, defined the competence and authority of his ministers and deputy ministers. *See* Ex. D28; *see also* Ex. P128 at EXPERT00000045-65. As set forth herein, in the aftermath of decades of war, corruption and economic collapse, the 2002 Decree restricted, *inter alia*, the authority of DRC ministers to undertake decisions that "may" have an immediate or future impact on the budget or collective liability of the DRC.

Article 53 of the 2002 Decree defined the authority of DRC officials to sign private law agreements on behalf of the DRC. Ex. D28, Art. 53. As Mr. Lubala stated, Article 53 defined the authority of Interim Minister Loungwe at the time he signed the 2003 Acknowledgment. *See* Ex. P124 at ¶ 15. Article 53 states:

> Ministers, Delegated Ministers and, where applicable, Vice Ministers can validly commit the State in private law agreements *only in compliance with the provisions of articles 11 and 41 above*.

Ex. D28, Art. 53 (emphasis added); *see also* Ex. P124 at ¶ 17. And Article 11 of the 2002 Decree provides that:

> In carrying out their duties, Ministers, Delegated Ministers and Vice Ministers are required to obey the laws and regulations of the Republic, particularly the laws and regulations governing the matters that come under their respective ministries.
>
> More particularly, *they are required to comply strictly with the financial and budgetary laws*. For this purpose, they will make sure that any legislative bill, executive order, decree, order or agreement, *any decision that may have immediate or future budgetary repercussions* both with respect to revenue and expenses . . . is submitted for the prior opinion of

7

> the Minister responsible for Finance and Budget and *for deliberation by the Council of Ministers or, in case of emergency, the approval of the President of the Republic*.

Ex. D28, Art. 11 (emphasis added); *see also* Ex. P124 at ¶ 16.[5]

Additionally relevant is Article 20 which further provides that the Council is the "discussion, consultation and decision-making authority of the Government[,]" and

> is "competent to discuss all issues coming within the competence of the Government, particularly:   .  .  .   5.   proposed treaties or international agreements and private law agreements whose importance requires the authorization of the Council of Ministers, *particularly those concerning borrowing*, granting loans, guarantees, subsidies or acquisitions of equity interests; [and] . . . 7. *decisions or measures that, by their nature or their possible repercussions, may result in general policy decisions and the collective liability of the Government*[ ] . . . ."

Ex. D28, Art  20 (emphasis added).

As Mr. Lubala stated in his expert report, and as the foregoing text of the 2002 Decree demonstrates, the Interim Minister of Finance and Budget could not commit the DRC to the 2003 Acknowledgement Letter without first submitting the matter to the Council of Ministers for approval (or, in case of emergency without obtaining the approval of President Kabila). Ex. P124 at ¶¶ 18-21.   It is, of course, axiomatic that the decision to execute the 2003 Acknowledgement, itself a private law agreement (Ex. D28, Art. 53), was one that "may have immediate or future budgetary repercussions" for the DRC (*id.*, Art. 11) and one that "may result in . . . the collective liability of the [DRC] Government" (*id.*, Art. 20) and the Plaintiffs' efforts to argue otherwise are absurd.   The document's purported effect was to confirm the DRC's commitment to be bound by Zaire's obligations under the decades-old Credit Agreement and to allow creditors, such as the Plaintiffs, to file future lawsuits seeking to enforce the debt,

---

[5]      Article 41 of the 2002 Decree requires members of the Government to recuse themselves from deliberations of the Council of Ministers in which they have "a direct or indirect interest."  Ex. D28, Art. 41.

including interest which would continue to accrue thereunder. *See* Ex. P124 at ¶ 19.[6]  According to the servicing bank's calculations, this one document, if valid, would represent the recognition of the DRC to pay approximately $833 million (*see* Ex. P43 at UB00001915); and, if the Plaintiffs' theory of multiple generations of compounding interest applies—it does not—the debt at issue would reach into the billions.

Notwithstanding the 2002 Decree's strict rules for approving agreements that may impact the DRC's budget, there is no evidence that the 2003 Acknowledgment—*which purports to affirm the DRC's obligation to pay hundreds of millions of dollars*—was ever submitted for consideration or approval to the Council of Ministers. *See, e.g.,* Def. Conclusions at ¶ 13.  In fact, the record suggests that the only parties involved in the signing of the 2003 Acknowledgment were Citibank and the DRC officials it lobbied, Interim Minister Luongwe and Governor Masangu—himself a former Citibank employee. *See id. at* ¶¶ 137-49.  As the record indicates, Citibank sent a letter to the Interim Minister on February 20, 2003, requesting his signature on the 2003 Acknowledgment, and within five days, the 2003 Acknowledgment was signed by the Interim Minister and counter-signed by the Governor. *Id.* ¶¶ 144-48.  (A five-day turn-around time to complete a transaction in the DRC requiring government approval for anything, let alone to commit the State to repay hundreds of millions of dollars, should raise immediate suspicion.)[7]  There is no evidence that the Council of Ministers met between February

---

[6]     *See also* Ex. P121 at 155:3-24 (Mr. Chikuru acknowledged that the signing of the 2003 Acknowledgment, and this corresponding litigation, had budgetary repercussions for the DRC); *id. at* 162:8-163:10 (same); *id.* at 108:3-17 (acknowledging that the signing of the 2009 Acknowledgement "could create new obligations for DRC, brand new obligations," *id. at* 141:20-143:2, therefore requiring submission to the Council of Ministers for approval.)  Plaintiffs now suggest that Mr. Chikuru will testify that the signing of the 2003 Acknowledgment did not have any potential budgetary or liability implications for the DRC, Pl. Br. at 31, but the very fact of this litigation demonstrates the absurdity of this proposed testimony.

[7]     The DRC currently ranks 183rd out of 189 countries on the World Bank's "Ease of Doing Business" chart  (*see*  http://www.doingbusiness.org/data/exploreeconomies/congo-dem-rep/#starting-a-business  (last accessed Feb. 4, 2013), and, in 2003, it took longer to start a business (215 days) in the DRC than it did in any

20th and February 25th, let alone any evidence that the Interim Minister attempted to submit the 2003 Acknowledgment to the Council of Ministers for its consideration.  In fact, the record indicates that Citibank approached the Interim Minister to sign the 2003 Acknowledgment only after it was unable to get Minister Matungulu to sign it before he resigned from office on February 17, 2003 after refusing to endorse "extra-budgetary (political) expenses."  *Id.*  at ¶¶ 143-44.[8]  In reporting on Matungulu's resignation, Citibank's Kinshasa employee commented

---

other country in the world due to onerous government procedures (*see Doing Business in 2004*, World Bank, at xiii, 18 & 118 (2004) available at http://www.doingbusiness.org/~/ media/GIAWB/Doing%20Business/Documents/Annual-Reports/English/DB04-FullReport.pdf (last accessed Feb. 4, 2014)).

[8]      At the November 26, 2013 pretrial conference this Court asked Plaintiffs about former Minister of Finance Matungulu and why his deposition was not taken in this case.  Nov. 26, 2013 H'rg Tr. at 61:15-22; 62:19-63:13 (ECF No. 179).   At that time, Plaintiffs' counsel advised the Court that Mr. Matungulu was "not with the subpoena reach of this Court" and that there was "no way to summon him to appear to a deposition because he's not within the control of a party named in the DRC."  *Id*. at 63:14-17.   While Defendants did not take issue with Plaintiffs' representation  at the time, they subsequently determined that Mr. Matungulu has been living and working in the United States for years.  Specifically, Mr. Matungulu's social media accounts indicate that he lives in the Washington D.C. area and works at the IMF.  Specifically, Mr. Matungulu's Twitter account (https://twitter.com/CongoCheri), which features a picture of him with Kofi Annan, indicates that Mr. Matungulu is the "Country Mission Chief, IMF, Washington DC" and that he is in the "Washington, DC, area, USA."   Mr. Matungulu's Facebook account (https://www.facebook.com/mbuyamu.matungulu), which features the same picture, notes that Mr. Matungulu lives in Potomac, Maryland and works at the IMF.  Mr. Matungulu's LinkedIn account (http://www.linkedin.com/pub/mbuyamu-matungulu/4b/b6b/965) indicates the same, i.e., that Mr. Matungulu lives in Potomac, Maryland and works as the "Deputy Division Chief at International Monetary Fund."  Plaintiffs apparently also came to this realization and, in their pretrial brief, now contend that they did not depose former Minister of Finance Matungulu for a different reason – i.e., because he "works at the IMF—which enjoys immunity from discovery under the International Organizations Immunities Act."  Pl. Br. at 15 n.6 (citing 22 U.S.C. § 288 et seq.).  This reason, however, also does not withstand scrutiny because the Immunities Act provides no such blanket immunity for representatives of foreign governments to international organizations.  Instead, the Act states that such officials "shall be immune from suit and legal process relating to acts performed by them in their official capacity and falling within their functions as such representatives, officers, or employees . . . ."  22 U.S.C. § 288D(b) (emphasis added); *see also Veiga v. World Meterological Org*., 568 F. Supp. 2d 367, 370 (S.D.N.Y. 2008) ("Section 288d extends that immunity to acts performed by officers and employees of international organizations in their official capacity and falling within their jurisdictions"); *Rhee v. Dahan*, 457 N.Y.S.2d 684, 685 (1982) ("A representative to international organizations is immune from suit or legal process only relating to acts performed by him in his official capacity and falling within his function as such an employee.").  Further, this immunity "may be waived by the foreign government or international organization concerned."  *Keeney v. U.S.*, 218 F.2d 843, 845 (D.C. Cir. 1954); *see also Veiga*, 568 F. Supp. 2d at 370 (same).  Here, any discovery that Plaintiffs would have sought from Mr. Matungulu would have related to his tenure as Minister of Finance of the DRC, and would almost certainly not have been related to any acts performed in his official capacity for the IMF.  Nor is there any indication that Plaintiffs even attempted to subpoena or depose Mr. Matungulu.  Accordingly, they cannot rely on his "immunity" to excuse any evidentiary lacunae in their case.

that his "strictness was highly appreciated in Washington, . . . and very controversial in Kinshasa." *Id.* at ¶ 144. After Matungulu's resignation, Citibank enlisted the Governor—a former Citibank employee—to "give us a hand in talking to [the Interim Minister]" about signing the 2003 Acknowledgment—which was then signed almost immediately. *Id.* at ¶¶ 145-48.

Plaintiffs' current argument, that the 2002 Decree is irrelevant to determining the authority of the signatories to the 2003 Acknowledgment to bind the DRC and Central Bank (*see, e.g.,* Pl. Br. at 30-31), is another reversal of course: *Plaintiffs themselves initially argued that the 2002 Decree defined the competence of the Interim Minister to sign the 2003 Acknowledgment.* Specifically, Plaintiffs' DRC law expert, Mr. Chikuru, opined that the Interim Minister had the authority to bind the DRC to the 2003 Acknowledgement pursuant to 2002 Decree, Section 1 ("Treaties and international agreements"), Article 50. *See* Ex. P122 at 9(d), 38, 41-42. However, after reading the report of Defendants' DRC law expert, Mr. Chikuru admitted that his reliance on Article 50 was "wrong":

> Q.   I would like you to turn to Article 50 [in the 2002 Decree]. Mr. Chikuru, have you ever opined that the interim Minister of Finance, Luongwe, had the authority to bind the DRC to the 2003 Acknowledgment Letter based solely on Article 50 of [the 2002 Decree]?
>
> A.   I said that but I discovered that I [was] mistook.

Ex. P121 at 76:7-14; *see also id.* 79:11-19 (testifying that he was "wrong" in originally opining that Article 50 gave the Minister of Finance authority to bind the DRC); 80:7-20 (same); 95:12-14 (same); 83:3-11 (testifying that he learned he was wrong by "reading this Decree again in the light of the opinion of Mr. Lubala"). Incredibly, once Mr. Chikuru discovered his error, he did not apply the correct provision of the 2002 Decree, which is, as Mr. Lubala testified, Article 53, but rather questioned, *for the first time*, whether the 2002 Decree was enforceable against third parties absent evidence that it was published in the Official Gazette. *See* Ex. P123 at ¶ 12(c).

This argument, which Plaintiffs continue to pursue (*see*  Pl. Br. at 30-31) is illogical and misguided.

As an initial matter, Plaintiffs' contention that an absence of evidence that the 2002 Decree was published in the Official Gazette makes it 'unenforceable' *against* Plaintiffs is a red herring.  It is undisputed that the 2002 Decree defined the competence and authority of the ministers and deputy ministers who served in Joseph Kabila's government during the relevant time period and that its terms bound his ministers and deputy ministers during the same time period.   The question in this case is whether the DRC officials who signed the 2003 Acknowledgment had authority *from the DRC government to bind the DRC government*.  In no case cited by the Plaintiffs or found by the Defendants has the question of actual authority turned on whether a party published the limitations of its agents prior to their taking an unauthorized act.  Moreover, accepting Plaintiffs' argument, and rejecting the DRC's interpretation of its own law, would effectively nullify Joseph Kabila's government and call into question the authorities of his ministers to enter into any agreement with third parties after the enactment of the 2002 Decree as well as the enforceability of all DRC acts and decrees that relied on the authority provided by the 2002 Decree (*see, e.g.*, Exs. D3-D5).  *See U.S. v. Pink*, 315 U.S. 203, 220 (1942) (foreign sovereign's interpretation of its own law is entitled to "conclusive" deference); *Karaha Bodas Co., L.L.C. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*, 313 F.3d 70, 92 (2d Cir. 2002) (courts must defer to foreign sovereign's interpretation of its own laws, especially where the choice between two interpretations "rests finely balanced").

Even if the issue of public notice of the 2002 Decree were an issue in this case—it is not—as Mr. Lubala testified, based on his experience as a practicing lawyer in the DRC, the certification at the conclusion of the 2002 Decree indicates that it was made available to the

public on March 12, 2002, and became effective that same day.  Ex. P78 at 76:23-79:18, 70:9-12; *see also id. at* 79:25-80:10.  There is nothing in the record that refutes this conclusion. Moreover, many DRC laws enacted between June 2002 and January 2003 expressly cite to, and rely upon, the 2002 Decree, *see* Exs. D3-D5, belying any suggestion that this Decree—which organized the functioning of Joseph Kabila's Government—was somehow unknown or unenforceable at the time that the 2003 Acknowledgment was signed.[9]

Because the 2002 Decree required the Interim Minister to obtain the approval of the Council of Ministers before signing the 2003 Acknowledgment—approval that was neither sought nor obtained—the Interim Minister lacked authority to bind the DRC to that Acknowledgment.[10]

---

[9]     Indeed, many laws and regulations of the DRC are not published in the Official Gazette—a fact which is true especially in times of war and crisis, as was the case at the time the 2002 Decree was enacted.  Ex. P78 at 68:23-71:23.  In such times of war and crisis, the DRC lacked the resources to publish the Official Gazette and laws and decrees were alternatively published through the "written press, radio, TV, through the media." *Id*. at 74:12-75:16.  The absence of publication in the Official Gazette does not preclude a law from being enforced by Congolese courts. *Id*. at 68:23-71:23 ("There have been years, for instance, and everyone knows about this, when the Official Gazette was not published for a full year or a full period of time[.]  . . .  The Code that we use today in the Congo . . . contain[s] a great many number of texts that were never published [in the Official Gazette], yet they are being applied by the judge, the lawyers and legal practitioners all the same and no one can say that they are not applicable  . . .  because any practitioner is fully aware of this and of what happened for a good many years in our country.").

[10]     With respect to the 2009 Acknowledgement, Order No. 08/073 of December 24, 2008 regarding the organization and functioning of the Government similarly restricts the Minister of Finance's authority. Ex. P124 at ¶¶ 26-28.  Order No. 08/073, Art. 74 states: "With the agreement of the Council of Ministers, agreements for lending, borrowing or gifts that are binding on the State may be negotiated and signed by the Ministers responsible for Finance, the Budget and the Plan.  . . . . *Borrowing, lending or gift agreements that are binding on the State must be entered into in accordance with the law respecting finance.  Those agreements take effect only after they have been approved by an order of the President of the Republic after deliberation by the Council of Ministers*." Ex. P120, Art. 74 (emphasis added).  Yet Plaintiffs have produced no evidence to demonstrate that the 2009 Acknowledgment was ever "approved by an order of the President of the Republic after deliberation by the Council of Ministers."  *Id*.  The Plaintiffs have not submitted credible information to establish that the signatures on the 2009 Acknowledgment were duly authorized to bind the DRC or the Central Bank.  The only materials that the Plaintiffs have produced on this point are the expert reports of Mr. Chikuru; however, Plaintiffs have since acknowledged that they will not rely on Mr. Chikuru's opinions to prove this point; thus, Plaintiffs have failed their burden of proof with respect to establishing the actual authority of the signatories to the 2009 Acknowledgment.  *See* Ex. D27 (Email exchange between D. Mateyaschuk, Esq. and D. Hranitzky, Esq., dated Nov. 7, 2013); *see also* Ex. P121 at 122:6-7 ("The 2009 letter doesn't concern the Plaintiffs in this case"), 122:15-16 ("Plaintiffs . . . are not concerned with the 2009

2.   **The Governor of the Central Bank Lacked Actual Authority to
Sign the 2003 Acknowledgment Letter on Behalf of the Central Bank.**

Under the laws governing the Central Bank at the time the 2003 Acknowledgment was signed, the Governor of the Central Bank was not authorized to execute that document on behalf of the Central Bank without first obtaining the appropriate approvals from the State.   Ex. P124 at ¶¶ 29-34.   This requirement is consistent with the Central Bank's relationship *vis-à-vis* the country and its limited role under the Credit Agreement.

