UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------X
:
THEMIS CAPITAL, LLC and DES MOINES                    :
INVESTMENTS LTD.,                                      :
:                          09 Civ. 1652 (PAE)
                                      Plaintiffs,      :
          -v-                                          :          OPINION & ORDER
:
DEMOCRATIC REPUBLIC OF CONGO and                       :
CENTRAL BANK OF THE DEMOCRATIC                         :
REPUBLIC OF THE CONGO,                                 :
:
                                     Defendants.       :
:
------------------------------------------------------------------X

PAUL A. ENGELMAYER, District Judge:

          Plaintiffs Themis Capital, LLC ("Themis") and Des Moines Investments, Ltd. ("Des

Moines") (collectively, "plaintiffs" or "Themis") bring this claim for breach of contract against

the Democratic Republic of the Congo (the "DRC") and the Central Bank of the Democratic

Republic of the Congo ("Central Bank of the DRC") (collectively, "defendants"). Themis and

Des Moines are successors-in-interest to portions of debt that the DRC restructured in 1980,

which have been in default since 1990. Plaintiffs' lawsuit seeks to recover on this debt.

          Plaintiffs' lawsuit would ordinarily be time-barred under New York's six-year statute of

limitations governing breach-of-contract claims. To sustain this claim, plaintiffs rely on a series

of debt acknowledgment letters that purport to have been signed by officials of the DRC and

Central Bank in 1991, 1997, and again in 2003. These letters, by their terms, tolled the statute of

limitations, and, if effective, would make this lawsuit, brought in 2009, timely.

          Defendants, however, assert that the signatories to these letters lacked actual or apparent

authority to bind the DRC and the Central Bank. Thus, they argue, the statute of limitations

expired long ago.  Whether defendants are liable to pay the debts at issue here therefore turns on whether the debt acknowledgment letters are legally binding.

Following pretrial discovery and the resolution of pretrial motions, a bench trial on these issues was held on February 13 and 14, 2014.  For the following reasons, the Court holds that the signatories to the 1991, 1997, and 2003 debt acknowledgment letters had actual and apparent authority to bind the DRC and the Central Bank.  Accordingly, plaintiffs' attempt to collect on this long-owed debt is not barred by New York's six-year statute of limitations, and judgment must be, and is, entered in favor of Themis and Des Moines.

As to damages, the Court holds that plaintiffs are entitled to recover the outstanding principal and interest charges on their debt, and to recover compound interest on the interest that accrued on the unpaid principal.  However, plaintiffs are not entitled to recover any compound interest on such compound interest.  Finally, the Court holds, plaintiffs may recover these damages, jointly and severally, from the DRC and the Central Bank of the DRC.

I.      **Background**[1]

   A.      **The Credit Agreement**

On March 31, 1980, the Republic of Zaire ("Zaire"), a sovereign state in Central Africa, and the Bank of Zaire, Zaire's central bank, entered into a Refinancing Credit Agreement with various creditors and agents.  Stip. ¶ 11; Pl. Ex. 10 ("Credit Agreement").  The Credit Agreement

---

[1] The background facts are drawn from the parties' helpful joint stipulations of fact (Dkt. 206) (Joint Pretrial Order, Ex. A) ("Stip."), the trial testimony of plaintiffs' expert witness, Nicaise Chikuru Munyi Ogwarha ("Chikuru") (Dkt. 209) ("Feb. 13, 2014 Tr."), the depositions designated by the parties (Dkt. 206), and the trial exhibits offered by plaintiffs ("Pl. Ex.") and defendants ("Def. Ex.").  The following abbreviations are used for the parties' pretrial submissions:  plaintiffs' pretrial memorandum (Dkt. 186) ("Pl. Br."); and defendants' pretrial memorandum (Dkt. 197) ("Def. Br.").

refinanced, consolidated, and restructured various debts that Zaire owed to its creditors, and designated the Bank of Tokyo Trust Company ("Bank of Tokyo") as the servicing bank. Stip. ¶ 13; *see* Credit Agreement. In return, the agreement obliged Zaire to make periodic payments of principal and interest to the creditors (or their assignees[2]), and to repay all principal and interest on or before April 2, 1990. Stip. ¶ 14. Attached to the agreement were credit schedules "setting forth outstanding principal amounts for the various debts refinanced, consolidated and restructured pursuant to the Credit Agreement." *Id.* ¶ 15; Credit Agreement at R-1(a).

The Credit Agreement was executed, on behalf of Zaire, by the State Commissioner of Finances, and, on behalf of the Bank of Zaire, by the Bank's Governor. Stip. ¶¶ 16, 17. On April 21, 1980—about three weeks after the execution of the Credit Agreement—Zaire's President, Mobutu Sésé Seko ("Mobutu"), signed an ordinance that officially authorized these two individuals—the Commissioner of Finances and the Governor of the Bank of Zaire—to sign the Credit Agreement. *Id.* ¶ 20; Def. Ex. 29 (Ordinance No. 80-073). That ordinance stated:

> The President and Founder of the Popular Movement of the Revolution, President of the Republic, in light of the Constitution, in particular Article 42 therein;
>
> HEREBY ORDERS:
>
> Article 1—The signing of the refinancing loan agreement between the Republic of Zaire, the Bank of Zaire and the private bank creditors is hereby authorized.

---

[2] Defendants do not dispute that plaintiffs are the assignees of all rights, title, interest, benefits, and obligations of the creditors under the Credit Agreement. Under the Credit Agreement, the DRC owed principal of $9,562,500 to Citibank N.A. and $459,999.67 to Bayerische Vereinsbank International S.A., for a total of $10,022,499.67. Following the execution of a deed of assignment, effective August 5, 2008, Themis succeeded to these rights. Pl. Exs. 55–56. The DRC also owed principal of $487,900.00 to Citibank N.A. under Schedule A-1; $308,463.08 to Banque Bruxelles-Lambert S.A. ("Bruxelles-Lambert") under Schedule A-2; $483,125 to Electro Banque under Schedule A-14; $254,472.50 to Bruxelles-Lambert under Schedule A-19; $308,451.77 to Bruxelles-Lambert under Schedule A-21; and $4,689,271 to Citibank N.A. under Schedule A-26, for a total of $7,981,058.35. Following the execution of a deed of assignment, effective February 2, 2009, Des Moines succeeded to these rights. Pl. Exs. 57–58.

> Article 2—The State Commissioner of Finances and the Governor of the Bank of Zaire are each in turn assigned with the duties of implementing the present Executive Order, which enters into effect on the date of its signing.

Def. Ex. 29.  It is therefore undisputed that the State Commissioner of Finances[3] and the Governor of the Bank of Zaire had actual authority to execute the Credit Agreement in 1980.

Section 8.01 of the Credit Agreement included several "Affirmative Covenants of the Obligor," including:

> So long as any Credit shall remain outstanding, the Obligor will:
>
> . . .
>
> (b) Duly obtain and maintain in full force and effect all governmental approvals (including any exchange control approvals) which may be necessary under the law of the Republic of Zaire for the execution, delivery and performance of this Agreement by the Obligor or for the validity or enforceability hereof and duly take all necessary and appropriate governmental and administrative action in the Republic of Zaire in order to make all payments to be made hereunder as required by this Agreement.

Credit Agreement § 8.01.  The Credit Agreement defines the Republic of Zaire, now the DRC,[4] as the "Obligor."  *See id.* at R-1.

Zaire's first missed payment under the Credit Agreement was in 1982; the second was in April 1985.  *See* Pl. Ex. 11 (Memorandum Regarding the Republic of Zaire Refinancing Credit Agreement, dated March 13, 1991).  In March 1988, Zaire ceased making monthly payments on the Credit Agreement.  Stip. ¶ 23.  Payments resumed in July 1989, but ceased again in January

---

[3] The Court has, following the parties' lead, used the titles, "Commissioner of Finances," "Minister of Finance," and "Finance Minister" interchangeably.

[4] In May 1997, after 32 years of authoritarian rule by President Mobutu, Mobutu was overthrown in a coup led by Laurent Kabila, who later became president and changed the name of the country from Zaire to the DRC.  Stip. ¶¶ 5–6.  It is undisputed that defendants DRC and the Central Bank of the DRC are successors-in-interest to the debts of the Republic of Zaire and the Bank of Zaire.

1990.  *Id.*  Neither the Republic of Zaire nor its successor state, the DRC, has made any

payments under the Credit Agreement, whether of principal or interest, since January 1990.  *Id.*

### B.       The Debt Acknowledgment Letters

#### 1.       The 1991 Letter

In 1991, a "Steering Committee" of Zaire's creditors met with the Bank of Tokyo to

discuss the payment missed in April 1985, and the fact that Zaire had ceased making payments in

1990.  *See* Pl. Ex. 11.  The creditors sought "to obtain an acknowledgment from the Republic of

Zaire and [the Bank of Zaire] of payments due in order to avoid any risk that the six-year

prescription period established by the New York Statute of Limitations would apply to the

payments now in default."  *Id.*  The Steering Committee instructed the Bank of Tokyo to institute

collection litigation against Zaire on behalf of all creditors if Zaire failed to sign an

acknowledgment letter by March 29, 1991.  *Id.*  However, the Steering Committee stated that it

was "optimistic that they [would] obtain the acknowledgment from Zaire at their meeting in

Paris during the last week of March; and that any litigation against Zaire would be of the last

resort."  *Id.* at 3.

On March 29, 1991, Zaire's Finance Minister and the Governor of the Bank of Zaire

executed a debt acknowledgment letter.  Pl. Ex. 12 ("1991 Acknowledgment Letter").  The letter

states:

> To:     All parts to the Refinancing Credit Agreement dated as of March 31, 1980
>         among Republic of Zaire, Bank of Zaire, the Banks and Agents party thereto
>         and the Bank of Tokyo Trust Company, as Servicing Bank.
>
>         The Republic of Zaire and the Bank of Zaire hereby refer to the Refinancing
>         Credit Agreement dated as of March 31, 1980 among Republic of Zaire, Bank of
>         Zaire, the Banks and Agents party thereto and The Bank of Tokyo Trust Company,
>         as Servicing Bank.

> The Republic of Zaire and the Bank of Zaire hereby acknowledge and confirm that Schedule 1 hereto sets forth the amounts of past due principal and past due interest on principal as of April 2, 1990 for each Credit Information Schedule under such Refinancing Credit Agreement.  The past due interest on principal consists of both interest accrued on principal installments prior to their maturity (regular interest) and interest accrued on overdue principal.  The Republic of Zaire and the Bank of Zaire further acknowledge and confirm their respective obligations with respect to such indebtedness and other obligations arising under such Refinancing Credit Agreement.
>
> It is the intention of the Republic of Zaire and the Bank of Zaire in executing and delivering this acknowledgement formally to recognize and confirm all such obligations in order to eliminate any concerns any Bank holding any such indebtedness may have due to any possible application of any principles of prescription, including without limitation, those established by the New York statute of limitations, which might lead any Bank to conclude that the forbearance demonstrated to date by such Bank in refraining from acting to enforce any rights it may have to collect such indebtedness might have an adverse effect on the ultimate collectability of such indebtedness.

*Id.*  Schedule 1 to the 1991 Acknowledgment Letter was a table listing the amounts of principal and interest outstanding under the Credit Agreement as of April 2, 1990.  *See* Pl. Ex. 17.

On March 29, 1991, in response to the execution of the 1991 Acknowledgment Letter, the Steering Committee sent a fax to the Bank of Tokyo, which read:  "Please find attached the confirmation from the . . . Steering Committee to cease any litigation against Zaire at this time." Pl. Ex. 14.  Included with this fax were separate, but identical, messages from each of the three Steering Committee members to the Bank of Tokyo, which stated:

> We refer to the Telex dated March 18, 1991 from Australia and New Zealand Banking Group Limited, Citibank, N.A., and Credit Commercial De France to the Agents and Banks party to the Zaire Refinancing Credit Agreement dated as of March 31, 1980.
>
> This communication is to advise you that we have received a debt acknowledgment satisfactory to the three banks sending such Telex so as to make the litigation described in such Telex unnecessary at this time.

*Id.*  Assuming that the 1991 Acknowledgment Letter restarted the statute of limitations on claims under the Credit Agreement, the creditors to the Agreement had, under New York's six-year

6

statute of limitations, until March 29, 1997 to file a lawsuit for breach of contract, or to otherwise preserve their rights.

### 2.     The 1997 Letter

In early 1997, Cecilia Bartner ("Bartner"), an executive in the debt restructuring department at Citibank in New York, prepared, with the assistance of legal counsel, the draft of a new debt acknowledgment letter.  Deposition of Cecilia Bartner, dated May 2, 2013 ("Bartner Dep.") at 53–54, 70–71.  The new letter was based on the 1991 Acknowledgment Letter, except that it did not contain an attachment with the reconciled amounts due under the Credit Agreement.  *Id.* at 54–55.  Bartner sent a draft of the new letter to Jean-Claude Masangu ("Masangu"), a Citibank executive in Kinshasa.  *Id.* at 53–54.

Masangu was the Managing Director of Citibank's Kinshasa office between April 1993 and August 1997.  Deposition of Jean-Claude Masangu, dated June 12, 2013 ("Masangu Dep.") at 118.  Once Masangu received the draft acknowledgment letter from Bartner, he personally met with the Minister of Finance and the Governor of the Bank of Zaire to discuss the need for both parties to sign the new letter.  *Id.* at 103.  Masangu testified that he did so on behalf of Citibank and the other creditors who were owed money under the Credit Agreement.  *Id.* at 102.

