UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------X
                                  :

THEMIS CAPITAL and DES MOINES       :
INVESTMENTS LTD.,                        :

                                  :         09 Civ. 1652 (PAE)

                       Plaintiffs,     :

              -v-                 :       OPINION & ORDER

                                  :

DEMOCRATIC REPUBLIC OF CONGO and  :
CENTRAL BANK OF THE DEMOCRATIC   :
REPUBLIC OF CONGO,                 :

                                  :

                     Defendants.     :

------------------------------------------------------------------------X

PAUL A. ENGELMAYER, District Judge:

On July 9, 2014, the Court entered judgment in favor of Themis Capital, LLC ("Themis")

and Des Moines Investments, Ltd. ("Des Moines") (collectively, "plaintiffs" or "Themis") in

their breach-of-contract lawsuit against the Democratic Republic of the Congo (the "DRC") and

the Central Bank of the Democratic Republic of the Congo ("Central Bank of the DRC")

(collectively, "defendants"). Dkt. 213; *Themis Capital, LLC v. Democratic Republic of Congo*,

No. 09 Civ. 1652 (PAE), 2014 WL 3360709 (S.D.N.Y. July 9, 2014) ("July 9, 2014 Opinion").

The Court held that plaintiffs were entitled to recover the principal, interest, and compound

interest on debt that had been restructured—pursuant to a Restructuring Credit Agreement

("Credit Agreement")—in 1980, and which had gone unpaid since 1990.

The Court, however, reserved judgment on plaintiffs' application for the reimbursement

of attorneys' fees and costs. The Court directed the parties to brief those issues. On August 8,

2014, plaintiffs submitted a motion for such fees and costs, Dkt. 218, an accompanying

memorandum of law, Dkt. 219 ("Themis Br."), and a declaration in support, Dkt. 220

("Hranitzky Decl.").  On August 15, 2014, defendants filed a memorandum of law in opposition.

Dkt. 223 ("DRC Br.").

For the reasons that follow, the Court approves an award to plaintiffs from defendant

DRC, representing attorneys' fees and costs.  However, as described in this decision, the Court

has reduced the size of, and excluded discrete items from, plaintiffs' application.  The Court also

holds that the award of fees and costs runs solely against the DRC, and not against co-defendant

the Central Bank of the DRC.

## I.      Defendant Responsible for Paying Fees and Costs

At the outset, defendants seek a ruling that plaintiffs may recover an award for attorneys'

fees and costs solely from the DRC—and not the Central Bank of the DRC.  The basis for this

argument is that under the Credit Agreement, only the "Obligor" is responsible for paying such

fees and costs, and the DRC alone is defined as the "Obligor."

The Court agrees with defendants.  The relevant provision of the Credit Agreement states

that:

> *The Obligor* agrees to pay, in the currency in which incurred:
>
> . . .
>
> (iv) to each Bank and Agent upon its demand all out-of-pocket expenses (including, without limitation, all counsel fees and court costs, stamp taxes, duties and fees) incurred in connection with investigating any Event of Default or enforcing this Agreement or suing for or collecting any overdue amount payable by the Obligor hereunder or otherwise protecting its rights in the event of any failure by the Obligor or Bank of Zaire to comply with the provisions [of the Credit Agreement.]

Credit Agreement § 12.05(a) (emphasis added).  The Credit Agreement defines the Republic of

Zaire as the "Obligor," *see* Credit Agreement at R-1; it is undisputed that the DRC is the

successor-in-interest to the Republic of Zaire.  Accordingly, any award for attorneys' fees and

costs is binding solely on the DRC, not the Central Bank of the DRC.

This ruling is consistent with the Court's July 9, 2014 Opinion, which held, *inter alia*, that the DRC and the Central Bank of the DRC are jointly and severally liable for all damages awarded to plaintiffs.  *See* 2014 WL 3360709, at *30–31.  The basis of that ruling was that two provisions in the Credit Agreement—§ 9.01 and § 8.03—expressly make "the Central Bank of the DRC legally responsible for paying plaintiffs the principal and interest owed them."  *Id.* at *30.  By contrast, here, no provision in the Credit Agreement analogously obliges the Central Bank of the DRC to pay the fees and costs that plaintiffs incurred in enforcing the agreement.  Accordingly, plaintiffs may recover the award for attorneys' fees and costs only from the DRC, and not from the Central Bank of the DRC.

## II.     Assessment of Plaintiffs' Fee Application

In their application for fees and costs, plaintiffs request a total of $4,197,131.54, broken down as follows:

- $3,793,121.35 in fees for attorneys and support staff;

- $273,371.63 in costs for expert witnesses, translators, and interpreters; and

- $130,638.56 in other litigation costs.

Defendants object to plaintiffs' request on three grounds:  that (1) certain categories of fees should be excluded from the fee award ("category objections"); (2) the amount requested in attorneys' and support staff fees is unreasonable ("fee reasonableness objections"); and (3) the amount requested for experts and other litigation costs is unreasonable ("cost reasonableness objections").  The Court addresses each objection in turn.