Specifically, the preamble to Act No. 005/2002 of May 7, 2002 governing the Constitution, Organization and Functioning of the Central Bank affirms that the independence of the Central Bank:

> does not in any way call into question the principle of uniqueness of the sequencing center granted to the Ministry of Finance in accordance with the Finance Act, the General Regulations on Public Accounting and the State Cashier Agreement, or the requirement for prior approval by the Budget Ministry as instituted by the various budgetary laws.

Ex. P118 at EXPERT00000083.   Act No. 005/2002 further provides that, in accomplishing its role of State Cashier, the Central Bank cannot make any State expense that has not been in advance decided by the Government, approved by the Ministry of Budget and approved by the Ministry of Finance.   Ex. P118 at EXPERT00000083.   Article 16 of Act No. 005/2002 further provides that the Bank is prohibited from "[g]uarantee[ing] the State's debts and commitments." *Id.* at EXPERT00000087.   And Title III (Relationships with the Public Powers), Article 55 of Act No. 005/2002, provides that the "Bank shall fulfill the functions of State Banker and Government Advisor in economic, monetary and financial matters" as well as the "function of

---

Acknowledgment Letter[.]"), 124:3-6 ("As I said, the 2009 Acknowledgment Letter doesn't concern the Plaintiffs in this case, and I gave my opinion in consideration with the Plaintiffs rights concerning the case.").

State Cashier in line with the agreement entered into with the Ministry of Finance."  Ex. P118 at EXPERT00000093.

Taken together, these provisions of Act No. 005/2002 make clear that the Central Bank could not enter into an agreement with potential budgetary implications for the DRC without first obtaining the appropriate approvals from the DRC.  Stated otherwise, the Governor of the Central Bank was not authorized to sign the 2003 Acknowledgement without first obtaining the approval of a duly authorized Minister of Finance.  Because Interim Minister Loungwe did not obtain the appropriate approvals in order to bind the DRC to the 2003 Acknowledgment, it necessarily follows that the Central Bank could not be bound.  To hold otherwise – *i.e.*, to permit the Governor to unilaterally sign documents committing the treasury of the State to third parties – would entirely undermine the purpose of the 2002 Decree in requiring budgetary approvals of the Council of Ministers.[11]

Plaintiffs respond by pointing to language in Act 005/2002 that indicates that the Governor of the Central Bank has the general power to sign contracts on behalf of the Central Bank, and deposition testimony from Governor Masangu, in which he acknowledges that fact. *See* Pl. Br. at 29.  However, the fact that the Governor has, in general, the power to sign contracts on behalf of the Central Bank does not negate the restrictions imposed on the Governor by the aforementioned provisions of Act 005/2002.  As the record makes clear, in practice and by law, the Governor is prohibited from signing contracts that may impact the treasury of the DRC without first obtaining necessary approvals from the DRC.  *See, e.g.,* Ex. P80 at 188:18-189:4

---

[11]     As Mr. Chikuru testified:  "[t]he Governor of the Central Bank is not in the executive government of the DRC.  He is the Governor of the Central Bank.  He is not, I can say the decider, the decision maker for the Republic of the DRC.  *The decision makers are the ministers and other persons empowered to represent the Republic, the Government who are empowered by the Constitution and by specific administrative acts.*"  Ex. P121 at 169:8-22 (emphasis supplied).

15

(testifying that the Governor of the Central Bank told a creditor under the Credit Agreement that he would "only be willing to countersign" the 2003 Acknowledgement); Ex. P79 at 14:8-15:5 (explaining that the Minister of Finance is "the one who gets the document, signs it, and then pass it on to the governor of the Central Bank" and that his role as Governor of the Central Bank in relation to the Credit Agreement was "to accompany the government in to fulfilling its obligation").[12]

### 3.   Plaintiffs' Theory Of "Implied" Actual Authority Is Unavailing.

Plaintiffs concede, as they must, that there is no DRC law, ordinance or decree that expressly authorized the signing of the 2003 Acknowledgment.  *See* Pl. Br. at 28-32.  Instead, they advance a novel theory of "implied" actual authority.  *See id. at* 28-29.  According to this theory, Ordinance 80-73, which authorized the signing of the Credit Agreement, *implicitly* authorized Zaire's State Commissioner of Finance and the Governor of the Bank of Zaire to carry out all of Zaire's and the Bank of Zaire's obligations under the Credit Agreement in perpetuity, and one of those obligations was to "obtain and maintain" needed "government approvals" for the execution, performance, delivery, validity and enforceability of the Credit

---

[12]      *See also id.* at 24:6-25:9 (testifying that the Central Bank gets involved in "servicing debts" because "the Ministry of Finance is in charge of delivery, the payment orders, and the Central Bank is in charge of executing the orders received by the Ministry of Finance"); Ex. P78 at 51:19-52:4 ("Whenever an Agreement commits the Congolese Government to effecting a payment, even if this Agreement has not been signed by the Minister of Finance, it is only normal that when the time comes to actually hand in the money, the Ministry of Finance and/or the Governor of the Central Bank should be involved, because there is no way such payments could be made without first the approval of the Minister of Finance and, secondly, the money coming out of the Central Bank."); *id.* at 52:14-17 ("Any time there is a payment that has to be made on behalf of the State it has to be instructed by the Minister of Finance and paid up by the Central Bank"); *id.* at 53:8-12 ("I said each and every time that there is an agreement involving the payment on behalf of the DRC it is up to the Minister of Finance to order the payment and up to the Central Bank to make sure that the payment is made.").

As discussed *supra at* nn.1&10, the Plaintiffs have dropped their argument that the 2009 Acknowledgment was duly authorized.  However, for the same reasons that the Governor's signature on the 2003 Acknowledgment was not properly authorized, his signature on the 2009 Acknowledgment was also unauthorized.  *See* Def. Findings ¶¶ 157-167; Def. Conclusions at ¶¶ 14-25, 71-72.

Agreement, which Plaintiffs argue included the signing of acknowledgment letters.  *See id.*  This theory is flawed in numerous respects.

First, Mr. Chikuru conceded, as he must, that Ordinance 80-73 states that it was enacted for the limited purpose of authorizing the signing of the Credit Agreement, and not for any other purpose.[13]  Mr. Chikuru additionally conceded that without the express authority provided by Ordinance 80-73, the execution of the Credit Agreement by Zaire's State Commissioner of

---

[13]      Mr. Chikuru's testimony on this point was clear:

Q: "Do you agree that the text of Ordinance 80/73 provides only the authority to the State Commissioner of Finances and the Governor of the Bank of Zaire to sign the 1980 Refinancing Agreement?" A: "In itself, yes." [Ex. P121 at 90:4-8];

Q: "You stated [that] Executive Order 80/73 in itself only provides the authority to the State Commissioner of Finances and the Governor of the Bank of Zaire to sign the 1980 Refinancing Agreement on behalf of the [Government] of the DRC and the Central Bank of Zaire; is that correct" A: "Yes, it is authorized to sign the Agreement." [*id.* at 90:19-91:4];

"Q: "Does Ordinance 80/73 refer to the signing of any other documents other than the 1980 Refinancing Agreement?" A: "No, it is not referring to another document other than signing the Credit Agreement." [*id.* at 101:20-25].

*See also* Ex. D29, Art. 1 ("The signing of the refinancing loan agreement between the Republic of Zaire, the Bank of Zaire and the private bank creditors *is hereby authorized*.") (emphasis added); Ex. P78 at 49:3-50:4 (Ordinance 80-73 "authorized the Minister of Finance and the Governor of the Central Bank to sign, and only to sign the Credit Agreement[.]").  Indeed, Ordinance 80-73 was required by the Credit Agreement (Ex. P10 § 6.01(b)(i)-(v)) to confirm that the signatories to the Credit Agreement had the power to bind Zaire and the Bank of Zaire to the terms of the Credit Agreement.  *See* Def. Findings ¶¶  28, 32-33.

After acknowledging that Ordinance 80-73 relates, by its own term, only to the signing of the Credit Agreement, Mr. Chikuru's opinion that the 2003 Acknowledgment was duly authorized relies entirely on his interpretation of the Credit Agreement and his conclusion that, under the Credit Agreement, the DRC was obligated to sign debt acknowledgments.  However, during his deposition, Mr. Chikuru repeatedly admitted that the Credit Agreement was not a law of the DRC and, therefore, he was not qualified to interpret it.  *See, e.g.*, Ex. P121 at 98:12-104:23 (admitting that he was not qualified to opine, as he did in his expert report, that certain provisions of the Credit Agreement "gave the unconditional authority" to the Minister of Finance and the Governor of the Central Bank to "acknowledge, reaffirm and/or renew the obligations of the DRC and the Central Bank" under the Refinancing Agreement); *see also id.* at 116:5-12, 86:14-24; Ex. P122 at ¶ 9b, 10 ("Because the Credit Agreement is governed by New York law I express no opinion as to the interpretation or enforceability of any provision in that Agreement . . . .").  Therefore, Mr. Chikuru's opinion that the 2003 Acknowledgment was duly authorized has limited, if any, probative value—a conclusion that Plaintiffs themselves must have drawn when they initially waived their actual authority theory of liability *and served the Defendants with their own motion in limine to exclude the Defendants from introducing Mr. Chikuru's testimony at trial* (a motion that they withdrew before filing).

Finances (the "Commissioner") and the Governor of the Bank of Zaire would have been unauthorized.  *See* Ex. P121 at 171:13-172:3.[14]   Therefore, Plaintiffs' suggestion that Ordinance 80-73 provided "implicit" authority to the Commissioner and the Governor of the Bank of Zaire (or their successors) to do anything other than sign the Credit Agreement on behalf of Zaire and the Bank of Zaire is nothing more than unsubstantiated speculation.[15]   Moreover, ascribing a broad implicit meaning to an explicitly narrow statute would violate all accepted rules of statutory interpretation.  *See, e.g., States v. Great N. Ry. Co.,* 343 U.S. 562, 575 (1952) ("it is our judicial function to apply statutes on the basis of what Congress has written, not what Congress might have written."); *see also Devine v. U.S.*, 202 F.3d 547, 551 (2d Cir. 2000) (when the words of a statute are unambigious, judicial inquiry should end).[16]

Second, Plaintiffs' argument that the Commissioner and the Governor of the Bank of Zaire were implicitly authorized to "obtain and maintain" needed "government approvals" for the execution, performance, delivery, validity and enforceability of the Credit Agreement is contradicted by the text of the Agreement itself.  As already discussed, Plaintiffs concede that Ordinance 80-73, signed by *President Mobutu*, was required for the "execution" of the Credit Agreement.   Moreover, the Credit Agreement specifies numerous other "Conditions of Effectiveness" (i.e., conditions necessary for the execution, delivery, performance, validity and

---

[14]     Consistent with this testimony, in response to a query from the Court at the November 26, 2013 pretrial conference, Plaintiffs conceded that they were not contending that the Minister of Finance or the Governor of the Central Bank had inherent authority to enter into any acknowledgment of debt simply by virtue of the titles they held.  Hr'g Tr. at 59:20-61:15, Nov. 26, 2013.

[15]     Mr. Chikuru does not base his opinion that Ordinance 80-73 implicitly authorized the Commissioner and the Governor of the Bank of Zaire to perform the Credit Agreement on any principal of Zaire or DRC law, but rather on an illogical presumption drawn from the fact that "the Agreement was not signed to be put under the table, but to be [performed]" and "Agreements are not signed to be ignored.  They are signed to be performed." Ex. P121 at 90:19-91:9 & 91:21-23; 102:16-17.

[16]     If courts must refrain from ascribing implicit meanings to domestic statutes, they certainly should not do so with respect to foreign statutes, where risk of adverse foreign policy consequences are present.

enforceability of the Credit Agreement) that contemplate performance by parties other than the Commissioner and Governor of the Bank of Zaire. *See, e.g.,* Def. Findings ¶¶ 28-30 (contemplating performance by, *inter alia*, Zaire's President, Director of the Office of the President, and legal counsel). Finally, it simply does not make any logical sense to assume that, even if they wanted to, the Commissioner and the Governor of the Bank of Zaire could, by themselves, "maintain" needed "government approvals" for the execution, performance, delivery, validity and enforceability of the Credit Agreement—both parties are servants to the Government, who must perform in adherence to the policies set by the head of state who was, at the time, a renowned dictator.

Third, even if the Plaintiffs were correct, and Ordinance 80-73 granted the Commissioner and the Governor of the Bank of Zaire implicit powers to perform the Credit Agreement and performance of the Credit Agreement included "*obtain[ing]* and maintain[ing]" needed "*government approvals*" for the validity and enforceability of the Credit Agreement—and that language hypothetically contemplated acknowledgments of debt—Plaintiffs have failed to submit any evidence that such "government approvals" were obtained in this case; in fact, *Plaintiffs assume that the Council of Ministers were not consulted and did not approve the 2003 Acknowledgment.*[17] *See supra* at III.A.1.

Finally, as made clear by Mr. Lubala's report and testimony, even if Plaintiffs' novel theory of "implicit" actual authority could withstand scrutiny—it cannot—the 2002 Decree clearly abrogated any such "implicit" authority by defining the competence and authority of the officials serving in Joseph Kabila's government and stating that "[a]ll prior provisions contrary

---

[17]     Nothing in the Credit Agreement contemplates a debt acknowledgment letter, which is a highly unusual instrument (*see, e.g.,* Def. Findings ¶ 72). Plaintiffs' assumption that the parties contemplated the need for such a rare instrument in drafting the Credit Agreement is more groundless speculation.

to this Decree . . . are repealed." *See* D28 at Art. 64; *see also* Ex. P124 at ¶¶ 24-25; Ex. P78 at 40:4-41:16.

For these reasons, and those set forth in the Defendants' proposed findings of fact (at ¶¶ 1-39), proposed conclusions of law (the "Def. Conclusions") (at ¶¶ 1-25) and expert report and testimony of Emmanuel Lubala, the signatories to the 2003 Acknowledgment were not authorized to bind the DRC or the Central Bank.

### B.    The DRC Never Ratified the 2003 Acknowledgement.

Just as Plaintiffs are unable to prove that the signatories to the 2003 Acknowledgment were authorized to bind their principals, they cannot satisfy their burden of proof on their ratification theory of liability. Under New York law, "[r]atification is the express or implied adoption, *i.e.*, recognition and approval, of the unauthorized acts of another." *Vargas Realty Enters., Inc. v. CFA W. 111 Street, L.L.C.*, 440 B.R. 224, 235 (Bankr. S.D.N.Y. 2010) (citations omitted). The burden of proof rests upon the party asserting ratification. *Ryan v. Presco*tt, No. 5466–11, 2013 WL 1150216, at *8 (N.Y. Sup. Ct. Albany Cnty., Feb. 14, 2013). Parties failing to present sufficient and persuasive evidence as to ratification will not meet this burden. *See Playboy Enters. Inc. v. Dumas*, 960 F. Supp. 710, 722 (S.D.N.Y. 1997) (plaintiff did not prove ratification absent "persuasive evidence showing that [principal] knew that his agents" signed various agreements).