On March 7, 1997, the new debt acknowledgment letter was signed by both the Minister of Finance and the Governor of the Bank of Zaire.  Pl. Ex. 17 ("1997 Acknowledgment Letter").
The letter states:

> To:     All persons holding claims under the Refinancing Credit Agreement dated as of March 31, 1980 among the Republic of Zaire, the Bank of Zaire, the Banks and Agents party thereto and the Bank of Tokyo-Mitsubishi Trust Company (formerly known as Bank of Tokyo Trust Company), as Servicing Bank.
>
> The Republic of Zaire and the Bank of Zaire hereby refer to the Refinancing Credit Agreement dated as of March 31, 1980 among Republic of Zaire, the Bank

of Zaire, the Banks and Agents party thereto and the Bank of Tokyo-Mitsubishi Trust Company (formerly known as Bank of Tokyo Trust Company), as Servicing Bank.

The Republic of Zaire and the Bank of Zaire hereby acknowledge and confirm as of the date hereof their respective obligations with respect to the principal and interest unpaid under such Refinancing Credit Agreement consisting, in the case of interest, both of interest accrued on principal installments prior to the maturity and interest accrued on overdue principal and interest, and all other obligations arising under such Refinancing Credit Agreement in accordance with the terms thereof.

It is the intention of the Republic of Zaire and the Bank of Zaire in executing and delivering this acknowledgement formally to recognize and confirm all such obligations in order to eliminate any concerns any person holding claims under such Refinancing Credit Agreement may have due to any possible application of any principles of prescription, including without limitation, those established by the New York statute of limitations, which might lead any such person to be concerned that the forbearance demonstrated to date by such person in refraining from acting to enforce such claims might have an adverse effect on the ultimate enforceability of such claims.

According to Masangu, his past experience caused him to conclude that it was unnecessary to inquire into whether the signatories to the 1997 Acknowledgment Letter had authority to bind the principals to the debt acknowledgment. Masangu Dep. at 104–105. Assuming that the 1997 Acknowledgment Letter restarted the statute of limitations on claims under the Credit Agreement, the creditors to that agreement had until March 7, 2003 to file a lawsuit, or to otherwise preserve their rights.

### 3.    Events Between 1997 and 2003

In April 1997, Masangu, the former head of Citibank's Kinshasa office, became the Governor of the Central Bank of the Congo, a position he held until May 2013. Masangu Dep. 133. On November 26, 2002, Masangu sent an invitation to Bartner of Citibank, the subject line

of which was "Invitation to the London Club[5] Agent Bank members' meeting on December 7,

2002 in Paris":

> The Central Bank of the Congo plans to organize an informal meeting with all of the Agent Banks that are members of the [London] Club, including yours. The meeting will allow us to assess our relationships, particularly with respect to the treatment of the accumulated arrears on your loans (Gentlemen's Agreement of June 24, 1989) and the definition of the new cooperation agreement with the London Club.
>
> I propose that this informal meeting, which I will personally chair and in which I invite your bank to take part, be held on December 7, 2002 in Paris, as a side event to the creditors' meeting planned for December 4–6 in the same city. Accordingly, please be so kind as to confirm your participation as soon as possible.
>
> Please find attached the list of the other Agent Banks, most of which have already expressed an interest in participating in this meeting.

Pl. Ex. 22. An identical letter was sent to the other creditor banks, such as BNP Paribas. Pl. Ex.

23. On December 4, 2002, however, Masangu informed Bartner that he was unable to travel to

Paris for the December 7, 2002 meeting. Pl. Ex. 24. Instead, he offered to have his subordinates

organize an information meeting on December 6, 2002 at the World Bank office in Paris, France,

regarding "the work product document drawn up to this effect," which was sent as an

attachment. *Id.*

The attached document was titled "Communication from the Governor of the Central

Bank of Congo to the London Club Agent Banks." *Id.* Section II of the document contained the

following summary of "The DRC's Relations with the London Club":

> 5. The first refinancing bank debt agreement signed by the DRC with its London Club partners is dated March 31, 1980. This agreement covered a refinanced debt of 402 million USD for a duration of 10 years, with an end date of March 31, 1990.

---

[5] "London Club" is a term used to refer, generically, to the creditor banks that entered into the 1980 Credit Agreement. *See* Pl. Ex. 37 (letter from the Governor of the Central Bank, Masangu, to the Bank of Tokyo, requesting assistance in re-establishing contact with the "creditor members of the London Club").

6. Because of coming up against payment difficulties, the DRC did not completely honor its engagements, which led it to negotiate and arrive at rescheduling agreements in the form of "Gentlemen Agreements" in May 1984 and June 1989 respectively.

7. These two agreements were not honored either. On June 30, 1991, at the time when the DRC was getting ready to negotiate a new global agreement to replace that which was signed in March 1980, its commitments to the London Club were reaching 490.70 million USD, broken down as follows:

| | | |
|---|---|---|
| – Principal | : | 359.51 million USD |
| – Contractual interest | : | 24.10 million USD |
| – Late interest on the principal due | : | 107.90 million USD |

*Id.* Section III of the document described "The DRC's Expectations of the London Club."

11. After a long period of progress within the dialogue with other creditors, the negotiations with the London Club represent the next decisive step before the DRC's eligibility for the HIPC Initiative [*i.e.*, the World Bank's debt relief program for Highly Indebted Poor Countries]. In order to allow the [International Monetary Fund] and the [World Bank] to proceed with a debt sustainability analysis, the DRC is planning to finalize negotiations with the London Club before the end of December 2002.

12. In a very clear way, the informal meeting with the London Club agent banks, organized on the sidelines of the Consulting Group's work, should allow to set a calendar of meetings, the goal of which would be:

1) to determine the actual level of its commitments to the syndicated banks, in accordance with prior agreements;
2) to determine the actual level of the DRC's commitments to the Bank of Tokyo in terms of service commission;
3) the composing of a new coordination committee with current agent banks at the lenders meeting;
4) the discussion of facilities that should be granted to the DRC as compared to the conditions set by the Paris Club on September 13, 2002;
5) the determining of [an] agreement negotiation calendar to be signed between the DRC and the London Club, replacing the Refinancing Agreement enacted March 31, 1980.

*Id.* Masangu did not anywhere suggest, in this document, that the debts under the Credit

Agreement were time-barred or otherwise unenforceable.

10

4.      **The 2003 Letter**

The 1997 Acknowledgment Letter had extended, until March 6, 2003, the statute of limitations on claims brought under the Credit Agreement.  In 1999 or 2000, Bartner became chief of staff for William Rhodes, Citibank's senior international officer, a position she held until 2006.  Bartner Dep. at 23–24.  In late 2002 and early 2003, Bartner was again involved with obtaining a renewed debt acknowledgment letter from DRC officials.  *Id.* at 108.  By then, Masangu had left Citibank to become the Central Bank's Governor.  Bartner therefore worked with Michel Losembe ("Losembe"), a Citibank employee in Kinshasa, in attempting to obtain the new letter.  *Id.* at 125–26.  On January 16, 2003, Bartner sent Losembe an e-mail, attaching a draft of the letter.  Pl. Ex. 25.  She instructed Losembe to get the Minister of Finance to sign it on behalf of the Government by March 7, 2003.  *Id.*  Bartner testified that she used the 1997 Acknowledgment Letter as the basis for the draft letter she sent to Losembe.  Bartner Dep. at 125–26.

On February 4, 2003, Bartner sent Losembe an e-mail, requesting an update on his progress in getting the new acknowledgement letter signed.  Pl. Ex. 26.  On February 5, 2003, Losembe responded to Bartner:

> Sorry for this long silence.  Since I came, I was unable to meet with the Min Fin.[6]
> Between travels and Budget session in front of Parliament (based in Lubumbashi),
> we did not ha[ve] a chance to organize a meeting.  He however promised to see me
> this week.  The external debt management has been officially removed from Central
> Bank [in favor of] MinFin[.]  Masangu will only be willing to countersign.  I'll keep
> you posted.

*Id.*  Later that day, Bartner responded:

> Thanks for your email. When you see the MinFin mention to him that the
> acknowledgment is a formality but if the Banks don't have it, they would need to
> sue the country so that the statute of limitations on the debt does not run out.  I am

---

[6] The abbreviations, "Min Fin" and "MinFin" refer to the DRC's Minister of Finance.

sure you will have a nicer way to say this to him if he gives you the runaround but
in a nutshell that is what it is.

I would hope that we have it signed as soon as possible.

*Id*.  On February 11, 2003, Losembe sent a formal letter to the DRC's Finance Minister, Ilankir

Mbuyamu Matungulu ("Matungulu"), which included as an enclosure a "draft recognition of

debt document."  Pl. Ex. 27.  In that letter, Losembe explained to Matungulu that:

> The signing of this document will extend for six (6) years the validity of the [Credit
> Agreement] on the 31st of next March, the date of expiration of the last extension.
> It is understood that failure to sign the aforementioned document at its maturity by
> the [DRC] could lead creditors to seek forced recovery of their loans based on the
> law applicable to this Agreement.
>
> Indeed the agreement is governed by the laws of the State of New York, United
> States and has a validity of six years.  The latest extensions, copies attached, were
> signed on March 20, 19991 and March 7, 1997 by the Ministers of Finance and
> Governors of the Central Bank who held those offices on those dates.
>
> Citibank Congo acts on behalf of all Banks and Agent Banks [that are] signator[ies]
> [to] the Agreement and the Recognition of Debt, duly signed, will be sent to the
> servicing bank designated by the Agreement, the Bank of Tokyo-Mitsubishi Trust
> Company, in New York, which will communicate it to all lenders.  In this way, the
> [DRC] can continue to manage the outstanding London Club loans within . . . a
> well-defined framework.

*Id.*  On February 17, 2003, Losembe sent Bartner an e-mail, informing her that Matungulu had

resigned as Finance Minister.  Pl. Ex. 28.  In response, Bartner sent Losembe the following e-

mail on February 18, 2003:

> How about the Deputy to MinFin?  I suppose we could wait for a few days if we
> knew there was an appointment forthcoming but we really do not have the luxury
> of time.  Could Masangu give us a hand talking to him?

Pl. Ex. 30.

At the time of Matungulu's resignation, Leonard Luongwe ("Luongwe") was the Vice Finance Minister.[7]  The next day, Losembe informed Bartner that he had spoken to Masangu, the Governor of the Central Bank of the DRC, and that Masangu had agreed to help convince Luongwe to sign the letter.  *Id*.  Masangu testified that he helped persuade Luongwe to sign a new debt acknowledgment letter by explaining that the letter would extend the validity of the Credit Agreement for another six years, and that Citibank could take legal action if the DRC failed to sign.  Masangu Dep. at 69–70, 108–09.

On February 20, 2003, Losembe sent Luongwe a letter that included as an enclosure the same letter Losembe had sent to Matungulu on February 11, 2003.  *See* Pl. Ex. 76.  Its subject line was "March 31, 1980 Credit Refinancing Agreement," and it stated:

> We have the occasion to congratulate you on your new responsibilities in the Ministry of Finance and Budget, which are key departments at the current stage of the [DRC's] economic growth.
>
> You will find attached a copy of correspondence that we addressed to the Ministry on February 11, 2003, related to the above subject, for which we request your special attention, given the importance of the issues involved.
>
> Indeed, the legal validity of the Credit Refinancing Agreement signed between the [DRC], the Central Bank of [the DRC] and the creditor Banks and Agents of the DRC within the scope of the London Club, arrive at their maturity next March 31. The only way to extend its validity is to sign a debt recognition in the attached format.  This document has already been signed various times by the DRC (copies of the 1991 and 1997 extensions are attached).  It is understood that [the] failure to sign said document could lead the creditors to a forced recovery of their loans based on the agreement's applicable laws.

---

[7] Defendants do not challenge the authority of the Vice Finance Minister, Luongwe, to act on behalf of the DRC's Finance Ministry after the Finance Minister, Matungulu, resigned.  *See, e.g.*, Deposition of Emmanuel Lubala, dated August 30, 2013 ("Lubala Dep.") at 33 ("Mr. Hranitzky: When Mr. Luongwe took on the role of acting Minister of Finance did he acquire all of the powers of his predecessor Minister of Finance under the laws of DRC that were in effect at that time?  Mr. Lubala: On the principle, yes.").  However, defendants do assert, as discussed *infra*, that *no* official from the Finance Ministry had the authority to sign the 2003 debt acknowledgment letter without permission from the Council of Ministers.

We hope that you will kindly consider our request and that you will follow up on it at your earliest convenience.

*Id*.  On February 26, 2003, Bartner sent another follow-up e-mail to Losembe:

Any progress?  It's getting to the point where if they do not sign we will need to get lawyers involved to look into suing the country to preserve the creditors' rights. I am sure there is goodwill to sign, they just need to get it done.

Pl. Ex. 30.

On February 25, 2003, Luongwe and Masangu signed the letter on behalf of the DRC's

Ministry of Finance and the Central Bank of the DRC, respectively.  *See* Stip. ¶ 24; Pl. Ex. 29

("2003 Acknowledgment Letter").  In all material respects, the 2003 Acknowledgment Letter

was identical to the 1997 Acknowledgment Letter.  *Compare* Pl. Ex. 17 *with* Pl. Ex. 29.  It

stated:

> To:    All persons holding claims under the Refinancing Credit Agreement dated as of March 31, 1980 among the Democratic Republic of Congo (formerly known as the Republic of Zaire), the Central Bank of Congo (formerly known as the Bank of Zaire), the Banks and Agents party thereto and the Bank of Tokyo-Mitsubishi Trust Company (formerly known as Bank of Tokyo Trust Company), as Servicing Bank.
>
> The Democratic Republic of Congo and the Central Bank of Congo hereby refer to the Refinancing Credit Agreement dated as of March 21, 1980 among the Democratic Republic of Congo (formerly known as the Republic of Zaire), the Central Bank of Congo (formerly known as the Bank of Zaire), the Banks and Agents party thereto and the Bank of Tokyo-Mitsubishi Trust Company (formerly known as Bank of Tokyo Trust Company), as Servicing Bank.
>
> The Democratic Republic of Congo and the Central Bank of Congo hereby acknowledge and confirm as of the date hereof their respective obligations with respect to the principal and interest unpaid under such Refinancing Credit Agreement consisting, in the case of interest, both of interest accrued on principal installments prior to the maturity and interest accrued on overdue principal and interest, and all other obligations arising under such Refinancing Credit Agreement in accordance with the terms thereof.