A.     **Category Objections**

1.     **Work Between October 3 and November 12, 2013**

Defendants first argue that fees should not be granted for the "entire period between October 3 and November 12, 2013." DRC Br. at 3. As defendants note, the original deadline set by the Court for the parties' joint pretrial order ("JPTO") was October 22, 2013. Dkt. 159. On October 3, 2013, plaintiffs' counsel, Dechert LLP ("Dechert"), informed counsel for defendants, DLA Piper LLP ("DLA Piper"), that plaintiffs agreed to waive the issue of actual authority and to submit the case on the papers without a live trial. The parties then worked together on the JPTO based on this shared understanding. On October 22, 2013, however, Dechert informed DLA Piper that plaintiffs had changed course, that plaintiffs would no longer waive the actual authority argument, and that a live trial was therefore necessary on that point. The same day, the Court held a telephone conference with the parties to address this issue. The Court permitted plaintiffs to pursue the claim of actual authority and granted plaintiffs' request for an extension of time, until November 12, 2013, to submit the JPTO. Dkt. 162. However, in recognition that plaintiffs' change of course had potentially inconvenienced defense counsel, the Court directed plaintiffs to "reimburse defendants for reasonable out-of-pocket costs (not fees), which defendants and defendants' counsel expended due to their reliance on plaintiffs' statement, on October 3, 2013, but now repudiated, that it was waiving the issue of actual authority." *Id.*

Based on this sequence of events, defendants argue that, because plaintiffs' change of strategy was responsible for the extra work that each side did preparing the JPTO, plaintiffs ought not be reimbursed for the fees or costs that plaintiffs incurred between October 3 and November 12, 2013. This, defendants represent, would reduce plaintiffs' reimbursable fees by $450,326.50. DRC Br. at 3.

The Court agrees with defendants that plaintiffs' fee application should be reduced to reflect this circumstance, but does not agree as to the scope of the proposed remedy. Plaintiffs ought not be reimbursed for any fees or costs incurred during the period when the parties were working under the assumption that actual authority had been waived and would not be an issue in the case—*i.e.*, the period beginning on October 3, 2013 and extending up to and including October 22, 2013. In the interest of clarity, the Court categorically excludes all fees and costs incurred by plaintiffs' counsel during this period, even though some work during this period assuredly related to projects or issues unaffected by plaintiffs' change of position as to actual authority, and even though some of plaintiffs' counsel's work on October 22, 2013 likely post-dated counsels' call with the Court, in which the Court authorized plaintiffs to litigate the issue of actual authority. This order applies to the fees and costs both of Dechert, plaintiffs' lead counsel, and Miller & Wrubel P.C. ("Miller & Wrubel"), which also represented plaintiffs. However, there is no charter for excluding, from the sum to be reimbursed, fees and costs incurred *after* October 22, 2013, by which point plaintiffs' position as to actual authority had come to rest. The DRC properly is responsible for reimbursing plaintiffs for fees and costs incurred after October 22, 2013.

As discussed below, the Court is not equipped itself to tabulate the sum of fees and costs incurred by plaintiffs between October 2 and October 22, 2013. The Court will therefore leave it to the parties to tabulate that figure.

## 2.      "Second Generation" Compound Interest

Defendants next argue that plaintiffs are not entitled to fees related to their claim for "second generation" compound interest. DRC Br. at 3. Defendants argue that plaintiffs are entitled to fees and costs only to the extent they were the "prevailing party" in this litigation.

Because plaintiffs did not prevail on their claim for "second generation" compound interest, *see* July 9, 2014 Opinion, 2014 WL 3360709, at *1 ("plaintiffs are not entitled to recover any compound interest on such compound interest"), defendants argue that plaintiffs may not recover fees or costs incurred in pursuit of that claim.

The Court rejects this argument, for a number of independent reasons. First, defendants, relying on *Green v. Torres*, 361 F.3d 96 (2d Cir. 2004), wrongly depict it as a hard and fast rule that reimbursement may not be had for fees and costs associated with a failed claim. *Green* states only that a district court "*may* exclude any hours spent on severable unsuccessful claims." 361 F.3d at 98 (emphasis added). It does not require a district court to do so. *See Rozell v. Ross-Holst*, 576 F. Supp. 2d 527, 538 (S.D.N.Y. 2008) ("Reasonable paying clients may reject bills for time spent on entirely fruitless strategies while at the same time paying their lawyers for advancing plausible though ultimately unsuccessful arguments."). Moreover, *Green* arose in the context of awarding fees to a successful plaintiff in a case brought under 42 U.S.C. § 1983, under which the payment of fees is, by statute, expressly limited to the "prevailing party." *See* 42 U.S.C. § 1988(b) ("[T]he court, in its discretion, may allow the prevailing party . . . a reasonable attorney's fee."). But the Credit Agreement here is not cast in those terms, but in broader ones: It commits the Obligor to pay "without limitation, all counsel fees and [costs] . . . incurred in connection with investigating any Event of Default or enforcing this Agreement or suing for or collecting any overdue amount payable by the Obligor hereunder or otherwise protecting its rights in the event of any failure by the Obligor or Bank of Zaire to comply with the provisions [of the Credit Agreement.]"

In any event, on the facts of this litigation, plaintiffs' claim for compound interest does not afford a basis for reducing the fees and costs for which plaintiffs are to be reimbursed.

Plaintiffs clearly prevailed not only in their effort to enforce the Credit Agreement so as to recoup the principal amount of their loans to the DRC, but also in their effort to receive interest on that principal sum, and indeed also compound interest on interest on principal.   The only recovery which plaintiffs sought but failed to receive was for "second generation" compound interest.  This aspect of the case, however, was a far cry from the "central relief sought."  Indeed, it was not briefed with any distinctness:  The briefs for both sides barely referenced the issue of "second generation" compound interest, treating it instead as bound up in plaintiffs' broader bid for compound interest (which defendants resisted, but on which, as noted, plaintiffs largely prevailed).  Instead, the line drawn between first- and second-generation compound interest was drawn largely by the Court itself, based on its independent analysis of the Credit Agreement.

        For these reasons, the Court declines to reduce the award of fees and costs to reflect plaintiffs' unsuccessful attempt to obtain second-generation interest.

### 3.        Plaintiff's July 24, 2013 Letter

        Finally, defendants seek to strike the fees and costs associated with Dechert's drafting of a July 24, 2013 letter to the Court regarding plaintiffs' "subsequently aborted request for summary judgment."  DRC Br. at 5.  In that letter, plaintiffs asked the Court, with expert discovery having concluded, for leave to permit them to renew their motion for summary judgment.  Dkt. 156.  At a conference with the parties on August 1, 2013, however, the Court concluded, and plaintiffs appeared to come to agree, that it would be more time- and cost-effective to resolve the issues of actual and apparent authority at a bench trial.