To ratify an unauthorized act, a principal must have "full knowledge of the material facts," *Cnty. of Monroe v. Raytheon Co.*, 48 A.D.3d 1237, 1239 (4th Dep't 2008), including "the existence or extent of the obligations involved in the transaction," Restatement (Second) of Contracts § 91 (1958), and the unauthorized agent's conduct. *See Matter of N.Y. State Med. Transporters Ass'n*, 77 N.Y.2d 126,  130 (1990) (finding a government agency did not have full knowledge of the material facts because "there has been no showing that respondent knew of and

intentionally condoned its agent's practice").  In the normal course, a party that has knowledge of the material facts can ratify an unauthorized act "by intentionally accepting benefits under the contract, by remaining silent or acquiescing in the contract for a period of time after he has the opportunity to avoid it, or by acting upon it, performing under it, or affirmatively acknowledging it."  *U. S. v. Twenty Miljam-350 IED Jammers*, 669 F.3d 78, 89 (2d Cir. 2011) (citations omitted).

However, a government can only ratify an unauthorized act by taking some affirmative action clearly demonstrating its intent to do so.  *See Kawa v. U.S.*, 86 Fed. Cl. 575, 589 (2009) (holding that to establish ratification by a government agency of a government contract, "a party must show that an individual in the agency with contracting authority had 'actual or constructive knowledge' and 'demonstrated acceptance' of the contract.") (citing *Harbert/Lummus Agrifuels Projects v. U.S.*, 142 F.3d 1429, 1433–34 (Fed. Cir. 1998).  Therefore, in the government context, "ratification first requires knowledge of the unauthorized or otherwise ineffective initial agreement and then requires *action* to formalize that agreement by someone with appropriate authority."  *Kawa*, 86 Fed.Cl. at 589 (emphasis added); *see also Herbert/Lummus*, 142 F.3d at 1434 (finding silence alone was not enough to effect a ratification of a government contract because "ratification must also be based on a demonstrated acceptance of the contract."); *Doe v. U.S.*, 58 Fed. Cl. 479, 488 (2003) (finding no ratification of a contract between the government and a DEA informant, because plaintiff could not demonstrate "active acceptance of his alleged contract… For a claim of imputed knowledge to succeed, the acceptance by the DEA would have to be active in nature, and silence will not suffice."); *Elia v. Highland Ctr. Sch. Dist.*, 78 A.D.3d 1265, 1269-1270 (3d Dep't 2010); *E. Hampton Union Free Sch. Dist. v. Sandpebble Builders, Inc.*, 90 A.D.3d 815, 817 (2d Dep't 2011).

For the reasons set forth herein, Plaintiffs cannot prove that the DRC had knowledge of the material facts concerning the signing of the 2003 Acknowledgment and, even if they could, they cannot prove that the DRC acted to affirm the signing of the 2003 Acknowledgment; nor can they demonstrate that the DRC knowingly accepted benefits from the Acknowledgment or acquiesced to its signing, assuming it was appropriate to consider those factors in determining whether a government party ratified an unauthorized act of its agent.

### 1.   No Authorized Party Was Aware Of, Or Took Steps To Ratify, The 2003 Acknowledgment.

"Only a government employee with actual authority can make an otherwise unauthorized agreement binding by ratifying it."  *Adamowicz v. U. S.*, 101 Fed. Cl. 485, 490 (2011) (citing *Winter v. Cath-DR/Balti Joint Venture*, 497 F.3d 1339, 1346–47 (Fed. Cir. 2007)); 24 N.Y. Jur. 2d Agency § 189 (2013) ("[R]atification must be made by the person intended as principal.").[18] An agent cannot ratify his own unauthorized act. *Council Commerce Corp. v. Sterling Navigation*, 444 F. Supp. 1043, 1049 (S.D.N.Y. 1977) (citing *Giebler Mfg Co. v. Kranenberg*, 92 N.Y.S. 843 (2d Dept. 1905)).

For the reasons set forth *supra* at III.A, only the Council of Ministers, or in case of an emergency, the President, could have authorized the signing of the 2003 Acknowledgment, and it is only those parties that are able to ratify its unauthorized signing.  Yet Plaintiffs have submitted no evidence that even suggests that the Council of Ministers or President were ever aware of the 2003 Acknowledgment before this lawsuit, let alone took any action to ratify it.  *See In re Motors Liquidation Co.*, 486 B.R. 596, 636 (Bankr. S.D.N.Y. 2013) (if principal lacks

---

[18]     *See also Budge v. Town of Millinocket*, 55 A.3d 484, 491-92 (Me. 2012) ("when a principal is a government, the government can only ratify through a legally operative action."); Restatement (Third) of Agency § 3.04 cmt. d (2006) ("the legally operative actions that may be taken by governments and subdivisions of governments are often specified by statute, constitution, or charter," and this "limits a governmental principal's capacity to authorize agents.").

knowledge of material facts, he is not bound by a ratification); 24 N.Y. Jur. 2d Agency § 192 (citing Restatement (Third) of Agency, cmt. B ("burden of establishing that a ratification was made with knowledge is on the party attempting to establish that ratification occurred."). In fact, we respectfully submit, the only official act of the DRC at issue here is its decision, upon learning of Plaintiffs' complaint, *to oppose this lawsuit and contest the authority of the signatories to the 2003 Acknowledgment.*

In an effort to overcome their burden of proof, Plaintiffs cite a number of communications concerning "London Club" debt—the debt that was refinanced by the Credit Agreement and subject to a multilateral negotiation to settle creditor claims.[19] Yet none of these communications mention or discuss the 2003 Acknowledgement, nor do they involve the Council of Ministers.  This deficiency is fatal.  *See Matter of New York State Med. Transporters Ass'n*, 77 N.Y.2d at 131  (government agency did not have full knowledge of the material facts of its agents who were acting outside of the law because "there has been no showing that the respondent knew of and intentionally condoned its agent's practice.").  Moreover, the record demonstrates that efforts by agents of the DRC to negotiate with London Club creditors to achieve an 80%-100% reduction in potential claims against the DRC were for the purposes of restoring the DRC's credit worthiness and reputation in the international financial community – a

---

[19]     *See, e.g.*, Ex. P37 at UB00001031-1032 (March 28, 2003 letter from Masangu to Bank of Tokyo), Ex. P40 at CITI0001108-1113 (February-March 2003 meeting and follow-up correspondence between Central Bank and Bank of Tokyo); Ex. P41 at UB00000556-557 (September 2003 meetings between Central Bank and Bank of Tokyo); Ex. P42 at CITI0001218 (September 2003 meeting between Central Bank and Citibank); Ex. P35 at UB00001268; Ex. P43 at UB00001915 (September 2003 meeting between Central Bank and London Club); Ex. P45 at UB00000938-939 (June 2004 meetings with World Bank); Ex. P47 at UB00000950-951 (March 2005 meetings between Ministry of Finance, Ministry of Budget and Union Bank); Ex. P53 at UB00001500 (Certificate of Outstanding Debt signed by representatives from Central Bank); Ex. P74 at DRC00003523-3526;     Ex. P75     at DRC00003545-3546;     Ex. P66     at DRC00003556;     Ex. P115 at DRC00003569-3570 (2011 correspondence between Ministry of Finance, Central Bank, Union Bank, and London Club creditors); Ex. P106 at DRC00003714-3717; Ex. P65 (excerpts from 2007 and 2011 Annual Reports of the Central Bank).

community the deeply impoverished country would need to call on again.   *See* Ex. P24

(November 2002 "Communication from the Governor of the Central Bank of Congo to the

London Club Agent Banks" noting that "[r]elations between the Democratic Republic of Congo

and the International financial community have been profoundly damaged since the beginning of

1990, mainly following the accumulation of payment arrears related to external debt", that the

DRC has made "progress . . . in terms of both cleaning up the macro-economic atmosphere and

having a dialogue with its bi-and multilateral partners", but that "huge efforts are still to be

made" and "to do this, the DRC need[s] technical and financial support from all of its

development partners, including those of the London Club" and that the communication "aims to

open back up the dialogue with the London Club in light of settling the arrears issue, as well as

defining a new cooperation framework").   To the extent the Plaintiffs ask this Court to equate

those efforts with either knowledge of, or an intent by the Council of Ministers or President of

the DRC to ratify, a document (the 2003 Acknowledgement) which purports to obligate the DRC

to repay hundreds of millions of dollars (or billions of dollars, under Plaintiffs' calculations) of

distressed debt, there is no evidence that would support the Plaintiffs' request. [20]   Put simply,

there is no document in the record indicating that anyone outside the Ministry of Finance or

Central Bank—the agents that signed the 2003 Acknowledgment—was aware of the 2003

Acknowledgement.

---

[20]      In this regard, the London Club process is closely analogous to settlement negotiations, which are
routinely excluded as trial evidence due to their low probative value and high prejudicial effect.   *See, e.g.,*
*Sanders v. Madison Square Garden, L.P.*, 525 F. Supp. 2d 364, 367-68 (S.D.N.Y. 2007) (excluding evidence
of settlement negotiations because, *inter alia*, it had little probative value and was highly prejudicial).   Because
this is a bench trial, the risk of prejudice is minimal.   However, for the reasons stated herein, the London Club
communications submitted by Plaintiffs provide less than a scintilla of probative weight on the issues that this
Court must decide.

2.    **There Is No Basis To "Impute" Knowledge
Of The 2003 Acknowledgment To Authorized
Parties Or Issue An Adverse Inference On This Issue.**

Absent any evidence that the Council of Ministers or, in case of emergency, the President

of the DRC, had actual knowledge of the 2003 Acknowledgment, Plaintiffs argue that this Court

should either impute such knowledge to them, or, in the alternative, impose an adverse inference

against the Defendants on this issue. These arguments are unavailing.

In arguing that knowledge of the 2003 Acknowledgment should be imputed to the

Council of Ministers, Plaintiffs rely upon *EUA Cogenex Corp. v. N. Rockland Ctr. Sch. Dist.*,

124 F. Supp. 2d 861 (S.D.N.Y. 2000) and *Kirschner v. KPMG LLP*, 938 N.E.2d 941 (N.Y.

2010).  Pl. Br. at 34, 39.  In *EUA Cogenex*, the court found reason to impute knowledge of an

agent's execution of a contract to a principal where the principal proceeded to make substantial

payments due under the contract. *EUA Cogenex*, 124 F. Supp. 2d at 871.  In *Kirschner*, which

does not address the issue of ratification at all, the court considered whether an agent's

knowledge can be imputed to the principal in determining corporate liability for fraud—an

entirely different matter from ratification.  *Kirschner*, 938 N.E. at 950-51.  Neither case is on

point; here, neither the Council of Ministers nor the President were aware of, or took action to

approve, the 2003 Acknowledgment, nor did the DRC pay any obligation supposedly recognized

by the 2003 Acknowledgment.[21] *See Long Island City Sav. & Loan Ass'n v. Skow*, 25 A.D.2d

---

[21]     Plaintiffs understandably try to confuse an otherwise simple issue by citing to documents demonstrating: (i) knowledge of the 2003 Acknowledgment by the Ministry of Finance and its subservient agencies (*see* Pl. Br. at 38-40)—a fact that is obviously not in dispute since the 2003 Acknowledgment was signed by the Interim Minister of Finance;  (ii) identification of London Club debts and creditors in the Central Bank's Annual Reports (*see id.* at 39-40); (iii) payment by the Central Bank of past due administrative fees to the servicing bank for the London Club debts (*see id.* at 37-38); and (iv) the duty under Article 9 of the 2002 Decree of the Minister of Finance to report "legislative bills, executive orders, decrees, interministerial orders, orders and other instruments likely to . . . have a budgetary impact" to the Council of Ministers (*see id.* at 36-37 (citing *Center v. Hampton Affiliates, Inc.*, 497 N.Y.S.2d 898 (1985)).  None of these facts are availing.

880, 882 (N.Y.A.D. 1966) (finding it unreasonable to "impute the knowledge of… an agent, to [the principal] for the purpose of making out a ratification… for then it would have to be said that principals necessarily ratify all unauthorized conduct.").

Presumably recognizing the deficiencies of their proof, Plaintiffs next argue that they should be entitled to an adverse inference as to the Council of Ministers' knowledge of the 2003 Acknowledgment (*see* Pl. Br. at 33-34).  As an initial matter, "adverse inference instructions generally are not appropriate sanctions in bench trials." *Jorgensen v. United Comm. Group Ltd. Partnership*, No. 8:10–cv–00429–AW, 2013 WL 1726703, at *5 (D. Md. Apr. 19, 2013). Moreover, "[p]lacing the court's hand on the scale [by imposing such sanctions] to favor or disfavor a party in a decision on the merits is discouraged."  *Gill v. Arab Bank, PLC*, 893 F. Supp. 2d 542, 551 (E.D.N.Y. 2012) ("Under the Federal Rules, disputes must be decided on the merits if at all practicable.").

---

<u>First</u>, the knowledge of the agent that performed the unauthorized act cannot possibly be sufficient to impute knowledge of that unauthorized act to the principal for the same reason that an unauthorized agent cannot ratify his own unauthorized acts.  *See Council Commerce Corp.*, 444 F. Supp. at 1049.  <u>Second</u>, none of the Central Bank annual reports mention the 2003 Acknowledgment, and therefore even if knowledge of their full contents could be imputed to the Council of Ministers, such knowledge would be insufficient.  <u>Third</u>, the DRC's payment of overdue administrative fees to the Bank of Tokyo was not made pursuant to the 2003 Acknowledgment (as opposed to the payments made in *EUA Cogenex*, 124 F. Supp. 2d at 871, made pursuant to the alleged unauthorized contract), moreover, there is no evidence that the Council of Ministers approved the payment to the Bank of Tokyo, or, even if such evidence existed—it does not—that the Council of Ministers understood that the payment was made because of the 2003 Acknowledgment—which it was not. <u>Fourth</u>, Plaintiffs' contention that because the Minister of Finance was obligated by Article 9 of the 2002 Decree to submit for deliberation the 2003 Acknowledgment to the Council of Ministers—an acknowledgment that itself concedes Plaintiffs' actual authority theory of liability—has received no support from Plaintiffs' DRC law expert and is otherwise based on inapposite authority.  Plaintiffs' sole cited case, *Center v. Hampton Affiliates, Inc*, 497 N.Y.S.2d 898 (1985), did not even address the issue of ratification, and instead focused on whether a buyer of shares was a bona fide purchaser given his agent's knowledge as to the questionability of title.  *Hampton Affiliates* said <u>nothing</u> about imputing the agent's knowledge to the principal for the purposes of satisfying the knowledge requirement of ratification, nor is there any other authority to support that theory. Moreover, there is no evidence that the payment of nominal fees on an overdue bill triggers the Minister of Finance's obligation to report to the Council of Ministers under Article 9 of the 2002 Decree (such payment obviously does not involve "legislative bills, executive orders, decrees, interministerial orders, orders and other instruments likely to . . . have a budgetary impact").

26

Moreover, Plaintiffs' surprising request for an adverse inference sanction is both baseless and procedurally improper. Plaintiffs' argument is based on a flawed premise: that the DRC made no effort to search for or produce Council of Ministers' records. In fact, DRC officials undertook a search for responsive Council of Ministers' records, but were not able to locate any.[22]

Nevertheless, Plaintiffs cannot demonstrate, as they must, that the unproduced evidence "would have been favorable" to them. *See Zubulake v. UBS Warburg* LLC, 229 F.R.D. 422, 431 (S.D.N.Y. 2004). Here, Plaintiffs have submitted no evidence that the Council of Ministers met to consider the 2003 Acknowledgment, let alone any evidence to suggest that minutes of any such meeting would be favorable to their case. *See* Def. Findings ¶¶ 143-48. Moreover, as previously discussed, far from suggesting that the Council of Ministers was consulted with regard to the 2003 Acknowledgment, the factual record suggests that Citibank employed Governor Masangu—himself a former Citibank employee—to "give [them] a hand" in getting Interim Minister Loungwe to sign the 2003 Acknowledgment after Minister Matungulu's sudden resignation on February 17, 2003. *Id.* at ¶¶ 145-46. And the rest, as they say, is history: five days after Citibank first sent the 2003 Acknowledgment to Interim Minister Loungwe, the 2003 Acknowledgment was signed. *Id.* at ¶¶ 147-48.

---

[22]    Moreover, throughout defense counsels' diligent discovery efforts—efforts which entailed multiple trips to Kinshasa and coordination with a DRC team assembled to conduct document searches—Plaintiffs' counsel was regularly apprised of all discovery progress and challenges. At the close of fact discovery, Plaintiffs never objected to the adequacy of Defendants' production. And when Defendants presented Governor Masangu for deposition in New York—a deposition that Plaintiffs' counsel was sure would never take place—Plaintiffs never asked a single question about location of, or search for, Council of Ministers' records or any other records. Nor did Plaintiffs ever reopen any of their 30(b)(6) depositions, or request any new 30(b)(6) depositions with regard to Defendants' document searches and production in 2013. Plaintiffs' eleventh-hour request for discovery sanctions is, therefore, an apparent smokescreen to obscure otherwise glaring evidentiary deficiencies.