2003 Acknowledgment Letter.  The letter also specifically provided that it was intended to

overcome any concerns that the DRC's and Central Bank's debts were no longer collectible,

including based on the New York statute of limitations applicable to breach of contract claims:

> It is the intention of the Democratic Republic of Congo and the Central Bank of Congo in executing and delivering this acknowledgment formally to recognize and confirm all such obligations in order to eliminate any concerns any person holding claims under such Refinancing Agreement may have due to any possible application or any principles of prescription, including without limitation, those established by the New York statute of limitations, which might lead any person in refraining from acting to enforce such claims might have an adverse effect on the ultimate enforceability of such claims.

*Id*.  Masangu testified that one of his responsibilities as the Governor of the DRC's Central Bank

was to "sign contracts concluded by the Bank," Masangu Dep. at 129, and he acknowledges

signing the 2003 Acknowledgment Letter, *id.* at 13, 24.  Neither side disputes that Luongwe also

signed the letter, and that, at the time he did so, he held the position of Vice (or Interim) Finance

Minister.[8]  Pl. Ex. 89 at 12.

> On February 26, 2003, Losembe sent Bartner an e-mail:

> Good news!  Just hung up the phone with Deputy Min Fin.  He confirms having signed the Acknowledgment of Debt that will allow rollover of the March 31st, 1980 Refinancing Credit Agreement for another 6 years.

> The Governor of the Central Bank co-signed the document.  [I] should receive the letter tomorrow, and will fax it right away, so no need to "release" the lawyers as yet.  Should I send the original to your office?

Pl. Ex. 38.  Later that same day, Bartner sent an e-mail to Losembe:

> Congratulations on getting the acknowledgment of debt signed.  It could not have been done without you!  Many thanks for the time you took to get it done.

> You could send me the original and I will deliver it to Bank of Tokyo Mitsubishi.

*Id.*

---

[8] Luongwe is now dead.  He did not testify, and was not deposed, in connection with this lawsuit. Pl. Br. at 15 n.6.

On February 27, 2003, Luongwe sent a letter, on the official letterhead of the DRC's Ministry of Finance and Budget, to Losembe, copying the Central Bank Governor:

> I have the honor of confirming receipt of your letter . . . dated February 20, 2003 by which you sent me, for signature, the draft prorogation document of the refinancing credit Agreement dated March 31, 1980 with the London Club Banks.
>
> And following suit, I return it to you duly reflecting the authorized signatures.  As this document constitutes a recognition of debt, I request the Central Bank of Congo and the OGEDEP who are copied herein, to take it into consideration, each insofar as it is concerned, in the daily keeping of the great book of the public debt.

Pl. Ex. 33.  On March 4, 2003, Bartner sent Losembe an e-mail that stated, *inter alia*, "[j]ust wanted to let you know that I received the acknowledgment of debt.  Thanks again!"  Pl. Ex. 31. Losembe responded the next day:  "I'll also fax Min Fin's transmission letter that I omitted to send (to complete the file)."  *Id.*

Pursuant to the 2003 Debt Acknowledgment Letter, the creditors to the Credit Agreement had, under New York's six-year statute of limitations, until February 25, 2009 to file a breach-of-contract lawsuit.[9]

## C.     Procedural History of this Lawsuit

On February 23, 2009, Themis and Des Moines, after succeeding to the rights of the creditors who were their respective predecessors in interest, *see* note 2, *supra*, initiated this lawsuit.  They alleged that defendants had breached the Credit Agreement by failing to pay the

---

[9] Plaintiffs' pre-trial brief recounts several incidents between 2003 and 2009, which are relevant solely to Themis's claim that the DRC ratified the debt owed to it.  *See* Pl. Br. at 16–27.  Because the Court has not relied on plaintiffs' claim of ratification in ruling in plaintiffs' favor, *see* note 18 *infra*, the Court, in reciting relevant facts, has not summarized these incidents.

principal and interest owed to the assignees of the debt consolidated under the Credit Agreement.[10]  Dkt. 1.

On May 22, 2009, plaintiffs filed an amended complaint.  Dkt. 5.  On February 1, 2010, after defendants failed to appear, Themis moved for summary judgment or, in the alternative, for a default judgment.  Dkt. 9–12.  On April 28, 2010, the Hon. George B. Daniels, to whom this case was then assigned, entered an order granting plaintiffs a default judgment.  Dkt. 13.

On June 17, 2010, Judge Daniels referred this case to the Hon. Kevin N. Fox, United States Magistrate Judge, for a calculation of the damages owed to plaintiffs.  Dkt. 15.  On November 1, 2010, Judge Fox issued a Report and Recommendation, which recommended that the Court adopt plaintiffs' interest calculations.  Dkt. 16 ("Report").  The Report recommended that plaintiffs be awarded a total of $18,003,558.32 in principal, $61,316,391.16 in interest, and $228,405.24 in "out-of-pocket" expenses.  *See* Report at 6.  This recovery was allocated so as to provide roughly $44 million for Themis and roughly $35 million for Des Moines.  *Id.*

On November 29, 2010, defendants made their first appearance in this case, in the form of a letter to the Court requesting additional time to object to the Report.  Dkt. 18.  Plaintiffs consented to that request.  On January 21, 2011, defendants filed objections to the Report.  Dkt. 23–24.  On March 4, 2011, plaintiffs responded to these objections.  Dkt. 28–29.  On April 28,

---

[10] On July 15, 2009, another debt acknowledgment letter was signed by Athanase Matenda Kyelu, then-Minister of Finance of the DRC, and Jean Claude Masangu Mulongo, then-Governor of the DRC's Central Bank.  Stip. ¶ 25; Pl. Ex. 27 ("2009 Acknowledgment Letter").  Because plaintiffs filed this lawsuit within six years of the signing of the 2003 Acknowledgment Letter, the Court has not relied on the 2009 Acknowledgment Letter in concluding that this lawsuit was timely filed.  However, the fact that the DRC's Minister of Finance and the Governor of the DRC's Central Bank executed another debt acknowledgment letter in 2009 would arguably support an inference that the parties to the Credit Agreement did not, as of July of 2009, believe that the collection of debt under the Agreement was barred by the statute of limitations.

2011, defendants moved to set aside the default judgment.  Dkt. 30–32.  Plaintiffs did not oppose defendants' motion.  On June 3, 2011, the Court granted the motion and entered an order setting aside the default.  Dkt. 38.

On June 28, 2011, Judge Daniels referred the case to Magistrate Judge Fox for settlement purposes.  Dkt. 44.  Settlement negotiations were unsuccessful.

On October 18, 2011, following reassignment of the case to this Court, the parties were directed to submit a proposed case management plan and briefing schedule.  Dkt. 53.  On December 6, 2011, the Court set a schedule for the briefing of a pre-discovery summary judgment motion, which plaintiffs had asked to make.  On April 3, 2012, after plaintiffs' summary judgment motion was fully briefed, the Court requested supplemental briefing, limited to the issue of whether the defendants had apparent authority to renew the 1980 Credit Agreement.

On July 26, 2012, the Court denied plaintiffs' motion for summary judgment without prejudice.  Dkt. 84; *Themis Capital, LLC v. Democratic Republic of Congo*, 881 F. Supp. 2d 508 (S.D.N.Y. 2012) ("*Themis I*").  Plaintiffs had argued that summary judgment was merited because it was apparent on the face of the governing documents that the DRC was obliged to repay the principal and accrued interest.  Defendants, in turn, had argued that the Court lacked jurisdiction over the dispute due to sovereign immunity, and because plaintiffs' claims were time-barred under New York law.

In *Themis I*, the Court held that it could properly exercise jurisdiction, and rejected defendants' claim based on sovereign immunity.  The Court also analyzed at some length the case law regarding when the doctrine of apparent authority can be applied to bind a sovereign. Based on its synthesis of that law, the Court held that the DRC can be so bound here, at least in

principle.  *See* 881 F. Supp. 2d at 522–26.  However, the Court held, it could not grant pre-discovery summary judgment, on either a claim of actual authority or apparent authority.  Instead, it held, "discovery on discrete topics" bearing on DRC's argument that plaintiffs' claims were time-barred, was required before the Court could resolve the case.  *Id.* at 515.  Specifically, the Court directed that discovery be taken into:  (1) "all communications leading up to the 2003 Letter between . . . representatives of the DRC and the Central Bank, and . . . plaintiffs or their predecessors in interest"; (2) "internal communications among [creditors] with respect to the initiation, drafting, or development of the 2003 Letter"; (3) "communications within the DRC and the Central Bank with respect to these subjects"; (4) "any evidence that rebuts the presumption that the signatures on the 2003 Letter are, in fact, authentic"; and (5) "evidence as to actual authority."  *Id.* at 531.

Notably, at the time of *Themis I*, the 1991 and 1997 Acknowledgment Letters had not yet come to light.  The issue of apparent and actual authority appeared to arise in the context of whether the DRC and the Central Bank, in 2003, had thereby authorized the revival of by-then long-time-barred claims.  *See id.* at 529; Dkt. 179 ("Nov. 26, 2013 Tr.") at 47–48 (Mr. Hranitzky:  "[T]he reason the 1991, 1997 and 2009 acknowledgment letters weren't addressed in summary judgment briefing is because we didn't know about them at the time.").  However, in the discovery period that followed *Themis I*, the 1991 and 1997 Debt Acknowledgment Letters came to light.  Consequently, as the parties and the Court came to appreciate, the issues of actual and apparent authority arose in a less remarkable context:  Whether the 2003 Acknowledgment Letter, the latest in a series of tolling agreements each affecting non-time-barred claims, was binding so as to extend the deadline for plaintiffs to sue to collect the debts owed them by the DRC and the Central Bank from March 31, 2003, for an additional six years.

On April 18, 2013, the Court denied defendants' motion to amend their Answer.  Dkt. 147; *Themis Capital, LLC v. Democratic Republic of Congo*, No. 09 Civ. 1652 (PAE), 2013 WL 1687198 (S.D.N.Y. April 18, 2013).  In September 2013, the parties concluded fact and expert discovery.

A bench trial in this case was held on February 13 and February 14, 2014.[11]

## II.   Discussion

Themis asserts that the DRC breached the Credit Agreement, and therefore owes, as damages, outstanding principal, plus three categories of interest, on the debt consolidated by that Agreement.  *See* Pl. Exs. 91A–92A.

Under New York law, "to state a claim of breach of contract, the complaint must allege: (i) the formation of a contract between the parties; (ii) performance by the plaintiff; (iii) failure of defendant to perform; and (iv) damages."  *Johnson v. Nextel Commc'ns, Inc.*, 660 F.3d 131, 142 (2d Cir. 2011) (citations omitted).

Here, the DRC concedes that a valid contract was formed, that plaintiffs performed their end of the bargain, that the DRC failed to make payments required by the Credit Agreement, and that this failure caused plaintiffs to suffer damages.  The DRC asserts, however, that plaintiffs' claim is barred by New York's six-year statute of limitations.  *See* N.Y. C.P.L.R. § 213(2).  The DRC made its last payment under the Credit Agreement in 1990; plaintiffs initiated their lawsuit in 2009.  Ordinarily, then, plaintiffs' breach-of-contract claim would be time-barred.  However,

---

[11] The Complaint in this case did not contain a jury demand, and for good reason.  "[I]t is well-settled that a jury trial is unavailable against a foreign state, even where a foreign state is subject to suit under the [Foreign Sovereign Immunities Act]."  *Marchisella v. Gov't of Japan*, No. 02 Civ. 10023 (DC), 2004 WL 307248, at *4 (S.D.N.Y. Feb. 17, 2004) (citations omitted); *see also* 28 U.S.C. §§ 1330(a), 1441(d); *Bailey v. Grand Trunk Lines New England*, 805 F.2d 1097, 1100 (2d Cir. 1986); *Ruggiero v. Compania Peruana De Vapores "Inca Capac Yupanqui"*, 639 F.2d 872, 878 (2d Cir. 1981).

plaintiffs assert that the debt acknowledgment letters signed in 1991, 1997, and 2003 tolled the statute of limitations, such that the present lawsuit was timely in 2009.

New York law recognizes that an acknowledgement of a debt may restart, or, as relevant here, reset the running of the statute of limitations:

> A promise to waive, to extend, or not to plead the statute of limitation applicable to an action arising out of a contract . . . if made after the accrual of the cause of action and made . . . in a writing signed by the promisor or his agent is effective, according to its terms, to prevent interposition of the defense of the statute of limitation in an action or proceeding commenced within the time that would be applicable if the cause of action had arisen at the date of the promise[.]

New York General Obligations Law ("NYGOL") § 17-103(1).  Such an acknowledgment or promise must: (1) be in writing, (2) be signed by the debtor party, (3) recognize an existing debt, and (4) "contain nothing inconsistent with an intention on the part of the debtor to pay it." *Falkner v. Arista Records*, 797 F. Supp. 2d 299, 312 (S.D.N.Y. 2011) (citing *GP Hemisphere Assocs., LLC v. Republic of Nicar.*, No. 99 Civ. 10302 (WHP), 2000 WL 1457025, at *3 (S.D.N.Y. Sept. 28, 2000)).