        The Court declines to penalize plaintiffs for proposing to attempt to resolve this case at summary judgment, even if the Court eventually decided that a bench trial was the better and more efficient course.  *See Rozell*, 576 F. Supp. 2d at 538.  Plaintiffs' advocacy of summary

judgment was legitimate and indeed helped focus the Court on the pros and cons of the case-management options available to it.  There is no basis to suggest that plaintiffs' proposal to move for summary judgment was the product of bad faith or dilatory conduct.  Defendants' application to reduce plaintiffs' fee award on that ground is, therefore, denied.

### B.        Fee Reasonableness Objections

Next, defendants assert that the amount that plaintiffs seek in fees for attorneys and paralegals is unreasonable.[1]  Defendants argue that both the number of hours, and the hourly rates at which plaintiffs seek to be compensated, are unreasonable.

"Under New York law, 'when a contract provides that in the event of litigation the losing party will pay the attorneys' fees of the prevailing party, the court will order the losing party to pay whatever amounts have been expended by the prevailing party, so long as those amounts are not unreasonable.'"  *Antidote Int'l Films, Inc. v. Bloomsbury Pub., PLC*, 496 F. Supp. 2d 362, 364 (S.D.N.Y. 2007) (quoting *F.H. Krear & Co. v. Nineteen Named Trustees*, 810 F.2d 1250, 1263 (2d Cir. 1987)).  "A variety of factors informs the court's determination of whether a requested amount of attorneys' fees is reasonable or unreasonable, including the difficulty of the questions involved; the skill required to handle the problem; the time and labor required; the lawyer's experience, ability and reputation; the customary fee charged by the Bar for similar services; and the amount involved."  *Id.* (citation omitted).  District courts have broad discretion to determine both the reasonable number of compensable hours and the reasonable hourly rate. *See Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983).  Plaintiffs are to be compensated only for

---

[1] Defendants depict plaintiffs as claiming that they are entitled to attorneys' fees and costs "without limitation," as opposed to only "reasonable" attorneys' fees.  DRC Br. at 5–6. Plaintiffs, however, plainly state that they are entitled only to *reasonable* fees and costs, and their brief is substantially devoted to arguing why their requests are in fact reasonable.  *See* Themis Br. at 5–21.

"hours reasonably expended on the litigation," and not for hours "that are excessive, redundant, or otherwise unnecessary." *Id.* at 433–34.

Here, plaintiffs' request—prior to the exclusion the Court has made for the October 3–22, 2013 period—is for $3,729,973.82 in attorneys' fees ($3,590,185.07 billed by Dechert and $139,788.75 billed by Miller & Wrubel) and $314,319 in fees for legal assistants, office support, and office administrative staff ($307,736.72 billed by Dechert and $6,582.28 billed by Miller & Wrubel).[2]  Hranitzky Decl. Ex. D.  The total request for fees paid to Dechert and Miller & Wrubel, therefore, equals $4,044,292.82.  Defendants propose that these fees be reduced, across-the-board, by (1) one-third to account for unreasonable hours, and (2) 20% to account for unreasonable rates.

The Court has closely, and at length, examined plaintiffs' counsels' billing records, particularly those of Dechert, which did the vast majority of work on plaintiffs' behalf.  The Court does not believe there is a basis for the sizeable across-the-board adjustments that defendants pursue.  However, there is a basis for more targeted reductions to the proposed fee award, as detailed below.

### 1.      Number of Hours Billed for Attorneys

First, some reduction is merited in light of the sheer number of attorney timekeepers who billed time on the case.  A total of 48 attorneys from Dechert billed time on this case.  This consisted of 10 partners, one counsel, one senior attorney, 32 associates, two law clerks, one staff attorney, and one summer associate.  *See* Hranitzky Decl. Ex. D.   The Court does not fault

---

[2] For attorneys' fees, plaintiffs seek reimbursement for persons with the following job titles: Partner, Counsel, Senior Attorney, Associate, Law Clerk, Staff Attorney, and Summer Associate. *See* Hranitzky Decl. Ex. D.

plaintiffs for such staffing.  The case lasted for five years, during which time some turnover of personnel, particularly at junior levels, was inevitable.  It also called upon a variety of litigation skill-sets.  Inevitably, however, with that many attorneys, some inefficiency creeps in, as new entrants to the case are required to get up to speed, and to learn relevant facts, law, and strategy.

To address these problems, plaintiffs have proposed to "voluntarily exclude[] the majority of hours worked by various Dechert employees who spent less than ten hours working on this matter, or who billed less than $2,000 to it."[3]  Themis Br. at 22.  However, plaintiffs' formulation—in which they state that they have excluded "the majority of hours worked" by such attorneys—leaves unclear to the Court which specific employees, and which specific hours, have been excluded.

In the Court's judgment, two separate, more substantial excisions are warranted to take account of these inefficiencies and to address the DRC's legitimate concern about overstaffing.  First, the Court will exclude *all* time entries by *all* attorneys who billed less than 25 hours total to the case.  By the Court's calculation, this would remove 34 Dechert attorneys from the bill—nine partners, one senior attorney, 22 associates, one law clerk, and one summer associate.  *See* Hranitzky Decl. Ex. D.  Plaintiffs would then be reimbursed for the hours billed by 14 Dechert

---

[3] Plaintiffs claim that these exclusions result in a "reduction of $251,171.47 from the fees sought by Plaintiffs."  *Id.*  For this reason, plaintiffs state, the amount of their request for attorneys' fees is $3,793,121.35, not $4,044,292.82.  The Court's review of the Hranitzky Decl. Ex. D, however, does not substantiate this math.  Even eliminating all hours worked by Dechert attorneys who billed 10 hours or fewer to the case reduces the overall request by only $44,573.40.  It appears to the Court that the $251,171.47 reduction plaintiffs contemplate is substantially comprised of time excluded for other reasons.

attorneys—one partner, one counsel, 10 associates, one law clerk, and one staff attorney. This adjustment would, by the Court's calculation, reduce plaintiffs' fee award by $102,217.77.[4]

Second, the Court will reduce by 10%, across the board, the hours for the remaining Dechert attorney timekeepers. This reduction achieves two purposes. First, it reflects the staffing inefficiencies addressed above. Second, although by and large Dechert's time entries were admirably clear and sufficiently detailed, this adjustment takes account of occasional (but far from widespread) instances of block billing, or vague time entries, that the Court has noted in the course of reviewing Dechert's time entries.