None of the facts surrounding the signing of the 2003 Acknowledgment suggest knowledge by the Council of Ministers.  Notably, even though Citibank Kinshasa employee Michel Losembe provided real time reports to his colleague in New York about the process of getting the 2003 Acknowledgment signed, at no point did he report that Minister Matungulu or Interim Minister Loungwe needed to, or did, seek the approval of the Council of Ministers.  *See generally id.* at ¶¶ 137-49.  Equally compelling is the fact that Plaintiffs have produced no evidence that the Council of Ministers met at any point between February 11, 2003 (the date Citibank first transmitted the unsigned 2003 Acknowledgment to Minister Matungulu) and February 25, 2003 (the date of execution of the 2003 Acknowledgment by Interim Minister Loungwe and Governor Masangu).  *See id.* ¶¶ 143-49.  Having failed to produce any evidence that the Council of Ministers convened during this pertinent time period, Plaintiffs are obviously unable to demonstrate that responsive records were withheld or destroyed, or that such records "would have been favorable" to them.  *See Zubulake*, 229 F.R.D. at 431; *see also Curcio v. Roosevelt Union Free Sch. Dist.*, 283 F.R.D. 102, 107 (E.D.N.Y. 2012) (citing *Residential Funding Corp. v. DeGeorge Fin. Corp.*, 306 F.3d 99, 107 (2d Cir. 2002)).[23]  Indeed, despite having an expert on DRC law on retainer since 2012—an expert who has served within a DRC ministry—Plaintiffs have not submitted any evidence of any meetings of the Council of Ministers in the months surrounding the signing of the 2003 Acknowledgment or that the

---

[23]      Plaintiffs' eleventh-hour claim that they have been materially prejudiced by Defendants' document production is, moreover, inconsistent with their prior statements to this Court.  *See, e.g.,* Ltr. from D. Hranitzky, Esq., to Hon. Paul A. Engelmayer, at 2, dated Jan. 24, 2013 ("the discovery Plaintiffs have obtained from third parties indicates that, when discovery is complete, there will be no genuine issue of material fact with respect to Plaintiffs' entitlement to collect the amounts owed under the Credit Agreement.") (ECF No. 124); Ltr. from D.  Hranitzky, Esq., to Hon. Paul A. Engelmayer, at 2, dated July 24, 2013 (stating Plaintiffs' intent to move for summary judgment based on the discovery record without mentioning any alleged discovery infirmity or intention to seek adverse inference sanctions) (ECF No. 156 at 2).

Council of Ministers ever considered the 2003 Acknowledgment.  Accordingly, their request for an adverse inference fails.

Even if Plaintiffs could establish that adverse inference sanctions are warranted—they are not—their request is untimely and procedurally deficient.  Under this Court's rules, the proper procedure for requesting an adverse inference in all cases is through a motion *in limine* at the time that the joint pretrial order is due—here, November 12, 2013.  *See* The Hon. Paul Engelmayer, Individual Rules of Practice in Civil Cases ("Individual Rules"), at 5.B (""[e]ach party shall file and serve with the joint pretrial order… *motions addressing any evidentiary issues or other matters which should be resolved in limine*.") (emphasis added); *see also Weber v. Fujifilm Med. Sys. USA*, No. 3:10 CV 401(JBA), 2011 WL 3163597, at *5 (D. Conn. July 27, 2011) ("The issue of an adverse inference should be raised… prior to trial in a motion *in limine*").[24]  Plaintiffs did not, however, file a motion on November 12, 2013, the date the joint pre-trial order was due.[25]  Plaintiffs have not complied with proper procedures and their untimely request for sanctions should be denied.

---

[24]     Courts routinely deny requests for adverse inferences when a party waits too long to file a request. *See, e.g., Hogan v. Bellsouth Corp*., 396 F. Supp. 2d 1333, 1335-36 (N.D. Ga. 2004) (holding that plaintiff's motion for adverse inference was untimely because, *inter alia*, it was submitted after magistrate judge filed a report and recommendation on summary judgment).

[25]     At the Aug. 1, 2013 hearing, this Court denied the Defendants' request for permission to consider moving for summary judgment at the close of expert discovery, because, *inter alia*, such a request was not made by July 24, 2013, the deadline for filing a letter brief requesting permission to seek summary judgment established by the Individual Rules. See Hr'g Tr. (ECF No. 160) at 9:20-10:20.  Here, Plaintiffs have already sought and obtained relief from the original due date set by the Court for the filing of the joint pretrial order, and they were further afforded an opportunity to submit a pretrial brief after the date that brief was due under the Individual Rules (*i.e.*, November 12, 2013).  Individual Rules at 5.B ("*Required Pretrial Filings*. Each party shall file and serve with the joint pretrial order: **.** **.** **.** ii. *In all cases where a party believes it would be useful to the Court, a pretrial memorandum of law*[.]") (emphasis supplied).  We respectfully submit that Plaintiffs should not be afforded another mulligan on the important issue of adverse inference sanctions, where they failed to comply with the Individual Rules by not filing a proper motion at the appropriate time.

**3.    Even If Plaintiffs Could Establish Knowledge
Of The 2003 Acknowledgment By Authorized Parties,
They Have Failed To Prove That Such Parties Ratified Its Signing.**

Even if Plaintiffs could demonstrate that the Council of Ministers was aware of the 2003 Acknowledgment, that fact alone is not sufficient to establish ratification. In order for the Council of Ministers to be deemed to have ratified the 2003 Acknowledgment, Plaintiffs must prove by a preponderance of the evidence that it intentionally affirmed the signing of the 2003 Acknowledgment.  "[A] necessary element of ratification is intent."  *Robinson v. Day*, 960 N.Y.S.2d 397, 401 (1st Dep't 2013) (quoting *Soma v. Handrulis*, 277 N.Y. 223, 230, 14 N.E.2d 46 (1938)).  New York courts are clear that "[t]he intent required for ratification 'must be clearly established and may not be inferred from doubtful or equivocal acts or language.'" *In re Adelphia Recovery Trust*, 634 F.3d 678, 693-94 (2d Cir. 2011) (quoting *Chemical Bank v. Affiliated FM Ins. Co.*, 169 F.3d 121, 128 (2d Cir. 1999)); *see also Kuwait Airways Corp. v. Am. Security Bank, N.A.*, 890 F.2d 456, 465 (D.C. Cir. 1989) ("[T]he conduct which implies ratification must be conduct which is 'inconsistent with any other hypothesis.'") (quoting *Lewis v. Washington Metro. Area Transit Auth.*, 463 A.2d 666, 671-72 (D.C. 1983)).

Moreover, in a case where the alleged ratifying party is a government (here, the DRC), "ratification . . .requires *action* to formalize that agreement by someone with appropriate authority." *Kawa*, 86 Fed. Cl. at 589.  In *Kawa*, the court held that an amendment to a contract with the U.S. government granting third party beneficiary status to a plaintiff was not subsequently ratified by anyone from the government with contracting authority.  The court noted that, even assuming that the authorized contracting officer had knowledge of the third party conveyance, she "would have had to take some action manifesting her intent to confer contractual rights upon [plaintiff]" and "[s]he took no such action."  Nor did anyone else with contracting authority affirmatively demonstrate acceptance of the contract.  *Kawa*, 86 Fed. Cl. at

589-90;  *See also Elia v.*  78 A.D.3d at 1269-1270 (finding that a local school board had not ratified the extension of health benefits, because (1) only the School Board had the power to enter agreements to provide such benefits, and the Board did not do so; and (2) the Board took no subsequent action that was "specifically grounded upon [the] written agreements"); *see also E. Hampton Union Free Sch. Dist.* 90 A.D.3d at 817.Because Plaintiffs cannot prove by a preponderance of the evidence that the Council of Ministers took any affirmative act to approve the signing of the 2003 Acknowledgment or performed any act in furtherance of its terms, Plaintiffs' ratification theory must fail.[26]

Moreover, even if the DRC, a government actor, could have ratified the 2003 Acknowledgement by mere acceptance of benefits or acquiescence—it cannot—there is no evidence to support either finding.  First, the DRC could not have accepted any benefits under the 2003 Acknowledgement, which refers only to the respective *obligations* of the DRC and the Central Bank.  Ex. P22 at CITI0000202.  Second, no benefits were realized.  Plaintiffs have vaguely suggested that the DRC benefited from the 2003 Acknowledgment by avoiding litigation—despite the existence of this case, and prior creditor actions—and "improved prospects for obtaining HIPC debt relief"—despite no demonstration that any benefits were realized from the HIPC process.  *See* Pl. Br. at 32.  With regard to the former purported benefit, it is far from clear that there was any real threat of litigation at the time of the signing of the 2003 Acknowledgment;[27] with regard to the latter purported benefit, nowhere in Plaintiffs' discussion

---

[26]    At most, Plaintiffs' evidence suggests knowledge by the DRC of the Credit Agreement and London Club negotiations; none of this evidence demonstrates conduct undertaken by the Council of Ministers pursuant to the 2003 Acknowledgment.

[27]    Indeed, it does not appear that Citibank was considering filing suit against the DRC if it was unable to obtain the 2003 Acknowledgment before the statute of limitations would have run on the 1997 Acknowledgment (assuming its validity).  *See* Ex. P80 at 96:14-25; 97:3-15; 135:2-10 (when asked "am I correct that had they refused to sign you would have brought suit", Bartner responded:  "No.  We would have had to convene meetings of banks to determine that").  With less than two weeks remaining before the statute

of HIPC (*see* Pl. Br. at 16-26) is there any mention of what the DRC *actually achieved* through HIPC, nor have Plaintiffs proffered any admissible evidence to suggest that without the inclusion of potential London Club claims in its substantial debt figures, the DRC would failed to achieve HIPC status.  In fact, the 2012 Annual Report of the Central Bank, which Plaintiffs rely upon, specifically states that the HIPC negotiations "proved less successful as were hoped, *given the lack of response on the part of creditor members of this club*."  Pl. Br. at 25-26 (emphasis added).  Accordingly, Plaintiffs have failed to meet their burden to prove that the DRC realized a "benefit" from the 2003 Acknowledgement.

Nor can Plaintiffs establish the DRC's ratification of the 2003 Acknowledgement through silence, assuming that such a consideration was appropriate to evaluate in this case, which it is not.  As noted above, there is no evidence that the Council of Ministers was aware of the 2003 Acknowledgment, but even if it was, given the complex circumstances in the DRC at the time of the signing of the 2003 Acknowledgment, including, but not limited to, a lingering war, government transition, and economic disintegration (*see* Def. Findings ¶¶ 95-114), silence alone cannot constitute ratification.  *See In re Adelphia Recovery Trust*, 634 F.3d at 693-94 ("[w]here the allegedly ratifying party's silent acquiescence to a transaction credibly appears to have resulted from the complexity of the situation rather than intent, ratification does not occur.").

---

of limitations would have run out on the 1997 Acknowledgement (assuming its validity), Bartner had not spoken to an attorney.  *Id*.  The likely outcome of signing the 2003 Acknowledgment was, therefore, liability exposure, rather than avoidance.  This fact is made further clear by the factual circumstances surrounding the signing of the 2009 Acknowledgment:  after the 2003 Acknowledgment would have expired (assuming its validity) on February 25, 2009, no creditors filed suit; yet, despite the undisputed fact that as of February 26, 2009 all potential additional creditor claims against the DRC were time-barred, BNP Paribas (who turned to Cecilia Bartner for advice) managed to obtain another acknowledgment of debt, signed by the same unauthorized agents (*i.e.*, the Governor of the Central Bank and Minister of Finance), *in July 2009*.  *See* Def. Findings ¶¶ 158-67.  (However, as noted *supra* and *infra*, the creditor who obtained the 2009 Acknowledgment publicly disavowed any knowledge of whether it was duly authorized and encouraged interested creditors to perform their own independent investigation regarding its validity.  *See id.* at ¶ 167.)

Finally, there was no performance under the 2003 Acknowledgement.  As already discussed, the 2003 Acknowledgement is a one-sided agreement, whereby Interim Minister Luongwe and Governor Masangu purport to obligate the DRC to repay hundreds of millions of dollars (or billions of dollars, according to Plaintiffs' calculations) to commercial creditors under the Credit Agreement.  Ex. P22 at CITI0000202.  No such payments were made.

In short, Plaintiffs cannot meet their burden to establish material knowledge of the 2003 Acknowledgement by the Council of Ministers, or any informed affirmative conduct suggesting a ratification of the 2003 Acknowledgement by the Council of Ministers.  Accordingly, their ratification theory fails.

### C.   Neither Luongwe Nor Masangu Had Apparent Authority to Sign the 2003 Acknowledgement.[28]

Under New York law, "[a] principal may be bound by the actions of an agent on the basis of apparent authority only where it is shown that a third party . . . reasonably relied upon the misrepresentation of the agent 'because of some misleading conduct on the part of the *principal*.'"  *Stichting Ter Behartiging Van de Belangen Van Oudaadeelhouders In Het Kapitaal Van Saybolt Int'l B.V. v. Schreiber*, 407 F.3d 34, 56 (2d Cir. 2005) (internal quotations omitted) (emphasis added in original).  *See also Themis Capital*, 881 F. Supp. 2d at 526 ("Apparent authority exists when the principal (here, a state) causes third parties to reasonably rely on the representation – explicit or implicit – that the agent (here, a government official) is acting on behalf of the state").  Thus, to bind the DRC to the 2003 Acknowledgment under the theory of apparent authority, Plaintiffs would have to prove that the DRC acted in such a way that represented that the Minister of Finance and Governor of the Central Bank had the unilateral

---

[28]   This Court previously held that "apparent authority can bind foreign governments whose acts are private, including enter[ing] into commercial transactions on apparent behalf of a sovereign state."  *Themis Capital*, 881 F. Supp. 2d at 526.  Defendants respectfully reserve all rights on appeal with respect to this issue.

authority to sign acknowledgements of debt and that Citibank reasonably relied on such conduct in obtaining the 2003 Acknowledgement.  Plaintiffs proffer no such proof.

Instead, the evidence shows that the State of the DRC (and Zaire), acting through its *authorized* agents, did not engage in any conduct which could imply that the Minister of Finance or Governor of the Central Bank had the unilateral authority to sign acknowledgements of debt or other documents relating to the Credit Agreement without seeking and obtaining approval from the State.  Quite the contrary, the only conduct that can be attributed to the DRC confirms that its officials did <u>not</u> have such authority.  *See* Ex. D28 (2002 Decree); D29 (1980 Ordinance); Def. Findings ¶¶ 32-33 (discussing 1980 Ordinance); Def. Conclusions ¶¶ 115-117 (discussing 2002 Decree).

Discovery has also shown that there was nothing "reasonable" about the process through which the 2003 Acknowledgement was obtained.  Citibank charged Cecilia Bartner, an employee with "very little" familiarity with the underlying Credit Agreement, with obtaining the 2003 Acknowledgement.  Ex. P80 at 42:21-43:4.  Despite the legal and financial significance of this document, Bartner treated the entire transaction as a "formality" which she pushed through to completion without seeking the advice of counsel or undertaking any due diligence.  Def. Findings ¶¶ 127; 134-135; 155-156.  In doing so, she ignored numerous red flags which indicated that such due diligence was warranted.  Def. Conclusions ¶¶ 45-60.  More specifically, although the DRC was in the midst of "severe political turmoil" and the "lack of a functioning government" was "widely known", *Themis Capital*, 881 F. Supp. 2d at 531, Bartner took no steps to determine who, in this chaotic and uncertain environment, had the authority to bind the DRC to hundreds of millions of dollars in purported debt obligations.  In obtaining another acknowledgement of debt under the Credit Agreement in 2009, BNP Paribas expressly

acknowledged the need to "check the powers of the signatories of [the] acknowledgement of debt" and verify "the validity of [the] document." Ex. D24. Citibank's failure to heed these warnings in 2003 was inexcusable and, on these grounds alone, Plaintiffs' apparent authority theory fails.

In an effort to avoid this factual record that is clearly fatal to their claim, Plaintiffs proffer a revisionist history that can only be characterized as wishful thinking. Specifically, Plaintiffs contend that, in obtaining the 2003 Acknowledgement, Citibank "reasonably relied" on: (1) the existence of Ordinance No. 80-73 and Section 8.01(b) of the Credit Agreement; (2) the fact that the Finance Minister and Governor of Zaire's central bank signed the 1991 and 1997 Acknowledgements; and (3) the fact that Defendants were applying for HIPC relief in order to, among other things, address their obligations under the Credit Agreement. Pl. Br. at 41. Plaintiffs' contention is both factually inaccurate and legally insufficient to satisfy their burden with respect to apparent authority.