There is no dispute that the acknowledgment letters in this case satisfy three of the four requirements of NYGOL § 17-103—they were in writing, they recognized an existing debt, and they contained nothing inconsistent with an intention on the part of the debtor to pay.  The validity of the letters therefore turns on the second element—*i.e.*, whether they were "signed by the debtor party."  Although defendants concede that Luongwe and Masangu *signed* the 2003 Acknowledgment Letter, they contend that these officials lacked the *authority* to do so. Accordingly, liability in this case turns on whether Luongwe and Masangu (the "signatories") had the authority—actual or apparent—to bind the DRC and Central Bank, respectively, to an acknowledgment of their existing debt under the Credit Agreement.

21

### A.      Liability

####      1.      Actual Authority

If the signatories had actual authority to sign the 2003 Acknowledgment Letter, then Themis's lawsuit is timely, and the DRC is liable for breach of contract.

"Under New York law, an agent has actual authority if the principal has granted the agent the power to enter into contracts on the principal's behalf, subject to whatever limitations the principal places on this power, either explicitly or implicitly." *Highland Capital Mgmt. v. Schneider*, 607 F.3d 322, 327 (2d Cir. 2010) (citing *Ford v. Unity Hosp.*, 32 N.Y.2d 464 (1973)). Actual authority "may be express or implied," and in either case "exists only where the agent may reasonably infer from the words or conduct of the principal that the principal has consented to the agent's performance of a particular act." *Minskoff v. Am. Express Travel Related Servs.*, 98 F.3d 703, 708 (2d Cir. 1996).  Regardless, "[t]he existence of actual authority depends upon the actual interaction between the putative principal and agent, not on any perception a third party may have of the relationship." *Merrill Lynch Capital Servs. v. UISA Fin.*, No. 09 Civ. 2324 (RJS), 2012 WL 1202034, at *6 (S.D.N.Y. Apr. 10, 2012).  "[T]he extent of the agent's actual authority is interpreted in the light of all circumstances attending those manifestations, including the customs of business, the subject matter, any formal agreement between the parties, and the facts of which both parties are aware." *Peltz v. SHB Commodities, Inc.*, 115 F.3d 1082, 1088 (2d Cir. 1997) (citation omitted).

In its previous opinion, the Court held that DRC law governs whether Luongwe and Masangu had actual authority to bind the DRC and the Central Bank to a commercial contract, *see Themis I*, 881 F. Supp. 2d at 521—here, an agreement to toll the running of the statute of limitations for an action to collect upon an unpaid debt.  "In determining foreign law, the court may consider any relevant material or source, including testimony, whether or not submitted by a

party or admissible under the Federal Rules of Evidence." Fed. R. Civ. P. 44.1. At trial, the

Court received live testimony from plaintiffs' expert witness on DRC law, Nicaise Chikuru

Munyi Ogwarha ("Chikuru"), and deposition testimony from defendants' expert witness on DRC

law, Emmanuel Lubala Mugisho ("Lubala"). Both witnesses also submitted expert reports. *See*

Pl. Exs. 122 ("Chikuru Expert Report"), 124 ("Lubala Expert Report"), and 123 ("Chikuru

Rebuttal Report").

     In asserting that the signatories possessed actual authority, plaintiffs' expert, Chikuru,

relied on § 8.01(b) of the Credit Agreement, combined with DRC Ordinance 80-073.

     First, § 8.01(b) states that, so long as "any Credit shall remain outstanding," the DRC is

required to:

> Duly obtain and maintain in full force and effect all governmental approvals
> (including any exchange control approvals) which may be necessary under the law
> of the [DRC] for the execution, delivery and performance of this Agreement by the
> Obligor or for the validity or enforceability hereof and duly take all necessary and
> appropriate governmental and administrative action in the [DRC] in order to make
> all payments to be made hereunder as required by this Agreement.

Credit Agreement § 8.01(b). Under the plain language of this section of the Credit Agreement,

the DRC is affirmatively required to take all steps necessary to keep the Credit Agreement in

effect until the DRC's creditors are paid in full.

     The dispositive question, then, is which officials in the DRC had the authority to ensure

that the DRC abided by the terms of the Credit Agreement, including § 8.01(b). The answer,

according to Chikuru, is found in Ordinance No. 80-073, which Zaire executed in 1980. Article

2 of the Ordinance states that:

> The State Commissioner of Finances and the Governor of the Bank of Zaire are
> each in turn *assigned with the duties of implementing the present Executive Order*,
> which enters into effect on the date of its signing.

Def. Ex. 29 (emphasis added).  The purpose of the Ordinance was to authorize the signing of the Credit Agreement, *id.*, and the State Commissioner of Finances and the Governor of the Bank of Zaire were, in turn, charged with implementing the Ordinance.  By extension, then, these two officials were also charged with the "execution, delivery, and performance" of the Credit Agreement, including § 8.01(b).  *See* Feb. 13, 2014 Tr. at 54 (Ordinance No. 80-073 empowered the Finance Minister and Central Bank Governor to implement the obligations of the Credit Agreement "until the period the DRC could pay all . . . its debt under the Credit Agreement"); *accord* Chikuru Expert Report ¶¶ 9(b), 14 (Ordinance No. 80-073 and Section 8.01 gave the "unconditional authority to acknowledge, reaffirm and/or renew the obligations of the DRC and the Central Bank to the Minister of Finances of the DRC and the Governor of the Central Bank, respectively").

This unremarkable interpretation of DRC law is strongly supported by actions taken by DRC officials after the Credit Agreement was breached in 1990.  As recounted above in detail, three debt acknowledgment letters were executed in 1991, 1997, and 2003; all three were jointly signed by the same two officials—the Finance Minister and the Central Bank Governor—who were named in Ordinance No. 80-073 and charged with implementing the Credit Agreement.[12]

---

[12] Plaintiffs also rely on Act No. 005/2002 (May 7, 2002) as a separate basis for the Central Bank Governor's authority to sign the 2003 Acknowledgment Letter.  *See* Pl. Br. at 29.  Article 31 of the Act provides:

> The Governor shall represent the Bank in all of its relationships and ties to third parties, including the government, and in this capacity has the following powers:
>  . . .
>
> (b) Singlehandedly or with other signatories sign contracts entered into by the Bank, Bank correspondence and other documents.

Pl. Ex. 118.  The Court agrees with plaintiffs that Article 31 authorized the Central Bank Governor to enter into contracts on the Central Bank's behalf.  There is, however, no need here

There is no evidence that, before this litigation commenced, any of the affected parties treated the letters as illegitimate or, in any way, objected to the role these two officials had played in executing the letters.  Indeed, based on their actions, recounted below, it appears that both Zaire (later DRC) and its creditors consistently regarded claims arising from the breach of the Credit Agreement as viable and enforceable in court at least as late as February 2003, when the 2003 Acknowledgment Letter was signed.  The Court addresses each acknowledgment letter in turn.

In 1991, a steering committee of creditors sought a debt acknowledgment letter from Zaire in order to preserve their claims for payments that were missed beginning in April 1985. On March 29, 1991, a debt acknowledgment letter was signed and executed by the Finance Minister and the Governor of the Bank of Zaire.  *See* Pl. Ex. 12.  There is no evidence in the record that any of the relevant parties believed or stated that the Finance Minister or the Governor of the Bank of Zaire lacked the authority to execute this letter.

Much the same occurred in 1997.  Concerned that their claims would become time-barred under New York's six-year statute of limitations, the creditors, acting through Citibank, prepared a new debt acknowledgment letter.  The 1991 letter had been signed on March 29, 1991; the 1997 letter was signed just before the six-year deadline, on March 7, 1997.  *See* Pl. Ex. 17.  Once again, the same two officials, the Finance Minister and the Governor of the Bank of Zaire, signed the 1997 letter.  And once again, there is no evidence that any person ever objected, or took a negative position, as to the letter's validity or legitimacy.

---

to rely on Act No. 005/2002's general grant of contracting authority, because, as explained *infra*, Ordinance No. 80-073 and Section 8.01(b) gave both the Finance Minister and the Central Bank Governor the necessary authority to sign the 1991, 1997, and 2003 debt acknowledgment letters.

The only acknowledgment letter that defendants meaningfully challenge is the 2003 letter—the last of the tolling agreements and the one that, if valid, makes this lawsuit timely. Defendants' expert, Lubala, asserts that the Finance Minister and Central Bank Governor lacked actual authority to sign the 2003 letter due to an intervening law passed in 2002. According to Lubala, that law—Decree 28/2002—established the "Council of Ministers" as the sole entity with authority to acknowledge defendants' obligations under the Credit Agreement. Lubala Expert Report ¶¶ 18–21. Specifically, Lubala points to Article 11 of Decree 28/2002, which states:

> In carrying out their duties, Ministers, Delegated Ministers and Vice Ministers are required to obey the laws and regulations of the Republic, particularly the laws and regulations governing the matters that come under their respective ministries.
>
> More particularly, they are required to comply strictly with the financial and budgetary laws. For this purpose, they will make sure that any legislative bill, executive order, decree, order or agreement, *any decision that may have immediate or future budgetary repercussions both with respect to revenue and expenses*, as well as any instrument creating or expanding employment and modifying the financial status of officials is submitted for the prior opinion of the Minister responsible for Finance and Budget *and for deliberation by the Council of Ministers* or, in case of emergency, the approval of the President of the Republic.

Def. Ex. 28 (emphases added). Lubala asserts that, under Decree 28/2002, the Finance Minister and Central Bank Governor could not sign the 2003 Acknowledgment Letter without first submitting it to the Council of Ministers for deliberation. *See* Lubala Expert Report ¶ 21 ("[W]ithout the prior agreement of the Council of Ministers, the letter of acknowledgment of debt signed by the Minister of Finance on February 25, 2003 cannot bind the [DRC]."). Because plaintiffs concede that the Council of Ministers was not consulted, the signatures on the 2003 Acknowledgment Letter were unauthorized if Decree 28/2002 means what defendants, and Lubala, claim it means.

Plaintiffs, however, supported by their expert, Chikuru, interpret Decree 28/2002 differently.  They assert that the Decree did not deprive the signatories of authority to sign the 2003 Acknowledgment Letter for three independent reasons:  (1) Decree 28/2002 cannot be enforced against private parties because it was never published in the Congolese "Official Journal"; (2) under the civil law doctrine of *lex specialis derogate lege generali*, a general provision like Decree 28/2002 cannot abrogate a specific provision like Ordinance No. 80-073; and (3) Decree 28/2002 does not apply to this case because the signing of the 2003 Acknowledgment Letter did not "have immediate or future budgetary repercussions."  *See* Pl. Br. 30–32.

The first of these reasons is unpersuasive.  At trial, plaintiffs' expert, Chikuru, was unable to identify a single instance in which a court in the DRC, or anywhere else, refused to apply a Congolese law against a private party based solely on a failure to publish that law in the "Official Journal."  *See* Feb. 13, 2014 Tr. at 67 ("The Court:  [A]re there published decisions of a court in the DRC that hold that a law that was otherwise enacted properly is not enforceable and can't apply because it wasn't published?  Are there other cases you can bring to my attention?  Chikuru:  I didn't make such research, but if I search, I will find it.").  Plaintiffs also failed to provide the Court with any such case authority before or after trial.  Plaintiffs' position thus lacks objective legal support and reduces to a bare claim by Chikuru that non-publication of a decree in the "Official Journal" makes it ineffective.  On this sparse record, the Court declines to hold that a law in the DRC that remains unpublished lacks legal effect against private parties.

Plaintiffs' second argument presents a more difficult question.  It is certainly true that, as a general matter of statutory construction, under the doctrine of *lex specialis derogate lege generali*, a general provision like Decree 28/2002 cannot ordinarily abrogate a specific provision

27

like Ordinance No. 80-073.[13]  However, as Chikuru acknowledged at trial, Decree 28/2002 served a unique purpose:  It set forth the organization and functioning of the new government led by President Joseph Kabila.  *See* Feb. 13, 2014 Tr. at 69 ("[T]he decree 28/2002 is a general regulation concerning the functioning of the government as a whole.").  The Decree, therefore, stands on a different footing, and is more consequential, than the typical general provision of the law that would be insufficient to abrogate a conflicting specific provision.  And the principle of *lex specialis derogate lege generali* is not addressed to this particular circumstance.  In the Court's view, that canon does not convincingly mandate that specific laws passed under a previous government necessarily survive a general law of this nature passed by the new government, where the purpose of the general law was to restructure and create an entirely new legal regime.  Nor did Chikuru point to any authority to the effect that the principle of *lex specialis derogate lege generali* is determinative as applied to a Decree of this nature.  Without some corroboration for his theory, the Court is unpersuaded by Chikuru's claim that this canon carries the day in this unusual circumstance.