In addition, with respect to two Dechert attorney timekeepers, the Court is reducing the hours worked by 20%, rather than by 10%. These are the attorneys who billed 1,314.30 hours and 806.50 hours, respectively, to the case. The Court has no reason whatsoever to doubt that these attorneys worked these hours, and that they did so diligently, productively, and with complete professionalism. However, defendants are correct that these two attorneys, as a formal matter, have engaged in fairly frequent "block billing," which the Court defines as grouping multiple tasks into a single billing entry, so as to leave unclear how much time was devoted to each constituent task. On many occasions, these two attorneys compressed more than five hours of work on multiple tasks into a single time entry, without specifying the time spent on each task. For instance: (1) 10.5 hours to "prepare for and attend deposition of professor Songa, follow up re waiver issues, communications with plaintiffs' counsel, prepare outline for central bank dep, review documents produced" (Oct. 22, 2012); (2) 9.0 hours for "tel con with H Tether to discuss

---

[4] This steps also eliminates the 12 hours billed by a summer associate for which plaintiffs seek to recover from the DRC. In the Court's experience, clients often will not pay for the work of summer associates. The Court's judgment, apart from the fact that the hours worked by this summer associate were below the 25-hour cutoff that the Court has set, is that the DRC ought not be required to pay for them either.

response to Butler report, draft outline of H Tether report to send to the expert, review DRC law expert report and discuss same with the experts, follow up re travel logistics and dep arrangements for DRC law experts, meet with [colleagues] to review the task list" (Aug 2, 2013); (3) 9.3 hours for "finalize pretrial filings, numerous communications with defense counsel, review and suggest revisions to summary exhibit, arrange for copying of exhibits, review draft letter to the court, review Red Barn calculations, review dep designations" (Oct. 21, 2013); (4) 8.2 hours for "team meeting in New York for discovery plan, drafting letter to the court, exchanging emails regarding discovery" (Aug. 7, 2012); (5) 7.1 hours for "research case law in response to motion to amend answer, research proof of assignment case law, review letter to court" (March 4, 2013); and (6) 9.1 hours for "drafting and editing pretrial filings, findings of fact, conclusions of law, deposition designations" (Oct. 16, 2013).

By the standards used in this District in fee-shifting cases, these entries are impermissibly broad. To be sure, there is no *per se* rule against block billing, *see Rodriguez v. McLoughlin*, 84 F. Supp. 2d 417, 425 (S.D.N.Y. 1999), but to justify imposing an award of attorney's fees on an opposing party, counsel must provide enough information for the Court, and the adversary, to assess the reasonableness of the hours worked on each discrete project. The block billing at issue here effectively prevented the Court, and the DRC, from independently assessing whether the time spent on each task was reasonable. Accordingly, the Court decreases the total number of compensable hours for these two attorneys by 20%. *See Kirsch v. Fleet Street, Ltd.*, 148 F.3d 149, 173 (2d Cir. 1998) (upholding 20% reduction in fee award because of "vagueness, inconsistencies, and other deficiencies in the billing records," including block billing); *Abeyta v. City of New York*, No. 12 Civ. 5623 (KBF), 2014 WL 929838, at *5 (S.D.N.Y. Mar. 7, 2014) ("[G]iven the vague nature of certain entries in the spreadsheet documenting the hours worked

by defendants' counsel, the Court hereby decreases the total number of hours for which compensation is sought by 10%."); *Wise v. Kelly*, 620 F. Supp. 2d 435, 452 (S.D.N.Y. 2008) (reducing fees by 25% because certain entries were too vague to enable the court to assess their reasonableness).

The Court estimates that these adjustments—reducing the compensable hours for Dechert's attorneys by 10% and, in two instances, by 20%—will reduce the overall recovery for Dechert's attorneys' fees by an additional $490,846.68.  *See Rodriguez*, 84 F. Supp. 2d at 425 ("Upon finding that counsel seeks compensation for excessive hours, 'the court has discretion simply to deduct a reasonable percentage of the number of hours claimed as a practical means of trimming fat from a fee application.'") (quoting *Kirsch*, 148 F.3d at 173).  With these adjustments having been made, in an exercise of the Court's discretion and based on its careful review, the Court is confident that the resulting attorney hours were well spent, entirely reasonable, and tightly targeted on relevant tasks.  They are thus appropriately reimbursed by the DRC.

### 2. Billing Rate for Attorneys

Second, defendants object to the rates at which the Dechert lawyers billed their hours. The average hourly rates, for the remaining Dechert attorneys, over the course of the engagement were as follows:  for (1) the one partner, $871.04; (2) the one counsel, $742.84; (3) the ten associates, $505.55[5]; (4) the one law clerk, $204.89; and (5) the one staff attorney, $388.23.

---

[5] The billing rate for the associates ranged from approximately $380 to $682.  *See* Hranitzky Decl. Ex. D.  But considered cumulatively, the remaining 10 associates on the case averaged a billing rate of $505.55 per hour.  *Id.*

Defendants assert, without citation to case authority, that these "rates are too high and are therefore unreasonable." DRC Br. at 7.