### 1. The Record Demonstrates the Absence of Any Misleading State Conduct or Reasonable Reliance.

First, the record does not support Plaintiffs' contention that Bartner or Losembe – the only two people at Citibank who were involved in obtaining the 2003 Acknowledgement – actually relied on any of the aforementioned facts. Indeed, the notion that Bartner was even aware of, much less relied on, an obscure Ordinance issued in the DRC twenty three years earlier and a single paragraph of the voluminous Credit Agreement in obtaining the 2003 Acknowledgement cannot be reconciled with the factual record which demonstrates that she was given responsibility for managing the Zaire file because she was the only person left in Citibank's debt restructuring department, she had no prior experience with the file, "very little" familiarity with the Credit Agreement and undertook no due diligence in her quest to get the

document signed.[29]Def. Findings ¶¶ 73-74; 134-135; 155-156; Ex. -80 at 42:21-43:4.  Bartner

also testified that she was unaware of who signed the 1991 Acknowledgement.  Def. Findings ¶

78.  Further, she testified that she understood that the signatories to the 2003 Acknowledgement

were authorized to sign the document not because of their HIPC efforts or any other prior

conduct, but based simply on the fact "[t]hat they signed."  Ex. P80 at 42:21-43:4.[30]  When

Plaintiffs purchased their purported interest in the debt, this is the historical record they acquired

and they are not entitled to rewrite it.

In any event, even assuming Plaintiffs could prove reliance (which they cannot), any such

reliance would not have been reasonable nor could it otherwise save the Plaintiffs' apparent

authority claim.  *See In re Elsa Designs, Ltd.*, 155 B.R. 859, 868 (Bankr. S.D.N.Y. 1993) ("A

third party with whom the agent deals may rely on the appearance of authority only to the extent

that such reliance was reasonable") (citation omitted).  In the first instance, the fact that Zaire

---

[29]     Plaintiffs attempt to avoid this inconvenient factual record by arguing that "Citibank is presumed to have been aware" of Section 8.01's purported requirement that the DRC maintain the enforceability of the Credit Agreement.  Pl. Br. at 42.  Plaintiffs' interpretation of Section 8.01 is untenable for the reasons described *supra* at III.A.3.  And, in any event, the only authority Plaintiffs cite in support, *Progressive Cas. Ins. Co. v. CA Reaseguradora Nacional de Venezuela*, 991 F.2d 42 (2d Cir. 1993), merely states the truism that a party that signed a written contract and later seeks to *evade enforcement of a provision of that contract* "is conclusively presumed to know its contents and to assent to them, and he is therefore bound by its terms and conditions."  991 F.2d at 46.  There is nothing in *CA Reaseguradora* supporting either Plaintiffs' theory of imputed knowledge or the notion that a party seeking to justify a lack of due diligence to a transaction can be deemed to have "relied" on provisions of a contract when it is clear that the party's agent did not do so.  In that regard, Plaintiffs also mischaracterize Defendants' Conclusions of Law.  Pl. Br. at 42.  The fact that Citibank *should* have been aware of certain facts relating to the Credit Agreement does not constitute evidence that Bartner relied on any particular provision – particularly in the face of testimony that clearly demonstrates she did not.

[30]     In their pretrial brief, Plaintiffs state that Mr. Losembe resides in the DRC and that the Court would not compel Citibank N.A. to produce him for deposition.  Pl. Br. at 15, n.6 (citing Transcript of November 28, 2012 Telephonic Conference (DE 103) at 10:3-14).  What they fail to mention is that at a November 30, 2012 conference convened to address the matter of Mr. Losembe, Citibank's counsel appeared before this Court and indicated that, although Losembe had left or was soon leaving Citibank's employment, he had nonetheless "expressed his willingness to cooperate with Citibank in connection with this matter even after he leaves Citibank" and, specifically, to have a "telephone conversation with the designee by Citibank for a 30(b)(6) deposition to try to impart whatever knowledge he has to that witness."  Nov. 30, 2012 H'rg. Tr. at 3:9-19 (ECF No. 116).  Plaintiffs, however, ultimately declined to proceed with the Rule 30(b)(6) deposition of Citibank that they had previously noticed.

issued Ordinance 80-073 in connection with the execution of the 1980 Credit Agreement refutes, rather than supports, the Plaintiffs' apparent authority theory.   Far from conveying the impression that the Minister of Finance and the Governor of the State's central bank had unilateral authority to sign important documents regarding the country's debt, this Ordinance demonstrates that they did not and, instead, required an official act granting them such authority. *See* Ex. P121 at 90:4-8, 90:19-91:4, 101:20-25.  *See also* Nov. 26, 2013 H'rg. Tr. at 59:20-60:11; 61:8-15 (ECF No. 179) (Plaintiffs confirming that the Court could assume "an affirmative grant of authority was needed" to show actual authority).  Moreover, the Ordinance expressly limits the authority it conveyed to the execution of the Credit Agreement.  *See* Ex. D29, Art. 1, 2 ("The signing of the refinancing loan agreement between the Republic of Zaire, the Bank of Zaire and the private bank creditors is hereby authorized.").  The Ordinance does not refer to any document other than the Credit Agreement, much less the authority of any DRC official to sign unspecified legal documents years and even decades into the future.  Thus, this 1980 Ordinance could not have created the appearance of authority with respect to the 2003 Acknowledgement.[31]

Section 8.01 of the Credit Agreement is similarly unhelpful to the Plaintiffs' cause. [32]   In that provision, Zaire agreed to "[d]uly *obtain* and maintain in full force and effect all *governmental approvals*… which may be necessary under the law of the Republic of Zaire for

---

[31]      As previously noted, even if Plaintiffs' interpretation of the authority granted by Ordinance 80-73 was correct—it is not, such authority was abrogated by the 2002 Decree.  *See supra* at III.A.3.

[32]      The Plaintiffs' recent reliance on the 1980 Ordinance and Section 8.01(b) is a classic Hail Mary pass which was obviously thrown in an effort to avoid a factual record that is fatal to their claim.  Indeed, Plaintiffs never mentioned either the 1980 Ordinance or Section 8.01(b) when they moved for summary judgment on the issue of apparent authority in 2011.  *See* ECF No. 63.  Nor was either document mentioned by the witness or counsel during the deposition of Cecilia Bartner – despite the fact that the focus of that deposition was the 2003 Acknowledgement and the information that she relied on in obtaining that document. *See* Ex. P80.  And, Plaintiffs'  July 24, 2013 letter requesting a pre-motion conference on their proposed renewed motion for summary judgment (which they subsequently withdrew) similarly included no mention of either the 1980 Ordinance or Section 8.01(b).  *See* ECF No. 156.

the execution, delivery and performance of this Agreement by the Obligor or for the validity or enforceability hereof . . . ."  Ex. P10 § 8.01(b) at UB00000666 (emphasis added).  Putting aside the fact that the scope of Section 8.01 is limited to the Credit Agreement and it says nothing about the execution of separate legal documents decades after the fact, Section 8.01 directly refutes the notion that such legal documents could be unilaterally signed by any official without the need for government approval because it expressly contemplates the need to "obtain" such "governmental approvals".

The fact that the Finance Minister and Governor signed acknowledgement letters in 1991 and 1997 is also unavailing.  To begin with, the simple fact that the 1991 and 1997 Acknowledgements were signed, without any evidence sufficient to establish the authority of the parties that did so, does not establish conduct by the *State* on which Citibank could have relied. While the record clearly establishes the authority required to sign such a document on behalf of the DRC after the enactment of the 2002 Decree (following the disintegration of Zaire, displacement of its dictator, and the formation of a new Government), there is not sufficient evidence in the record from which this Court can determine the authority question with regard to the 1991 and 1997 Acknowledgments.[33]  Plaintiffs' contention that the 1980 Ordinance authorized the execution of these two acknowledgements fails because, as discussed *supra* at III.A.3, that Ordinance did not provide authority for anything other than the signing of the Credit Agreement.  Nor, of course, can Plaintiffs' establish ratification of the 1991 and 1997 Acknowledgments in the absence of proof as to who had ratification powers before the 2002 Decree, and, with respect to the time period after the 2002 Decree, for the same reasons that they have failed to prove ratification of the 2003 Acknowledgment.  Moreover, while the record with

---

[33]     Contrary to the Plaintiffs' suggestion, Pl. Br. at 43, n.16, they bear the burden of proof to establish that the 1991 and 1997 Acknowledgments were authorized, but they have failed to meet their burden.

respect to the 1991 and 1997 Acknowledgments is sparse, there is no indication that anyone outside the Ministry of Finance or the Bank of Zaire was involved with, or otherwise had knowledge of, these documents.[34]*See* Def. Findings ¶¶ 33-34.Having failed to prove that Citibank had any basis to believe that the 1991 or 1997 Acknowledgements were authorized by, or even known to anyone outside of these offices, Plaintiffs cannot bootstrap these documents into evidence supporting their apparent authority claim for the 2003 Acknowledgement.

Plaintiffs construct a similar bootstrap argument using Defendants' HIPC efforts and this too fails.  Again, there is no evidence that anyone at Citibank relied on Defendants' HIPC efforts in obtaining the 2003 Acknowledgement, but even if they had, the fact that the deeply impoverished country was trying to obtain assistance in restoring its standing with lenders in 2002 or 2003 has virtually nothing to do with the question of its officials' authority to sign legal documents on its behalf.  *See supra* at III.B.3 (discussing HIPC).

Finally, contrary to Plaintiffs' contention, *see* Pl. Br. at 44, the mere fact that Luongwe and Masangu held the titles of Minister of Finance and Governor of the Central Bank is insufficient to support their apparent authority claim.   Although the Second Circuit has

---

[34]     *Parlato v. Equitable Life Assurance Soc. of the U. S.*, 749 N.Y.S.2d 216 (1st Dep't 2002), and *Seetransport Wiking Trader Schiffarhtsgesellschaft MBH & Co. Kommanditgesellschaft v. Rep. of Romania*, 123 F. Supp. 2d 174 (S.D.N.Y. 2000), cited by the Plaintiffs, are distinguishable.  Pl. Br. at 43.  Both of those cases involved situations where the agent in question had previously been operating under an express grant of authority from the principal  In *Parlato*, the plaintiffs were defrauded by an investment company's formerly authorized agent, who had previously had authority to open customer investment accounts with the company.  *Parlato*, 749 N.Y.S.2d at 222.  In *Seetransport,* this Court found that the Romanian Finance Minister had apparent authority to bind the Romanian government to a settlement agreement because the Romanian prime minister explicitly represented to a negotiator that the Finance Minister had the capacity to discuss the case, to finalize the case, and to sign the settlement.  *Seetransport*, 123 F. Supp. 2d at 190.  No such express grant existed as to any of the acknowledgement letters at issue here; as already discussed, any authority previously granted to the Minister of Finance and the Governor of the Central Bank was strictly limited by the 1980 Ordinance to executing the Credit Agreement.  Neither official ever had any express grant of authority to sign anything resembling the 2003 Acknowledgement or any other acknowledgements for that matter.  Thus, contrary to Plaintiffs' theory, there is no evidence of an "unbroken chain of authority," but only a house of cards constructed of faulty and unsupported assumptions which will not bear the weight they attempt to place on it.

recognized that "[t]he appointment of a person to a position with generally recognized duties may create apparent authority", this principle is still subject to a factual inquiry. *First Fidelity Bank N.A. v. Gov't Antigua & Barbuda-Permanent Mission*, 877 F.2d 189, 193-194 (2d Cir. 1989). *See also Themis Capital*, 881 F. Supp. 2d at 528 ("[It] would presumptuous to assume, without allowing discovery on the point, that [Luongwe and Masangu's] responsibilities had been publicly described so as to appear to embrace the official actions at issue here"); *Storr v. Nat'l Def. Sec. Council of the Rep. of Indon.*, No. 95-CIV-9663(AGS), 1997 WL 633405 at *3 (S.D.N.Y. Oct. 14, 1997) (finding no apparent authority by Indonesian officials to sign promissory notes where Plaintiff simply relied on the officials' appointment, and offered "no evidence to the effect that the 'generally recognized duties' of the deputy or of the ambassador included issuing and/or confirming promissory notes."). Here, Plaintiffs point to no evidence demonstrating the unilateral authority to sign debt acknowledgements was among the generally recognized duties of the Minister of Finance or the Governor of the Central Bank as "explicitly or implicitly represented *by the DRC*." *Themis Capital*, 881 F. Supp. 2d at 528 (emphasis added). And, substantial evidence demonstrates it was not. *See* Ex. D29 (1980 Ordinance); Def. Findings ¶¶ 32-33 (demonstrating that under 1980 Ordinance, Minister of Finance and Governor of Bank of Zaire needed specific authorization to sign contract on behalf of Zaire); Ex. D28 (2002 Decree); Def. Findings ¶¶ 115-117 (demonstrating that under the 2002 Decree, neither Minister of Finance nor Governor of the Central Bank had authority to bind the country without approval of Council of Ministers).[35] *See also* Nov. 26, 2013 H'rg. Tr. at 60:1-11 (ECF No. 179) (Plaintiffs confirming that they have no support for, and are not relying on, the notion that the

---

[35]     For this reason, the Plaintiffs' reliance on *Seetransport*, 123 F. Supp. 2d at 174, is misplaced. In that case, the court found that the Romanian finance minister had apparent authority to bind Romania to a settlement agreement, but did so based on the fact that Romania's prime minister had made express statements to that effect. *Seetransport*, 123 F. Supp. 2d at 190. No such evidence exists here.

Minister of Finance had authority to execute acknowledgments of debt simply by virtue of the title that he held).

> ### 2. Plaintiffs Cannot Establish Reasonable Reliance Because The Extraordinary Circumstances Surrounding the 2003 Acknowledgement Imposed a Duty to Inquire on Citibank Which it Failed to Fulfill.

Putting all else aside, Plaintiffs' apparent authority claim is also fatally flawed because there is no evidence that anyone at Citibank undertook any inquiry into the authority of the signatories to the 2003 Acknowledgement despite numerous red flags which arose at the time and indicated such an inquiry was appropriate.  Under New York's apparent authority doctrine, a duty of inquiry arises when "(1) the facts and circumstances are such as to put the third party on inquiry, (2) the transaction is extraordinary, or (3) the novelty of the transaction alerts the third party to a danger of fraud."  *FDIC v. Providence Coll.*, 115 F.3d 136, 141 (2d Cir. 1997).  "[T]he duty of inquiry amounts to an alternative way of asking whether the third party reasonably relied on the representations of the agent that he possessed authority to bind the principal." *Themis Capital*, 881 F. Supp. 2d at 528 (quoting *C.E. Towers Co. v. Trinidad & Tobago (BWIA Int'l) Airways Corp.*, 903 F. Supp. 515, 525 (S.D.N.Y. 1995)).  If, under the circumstances of the transaction, a third party had a duty to inquire into the agent's authority and failed to fulfill that duty, reasonable reliance will not be found. *Id.* (citing *First Fid. Bank,* 877 F.2d at 193-94).

In obtaining the 2003 Acknowledgement, Citibank had a duty to inquire into the signatories' authority based on the extraordinary nature of the transaction, the facts before it and the extraordinary political turmoil which characterized the DRC at the time.  Citibank was seeking to obtain a document extending the enforceability of millions of dollars of long distressed debt from one of the world's poorest countries in the wake of a regime change and the assassination of its new leader and in the midst of a war which resulted in the deaths of millions.

This Court has previously taken judicial notice of the fact that, as of 2003, the DRC was in the midst of "*severe political turmoil*" with a "*lack of a functioning government*" and that these facts were "*widely known.*"   *Themis Capital*, 881 F. Supp. 2d at 531 (emphasis added).   Plaintiffs' suggestion that these events should not have given Citibank pause is nothing short of disingenuous.