The Court is, however, strongly persuaded by plaintiffs' third argument as to why Decree 28/2002 does not apply here:  By its terms, the Decree applies only to actions with budgetary repercussions, and the 2003 Acknowledgment Letter, as Chikuru persuasively testified, *see* Feb. 13, 2014 Tr. at 70–74, did not have such repercussions.  It is important to keep the 2003 letter in context.  In light of the prior debt acknowledgment letters, executed in 1991 and 1997, the 2003 letter was merely the latest in a series of tolling agreements that had been entered into between

---

[13] This canon of construction is familiar in the United States.  *See, e.g.*, *HCSC-Laundry v. United States*, 450 U.S. 1, 6 (1981) ("[I]t is a basic principle of statutory construction that a specific statute . . . controls over a general provision[.]"); *Bulova Watch Co. v. United States*, 365 U.S. 753, 758 (1961) ("[I]t is familiar law that a specific statute controls over a general one without regard to priority of enactment.").

the DRC and its creditors.  The debt owed to these creditors had already been restructured by the Credit Agreement; the Agreement had already been breached by 1990.  The sole purpose of the 2003 Acknowledgment Letter was to allow the DRC's creditors to preserve their legal rights for another six years, and to forestall an imminent lawsuit against the DRC and the Central Bank. The letter thereby permitted (although it did not require) the DRC and the Central Bank to postpone, yet again, the final reckoning on their outstanding debt.  In no sense, then, did the 2003 Acknowledgment Letter have "immediate or future budgetary repercussions."  Properly understood, all that letter did was maintain the status quo.  Both before and after its execution, the DRC and the Central Bank owed, and continued to be legally accountable for, a determinate sum.[14]

  The analysis would perforce have been different had the 2003 Acknowledgment Letter revived time-barred claims.  Execution of the letter would then have made the DRC, all of a sudden, on the hook for tens of millions of dollars in debt.[15]  Such an extraordinary step would

---

[14] The fact that this determinate sum would continue to accrue interest does not change the Court's analysis.  One purpose of interest is to compensate creditors for the loss of the use of their money—in other words, to account for "the time value of money."  *Mosesson v. 288/98 W. End Tenants Corp.*, 743 N.Y.S.2d 269, 270 (1st Dep't 2002).  If the bank creditors here had been paid in 2003, they would have been able to invest those funds, between 2003 and 2009, in interest-bearing accounts.  Accordingly, the amount that was due in 2003 would, in theory, have been the same as the nominally higher amount that was due in 2009, once the latter amount was discounted by the appropriate interest rate.

[15] At the time of the 2012 opinion in *Themis I*, denying pre-discovery summary judgment and directing that the case proceed to discovery, plaintiffs (who succeeded to the rights of the initial creditors) had not discovered the earlier debt acknowledgment letters, from 1991 and 1997.  For this reason, the Court, in that opinion, had described the 2003 letter as having "renewed a financial obligation, now totaling approximately $80 million, against which claims were long barred by the statute of limitations, and evidently for no consideration whatsoever."  *Themis I*, 881 F. Supp. 2d at 529.  As stated above, Themis learned of the 1991 and 1997 letters during discovery, and so notified the Court at a later pretrial conference.  *See* Nov. 26, 2013 Tr. at 47–48.  The discovery of two other debt acknowledgment letters was thus a highly significant development in this case.  Before this discovery, the 2003 Acknowledgment Letter was an

have had a substantial budgetary impact, by making the DRC liable for debt that its creditors would otherwise have had no prospect of collecting. But that was not the case here. As the prior debt acknowledgment letters and the assembled record reflect, the DRC's creditors had taken great care to ensure that their claims under the Credit Agreement never expired; the 1991, 1997, and 2003 debt acknowledgment letters all tolled the statute of limitations for six years and each was signed on a date before the previous six-year extension had run its course. Had Citibank failed in February 2003 to convince the Vice Finance Minister and the Central Bank Governor to sign the 2003 Acknowledgment Letter, then the DRC's creditors could easily have initiated, at that point, a timely lawsuit against the DRC and the Central Bank. Viewed in proper context, the 2003 Acknowledgment Letter is, thus, nothing more than a routine tolling agreement.

For these reasons, the Court holds that the signatories to the 2003 Acknowledgment Letter had actual authority to bind the DRC and the Central Bank. Accordingly, this lawsuit, filed in 2009, was timely.

## 2.      Apparent Authority

In the alternative, Themis argues that the signatories to the 2003 Acknowledgment Letter had the apparent authority to bind the DRC and the Central Bank.

Even where an agent lacks actual authority, it is well settled under New York law that an agent may "bind his principal to a contract if the principal has created the appearance of authority, leading the other contracting party to reasonably believe that actual authority exists." *Highland Capital*, 607 F.3d at 328; *see also Goldston v. Bandwith Tech. Corp.*, 859 N.Y.S.2d

---

extraordinary act against financial self-interest, one which revived a multi-million debt time-barred for over a decade. In light of this discovery, the 2003 Acknowledgment Letter was a routine tolling agreement that did no more than preserve the creditors' rights to sue for another six years.

651, 655 (1st Dep't 2008) ("[A]n agreement entered into within the exercise of a corporate officer's apparent authority is binding on the corporation without regard to the officer's lack of actual authority.").  This Court has previously held, in this case, that "apparent authority can bind foreign governments whose acts are private," including entering into "commercial transactions on apparent behalf of a sovereign state."  *See Themis I*, 881 F. Supp. 2d at 526.  Here, the governmental acts in question—restructuring debts owed to creditors and entering into tolling agreements regarding the dates on which collection actions may be brought—are quintessentially private.  Accordingly, if the Court finds that the signatories—Luongwe and Masangu—had apparent authority to sign the 2003 Acknowledgment Letter, then the DRC and Central Bank are bound to honor that acknowledgment.

Apparent authority authorizes an agent to bind its principal when the "principal, either intentionally or by lack of ordinary care, induces a [third party] to believe that an individual has been authorized to act on its behalf."  *Merrill Lynch*, 2012 WL 1202034, at *6 (citing *Highland Capital*, 607 F.3d at 328); *see also Reiss v. Societe Central du Groupe Des Assurances Nationales*, 235 F.3d 738, 748 (2d Cir. 2000) ("[A]pparent authority depends on some conduct by the principal, communicated to a third party, which reasonably gives the appearance that the agent has authority to conduct a particular transaction.").  In this case, there are thus two requirements to finding apparent authority:  First, Citibank must have reasonably believed, based on the DRC's conduct, that the Finance Minister and Central Bank Governor had authority to sign the 2003 Acknowledgment Letter; Second, Citibank must have, considering the relevant circumstances, fulfilled its duty of inquiry.  *See First Fidelity*, 877 F.2d at 193–94.

The Court evaluates each requirement in turn.

### a.      The DRC's Conduct

To find apparent authority, the DRC and the DRC's Central Bank (the principals) must have made a representation—upon which a third party (Citibank) could reasonably have relied—that certain agents (the Finance Minister and Central Bank Governor) were acting on the principals' behalf.  Whether a party reasonably relied on a representation by the principal turns heavily on the circumstances surrounding both the representation and the reliance, and "requires a factual inquiry into the principal's manifestations to third persons."  *Id.* at 193 (citing *General Overseas Films, Ltd. v. Robin Int'l, Inc.*, 542 F. Supp. 684, 689 (S.D.N.Y. 1982), *aff'd*, 718 F.2d 1085 (2d Cir. 1983)).  This maxim applies equally to representations made by foreign states.  *See id.* ("[A]n ambassador's actions under color of authority do not, as a matter of law, automatically bind the state that he represents.").  Accordingly, in assessing whether a government official's act binds a sovereign on the basis of apparent authority, courts must consider "whether the affected parties reasonably considered the action to be official."  *Id.* (quoting *Restatement (Third) of Foreign Relations* § 712(2) cmt. h).

Here, the document at issue—the 2003 Acknowledgment Letter—was signed by the DRC's Vice Minister of Finance[16] and Governor of the Central Bank.  The Court has already held, *supra* Part II.A.1, that these two officials had actual authority to sign the letter.  But even if they lacked actual authority, it was eminently reasonable for Citibank to *believe*, based on the powers vested in these officials and on the conduct of the principals, that the signatories possessed such authority.  That is so for two independent and mutually reinforcing reasons.

---

[16] As noted in note 7, *supra*, defendants have not challenged the authority of the Vice Finance Minister, Luongwe, to act on behalf of the DRC's Finance Ministry after the Finance Minister, Matungulu, resigned.  Therefore, for purposes of this opinion, the Vice Minister of Finance was the acting-Minister of Finance at the time he signed the 2003 Acknowledgment Letter.

First, the Finance Minister and Central Bank Governor are national-level officials charged with safeguarding the DRC's monetary and fiscal health. These two officials had been vested with the authority to execute the Credit Agreement, *see* Ordinance No. 80-073, and to prevent that agreement from becoming unenforceable, *see* Credit Agreement § 8.01(b). Particularly in light of that authority, it would not have been unreasonable at all for Citibank to conclude that these same two officials had also been given the authority to enter into a tolling agreement that deferred the deadline for filing breach-of-contract lawsuits to collect debts owed under the Credit Agreement, and that served to deter creditors from filing such lawsuits. Indeed, given the role these two officials played in the national government, Citibank was completely reasonable in concluding that these two officials could act on behalf of the DRC and Central Bank in signing the 2003 Acknowledgment Letter.

Second, the Finance Minister and Governor had signed, without incident or objection, debt acknowledgment letters in 1991 and 1997. This would have also led a reasonable party to believe that these same two officials had the authority to sign a substantively identical letter in 2003. As noted, there is no evidence that anyone from DRC or the Central Bank had ever claimed, before this case was filed in 2009, that these officials lacked the authority to sign either the 1991 or 1997 letter. And there is no evidence that anyone from the DRC had ever *disclaimed* the authority of these officials to sign an identical letter in 2003. *See Parlato v. Equitable Life Assur. Soc. of U.S.*, 749 N.Y.S.2d 216, 222–23 (2002) ("[A] third party who . . . previously dealt with the principal through the principal's authorized agent, is entitled to assume that the agent's authority continues until the third party receives notice that the principal has revoked the agent's authority.") (citing *McNeilly v. Cont'l Life Ins. Co.*, 66 N.Y. 23, 28 (1876)); *Seetransport Wiking Trader Schiffarhtsgesellschaft MBH & Co. Kommanditgesellschaft v. Republic of Romania*, 123

F. Supp. 2d 174, 190 (S.D.N.Y. 2000) (in concluding that sovereign officials possessed apparent authority, stating that "defendant's failure to make any representation during the entire course of negotiations that would at all suggest that the Finance Minister did not have such authority, made it entirely reasonable for plaintiff to have relied upon such representations").

Based on the previous course of dealing, the signing in 2003 of a debt acknowledgment letter that served to further toll the expiration of the statute of limitations would have seemed, from Citibank's perspective, entirely routine and uncontroversial.  It was thus reasonable for Citibank to believe that the Finance Minister and Governor maintained the authority, in 2003, to bind the DRC and the Central Bank to an acknowledgment of their debt under the Credit Agreement.

### b.        Duty to Inquire

Defendants argue, however, that even if it was reasonable for Citibank to assume that the two officials who signed debt acknowledgment letters in 1991 and 1997 were also authorized to sign the same letter in 2003, Citibank failed to satisfy its duty to inquire.  *See* Def. Br. at 41–49. Under the apparent authority doctrine, this duty is triggered when "'(1) the facts and circumstances are such as to put the third party on inquiry, (2) the transaction is extraordinary, or (3) the novelty of the transaction alerts the third party to a danger of fraud.'"  *Republic of Benin v. Mezei*, No. 06 Civ. 870 (JGK), 2010 WL 3564270, at *7 (S.D.N.Y. Sept. 9, 2010) (quoting *FDIC v. Providence Coll.*, 115 F.3d 136, 141 (2d Cir. 1997)).  "[T]he duty of inquiry amounts to an alternative way of asking whether the third party reasonably relied on the representations of the agent that he possessed authority to bind the principal."  *C.E. Towers Co. v. Trinidad and Tobago (BWIA Int'l) Airways Corp.*, 903 F. Supp. 515, 525 (S.D.N.Y. 1995) (quoting *Herbert Constr. Co. v. Cont'l Ins. Co.*, 931 F.2d 989, 995–96 (2d Cir. 1991)).

Here, it was unnecessary for Citibank to inquire into whether the Finance Minister and/or Central Bank Governor had the authority to sign the 2003 Acknowledgment Letter.  As the Court has noted, the transaction was not extraordinary—it involved the execution of a tolling agreement, substantively identical to those signed in 1991 and 1997.  And there were no facts or circumstances known to Citibank that put it "on inquiry" or alerted it to the danger of fraud.  To the contrary—all of the circumstances surrounding the 2003 Acknowledgment Letter made the signing of that letter seem utterly routine, and the DRC's claim to lack authority was made only years later, after plaintiffs filed this lawsuit.  Citibank, in fact, sent a draft of the 2003 letter to both the Vice Minister of Finance and the Central Bank Governor, explaining that the draft was similar to the one that had been signed in 1997.  Both officials, in short order, returned the letters signed.  Before the Complaint was filed in this case, there had never been any indication or claim that these officials lacked the authority to sign the letter, or that the letter was in any other way invalid.  *See Herbert Construction Co. v. Continental Ins. Co.*, 931 F.2d 989, 995 (2d Cir. 1991) ("a recovery based on the doctrine of apparent authority does not require that the third party have inquired into the scope of the agent's authority"; only in cases where seemingly actual authority is placed in doubt by a transaction that is "extraordinary" or patently fraudulent does a duty to inquire into the state of that authority arise); *see also Am. Nat. Fire Ins. Co. v. Kenealy*, 72 F.3d 264, 269 (2d Cir. 1995) (same).  Although defendants assert that the duty of inquiry was triggered by the political turmoil present in the DRC in 2003, the same, if not more serious, turmoil beset Zaire in March 1997.[17]  And there was no question in 2003 that the 1997 Acknowledgment Letter had been validly signed and executed.