The Court disagrees. Based on the relevant factors, including the difficulty of the questions involved, the skill required to handle the problem, and the lawyer's experience, ability and reputation, *see Antidote Int'l Films, Inc.*, 496 F. Supp. 2d at 364, this case is one in which higher than ordinary rates were justified. This case presented difficult questions of law and fact; the skill, time, and labor required was substantial; and the experience, ability, and reputation of the attorneys were high. Plaintiffs' counsel were required, *inter alia*, to brief and argue summary judgment motions dealing with complex issues of sovereign immunity and the actual or apparent authority of officials of a foreign government to sign debt acknowledgment letters. Counsel engaged in cross-border fact discovery and deposed various witnesses and experts, before litigating a bench trial on whether Congolese law granted certain government officials actual authority to sign the debt acknowledgment letters. Having witnessed the litigation (pretrial and trial), having been in a position to appraise counsel's performance firsthand, and having taken into consideration the factors the Court is required to weigh under New York law, the Court's firm judgment is that the rates at which Dechert billed for these estimable professionals were not, in any sense, unreasonable.[6] Further, as plaintiffs note, billing rates substantially above those charged here, including partner billing rates in excess of $1,000 an hour, are by now not uncommon in the context of complex commercial litigation. *See* Hranitzky Dec. Exs. M–V. And, although not necessary to the Court's determination, the fact that Themis, the plaintiff, has paid Dechert's bills in full at these rates supplies a form of market confirmation as to their

---

[6] The Court's conclusion that Dechert's rates in this case were reasonable and appropriate is also informed by, and consistent with, the Court's prior experience as a commercial litigator.

reasonableness.  *See Arbor Hill Concerned Citizens Neighborhood Ass'n v. Cnty. of Albany &
Albany Cnty. Bd. of Elections*, 522 F.3d 182, 190 (2d Cir. 2008) ("The reasonable hourly rate is
the rate a paying client would be willing to pay."); *Anderson v. YARP Rest., Inc.*, No. 94
Civ.7543 (CSH) (RLE), 1997 WL 47785, at *2 (S.D.N.Y. Feb. 6, 1997) ("The best evidence of a
reasonable fee rate is the amount actually charged by counsel[.]") (citations omitted).
Accordingly, the Court rejects defendants' challenge to the rates billed by Dechert.

Therefore, the only adjustment to the amount requested in Dechert's attorneys' fees is to
the number of hours billed.  Applying this adjustment, the Court's calculation is that plaintiffs
are entitled to recover $2,997,120.62 in attorneys' fees paid to Dechert.

In addition to attorneys' fees from Dechert, plaintiffs seek to recover for legal work
performed by Miller & Wrubel.  After excluding the hours worked by attorneys who billed fewer
than 25 hours, which the Court again finds appropriate as a means of correcting against overall
inefficient staffing, plaintiffs are entitled to recover fees for two attorneys—one partner and one
associate.  *See* Hranitzky Decl. Ex. D.  These attorneys' time records do not present concerns
about block billing or vagueness.  The Court will, therefore, not reduce, by any percentage, the
hours claimed by Miller & Wrubel.  The Court also finds the rates charged by these lawyers
reasonable.  Accordingly, plaintiffs may recover $123,022.75 in the attorneys' fees paid to Miller
& Wrubel.

In total, across the two firms, plaintiffs may therefore be reimbursed $3,120,143.37 for
attorneys' fees, less the fees incurred between the period October 3 and October 22, 2013.

### 3.    Fees for Paralegals

Plaintiffs also seek reimbursement for fees charged for the work of legal assistants
(paralegals) and administrative staff.  Here, Dechert billed a total of $286,088 for its paralegals.

Hranitzky Decl. Ex. D.  A total of 17 paralegals are listed, most of whom billed well under 10 hours.  Again, as a corrective for potential staffing inefficiencies over this long case, the Court will (1) permit reimbursement for the work only of employees who worked at least 25 hours on the case, which would leave just four paralegals, who billed, respectively, 722, 189, 67.20, and 27.40 hours; and (2) reduce the compensable hours of these four paralegals by 10%.

Plaintiffs also seek $6,582.28 in fees for the five paralegals billed by Miller & Wrubel. Of the five, four billed fewer than 10 hours; the fifth billed 12.13 hours.  The Court will permit plaintiffs to be reimbursed for the full hours of that fifth paralegal, but, in the interest of addressing defendants' valid concerns about overall staffing inefficiency, it will not permit reimbursement as to the other four paralegals.  *See supra* Part I.B.1.  In total, these adjustments would reduce the total number of hours reimbursed for paralegals from 1091.08 to 917.17.

As to the paralegals' hourly billing rates, plaintiffs seek reimbursement for rates ranging from $125 to $340 an hour.  Plaintiffs in fact paid these rates to Dechert and to Miller & Wrubel. However, unlike in the context of counsel's legal work, the Court is unpersuaded, and there has been no showing, that the nature of the paralegal work in this case was unusually complex, so as to justify billing an above-market rate.  And the caselaw reflects that paralegal billing rates of between $90 and $125 are more in line with the prevailing market rates in this District.  *See, e.g.*, *K.L. v. Warwick Valley Cent. Sch. Dist.*, No. 12 Civ. 6313 (DLC), 2013 WL 4766339, at *8 (S.D.N.Y. Sept. 5, 2013) ("With respect to paralegal rates, courts in the Southern District typically award fees for paralegal work in IDEA cases at a rate of $90 or $125 per hour."); *M.C. ex rel. E.C. v. Dep't of Educ. of City of N.Y.*, No. 12 Civ. 9281 (CM) (AJP), 2013 WL 2403485, at *7 (S.D.N.Y. June 4, 2013) ("$125 per hour . . . is the prevailing market rate in this District for paralegals"), *report and recommendation adopted*, No. 12 Civ. 9281 (CM) (AJP), 2013 WL

3744066 (S.D.N.Y. June 28, 2013).  Plaintiffs do not provide any case support for the much

higher paralegal billing rates they propose to use in calculating their fee award.  Accordingly, the

Court will permit reimbursement for paralegals at a rate of $125 an hour.  At that rate, plaintiffs

may recover a total of $114,646.25 in paralegal fees—or, about $178,024.03 less than the

$292,670.28 requested.