**a.    The 2003 Acknowledgement Was an Extraordinary
Transaction Which Imposed a Duty of Inquiry on Citibank.**

To begin with, Citibank N.A. had a duty to conduct due diligence because the 2003 Acknowledgement was an extraordinary transaction in and of itself.   When evaluating whether a transaction is extraordinary under New York's apparent authority doctrine, the question is not whether the transaction is completely without precedent; rather, "the question is whether the particular transaction falls within the range of transactions in which [the principal] or similarly situated institutions normally engage." *FDIC*, 115 F.3d at 142.   As with all other aspects of an agency theory of liability, the plaintiff bears the burden of establishing that a transaction was neither extraordinary nor novel.   *Id.*   Plaintiffs cannot meet this burden here for at least three reasons.[36]

*First*, there is no evidence that acknowledgements of debt fall within the "range of transactions in which [Citibank] or similarly situated institutions normally engage."   *Id.*   While the 2003 Acknowledgement was not entirely unprecedented, the record demonstrates that this type of transaction was not common.   In particular, Bartner testified that during almost 10 years of experience in Citibank's sovereign debt restructuring department, the 1997 Acknowledgement

---

[36]    In their Pretrial Brief, Plaintiffs conflate these facts and circumstances, which are relevant to whether the transaction was extraordinary, with the facts concerning the political turmoil in the DRC, which are relevant to whether the circumstances that surrounded the transaction were extraordinary.   As discussed below, the 2003 Acknowledgement was <u>both</u> an extraordinary transaction in itself, <u>and</u> was signed in extraordinary circumstances.

was the first document of this type she had been involved in obtaining. Ex. P80 at 193:17-194:2; 34:20-35:14. Given that Bartner had not dealt with a transaction of this type over the course of working at one of the world's largest financial institutions for almost a decade, it necessarily follows that the situation in which Citibank found itself in 2003 – where it was seeking a *third* acknowledgement of the same debt 23 years after the underlying debt instrument had been executed – was quite extraordinary.[37]

*Second*, it was undoubtedly unusual for Citibank to find itself in a situation where there was significant uncertainty as to the outstanding amounts under the Credit Agreement. As Bartner testified, reconciling the debt would not be easy and the Bank of Tokyo had refused to do it due to the fact that its outstanding fees had not been paid. *Id*. at 45:15-19; 46:12-47:3; 58:21-23; Ex. P90 at CITI0000107; Ex. P80 at 202:17-202:2. As a result, Bartner prepared "blanket" acknowledgements, whereby Citibank would not have to specifically state what was owed. *Id*. at 57:9-18; 59:5-11; 130: 14-18. Plaintiffs contend that Citibank's decision to use this blanket acknowledgment somehow eliminated the uncertainty or the extraordinary nature of the situation. *See* Pl. Br. at 45. But the actions Citibank took to address an extraordinary situation does not render the situation it faced any less extraordinary.

*Third*, the stakes were potentially very significant. The purpose of the acknowledgement was to toll the statute of limitations, thereby preserving the creditors' right to sue and enforce claims under the Credit Agreement for *hundreds of millions of dollars* in principal and interest. *See* Ex. P43 at UB00001915 (estimating debt level at approximately $833 million). This

---

[37]    Plaintiffs claim that the existence of the 1991 and 1997 Acknowledgements demonstrate that the 2003 Acknowledgement was not extraordinary, *see* Pl. Br. at 45, but the fact that the 2003 Acknowledgement was the third time that the creditors had sought confirmation of the debtor's obligations and was being pursued *more than twenty years after the underlying Credit Agreement was entered* and *with a new government formed after the disintegration of Zaire (the original Obligor)* only serves to underscore how unusual this transaction was.

exorbitant amount, by itself, rendered the signing of any acknowledgement of debt an extraordinary transaction and one that would have warranted a level of due diligence that was not present here.[38]

### b.     The 1980 Ordinance Was a Fact Which Imposed a Duty of Inquiry on Citibank.

The fact that  the Minister of Finance and Governor of the Bank of Zaire could not sign the Credit Agreement without implementing legislation (Ordinance No. 80-073) was a fact that Citibank should have known and which should have indicated to it that a similar authorization from the DRC government was necessary before any official could sign a subsequent agreement relating to the debt.  *See supra* at III.A.3; *See also Benin v. Mezel*, No. 06-Civ-870(JGK), 2010 WL 3564270, at *7 (S.D.N.Y. Sept. 9, 2010) (finding that defendants had a duty to inquire as to diplomat's authority to convey property, when previous deed made it clear that written authorization to convey property would be necessary, and diplomat later conveyed property without such written authorization).

Contrary to Plaintiffs' contention, Section 8.01(b) of the Credit Agreement did not relieve Citibank of its duty to make the appropriate inquires on this issue.  First, Section 8.01(b) explicitly referred only to the Credit Agreement.  *See supra* at III.A.3.  Second, Plaintiffs conveniently ignore that Section 8.01(b) expressly contemplated the need to "obtain" government approvals thus underscoring the need for Citibank to determine if such approvals

---

[38]     The lack of due diligence in connection with the 2003 Acknowledgement stands in marked contrast to the due diligence conducted in connection with the Credit Agreement where multiple certifications, a Presidential ordinance, and legal opinions from several separate law firms were obtained to establish the validity of the document.  *See* Ex. P10 at Exs. 1-12 at UB00000777-803. *See also supra* at Def. Findings ¶¶ 23-35.  It also stands in contrast to the circumstances surrounding the signing of the 1991 Acknowledgment, which involved a steering committee and legal advisers (*see* Def. Findings ¶¶ 75-80).  By 2003, however, the DRC had been in default for more than a decade, and Citibank had long since written off the debt.  Ex. P79 at 82:9-14 (testifying debt was written off by Citibank in or before 1997).  Perhaps this is why Citibank was not concerned with determining what the legal requirements were for obtaining a valid acknowledgement of debt from the newly formed DRC government in 2003.

had, in fact, been obtained.  Def. Findings ¶ 25.Plaintiffs attempt to excuse Citibank's lack of due diligence by suggesting that Section 8.01(b) absolved it of a duty to conduct due diligence and that  "one of the reasons the parties [allegedly] chose to impose this duty on Defendants was so that the Agent Banks would not be forced to ascertain for themselves what approvals might be required."  This contention, however, is rank and wishful speculation that cannot be reconciled with the fact that creditors took substantial action in 1980 to ascertain that the appropriate approvals required for execution of the Credit Agreement had been obtained.  *See* Ex. P10 §§ 6.01(a),(b), 7.01(a), 8.01(a),(b), 9.02; *id.* at Exs. 1, 2, 8, 10; Def. Findings ¶¶ 24-38.Nor can it be reconciled with the fact that, in 2009,  BNP Paribas explicitly recognized the need for the banks to conduct their "own independent investigation regarding the validity of" the 2009 Acknowledgement  Ex. D24.

<blockquote>
**c.    The Historical Context Surrounding the
2003 Acknowledgement Was Extraordinary
<u>and Imposed a Duty of Inquiry on Citibank N.A.</u>**
</blockquote>

Finally, and most importantly, the extraordinary political chaos which characterized the DRC in late 2002 and early 2003 should have put Citibank on notice of the need to inquire as to the authority of the signatories to the 2003 Acknowledgement.  Between 1997 and 2003, the DRC experienced financial collapse, a civil war, the fall of the infamously corrupt Mobutu regime, an attempt to create a democracy, the formation of a new government and the renaming of the country, invasion by numerous foreign powers, the assassination of President Laurent Kabila, and an international war that caused approximately four million deaths.  Def. Findings ¶¶ 95-114.  Further, in February 2003, when the 2003 Acknowledgement was signed, the Second Congo War was still ongoing and would not end until July 2003.  These circumstances were

widely known, and this Court has already taken judicial notice of that fact.[39] *See Themis Capital*, 881 F. Supp. 2d at 531 ("[A]s of 2003, the *severe political turmoil* plaguing the DRC *and lack of a functioning government* were widely known.") (emphasis added); *see also* Def. Findings, ¶¶ 105, 114 (discussing how the circumstances of this political turmoil were extensive, extraordinary and widely reported at the time).  Indeed, Bartner testified that the change from Zaire to DRC was the impetus for her efforts to secure the 2003 Acknowledgement and that she knew that the country was experiencing political issues at the time.  Ex. P80 at 79:1-4; 186:21-24.[40]

This Court has already recognized that the circumstances in the DRC prior to the signing of the 2003 Acknowledgment "arguably enhanced any duty plaintiffs had to inquire, for the political chaos may have created an outsized risk of officials (whether recently ousted from power, or otherwise), acting outside the scope of their authority of individuals claiming to act on

---

[39]   Pursuant to Federal Rule of Evidence 201, a "court may judicially notice a fact that is not subject to reasonable dispute because it (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."  Courts may take judicial notice of many types of facts, including "matters of political history," *Shahar v. Bowers*, 120 F.3d 211, 214 (11th Cir. 1997), and facts contained in government documents, *Abely v. Aeterna Zentaris Inc.*, No. 12 Civ. 4711(PKC), 2013 WL 2399869, at *21 (S.D.N.Y. May 29, 2013) (holding that government documents, available on government agency website, "are published by government sources from which the Court may appropriately take judicial notice.").  Courts may also take judicial notice of "facts that various newspapers, magazines, and books were published solely as an indication of information in the public realm at the time, not whether the contents of those articles were, in fact, true." *Effie Film, LLC v. Pomerance*, 909 F. Supp. 2d 273,  299 (S.D.N.Y. 2012) (quoting 1–4 WEINSTEIN'S EVIDENCE MANUAL § 4.02); *Gonzalez v. Nat'l Westminster Bank PLC*, 847 F. Supp. 2d 567, 569 n.2 (S.D.N.Y. 2012) ("Court may take judicial notice of publicly available information including newspaper articles and other public disclosures.").

[40]   Nor does it appear that Plaintiffs, when purchasing their purported interest in the debt, undertook any due diligence to determine if Citibank made the appropriate inquiries when it obtained the 2003 Acknowledgment.  *See* Pl. Exs. 25-26 (acknowledging that Plaintiffs had no non-privileged communications with anyone with respect to the 2003 Acknowledgment, other than the communications disclosed in discovery—communications that do not reflect an effort to check the validity of the 2003 Acknowledgment).

behalf of the government." *Themis Capital*, 881 F. Supp. 2d at 531 .Plaintiffs cannot disregard those circumstances now simply because Citibank N.A. chose to ignore them in 2003.[41]

<b>d.   <u>Citibank Made No Effort to Satisfy Its Duty of Inquiry.</u></b>

There is no question that Citibank failed to satisfy the duty it had to inquire into the authority of the signatories to the 2003 Acknowledgement.  Under New York law, once the duty to inquire has been established, the party asserting apparent authority "must conduct a reasonable inquiry into circumstances surrounding the action."  *In re Cohen*, 422 B.R. 350, 369-370 (E.D.N.Y. 2010) (finding no apparent authority because, *inter alia*, the record did not show that "mortgagees made any inquiry whatsoever into the scope of [an agent's] authority" to sign certain deeds).  Here, the record demonstrates that Bartner conducted virtually no due diligence in obtaining the signatures to the 2003 Acknowledgement.[42]  Rather, the documentary evidence clearly demonstrates that Bartner's focus was on getting the document signed, with a complete

---

[41]     Plaintiffs argue that "[t]o impose a duty of inquiry... courts require circumstances far more extraordinary or suspicious than those present here."  Pl. Br. at 46.  Again, their attempt to dismiss the DRC's political situation in 2003 as anything less than extraordinary is disingenuous.  The circumstances in the first case cited by Plaintiffs, *Mason Tenders District Council v. JNG Construction Ltd.*, No. 00cv1032 (GBD), 2003 WL 22999453 (S.D.N.Y. Dec. 19, 2003) do not even begin to approach those implicated here, which involved the acknowledgement of millions of dollars in debt by a country in the midst of political turmoil, and during the course of a war that claimed millions of lives.  Further, Plaintiffs' second cited case, *Republic of Benin v. Mezei*, No. 06cv870(JGK), 2010 WL 3564270 (S.D.N.Y. Sept. 9, 2010), specifically states that when a contract calls for a written authorization that an agent had authority, and none is provided, then the duty of inquiry is implicated.  That was precisely the case here, given the existence of the 1980 Ordinance.  Finally, Plaintiffs completely distort the holding of *American National Fire Insurance Co. v. Kenealy*, 72 F.3d 264 (2d Cir. 1995).  Plaintiffs contend that in *Kenealy*, the Second Circuit "refused to impose a duty of inquiry on the defendant" after an agent modified an insurance policy "in violation of a provision in the policy expressly prohibiting agents from modifying the policy without the insurer's authorization."  Pl. Br. at 47.  But in finding that the duty to inquire did not apply, the Second Circuit specifically stated that the relevant contractual provision said <u>no such thing</u>.  *See Kenealy*, 72 F.3d at 268.

[42]     Notably, any due diligence that Bartner conducted for the 1997 Acknowledgement was also lacking.  When preparing that document, Bartner did not discuss who should sign it with counsel.  Ex. P80 at 72:25-73:12.  And, Bartner took no steps to ascertain whether the Minister of Finance and the Governor of the Central Bank were the appropriate signatories.  Nor did she ask anyone to take such steps.  *Id*. at 226:14-25; 227:23-228:9.  Bartner felt that these responsibilities were "not part of my job."  *Id*. at 228:10-14.  In obtaining signatures from Zaire officials, Bartner had no direct discussions with anyone from the government, *id*. at 59:18-25, 60:23-24, and had no follow-up conversations with Masangu regarding his efforts to get the 1997 Acknowledgement signed.  *Id*. at 60:1-9.

disregard of whether the persons signing had the appropriate authority to do so.  Confronted by an uncommon transaction in extraordinary circumstances, Bartner did nothing.  This lack of due diligence is fatal to Plaintiffs' apparent authority argument.[43]

In that regard, even assuming that the 1997 Acknowledgement had been validly signed, Bartner made no efforts to determine whether the laws of the DRC had changed in the intervening six years marked by political transition and turmoil.  Bartner neither sought nor obtained legal advice throughout the process of obtaining the 2003 Acknowledgement, *id*. at 97:3-15, 135:2-5.  Nor did Bartner make any such inquiries into DRC law on her own.  *Id*. at 187:12-22.

And, although Bartner directed Losembe to have the Minister of Finance sign the 2003 Acknowledgement, she made virtually no effort to determine if Luongwe or Masangu were the appropriate signatories.  When the Minister of Finance resigned in February of 2003, Bartner quickly instructed Losembe to have the Deputy Minister, "or whoever at the Ministry" sign  – without inquiring into whether such persons had the authority to do so.  *Id*. at 149:18-25.  Bartner further admitted that aside from the 1997 Acknowledgement, she had no basis for believing that the Minister of Finance was competent to sign, and she could not recall from where she had gained the understanding that the Deputy Minister of Finance had the authority to sign.  *Id*. at 127:15-20; 185:15-21; 190:4-14.   Indeed, she never took any steps to determine whether Luongwe had authority to sign the 2003 Acknowledgement, because she testified that it "wasn't part of my job."  *Id*. at 230:25-231:4; 231:6-9.  Nor did anyone else from Citibank conduct such due diligence.  *Id*. at 228:23-229:14; 230:20-24.  Rather, Bartner testified that she believed the

---

[43]     Notably, Plaintiffs nowhere argue that Bartner's efforts in connection with the 2003 Acknowledgement satisfied Citibank N.A.'s duty of inquiry.

Acknowledgement had been duly signed, but admitted that her basis for this belief was merely "[t]hat they signed." *Id.* at 165:15-21.[44]

Nothing in the record excuses Bartner's failure to conduct due diligence or suggests that her conduct was reasonable.   To the contrary, the record unequivocally demonstrates that extensive due diligence was undertaken in connection with the Credit Agreement to ensure that the signatories to that Agreement had the requisite authority.  *See* Def. Findings ¶¶ 23-35.  More recently, BNP Paribas specifically noted that such diligence was appropriate by explicitly advising creditors that it was "neither in a position to check the signatures nor the powers of the signatories of this [2009] acknowledgement of debt[,]" and cautioning them "to make in case of need your own independent investigation regarding the validity of this document."   Ex. D24 at UB00001931.Such an investigation was all the more appropriate in 2003 when "political chaos may have created an outsized risk of officials (whether recently ousted from power, or otherwise), acting outside the scope of their authority . . . ."  *Themis*, 881 F. Supp. 2d at 531.

Bartner's failure to conduct due diligence cannot be characterized as merely substandard or simple carelessness.   Rather, given the extraordinary circumstances surrounding the 2003 Acknowledgement, Bartner's cursory efforts represented an abject failure of Citibank's responsibility to ascertain whether Luongwe or Masangu had authority to bind the DRC.   Given Plaintiffs' burden to establish due diligence, this complete failure to investigate cannot satisfy the element of reasonable reliance  Accordingly, Plaintiffs' apparent authority theory fails.

---

[44]      Incredibly, Bartner admitted that she saw no reason whatsoever to conduct any due diligence.  Ex. P80 at 232:13-15 ("The Minister and Governor signed.  If they were not the persons that they claim to be, why did they sign?").