---

[17] Defendants' own proposed findings of fact, citing the 2011 United States Department of State Report on "The Mobutu Era," summarizes the turmoil in Zaire in late 1996 and early 1997:

Based on these circumstances, Citibank did not have a duty to inquire into the Finance Minister and Central Bank Governor's authority to sign the 2003 Acknowledgment Letter. Because these officials had the apparent authority to bind the DRC and the Central Bank to that letter, this lawsuit, filed in 2009, is timely.[18]

### B.    Damages

Having held defendants liable for breach of contract, the Court turns next to the damages owed to Themis and Des Moines.  As to much of the damages analysis, the parties agree.  They agree that, assuming plaintiffs' claims were timely brought, Themis and Des Moines are each entitled to recover:  (1) the principal that their predecessors in interest loaned to the defendants ($10,022,499.97 for Themis; $7,891,058.35 for Des Moines); and (2) the interest that has accrued on that principal ($15,987,935.67 for Themis; $12,731,419.09 for Des Moines), based on, and as measured under, §§ 3.03, 3.04, and 3.05(a) of the Credit Agreement.  These agreed categories of damages total $46,722,913.08—$26,010,435.64 for Themis and $20,712,477.44 for Des Moines.  *See* Pl. Exs. 91A & 92A.

---

In October 1996, Rwandan troops (RPA) entered Zaire, simultaneously with the formation of an armed coalition led by Laurent-Desire Kabila known as the Alliance des Forces Democratiques pour la Liberation du Congo-Zaire (AFDL). With the goal of forcibly ousting Mobutu, the AFDL, supported by Rwanda and Uganda, began a military campaign toward Kinshasa.  In May 1997, Mobutu was overthrown as the result of the Laurent-Desire Kabila-led forces.

Defendants' Proposed Findings of Fact (Dkt. 170) ¶¶ 102–03.

[18] Plaintiffs also assert that the Council of Ministers ratified the 2003 Acknowledgment Letter. *See* Pl. Br. at 32–40.  However, because the Court holds that (1) the signatories had both actual and apparent authority to sign the 2003 letter; and (2) the approval of the Council of Ministers was not required because Decree 28/2002 did not apply to the 2003 Acknowledgment Letter, the Court has no occasion to reach plaintiffs' separate argument based on ratification.

The parties disagree, however, on a distinct, but monetarily significant, damages issue. That is, whether plaintiffs may recover compound interest under § 3.05(d) of the Credit Agreement.  Plaintiffs seek two forms of compound interest, both of which defendants resist.

First, plaintiffs seek compound interest, under § 3.05(d), on the interest on overdue principal that accrued under § 3.05(a).  Whether plaintiffs are entitled to such interest turns on how § 3.05(a) is construed—in particular, what was required under § 3.05(a) for an interest payment after March 31, 1990 to become "due," triggering, under § 3.05(d), the accrual of compound interest on such interest.  Plaintiffs argue that such interest was automatically "due" at monthly intervals after a defendant's default.  Defendants counter that, under § 3.05(a), a demand by the creditor for such unpaid interest was required for it to become "due."  And it is undisputed that no creditor (including Themis, Des Moines, and their predecessors in interest) ever made such a demand.

Second, plaintiffs seek compound interest on compound interest—*i.e.*, "second-generation" compound interest.  Whether plaintiffs are entitled to such interest turns on whether the compound interest that accrues under § 3.05(d) is subjected to further compounding, also under § 3.05(d).

Recovery of the first form of compound interest would increase plaintiffs' recovery by $22,815,802.43—$12,701,454.63 for Themis and $10,114,347.80 for Des Moines.  *See* Pl. Exs. 91A & 92A.  Recovery of the second form of compound interest would increase plaintiffs' recovery by $18,762,372.27—$10,444,928.28 for Themis and $8,317,443.99 for Des Moines. *Id.*

Addressing the parties' competing claims, the Court first reviews the pertinent facts, including the provisions of the Credit Agreement relating to interest, the parties' course of

dealings with regard to unpaid interest, and the parties' relevant factual stipulations in this

litigation.  The Court then sets out its legal analysis.

> 1.    **Facts**

>> a.    **Relevant Provisions of the Credit Agreement**

A series of provisions in Section 3 of the Credit Agreement govern the calculation of

interest on the debt consolidated in 1980 and due to be repaid by March 31, 1990.  Sections

3.02–04 govern the calculation of "regular" interest—*i.e.*, interest that accrued before any breach

of the Agreement.  Section 3.05, by contrast, governs the calculation of "penalty" interest—*i.e.*,

interest that accrues only upon a breach.  Section 3.05, in turn, consists of two provisions:

§ 3.05(a), which governs interest on overdue principal, which defendants undisputedly owe

given the Court's finding that plaintiffs' lawsuit was timely; and § 3.05(d), which governs

compound interest—*i.e.*, interest on overdue interest.  The present dispute arises under § 3.05(d)

and turns on the construction of § 3.05(a) and § 3.05(d).  However, because the construction of

these provisions is informed by the text of the preceding sections relating to interest, the Court

reviews here all these sections.

As to regular interest:

Section 3.02 governs the calculation of interest between the "Reference Date" (January

31, 1980) and the "Reconciliation Date" (September 2, 1980):

> The Obligor shall pay interest on each Credit from the Reference Date to
> the Reconciliation Date at the interest rates applicable to such Credit . . . such
> interest to be due and payable on the Reconciliation Date and to be payable on the
> Outstanding Principal Amount of such Credit during the period from the Reference
> Date to the Payment Date and on the Refinanced Principal Amount of such Credit
> from the Payment Date to the Reconciliation Date.

Credit Agreement § 3.02(a).

Section 3.03 governs the calculation of interest between the "Reconciliation Date" and the final "Principal Payment Date" (March 31, 1990):

> The Obligor shall pay interest on each Credit from the Reconciliation Date to the final Principal Payment Date . . . such interest to be due and payable on the last day of each Interest Period for interest accrued during such Interest Period.

Credit Agreement § 3.03.

Finally, Section 3.04 defines each "Interest Period" to run consecutively for a period of six months during the period up until March 31, 1990:

> The period from the Reconciliation Date to the final Principal Payment Date shall be divided into successive Interest Periods.  The first Interest Period shall begin on the Reconciliation Date and end on the last day of the Month in which occurs the first anniversary of the date of this Agreement.  Each subsequent Interest Period shall be a period of six Months and shall begin on the last day of the immediately preceding Interest Period.

Credit Agreement § 3.04.

Considering §§ 3.02, 3.03, and 3.04 together, the regular interest for the period between January 31, 1980 and September 2, 1980 thus became "due and payable" on the Reconciliation Date (September 2, 1980), and the interest that accrued during the period between September 2, 1980 and March 31, 1990 became "due and payable" on the last day of each of the six-month "Interest Periods" that comprised that near-decade-long period.

As to penalty interest:

Section 3.05(a) governs "Interest on Overdue Principal," meaning interest on principal that was not timely repaid.  It states:

> In the event that any principal amount of any Credit is not paid when due after the Effective Date, the Obligor shall pay interest on such unpaid principal amount from the date such principal amount is due to the date such principal amount is paid in full, payable on demand, at an interest rate per annum equal at all

times during each Overdue Period to the sum of one percent (1%) plus the Applicable Margin plus the LIBO[19] Rate for such Overdue Period.[20]

Credit Agreement § 3.05(a).  Important as to the instant dispute, § 3.05(a) does not explicitly identify the date when the type of penalty interest for which it provides—*i.e.*, interest on unpaid and overdue principal—itself becomes "due."  It states only that this penalty interest is "payable on demand."

Finally, § 3.05(d) governs compound interest.  It states:

> To the extent permitted by law, the Obligor further agrees to pay interest as provided in subsections (a) and (b) above on all interest *which is not paid when due* hereunder after the Effective Date, such interest is to be payable on demand, to accrue from the *due date* of such interest until payment in full thereof and to be calculated on the basis of successive Overdue Periods of one month.

Credit Agreement § 3.05(d) (emphases added).  The Court refers to the interest addressed by this section ("interest . . . on all interest which is not paid when due") as "compound interest."  This interest begins accruing on the date when interest that is due goes unpaid, and ends only when such interest is paid in full.

### b.    The Parties' Course of Dealing

On several occasions since March 31, 1990, when defendants went into breach, the bank creditors and their servicing bank, the Bank of Tokyo, generated charts and spreadsheets

---

[19] The Credit Agreement uses the terminology "LIBO Rate," rather than the more commonly-recognized "LIBOR."  As discussed *infra*, the parties have stipulated to the proper interest rates used to calculate damages.

[20] The term "Effective Date" refers to the date the Credit Agreement took effect; both sides treat that date as March 31, 1980, the date the agreement was executed.  *See* Stip. ¶ 11.  The term "Overdue Period" is defined in § 3.05(b), which states that "the period between the date the principal amount referred to therein is due and the date such principal amount is paid in full shall be divided into Overdue Periods of one Month[.]"

summarizing the amounts they believed defendants owed.  None reflected the accrual of compound interest.

For example, the 1991 Acknowledgment Letter included a chart that summarized the amounts defendants owed to the bank creditors as of April 2, 1990.  *See* Pl. Ex. 17.  The chart included columns for "past due principal," "regular interest" and "interest on overdue principal." *Id.*  It did not include any columns for compound interest.  Similarly, on April 5, 2004, the Bank of Tokyo provided a "spreadsheet of past due principal and interest as of April 1, 2004," which included amounts for these same categories—"past due principal," "past due regular interest," and "past due interest on overdue principal."  Def. Ex. 18; *see also* Def. Ex. 19 (showing similar chart for past due principal and past due interest on principal as of April 1, 2005).  Again, these spreadsheets did not include any amounts for compound interest.  Finally, at a September 2003 meeting, the creditor banks agreed with the debt figures calculated by the Bank of Tokyo, which, again, did not include compound interest.  *See* Def. Ex. 14.  The notes from that meeting taken by Citibank's Losembe noted that the banks "approved [the Bank of Tokyo's] interest computation methodology, *i.e.*, no interest on interest should be considered in the numbers."  *Id.*

Plaintiffs have not come forward with any evidence that, before this litigation, any creditor ever claimed to defendants that they owed compound interest.

### c.  The Parties' Damages Calculations

On February 14, 2014, after the bench trial, the Court directed the parties to try to reach agreement as to the calculation of damages by category, including compound interest.  Dkt. 204. On February 21, 2014, the parties reported that they had reached such an agreement, Dkt. 208, and provided the Court with exhibits, containing their stipulations as to the amounts of each category of potential damages, *see* Pl. Exs. 91A (Themis) and 92A (Des Moines).

The Court credits these calculations; the amounts awarded below therefore reflect the parties' stipulations.

### 2.    Analysis

Section 3.05(d) of the Credit Agreement authorizes the payment of compound interest if "permitted by law." New York law, which governs the Agreement, makes contract provisions that provide for compound interest enforceable, "notwithstanding the date that such loan or other agreement providing for such compound interest shall have been executed."[21] *See* NYGOL § 5-527(1) (1997).

---

[21] In 1980, when the parties entered into the Credit Agreement, New York law generally disfavored contract provisions that provided for compound interest. *See Debentureholders Protective Comm. of Cont'l Inv. Corp. v. Cont'l Inv. Corp.*, 679 F.2d 264, 271 (1st Cir. 1982) ("For a century the New York Court of Appeals consistently has held that a contractual provision to pay interest on interest is void under the law of New York.") (applying New York law); *Giventer v. Arnow*, 37 N.Y.2d 305 (1975) (provision to pay interest on interest is void); *Matter of Estate of Jackson*, 508 N.Y.S.2d 671, 674 (3d Dep't 1986) ("[A]greements to pay compound interest have not found favor with the courts."). However, in 1989, the New York Legislature enacted New York General Obligations Law ("NYGOL") § 5-527, which made compound interest provisions enforceable. The version of the statute passed in 1989 stated:

> A loan or other agreement providing for compound interest shall be enforceable. For purposes of this subdivision, the term "compound interest" shall mean the accruing of interest upon unpaid interest irrespective of whether such unpaid interest is added to the principal debt.

NYGOL § 5-527(1) (1989). In 1997, responding to a number of decisions declining to give § 5-527 retroactive effect—*see, e.g.*, *In re Chateaugay Corp.*, 170 B.R. 551, 551 (S.D.N.Y. 1994); *Pravin Banker Associates, Ltd. v. Banco Popular del Peru*, 912 F. Supp. 77, 83 (S.D.N.Y. 1996)—the New York Legislature amended that provision to make it explicitly retroactive. The statute now states:

> A loan or other agreement providing for compound interest shall be enforceable notwithstanding the date that such loan or other agreement providing for such compound interest shall have been executed; provided, however, that such compound interest shall begin to accrue and become due and payable on the later to occur of (a) June twenty-fourth, nineteen hundred eighty-nine or (b) the date that any obligation to pay such compound interest may have arisen, including, but not limited to, the date of any default or event of default under such loan or other

The decisive issue under § 3.05(d) as to what (if any) compound interest accrued is when the "Interest on Overdue Principal" covered by § 3.05(a) became "due," and thus when (if ever) compound interest began to accrue under § 3.05(d).  The Court is presented with a choice between the parties' divergent interpretations on this issue, with plaintiffs claiming such interest became due monthly and defendants claiming it became due on demand.  The Court considers these competing constructions in light of familiar principles of contract interpretation.

"The primary objective of a court in interpreting a contract is to give effect to the intent of the parties as revealed by the language of their agreement." *Compagnie Financiere CIC L'Union Europeenne v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 232 F.3d 153, 157 (2d Cir. 2000).  The "words and phrases [in a contract] should be given their plain meaning, and the contract should be construed so as to give full meaning and effect to all of its provisions." *LaSalle Bank Nat. Ass'n v. Nomura Asset Capital Corp.*, 424 F.3d 195, 206 (2d Cir. 2005).  "A written agreement that is clear, complete and subject to only one reasonable interpretation must be enforced according to the plain meaning of the language chosen by the contracting parties." *In re Coudert Bros.*, 487 B.R. 375, 389 (S.D.N.Y. 2013) (citation omitted).