Finally, plaintiffs request reimbursement for $11,442.75 in fees paid to Dechert for

"Office Support" and $10,205.97 for "Other, Admin."  *See* Hranitzky Decl. Ex. D.  Plaintiffs do

not adequately explain or support these expenses.  Accordingly, plaintiffs may not recover them.

### 4.     Conclusion

For the reasons above, plaintiffs may recover $3,120,143.37 in attorneys' fees and

$114,646.25 in paralegal fees, for a total of $3,234,789.62, less the amount of fees and costs

incurred during the period from October 3 to October 22, 2013.[7]

### C.     Cost Reasonableness Objections

In addition to attorneys' and paralegal fees, plaintiffs also request reimbursement for

"costs"—*i.e.*, for experts, translators, and other expenses.  Plaintiffs seek a total of $404,010.19

in costs.

### 1.     Experts

Defendants object to the amount requested for experts on two grounds:

First, they assert that plaintiffs are not entitled to be reimbursed for the costs of experts

who did not testify at trial.  Defendants rely on *U.S. for Use & Benefit of Evergreen Pipeline*

---

[7] Plaintiffs also claim that they incurred fees totaling $28,253.30, which were paid to law firms
in Canada and Hong Kong, for work relating to "the enforceability of a potential default
judgment in those jurisdictions."  *See* Themis Br. at 22.  Plaintiffs have agreed to forego
reimbursement for these fees.  *Id.* at 22 n.5.

*Const. Co., Inc. v. Merritt Meridian Const. Corp.*, 95 F.3d 153 (2d Cir. 1996).  But that case involved the shifting of costs associated with *fact* witnesses, not experts, and pursuant to statute, not a contractual obligation.  *See id.* at 173.  It does not support defendants' broad claim that a party's retention of an expert is subject to reimbursement only where the expert testifies at trial. Quite the contrary, courts in this District routinely reimburse prevailing parties for the costs of expert witnesses and consultants, regardless whether the expert testified at trial.  *See, e.g.*, *Weiwei Gao v. Sidhu*, No. 11 Civ. 2711 (WHP) (JCF), 2013 WL 2896995, at *6 (S.D.N.Y. June 13, 2013) (granting the full $5,000 requested "for the expert valuation performed by LVP" because the expense was "reasonable and necessary," and because the "Fee Sharing Agreement provides for recovery of 'other costs incurred'"); *Austrian Airlines Oesterreichische Luftverkehrs AG v. UT Fin. Corp.*, No. 04 Civ. 3854 (LAK) (AJP), 2008 WL 4833025, at *9 (S.D.N.Y. Nov. 3, 2008) (because the contract "clearly—and undisputedly—provide[d] for reasonable attorneys' fees 'and other costs'" and because defendant did not use "duplicative or unnecessary expert witnesses," the Court declined to "make any reductions in the costs related to [defendant's] use of these witnesses").  And in the Court's experience, the expertise of such non-testifying experts may often prove pivotally helpful in educating counsel, shaping litigation strategy, and/or eliminating areas of controversy.  The Court, therefore, denies defendants' request to limit recovery to the costs of experts who testified at trial.

Second, defendants claim that the costs billed by plaintiffs' experts are unreasonable. The Court's assessment of that issue is governed by familiar standards.  "Courts in this district assess the reasonableness of expert fees using the same method they do for attorneys' fees—by first multiplying the reasonable hourly rate by the reasonable number of hours expended." *Matteo v. Kohl's Dep't Stores, Inc.*, No. 09 Civ. 7830 (RJS), 2012 WL 5177491, at *5 (S.D.N.Y.

Oct. 19, 2012) *aff'd*, 533 F. App'x 1 (2d Cir. 2013).  The party "seeking reimbursement for expert fees bears the burden of proving reasonableness."  *Penberg v. HealthBridge Mgmt.*, No. 08 Civ. 1534 (CLP), 2011 WL 1100103, at *15 (E.D.N.Y. Mar. 22, 2011) (citation omitted).  "If the parties do not provide sufficient evidence to support the moving party's interpretation of a reasonable rate, a court may use its discretion to determine a reasonable fee."  *Matteo*, 2012 WL 5177491, at *5. "In the face of very limited evidence, a court may, in its discretion, simply apply an across-the-board reduction of expert's fees."  *Id.*; *see also Watson v. E.S. Sutton, Inc.*, No. 02 Civ. 02739 (KMW) (THK), 2006 WL 6570643, at *13 (S.D.N.Y. Aug. 11, 2006) (reducing expert fees by 50% for lack of detailed information provided in support of proposed fees).

Defendants validly challenge several, but not all, of plaintiffs' expert expenditures as insufficiently justified to support full reimbursement.  The Court addresses these in turn.

Here, the first expert employed by plaintiffs was Nicaise Chikuru Munyiogwarha ("Chikuru").  Chikuru was plaintiffs' testifying expert on DRC law at trial.  Plaintiffs seek to be reimbursed $117,731.69, which they represent to be the fees they paid to Chikuru, and which appears to reflect a rate of $300 per hour for Chikuru and $200 per hour for his research assistant.  Themis Br. at 24.  The amount also reflects travel expenses and value-added taxes ("VAT") under Congolese law.  *Id.*

However, the three invoices received from Chikuro that plaintiffs adduce to support the reasonableness of these costs are woefully inadequate.  *See* Hranitzky Decl. Ex. G.  They merely provide the total amount billed by Chikuru and a terse explanation of services rendered. Chikuri's invoice provides absolutely no insight into how he, or his research assistant, spent their time.  *Id.*  It does not even identify the hours worked on this matter by Chikuru (or his research assistant).  These omissions are particularly significant given that Chikuru's expertise is in law.