**D.    The Plaintiffs Have Failed to Prove Any Facts Sufficient
to Render the Central Bank Liable for Breach of Contract.**

The Plaintiffs seek a monetary judgment against the Central Bank for breach of contract
based solely on the fact that certain amounts owed under the Credit Agreement were not repaid.
Contrary to the Plaintiffs' contention, however, the Central Bank did not agree "to pay the debt
owed by the DRC under the Credit Agreement, subject only to the availability of foreign
currency sufficient to cover such payments."  Pl. Br. at 47.   Quite simply, that is not what the
Agreement says.   While there is no dispute that the Central Bank is a party to the Agreement,
undertook limited obligations with respect to the debt and thus could potentially be subject to
suit thereunder for breach of *those obligations*, the Bank did not guarantee the DRC's obligation
to pay principal or any other amounts under the Credit Agreement and the mere fact that those
amounts are unpaid does not entitle the Plaintiffs to a judgment against it.

Most tellingly, the Agreement clearly defines the "Obligor" as only the Republic of Zaire
and does not define the Bank of Zaire as the "guarantor."  Ex. P10 at UB00000624.[45]   Rather,
under the Agreement, the State was required to make payments in dollars, *see id.* at § 5.02
at UB00000647, and the Agreement makes clear that the Bank's obligations were limited to a
"Foreign Exchange Undertaking" pursuant to which it agreed to use best efforts to ensure that
sufficient dollars or other foreign currency was maintained so that payments could be made as
required.  *Id.* § 9.01(b) at UB00000671.  Consistent with this undertaking, the Bank did not agree
to guarantee the State's obligations to pay, but rather agreed only that,

---

[45]     The term "Guarantee" is a defined term in the Credit Agreement and is used in other contexts
throughout the document.  *See* Ex. P10 at UB50628 (defining "Guarantee").  If the drafters had intended for
the Bank of Zaire to guarantee the debt of the Obligor, they could have easily and clearly said so.  Notably too,
the legal opinion that Zaire and the Bank of Zaire were required to provide from their counsel as a "Condition
of Effectiveness" of the Credit Agreement assessed only the enforceability of the "payment obligation of the
Obligor".  Ex P10 at Ex. 8 at 5(e) and (j).  There is no mention of any "payment obligation" by the Bank of
Zaire.

> Subject to the availability to the Bank of Zaire of Dollars or other Foreign Currency and pursuant to the Instructions of the Obligor contained in Sections 8.03, the Bank of Zaire will *either* make available to the Obligor sufficient Dollars or other Foreign Currency to enable the Obligor to make each such payment as so required *or* (ii) *on behalf of the Obligor* make each payment as so required.

*Id*. § 9.01(c) at UB00000671 (emphasis added). Thus, pursuant to the express terms of the Agreement, the Bank could have fulfilled its obligation under Section 9.01(c) by making "available to the Obligor sufficient Dollars or other Foreign Currency to enable the Obligor to make each such payment as so required[.]" Ex. P10 § 9.01(c) at UB00000671. As there is no evidence it failed to make such currency available to State, there is no evidence that the Bank breached the Agreement.[46]

In their pretrial brief, Plaintiffs argue that because Section 8.03 contains the State's "instruct[ion to] the Bank of Zaire, for the benefit of each Bank, to make all payments required by this Agreement as contemplated by clause (ii) of Section 9.01(c)," that the Bank was required to make such payments if sufficient currency was available and that it no longer had the alternative explicitly made available to it in Section 9.01(c) – i.e., to "either (i) make available to the Obligor [sufficient Foreign Currency] to enable the Obligor to pay each payment as so required or (ii) on behalf of the Obligor make each payment as so required." This interpretation is without merit and would violate a fundamental canon of contract construction by rendering clause (i) of Section 9.01(c) meaningless. Recognizing as much, the Plaintiffs argue that Section 9.01(c)(i) should be construed as effective, and Section 8.03 as unnecessary, "as long as the DRC is meeting its payment obligations under the Credit Agreement." Pl. Br. at p. 55, n. 23. Stated

---

[46]   *See Pisani v. Weschester Cnty. Health Care Corp.*, 424 F. Supp. 2d 710, 719 (S.D.N.Y. 2006) ("Under New York law, to recover for breach of contract a plaintiff bears the burden of proving by a preponderance of the evidence: (1) the existence of an enforceable contract; (2) performance by one party; (3) breach by the other party; and (4) damages.") (*citing Harasco Corp. v. Segui*, 91 F.3d 337, 348 (2d Cir. 1996)).

otherwise, Plaintiffs ask the Court to rewrite Section 9.01(c) to provide that the Central Bank is obligated to make payments under the Agreement "if the DRC does not." This interpretation would require the Court to read into the contract additional language that is contained nowhere in the Agreement and effectively make the Central Bank a guarantor of the State's debt despite no indication that that was the parties' intent. The Plaintiffs' interpretation should therefore be rejected, particularly when there is another interpretation that can reconcile the two provisions without taking liberties with either. Reading Section 8.03 and Section 9.01(c) together as written, it is clear that Section 9.01(c) gave the Central Bank two alternative ways in which it could fulfill its obligation under the contract and Section 8.03 simply gave the Central Bank the permission it would require in order to undertake the second of those two alternatives.[47]

Nothing that the Plaintiffs say in their pretrial brief compels a different conclusion. There is no dispute that the Central Bank is a party to the Credit Agreement, that it undertook certain obligations under the Agreement (e.g., to try and ensure sufficient foreign currency would be available to make payments as required under the Agreement) and that, as such, the Agreement contemplated the Central Bank could be subject to suit for breach of its provisions. *See* Pl. Br. at 49-50. Nor is it surprising that the Bank of Zaire would have been a party to the

---

[47]     Contrary to the Plaintiffs' contention, none of these provisions would be rendered superfluous if, as the Credit Agreement states, only the DRC is obligated to pay principal and interest thereunder. The Credit Agreement unquestionably imposes certain obligations on the Central Bank regarding the debt – namely the foreign exchange undertaking outlined in Section 9.01. The mere fact that it has undertaken certain obligations does not demonstrate that the Central Bank had an independent obligation to pay the debt owed under the Agreement. The 1997 and 2003 Acknowledgements do not support the Plaintiffs' interpretation either, as neither delineates the nature of the Central Bank's obligations vis a vis the Credit Agreement, but rather refer only to the Central Bank and DRC's "respective obligations" with respect to the debt. *See* Ex. P17 and P29. Finally, Ms. Bartner's testimony does not support the Plaintiffs' interpretation as she testified only that the central bank is normally a party to sovereign restructuring agreements, Ex. P80 at 176:17-23. However, Defendants do not dispute that the Central Bank is a party to the Credit Agreement, only the nature of its obligations thereunder. On this latter issue, Ms. Bartner had no knowledge, testifying that she had very little familiarity with the Credit Agreement and no understanding as to why central banks are historically parties to such agreements. *Id*. at 8-12; 17-23.

Credit Agreement.   Among other things, the Credit Agreement indicates that approval (e.g., exchange control approval) was required for the execution and performance of the Agreement by the Obligor and that such approval was "obtained . . . by virtue of the execution of the Agreement by the Bank of Zaire[.]"  *See* Ex. P10, Ex. 8  ¶5(c).  Further, as the country's central bank, the Bank controls the State's reserves, among other assets.  *See id.*, Ex. 8 ¶5(f) (noting that Bank  of Zaire "is duly organized and validly existing under the law of the Republic of Zaire as the central bank of the Republic of Zaire and *as such exercises, with the Obligor, full power and control over the International Monetary Assets of the Republic of Zaire"*) (emphasis added).  *See also*  PX118 at EXPERT00000093 (describing Bank as fulfilling function of "State Cashier").Given this control, it is understandable that the creditors would seek the Bank's commitment that it would make such assets available to the DRC for the purposes of paying off the debt – which is precisely the commitment set forth in Section 9.01.  As there is no evidence that it breached that commitment, the Plaintiffs' claim against the Central Bank must be dismissed.

### E.   The Plaintiffs Are Not Entitled to Compound Interest.

Even assuming that the Plaintiffs could establish that their suit was timely filed, their request for damages should be denied to the extent they seek any form of compound interest.

In that regard, it is undisputed that when the DRC failed to repay principal when due, interest on that overdue principal accrued pursuant to Section 3.05(a) of the Credit Agreement. Ex. P10 § 3.05(a) (providing for the payment of interest on unpaid principal from "the date such principal amount is due to the date such principal amount is paid in full").  Plaintiffs, however, seek not only to recover more than $46 million in principal *and* interest on that overdue principal*, but another $41 million* consisting of two forms of compound interest:  (1) interest *on interest* on overdue principal (approximately $23 million); and (2) interest *on interest on interest*,

interest *on interest on interest on interest* and so on *ad infinitum* (or, what they refer to, as Generation 3+ interest) (approximately $18 million).  *See* Exs. P91 & P92.[48]  Neither the Credit Agreement nor any other evidence before the Court supports their claim for these latter forms of interest.

### 1.   The Relevant Contractual Provisions.

In analyzing the Credit Agreement's interest provisions, it is important to understand that the Credit Agreement provides for two types of interest – regular interest and penalty interest – and lays out a different construct for each.  Regular interest is interest which accrues under the Agreement as a matter of course – *i.e.*, regardless of whether the Obligor's payments are timely or not.  Penalty interest, by way of contrast, is interest which is triggered only when payments are not made when due.Compound interest is a form of penalty interest.[49]

Sections 3.01 through Section 3.04 of the Credit Agreement govern the payment of regular interest.  Section 3.01 governs interest accrued as of January 31, 1980 ("Reference Date Interest") and provides that such interest was to be paid "[o]n or before the eighth Business Day after the signature of th[e] Agreement."  *Id*. § 2.01 at UB00000635.  Section 3.02 governs interest accrued between the "Reference Date" (January 31, 1980) and the "Reconciliation Date" (September 2, 1980) and provides that such interest was "to be due and payable on the

---

[48]    Plaintiffs indicate that they intend to rely on Exhibits 91 and 92 as demonstrative evidence, Pl. Br. at 52, n.21.  However, Defendants object to the introduction of these documents for the reasons stated in the Joint Submission Identifying Outstanding Objections to Proposed Exhibits and Deposition Designations filed with the Court on January 31, 2014.   Contrary to the Plaintiffs' contention, these charts are not properly characterized as demonstrative exhibits because they do not summarize record evidence, but rather have been drafted by Plaintiffs' counsel in lieu of evidence that corroborates their theory of multiple generations of compounding interest.  The Plaintiffs have identified no expert or other witness that will authenticate this document or testify to its accuracy.  Moreover, Exhibits 91 and 92 appear to include not only counsel's charts, but also charts prepared by a third-party (0091.0007-0010 and 0092.0008-0011) which have not been authenticated, nor has a proper foundation been established for admitting their contents.

[49]    Plaintiffs, in this case, are seeking only penalty interest which they claim accrued after the date of maturity.  *See* Ex. P91 and P92.

Reconciliation Date [defined as September 2, 1980][.]" *Id*. § 3.02. Section 3.03 and 3.04 govern interest accruing during the approximately ten year period between September 2, 1980 and March 31, 1990. Rather than specify a particular due date for the payment of such interest, Section 3.03 provides that such interest was to "be due and payable on the last day of each Interest Period for interest accrued during such Interest Period." *Id*. § 3.03. Pursuant to Section 3.04, those Interest Periods were six-month periods which would run consecutively:

> The period from the Reconciliation Date to the final Principal Payment Date shall be divided into successive Interest Periods. The first Interest Period shall begin on the Reconciliation Date and end on the last day of the Month in which occurs the first anniversary of the date of this Agreement. Each subsequent Interest Period shall be a period of six Months and shall begin on the last day of the immediately preceding Interest Period.

*Id*. § 3.04.

Section 3.05 governs penalty interest and provides for two categories of such interest. First, Section 3.05(a) provides for interest on *overdue principal* to accrue from the "date such principal amount is due to the date such principal amount is paid in full." *Id*. § 3.05(a) at UB00000638. Unlike the provisions for regular interest, however, no due date for such interest is specified. Rather, Section 3.05(a) provides that interest on overdue principal is "payable on demand[.]" *Id*.[50] Second, Section 3.05(d) provides for interest on interest which is "not paid when due" with such interest to "accrue from the due date of such interest until payment in full thereof[.]"[51] Again, no due date for this additional category of penalty interest is specified; rather, it is also to be "payable on demand." *Id*. § 3.05(d) at UB00000639.

---

[50] Any demand for interest made pursuant to Section 3.05(a) would have to comply with the requirements of Section 12.02 the Credit Agreement which governs "[a]ll notices and other communications provided for" under the Agreement. Ex. P10 § 12.02 at UB00000684.

[51] Specifically, Section 3.05(d) provides that, "[t]o the extent permitted by law, the Obligor further agrees to pay interest . . . . on all interest which is not paid when due hereunder . . . , such interest is to be

2.    **Under the Express Terms of the**
       **Credit Agreement, Plaintiffs are Not**
       **Entitled to "Interest on Interest on Overdue Principal" Because**
       **No Demand for "Interest on Overdue Principal" Has Been Made.**

To the extent permitted by law, the Credit Agreement provides for the payment of interest on interest "*which is not paid when due.*" Ex. P10 § 3.05(d) at UB00000639 (emphasis added).[52]    While the Credit Agreement specifies particular dates or time periods on which regular interest is due, *see id.* §§ 3.01-03, no due date is specified for interest on overdue principal.  Rather, the Agreement provides only that such interest is "payable on demand[.]" *Id.* § 3.05(a) at UB00000638.  It necessarily follows that such interest does not become due (or, by extension, overdue) until after a demand is made.  *See Steingut v. Guaranty Trust Co. of New York*, 161 F.2d 571, 573 (2d Cir. 1947) **("As the deposits were debts *payable* on demand, nothing was *due and payable until a demand*")** (emphasis added).  Here, nothing in the record demonstrates a demand for interest on overdue principal by Plaintiffs' predecessors in interest and Plaintiffs do not contend otherwise.  Accordingly, without a demand for interest on overdue principal, such interest never became overdue and thus no additional interest on that category of interest could accrue under Section 3.05(d).

While the inclusion of the words "due and payable" instead of just "payable" in Section 3.05(a) may have made this provision even clearer, the omission of the word "due" from Section

---

payable on demand, to accrue from the due date of such interest until payment in full thereof and to be calculated on the basis of successive Overdue Periods of one Month." *Id.* at UB00000639.

[52]    Historically, compound interest has been disfavored under New York law and courts consistently found agreements for such interest to be void as against public policy.  *See In re Chateaugay Corp.*, 170 B.R. 551, 555 (Bankr. S.D.N.Y. 1994) (citations omitted).  *See also Matter of Estate of Jackson*, 508 N.Y.S.2d 671, 673-74 (3d Dep't 1986); *In re Rosner*, 48 B.R. 538, 558 (Bankr. E.D.N.Y. 1985); *Giventer v. Arrow,* 37 N.Y.2d 305, 308 (1975).  This was the law in New York at the time the Credit Agreement was executed in 1980.  In 1989, however, the New York legislature enacted General Obligations Law Section 5-527 which, in certain cases, provides that a "loan or other agreement providing for such compound interest" is enforceable.  *See* N.Y. Gen. Obl. Law § 5-527(1).