"Where the parties dispute the meaning of particular contract clauses, the task of the court 'is to determine whether such clauses are ambiguous when read in the context of the entire

---

agreement. For purposes of this subdivision, the term "compound interest" shall mean the accruing of interest upon unpaid interest irrespective of whether such unpaid interest is added to the principal debt.

NYGOL § 5-527(1) (1997); *see Elliott Associates, L.P. v. Banco de la Nacion*, 194 F.R.D. 116, 122 (S.D.N.Y. 2000) (the legislature's intent in 1997 was "to make application of the compound interest provision retroactive, and to permit enforcement of the compound interest provision going forward from June 24, 1989 notwithstanding the fact that such provision was not enforceable at the time the parties entered into the agreements").

agreement.'" *Law Debenture Trust Co. of N.Y. v. Maverick Tube Corp.*, 595 F.3d 458, 467 (2d

Cir. 2010) (quoting *Sayers v. Rochester Tel. Corp. Supp. Mgmt. Pension Plan*, 7 F.3d 1091, 1095

(2d Cir. 1993)).  Ambiguity is "defined in terms of whether a reasonably intelligent person

viewing the contract objectively could interpret the language in more than one way." *Topps Co.

v. Cadbury Stani S.A.I.C.*, 526 F.3d 63, 68 (2d Cir. 2008).  "An ambiguity exists where the terms

of the contract 'could suggest more than one meaning when viewed objectively by a reasonably

intelligent person who has examined the context of the entire integrated agreement and who is

cognizant of the customs, practices, usages and terminology as generally understood in the

particular trade or business.'" *Law Debenture Trust*, 595 F.3d at 466 (quoting *Int'l Multifoods

Corp. v. Commercial Union Ins. Co.*, 309 F.3d 76, 83 (2d Cir. 2002)).

 In contrast, "[n]o ambiguity exists where the contract language has 'a definite and precise

meaning, unattended by danger of misconception in the purport of the [contract] itself, and

concerning which there is no reasonable basis for a difference of opinion.'" *Id.* at 467 (second

alteration in original) (quoting *Hunt Ltd. v. Lifschultz Fast Freight*, 889 F.2d 1274, 1277 (2d Cir.

1989)).  "Thus, the court should not find the contract ambiguous where the interpretation urged

by one party would 'strain[ ] the contract language beyond its reasonable and ordinary

meaning.'" *Id.* (quoting *Bethlehem Steel Co. v. Turner Constr. Co.*, 2 N.Y.2d 456, 459 (1957)).

As the Second Circuit has put the point: "[N]o ambiguity exists where the alternative

construction would be unreasonable." *Readco, Inc. v. Marine Midland Bank*, 81 F.3d 295, 299

(2d Cir. 1996); *accord Mycak v. Honeywell, Inc.*, 953 F.2d 798, 802 (2d Cir. 1992) (no

ambiguity exists unless "the contractual language is susceptible of at least two fairly reasonable

meanings" (citation omitted)).

That a text is complex or imperfect does not make it ambiguous.  *See Aramony v. United Way of Am.*, 254 F.3d 403, 411 (2d Cir. 2001) (finding contract unambiguous and noting that "[t]he fact that we remanded to the district court for an initial determination of the meaning of this complex contract in no way implies that we found it ambiguous as a matter of law"); *Carolina First Bank v. Banque Paribas*, No. 99 Civ. 9002 (NRB), 2000 WL 1597845, at *6 (S.D.N.Y. Oct. 26, 2000) (that a contract is not a "portrait of clarity" does not prevent a finding that it is unambiguous where the court finds only one reasonable interpretation).

Where the language of a contract is held ambiguous, the factfinder—in this bench trial, the Court—may properly consider "extrinsic evidence as to the parties' intent."  *JA Apparel Corp. v. Abboud*, 568 F.3d 390, 397 (2d Cir. 2009); *see also Collins v. Harrison–Bode*, 303 F.3d 429, 433–34 (2d Cir. 2002) ("[W]here . . . there are internal inconsistencies in a contract pointing to ambiguity, extrinsic evidence is admissible to determine the parties' intent." (citation omitted)).  "Where there is such extrinsic evidence, the meaning of the ambiguous contract is a question of fact for the factfinder."  *JA Apparel Corp.*, 568 F.3d at 397; *see also U.S. Naval Inst. v. Charter Commc'ns, Inc.*, 875 F.2d 1044, 1048 (2d Cir. 1989) ("In determining the meaning of an ambiguous contract term, the finder of fact seeks to fathom the parties' intent.  That intent may be proven by extrinsic evidence.").  Analysis of extrinsic evidence may entail review of "negotiations . . . made prior to or contemporaneous with the execution of a written contract which may tend to vary or contradict its terms."  *U.S. Fire Ins. Co. v. Gen. Reinsurance Corp.*, 949 F.2d 569, 571 (2d Cir. 1991) (alteration omitted) (quoting *67 Wall St. Co. v. Franklin Nat'l Bank*, 37 N.Y.2d 245, 248–49 (1975)).  The review of the surrounding facts and circumstances may also include consideration of industry custom and practice, and any relevant course of performance or course of dealing.  *See Hoyt v. Andreucci*, 433 F.3d 320, 332 (2d Cir. 2006) (in

45

determining the meaning of ambiguous contractual language, the factfinder "may consider extrinsic evidence such as the parties' course of conduct throughout the life of the contract").

The Court considers, first, plaintiffs' claim that interest on overdue principal should be read to have come "due" at the end of each "Overdue Period."  Unlike the preceding sections relating to "regular" interest, which as noted set explicit due dates for such interest, § 3.05(a) does not do so.  But, as plaintiffs note, § 3.05(a) applies the term "Overdue Period" in the context of explaining how to calculate the amount of interest due on unpaid principal.  The interest rate applicable to such interest is thus set at the sum of 1% plus LIBO for that period, *see* § 3.05(a), with each Overdue Period defined as every month, *see* § 3.05(b).  Plaintiffs argue that because interest on overdue principal was therefore *calculated* monthly, it stands to reason that such interest also became *due* monthly.  Plaintiffs posit that, much as the parties to the Agreement provided for regular interest on principal to become due at the end of each "Interest Period," they intended for interest on overdue principal analogously to come due at the end of each "Overdue Period."

Plaintiffs' construction is imperfect in one obvious respect:  Unlike the Agreement's other interest provisions, it requires the due date for such interest to be discerned by a process of inference; the due date is not textually apparent.  But this critique is equally true of defendants' theory, that overdue interest was due only on demand.  Section 3.05(a) does not say that, either.

Defendants offer another critique of plaintiffs' construction.  That construction, they note, would create an asymmetry with the Agreement's sections on "regular" interest.  Those sections each make regular interest "due and payable" on the same date; by contrast, § 3.05(a) makes interest on overdue principal "payable on demand," a date necessarily different from the monthly "due date" that plaintiffs urge.  But this argument, on close analysis, has limited force.  It is

textually clear that the parties to the Agreement intended interest on overdue principal to be payable on "demand."  The date or dates of such a demand, by definition, are indeterminate *ex ante*.  It is entirely reasonable to infer that the parties to the Agreement did not intend to make the "due date" for overdue interest similarly indeterminate, or to vary with the unpredictable timing of the creditors' demand or demands.  The lack of symmetry between the structure of the regular interest and overdue interest provisions thus does not significantly favor defendants' interpretation.  At least as plausibly, and in the Court's view more plausibly, it may reflect the different nature of "regular" and "penalty" interest, and that the latter, unlike the former, was to be payable, though not due, on demand.  Put differently, the asymmetry in the Agreement between the regular and penalty interest provision is not a function of plaintiffs' construction.  It derives instead from the different types of payable dates (fixed versus on demand) that the Agreement sets out for these different species of interest.

The Court thus regards plaintiffs' construction, although imperfect, as reasonable.  Most important, the monthly due date that plaintiffs urge for overdue interest has a textual anchor in § 3.05(a) itself, which adopts monthly "Overdue Periods."  The fact that "penalty" interest—*i.e.*, interest on overdue principal and compound interest—is made to calculate every month, rather than every six months as with "regular" interest, makes logical sense; with the defendants already having missed the payment deadline, a more frequent tabulation of interest than every six months is eminently logical.  It would be a strange result to have such interest *accrue* monthly, but to make it *due* only upon the creditors' demand.  More sensible is a construction whereby interest on overdue principal is both accruing and due at the end of each "Overdue Period"—*i.e.*, at the end of each month—even though it is only "payable" upon the creditors' demand.

Plaintiffs' construction, in sum, does not "strain[ ] the contract language beyond its reasonable and ordinary meaning." *Law Debenture Trust*, 595 F.3d at 467.

By contrast, defendants' construction requires adding a due date to § 3.05(a) that is not expressed anywhere therein. Defendants would effectively "caret in" to that provision, before the clause "payable on demand," the words "due and." Defendants argue that doing so creates symmetry with the "regular interest" provisions. However, as the Court has noted, there is no reason to assume that the drafters of the Agreement, having made interest on overdue principal payable on demand rather than on a determinate date, intended to achieve such symmetry. Defendants' supposition that the drafters intended and prioritized such symmetry is an *ipse dixit*.

And defendants' construction gives rise to a raft of serious interpretative problems. Unlike plaintiffs' claim that a monthly due date logically follows from the definition of "Overdue Period" to which § 3.05(a) refers, defendants' proposal to insert the words "due and" into § 3.05(a) is an act of editorial addition, not one of construing extant terms: As the Agreement elsewhere reflects, the drafters were quite capable of using the clause "due and payable" rather than just "payable." That they did not do so in § 3.05(a) suggests that they did not intend overdue interest to be due on demand. Moreover, defendants' construction leaves unhelpfully unmoored the date—or dates—later to be used to calculate compound interest on this interest, pursuant to § 3.05(d). In that respect, it is strikingly at odds with the evident care that the drafters took, in § 3.05(a), to put in place a clear and mechanistic formula (LIBO plus 1%, applied at the end of each month) for the calculation of monthly interest on unpaid and overdue principal. Making "on demand" the due date on which compound interest was to run invites post-hoc disputes about: (1) whether a particular communication constituted a demand; (2) to which creditors and/or unpaid principal such a demand related; (3) whether such a demand

48

had to be renewed each month in order to make such interest "due"; and (4) even the exact date of the demand.  That the parties to this case have amicably agreed on such inputs does not mean that such agreement among the DRC and the Central Bank, on the one hand, and their future creditors, on the other, was inevitable.  By including § 3.05(d) in the agreement, the parties indicated their intention to authorize compound interest; it is highly unlikely that they intended the accrual of such interest to turn on the vagaries of whether and when a formal demand for payment was (or was not) made.  It would be far more logical to allow compound interest to start accruing monthly, once the amount of interest on overdue principal for the given "Overdue Period" became fixed and determinate.

Finally, defendants' construction of § 3.05(a) is in tension with § 3.05(d).  Defendants construe § 3.05(a) to require a demand for unpaid interest on principal before such interest could become "due."  Absent a demand, such interest would never be due.  But if this were so, the formulation used in § 3.05(d) to define the point at which compound interest begins to accrue on such unpaid principal—that it is "to accrue from the due date of such interest until payment in full thereof"—is extraordinarily unhelpful and opaque.  To accomplish defendants' reading, § 3.05(d) ought instead to have stated that compound interest is "to accrue from the date there is a demand for interest on unpaid principal."  That § 3.05(d) did not so state, and instead used the term "due date" to define the start of accrual, indicates that its drafters likely believed that the due date was apparent from the preceding provisions of Credit Agreement.  Yet no text in the Agreement makes at all apparent the demand-based due date that defendants imagine.

Further, defendants' construction of these sections would appear to needlessly require multiple demands, at different points in time, for compound interest to ever accrue.  Section 3.05(d) makes compound interest "payable on demand" as well.  On defendants' construction,

that demand necessarily must be separate from an earlier demand for unpaid interest on overdue principal under § 3.05(a).  That is because, were the demands for unpaid interest on overdue principal and for compound interest one and the same, by definition, zero compound interest would have accrued at the moment such compound interest became payable, because such interest only began to accrue under § 3.05(d) upon a demand for interest under § 3.05(a).  To kickstart the accrual of compound interest, a creditor would instead have had to demand, at some earlier point or perhaps at many earlier points keyed to multiple installments of unpaid interests, that each period of unpaid interest be paid.  And the parties would have to record reliably the dates of each demand and the specific tranche of unpaid interest.  There is nothing in either § 3.05(a) or § 3.05(d) that suggests that the drafters of the Credit Agreement attached such signal importance or calculative relevance to the mechanistic act of a demand, or that they envisioned the proliferating demands that are implicit in defendants' construction.  It is thus improbable that the drafters of the Credit Agreement intended to key the accrual of compound interest to an onerous and inefficient system of interlocking demands.  The use in those provisions relating to unpaid interest of the term "payable on demand" instead logically means simply this:  When the debtor owes interest on principal, or compound interest, and has not paid it, and when a demand for such interest is made, the Agreement affords the delinquent debtor no grace period.  Such "penalty" interest is to be paid forthwith, upon the demand.

The Court is therefore presented with a choice between two constructions of § 3.05(a).  Both are imperfect.  Plaintiffs' interpretation—that interest on overdue principal was "due" at the end of each monthly "Overdue Period," and that compound interest accrued from such due dates—is imperfect but reasonable.  Defendants' interpretation—that interest on overdue principal was not "due" until it was demanded—is imperfect and unreasonable.  There are no

other reasonable constructions of § 3.05(a) advanced by the parties or apparent to the Court. Where one construction is reasonable and affords a clear and definite meaning and all others are not reasonable, a contract is not ambiguous.  *See Law Debenture Trust*, 595 F.3d at 467. Because plaintiffs' interpretation of § 3.05(a) is the only reasonable construction, the Credit Agreement is not ambiguous on this point.  Accordingly, the Court holds, with plaintiffs, that interest on overdue principal was due at the end of each monthly "Overdue Period."