19

There is no reason why his invoices could not have described his work in the same manner and level of detail as expected of a domestic attorney. Further, plaintiffs do not explain the basis upon which Chikuru chose to bill, for himself and his research assistant, respectively, at hourly rates of $300 and $200. *See Matteo*, 2012 WL 5177491, at *5 (listing eight factors for determining whether an expert's proposed rate is reasonable, including the expert's education and area of expertise, and the cost of living in the particular geographic area).

That said, the Court did review Chikuru's expert report (and rebuttal report) and his deposition, and heard his live testimony at trial. It was clear to the Court that Chikuru had genuine expertise and that he had devoted thoughtful attention and time to the matter. Those three tasks themselves (the expert report, the deposition, and the trial testimony) perforce took substantial time. However, apart from the time spent on his deposition and trial testimony, the Court is unable to reliably estimate the amount of time Chikuru had spent actually working on the matter. It is also unclear how much of Chikuru's relevant knowledge was already in hand before he began work on this engagement.

Because plaintiffs have failed to establish the reasonableness of their bill for Chikuru's services, and because plaintiffs have not equipped the Court or the defense with evidence that would allow it to determine the value of his services, the Court, to assure that the DRC is obliged to pay only reasonable expenses of plaintiffs, is compelled to substantially reduce the request for reimbursement as to Chikuru's time. The Court reduces the bill as to Chikuru by 75%. Accordingly, plaintiffs may recover $29,432.92 in costs billed by Chikuru.

The second expert employed by plaintiffs was Steven De Backer, a lawyer with Webber Wentzel, a law firm in South Africa. De Backer billed at a rate of $500 and his colleagues billed at rates between $85 and $340 per hour. The total bill for Webber Wentzel, for which plaintiffs

seek to be reimbursed, was $53,799.99.  *See* Hranitzky Decl. Ex. H.  According to plaintiffs, De Backer and his firm provided "expert consulting services on African law" and acted as a liaison between Dechert and Chikuru with respect to Chikuru's expert reports.  Themis Br. at 25.  In fact, nearly every item on Webber Wentzel's bill concerned "liais[ing] with Chikuru" and attending meetings.  *See* Hranitzky Decl. Ex. H.  The only subject of African law relevant to this litigation was actual authority under Congolese law.  Therefore, in total, plaintiffs paid their expert on DRC law, Chikuru, $117,731.69 for the work surrounding his expert reports and testimony as to this single issue, and paid Webber Wentzel another $53,779.99 to serve as a liaison to Chikuru.  Chikuru, however, is fluent in English.  He could just as easily have spoken with Dechert's own attorneys.  It is unclear why a liaison with him was necessary.  Because plaintiffs have not justified the fees paid to De Backer, plaintiffs' request for the reimbursement of the $53,779.99 paid to Webber Wentzel is denied in its entirety.

The third expert employed by plaintiffs was Harry Tether ("Tether"), who charged $500 per hour.  Plaintiffs seek reimbursement for the $49,524.70 in costs paid to Tether for his expert work, which related to banking practices relevant to the negotiation and restructuring of defaulted sovereign debt.  Plaintiffs employed Tether as an expert to rebut the testimony that defendants for a time intended to proffer from their expert on sovereign debt, James Butler.  Themis Br. at 18.  Defendants ultimately withdrew Butler as an expert; plaintiffs, in response, withdrew Tether.  Tether's expenses were therefore all incurred in response to defendants' decision to use Butler as an expert.  As to Tether, plaintiffs have submitted detailed invoices and receipts as evidence of the outlays made to Tether.  *See* Hranitzky Decl. Ex. I.  Because the Court concludes that this evidence is adequate to justify the costs associated with Tether, and

because Tether's rate of $500 per hour is reasonable, plaintiffs may be reimbursed for the $49,524.70 paid in fees to Tether.

Finally, the fourth expert employed by plaintiffs was John Hargett, a handwriting expert. Hargett was retained to verify that the signatures on the Acknowledgement Letter were authentic. At the time Hargett was retained, defendants' stated position was that they intended to challenge the authenticity of those signatures. Once defendants withdrew that challenge, plaintiffs ceased using Hargett's services. Plaintiffs seek to recover $1,000 for the costs associated with Hargett. *See* Hranitzky Decl. Ex. J. Because that fee is reasonable, its recovery is granted.

Accordingly, plaintiffs are entitled to recover a total of $79,957.62 in costs for their expert witnesses and consultants—$29,432.92 for Chikuru, $49,524.70 for Tether, and $1,000 for Hargett.

### 2.      Other Costs and Expenses

Finally, defendants assert that plaintiffs' request for other costs and expenses are "exorbitant and should be reduced." DRC Br. at 17.

These costs include, first, $51,335.25 for translation fees. These costs are substantiated by detailed billing records. *See* Hranitzky Decl. Ex. K. In the Court's judgment, such costs were reasonable to incur in a case that involved the translation of numerous documents from French into English and that lasted for approximately five years. Plaintiffs' request to be reimbursed for these translation costs is, therefore, granted.

The remaining costs sought by plaintiffs total $130,638.56 ($128,054.15 for costs incurred by Dechert and $2,584.41 for costs incurred by Miller & Wrubel). *See* Hranitzky Decl. Ex. F. The breakdown of this amount is as follows: (1) online research (*i.e.*, Westlaw and Lexis charges) ($45,334.13); (2) making copies ($25,031.30); (3) ordering transcripts ($16,711.19);

(4) travel and accommodations ($16,781.57); (5) meals ($5,835.29); and (6) "miscellaneous" ($20,945.08)—which, in turn, includes legal publication expenses, staff overtime, document review, and shipping and delivery costs. *Id.* Defendants object to these costs on the grounds that plaintiffs fail to itemize these costs or support them with any evidence, such as invoices or other forms of documentation.