3.05 is not dispositive.  In ordinary parlance, "payable" and "due and payable" are often used interchangeably.  *See Steingut*, 161 F.2d at 573 ("As the deposits were debts payable on demand, nothing was due and payable until a demand").  Further, it is apparent from the Agreement as a whole that the drafters used the terms "due", "payable" and "due and payable" interchangeably. *See, e.g.*, Ex. P10 at § 2.01 (providing that the "Obligor shall pay" certain amounts by the eighth business day after the Agreement's execution"); *id*. at 1-6 (defining "Payment Date" as the date on which the "Obligor pays in full the aggregate First Principal Payments *due* on all Credits under Section 2.01(a)") (emphasis added); *id*. at § 5.02(a)(i) (directing the account into which payments "with respect to (i) all amounts *payable* pursuant to Section 2.01" should be made) (emphasis added); *id*. at § 3.07(b) (providing that "[a]ll computations of interest shall be made on the basis of a year of 360 days for the actual number of days . . . occurring in the period for which interest is *payable*").  By way of example, Section 5.05 provides that "[e]ach Bank, with respect to Credits owed to it, each Agent, with respect to Credits of its Syndicates, and the Servicing Bank, with respect to all the Credits, shall maintain on its books control accounts setting forth the amounts of principal, interest and other sums paid *and payable* by the Obligor from time to time hereunder[.]"  Ex. P10 §5.05 (emphasis added).  Again, there can be no dispute that the term "payable" in this context means "due."  To hold otherwise (i.e., if one assumes, as the Plaintiffs contend, that there is a meaningful distinction between interest which is "due" and interest which is "payable"), then Section 5.05 would not require the parties to track interest under Section 3.05 which was due to a creditor unless a demand for payment had actually been made.  This would be an illogical result.[53]

---

[53]       The Plaintiffs attempt to discredit the Defendants' interpretation by arguing that it would lead to "absurd and burdensome results."  Pl. Br. at 55.  The results to which the Plaintiffs point, however, are either strained hypotheticals of their own design or results which are not at all unreasonable or inconsistent with the Agreement.  For example, nowhere in the Credit Agreement does it say that creditors could compound interest

3.     **The Plaintiffs' Proposed Interpretation of Section 3.05 is Untenable.**

Unable to proffer evidence that any demand for interest pursuant to Section 3.05 was made by their predecessors, the Plaintiffs instead argue that it would be "more natural" to read Section 3.05(a) and (d) in a way that "mirrors the scheme set up in Section 3.03 for accrual of interest prior to Defendants' default[.]"  Pl. Br. at 58.  More particularly, Plaintiffs ask this Court to find that interest on overdue principal comes due, not when a demand is made as indicated by Section 3.05(a), but rather automatically at the end of each monthly Overdue Period – just as regular interest under Section 3.03 came due at the end of each Interest Period.This interpretation suffers from several fatal flaws.

First, the Plaintiffs point to nothing in Section 3.05 – i.e., the provision at issue – which actually supports their interpretation.  *See Chesapeake Energy Corp. v. Bank of New York Mellon Trust Co., N.A.*, -- F. Supp. 2d --, No. 13 Civ. 1582 (PAE), 2013 WL 1890278, *15, (S.D.N.Y. May 8, 2013) (rejecting the defendant's interpretation and noting that, "[i]n contrast to [the plaintiff's] construction, there is no specific sentence or provision within [the contract section at issue] that cleanly – or even closely – articulates the reading urged by [the defendant]").  Instead, the Plaintiffs effectively ask this Court to rewrite Section 3.05 so that it will "mirror" Sections 3.03 and 3.04.

---

as often as they like and that result would not logically follow from a finding that interest on overdue principal is due on demand.  In any event, the possibility that creditors could elect to "compound interest at different or irregular intervals" would not impose such a "huge administrative burden" that it would justify disregarding the terms of the Agreement.  The Agreement is a complex document which not only imposes significant administrative responsibilities on the parties, but also provides for the involvement of "agents" and a "servicing bank" for the specific purpose of taking on such functions.  Ex. P10 at R-2.  The Agreement also contemplates that different interest rates might apply to different creditors, *see* Ex. P10 at § 3.02(b) (providing for either the "Interim Rate" or the "Existing Rate" to apply depending on whether the creditors under a given credit had made an "Interim Rate Election"); § 3.06 (providing that alternative interest rates could apply to Syndicates for which the rate calculated by the Servicing Bank did not adequately reflect the cost of funding), and thus, there is nothing "bizarre" about the possibility that interest calculations might differ from creditor to creditor.

Second and relatedly, the Plaintiffs' interpretation completely disregards what the Agreement actually says. Section 3.03 explicitly provides that regular interest accruing during the 10 year period leading up to March 31, 1990 is "to be due and payable on the last day of each Interest Period" and Section 3.04 defines Interest Periods as six month periods running consecutively throughout that ten year period. Section 3.05, by way of contrast, deals with a different type of interest and sets up a different scheme. Rather than providing that interest on overdue principal is due and payable at the end of each Overdue Period, Section 3.05 provides that it is "payable on demand", *id*. at 3.05(a), and explicitly introduces the concept of "Overdue Period" only for "purposes of determine the interest rate" to be applied. *See* Ex. P10 § 3.05(b) at UB00000638. ("For purposes of determining the interest rate pursuant to subsection (a) above, the period between the date the principal amount referred to therein is due and the date such principal amount is paid in full shall be divided into Overdue Periods of one Month[.]").Contrary to Plaintiffs' contention, there is nothing "natural" about reading these two *different* provisions of the Credit Agreement as though they are the *same*.

Third, Plaintiffs' proposed interpretation cannot be reconciled with either logic or the canons of contractual interpretation. To begin with, the Plaintiffs do not proffer any explanation as to why the drafters of Section 3.05 would have intended that interest on overdue principal would be "due" on one date (i.e., at the end of each month) and "payable" on another and no such explanation is apparent, particularly when the Agreement does not adopt this separation for regular interest.More importantly, Plaintiffs' contention that interest is "due" at the end of each Overdue Period but "payable" at some other time (i.e., on demand) *cannot be reconciled with Section 3.05(d) which provides for interest on all interest which "is not paid when due*." By explicitly contemplating that interest will be "paid when due," Section 3.05(d) compels the

conclusion that interest under the Credit Agreement is due and payable at the same time (i.e., on demand).

Finally, Plaintiffs' interpretation also assumes that simply by creating monthly Overdue Periods, the drafters must have intended (without saying so) that interest accruing under Section 3.05(a) would fall due at the end of each Overdue Period.  If adopted, however, this assumption would render superfluous the language in Section 3.03 which explicitly provides that interest under that provision is "to be due and payable on the last day of each Interest Period for interest accrued during such Interest Period."[54]  If one could simply assume that interest falls due at the end of the Interest Period, there would be no need for the drafters to explicitly say so.The fact that they expressly said so in Section 3.03 compels the conclusion that their omission of such language from Section 3.05 was intentional.[55]

---

[54]      In order to find that interest on overdue principal is "due" at the end of each Overdue Period, the Court would also have read into Section 3.05 language that appears nowhere in that provision and disregard the introduction of Section 3.05(b) which specifies precisely the purpose of Overdue Periods intended by the drafters.

[55]      Contrary to the Plaintiffs' contention, the decisions issued in *Elliott Assocs., L.P. v. Banco de la Nacion*, 194 F.R.D. 116 (S.D.N.Y. 2000) and *Van Eck Emerging Markets Opportunity Fund, L.P. v. Republic of Nicaragua*, No. 00 Civ. 5756 (WHP) (S.D.N.Y.) do not support their proposed interpretation of the contract or their claim for compound interest.  To begin with, the materials relied upon by the Plaintiffs do not indicate whether a demand for payment was made in either case or whether that issue was ever raised before the presiding Courts.   Indeed, the Court's opinion in *Elliott Associates* indicates the Defendants in that case argued that the 23 letter agreements at issue did "not contemplate collection of compound interest," and further disputed the methodology, rates and default dates used to contemplate such interest, but there is no discussion of the applicable contract language and whether a demand was required.  194 F.R.D. at 121-122.  Similarly, the Court's one page decision in *Van Eck* gives no indication of the Court's reasoning and a review of the electronic docket for that case indicates that judgment was entered for the Plaintiffs only after the Defendant failed to submit any response to the Plaintiffs' damages presentation.   Ultimately, the fact that compound interest may have been awarded in different cases involving different parties, different contracts and different factual circumstances and where different legal arguments may have been raised and considered by the Court is of no significance here.

### 4.  Only the Defendants' Interpretation
### is Supported by the Parties' Course of Performance.

The Defendants submit that Section 3.05(a) is subject to only one interpretation that is reasonable and consistent with the terms of the Credit Agreement – i.e., that interest on overdue principal does not itself become due or overdue until a demand for it has been made.  In the event, however, that the Court finds the Agreement ambiguous, then the Court "may properly consider 'extrinsic evidence as to the parties' intent.'"  *Chesapeake Energy*, 2013 WL 1890278, *10 (*quoting JA Apparel Corp. v. Abbound*, 568 F.3d 390, 397 (2d Cir. 2009)).  Among other things, the analysis of extrinsic evidence may include a review of "any relevant course of performance or course of dealing[.]"  *Chesapeake Energy,* 2013 WL 1890278, *10 (citing *Hoyt v. Andreucci*, 433 F.3d 320, 332 (2d Cir. 2006)).  *See also Gulf Ins. Co. v. Transatlantic Reinsurance Co.*, 886 N.Y.S.2d 133, 143-44 (1st Dep't 2009) ("[T]he practical interpretation of a contract by the parties to it for any considerable period of time before it comes to be the subject of controversy is deemed of great, if not controlling, influence."); *United Fire & Cas. Co. v. Arkwright Mut. Ins. Co.*, 53 F. Supp. 2d 632, 640-41 (S.D.N.Y. 1999) ("[T]he parties' course of performance of a contract is relevant to understanding the contract *even if the contract is unambiguous*… An interpretation of the contract in practice, prior to litigation, can constitute evidence of the parties' intent.") (emphasis added) (citations omitted).  Importantly, such evidence unequivocally supports the Defendants' interpretation and demonstrates that the Plaintiffs are not entitled to compound interest.

More particularly, the Defendants' interpretation of the Credit Agreement and the attendant conclusion that interest on interest on overdue principal has not accrued is consistent with the parties' course of dealing over the last 30 years.  In that regard, the record does not contain any evidence indicating that any of the original parties to the Credit Agreement or any

bank, outside of litigation, included compound interest in their calculation of amounts owed under the Credit Agreement.  Similarly, the servicing bank did not include compound interest in its interest calculations either.  This is reflected by numerous discussions between the parties, as well as spreadsheets and charts, which discuss principal and interest, but omit any reference to compound interest.  *See* Ex. P11 at UB00002460 (March 1991 Union Bank schedule of amounts owed); Ex. P17 at CITI0003701; 3703 (1991 Acknowledgement and attached Schedule 1); Ex. D18 at UB0001517-1520 (faxed letter from Union Bank to DRC, with accompanying spreadsheet of amounts owed); Ex. D19 at UB00000980-982 (Union Bank spreadsheet of amounts owed as of April 1, 2005); Ex. P53 at UB00001500 (November 2007 certificate of total outstanding debt); Ex. D20 at UB00001958 (April 2008 email from Gindraux to Central Bank with total amounts owed); Ex. D23 at UB00001349 (discussion of April 17, 2009 correspondence from Union Bank to Dechert, with no calculation of compound interest).

Most tellingly, at a September 2003 London Club meeting of banks which were party to the Credit Agreement, those banks agreed with provisional numbers compiled by the Bank of Tokyo as to outstanding principal and interest.  These numbers did not include compound interest.  Ex. D14 at CITI00001761. Further, at that meeting, the banks specifically "approved [Bank of Tokyo's] interests' computation methodology – i.e., ***no interest on interest should be considered in the numbers***."  *Id.* (emphasis added).  The minutes of the meeting, taken by Citibank's Losembe, noted that this agreed upon methodology "remains is [sic] consistent with all numbers communicated to agents *since the Agreement is effective*."  *Id.* (emphasis added).[56]

---

[56]    Notably, of the approximately $18 million in principal that Plaintiffs claim title to under the Credit Agreement, they purport to have acquired approximately 90 percent of their interest in such debt from Citibank.  Ex. P55 at PLAINTIFFS0000495-99; Ex. P57 at PLAINTIFFS0000446-66.

By way of contrast, the Plaintiffs' claim for more than $40 million in compound interest is not supported by a single piece of evidence indicating that either the Servicing Bank, any agent bank or any one of their purported predecessors calculated interest in the manner they propose.[57]   The lack of such evidence is significant.   Section 5.05 of the Credit Agreement provides that each Bank (with respect to Credits owed to it), each Agent (with respect to Credits of its Syndicates) and the Servicing Bank (with respect to all Credits) "*shall maintain on its books control accounts* setting forth the amounts of principal, interest and other sums paid and payable by the Obligor from time to time hereunder."  Ex. P10 § 5.05 at UB00000650 (emphasis added).  Section 5.05 further provides that, in the event of a dispute, such control accounts are to constitute "prima facie evidence of the amount of such Credit and of such amounts paid and payable."  *Id*.[58] Section 5.05 was clearly intended to assign some evidentiary weight to historical accounting records or "control accounts" of the parties to the Credit Agreement.   And, yet, despite conducting discovery for the better part of a year and collecting thousands of pages of documents from the Servicing Bank and Citibank, the Plaintiffs have not proffered a single piece of evidence indicating their calculations of interest are consistent with the historical records of

---

[57]    Initially, Plaintiffs indicated that they would rely on calculations purportedly prepared on their behalf and calculations purportedly prepared by supposed agent "Red Barn Capital LLC" – the entity from whom Themis Capital claims to have obtained its interest in the debt.  *See* Plaintiffs' Proposed Conclusions of Law ¶¶ 40, 44-45.  *See also* Ex. P55 (indicating Themis acquired interest from Red Barn).  For all of the reasons identified in Defendants' Proposed Conclusions of Law, these calculations  - which were submitted without evidentiary foundation and were obviously prepared after this litigation began and solely for the purposes of this litigation - were neither admissible nor credible evidence supporting their claim for compound interest.  *See* Def. Concl. of Law ¶¶ 110-116.   Presumably as a result, Plaintiffs subsequently withdrew the Red Barn calculations.  *Compare* Joint Pretrial Order (submitted to the Court via email on November 12, 2013), Ex. C (referencing P105) and Plaintiffs' First Revised Exhibit List at p. 10 (indicating P105 was withdrawn).  And, to the extent Plaintiffs seek to rely on Plaintiffs' Exhibits 91 and 92, they have now acknowledged that they are calculations prepared by their counsel and do not constitute evidence supporting the Plaintiffs' entitlement to compound interest.  *See* Pl. Br. at 53, n.21.

[58]    Section 5.05 further provides that, in the event of a discrepancy, "each Agent's account shall be considered correct in the absence of manifest error with respect to Credits of its Syndicates[.]"  *Id*.  Here, however, there is no discrepancy – none of the evidence collected from the Servicing Bank or Plaintiffs' predecessors in interest support the claim for compound interest.

any party.  To the contrary, to the extent they seek compound interest, the Plaintiffs' calculations are inconsistent with the records of both the Servicing Bank and Citibank, the entity in whose shoes they now claim to stand.  *See* Exs. D11, D12 and D14 at CITI0001761.

In summary, the Plaintiffs' claim for compound interest cannot be reconciled with the law, the express terms of the Credit Agreement or the course of performance of the parties to that Agreement for over 30 years.  For all of these reasons, the Plaintiffs are not entitled to recover any of the interest on interest that they seek.[59]

---

[59]     In addition to seeking interest on interest on overdue principal, Plaintiffs also seek yet an additional form of compound interest which they would not be entitled to under any circumstances.  Specifically, in addition to overdue principal, interest on overdue principal and interest on interest on overdue principal, Plaintiffs claim that they are entitled to an additional $18 million which they call "Generation 3+ interest." Plaintiffs are not entitled to such interest in the first instance because they are not entitled to any compound interest, as set forth above.  Even assuming, however, that a demand had been made for interest under Section 3.05 and Plaintiffs were entitled to interest on interest on overdue principal, there is no provision in the Credit Agreement which would entitle them to this additional "Generation 3+ interest".  In the interest of efficiency, Defendants refer the Court to Section III.G.2 of their proposed Conclusions of Law which discusses this issue at length.  Notably, although Defendants' Proposed Conclusion of Law specifically addressed Plaintiffs' claim for Generation 3+ interest, Plaintiffs' pretrial brief does not respond to any of the arguments raised therein.

## IV.   **CONCLUSION**

For the foregoing reasons and the reasons set forth in the Defendants' proposed findings of fact and conclusions of law, Plaintiffs cannot meet their burden of proof on their actual authority, apparent authority or ratification theories of liability and their attempt to extract $90 million from one of the most impoverished countries in the world must be rejected.   We respectfully request that this Court enter judgment in favor of the DRC and Central Bank.

Respectfully submitted,
DLA PIPER LLP

By:   _/s/_____

Dated:  New York, New York
    February 4, 2014

Douglas Walter Mateyaschuk
1251 Avenue of the Americas
New York, NY 10020-1104
(212) 335-4984 (phone)
(212) 884-8455 (fax)
douglas.mateyaschuk@dlapiper.com

Tara M. Lee
DLA Piper LLP (US)
One Fountain Square
Suite 300
Reston, Virginia 20910-5602
(703) 773-4150 (phone)
(703) 773-5150 (fax)
tara.lee@dlapiper.com

Sara Moghadam
DLA Piper LLP (US)
500 Eighth Street, NW
Washington, DC 20004
(202) 799-4512 (phone)
sara.moghadam@dlapiper.com

*Attorneys for Defendants Democratic Republic of Congo and Central Bank of the Democratic Republic of the Congo*