The Court having found no ambiguity, there is no charter or occasion to consult extrinsic evidence as to the parties' intentions.  Had the Court done so, however, it would have found this evidence far too spare as to yield a reliable conclusion.  Neither side has provided the Court with any extrinsic evidence—*e.g.*, negotiating history—as to the parties' understandings of the due dates under § 3.05(a).  Nor has either side supplied evidence of pertinent industry custom and practice.

The scant evidence with which the Court has been furnished are several spreadsheets that plaintiffs' predecessors in interest over the years used to chronicle the damages defendants then owed them.  Defendants emphasize that these spreadsheets do not address compound interest; the damages figures reflect only unpaid principal and non-compound interest.  However, without more evidence or context, these spreadsheets cannot be read reliably to bespeak plaintiffs' (let alone both parties') construction of the § 3.05(a) due date.  First, the spreadsheets do not reflect an affirmative decision to calculate the compound interest due as zero—they simply are silent on the point.  The spreadsheets are at least equally consistent with the conclusion that the persons who created them did not consider compound interest at all, or that the creditors decided, at that time, to forego compound interest in the hopes that doing so would make defendants more likely to pay the overdue principal and non-compound interest amounts.  Second, the spreadsheets say

51

nothing about the specific "due date" issue on which the compound interest tabulation turns. Third, the spreadsheets reflect unilateral conclusions by plaintiffs' representatives; defendants not only did not adopt them, they did not pay the amounts reflected on these spreadsheets as due. They are thus a far cry from the sorts of documents reflecting the parties' joint "practical construction" that is sometimes used to give meaning to ambiguous agreement terms.  *See, e.g.*, *Dar El–Bina Eng'g & Contracting Co., Ltd. v. The Republic of Iraq*, 79 F. Supp. 2d 374, 384– 385 (S.D.N.Y. 2000) ("There is a long line of New York case law endorsing the doctrine of practical construction and allowing courts to look to the parties' practical interpretations of a contract, as demonstrated by their conduct, in determining their intentions with regard to ambiguous contractual language."); *CT Chemicals (U.S.A.), Inc. v. Vinmar Impex, Inc.*, 81 N.Y.2d 174, 179 (1993) ("Where a contract involves repeated occasions for performance and opportunity for objection any course of performance accepted or acquiesced in without objection shall be relevant to determine the meaning of the agreement." (citation omitted)).

For the foregoing reasons, the Court holds that the interest on overdue principal, under § 3.05(a), became due monthly, at the end of each "Overdue Period."  Compound interest on the interest on overdue principal therefore accrued, under § 3.05(d), from those dates.[22] Accordingly, plaintiffs' request for the first category of compound interest is granted.

However, plaintiffs' request for the second category of compound interest—*i.e.*, compound interest on the compound interest—lacks a textual basis.  It is therefore denied.

---

[22] Plaintiffs, in their pre-trial brief, also cite two cases from this District in support of their claim for compound interest.  *See* Pl. Br. 59–61 (citing *Elliott Assocs.*, 194 F.R.D. at 121 and *Van Eck Emerging Markets Opportunity Fund, L.P. v. the Republic of Nicaragua*, No. 00 Civ. 5756 (WHP) (S.D.N.Y.), Dkt. 18 (April 13, 2001)).  Because it is not clear that the issue of compound interest was ever raised or fully litigated in either case, and because the Court has independently interpreted the Credit Agreement here to authorize the monthly accrual of compound interest, the Court did not rely on either case.

While plaintiffs devoted virtually no attention to this issue in their pre-trial briefing or at trial, the Court's understanding of their position is that compound interest under § 3.05(d) also became due at the end of each "Overdue Period," and that § 3.05(d) could therefore be invoked a *second* time to provide for the accrual of "*second-generation*" compound interest on all past-due compound interest.  Put differently, plaintiffs interpret § 3.05(d) to have created a self-referential feedback loop with no logical end point.  Although § 3.05(d) envisions the accrual of compound interest on "all interest which is not paid when due," the term "all interest" cannot reasonably— as plaintiffs appear to urge—be read to include the compound interest accruing under that same section; otherwise, each generation of compound interest could logically be compounded again and again, *ad infinitum*.  Plaintiffs here have strategically chosen to limit their request to just one additional round of compound interest beyond the interest on unpaid interest on overdue principal that § 3.05(d) envisions.  But plaintiffs' interpretation of § 3.05(d) does not logically require such forbearance.  Absent a clear statement, it is highly unlikely that the drafters of the Credit Agreement intended to provide creditors with such an open-ended ability to compound past-due compound interest.  *See Law Debenture Trust*, 595 F.3d at 467.  And there is no textual basis outside of § 3.05(d) to permit such a continuous loop.  Had the parties to the Agreement intended to provide for second, third, or tenth-generation compound interest, they could have included separate sections explicitly saying so.  *See Rourke v. Fred H. Thomas Associates*, 627 N.Y.S.2d 831, 832 (3d Dep't 1995) ("It is established law that in the absence of an express agreement for either compound interest or interest on interest, or statutory authority, such interest is not recoverable." (citation omitted)).  Because § 3.05(d) cannot be read to provide for compounding of compound interest, plaintiffs' request for "second-generation" compound interest is denied.

Based on the calculations stipulated by the parties and summarized above, damages are therefore awarded as follows:

1. As to Themis, $10,022,499.97 in principal, $15,987,935.67 in interest, and $12,701,454.63 in compound interest on interest on overdue principal, for a total of $38,711,890.27.

2. As to Des Moines, $7,981,058.35 in principal, $12,731,419.09 in interest, and $10,114,347.80 in compound interest on interest on overdue principal, for a total of $30,826,825.24.

*See* Pl. Exs. 91A & 92A.  Accordingly, plaintiffs are awarded total damages of $69,538,715.51.[23]

### C.      Liability of the Central Bank

The final disputed issue is whether, as plaintiffs assert, the Central Bank is jointly liable with the DRC, and therefore jointly and severally liable for these damages, or whether, as defendants contend, only the DRC may be held liable.

Plaintiffs argue that both defendants are liable because the Credit Agreement was signed by the Bank of Zaire (the Central Bank's predecessor in interest) and, under the Agreement, the "Central Bank agreed to pay the debt owed by the DRC . . . subject only to the availability of foreign currency sufficient to cover such payments."  Pl. Br. at 48.  For that assertion, plaintiffs rely on two provisions of the Agreement—§ 9.01 and § 8.03—that govern the Bank of Zaire.

Section 9.01 provides:

The Bank of Zaire irrevocably and unconditionally states and agrees for the benefit of each Bank that:

(a) All payments of principal, interest and other amounts required under this Agreement are irrevocably authorized by all action required in the Republic of Zaire so that such payments can be made in the currency and manner and at the time required by the terms of this Agreement.  The Bank of Zaire will maintain

---

[23] Second-generation compound interest, which the Court has held is not authorized by the Credit Agreement, would have added $10,444,928.28 to Themis's damages award and $8,317,443.99 to Des Moines's.

in full force and effect all authorizations necessary to make all such payments as so required.

(b) The Bank of Zaire will use its best efforts to ensure that the Obligor and the Bank of Zaire will maintain sufficient Dollars or other Foreign Currency so that all such payments will be made as so required.

(c) Subject to the availability to the Bank of Zaire of Dollars or other Foreign Currency and pursuant to the instructions of the Obligor contained in Section 8.03, the Bank of Zaire *will either (i) make available to the Obligor sufficient Dollars or other Foreign Currency to enable the Obligor to make each such payment as so required or (ii) on behalf of the Obligor make each payment as so required.*

Credit Agreement § 9.01 (emphasis added).  As stated above, the Obligor is defined as Zaire, and later, the DRC.

Section 8.03, in turn, provides:

The Obligor hereby irrevocably and unconditionally instructs the Bank of Zaire, for the benefit of each Bank, *to make all payments* required by this Agreement as contemplated by clause (ii) of Section 9.01(c).

Credit Agreement § 8.03 (emphasis added).

These provisions on their face made the Central Bank of the DRC legally responsible for paying plaintiffs the principal and interest owed them.  The second clause of § 9.01 committed the Central Bank "on behalf of the Obligor [the DRC] [to] make each payment as so required." And § 8.03 contains an irrevocable instruction from the DRC to the Central Bank "to make all payments required by this Agreement as contemplated by [the second clause]."

The Central Bank nevertheless argues that it lacked an independent duty to pay plaintiffs under the Agreement.  It construes these two sections as merely giving it alternative ways to make currency available to the DRC.  But that interpretation is unconvincing.  To be sure, § 9.01(c) gave the Central Bank two alternative means of ensuring that payments were made to creditors under the Agreement:  To make sufficient dollars or foreign currency available to the

DRC, or, on behalf of the DRC, to make each payment directly.  But, importantly, this choice was limited, under the Agreement, by two conditions:  The choice (1) is "[s]ubject to the availability to the Bank of Zaire of Dollars or other Foreign Currency"; and (2) must be made "pursuant to the instructions of the Obligor contained in Section 8.03."  And again, § 8.03 contains a mandatory instruction to the Central Bank:  the Obligor "irrevocably and unconditionally *instructs* the Bank of Zaire, for the benefit of each Bank, *to make all payments required* by this Agreement as contemplated by clause (ii) of Section 9.01(c)."  Credit Agreement § 8.03 (emphases added).

The Central Bank asserts such an interpretation of the Credit Agreement would render § 9.01(c)(i) superfluous, in violation of New York principles of contract construction.  *See* Def. Br. at 51; *Mionis v. Bank Julius Baer & Co., Ltd.*, 301 A.D.2d 104, 109 (1st Dep't 2002) ("Courts are obliged to interpret a contract so as to give meaning to all of its terms.").  The Court disagrees.  Section 9.01(c)(i) directs the Central Bank to make available to the DRC sufficient dollars or foreign currencies to enable the DRC to make the required payments.  If the DRC had used the currency provided by the Central Bank under § 9.01(c)(i) to pay the creditor banks, then the creditors would not have had to invoke § 8.03, which, after all, only obliges the Central Bank to make the required payments "for the benefit of each Bank"—*i.e.*, for the benefit of the creditors.  Therefore, both parts of § 9.01(c) have a purpose; part (i) applies in cases where the DRC is paying its obligations under the Credit Agreement and part (ii) applies in cases where the DRC has breached, in which case § 8.03 instructs the Central Bank to make all required payments.  It follows that, if the DRC breached the Credit Agreement, so long as the Central

Bank of the DRC had dollars or other foreign currency available, it was required, under § 8.03, to make all payments required by the Credit Agreement.[24]

It is undisputed that the Central Bank (like the DRC) has not made any payments under the Credit Agreement since 1990. Plaintiffs have also submitted uncontroverted evidence—in the form of the Central Bank's annual reports—that, since at least 2002, the Central Bank has continuously held foreign currency reserves exceeding the amount of plaintiffs' claims. *See* Pl. Ex. 114 (summarizing reserve levels reported in the Central Bank Annual Reports from 2002 to 2012). As of December 31, 2012, the Central Bank's foreign currency reserves exceeded $1.1 billion, far more than the approximately $69.5 million in damages the Court has ordered. Because the Central Bank had available sufficient dollars or other foreign currency to make the payments required by the Credit Agreement but did not make those payments, the Central Bank was in breach of its duties to the creditors under the Credit Agreement. As such, the DRC and the Central Bank are jointly and severally liable for the damages due to Themis and Des Moines.

## CONCLUSION

For the foregoing reasons, the Court holds that the Finance Minister and Central Bank Governor had actual and apparent authority to sign debt acknowledgment letters in 1991, 1997, and 2003. Accordingly, plaintiffs' attempt to collect on this long-owed debt is not barred by New York's six-year statute of limitations. Judgment is therefore entered in favor of Themis and Des Moines, against both the DRC and the Central Bank.

As to damages, the Court holds that plaintiffs are entitled to recover the outstanding principal and interest charges on their debt, and also to recover the first form of compound

---

[24] Further evidence of the parties' intent to allow creditors to sue the Central Bank to recover outstanding debt under the Credit Agreement is that, in Section 12.07, the Central Bank waived its claim to sovereign immunity and consented to be sued in this Court.

interest requested by plaintiffs.  Accordingly, Themis is entitled to damages of $38,711,890.27, and Des Moines is entitled to $30,826,825.24.  Plaintiffs may recover these damages, jointly and severally, from the two defendants.

The Court directs counsel for Themis and DRC to identify what, if any, open issues remain to be addressed in this litigation, and to submit a joint letter identifying any such issues by July 18, 2014.  The Court has not addressed plaintiffs' application for reimbursement of attorneys' fees under Credit Agreement § 12.05(a)(iv).  Neither side thoroughly briefed this issue in their pre-trial briefs, and this issue was not addressed or argued at trial.  The Court therefore has reserved judgment on that issue.  However, if plaintiffs still intend to seek attorneys' fees, and if defendants still intend to oppose that application, the parties are directed to propose, in their joint letter, an expedited briefing schedule as to that issue.  In the event that there remain no open issues, the parties are directed to submit, by July 18, 2014, a judgment for the Court's approval (by e-mail in Microsoft Word format), which will include the amount in damages consistent with this Opinion & Order, as well as an amount, if agreed to by the parties, to cover plaintiffs' reasonable attorneys' fees.

SO ORDERED.

*Paul A. Engelmayer*

Paul A. Engelmayer
United States District Judge

Dated: July 9, 2014
       New York, New York