Although plaintiffs could have done a better job coming forward with documentary corroboration of the fact of these expenses, *e.g.,* for online legal research, defendants do not dispute that these were incurred. Defendants claim instead that they were unreasonable. Based on its detailed familiarity with and close attention to this litigation, the Court disagrees. The first four of these expenses are reasonable both in nature and scale. The Court will permit plaintiffs to recover for costs that are typical in a complex litigation such as this—*i.e.*, the cost of online research, making copies, and ordering transcripts. The Court can independently verify that the legal research required in this case was substantial and that plaintiffs sent the Court large binders containing courtesy copies of all pleadings and trial exhibits, reflecting voluminous copying. The Court will also permit plaintiffs to recover the costs of travel and accommodations, which are justified by the fact that plaintiffs had to travel, *inter alia*, to take various depositions in this case and to litigate the bench trial.

The Court will not, however, permit the recovery of the cost to plaintiffs of counsels' meals or "miscellaneous" expenses. Clients often decline to pay for attorney or legal assistant meals, and reasonably decline to pay expenses labeled only as "miscellaneous."

Accordingly, of the $130,638.56 in other expenses requested by plaintiffs, the Court will permit the recovery of $103,858.19.

Therefore, of the $404,010.19 in costs requested, plaintiffs will be permitted to recover a total of $235,151.06, less the costs incurred between October 3 and 22, 2013.

## CONCLUSION

For the foregoing reasons, the Court grants plaintiffs' motion for an award of fees and costs as follows:

As to fees:

- Plaintiffs will not be reimbursed for any attorney or paralegal fees incurred between October 3 and October 22, 2013, inclusive;

- Plaintiffs will be reimbursed only for fees incurred by: (1) attorneys from Dechert and Miller & Wrubel who worked at least 25 hours on this matter; (2) paralegals from Dechert who worked at least 25 hours on this matter; and (3) the paralegal from Miller & Wrubel who worked 12.13 hours on this matter;

- The hours billed by the Dechert attorneys and paralegals who worked at least 25 hours on the case will be reduced by 10% and, in the case of the two attorneys identified above, these hours will be reduced by 20%;

- Plaintiffs will be reimbursed for the hours worked by Dechert and Miller & Wrubel attorneys at the rates those firms billed plaintiffs, and will be reimbursed for the work of paralegals at a rate of $125 per hour; and

- Plaintiffs will not be reimbursed for fees incurred by "Office Support" or "Other, Admin."

Based on the Court's calculation, plaintiffs may therefore recover $3,234,789.62 in attorneys' and paralegals' fees, less the fees incurred between October 3 and October 22, 2013.

As to costs:

- Plaintiffs will not be reimbursed for any costs incurred by their law firms between October 3 and October 22, 2013, inclusive;

- Plaintiffs will be reimbursed for 25% of the costs billed by expert Chikuru;

- Plaintiffs will not be reimbursed for any costs billed by expert Webber Wentzel;

- Plaintiffs will be reimbursed for the full costs billed by experts Tether and Hargett;

- Plaintiffs will be reimbursed for the full costs of translation services;

- Plaintiffs will be reimbursed for all costs associated with legal research, making copies, ordering transcripts, and travel and accommodations; and

- Plaintiffs will not be reimbursed for the cost of meals or "miscellaneous" expenses.

Based on the Court's calculations, plaintiffs may therefore recover $79,957.62 in costs for expert witnesses and consultants, $51,335.25 for translators and interpreters, and $103,858.19 for other litigation expenses—for a total of $235,151.06, less the costs incurred between October 3 and October 22, 2013.

Accordingly, plaintiffs may recover a total of $3,469,940.68, less the amount billed for fees and costs between October 3 and October 22, 2013.[8]  This amount is recoverable solely from the DRC.

The Clerk of Court is directed to terminate the motion pending at docket number 218. The parties are directed to meet and confer promptly as to the tabulation of fees and costs consistent with this Opinion & Order, and to submit, by September 11, 2014, a proposed order with respect to fees and costs that reflects the rulings herein.[9]  The Court's intention is to promptly sign such an order and then to close this case.

---

[8] As part of this figure, the Court notes, plaintiffs seek reimbursement for fees and costs associated with the preparation of their application for fees and costs.  *See* Themis Br. at 21. Defendants do not object to this aspect of the request, and for good reason.  In other contexts, the prevailing party is generally entitled to recover fees incurred in connection with the preparation of a fee application.  *See, e.g.*, *Tucker v. City of New York*, 704 F. Supp. 2d 347, 358 (S.D.N.Y. 2010) ("Time devoted to a fee application is generally compensable.") (collecting cases); *cf. Barbour v. City of White Plains*, 788 F. Supp. 2d 216, 223 (S.D.N.Y. 2011) ("[T]he law . . . dictates that a prevailing civil rights plaintiff may include the costs of drafting a motion to recover fees as part of a fee award.").  Because no reply brief was filed with respect to plaintiffs' fee application, the compensable time will be measured up to July 31, 2014, which is "the end of the period for which [plaintiffs seek] attorneys' fees."  *See* Themis Br. at 21.

[9] The Court has endeavored to calculate accurately the bottom-line fee and cost figures that result from its rulings herein.  However, it is possible that the Court's math was in error.  In that event,

SO ORDERED.

Paul A. Engelmayer
United States District Judge

Dated: September 4, 2014
       New York, New York

---

counsel are directed that it is the Court's rulings—*e.g.*, the exclusion of certain timekeepers and the application of various percentage reductions to other timekeepers' hours—and not its arithmetic that controls.